JONES AND ASSOCIATES

COMPLAINT

EXHIBITS ONE THROUGH TEN

# D.C. AUDITORS' REPORT ON CFSA

# APRIL 1, 2008

EXHIBIT ONE

# OFFICE OF THE DISTRICT OF COLUMBIA AUDITOR

717 14TH STREET N.W., SUITE 900
WASHINGTON, D.C. 20005
TEL. 202-727-3600 • FAX: 202-724-8814

Deborah K. Nichols
District of Columbia Auditor
008:08:CTA NW MM gk

•

**Audit of Child and Family Services Agency's
Contracting and Quality Assurance Procedures**

**April 1, 2008**

## TABLE OF CONTENTS

*EXECUTIVE SUMMARY* .................................................................. i

PURPOSE .................................................................. 1

OBJECTIVES, SCOPE, AND METHODOLOGY .................................... 1

BACKGROUND .................................................................. 2

CFSA's Current Contracting Practices Are Inconsistent With the Agency's
    Standard Operating Procedures and District Contracting Regulations ............. 5

CFSA Contracting Personnel Did Not Comply With Title 27 DCMR When Soliciting,
    Executing, and Modifying Contracts ............................................ 9

CPA Staff's Poor Planning, Contract Monitoring, and File Maintenance
    Resulted in Prolonged Delays When Exercising Option Year Three
    of the Congregate Care Contracts ............................................ 11

Jones & Associates Has Provided Services Without a Valid Contract Since
    August 2006 At a Cost of At Least $1,985,690.88 ........................... 14

CFSA's Fiscal Office Authorized Payments Totaling $1,985,690.88 to Jones
    and Associates That Were Not Ratified by the District's Chief
    Procurement Officer as Required ............................................ 19

CFSA Lacks an Automated Child Welfare Contracting and Procurement
    System Which Is Needed to Improve Overall Operational Efficiency
    and Accountability ......................................................... 20

High Turnover in Key CFSA Management Positions Resulted in Inconsistent
    Procurement and Contracting Practices ...................................... 22

Lack of Official OLM Policies and Procedures Impaired CFSA's Accountability
    and Quality Assurance Systems and Did Not Provide a Framework for
    Consistent OLM Practices ................................................... 23

CFSA's Contracts and Procurement Administrator Failed to Follow Procedures
    for Obtaining A Criminal Background Check For One OLM Personal
    Services Contractor ........................................................ 24

CONCLUSION .................................................................. 26

## *EXECUTIVE SUMMARY*

### PURPOSE

Pursuant to a request from Councilmember Tommy Wells, Chairperson, Committee on Human Services, and in accordance with section 455 of Pub.L. No. 93-198, the District of Columbia Auditor (Auditor) examined the adequacy and effectiveness of the Child and Family Services Agency's (CFSA) contracting and quality assurance procedures related to certain congregate care contracts.

### CONCLUSION

The Auditor's examination found that between July 1, 2004 and December 31, 2007, CFSA's Director, Contracts and Procurement Administrator (C&P Administrator), Fiscal Officer, and other agency managers failed to develop and implement adequate internal controls to ensure efficient operations and compliance with applicable laws and regulations. The Auditor found that CFSA's contracting practices did not comply with 27 DCMR, or the agency's internal standard operating procedures in the following areas:

- CFSA did not perform advanced acquisition planning;
- the C&P Administrator did not require consistent use of contract action requests;
- individuals serving as contract COTRs had not been adequately trained or formally designated to serve in that capacity;
- CFSA's Director did not develop contracting and procurement training plans;
- contract files were incomplete and inadequately maintained;
- CFSA's standard letter to request best and final offers lacked components required by 27 DCMR;
- the C&P Administrator failed to timely execute definitive contracts after issuing letter contracts to two providers;
- the C&P Administrator failed to certify all contract modifications; and
- the C&P Administrator failed to timely submit third option year contracts to the Council for review and approval.

Additionally, one provider, Jones and Associates, provided services without a contract and CFSA paid at least $1,985,690.88 for these services between August 2006 and December 2007. Further, CFSA's Director did not submit a ratification request to the District's Chief Procurement Officer for approval to pay for these unauthorized services.

11.    The C&P Administrator develop a detailed checklist to ensure compliance with applicable District procurement and contracting regulations when completing the contracting process. Contract Specialists should complete a checklist for all contracts and retain the completed checklist in the corresponding contract file.

12.    The C&P Administrator ensure that all Contract Specialists are routinely trained on the application of District contracting and procurement regulations.

13.    The C&P Administrator review contract modifications for compliance with Title 27 DCMR, and properly sign and date each modification.

14.    The C&P Administrator maintain a Contract Tracking Database.

15.    The C&P Administrator include a policy requiring Contract Specialists to begin the process for exercising options no later than 120 days prior to the expiration of a contract.   All contract options requiring Council approval should be submitted to Council at least 60 days prior to the expiration of the contract.

16.    The C&P Administrator include compliance with the above policy as a factor in CPA staff's annual performance evaluations.

17.    The CFSA Director include effective management and monitoring of compliance with 27 DCMR and the SOPs as a factor in the C&P Administrator's annual performance evaluation.

18.    The C&P Administrator, CFSA Placement staff, and Jones and Associates representatives immediately identify and address all issues that have prevented successful negotiation of a contract.  The CFSA Director  should consult with the Office of the Attorney General and other legal advisors to the extent necessary to resolve all outstanding issues.

19.    If determined to be in the best interests of the District and the youth to be served, the C&P Administrator and CFSA Placement staff  immediately negotiate a reasonable and legally binding contract with Jones and Associates within 30 days of the date of this report, and provide a copy of the contract to the Office of the D.C. Auditor immediately after execution.

20.    To the maximum extent allowed by law, consistent with D.C. Code § 2-301.05 (d) (2) and the Anti-Deficiency Act, CFSA's contracting staff, Fiscal Officer and Director be held accountable to the fullest extent permissible by applicable personnel rules for allowing Jones and Associates to continue providing services and making payments without a valid contract.

PURPOSE

Pursuant to a request from Councilmember Tommy Wells, Chairperson, Committee on Human Services, and in accordance with section 455 of Pub.L. No. 93-198,[1] the District of Columbia Auditor (Auditor) examined the adequacy and effectiveness of the Child and Family Services Agency's (CFSA) contracting and quality assurance procedures related to certain congregate care[2] contracts.

OBJECTIVES, SCOPE, AND METHODOLOGY

The objectives of the audit were to:

1.   identify CFSA's current contracting and quality assurance procedures and assess their effectiveness;

2.   determine whether CFSA's contracting procedures and practices comply with Title 27 of the D.C. Municipal Regulations, entitled Contracts and Procurements;

3.   determine whether CFSA's quality assurance procedures comply with Title 29 of the D.C. Municipal Regulations, entitled Public Welfare; and

4.   determine whether CFSA adequately monitored congregate care contracts and routinely evaluated the quality of services provided.

---

[1] *See* section 455 (b) of the District of Columbia Home Rule Act, approved December 24, 1973 (Pub. L. No. 93-198; 87 Stat. 803); D.C. Code § 1-204.55 (b) (2001) which states: "The District of Columbia Auditor shall each year conduct a thorough audit of the accounts and operations of the government of the District in accordance with such principles and procedures and under such rules and regulations as he [she] may prescribe. *See also* D.C. Code § 1-204.55 (c) which states: "The District of Columbia Auditor shall have access to all books, accounts, records, findings, and all other papers, things, or property belonging to or in use by any department, agency, or other instrumentality of the District government and necessary to facilitate the audit.'

[2] *See* RFP # CFSA-03-R-0005, dated July 28, 2003, p. 24, paragraphs C.1.1 through C.1.3.  Congregate care is one type of living environment in which children and youth in foster care may be placed.  Unlike more family-based settings, congregate care facilities typically house several youth or children at a time.  There are several categories of congregate care, some of which are:  Diagnostic and Emergency Care, Traditional Group Home Care; Specialized Group Home Care; Independent Living Programs; Assisted Living Programs; Teen Parent Programs; and Community Based Return Diversion Programs.

The scope of the audit covered the period July 23, 2003 through December 31, 2007, and included a review of all relevant contracting and quality assurance activities that occurred during the audit period. The Auditor examined the contracting and quality assurance activities associated with the following five congregate care contracts: CFSA-04-C-0346, **Echelon Community Services, Inc.**; CFSA-04-C-0363, **Fihankra Place, Inc.** CFSA-04-C-0350, **Jones and Associates, Inc.**; CFSA-04-C-0340, **TERRIFIC, Inc.**; and CFSA-04-C-0344, **Umbrella, Inc.**

In conducting the audit, the Auditor interviewed staff in CFSA's Contracting and Procurement Administration (CPA), Office of Licensing and Monitoring (OLM), and certain provider staff; reviewed CFSA's Contracting and Procurement Standard Operating Procedures (SOPs), applicable sections of Titles 27 and 29 of the D.C. Municipal Regulations (DCMR), and previous reports issued on CFSA's contracting and quality assurance procedures; and examined a sample of contract files.

The audit was conducted in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## BACKGROUND

Pursuant to the Procurement Reform Act of 1996, the Council of the District of Columbia (the Council) exempted CFSA from the authority of the District's Office of Contracting and Procurement, thereby granting CFSA independent procurement authority.[3] However, CFSA's contracting practices must comply with the Procurement Practices Act of 1985, as amended,[4] and thus Title 27 of the DCMR. For five years after the agency's creation in 2001, CFSA lacked formal contracting and procurement policies and procedures, as noted in one consultant's report.[5] Effective July 1, 2006, CFSA implemented Contracting and Procurement Standard Operating Procedures

---

[3] *See* the Procurement Reform Amendment Act of 1996, effective April 9, 1997 (D.C. Law 11-259; D.C. Code §§ 2-301.01 *et seq.*)

[4] *See* D.C. Code §§ 2-301.04 and 2-303.20(n).

[5] *See* District of Columbia Child and Family Services Office of Contracting and Procurement, Contracts Operation Assessment Final Report, issued by Thompson, Cobb, Bazilio, & Associates, dated June 28, 2004, p. 10.

(SOPs) in response to the consultant's findings.  Although CFSA has independent procurement authority, CFSA's SOPs must be consistent with Title 27 of the DCMR.[6]

CFSA was created in June 2001 to protect children and youth from abuse and neglect, and ensure that they are placed in a safe environment that adequately supports their needs and well-being.[7]  To achieve the agency's mandate to protect children and youth, CFSA personnel rely on CFSA's Contracting and Procurement Administration (CPA) to acquire goods and services needed to support the agency's mission, operations and functions. The CPA solicits, negotiates, awards, and manages approximately 200 contracts each fiscal year, of which approximately 180, or 90%, are for services delivered to children and youth.

During the audit period, CFSA's CPA was staffed with 13 employees, including:

- a **Contracts and Procurement Administrator (C&P Administrator)** serving as the Agency's Chief Contracting Officer to oversee, manage, administer, and direct the design, establishment and maintenance of CFSA's contracts and procurement process;

- a **Contracts Manager** to manage the day-to-day operations of CFSA's contracting function;

- a **Contracts Assistant** to provide clerical support to the CPA and perform a variety of special projects and assignments;

- 2 **Cost/Price Analysts** to perform price, cost, and financial analyses of contractors' proposed costs before contract award and to examine actual costs billed under contracts;

- a **Contract Compliance Officer** to plan, direct, coordinate, and advise CFSA managers and staff on compliance requirements related to CFSA's contracts;  and

---

[6]*See* District of Columbia Child and Family Services "Office of Contracting and Procurement Standard Operating Procedures," effective July 1, 2006, Section 1-200 (a), p. 4.

[7]*See* D.C. Code § 4-1303.01a.

- 7 **Contract Specialists** to handle all functions before and after contract award, including, but not limited to, procurement planning, contract solicitation, and negotiation, preparation of contract modifications, issuance of stop work orders, approval of progress payments, and contract closeout.

Appendix I presents the organizational structure of CFSA's CPA.

Quality Assurance Monitoring

CFSA has 25 employees in the Office of Licensing and Monitoring (OLM) who monitor program activities and conduct assessments, inspections, and evaluations, of congregate care facilities and family-based programs that operate under the authority of CFSA. Specifically, Program Monitors review and track activities of contractors that provide services to children, youth, and families under the care of CFSA. CFSA's program monitoring activities include, but are not limited to:

- evaluating providers' program service delivery and methods used to coordinate clients' care, education, mental health, and substance abuse services;

- completing sanitary and environmental inspections;

- conducting on-going announced and unannounced sit e visits, monthly service meetings, youth and staff satisfaction interviews, and program observations; and

- engaging in program improvement and planning follow-up activities.[8]

Appendix II presents OLM's organizational structure and staffing pattern.

---

[8] *See* Child and Family Services Office of Licensing and Monitoring Program Manager's Administrative Guidance, prepared March 7, 2006 and updated December 12, 2007, pp. 1-2.

## FINDINGS

### CFSA's Current Contracting Practices Are Inconsistent With the Agency's Standard Operating Procedures and District Contracting Regulations

In July 2006, CFSA officials implemented standard operating procedures (SOPs) for contracting and procurement. However, the Auditor noted instances in which the agency's practices did not comply with Title 27 of the DCMR or its SOPs, including:

- **No Advanced Acquisition Planning.** Section 5-200 of the SOPs state that: "CFSA shall perform acquisition planning for all CFSA acquisitions above the small purchase threshold [purchases costing $100,000 or less]."[9] Moreover, Section 5-500 of the SOPs indicate that, on an annual basis, CFSA managers are to provide the C&P Administrator with information regarding needed contracts for the upcoming fiscal year, and an acquisition team, comprised of contracting, fiscal, legal, and technical personnel, is to develop an acquisition plan.[10]

  27 DCMR § 1210.1 states that: "Agencies shall perform procurement planning and conduct market surveys to promote and provide for full and open competition with due regard to the nature of supplies and services to be acquired." Further, 27 DCMR § 1210.3 states that: "Procurement planning shall integrate the effort of all personnel responsible for significant aspects of the procurement." Also, 27 DCMR § 1210.5 states that, "Procurement planning shall begin as soon as the need is identified, preferably well in advance of the fiscal year in which the contract award is necessary. In developing the plan, the planner may form a team consisting of all those who will be responsible for significant aspects of the procurement, such as contracting, fiscal, legal, and technical personnel. . ."

  The Auditor found that accountable CFSA management personnel did not perform advanced acquisition planning as required by Section 5-500 of the SOPs and 27 DCMR §§ 1210.1, 1210.3 and 1210.5. As a result of this violation, the amount of money needed annually to fund CFSA's contracts was not known prior to the start of each fiscal year. Additionally, a

---

[9] *See* District of Columbia Child & Family Services "Office of Contracting and Procurement Standard Operating Procedures," effective July 1, 2006, Chapter 5, Advanced Acquisition Planning, Section 5-200, p. 26.

[10] *See* District of Columbia Child & Family Services "Office of Contracting and Procurement Standard Operating Procedures," effective July 1, 2006, Chapter 6, Contract Action Request, p. 33., A contract action package is a group of CFSA forms used by Divisions and Program areas to originate requests to the CPA to procure goods or services from vendors..

baseline assessment has never been performed to determine and document CFSA's recurring contracting and procurement needs.

- **Inconsistent Use of Required Contract Action Requests.** Section 6-100 of the SOPs state that: "Persons requesting goods or services shall submit an adequate contract action package[11] to the CPA in either electronic or manual form." The purpose of the contract action package is to provide a basis for obtaining goods and services that meet the requestor's needs at the most economical prices. The Auditor found that the C&P Administrator failed to ensure compliance with this requirement.

- **Unqualified and Untrained Employees Serve as Contracting Officer's Technical Representative (COTR).** Section 15-100 of the SOPs requires the C&P Administrator to appoint a COTR for each contract awarded by CFSA. The SOPs further require all COTRs to be adequately trained regarding their responsibilities prior to being appointed to a contract. The Auditor found that only two CFSA employees, the Health Services Program Manager and a Planning Specialist, have been formally designated as COTRs by the C&P Administrator and trained to serve in that capacity. For most CFSA contracts, the assigned Program Monitor[12] performs the COTR's functions, although they have not been officially designated as COTRs. In addition, the Auditor found no evidence that Program Monitors have received COTR training.

- **Inadequate Procurement Staff Training.** 27 DCMR § 4501.1 states: "The head of each agency shall annually prepare an agency training plan which describes the existing level of procurement training of agency employees and the need for additional procurement training for agency personnel, including non-procurement personnel." Additionally, 27 DCMR § 4502.1 states that: "District procurement personnel may attend training programs provided by any of the following subject to the prior approval of the program by the Director: (a) the federal government; (b) the government of any of the fifty (50) states; (c) a foreign government or international organization; (d) an educational, research, technical, or

---

[11]*See* District of Columbia Child & Family Services, "Office of Contracting and Procurement Standard Operating Procedures," effective July 1, 2006, Chapter 15, Contract Administration, Section 15-100, Policy, paragraph (1), p. 135.

[12]Program Monitors are employees within CFSA's Office of Licensing and Monitoring who monitor programs that provide services to children, youth or families entrusted to the care of CFSA. They engage in a number of activities to evaluate service coordination and delivery, including: facility inspections; announced and unannounced site visits; youth and staff interviews; program observations; and other similar information-gathering techniques.

professional institution, foundation, or organization; or (e) a business, commercial or industrial firm, corporation, partnership, sole proprietorship, or other organization."[13] This suggests that agency staff should routinely and regularly receive contracting and procurement training.

•

The Auditor found no evidence that contracting and procurement training plans were ever developed and implemented. The Auditor noted, however, that during FY 2006 and FY 2007, CPA staff participated in training offered by the National Institute of Government Purchasing (NIGP), the USDA Graduate School, the District's Office of Contracting and Procurement, and private firms. Although training was made available to staff, the Auditor found that only two of the CPA's 13 staff had attained professional certification in government contracting and procurement.

- **No Filing and Records Retention Policies and Procedures.** 1 DCMR § 1502.1 states that: "Agency heads shall establish controls over the creation of records to ensure that adequate and proper records are made and preserved in the District government." Additionally, 1 DCMR § 1502.3 states: "The record of every transaction of public business by any District official or employee shall be complete to the extent required by the following: (a) to facilitate actions by incumbents and their successors in office; (b) to make possible proper oversight by the Council of the District of Columbia, courts and other authorized agencies of the government, and other persons responsible for the manner in which public business has been discharged; and (c) to protect the financial, legal and other rights of the government and of persons affected by the government's actions."

Additionally, 27 DCMR § 1203 states: "The head of each office performing contracting or contract administration functions shall establish files containing the records of all contractual actions pertinent to that office's responsibility."[14] Further, 27 DCMR § 1202.2 states: "The documentation in each contract file maintained by the contract office shall be sufficient to constitute a complete history of the transaction for the following purposes: (a) providing a complete background as a basis for informed decisions at each step of the procurement process; (b) supporting actions taken; (c) providing information for reviews and investigations; and (d) furnishing essential facts in the event of litigation." Finally, 27 DCMR § 1203.4 and 1203.5 state: "The contracting office file shall document the basis for the procurement and the award, the assignment of contract administration (including payment

---

[13] See 27 DCMR § 4501.1 - 4501.4. See also 27 DCMR § 4502.1.

[14] See 27 DCMR § 1203.1 - 1203.8.

7

responsibilities), and any subsequent action taken by the contracting office... The contract file shall document actions prerequisite to, substantiating, and reflecting contract payments."

The Auditor found that the CPA did not maintain central contract files that clearly documented the history of each congregate care contract under the auditor's review. The files were incomplete, lacking solicitation information, and detailed pricing analyses and evaluations. The Auditor further found that the contract files lacked such information as written justifications for source selection, evidence of CFSA's submission of all contracts for Council's approval, when required, and documentation of Council's approval of contracts. Finally, the contract files lacked information reflecting contract payments.

## RECOMMENDATIONS

1.  The C&P Administrator provide CFSA managers with training on acquisition planning procedures to facilitate smooth implementation of the acquisition planning process.

2.  At least 120 days prior to the start of FY 2009, the CFSA Director and C&P Administrator initiate the acquisition planning process for FY 2009.

3.  The C&P Administrator require consistent use of the Contract Action Request as the initial stage in CFSA's contracting and procurement process.

4.  The C&P Administrator ensure that all COTRs are adequately trained and qualified to serve in that capacity before assigning them to this function.

5.  The C&P Administrator immediately revise the SOPs to include staff training, filing, and records retention policies and procedures.

6.  The C&P Administrator implement measures to ensure CFSA's compliance with applicable sections of Title 27 of the DCMR related to acquisition planning, training, filing, and records retention.

7.  The C&P Administrator work with the CFSA Director to ensure that adequate funding is in place to allow CPA staff to attend at least two contracting, procurement, or acquisition training sessions per year. CPA staff should take full advantage of all training that may be offered by the District's Office of Contracting and Procurement.

8.   The C&P Administrator and CFSA Director develop incentives for CPA staff to obtain professional certification, such as opportunities for promotion, non-monetary and monetary incentive awards, or other forms of special recognition.

9.   The C&P Administrator review the current filing system to assess its adequacy and efficiency. To the extent necessary, CFSA should consider engaging a consultant to assist in this effort.

10.  The C&P Administrator develop a checklist to properly document items to be included in each contract file in compliance with CFSA's SOPs and applicable sections of Title 27 of the DCMR.

11.  The C&P Administrator consider hiring a Document Control Clerk to maintain contract files, manage the process for retrieving and returning files, and periodically audit files for accuracy and completeness.

## CFSA Contracting Personnel Did Not Comply With Title 27 DCMR When Soliciting, Executing, and Modifying Contracts

According to CFSA's Standard Operating Procedures, CFSA is to follow Title 27 of the D.C. Municipal Regulations when contracting for goods or services. The Auditor found several instances in which CFSA did not comply with Title 27 of the DCMR when soliciting, awarding, and modifying contracts. Some of the noted violations were:

- **Inadequate Best and Final Offer (BAFO) Request Letter.** 27 DCMR § 1622 2 states: "The request for best and final offers shall include the following: (a) notice that discussions are concluded; (b) notice that this is the opportunity to submit a best and final offer; (c) a common cut-off date and time that allows a reasonable opportunity for submission of written best and final offers; and (d) notice that if any modification is submitted, it must be received by the date and time specified and is subject to the provisions of this chapter [27 DCMR Chapter 16] covering late proposals."

  The Auditor found that CFSA's standard letter requesting a BAFO did not include any of the requirements set forth in 27 DCMR § 1622.2 (a) and (d) discussed above. As a result, offerors could have made further attempts to revise their proposed prices after submitting their BAFOs and CFSA would have no policy basis for refusing to accept revisions.

9

- **Untimely Execution of Definitive Contracts.** 27 DCMR § 2425.9 states: "The contracting officer shall execute a definitive contract[15] within one hundred and twenty (120) days after the date of execution of the letter contract[16] or before completion of fifty percent (50%) of the work to be performed, whichever occurs first. . ."[17]                    •

  The Auditor found that the C&P Administrator did not execute a definitive contract within 120 days after executing a letter contract with TERRIFIC, Inc. and Fihankra Place, Inc. The initial letter contracts for these two contractors were executed on July 1, 2004 and the definitive contracts were not executed until December 7, 2004. In these instances, the definitive contracts should have been executed by November 1, 2004. As a result, for approximately 30 days TERRIFIC, Inc. and Fihankra Place, Inc. provided services without valid contracts.

- **Unauthorized Contract Modifications.** 27 DCMR § 3606.1 states: "For a solicitation, amendment, change order, or administrative change, the effective date shall be the date on which the contracting officer issues the amendment, change order, or administrative change." The C&P Administrator issued 46 modifications to the contracts reviewed by the Auditor These modifications were issued to correct inaccurate dates and contract amounts and to reflect other changes authorized by contract provisions. Modifications were also issued to properly number prior modifications which had not been issued in sequential order. Prior modifications were not issued in sequential order because the assigned Contract Specialist preparing the modifications had not been properly trained to perform that function and the C&P Administrator was not routinely verifying the numerical order of the modifications prior to signing them.

---

[15]*See* 27 DCMR § 2499. A definitive contract is a contract executed pursuant to a letter contract.

[16]Ibid. A letter contract is a " written preliminary contractual instrument that authorizes the contractor to begin immediately manufacturing or delivering supplies or performing services." A letter contract, by itself, cannot be the sole document used for a complete procurement.

[17]*See* Section 2499, 27 DCMR. A definitive contract is a contract executed pursuant to a letter contract.

10

The Auditor found that 9 of the 46 contract modifications reviewed had not been executed, or signed, by the C&P Administrator. Without the C&P Administrator's dated signature, these modifications were not properly authorized or legal.

As a result of CFSA's noncompliance, CFSA's price negotiation, contract execution, and modification processes were inefficient and ineffective for purposes of establishing accountability and protecting the District's interest and resources.

## RECOMMENDATIONS

1.  The C&P Administrator develop a detailed checklist to ensure compliance with applicable District procurement and contracting regulations when completing the contracting process. Contract Specialists should complete a checklist for all contracts and retain the completed checklist in the corresponding contract file.

2.  The C&P Administrator ensure that all Contract Specialists are routinely trained on the application of District contracting and procurement regulations.

3.  The C&P Administrator review contract modifications for compliance with Title 27 DCMR, and properly sign and date each modification.

## CPA Staff's Poor Planning, Contract Monitoring, and File Maintenance Resulted in Prolonged Delays When Exercising Option Year Three of the Congregate Care Contracts

27 DCMR § 2008.1 states: "when exercising an option, the contracting officer shall provide written notice to the contractor within the time period specified in the contract." For the five congregate care contracts reviewed, the required timeframe was at least 30 days prior to the expiration of the contract. Additionally, 27 DCMR § 2008.4 states:

" a contracting officer shall exercise an option only after determining the following:
(a) that sufficient budget authority is available; (b) that the requirement covered by the option fulfills an existing District need; and (c) that the exercise of the option will be the most advantageous method of fulfilling the District's need, when price and other factors are considered."

11

Further, 27 DCMR § 2008.5 states:

"The contracting officer, after considering price and other factors, shall make a
determination on the basis of one (1) of the following: (a) a new solicitation fails to
produce a better price or a more advantageous offer than that offered by the option;
Provided , that if it is anticipated that the best price available is the option price (or
that this is the more advantageous offer), the contracting officer shall not use this
method to test the market); (b) an informal analysis of prices or an examination of
the market indicates that the option price is better than prices that would be available
in the market or that the option would be the most advantageous offer; or (c) the short
time between the award of the contract containing the option and the exercise of the
option indicates that the option price is the lowest price obtainable or the most
advantageous offer."

This indicates that contracting staff must adequately plan well in advance. Sufficient time
must be available to make all required determinations, prepare all required documents, and to deal
with unexpected events or circumstances in order to timely exercise contract options.

The Auditor found that the C&P Administrator notified the congregate care providers within
30 days of contract expiration, as required. However, CFSA did not timely submit the third option
year contracts to the Council for review and approval before the contracts expired.[18] The C&P
Administrator notified contractors on May 9, 2007 of CFSA's intent to exercise the third option year
but did not submit these contracts to the Council until September 12, 2007. On July 1, 2007, the
C&P Administrator executed contract modifications to exercise option year 3, allowing contractors
to continue providing services, without required Council review and approval. Due to CFSA's late
submission of the contracts, Council retroactively approved the contracts on November 6, 2007.
Thus, for approximately four months, Echelon Community Services, Inc., Fihankra Place, Inc.,
TERRIFIC, Inc., and Umbrella, Inc. provided services without a duly authorized contract.

According to Council Resolution #17-423, dated November 6, 2007, CFSA's delay in
forwarding these contracts to Council for timely approval was due to the contract files being
sequestered as part of a federal audit as well as the extended absence of the Contract Specialist
assigned to these congregate care contracts. The Resolution further indicates that after the contract

---

[18]See D.C. Code § 2-301.05a(a) which states: ". . .prior to the award of a multiyear contract or a contract in
excess of $1,000,000 during a 12-month period the Mayor or executive independent agency or instrumentality shall
submit the proposed contract to the Council for review and approval. . ."

12

files were returned to CFSA, many quality control issues were identified which took over a month for CFSA to resolve.[19]  However, the Auditor believes that these excuses did not relieve CFSA officials of their legal obligation to manage their duties and responsibilities in a manner which allowed them to promptly submit appropriate documentation for these contract options to the Council for review and approval.                •

Some of the quality control issues that were addressed included modifications not issued in numerical sequence, lack of written justifications for contract actions [Determination and Findings], and other missing documents, such as appropriately signed and dated funding documents.  This suggests that the C&P Administrator had not routinely and regularly reviewed the Contract Specialist's work or the files for which she was responsible and had not assigned contracting staff to adequately monitor and maintain these congregate care contracts during the extended absence of the responsible Contract Specialist.  This also suggests that the Contract Specialist needed additional training on exercising options and contract file maintenance.

## RECOMMENDATIONS

1. The C&P Administrator immediately revise the SOPs to include guidance on exercising contract options.

2. The C&P Administrator maintain a Contract Tracking Database to monitor: the date of each request for goods and/or services; name of the requesting CFSA department/employee; start and end date of contracts; the Contract Specialist assigned to each contract; contract value; and the services to be provided under each contract.  The database should also include data on contracts that have option years, for tracking: timeframes for exercising options; decisions made regarding whether to exercise an option; brief justification for decision; and completion dates for all required documents.

3. When developing the SOPs on exercising contract options, the C&P Administrator ensure that the SOPs comply with 27 DCMR § 2008.

---

[19]*See* the CFSA Congregate Care Contracts Option Year Three Approval and Payment Authorization Emergency Declaration Resolution of 2007, effective November 6, 2007.

4.     The C&P Administrator include a policy requiring Contract Specialists to begin the process no later than 120 days prior to the expiration of a contract.  All contract options requiring Council approval should be submitted to Council at least 60 days prior to the expiration of the contract.

•

5.     The C&P Administrator include compliance with the above policy as a factor in CPA staff's annual performance evaluations.

6.     The CFSA Director include effective management and monitoring of compliance with 27 DCMR and the SOPs as a factor in the C&P Administrator's annual performance evaluation.

7.     The C&P Administrator increase and document his/her level of supervisory oversight of all work assigned to Contract Specialists, including the tasks associated with exercising contract options.

**Jones & Associates Has Provided Services Without a Valid Contract Since August 2006 At a Cost of At Least $1,985,690.88**

D.C. Code § 2-301.05 (d)(1) states:

"No District employee shall authorize payment for the value of supplies and services received without a valid written contract.  This subsection shall not apply to a payment required by court order, a final decision of the Contract Appeals Board, or an approval by the Chief Procurement Officer in accordance with paragraph (4) or (5) of this subsection."

D.C. Code § 2-301.05(d)(2) also states:

"After April 12, 1997, no District employee shall enter into an oral agreement with a vendor to provide goods or services to the District government without a valid written contract.  Any violation of this paragraph shall be cause for termination of employment of the District employee." [Emphasis Added]

14

Additionally, CFSA's Standard Operating Procedures state that: "a valid contract or purchase order is required before a vendor or contractor may deliver goods or perform services for the Agency."[20]  Additionally, the Anti-Deficiency Act makes it illegal for a District employee to "obligate the District for the payment of money before an appropriation is made or before a certification of the availability of funds is made, unless authorized by law, or approve a disbursement without proper authorization."[21]

On July 1, 2004, CFSA initially executed contract number CFSA-04-C-0350, covering a base year and four option years, with Jones and Associates to provide congregate care services in the form of an independent living program, covering the period July 1, 2004 through September 30, 2004, in the amount of $849,886.34.  Under this contract, Jones and Associates was paid $429,346.07.  On October 1, 2004, CFSA modified the letter contract, increasing its value by $139,060 and extending the contract period until October 25, 2004.  The Auditor noted that CFSA issued the definitive base year contract on December 7, 2004 which covered the period July 1, 2004 through June 30, 2005.  Thus, between October 25, 2004 and December 7, 2004, Jones and Associates provided services without a contract.

Moreover, CFSA did not extend the base year contract by exercising the first option year.[22] Instead, CFSA issued two Memoranda of Understanding (MOUs) to Jones and Associates and allowed Jones and Associates to continue providing services.  On December 23, 2005, CFSA issued the first of these MOUs to Jones and Associates, covering the period December 1, 2005 to January 9, 2006, and on January 6, 2006, issued the second covering the period January 9, 2006 to March 16, 2006.  The Auditor determined that these MOUs were not valid legal contracts in that MOUs are not recognized by the Procurement Practices Act of 1985 or Chapter 24 of Title 27 of the DCMR as District contracting instruments. Thus, between June 30, 2005 (the expiration date of the base year definitive contract) and March 16, 2006, Jones and Associates continued providing services without a contract.  Table 1 presents information on CFSA's MOUs with Jones and Associates.

---

[20]*See* District of Columbia Child & Family Services "Office of Contracting and Procurement Standard Operating Procedures," effective July 1, 2006, Chapter 12, Purchase Order and Contract Award, p. 117.

[21]*See* District of Columbia Anti-Deficiency Act of 2002, effective April 4, 2003, (D.C. Law 14-285, D.C. Code § 47-335.01 *et seq.* (2004 Supp )) *See also* the federal Anti-Deficiency Act, 31 U.S.C. §§ 1341-1342 and §§ 1511-1519

[22]CPA staff did not provide the Auditor with any documentation showing why CFSA did not exercise the first option year; and no such documentation was found in the contract files.

15

Table I

Memoranda of Understanding Between CFSA and Jones & Associates, Inc.

| MOU Period | Effective Date | MOU Amount | Amount Paid by CFSA During MOU Period |
|---|---|---|---|
| December 1, 2005 - January 9, 2006 | 12/23/05 | No ceiling; agreed upon per diem rate; contracted base year rate of $139.06 per individual plus prorated cost reimbursements | $431,469.42 |
| January 9, 2006 - March 16, 2006 | 01/06/06 | No ceiling; agreed upon per diem rate contracted base year rate of $139.06 per individual plus prorated cost reimbursements | $416,388.32 |
| TOTAL | | | $847,857.74 |

Source: CFSA's contract files and payment data provided by CFSA's Fiscal Office

In March 2006, CFSA began issuing short-term letter contracts to Jones and Associates. Although 27 DCMR § 2425.9 states that: "The contracting officer may authorize an additional period if the additional period is approved in writing by the head of the contracting agency," the regulations do not specifically address the successive issuance of letter contracts. However, the Auditor determined that issuing successive letter contracts was not an efficient way to manage the business relationship with Jones and Associates because successive letter contracts must be closely monitored to prevent lapses in service and over-expenditure of funds. Also, issuing a series of letter contracts allowed CFSA to split the actual costs of contracted services over short service periods, thereby circumventing Council's scrutiny and approval. As presented in Table II, the total value of the two letter contracts with Jones and Associates was $1,555,498.99. Therefore, consistent with the requirements of D.C. Code § 2-301.05a, which states: "Pursuant to § 1-204.51 ("FRMAA"), prior to the award of a multiyear contract or a contract in excess of $1,000,000 during a 12-month period, the Mayor or executive independent agency or instrumentality shall submit the proposed

16

contract to the Council for review and approval in accordance with the criteria established in this section," these MOUs or expenditures in excess of $1,000,000 during a 12-month period should have been submitted to the Council for review and approval before services were rendered and payments were made to Jones and Associates.

•

**Table 11**

**CFSA's FY 2006 Letter Contracts wi th Jones & Associates**

| Letter Contract Period | Effective Date | Letter Contract Amount | Amount Paid to Jones & Associates |
|---|---|---|---|
| March 16, 2006 - May 15, 2006 | 03/16/06 | $556,394.00 | $210,322.66 |
| May 16, 2006 - August 31, 2006 | 06/05/06 | $999,104.99 | $718,942.86 |
| TOTAL | | $1,555,498.99 | $929,265.52 |

Source: CFSA's contract files and payment data provided by CFSA's Fiscal Office.

The Auditor also found that CFSA did not issue definitive contracts associated with these letter contracts within 120 days, as required. In fact, as of January 22, 2008, CFSA and Jones and Associates were still in the process of negotiating a contract. Thus, since March 16, 2006, Jones and Associates has been providing services without a valid contract. Appendix III presents a time line of Jones and Associates contract history.

As a result, CFSA continues to conduct business in a manner that fails to comply with applicable District laws, regulations, and standards. Additionally, Jones and Associates continues to incur client specific costs (not included in the per diem rate) that are associated with services for which there is no valid contract. Without a contract, CFSA has not established the appropriate legal means by which to hold Jones and Associates accountable for providing specified services. Therefore, some of the District's most vulnerable youth may be at risk of harm from this improper arrangement. Meanwhile, the District may be vulnerable to potential legal issues should any of the youth assigned to Jones and Associates be harmed in any way as a result of improper care, neglect, mistreatment, or other avoidable danger. The District is also vulnerable to the risk that Jones and Associates could discontinue business, leaving the District with no alternative plan for placement of the youth currently residing at the Jones and Associates facility.

17

## RECOMMENDATIONS

1. CFSA officials immediately transition youth from the Jones and Associates facility to another appropriate independent living facility until such time that a valid contract with Jones and Associates is executed.

2. The C&P Administrator, CFSA Placement staff, and Jones and Associates representatives immediately identify and address all issues that have prevented successful negotiation of a contract. The CFSA Director should consult with the Office of the Attorney General and other legal advisors to the extent necessary to resolve all outstanding issues.

3. If determined to be in the best interests of the District and the youth to be served, the C&P Administrator and CFSA Placement staff immediately negotiate a reasonable and legally binding contract with Jones and Associates within 30 days of the date of this report, and provide a copy of the contract to the Office of the D.C. Auditor immediately after execution.

4. To the maximum extent allowed by law, consistent with D.C. Code § 2-301.05 (d) (2) and the Anti-Deficiency Act, CFSA's contracting staff, Fiscal Officer, and CFSA Director be held accountable to the fullest extent permissible by applicable personnel rules for allowing Jones and Associates to continue providing services and making payments without a valid contract.

5. CFSA's Fiscal Officer require Accounts Payable staff to verify the existence of a valid contract prior to processing any payments to contractors.

6. To the maximum extent allowed by applicable personnel law and rules, consistent with the Anti-Deficiency Act, CFSA's financial managers also be held fully accountable, up to and including termination, for making payments to Jones and Associates in the absence of a contract.

**CFSA's Fiscal Office Authorized Payments Totaling $1,985,690.88 to Jones and Associates
That Were Not Ratified by the District's Chief Procurement Officer as Required**

D.C. Code § 2-301.05 (d) (1) states: "No District employee shall authorize payment for the value of supplies and services received without a valid written contract."[23]  The District's Chief Procurement Officer (CPO) may however authorize payments for supplies or services received *without* a valid written contract pursuant to D.C. Code § 2-301.05 (d) (4) which states:

> The Chief Procurement Officer shall review and verify a request submitted by an agency director for authorization for payment for supplies or services received without a valid written contract, and shall either approve or disapprove each request for authorization for payment . . . .

Effective August 9, 2006, the CPO issued OCP Policy Directive 1800.04 establishing procedures for the ratification of unauthorized commitments.[24]  This policy directive applied to all agencies of the District government that contract pursuant to the provisions of the Procurement Practices Act, as amended.[25]  The policy directive requires the submission of a ratification request package that must be approved by either the CPO or Council in order to pay a vendor for unauthorized commitments.[26]

The Auditor found that the CFSA Director failed to submit a ratification request to the CPO for the $1,985,690.88 in payments made to Jones and Associates without a valid written contract since August 2006. In the absence of the CPO's ratification, CFSA's Fiscal Officer should not have

---

[23] *See* Section 5.1.1 of OCP Directive 1800.04, "General Rules Prohibiting Unauthorized Commitments," which states: [N]o District employee shall authorize payment for the value of goods or services received without a valid written contract."

[24] A *ratification* is the action or process by which the CPO authorizes payment for goods or services received by the District without a valid written contract. *See* OCP Directive 1800.04, effective August 9, 2006.

[25] *See* the District of Columbia Procurement Practices Act of 1985, effective February 21, 1986 (D.C. Law 6-85; D.C. Code § 2-302.02 (b)) *See also* OCP Directive 1800.04, effective August 9, 2006, p. 1.

[26] *See* Section 5.5 of OCP Directive 1800.04, effective August 9, 2006, p. 3-4, which states that: "[F]or a Ratification Package that either exceeds $100,000 or is after the first two (2) requests submitted and approved on a vendor's behalf, the Ratification Package must first be approved by the Council before the CPO is authorized to take final action."

paid Jones and Associates. Additionally, the CFSA's failure to submit the ratification package circumvented required Council review and approval of these payments.[27]

## RECOMMENDATIONS

•

1.      The CFSA Director ensure that OCP Directive 1800.04 dated August 9, 2006, is distributed, with applicable training, to all contract and fiscal staff and that future requests for payments for unauthorized commitments are submitted to the CPO for review and approval, as required.

2.      To the maximum extent allowed by law, consistent with OCP Directive 1800.04, CFSA's contracting staff and CFSA Director be held accountable for the improper authorization and payments to Jones and Associates.

## CFSA Lacks an Automated Child Welfare Contracting and Procurement System Which Is Needed to Improve Overall Operational Efficiency and Accountability

To ensure efficient operations, which is one of the objectives of sound internal controls, managers are to develop and implement adequate policies and procedures. Automation of processes is an effective way to streamline workflow, increase productivity, reduce delays in information processing, minimize errors, and ultimately ensure accountability.

The Auditor found that CFSA's contracting and procurement processes are not fully automated. CFSA currently uses FACES, a State Automated Child Welfare System, to track all activities related to children and youth, including their care, related services, and payments to service providers, *after* contracts are awarded. However, the process for requisitioning children and youth services contracts and tracking all pre-award activities associated with those contracts is paper-driven. CFSA personnel complete paper documents, a contract action package, to request a contract and submit the contract action package to the CPA. Contracting Specialists in the CPA use these

---

[27] *See* D.C. Code 1-204.51 (b) (1) which states "[n]o contract involving expenditures in excess of $1,000,000 during a 12-month period may be made unless the Mayor submits the contract to the Council for its approval and the Council approves the contract (in accordance with criteria established by act of the Council)."*See also* D.C. Code 2-301.05d, which states that "pursuant to § 1-204.51 (b) the Mayor and all independent agencies and entities of the District government shall submit to the Council for approval any proposal to contract out services covered by this chapter that involves expenditures in excess of $1,000,000 during a 12-month period."

paper documents to obtain the needed services, and prepare other paper documents, such as a Request for Funding (Client/FACES Goods and Services) form, to be retained in the contract files.

As a result, there is the risk for delays in processing contract actions because forms must be completed manually; requisitions are not prepared and approved electronically; and funding availability is not verified and certified by electronic means. Additionally, completing forms manually presents an increased risk of errors, which may or may not be timely detected.

For contracts not related to youth and children services, CFSA uses the District's Procurement Automated Support System (PASS). Because approximately 90% of CFSA's contracts are for children and youth services, CFSA uses PASS for only 10% of its contracts. According to CFSA officials, CFSA has not used PASS for children and youth needs because they are required to track services on a per child per service basis in order to receive Medicaid reimbursements. CFSA has not identified ways to use PASS on a broader basis in meeting all of its contract requirements even though there appears to be no impediment for doing so.

## RECOMMENDATIONS

1.  The C&P Administrator identify various alternative systems that would best meet CFSA's contracting needs, including the District's PASS. The C&P Administrator should investigate the capabilities of PASS to determine whether it can be used for all CFSA contracting and procurement needs.

2.  With the assistance of consultants, the C&P Administrator estimate costs associated with implementing an automated contracting system.

3.  The CFSA Director and Fiscal Officer identify funding needed to procure and implement the system.

4.  CPA staff solicit contractor services to implement the most feasible system and train CFSA staff on using the new system.

## HIGH TURNOVER IN KEY CFSA MANAGEMENT POSITIONS RESULTED IN INCONSISTENT PROCUREMENT AND CONTRACTING PRACTICES

To ensure efficient and effective operations, managers must establish and implement an adequate system of internal controls[28] and accountability. Stable management is important to establishing and maintaining an effective control environment, identifying and analyzing risks, communicating information throughout the organization, and monitoring an organization's business practices and activities.[29]

The Auditor found that CFSA has experienced high turnover in critical management positions. For example, since April 2001, CFSA has been under the direction of four different Agency Directors.[30] Further, between April 2004 and December 2007, there have been four C&P Administrators. Similarly, between June 2005 and December 2007, there have been three different Contracts Managers.

As a result of high turnover and the lack of continuity in important management positions within CFSA, formal contracting policies and procedures have not been adequately developed or implemented; daily business practices within the CPA have not been standardized; filing and records retention practices have been inadequate; supervisory oversight and monitoring of CPA staff has been ineffective; and measures designed to evaluate and hold agency staff accountable for the quality of their job performance do not exist. Additionally, CPA staff have not received periodic training and longstanding issues, such as the adequacy of CPA's organizational structure and staffing[31] and the lack of an automated child welfare contracting and procurement system, have remained

---

[28]*See* D. Keith Wilson, C.P.A. et al., *PPC's Guide to Internal Control and Fraud Prevention, Second Edition*, Practitioners Publishing Company, December 2003, p. 1-6, which states: "Internal control is a process–effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding achievement of objectives in the following categories: (a) reliability of financial reporting; (b) effectiveness and efficiency of operations; and (c) compliance with applicable laws and regulations."

[29]*See* D. Keith Wilson, C.P.A. et al., *PPC's Guide to Internal Control and Fraud Prevention, Second Edition*, Practitioners Publishing Company, December 2003, pp. 2-10 and 2-11.

[30]These include Dr. Olivia Golden, appointed in April 2001; Ms. Brenda Donald-Walker, appointed in April 2004, Ms. Uma Ahluwalia, appointed in October 2005; and Dr. Sharlynn Bobo, appointed in December 2005

[31]CFSA engaged consultants to review the CPA's processes, staffing, and systems. *See* Child & Family Services Office of Contracting and Procurement Contracts Operation Assessment Report, dated June 28, 2004, prepared by Thompson, Cobb, Bazilio & Associates (TCBA)  *See also* the Child and Family Services Agency, Contracts & Procurement Staff Workload Assessment, dated 2006, prepared by TCBA. *See also* Summary Analysis of the Current State of CFSA's Contracting and Procurement Office (undated), issued by The Ashlin Group.

unaddressed. These conditions have prevented the establishment of sound business practices needed to ensure optimal operational efficiency.

## RECOMMENDATIONS

•

1.   The Agency Director investigate to determine the inherent reasons for the high rate of turnover in the C&P Administrator position. This may be accomplished by engaging a consultant to review the duties, daily responsibilities, workload, and work environment associated with the position.

2.   After reviewing the reasons for the high turnover rate, the Agency Director implement measures to specifically address the issues identified.

## LACK OF OFFICIAL OLM POLICIES AND PROCEDURES IMPAIRED CFSA'S ACCOUNTABILITY AND QUALITY ASSURANCE SYSTEMS AND DID NOT PROVIDE A FRAMEWORK FOR CONSISTENT OLM PRACTICES

It is the responsibility of management to develop and implement internal controls designed to ensure the effectiveness and efficiency of the operations within the scope of their authority.[32] The Auditor found that CFSA has no formal written OLM policies, procedures, or guidelines.

The current OLM Manager recently developed written guidelines for OLM staff roles, functions and responsibilities. However, the Auditor found that these guidelines have not been reviewed or approved by CFSA's Director.

Without official policies and procedures, there is no basis on which to hold OLM staff accountable for the quality of their work or the effectiveness of their daily practices. The Auditor is continuing to conduct an examination of CFSA's quality assurance procedures and activities. A separate report for this examination will be issued when completed.

---

[32]*See* D. Keith Wilson, C.P.A. et al., *PPC's Guide to Internal Control and Fraud Prevention, Second Edition*, Practitioners Publishing Company, December 2003, pp. 2-10 and 2-11.

23

:

RECOMMENDATIONS

1.    The OLM manager ensure that policies and procedures are consistent with 29 DCMR.

2.    The OLM manager present the internally developed administrative guidance to CFSA's Director for review and approval.

3.    When approved, the OLM manager incorporate the administrative guidance into the Agency's standard operating procedures.

### CFSA's Contracts and Procurement Administrator Failed to Follow Procedures for Obtaining A Criminal Background Check For One OLM Personal Services Contractor

D.C. Code § 4-1501.03 and (a) (3) states:

" Except as provided in subsections (b), (c), and (d) of this section, the following individuals shall apply for criminal background checks in accordance with the requirements of § 4-1501.05 and any regulations issued pursuant to § 4-1501.11: (1) An applicant who is under consideration for paid employment by a covered child or youth services provider; (2) An applicant who is under consideration for voluntary service in an unsupervised position by a covered child or youth services provider; (3) An employee of a covered child or youth services provider; or (4) A volunteer who serves a covered child or youth services provider in an unsupervised position.

Additionally, D.C. Code § Section 4-1501.04 (b)(1) states:

"Before any applicant for employment with any covered child or youth services provider may be offered a compensated position or an unsupervised volunteer position, the Mayor or the covered child or youth services provider shall inform the applicant that a criminal background check must be conducted on the applicant."

D.C. Code § 4-1501.02 defines a covered child or youth services provider as:

"any District government agency providing direct services to children or youth and any private entity that contracts with the District to provide direct services to children or youth, or for the benefit of children or youth, that affect the health, safety, and

24

welfare of children or youth, including individual and group counseling, therapy, case management, supervision, or mentoring. The term "covered child or youth services provider" does not include foster parents or grantees."

The Auditor found that one staff person in CFSA's OLM is a contract employee who has been working with the agency since October 2007 as a Part-Time Sanitarian. The Auditor found that CFSA Human Resources staff did not obtain a criminal background check/clearance on the contract employee nor did CFSA's contract with the Sanitarian include provisions requiring a criminal background check prior to starting work.  It is important that the criminal background check/clearance of those working in a Sanitarian position be conducted because CFSA Sanitarians often conduct unsupervised one-on-one interviews with youth clients.

## RECOMMENDATIONS

1.  The Part-Time Sanitarian be immediately prohibited from performing further services until a criminal clearance can be obtained.

2.  The current contract between CFSA and the Part-Time Sanitarian be immediately amended to require a criminal background check/clearance prior to continued employment.

3.  The C&P Administrator or his designee immediately assess all CFSA personal services contracts that require interaction with youth clients in order to determine if other contract employees are performing services without a criminal background check/clearance.  All persons providing services under personal services contracts without documented criminal background check/clearance should be immediately prohibited from performing further services until a clearance is obtained.

4.  The CFSA Director develop internal controls and Standard Operating Procedures to ensure compliance with criminal clearance regulations for all employees whether part-time, full-time, contractor, or volunteer.  CFSA's contracting staff must ensure that all personal services contracts that involve contact with children and youth include requirements for a criminal background check/clearance prior to the individual beginning work with CFSA.

25

CONCLUSION

The Auditor's examination found that between July 1, 2004 and December 31, 2007, CFSA's Director, Contracts and Procurement Administrator (C&P Administrator), Fiscal Officer, and other agency managers failed to develop and implement adequate internal controls to ensure efficient operations and compliance with applicable laws and regulations. The Auditor found that CFSA's contracting practices did not comply with 27 DCMR, or the agency's internal standard operating procedures in the following areas:

- CFSA did not perform advanced acquisition planning;
- the C&P Administrator did not require consistent use of contract action requests;
- individuals serving as contract COTRs had not been adequately trained or formally designated to serve in that capacity;
- CFSA's Director did not develop contracting and procurement training plans;
- contract files were incomplete and inadequately maintained;
- CFSA's standard letter to request best and final offers lacked components required by 27 DCMR;
- the C&P Administrator failed to timely execute definitive contracts after issuing letter contracts to two providers;
- the C&P Administrator failed to certify all contract modifications; and
- the C&P Administrator failed to timely submit third option year contracts to the Council for review and approval.

Additionally, one provider, Jones and Associates, provided services without a contract and CFSA paid at least $1,985,690.88 for these services between August 2006 and December 2007. Further, CFSA's Director did not submit a ratification request to the District's Chief Procurement Officer for approval to pay for these unauthorized services.

The Auditor further found that CFSA's lack of adequate controls is attributable, in part, to the high rate of turnover in management positions. Since April 2001, CFSA has had four different Agency Directors. Additionally, between April 2004 and December 2007, there have been four C&P Administrators; and between June 2005 and December 2007, there have been three different Contracts Managers.

26

The Auditor's examination also found other key operational inefficiencies at CFSA including the lack of formal policies, procedures or guidelines governing the activities and business processes within the Office of Licensing and Monitoring; and CFSA's Human Resources Director's failure to obtain a required criminal background check for a contractor working with CFSA under a personal services agreement.

Respectfully submitted,

Deborah K. Nichols
District of Columbia Auditor

27

# APPENDICES



December 10, 2007

APPENDIX I



December 10, 2007

**APPENDIX II**

### CFSA-Office of Licensing and Monitoring (OLM)
### Organizational Chart



APPENDIX III

Jones and Associates Congregate Care Contract Time-Line
From July1, 2004 through February 28, 2008



| 7/1/2004 | 9/30/2004 | 10/25/2004 | 12/7/2005 | 7/30/2005 | 12/23/2005 | 1/9/2006 | 3/16/2006 | 5/15/2006 | 8/31/2006 | 2/29/2008 |

Nov  2004          Aug.1, 2005 to Dec. 22, 2005          Sept 1, 2006 to February 29,2008

■ No Valid Contract In Place
■ CFSA issued letter contracts
■ CFSA-04-C-0350 congregate contract
■ CFSA issued Memorandums of Understanding

# AGENCY COMMENTS

## AGENCY COMMENTS

On March 13, 2008, the District of Columbia Auditor (Auditor) submitted this report in draft to the Child and Family Services Agency (CFSA), the Office of the Chief Financial Officer, and the Office of Contracting and Procurement (OCP) for review and comment. An exit conference was held with CFSA representatives on March 19, 2008.

The Auditor received written comments from each of the entities noted above. Where appropriate, the Auditor made changes to the final report in light of these comments. All agency comments are appended in their entirety to this final report. However, the Auditor offers an analysis addressing certain agency comments.

## AUDITOR'S RESPONSE TO AGENCY COMMENTS

The Auditor appreciates the comments on the draft report that were provided by the Child and Family Services Agency, the Office of the Chief Financial Officer, and the Office of Contracting and Procurement. The Auditor made revisions to the final report, based on these comments, and also offers the following response to certain agency comments.

1. **Unqualified and Untrained Employees Serve as Contracting Officer's Technical Representatives (COTR).** CFSA offered clarification, stating that "CFSA is not utilizing only two COTRs to monitor all contracts.  One COTR serves for the Children National Medical Center (DC Kids) contract and the other serves to monitor contracts with the Healthy Families/Thriving Communities Collaboratives for community based services. The remaining 200 + contracts are overseen by assigned monitors..."

   **Auditor's Analysis:**  Although monitors serve in this capacity, during the audit period, they were not formally designated as COTRs.  In addition, because, as indicated in CFSA's comments, newer monitors have not received COTR training, the substance of the finding as originally drafted remained unchanged.

2. **Commingling of Youth Residents at One Congregate Care Facility Violates District Law and Regulations and Compromises The Safety of Other Youth and Provider Staff.**

   **Auditor's Analysis:**  Upon further review of this finding as drafted and CFSA's response, the Auditor has removed it in its entirety from the report.



GOVERNMENT OF THE DISTRICT OF COLUMBIA
Child and Family Services Agency
★★★

Office of the Director

March 24, 2008

Ms. Deborah K. Nichols
District of Columbia Auditor
Office of the District of Columbia Auditor
717 14ᵗʰ Street, N.W.
Suite 900
Washington, DC  20005

Dear Ms. Nichols:

Thank you for providing the agency the opportunity to review and respond to the draft report entitled, "Audit of Child and Family Services Agency's Contracting and Quality Assurance Procedures". The agency's comments to the report's findings and recommendations are presented below.

**Finding 1.    CFSA's Contracting Practices are Inconsistent with the Agency's Standard Operating Procedures and District Contracting Regulations**

Formal Standard Operating Procedures for the Contracts and Procurement Administration (CPA) were established with the assistance of a previous management consultant a few years ago.  Both CPA and program staff received training on their use, but full implementation was not accomplished.  As the auditor has noted, the result has been inconsistent contracting practice.

Recognizing that we needed to strengthen contracting and procurement functions, in 2007 CFSA secured the services of the Ashlin Management Group to assess the functioning of CPA and to make recommendations for improvement.  Upon completion of that assessment, CFSA engaged Ashlin to immediately initiate a process of revising the existing SOP manual to bring it fully into compliance with DCMR 27.  A number of critical procedures, including procedures for file maintenance and quality assurance, close-out, compliance and reporting of contract deficiencies, and evaluation of Contractors' performance, were not included in the original manual. CPA management and staff are working with Ashlin to develop these revisions, an exercise that has resulted in positive team building and staff investment in improving the quality of contracting and procurement functions. SOP revisions are scheduled for completion by the end of May 2008, with formal training of Contracts and Procurement staff to follow within another two months.

Ashlin will also assist CFSA to create internal capacity within our Human Resources Administration for initial and ongoing training of program staff, including purchasers of services and program monitors. In addition, the Interim Contracts Administrator has been working with the District's central Office of Contracts and Procurement (OCP) to immediately improve the consistency of current contracting and procurement practice through technical

1

assistance to CFSA. CPA has also purchased copies of the DCMR for each staff member, and will conduct DCMR training for CPA staff during the spring and summer of 2008.

- **Lack of Advanced Acquisition Planning**

Although CFSA concurs with the Auditor that we have not implemented formal advanced acquisition planning, several factors have impeded our attempts to do so., CFSA has traditionally depended upon historical use of services on behalf of children as a proxy for acquisition planning and budgeting, a practice that admittedly falls short of the advanced acquisition planning required in DCMR. For at least the last year, however, CPA has been working to educate, train,

and prompt advanced planning among CFSA's purchasers of services. As noted in independent assessments of CPA shared with the DC Auditor, CFSA purchasers must project service needs if advanced acquisition planning is to be accomplished, since they are most knowledgeable about changing target populations and service needs and budgets. Contracting staff need guidance from program staff in order to complete contract actions that meet those identified needs. The very nature of the human services procured at CFSA, however, make projecting needs and costs and successfully completing solicitations and competitive awards challenging. Even after decisions have been made and contracts executed, the service landscape can rapidly shift for reasons beyond CFSA's control, prompting a change in service level need and expedient contract actions.

Adequate planning and timely execution of contract actions also requires both program and contracts staff to adhere to expected timeframes and procedures for each step of acquisition planning. Administrative purchases are often accomplished with more lead time because they are easier to plan for, the quantity of the service is more definable, and potential vendors are more numerous and easier to identify. CFSA acknowledges that we have not yet achieved that standard for human services contracts. Although CPA has used Microsoft Project to track contract actions, lack of an automated tracking system, identified by the Auditor as a deficiency, makes tracking procurement and contracting timelines more difficult, particularly for large procurements such as those needing legislative approval. CFSA requested funds for purchase of just such a system in FY 09, one that would match well with the agency's use of our federally mandated and certified State Automated Child Welfare Information System, through which client-specific services must be tracked.

Although CFSA will always require a capacity for emergency purchases because court-ordered services from specific vendors must often be procured for specific children, we continue to work with the Family Court to limit these requirements to providers with whom CFSA is already contracting. CPA began implementation of the Service Level Agreements (SLA's) developed by the District's central Office of Contracting and Procurement at the end of FY 07, but this acquisition planning has not been completed with all purchasers of services. Representatives from CFSA's Office of Policy, Planning and Program Support, which develops the agency's biannual Needs Assessment report and the Resource Development Plan, will participate in a planning session with representatives from CFSA's Placement Office, Office of Youth Development, and Office of Licensing and Monitoring in the first week of April to discuss planning for future congregate care placement services. Advanced planning sessions like this one, held with purchasers prior to the fiscal year, will result in better preparation for contract actions for the upcoming year, and in more effective budget planning and tracking of expenditures as well.

2

- **Inconsistent Use of Required Contract Action Requests**

CFSA acknowledged in the previous section that it has not consistently utilized required contracting tools, such as contract action packages to initiate contract actions. To date, we have been using a manual contract action package that has not been readily accepted by purchasers of services. CPA has already begun revising the contract action package to include more detailed information for its own use, and to make it more user-friendly as an on-line template that can be submitted electronically to improve tracking and accountability.

- **Unqualified and Untrained Employees Serving as Contracting Officer's Technical Representative (COTR).**

In our exit conference with the DC Auditor, we clarified CFSA's use of COTR's and Program Monitors. CFSA is not utilizing only two COTR's to monitor all contracts as stated in the draft report, but has two *officially* designated two agency COTR's; these persons monitor fewer than 5% of CFSA contracts. One COTR serves for the Children's National Medical Center (DC KIDS) contract, and the other serves to monitor contracts with the Healthy Families/Thriving Communities Collaboratives for community based services. The remaining 200 + CFSA contracts are overseen by assigned monitors working across several offices that procure services. For example, an entire Division of Program Monitors exclusively oversees congregate care providers, with each Monitor responsible for a small portfolio of specific contracts. A comparable group monitors CFSA's family-based foster care contracts. Although not officially appointed by the Contracting Officer, these Program Monitors perform essentially the same duties as COTRs. Program Monitors from the congregate care and family based care divisions were formally trained as COTRs in 2005, but newer staff have not all received that training. The Interim Contracts Administrator and Contracts Compliance Officer have conducted training for all Monitors on contract compliance, reporting of contract deficiencies, and contract performance evaluation. Program Monitors across the agency are becoming more adept at formally documenting deficiencies to the Contracts office, and, as of this fiscal year, are required to submit quarterly evaluations of their respective contracts. (See Appendix A for a sample report of contract deficiency and Appendix B for an example of a contract evaluation report).

- **Inadequate Procurement Staff Training**

In 2004-2005, then CPA staff received National Institute of Government Purchasing (NIGP) training that included all the courses for certification. Two staff still with the agency successfully obtained NIGP Certified Public Professional Public Buyer (CPPB) certification. In 2007 staff also attended USDA training, Writing for Results, and three NIGP certification courses, a record that exceeds the Auditor's recommendation that staff be required to participate in at least two training sessions per year. CFSA had already requested specific training funds for CPA in its FY 09 budget request, and will ensure that these resources are used to implement a formal training plan for CPA staff. Completion of expected training shall also be made part of staff performance standards.

- **No Filing and Records Retention Policies and Procedures**

File maintenance and quality assurance had previously been identified as subjects for inclusion in the revised Standard Operating Procedures. The Contracts Compliance Officer drafted a policy in 2007 that is being more fully developed as part of the Ashlin engagement. The Contracts Compliance Officer has also embarked upon a project of having all contract files

dating back to 2003 fully catalogued. Unfortunately, some older past files, including some examined in this audit, are deficient in ways that cannot be rectified. Each year strengthening of internal controls has resulted in improved files. Approximately a year ago, CFSA's former Contracts Administrator initiated an internal audit of contract files, using a checklist, to ensure that the contract files contain all the required elements. These audits have been useful in ensuring continual quality assurance and diminishing repetition of errors. In the third quarter of this fiscal year, we intend to begin building a database of active contracts that includes as much historical contract information as possible, and to scan critical paper hard copy files to provide electronic back-up copies.

**Auditor's Recommendations:** CFSA concurs with the Auditor's recommendations for this section, to the extent that resources permit. Provision of monetary incentive awards (recommendation #8) is currently restricted by the Office of the City Administrator. We agree that establishing a position for a dedicated Document Control Clerk would contribute to effectiveness, but no FTE currently exists to do so. We will prioritize identifying an FTE for that purpose, and implement as resources allow.

### Finding 2.    CFSA Contracting Personnel Did Not Comply with Title 27 DCMR when Soliciting, Executing, and Modifying Contracts

- Inadequate Best and Final Offer (BAFO) Request Letter

- Untimely Execution of Definitive Contracts

- Unauthorized Contract Modifications

CFSA concurs with the findings and recommendations for this category. The Interim Contracts Administrator has emphasized making specific improvements in this area, re-orienting Contract Specialists on the relevant DCMR regulations. Practice in completing best and final offer letters, execution of definitive contracts, and authorizing contract modifications has recently improved. As noted, the checklist recommended by the Auditor was developed as part of the internal audit procedures mentioned earlier. Each contract file now includes section overviews that list the components that are to be included in each part of the file.

### Finding 3.    CPA Staff's Poor Planning, Contract Monitoring, and File Maintenance Resulted in Prolonged Delays when Exercising Option Year Three of the Congregate Care Contracts

CFSA concurs with the findings and recommendations for this category. Guidance on exercising option years will be included in the Standard Operating Procedures. The contract tracking database previously mentioned will include all pertinent contract information, including those components recommended by the Auditor, as well as contract compliance information such as tax and performance compliance. The Interim Contracts Administrator is requiring compliance with the policy of beginning the process of exercising options no later than 120 days prior to the expiration of the current contract year. This process has already been initiated for CFSA's congregate care contracts, for which the final option year must start July 1, 2008. Compliance with this protocol and all other required contracting and procurement practices will be incorporated into PES performance standards effective April 1st.

4

**Finding 4.    Jones and Associates, Inc. has provided Services Without a Valid Contract since August 2006**

CFSA's contract with Jones and Associates, Inc. for independent living services has proven problematic since July of 2005, when the first option year of the competitively awarded contract could not be executed. Despite extended negotiations, CFSA and the Jones program could not come to agreement on a number of terms in the contract, and resorted to developing a series of

memoranda of understanding that have formed the basis for makeshift contract agreements since 2006 and the end of 2007. Throughout this period, Jones and Associates has continued to protest and resist CFSA's proposed terms, but was allowed to continue to provide services. In the absence of a definitized contract, CFSA authorized continuation of the per diem rate in FACES, verified that placement data were accurate for payments, and permitted the program to continue in response to high demand for main facility independent living placements. Jones has been providing these services for many years, and had earned a reputation for frequently sending youth to college. In an effort to stabilize youth placement, rather than allowing administrative issues to result in youth moving from place to place, CFSA elected not to discontinue these services. Further, of late Jones has served a number of challenging youth not readily accepted by other programs.

Jones and Associates signed a letter contract for the period of 1/1/08-2/29/08, and another for 3/1/08-4/30/08. Despite ongoing disagreements about specific contract terms, CFSA plans to execute a definitized contract by the end of this period or discontinue services with the provider. Having ceased working with another long-time ILP provider at the beginning of FY 08, we are aware of the challenges of having to move large number of youth from their homes because of contracting problems. Although we have some evidence that other providers may be able to accommodate additional youth, finding suitable housing and services for the 30 youth placed in the Jones program in a month's time is not feasible. Our priority is to come to terms with Jones, since the available options for replacing these services will each require additional resources that CFSA lacks, or will take too long to complete. They include issuing a solicitation for a more therapeutic transitional living program, rapidly increasing the capacity of existing independent living providers, or executing sole source contracts with new, untested vendors that have approached CFSA claiming to be able to offer more specialized services.

As discussed at length in the OCFO response to the Auditor's report of CFSA's expenditures for congregate care contracts, the CFSA Fiscal Office paid for services provided by Jones and Associates in the absence of a contract via FACES authorizations and documentation of children placed for each invoice period, although payments were appropriately documented and paid through SOAR. That lengthy explanation will not be repeated here, but it should be noted that expenditures for child-specific services must be tracked and documented in CFSA's federally certified SACWIS, FACES, which lacks the kind of procurement-fiscal automated controls extant in the PASS system. FACES does not contain a hard encumbrance function that requires verification of the execution of a legally binding contract, but does include a system of secure functions and permissions that enable only Contracts staff to enter official contract numbers, periods of performance and payment rates for these services. A workgroup of representatives from Fiscal, Contracts, and the Child Information Systems Administration (CISA) will explore the possibility of developing an additional module for FACES that enables automated encumbrance of funds and input of contract information, similar to PASS functionality. One meeting has already been held, and a draft proposal has been created.

5

**Finding 5.   CFSA's Fiscal Office Authorized Payments Totaling $1,985,690.88 to Jones and Associates that were not Ratified by the District's Chief Procurement Officer as Required**

Following receipt of the draft Auditor's report, CFSA consulted with David Gragan, the District's Chief Procurement Officer, who concurs that regardless of the reasons for payment of services in the absence of a contract, a ratification package is needed to rectify payments made to

Jones and Associates. CFSA intends to submit a ratification package the week of March 24, 2008. Appropriate action will be taken to hold personnel responsible for violation of DCMR 27.

**Finding 6.   CFSA Lacks an Automated Child Welfare Contracting and Procurement System Needed to Improve Operational Efficiency**

Lack of automation to support contracting functions similar to that which PASS offers had already been identified internally prior to the conduct of this audit. CFSA's intention to establish a database was discussed in a previous section, as was the establishment of a cross-agency workgroup from Fiscal, Contracts and CISA to address the lack of controls across the functional areas. CFSA will also further research whether CFSA might somehow use PASS and still comply with federal requirements for using a SACWIS certified system (FACES) for tracking child-specific services for payment. The Interim Contracts Administrator is also researching the use of other contracting vehicles for human services in use by other District agencies, but not currently in use by CFSA, to determine if they offer simpler contracting solutions.

**Finding 7.   High Turnover in Key CFSA Management Positions Resulted in Inconsistent Procurement and Contracting Practices**

CFSA agrees that turnover among Agency Contracting Officers over the past five years has contributed to lack of quality contracting and procurement functions. Since the agency returned to the District government from receivership, each Contracts Administrator and Contracts Manager has faced multiple barriers to efficient practice. Long-standing business relationships with vendors whose performance was not properly monitored has been a struggle as CFSA has incrementally raised the bar for performance and severed business ties with those providers that could not satisfactorily serve clients. Many contracts were historically sole source in type, and were in need of competitive award., Moreover, program purchasers of services have often been ill-prepared to prepare statements of work for services and serve on technical evaluation panels. Some vendors, accustomed to maintaining a high volume of business without competition, objected to CFSA's reforms, resorted to protests, submitted back claims from multiple fiscal years, and attempted to secure court orders for their services in response. These actions caused additional work and contributed to the stress these leaders endured. Inadequate resources, such as the lack of an automated contracting and procurement system and a staff complement that lacked the education and training needed to perform at a high level, also contributed to making the job of a CFSA contracting officer very challenging. Comparable turnover at the Director level has also been a factor.

Despite these difficulties, however, each Administrator has contributed to improvement in the contracting and procurement function in CFSA; a number of those incremental improvements have been discussed in this response, including securing professional staff training, conducting internal contracts audits, establishing a proper file room with catalogued files, launching SOPs,

6

internal contracts and program staff training. Perhaps most important, more highly qualified staff has joined the staff in recent years as a result of position upgrades, and performance expectations have been established for current CPA staff.

Despite these improvements, the agency Director acknowledges that CFSA continues to struggle to operate a responsive, high quality contracts and procurement system. Earlier this year, I approached the District's Chief Procurement Officer about OCP overseeing our contracting operation. Because CFSA's independent contracting authority can only be transferred back to

OCP with the permission of the federal court, Mr. Gragan and I have agreed on a plan in which CFSA will transfer its currently vacant Contracts Administrator position to OCP, which will promptly hire an experienced contracts professional to direct CFSA's contracting functions on-site at CFSA. If this plan is approved by the City Administrator and the agency's Court Monitor, we plan to implement it for a 12 month period and then re-evaluate whether CFSA should retain its independent authority or seek court approval to return the entire function to OCP.

### Finding 8.   Lack of Official OLM Policies and Procedures Impaired CFSA's Accountability and Quality Assurance Systems and did not Provide Framework for Consistent OLM Practices

CFSA concurs that we postponed the development of a formal policy and procedures for monitoring congregate care programs. Nonetheless, the current OLM Program Manager for the Congregate Care Monitoring Division has instituted numerous improvements to standardize CFSA's congregate program monitoring practices, including the document identified by the Auditor. CFSA's Executive Policy Team will incorporate formalization of the proposed business process into its policy review schedule this quarter, under the executive sponsorship of CFSA's Deputy Director for Program Operations, and issue a binding Administrative Issuance until a formal policy can be developed that supports CFSA's intention of adopting a performance-based contracting model for contracted congregate care services in FY 09.

### Finding.9.   Commingling of Youth Residents at One Congregate Facility Violates District Law and Regulations and Compromises the Safety of other Youth and Provider Staff

CFSA explained in the exit conference with the DC Auditor that all youth placed in CFSA programs are District wards committed to our care as a result of having been victims of child abuse or neglect. If one of these youth is found to have engaged in delinquent acts, he/she may also be committed to the Department of Youth Rehabilitative Services (DYRS) or placed on probation and referred back to CFSA for placement and services. These youth are sometimes referred to as having a "dual-jacket," i.e., they are involved in both the child welfare and juvenile justice systems. CFSA may legally place these youth in facilities that also house wards who do not have juvenile convictions because all are committed to our care. The Jones and Associates program currently houses several dual-jacketed youth, as do other programs, since a number of older youth in care have also been convicted of juvenile charges. Providing appropriate placements and services for these young adults is a continuing programmatic challenge. CFSA is not only discussing with Jones its capacity to provide a higher level of therapeutic services for these youth, but has begun internal conversations about changing its independent living model and regulations to tie entry to such programs to youths' developmental levels and appropriate conduct.

7

**Finding 10.   CFSA's Contracts and Procurement Administrator Failed to Follow
Procedures for Obtaining a Criminal Background Check for one OLM
Personal Services Contract**

CFSA contracts include requirements for criminal background checks in those contracts for
positions in which work performed brings a CFSA employee or contracted employee in contact
with children and youth. The contracted Sanitarian conducts facility inspection, but CFSA
concurs with the Auditor that the incumbent can come into contact with youth placed in our

congregate care facilities while performing those functions. We will immediately revise the
contract for the Sanitarian and secure a criminal background check for the incumbent, and audit
all other personal service contracts to determine whether others require criminal background
checks because the contractors may come into contact with children and youth served by CFSA.

**Finding 11.   Inconsistencies in District Regulations Gives Limited Guidance to Providers
Regarding the Use of Financially-Based Behavior Management and
Discipline Strategies**

CFSA has previously addressed this issue with congregate care providers. Our initial actions
were to secure adequate documentation and signed verification by youth that they were indeed
receiving the stipend and allowance monies due to them. In 2004-2005, as OLM continued to
receive complaints from youth residents about the disbursement of personal funds required by
Chapter 63, 29 DCMR, the independent living regulations, Monitoring and Contracts worked
together to develop a Resident Verification form for youth to sign to indicate receipt. That form
is now part of the certification package for cost-reimbursement to the provider. As the Auditor
recommends, CFSA will quickly work to ensure that the use of financially-based behavior
management strategies is guided by policy and is consistent across providers. CFSA will include
its Youth Peer Advisory Council and providers in establishing such guidelines.

Sincerely,

/SEB/


Sharlynn E. Bobo, Ph.D
Director

8

GOVERNMENT OF THE DISTRICT OF COLUMBIA
OFFICE OF CONTRACTING AND PROCUREMENT



Office of the Director

March 24, 2008

Ms. Deborah K. Nichols
District of Columbia Auditor
Office of the DC Auditor (ODCA)
717 14th Street, N.W., Suite 900
Washington, D.C. 20005

**RE: Review and Comment by the Chief Procurement Officer of Draft Report
entitled "Audit of Child and Family Services Agency's Congregate Care Contract
Expenditures."**

Dear Ms. Nichols:

I appreciate the opportunity to respond to the draft report entitled "Audit of Child and
Family Services Agency's Congregate Care Contract Expenditures" (Attachment 1),
dated March 13, 2008. In reviewing the draft report, I did not comment on fiscal
recommendations, but limited my detailed review to the one matter that is clearly a
contract issue.

**Recommendation #1:**

1. "CFSA established standard operating policies and procedures for the
   review and verification of charges invoiced by contractors/vendors prior to
   certification of payment. In doing so, CFSA also include compliance with
   the OCFO's internal control policies and procedures related to invoice
   review and certification as a performance measure for employee
   performance evaluation purposes.

2. CFSA actively enforce the OCFO's guidelines regarding the effective
   review and certification of invoices and supporting documentation before
   authorizing payment. CFSA employees violating the OCFO's guidelines
   must be immediately held accountable under the appropriate applicable
   personnel rules and procedure to the fullest extent permitted.

3. CFSA's Fiscal Officer review the current filing and records retention
   system to identify needed improvements and implement policies and

procedures to ensure adequate and effective financial accountability and records management.

4. CFSA's Fiscal Officer and Accounts Payable Supervisor immediately locate the 13 missing invoices totaling $1,125,315.51 to substantiate their proper payment.

5. The Accounts Payable Supervisor develop and implement procedures to ensure that Accounts Payable Technicians adhere to CFSA's invoice payment policies and procedures and always utilize the CFSA Payment Short/Adjustment forms when altering or adjusting monthly invoices.

6. The Accounts Payable Supervisor ensure that Document Control Technicians assign an Invoice Tracking System number to all invoices prior to forwarding them to Accounts Payable Technicians for processing. Accounts Payable Technicians must be required to return all invoices not bearing a tracking number to the Document Control Technician for assignment of a tracking number."

**Response:**    No comment.

**Recommendation #2:**

1. "CFSA's Contract Specialists and Program Monitors should communicate with CFSA's Accounts Payable Technicians routinely and regularly and provide supporting documentation regarding specific contract terms including per diem rates that directly affect provider payments. Proper and current documentation should be retained by CFSA's Fiscal Office of a minimum of five years.

2. After contract award, the assigned Contract Specialist immediately forward a copy of the contract's Price Schedule to the assigned Program Monitor and Accounts Payable Technician as notification of the contracted per diem rates. Whenever per diem rate adjustments are negotiated and approved, the Contract Specialist should immediately notify the Program Monitor and Accounts Payable Technician of the revised rates, provide a new Price Schedule and retain documentation of negotiated changes in the contract file.

3. When reviewing invoices for payment approval, the Program Monitor and Contract Specialist verify the accuracy of per diem rates by reviewing the contract and certify their review by initialing the rate shown on the provider's invoice.

4. Accounts Payable Technicians verify the accuracy of the per diem rate by comparing the invoiced per diem rate to the most recent rate documentation received from the Contract Specialist. All differences should be resolved with the Contract Specialist based on documented evidence.                •

5. CFSA's Fiscal Officer require Accounts Payable Technicians to verify the existence of a valid contract prior to processing provider payments. No services should be ordered or accepted from contractors or vendor and no payments should be made in the absence of a valid executed contract."

Response:     No comment.

**Recommendation #3:**

1. "CFSA Fiscal Officer require Accounts payable Technicians to verify the existence of a valid contract prior to processing provider payments. No services should be ordered and no payments should be made in the absence of a contract.

2. Since there is no valid contract between CFSA and Jones and Associates, goods and services provided by the vendor to CFSA were improper and therefore must immediately cease until a valid written contract is awarded to this vendor. Further, all payments made to or owed to Jones and Associates are improper in the absence of a valid written contract and must first be authorized through the District's procurement ratification process.

3. CFSA personnel authorizing the delivery of goods and services and payments to a vendor in the absence of a valid written contract must be held accountable to the fullest extent permissible including termination, under the provisions of applicable District personnel law and rules."

Response:     Concur.

**Recommendation #4:**

1. "CFSA Fiscal Officer, C&P Administrator, and CFSA IT Technicians within 30 days develop a means to properly account for payments by contract number within FACES, as well as develop a monthly report which details each individual payment made to provider by contract number, type of service, per diem, and service date.

2. CFSA provide this report to the Auditor each month, in hard copy and electronic format, until further notice.

3.  CFSA Fiscal Officer and CFSA IT Technicians within 10 days of this draft report provide the Auditor a listing of all scheduled and demand payments approved and issued through FACES for each of the providers by **contract number** from July 1, 2004 to December 31, 2007."

Response:     No comment.

I appreciate the opportunity to provide responses to the recommendations made by your office. Although CFSA is exempt from the authority of the District's Office of Contracting and Procurement (OCP) pursuant to the Procurement Reform Amendment Act of 1996, effective April 9, 2007 (D.C. Law 11-259; D.C. Code §§ 2-301.01 *et seq.*), it has been my experience that the agency is open to seeking procurement best practices. I am committed to working with this, and all other independent procurement agencies to bring consistency and a single public view of procurement in the District.

Sincerely

David P. Gragan, CPPO
Chief Procurement Officer

Cc:     Dan Tangherlini, City Administrator
        Sharlynn Bobo, Director, CFSA
        Wilbur Giles, Chief of Staff, OCP
        Nancy Hapeman, General Counsel, OCP
        Sheila Mobley, Assistant Director for Procurement Support, OCP

Attachment: Letter by the DC Auditor dated March 13, 2008 with Enclosure - Draft Report entitled "Audit of Child and Family Services Agency's Congregate Care Contract Expenditures."

GOVERNMENT OF THE DISTRICT OF COLUMBIA
Office of the Chief Financial Officer

Office of Integrity and Oversight



March 18, 2008

Deborah K. Nichols
District of Columbia Auditor
717 Fourteenth St., NW, Suite 900
Washington D.C. 20005

Dear Ms. Nichols:

Thank you for the opportunity to respond to the recommendations in your draft audit reports regarding the Child and Family Services Agency. Detailed responses to the recommendations in both reports are being prepared by Ms. Deloras Shepherd, Associate Chief Financial Officer for Human Support Services Cluster, who will communicate her responses to you in a separate letter.

However, the draft audit report captioned "Audit of Child and Family Services Agency's Contracting and Quality Assurance Procedures" raised issues concerning possible Anti-Deficiency Act violations in recommendations four and six on pages 18-19. Please be advised that I will refer these issues to the Chairperson of the Board of Review for Anti-Deficiency Violations so that the final audit report can be reviewed by the Board at an upcoming meeting to determine whether the report discloses potential violations of D.C. Code §47-355.02. Any potential violations will then be addressed and resolved according to the Board's established procedures.

Sincerely,

Robert G. Andary
Executive Director

cc: Deloras Shepherd, Associate Chief Financial Officer, Human Support Services Cluster



GOVERNMENT OF THE DISTRICT OF COLUMBIA
Office of the Chief Financial Officer

Office of Integrity and Oversight





March 24, 2008

Deborah K. Nichols
District of Columbia Auditor
717 Fourteenth Street, NW, Suite 900
Washington, DC 20005

Dear Ms. Nichols:

Thank you for the opportunity to respond to the recommendations in your draft report entitled:
"Audit of Child and Family Services Agency's Congregate Care Contract Expenditures." The
Office of the Chief Financial Officer (OCFO) comments to the report's findings and
recommendations are presented below.

## Agency's Overview of Actions To Address Findings

Before responding to each of the specific findings and recommendations, it is important to
clarify the role of the FACES client information system in both the Child and Family Services
Agency's (CFSA's) payment process to the vendors providing services to CFSA's children and
families. It is also important to outline three specific activities the agency and the Fiscal Office
have undertaken during the time period covered under the report that have strengthened internal
financial controls and address a portion of the findings and recommendations made in this report.
Taken together, these activities have produced a greater control and oversight of the agency's
payments to its child placement vendor community.

### The Role of FACES in the CFSA Payment Process

As noted in the draft report, CFSA uses a federally approved Statewide Automated Child
Welfare System (SACWIS) known as "FACES" to document all placement and payment
information for children that enter into the District's child welfare system. The development,
implementation and maintenance costs of SACWIS systems such as FACES are partially funded
by the federal government; therefore, the District is required to utilize the functionalities of the
system or be subject to financial penalties from the federal government. As part of the Federal
approval to be a certified SACWIS system, and in order to obtain federal funds, a functionality
of the FACES system is to make child specific payments for all services provided on behalf of
the children that enter into care. CFSA is therefore unique from other District agencies insofar
as these services are not managed or paid through the District's PASS procurement system.

Because of the federal requirements, the vendor placement contracts are not managed with a purchase order system and funds supporting these contracts are not obligated or encumbered through the District's SOAR system. However, as the Auditor's draft report notes, payments made through the FACES system are interfaced with SOAR to generate payment checks.

With regard to payment for placement services, there are several administrations within the CFSA organization that are responsible for ensuring that payments are made accurately and in conformance with the terms of the vendor contracts:

- First, it is the responsibility of the social worker assigned to the child to document the placement decision made for placement.
- Second, it is the responsibility of the Placement Unit to monitor all CFSA placements and ensure that any changes to all child placements are recorded as quickly as possible in FACES.
- Third, it is the responsibility of the Contracts and Procurement Administration to enter and maintain the relevant contractual data (service(s) that are contracted, negotiated rates for the service(s), number of children to be served, contract period for the service(s), and total value of contract) within FACES.
- Finally, it is the responsibility of the Fiscal Office to pay services invoiced, based on a review of the invoice and a determination of the final amount to be paid.

Each of these responsibilities are segregated within FACES based on which part of the agency an employee works in and on the security level provided by the FACES internal security staff. For each of these areas, there are procedures in place to ensure that all data into FACES are as accurate and as timely as possible.

**FACES Placement Provider Web Application - Implemented November 2006**

In an effort to streamline the processing of payments for child placements, CFSA implemented the Provider Placement Web (PPW) as part of the FACES system. The functionality is designed to ensure that the placement episodes of all children with the vendor agencies are entered into FACES in an accurate and timely manner. Based on this placement data and the vendor's approved per diem rate entered by the Contracts Specialist, a Monthly Placement Utilization Report (MPUR) is created for each of the vendor's room and board services. At the end of each month, the designated placement vendor staff reviews the MPUR and electronically approves it, which then converts the MPUR into an invoice for payment. The PPW system became operational in November, 2006 and all vendors were required to utilize PPW by February, 2007, per a modification to their contracts. The implementation of PPW has resulted in more accurate and timely payments made to the placement vendor community and greatly reduced the number and amount of reconciliation payments that had occurred prior to its implementation.

**CFSA Invoice Tracking System - Implemented September 2006**

In September 2006, the agency implemented the CFSA Invoice Tracking System (ITS). The ITS is a web-based system to track and monitor the processing and payment of all vendor invoices

Audit of CFSA's Congregate Care Contract Expenditures
March 24, 2008
Page 3

delivered to the CFSA Fiscal Office. All invoices received by the CFSA Fiscal Office are entered into the ITS, with a unique tracking number assigned to each invoice. Based on the program certification processes, the invoices are then assigned in ITS to the appropriate program staff for payment certification. The program staff is notified in ITS as invoices are delivered to them for certification. Once the program staff has certified the invoices for proper payment, the staff documents those approvals in the ITS, as well as on the invoice packages. The invoices are then tracked back to the Fiscal Office for payment.

The ITS system has proven to be an effective tool for managing the high volume of invoices that are delivered to the agency. The ITS has also aided in ensuring that payments are being made to the vendor community in an accurate and timely manner.

**CFSA Fiscal Office Policies and Procedures- August 2006**

In an effort to address issues with regard to the accuracy and timeliness of payments made to the vendor community and also in strengthening internal financial systems and controls, in August 2006, the CFSA Fiscal Office engaged a consultant to work with the accounts payable and document control staff to assess the functions within Fiscal Operations related to the processing and payment of provider invoices and the subsequent retention of invoices through a central filing system. In addition, the consultant also focused on the timely release of remittance advices and the short pay letters. The consultant worked to retrain staff and upgrade procedures related to these processes. These procedures support the internal controls that are now in place and that, with the exception of the FACES component, adhere to the District's financial control standards.

## Agency's Responses to Findings and Recommendations

**FINDING 1:  CFSA FISCAL OFFICER AND OTHER CFSA ADMINISTRATORS FAILED TO ESTABLISH ADEQUATE INTERNAL CONTROLS TO PREVENT ERRORS AND OTHER IMPROPRIETIES**

**Specific Auditor Findings:**

- CFSA's Fiscal Office staff could not locate 13 invoices totaling $1,125,315.51

  **OCFO Response:** In order to centralize files, beginning in January 2005, the CFSA Fiscal Office established a Document Control Unit. The Unit was established in order to centralize files that had previously been kept by individual accounts payable and other fiscal staff throughout the office. The Document Control Unit is responsible for managing the documents that flow through the CFSA accounts payable area and maintain other information pertaining to the flow of fiscal documents. As part of this responsibility, the Unit receives mail and manages the ITS in terms of inputting and closing out invoice activities. The Unit is also responsible for maintaining the Fiscal Office's central file room, which is located in a secure location near the Fiscal Office's work area.

In an effort to address issues with regard to the accuracy and timeliness of payments made to the vendor community and also in strengthening internal financial systems and controls, in August 2006, the CFSA Fiscal Office engaged a consultant to work with the accounts payable and document control staff to assess the functions within Fiscal Operations related to the processing and payment of provider invoices and the subsequent retention of invoices through a central filing system. In addition, the consultant also focused on the timely release of remittance advices and the short pay letters. The consultant worked to retrain staff and upgrade procedures related to these processes. These procedures support the internal controls that are now in place and that largely adhere to the District's financial control standards.

The CFSA Fiscal Office has located and presented to the Auditor two of the requested 13 missing invoices. Of the remaining 11 outstanding invoices, five invoices had been taken off-site as part of CFSA's Fiscal Office project to image older financial documents, five invoices are from FY 2006 and one is from FY 2007.

- CFSA's Account Payable technician failed to use required Notification of Short/Adjustment Payment forms to properly justify and support alterations made to 21 invoices totaling $2,817,847.82

  **OCFO Response:** The CFSA Fiscal Office was unable to ascertain from this finding which invoices the Auditor identified as requiring the use of the Notification of Short/Adjustment Payment forms. However, the CFSA Fiscal Office acknowledges some of the invoices examined by the Auditor did require the form. As part of the Consultant engagement noted above, accounts payable technicians were re-trained on the circumstances that necessitate the need for a Short Pay/Adjustment form. This point has been periodically re-emphasized to the accounts payable staff and will again be re-emphasized on an ongoing basis.

- CFSA's Accounts Payable staff improperly paid one invoice totaling $101,360.70 which was based on the use of an inaccurate per diem rate

  **OCFO Response:** The CFSA Fiscal Office provided documentation to the Auditor supporting the accurate payment of this invoice. The invoice in question totaled $107,632.00 and CFSA paid $101,360.70. The package submitted to the auditor included the following documentation:

  - o The vendor's invoice, signed by the vendor, date-stamped and payment sign-off signatures
  - o The Notification of Short/Adjustment Payment Form with notation indicating which child was not paid
  - o A screen shot from FACES noting the per diem for the service being invoiced
  - o The Contract Funding Document
  - o The Contract Pricing Schedule B

Audit of CFSA's Congregate Care Contract Expenditures
March 24, 2008
Page 5

- CFSA's Accounts Payable staff paid three invoices totaling $206,532.22 which lacked proper supporting documentation

    **OCFO Response:** In reviewing the documentation provided by the Fiscal Office to the Auditor, the Fiscal Office believes that proper supporting documentation was not lacking for two of the payments, totaling $206,507.22.

    - o The first invoice is the same one as referenced in the immediately preceding response with the documentation included in that response.
    - o The second invoice was for an invoice that was paid in full and included a vendor-signed invoice, date stamp and payment sign-off signatures.
    - o The CFSA Fiscal Office concurs that the third payment, totaling $25.00 was lacking proper supporting documentation.

- CFSA paid 24 invoices totaling $2,855,586.50 which lacked the provider's required certifying signature

    **OCFO Response:** In an effort to streamline the processing of payments for child placements, CFSA implemented the Provider Placement Web (PPW) as part of the FACES system. The functionality is designed to ensure that the placement episodes of all children with the vendor agencies are entered into FACES in an accurate and timely manner. Based on this placement data and the vendor's approved per diem rate entered by the Contracts Specialist, a Monthly Placement Utilization Report (MPUR) is created for each of the vendor's room and board services. At the end of each month, the designated placement vendor staff reviews the MPUR and electronically approves it, which then converts the MPUR into an invoice for payment. The PPW system became operational in November, 2006 and all vendors were required to utilize PPW by February, 2007, per a modification to their contracts.

    The CFSA Fiscal Office was unable to ascertain from this finding which invoices the Auditor identified as not having the required certifying signature. However, as noted in the Auditor's draft report (Page 5) and in the explanation above, placement invoices generated from the PPW are derived from the vendor's MPUR. Once the designated vendor staff approver reviews and electronically approves the MPUR, the status of the MPUR changes within PPW to an approved invoice. That invoice is downloaded by CFSA Fiscal Office's Document Control staff, entered into the CFSA Invoice Tracking System, reviewed and processed for payment. As part of the design of the PPW system, in lieu of a signature, the approval of the MPUR to an invoice serves as the formal transmission of a vendor invoice.

- 37 invoices totaling 44,956,670.94 lacked CFSA's document tracking numbers. The document tracking number aids CFSA's Accounts Payable staff in locating processed and paid invoices

OCFO Response: In September 2006, the agency implemented the CFSA Invoice Tracking System (ITS). The ITS is a web-based system to track and monitor the processing and payment of all vendor invoices delivered to the CFSA Fiscal Office. All invoices received by the CFSA Fiscal Office are entered into the ITS, with a unique tracking number assigned to each invoice. Based on the program certification processes, the invoices are then assigned in ITS to the appropriate program staff for payment certification. The program staff is notified in ITS as invoices are delivered to them for certification. Once the program staff has certified the invoices for proper payment, the staff documents those approvals in the ITS, as well as on the invoice packages. The invoices are then tracked back to the Fiscal Office for payment.

The CFSA Fiscal Office was unable to ascertain from this finding which invoices the Auditor identified as not having the CFSA document tracking control number. As noted above, the CFSA Fiscal Office implemented a CFSA Invoice Tracking System (ITS) in September, 2006. Any invoices reviewed by the Auditor prior to the implementation of the ITS will not have an assigned ITS number.

**Auditor Recommendations to Finding 1:**

1.) CFSA establish standard operating policies and procedures for the review and verification of charges invoiced by contractors/vendors prior to certification of payment. In doing so, CFSA also include compliance with the OCFO internal control policies and procedures related to invoice review and certification as a performance measure for employee performance evaluation purposes.

OCFO Response: As noted above, in August 2006, the CFSA Fiscal Office engaged a consultant to work with the accounts payable and document control staff and retrain them on the procedures related to the daily functions within the Fiscal Operations related to the processing, payment and subsequent retention of invoices through a central filing system, as well as the timely release of remittance advices and the short pay letters. The consultant worked extensively with staff to implement changes in procedures related to these processes. These procedures support the internal controls that are now in place and, with the exception of the FACES component, adhere to the District's financial control standards.

2.) CFSA actively enforce the OCFO's guidelines regarding the effective review and certification of invoices and supporting documentation before authorizing payment. CFSA employees violating the OCFO guidelines must be immediately held accountable under the appropriate applicable personnel rules and procedures to the fullest extent possible.

OCFO Response: As noted in previous sections of this letter, CFSA has undertaken initiatives during the time period covered under the report that have strengthened internal financial controls. These initiatives include the implementation of the FACES Placement Provider Web application, the implementation of the agency's invoice tracking system, the re-training of the agency's fiscal staff and the

establishment of the Fiscal Office's Document Control Unit. These activities have increased control and oversight of the agency's payments to its child placement vendor community. CFSA will continue to monitor the progress of these initiatives and the performance of the agency in adhering to the procedures in place for proper review and certification invoices.

3.) CFSA's Fiscal Officer review the current filing and records retention system to identify needed improvements and implement policies and procedures to ensure adequate and effective financial accountability and records management.

**OCFO Response:** In order to centralize files, beginning in January 2005, the CFSA Fiscal Office established a Document Control Unit. The Unit was established in order to centralize files that had previously been kept by individual accounts payable and other fiscal staff throughout the office. The Document Control Unit is responsible for managing the documents that flow through the CFSA accounts payable area and maintain other information pertaining to the flow of fiscal documents. As part of this responsibility, the Unit receives mail and manages the ITS in terms of inputting and closing out invoice activities. The Unit is also responsible for maintaining the Fiscal Office's central file room, which is located in a secure location near the Fiscal Office's work area.

As also noted above, in August 2006, the CFSA Fiscal Office engaged a consultant to work with and retrain the accounts payable and document control staff on the daily functions within the Fiscal Operations related to the processing, payment and subsequent retention of invoices through a central filing system, as well as the timely release of remittance advices and the short pay letters. The consultant worked extensively with staff to implement changes in procedures related to these processes. These procedures support the internal controls that are now in place and that, with the exception of the FACES component, adhere to the District's financial control standards.

The CFSA Fiscal Office is currently undertaking a project to image older financial documents and have them available in an electronic format. This project is designed to make space available for more current fiscal documents while ensuring access to older documents via electronic storage.

4.) CFSA's Fiscal Officer and Accounts Payable Supervisor immediately locate the 13 missing invoices totaling $1,125,315.51 to substantiate their proper payment.

**OCFO Response:** The CFSA is currently searching for the requested invoices. A portion of the requested records are being retrieved from an off-site location due to a project to image FY 2004 fiscal documents. Due to space limitations, the project is designed to make space available for more current fiscal documents while having access to older documents via electronic storage.

## FINDING 2:  CFSA'S FISCAL STAFF FAILED TO DOCUMENT THEIR VERIFICATION OF CONTRACTED PER DIEM RATES PRIOR TO PAYING VENDOR INVOICES

**OCFO Response to Finding:**  There is a three fold process CFSA utilizes to verify contracted per diem rates prior to paying vendor invoices.

1. Fiscal Verification of Per Diem Rates – The CFSA Fiscal Office requires copies of Schedule B of the Contract which lists the contracted per diem rates before funding is approved.  Upon obtaining a signed Funding Document which serves as verification of funds at the inception of a contract, the Fiscal Office is to be provided a copy of Schedule B and Section C (scope of work) of the Contract from the Contracts and Procurement Administration.  The Fiscal staff requires and verifies this information before the Funding Document receives final sign-off.  Copies of these documents are maintained by the Fiscal Office's Budget staff, with copies given to the Accounts Payable technicians.

2. Contracts Verification of Per Diem Rates – The Contracts and Procurement Administration is the only administration with the capability to enter per diem rates into FACES.  FACES entry is done at the beginning of each performance period.  Entry is based on Schedule B of the contract or on contract modifications.  Any changes in the per diem rates are accompanied by a contract modification which is sent to the Fiscal Office when requesting funding approval for the modification.

3. Placement Provider Web which was put into effect in November 2006 does not allow a vendor to produce and invoice for a per diem rate other that that which is loaded into the FACES system by the Contracts and Procurement Administration staff.

**Auditor Recommendations to Finding 2:**

1.) CFSA's Contract Specialists and Program Monitors should communicate with CFSA's Accounts Payable Technicians routinely and regularly and provide supporting documentation regarding specific contract terms, including per diem rates that directly affect provider payments.  Proper and current documentation should be retained by CFSA's Fiscal Office for a minimum of five years.

**OCFO Response:**  As noted above, regular and routine communications do occur between the Contracts and Procurement Administration and Fiscal Office staffs with regard to contract issues. CFSA Fiscal staff receives copies of the schedules.  Accounts Payable staff will be re-trained on this procedure, with an emphasis on review these documents prior to making payments.

2.) After contract award, the assigned Contract Specialist immediately forwards a copy of the contract's Price Schedule to the assigned Program Monitor and Accounts

Payable Technician as a notification of the contracted per diem rates. Whenever per diem rate adjustments are negotiated and approved, the Contract Specialist should immediately notify the Program Monitor and Accounts Payable Technician of the revised rates, provide a new Price Schedule, and retain documentation of negotiated changes in the contract file.

**OCFO Response:** As noted above, contract price schedules are forwarded by the Contracts Specialists to the Program Monitor and the Fiscal Office. The Accounts Payable staff then review the rates placed in FACES with the price schedules.

3.) When reviewing invoices for payment approval, the Program Monitor and Contract Specialist verify the accuracy of per diem rates by reviewing the contract and certify their review by initialing the rate shown on the provider's invoice.

**OCFO Response:** As previously noted, contract price schedules are forwarded by the Contracts Specialists to the Program Monitor and the Fiscal Office. The Accounts Payable staff then review the rates placed in FACES with the price schedules.

4.) Accounts Payable Technicians verify the accuracy of the per diem rate by comparing the invoiced per diem rate to the most recent documentation received from the Contract Specialist. All differences should be resolved with the Contract Specialist based on documented evidence.

**OCFO Response:** As noted above, the CFSA Fiscal staff receives these documents from the Contracts Specialist. Further, the Accounts Payable staff review the per diem rates that are placed in FACES and compare them to the current contract. Contract Specialists are responsible for entering the contract rates into FACES. Accounts Payable staff will be re-trained on this procedure, with an emphasis on review these documents prior to making payments.

5.) CFSA's Fiscal Officer requires Accounts Payable Technicians to verify the existence of a valid contract prior to processing provider payments. No services should be ordered or accepted from contractors or vendor and no payments should be made in the absence of a valid contract.

**OCFO Response:** See response below.

## FINDING 3: CFSA'S FISCAL STAFF MADE PAYMENTS TO A PROVIDER IN THE ABSENCE OF A VALID EXECUTED CONTRACT THAT WAS NOT RATIFIED

**OCFO Response to Finding:** As noted in the draft report, CFSA uses a federally approved Statewide Automated Child Welfare System (SACWIS) known as "FACES" to document all placement and payment information for children that enter into the District's child welfare system. The development, implementation and maintenance costs of SACWIS systems such as FACES are partially funded by the federal government;

therefore, the District is required to utilize the functionalities of the system or be subject to financial penalties from the federal government. As part of the Federal approval to be a certified SACWIS system, and in order to obtain federal funds, a functionality of the FACES system is to makes child-specific payments for all services provided on behalf of the children that enter into care. CFSA is therefore unique from other District agencies insofar as these services are not managed or paid through the District's PASS procurement system. Because of the federal requirements, the vendor placement contracts are not managed with a purchase order system and funds supporting these contracts are not obligated or encumbered through the District's SOAR system. However, as the Auditor's draft report notes, payments made through the FACES system are interfaced with SOAR to generate payment checks.

With regard to payment for placement services, there are several administrations within the CFSA organization that are responsible for ensuring that payments are made accurately and in conformance with the terms of the vendor contracts:

- o   First, it is the responsibility of the social worker assigned to the child to document the placement decision made for placement.
- o   Second, it is the responsibility of the Placement Unit to monitor all CFSA placements and ensure that any changes to all child placements are recorded as quickly as possible in FACES.
- o   Third, it is the responsibility of the Contracts and Procurement Administration to enter and maintain the relevant contractual data (service(s) that are contracted, negotiated rates for the service(s), number of children to be served, contract period for the service(s), and total value of contract) within FACES.
- o   Finally, it is the responsibility of the Fiscal Office to pay services invoiced, based on a review of the invoice and a determination of the final amount to be paid.

Each of these responsibilities are segregated within FACES based on which part of the agency an employee works in and on the security level provided by the FACES internal security staff. For each of these areas, there are procedures in place to ensure that all data into FACES is as accurate and as timely as possible.

With regard to this circumstance, payments were made to this contractor under the period in question. Contract negotiations with the vendor were protracted and contentious and discussions were ongoing for a long period of time. Despite the fact the vendor was not under contract, services continued to be provided to these children. To cut off payments to the vendor would have meant having to displace children from their existing placement and find new and appropriate placements on short notice. The children served by this vendor are among the very hardest to place—adolescent children who are not with a foster family. While the agency has attempted to develop additional placement resources for this hard to serve population, the ability to attract and retain stable and reliable vendors to serve these children has been difficult, as documented by the agency. Second, in light of this difficulty and given the requirements of the *LaShawn* Court Order, alternative and comparable placements for these children may not have readily existed.

The vendor in question now has letter contract that is set to expire on April 30, 2008. Future payments without a contract for this or any other vendor will not be made without prior and specific approval from the Central CFO office.

### Auditor Recommendations to Finding 3:

1.) CFSA's Fiscal Officer require Accounts Payable Technicians to verify the existence of a valid contract prior to processing provider payments. No services should be ordered and no payments should be made in the absence of a contract.

   **OCFO Response:** See response above.

2.) Since there is no valid contract between CFSA and Jones and Associates, goods and services provided by the vendor to CFSA were improper and therefore must be immediately cease until a valid written contract is awarded to the vendor. Further, all payments made to or owed to Jones and Associates are improper in the absence of a valid written contract and must first be authorized through the District's procurement ratification process.

   **OCFO Response:** CFSA has executed two letter contracts with Jones and Associates to provide services. The first letter contract ran from January 1, 2008 through February 29, 2008. The second letter contract is for the period of March 1, 2008 through April 30, 2008. If no contract is in place for services after April 30th, future payments without a contract will not be made without prior specific approval from the Central CFO office.

3.) CFSA personnel authorizing the delivery of goods and services and payments to a vendor in the absence of a valid written contract must be held accountable to the fullest extent permissible, including termination, under the provisions of applicable District personnel law and rules.

   **OCFO Response:** All CFSA Fiscal staff has been counseled on the District's requirement that no payments are to be made to vendors without valid written contract. Future payments without a contract will not be made without prior specific approval from the Central CFO office.

### FINDING 4: CFSA FISCAL OFFICER AND CONTRACTING OFFICER HAVE NOT PROPERLY MONITORED CONTRACT COST RESULTING IN PAYMENT EXCEEDING CONTRACT COST LIMITS

**OCFO Response to Finding:** The scope of the audit covers five contracts, each with a base year and three option years, for a total of 20 contract years and $33,183,825. Of the 20 contract actions, one contract action, the base contract year for Echelon (for

Audit of CFSA's Congregate Care Contract Expenditures
March 24, 2008
Page 12

the period of July 1, 2004 through June 30, 2005), appears to have had payments made in excess of its contract by $43,400 for services provided to children.

### Auditor Recommendations to Finding 4:

1.) CFSA Fiscal Officer, C&P Administrator and CFSA IT Technicians within 30 days develop a means to properly account for payments by contract number within FACES, as well as develop a monthly report by contract number, type of service, per diem and service date.

   **OCFO Response:** This capability already exists within FACES and reports can be generated.

2.) CFSA provide this report to the Auditor each month, in hard copy and electronic format, until further notice.

   **OCFO Response:** CFSA will provide the requested reports.

3.) CFSA Fiscal Officer and CFSA IT Technicians within 10 days of this draft report provide the Auditor a listing of all scheduled and demand payments approved and issued through FACES for each of the providers by contract number from July 1, 2004 through December 31, 2007.

   **OCFO Response:** This listing has been provided to the Auditor.

In closing, we appreciate the opportunity to respond to the findings of this draft audit report. If you have any questions or need additional information, please contact me at (202) 442-6433, or Justin Kopca, Agency Fiscal Officer for the Child and Family Services Agency, at (202) 727-7676.

Sincerely,

Robert G. Andary
Executive Director

cc: Sharlynn E. Bobo, Ph.D, Director, Child and Family Services Agency
Deloras Shepherd, ACFO, Human Support Services Cluster
Justin Kopca, Agency Fiscal Officer, Child and Family Services Agency

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
Office of the Chief Financial Officer

Office of Integrity and Oversight



March 18, 2008

Deborah K. Nichols
District of Columbia Auditor
717 Fourteenth St., NW, Suite 900
Washington D.C. 20005

Dear Ms. Nichols:

Thank you for the opportunity to respond to the recommendations in your draft audit reports regarding the Child and Family Services Agency. Detailed responses to the recommendations in both reports are being prepared by Ms. Deloras Shepherd, Associate Chief Financial Officer for Human Support Services Cluster, who will communicate her responses to you in a separate letter.

However, the draft audit report captioned "Audit of Child and Family Services Agency's Contracting and Quality Assurance Procedures" raised issues concerning possible Anti-Deficiency Act violations in recommendations four and six on pages 18-19. Please be advised that I will refer these issues to the Chairperson of the Board of Review for Anti-Deficiency Violations so that the final audit report can be reviewed by the Board at an upcoming meeting to determine whether the report discloses potential violations of D.C. Code §47-355.02. Any potential violations will then be addressed and resolved according to the Board's established procedures.

Sincerely,

Robert G. Andary
Executive Director

cc: Deloras Shepherd, Associate Chief Financial Officer, Human Support Services Cluster



---

# PICT
~~visit~~ ⊙examiner.com

## WHAT'S MAKING NEWS
# Council members blast plan to double ambulance fees

D.C. Council members took turns torching Fire Chief Dennis Rubin on Tuesday over a proposal that would nearly double ambulance fees.

Mayor Adrian Fenty wants the increase, but it fell to Rubin to defend the proposal during a Judiciary Committee hearing. Rubin said the fees were needed to offset the cost of spurious trips and might persuade the public to request an ambulance only in emergencies.

"How can you justify this?" asked chair Phil Mendelson, D-at large. Mary Cheh, D-Ward 3, attacked the proposal and got Rubin to admit that the department would likely waive fees for people who couldn't pay. Yvette Alexander, D-Ward 7, said she was worried about the credit of people who default.

Last year, patients had to pay $268 for a basic life-support ride in an ambulance and $471 for an advanced life-support ride. Under the new fees, basic life-support rides will cost $530, level-one advanced life support will cost $832 and level-two advanced life support will cost $953. – *Bill Myers*

── association, and Klaus Peters, of the to donate bed frames, mattresses, box ouses in Northwest. The donation was Mary Cheh, D-Ward 3, who recently ·appalled." "The conditions that I found "To me, we have every responsibility to best, not the worst."

---

## TODAY'S TOP STORY » INVESTIGATION

# Child welfare agency gave millions to uncontracted company, audit finds

### Department struggling with huge case backlog

By Dena Levitz
and Bill Myers
Examiner Staff Writers

D.C.'s struggling child welfare agency handed out millions of public dollars to contractors with little regard for laws and rules, a scathing new audit has found.

D.C. Auditor Deborah K. Nichols concluded that bureaucrats at the Child and Family Services Agency gave nearly $2 million per year for several years to a local company without a contract, raising disturbing questions about who is controlling the $292 million agency's purse strings.

Nichols' litany of revelations comes as the Child and Family Services Agency grapples with its largest-ever case backlog and its department head answers questions from anxious reformers about next year's budget.

D.C. Council Member Tommy Wells, who asked for the audit, told *The Examiner* he was extremely troubled by the findings.

"I'm very concerned about their capacity to handle and let contracts. Very concerned about the quality the care," he said. "These children are our wards."



Sharlyn Bobo, director of D.C.'s Child and Family Services Agency, has come under fire in an audit by Deborah K. Nichols. – *Andrew Harnik/Examiner file*

Wells is scheduled to convene a budget hearing for the agency Saturday.

The child welfare agency has been swamped with cases since Jan. 9, when the bodies of Banita Jacks' four daughters were found in a squatter's home in far Southeast. Many are concerned that CFSA — long under court monitoring — could be on the verge of collapse.

Nichols called Sharlyn Bobo's management of the agency "grossly deficient" and made 33 recommendations for drastic improvements.

City officials declined comment for this story.

Nichols' auditors cited high turnover in CFSA's staff, especially at the top tier, as a major cause behind the problems. They also cite the agency for failing to perform background checks on contracts and handing out nearly $2 million

### By the numbers

*Caseload increases since the Jacks case*

» **Backlog:** 1,800 open investigations; 1,200 of them are 30 days or older
» **January:** 3,400 hot line calls; 36 percent resulted in new investigations
» **February:** 3,900 calls, 54 percent resulted in new investigations
» **March:** 2,500 calls; 58 percent resulted in new investigations

since 2006 to Jones and Associates without a contract.

The child welfare agency has been under fire for years. In 2006 a federal court-appointed monitor documented many of the problems mentioned in the new audit. CFSA, though, has failed to fix its operations, Nichols found.

Nichols' report, dated April 1, was released Tuesday. At the same time the report was coming out, Bobo met with a packed room of child-welfare activists to describe her plans for the troubled department.

The agency is now trying to dig its way out of 1,800 abuse and neglect complaints, Bobo said. Most of them have come in the way of the Jacks case.

*dlevitz@dcexaminer.com*
*bmyers@dcexaminer.com*

---

# Father of dead Jacks girl files $25M suit against city

COUNCIL *Washington Post April 13, 2008*

# Paper Trail for Contracts Falls Short, Auditor Says

## *No Evidence of Impropriety, But Family Services Agency Urged to Tighten Controls*

By SUE ANNE PRESSLEY MONTES
*Washington Post Staff Writer*

D.C. Auditor Deborah K. Nichols said yesterday that the city's Child and Family Services Agency has used "sloppy practices" in its handling of millions of dollars in contracts but did not pay anyone who had not provided services to the agency.

Speaking at a day-long hearing before D.C. Council member Tommy Wells (D-Ward 6), Nichols said that one of the contractors, Jones and Associates, had received nearly $2 million in payments without a properly ratified contract. But the firm, which provides independent-living arrangements for teenagers, had gone "above and beyond" its duties in providing services to the community, she said.

The firm might even have been slightly underpaid, Nichols said. It provided extra services that could have earned it more if a contract had been in place.

"That situation could have resulted in a decline in the quality of services being provided," she said. "A lot will take the attitude, 'If you don't pay me, I might change the quality of what I give to you.' But in this case, that didn't occur."

Wells, who scheduled the unusual Saturday hearing, had ordered a review of the agency's contracts and contracting procedures. He joked to about 100 people who attended that "we'll just pretend it's raining all day long." But he also acknowledged that a tragedy, the discovery of the bodies of four young girls in a Southeast Washington home in January and the arrest of their mother, Banita Jacks, on murder charges, has forced officials and agencies to reassess their procedures.

Concerns about the family had been reported to the Child and Family Services Agency. Mayor Adrian M. Fenty (D) subsequently fired six social workers who were associated with the case.

"We've got to take a long, hard look at the mistakes we've made," Wells said yesterday. "The cost is just too high. It literally means the difference between life and death."

Nichols said she found no evidence of improperly paid funds, but she did note "unacceptable" business practices that "undermine the integrity" of the agency.

"When you are dealing with a situation where you do not have a paper trail, that's a big concern to me," she said. "You have to be able to provide a record of payments. That must change."

Nichols recommended that the agency's staff be better trained on how to assess and monitor the contracts. When Wells asked how long that might take, she replied: "Really, just a couple of weeks. It's just a matter of sitting down and developing, writing out, these procedures. I would think that's a relatively simple task."

Wells agreed and called for immediate action. "It's a management issue," he said, "and there can be no excuses."

## CHILD AND FAMILY SERVICES

# Audit Faults City Agency On Monitoring Contracts

## *One Firm Got $2 Million Before Deal Was Approved*

By PETULA DVORAK
Washington Post Staff Writer

Besides a record backlog of cases and a strained workforce, the city's Child and Family Services Agency is struggling with the improper monitoring of millions of dollars in contracts, according to an audit released last week.

The audit's findings will be one of the main topics of discussion Saturday when D.C. Council member Tommy Wells (D-Ward 6), who ordered the audit, has a budget hearing for the agency, said agency spokeswoman Mindy Good.

In her report, D.C. Auditor Deborah K. Nichols said that in the past four years, the agency never developed "adequate internal controls to ensure efficient operations and compliance with applicable laws and regulations."

The agency had problems following District procedures when it came to contracting with outside agencies that share the city's child abuse and neglect caseloads. The most eye-catching example of this was the case of Jones and Associates, which provides independent living situations for teenagers. It received almost $2 million in payments without having a contract that was properly ratified by the District's Office of Procurement, according to the report, which was first reported in the Examiner.

One of the biggest reasons for the faulty paperwork, the auditor's report concluded, was high turnover in key management positions at the agency.

This problem was highlighted last week by Judith W. Meltzer, the court monitor whose report was central in a U.S. District Court hearing evaluating the status of the long-troubled agency.

"We have been concerned about the need to improve contracting operations for some time," Meltzer said.

For last week's hearing, Meltzer issued a six-month stabilization plan that said the agency must find a permanent contracts and procurement administrator and move forward with plans for performance-based contracting.

The agency has been under siege since four girls were found dead inside their Southeast Washington home in January, months after concerns about the family had been reported to social workers. The girls' mother, Banita Jacks, has been charged with murder.

Mayor Adrian M. Fenty (D) fired six social workers who were associated with the case, a move that department employees said crushed morale. Meanwhile, the child welfare agency has been bombarded with reports of neglect or abuse from people worried that they might be witnessing another potential Jacks tragedy.

The audit focused on problems with contracting in the years before Sharlynn Bobo became the agency's director last year, and she said she has been trying to improve it. In every case cited in the report, including the $2 million payment to Jones and Associates, the agency knew what it was paying for, she said.

"The children never suffered for lack of service," Bobo said. But, she added, "there shouldn't be any excuse for not having a contract." Since the audit was released last week, most big contracts have been signed and finalized, she said.



BY JACQUELYN MARTIN — ASSOCIATED PRESS

**D.C. Council member Tommy Wells (D-Ward 6) will have a hearing on the troubled agency's budget Saturday.**



BY JAMES M. THRESHER — THE WASHINGTON POST

**D.C. Auditor Deborah K. Nichols found that Child and Family Services hasn't developed proper rules for contracting.**

# D.C.

# AUDITORS'

# REPORT

# ON

# CFSA

# APRIL 1, 2008



# OFFICE OF THE DISTRICT OF COLUMBIA AUDITOR
717 14TH STREET N.W., SUITE 900
WASHINGTON, D.C. 20005
TEL. 202-727-3600 • FAX: 202-724-8814

Deborah K. Nichols
District of Columbia Auditor
009:08:CTA:NW:MM:gk

**Audit of Child and Family Services Agency's
Congregate Care Contract Expenditures**

**April 1, 2008**

# TABLE OF CONTENTS

*EXECUTIVE SUMMARY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

PURPOSE . . . . . . . . . . . . . . . . . . . . . . . . . . . •. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

OBJECTIVES, SCOPE, AND METHODOLOGY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

CFSA's Invoicing and Payment Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

CFSA's Fiscal Officer and Other CFSA Administrators Failed to Establish
  Adequate Internal Controls to Prevent Errors and Other Improprieties . . . . . . . . . . . . . 7

CFSA'S Fiscal Staff Failed to Document Their Verification of Contracted
  Per Diem Rates Prior to Paying Provider Invoices . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

CFSA's Fiscal Staff Made Payments to a Provider In the Absence of a
  Valid Executed Contract That Were Not Ratified by the District's
  Chief Procurement Officer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CFSA's Fiscal Officer and Contracting Officer Have Not Properly Monitored
  and Accounted for Contract Cost Resulting in Payments That May
  Have Exceeded Contract Cost Limits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## EXECUTIVE SUMMARY

### PURPOSE

Pursuant to a request from Councilmember Tommy Wells, Chairperson, Committee on Human Services, and in accordance with section 455 of the District of Columbia Home Rule Act, as amended, Pub.L. No. 93-198, the District of Columbia Auditor (Auditor) conducted an audit of payments made by the Child and Family Services Agency (CFSA) under five congregate care contracts.

### CONCLUSION

The Auditor's examination found that CFSA's Fiscal Officer and other CFSA Administrators failed to establish adequate internal controls to prevent errors and potential improprieties in payments made to congregate care providers. The Auditor's review found that CFSA's invoice files lacked evidence that Fiscal Office staff consistently verified contracted per diem rates with CFSA's Office of Licensing and Monitoring or Contracting and Procurement Administration personnel, and handwritten changes to invoiced per diem rates were not adequately explained, justified, or documented in the paid invoice files.

The Auditor also found that since August 31, 2006 CFSA made improper payments totaling $1,985,690.88 to a provider without a valid executed contract that were not ratified by the District's Chief Procurement Officer, as required. The Auditor further found that neither CFSA's Fiscal Officer nor Contracting and Procurement Administrator (C&P Administrator) properly monitored contract cost to ensure that payments did not exceed contract cost limits.

Finally, the Auditor found that neither CFSA's Fiscal Officer nor the C&P Administrator were able to identify and provide complete actual payments made to each of the 5 providers by contract number. The Auditor believes these are unacceptable business practices that undermine the integrity of CFSA's fiscal and procurement operations.

### MAJOR FINDINGS

1.  CFSA's Fiscal Officer and other CFSA Administrators failed to establish adequate internal controls to prevent errors and other improprieties.

2.  CFSA's fiscal staff failed to document their verification of contracted per diem rates prior to paying provider invoices.

6.  When reviewing invoices for payment approval, the Program Monitor and Contract Specialist verify the accuracy of per diem rates by reviewing the contract and certify their review by initialing the rate shown on the provider's invoice.

7.  Accounts Payable Technicians verify the accuracy of the per diem rate by comparing the invoiced per diem rate to the most recent rate documentation received from the Contract Specialist. All differences should be resolved with the Contract Specialist based on documented evidence.

8.  CFSA's Fiscal Officer require Accounts Payable Technicians to verify the existence of a valid contract prior to processing provider payments. No services should be ordered or accepted from contractors or vendors and no payments should be made in the absence of a valid executed contract.

9.  CFSA's Director ensure that payments made to Jones and Associates without a contract are promptly authorized through the District's procurement ratification process.

10. The District's CFO and CFSA's Director hold the Fiscal Officer, C&P Administrator, and other CFSA personnel authorizing the delivery of goods and services and payments to a vendor in the absence of a valid written contract accountable to the fullest extent permissible, including termination, under the provisions of applicable District personnel law and rules.

11. CFSA Fiscal Officer and C&P Administrator monitor payments issued to providers to properly ensure providers are not paid in excess of their approved contract limits.

12. CFSA Fiscal Officer, C&P Administrator, and CFSA IT Technicians within 30 days develop a means to properly account for payments by contract number within FACES, as well as develop a monthly report which details each payment made to a provider by contract number, invoice number, invoice date, check number, payment type (scheduled or demand payment), type of service, per diem, and service date.

13. CFSA provide this report to the Auditor by the 15th of each month, in hard copy and electronic format, until further notice.

iii

## PURPOSE

Pursuant to a request from Councilmember Tommy Wells, Chairperson, Committee on Human Services, and in accordance with section 455 of the District of Columbia Home Rule Act, as amended, Pub.L. No. 93-198,[1] the District of Columbia Auditor (Auditor) conducted an audit of payments made by the Child and Family Services Agency (CFSA) under five congregate care[2] contracts.

## OBJECTIVES, SCOPE, AND METHODOLOGY

The objectives of this audit were to determine whether:

1.   invoices for payment were accurate, adequately supported, and in compliance with the corresponding congregate care contract, applicable District laws and regulations, and other relevant guidelines; and

2.   payments made to congregate care providers were reasonable and allowable under the corresponding contract and consistent with the planned contract budget.

The scope of the audit covered the period October 1, 2004 through December 31, 2007. The Auditor examined supporting documentation for payments made during the audit period that were related to the following five congregate care contractors: #CFSA-04-C-0346, Echelon Community Services, Inc.; # CFSA-04-C-0363, Fihankra Place, Inc.; #CFSA-04-C-0350, Jones and Associates, Inc.; #CFSA-04-C-0340, TERRIFIC, Inc.; and #CFSA-04-C-0344, Umbrella, Inc.

In conducting this audit, the Auditor reviewed the contracts and contract modifications, contract budgets, CFSA's invoice payment procedures, and invoices and supporting documentation; and interviewed CFSA's finance staff and contractor personnel.

---

[1]*See* section 455 (b) of the District of Columbia Home Rule Act, approved December 24, 1973 (Pub. L. No. 93-198; 87 Stat. 803); D.C. Code § 1-204.55 (b) (2001) which states: "The District of Columbia shall each year conduct a thorough audit of the accounts and operations of the government of the District in accordance with such principles and procedures and under such rules and regulations as he [she] may prescribe. *See also* D.C. Code § 1-204.55 (c) which states: "The District of Columbia Auditor shall have access to all books, accounts, records, findings, and all other papers, things, or property belonging to or in use by any department, agency, or other instrumentality of the District government and necessary to facilitate the audit.'

[2]*See* RFP # CFSA-03-R-0005, dated July 28, 2003, p. 24, paragraphs C.1.1 through C.1.3.. Congregate care is one type of living environment in which children and youth in foster care may be placed. Unlike more family-based settings, congregate care facilities typically house several youth or children at a time. There are several categories of congregate care, some of which are: Diagnostic and Emergency Care, Traditional Group Home Care; Specialized Group Home Care; Independent Living Programs; Assisted Living Programs; Teen Parent Programs; and Community Based Return Diversion Programs.

The audit was conducted in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## BACKGROUND

On July 28, 2003, CFSA's Contracting and Procurement Administration (CPA) issued Request for Proposal (RFP) # CFSA-03-R-0005 to competitively obtain congregate care services from multiple contractors. The five congregate care contracts reviewed by the Auditor were awarded by CFSA as a result of that competitive process. Each of the contracts awarded by CFSA through this RFP were indefinite quantity contracts[3] covering the period July 1, 2004 through June 30, 2005 (base year) with four option years. Under these indefinite quantity contracts, contractors were to be paid a fixed unit/daily per diem rate based on the actual number of youth served. Additionally, some contracts contained provisions allowing contractors to be reimbursed for certain client specific costs, such as youth allowances, household supplies and furniture. Of the five contracts reviewed, two contained the reimbursement provisions: Fihankra Place, Inc., # CFSA-04-C-0363, and Jones and Associates, # CFSA-04-C-0350. Table I presents a summary of the congregate care service types and annual payment terms for the five sampled contracts.

---

[3] *See* 27 DCMR §2499, which defines an indefinite quantity contract as " a contract that provides for an indefinite quantity, within written stated limits, of specific supplies or services, to be furnished during a fixed period, with deliveries to be scheduled by placing orders with the contractor. The contract requires the District to order and the contractor to furnish at least a stated minimum of supplies or services."

2

**Table I**
**Congregate Care Service Types and Payment Terms (By Provider)**

| | | | | | | |
|---|---|---|---|---|---|---|
| Echelon Community Services, Inc. | Traditional Group Home | 9 | $200.00 | $657,000.00 | $0 | $657,000.00 |
| Fihankra Place, Inc. | Teen Parents Program | 24 | $186.05 | $1,629,798.00 | $359,986.00 | $1,989,784.00 |
| Jones and Associates, Inc. | Independent Living | 55 | $139.06 | $2,791,629.50 | $584,975.00 | $3,376,604.50 |
| TERRIFIC, Inc. | Traditional Group Home | 6 (Female) | $241.08 | $527,965.20 | $0 | $527,965.20 |
| | | 6 (Male) | $237.42 | $519,949.80 | $0 | $519,949.80 |
| Umbrella, Inc. | Traditional Group Home | 5 | $294.00 | $536,550.00 | $0 | $536,550.00 |
| TOTAL | | | | $6,662,892.50 | $944,961.00 | $7,607,853.50 |

Source: Contract files maintained by CFSA's Contracting and Procurement Administration

Per diem rates were determined during contract negotiations and were based on providers' budgeted direct costs (e.g., staff salaries and wages, fringe benefits, consultant fees, insurance, rent, transportation, and maintenance costs) and indirect costs (e.g., administrative and overhead costs) associated with providing the required congregate care services. As shown in each contract's Price Schedule, per diem rates increased by 3 percent in each option year as a cost of living adjustment. Appendix I presents the selected providers' line item budgets used to develop the negotiated per diem rates.

CFSA's Contracts and Procurement Administrator (C&P Administrator) modified some of the providers' contracts to increase the maximum number of youth to be served, termed "slots," thereby increasing the maximum amount to be paid to the provider under the contract. Table II presents contract modifications made to increase the maximum number of slots with certain providers.

3

## Table II
### Summary of Modifications to Increase Provider Slots

|  | Echelon Community Services | TERRIFIC, Inc. | TERRIFIC, Inc. | Umbrella |
|---|---|---|---|---|
| Contract Modification Number | M0002 | M0001 | M0002 | M0003 |
| Original # of Slots Prior to Modification | 9 | 6 | 6 | 5 |
| Per Diem Rate | $200.00 | $241.08 | $241.08 | $294.00 |
| Total Original Contract Amount Prior to Modification | $657, 000 | $527,965.20 | $527,965.20 | $536,550 |
| Effective Date of Change Per the Contract Modification | 7/1/06 | 12/28/04 | 7/1/05 | 7/1/06 |
| Total increase of # slot per the Contract Modification | 8 | 6 (female) Only for 185 days | 6 (female) | 13 |
| Revised # of Slots per the Contract Modification | 17 | 12 | 12 | 18 |
| Per Diem Rate | $213.00[4] | $241.08[5] | $246.55[6] | $213.00[7] |
| New Contract Value After Modification | $1,321,665.00 | $795,564.00 | $1,079,889.00 | $1,399,410.00 |

Source: CFSA's contract files

---

[4] Per diem rate as stated per the Contract Modification dated July 1, 2006 is less than Echelon's Community Services, Inc. option year 2 contracted per diem rate of $224.

[5] TERRIFIC, Inc. base year contracted per diem rate.

[6] TERRIFIC, Inc. option year 1 contracted per diem rate.

[7] Per diem rate as stated per the Contract Modification dated July 1, 2006 is less than Umbrella's contracted option year 2 per diem rate of $311.

4

**CFSA's Invoicing and Payment Process**

Providers invoice CFSA for two types of payments, **scheduled payments** which are based on the contracted per diem rate and the actual number of youth served and **demand payments** which typically are payments for reimbursable expenses. •

Scheduled Payments

CFSA uses a computerized case management system, FACES, to track each youth client's placement and maintain all relevant client and provider information, including billing and payment data. As of February 1, 2007, providers use a web-based application within FACES, known as Placement Provider Web (PPW), to prepare and verify monthly invoices.

Clients' service needs are identified and assessed by their assigned CFSA social worker. This assessment is formally communicated to the CFSA Placement Unit and CFSA Placement Unit determines the provider based on availability. When a client is placed with a provider, CFSA's Reconciliation Unit enters the date of service for the provider into FACES. The assigned CFSA Program Monitor and CFSA Placement staff will review the inputted data in FACES for accuracy. Providers are required to submit daily, weekly, and monthly census reports to CFSA's Office of Licensing and Monitoring (OLM), which CFSA uses to monitor the placement of youth. If a youth client is moved from one provider to another, it is the responsibility of CFSA's Reconciliation Unit to update FACES, indicating the youth's transfer.

On a monthly basis, FACES generates a Monthly Placement Utilization Report (MPUR) which shows the number of clients being served by each CFSA provider/contractor. At the end of each month, providers review the MPUR by accessing PPW to confirm their respective numbers of filled slots (clients served). Providers must notify CFSA's Placement Unit to resolve any noted errors. The provider's staff electronically approves the MPUR. FACES then automatically converts the MPUR data into a monthly invoice. A CFSA Accounts Payable Technician prints the invoice and a CFSA Document Control Technician then logs the invoice into CFSA's Invoice Tracking System (ITS). CFSA's ITS automatically assigns a unique identifying number to invoices when a Document Control Technician enters invoices into ITS. However, the Document Control Technician is responsible for writing this ITS document control number on the printed invoice. The assigned Accounts Payable Technician then processes the invoice for payment and sends the processed invoice to the Accounts Payable Supervisor for approval in FACES and ITS.

5

On a nightly basis, there is an automatic interface between FACES and the District's System of Accounting and Reporting (SOAR). Whenever invoices are generated in FACES, information is "shared" between the two systems. FACES transmits the following information to SOAR: provider/contractor name, contractor identification number, document tracking number, and invoice number. SOAR transmits the following information back to FACES: check number issued, check issue date, and check amount.

CFSA typically receives electronic invoices by the first of each month for services rendered during the immediately preceding month. CFSA's fiscal staff are to review invoices by the 15th of the month, with a goal of paying providers by the 20th day of each month.

Prior to the implementation of PPW in 2006, CFSA's invoice process was completely manual. The manual process required CFSA to mail each provider a monthly invoice based on the information shown in FACES. Providers would then verify the invoice's accuracy, sign it, and send it back to CFSA for payment.

<u>Demand Payments</u>

Demand payments are payments made to providers for their reimbursable expenses. Most of these expenses are not directly related to client services and may include: office expenses, household supplies, furniture, monthly allowances, rent, and utilities. The invoicing process for reimbursable expenses is manual, not automated. Therefore, to be reimbursed for allowable expenses, providers must submit "paper" invoices and supporting documentation to CFSA's Fiscal Office. Upon receipt of the invoice, the Document Control Technician logs it into the Invoice Tracking System (ITS) and distributes it to the assigned Accounts Payable Technician for processing. The Accounts Payable Technician will then forward the invoice to an assigned Specialist in the Contracting and Procurement Administration (CPA) for approval and certification. After approving the invoice, the Specialist forwards the invoice back to the assigned Accounts Payable Technician. It is the Accounts Payable Technician's responsibility to then process the invoice for payment by sending it to the Accounts Payable Supervisor for review and approval in FACES and ITS.

6

FINDINGS

## CFSA'S FISCAL OFFICER AND OTHER CFSA ADMINISTRATORS FAILED TO ESTABLISH ADEQUATE INTERNAL CONTROLS TO PREVENT ERRORS AND OTHER IMPROPRIETIES

To establish adequate internal controls, management must develop and implement policies and procedures to ensure effective and efficient operations and to establish accountability at all levels of the agency.[8] With regard to financial management, the Office of the Chief Financial Officer (OCFO) has established written policies and procedures concerning the disbursement of public funds. Specifically, the OCFO's Financial Policies and Procedures manual (FPPM), Section 3020.700, entitled Internal Control, states that all invoices are to be examined prior to certification of payment, and payments are not to be made until the certifying or disbursing officer determines that the payment is proper, correct, and supported by adequate documentation. The Auditor found that CFSA's Fiscal Officer and other CFSA administrators failed to establish and adhere to necessary internal financial controls to ensure that payments made to providers were appropriately authorized and properly supported.

The Auditor examined supporting documentation for a sample of 100 payments made to the five congregate care contractors. The Auditor found that:

- CFSA's Fiscal Office staff could not locate 11 invoices totaling $1,190,968.48;

- CFSA's Accounts Payable Technician failed to use required Notification of Short/Adjustment Payment forms to properly justify and support alterations made to 21 invoices totaling $2,817,847.82;

- CFSA's Accounts Payable staff improperly paid one invoice totaling $101,360.70 which was based on the use of an inaccurate per diem rate;

- CFSA's Accounts Payable staff paid three invoices totaling $206,532.22 which lacked proper supporting documentation;

---

[8]*See* D. Keith Wilson, C.P.A. et. al., PPC's Guide to Internal Control and Fraud Prevention, Second Edition, Practitioners Publishing Company, December 2003, p.1-6, which states: "Internal control is a process−effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding achievement of objectives in the following categories: (a) reliability of financial reporting; (b) effectiveness and efficiency of operations; and (c) compliance with applicable laws and regulations.

7

- CFSA paid 24 invoices totaling $2,855,586.40 which lacked the provider's required certifying signature; and

- 37 invoices totaling $4,956,670.94 lacked CFSA document tracking numbers.[9] The document tracking number aids CFSA's Accounts Payable staff in locating processed and paid invoices.

The Auditor further found that the Accounts Payable Supervisor did not adequately review Accounts Payable Technicians' work to ensure compliance with CFSA's invoice payment procedures. Moreover, due to an inadequate recordkeeping system, and the Document Control Technician's failure to consistently write assigned tracking numbers on invoices, paid invoices and their supporting documentation could not be readily retrieved.

## RECOMMENDATIONS

1.  CFSA's Fiscal Officer establish standard operating policies and procedures for the review and verification of charges invoiced by contractors/vendors prior to certification of payment. In doing so, CFSA's Fiscal Officer should also include compliance with the OCFO's internal control policies and procedures related to invoice review and certification as a performance measure for employee performance evaluation purposes.

2.  CFSA's Fiscal Officer actively enforce the OCFO's guidelines regarding the effective review and certification of invoices and supporting documentation before authorizing payment. CFSA employees violating the OCFO's guidelines must be immediately held accountable under the appropriate applicable personnel rules and procedures to the fullest extent permitted.

3.  CFSA's Fiscal Officer review the current filing and records retention system to identify needed improvements and implement policies and procedures to ensure adequate and effective financial accountability and records management.

4.  CFSA's Fiscal Officer and Accounts Payable Supervisor immediately locate the 11 missing invoices totaling $1,190,968.48 to substantiate their proper payment.

---

[9]CFSA's Invoice Tracking System (ITS) automatically assigns a unique identifying number to invoices when a Document Control Clerk/Technician enters them into ITS.

5.   CFSA's Fiscal Officer and Accounts Payable Supervisor develop and implement procedures to ensure that Accounts Payable Technicians adhere to CFSA's invoice payment policies and procedures and always utilize the CFSA Payment Short/Adjustment forms when altering or adjusting monthly invoices.

•

6.   The Accounts Payable Supervisor ensure that Document Control Technicians assign a Document Tracking System number to all invoices prior to forwarding them to Accounts Payable Technicians for processing. Accounts Payable Technicians must be required to return all invoices not bearing a tracking number to the Document Control Technician for assignment of a tracking number.

## CFSA'S Fiscal Staff Failed to Document Their Verification of Contracted Per Diem Rates Prior to Paying Provider Invoices

Consistent with CFSA's Accounts Payable Technician Procedures,[10] a provider must submit backup documentation as required by the corresponding contract, and sign each monthly invoice as certification that the youth/children received the invoiced services. These invoices must also be certified by a Program Monitor in CFSA's Office of Licensing and Monitoring (OLM) or the assigned Specialist in CPA.

The Auditor found that paid invoice files did not contain evidence that Fiscal Office staff consistently verified contracted per diem rates with OLM or CPA personnel. Further, handwritten changes to invoiced per diem rates were not adequately explained, justified, or documented in the paid invoice files.

Additionally, the Auditor determined that CFSA contracting and accounts payable staff retained sufficient information to support the per diems paid to only two of the five sampled congregate care providers. For the remaining three providers, contract files and payment files lacked documentation of and justification for the per diem rates paid. CFSA contracting staff failed to retain Memoranda of Negotiations or Business Clearance Memoranda, which should have fully documented the negotiated per diem rates for the contract's base year and the four option years. CFSA contracting staff also failed to retain the original contract budget for Jones and Associates.

In accordance with the providers' contracts, per diem rates increased during each of the four option years. CFSA has not formally exercised options or negotiated a new contract with Jones and Associates. Further, between October 26, 2004 and January 1, 2008, CFSA paid Jones and

---

[10]*See* CFSA's Accounts Payable Technician Procedures, dated June 18, 2007, p. 8.

9

Associates an unadjusted per diem rate of $139.06. However, CFSA's C&P Administrator increased Jones and Associates per diem rate to $160 per day per child in January 2008, but failed to prepare written justification for the $21 increase.[11] The increased per diem rate is improper in absence of a valid contract between CFSA and Jones and Associates.

•

## RECOMMENDATIONS

1.  CFSA's Contract Specialists and Program Monitors communicate with CFSA's Accounts Payable Technicians regularly and provide supporting documentation regarding specific contract terms, including per diem rates that directly affect provider payments. Proper and current documentation should be retained by CFSA's Fiscal Office for a minium of five years.

2.  After contract award, the assigned Contract Specialist immediately forward a copy of the contract's Price Schedule to the assigned Program Monitor and Accounts Payable Technician as notification of the contracted per diem rates. Whenever per diem rate adjustments are negotiated and approved, the Contract Specialist should immediately notify the Program Monitor and Accounts Payable Technician of the revised rates, provide a new Price Schedule, and retain documentation of negotiated changes in the contract file.

3.  When reviewing invoices for payment approval, the Program Monitor and Contract Specialist verify the accuracy of per diem rates by reviewing the contract and certify their review by initialing the rate shown on the provider's invoice.

4.  Accounts Payable Technicians verify the accuracy of the per diem rate by comparing the invoiced per diem rate to the most recent rate documentation received from the Contract Specialist. All differences should be resolved with the Contract Specialist based on documented evidence.

5.  CFSA's Fiscal Officer require Accounts Payable Technicians to verify the existence of a valid contract prior to processing provider payments. No services should be ordered or accepted from contractors or vendors and no payments should be made in the absence of a valid executed contract.

---

[11] *See* CFSA's proposed Letter Contract # CFSA-08-C-0168, submitted to Jones and Associates on January 2, 2008.

10

**CFSA's Fiscal Staff Made Payments to a Provider In the Absence of a Valid Executed Contract That Were Not Ratified by the District's Chief Procurement Officer**

The Auditor found that since August 31, 2006, Jones and Associates has provided services without a contract and received payments totaling $1,985,690.88 that were not ratified by the District's Chief Procurement Officer, as required. Effective August 9, 2006, the CPO issued OCP Policy Directive 1800.04 establishing procedures for the ratification of unauthorized commitments.[12] This policy directive applied to all agencies of the District government that contract pursuant to the provisions of the Procurement Practices Act, as amended.[13] The policy directive requires the submission of a ratification request package that must be approved by either the CPO or Council in order to pay a vendor for unauthorized commitments.[14] All payments issued and authorized by CFSA's Fiscal Officer, C&P Administrator, and other CFSA personnel to Jones and Associates are improper in the absence of a valid written contract.

## RECOMMENDATIONS

1.  CFSA's Fiscal Officer require Accounts Payable Technicians to verify the existence of a valid contract prior to processing provider payments. No services should be ordered or accepted from contractors or vendors and no payments should be made in the absence of a valid executed contract.

2.  CFSA's Director ensure that payments made to Jones and Associates without a contract are promptly authorized through the District's procurement ratification process.

3.  The District's CFO and CFSA's Director hold the CFSA's Fiscal Officer, C&P Administrator, and other CFSA personnel authorizing the delivery of goods and services and payments to a vendor in the absence of a valid written contract accountable to the fullest extent permissible, including termination, under the provisions of applicable District personnel law and rules.

---

[12] A *ratification* is the action or process by which the CPO authorizes payment for goods or services received by the District without a valid written contract. *See* OCP Directive 1800.04, effective August 9, 2006.

[13] *See* the District of Columbia Procurement Practices Act of 1985, effective February 21, 1986 (D.C. Law 6-85; D.C. Code § 2-302.02 (b)) *See also* OCP Directive 1800.04, effective August 9, 2006, p. 1.

[14] *See* Section 5.5 of OCP Directive 1800.04, effective August 9, 2006, p. 3-4, which states that: ""[F]or a Ratification Package that either exceeds $100,000 or is after the first two (2) requests submitted and approved on a vendor's behalf, the Ratification Package must first be approved by the Council before the CPO is authorized to take final action or Ratification Package."

## CFSA's FISCAL OFFICER AND CONTRACTING OFFICER HAVE NOT PROPERLY MONITORED AND ACCOUNTED FOR CONTRACT COST RESULTING IN PAYMENTS THAT MAY HAVE EXCEEDED CONTRACT COST LIMITS

CFSA's Fiscal Officer is responsible for oversight and direct supervision of the financial and budgetary functions of CFSA.  On the other hand, the C&P Administrator serves as CFSA's Chief Contracting Officer, responsible for overseeing, managing, and administering CFSA's contracts and procurement process.

CFSA's Fiscal Officer provided the Auditor with a listing of payments made to each of the providers by contract number for the audit period. Upon review and assessment of the data's integrity, the Auditor found that supporting information to validate the payment data was insufficient. The payment data lacked basic financial audit trail information such as:  the clients' name; the clients' date of birth; and the per diem rates used to arrive at the total payments. Further analysis by the Auditor revealed that payment information provided by CFSA's Fiscal Officer could not be reconciled with payment information provided by the care providers.

Because CFSA's Fiscal Officer and C&P Administrator did not monitor or adequately report the actual payments made to providers, providers may have been paid amounts in excess of their contract limits. In fact, according to CFSA's Fiscal Officer, payments to one provider exceeded the contracted limit by $43,400 for services provided to clients. CFSA's Fiscal Officer, however, failed to provide the Auditor with documentation to substantiate this overpayment.

### RECOMMENDATIONS:

1. CFSA Fiscal Officer and C&P Administrator monitor payments issued to providers to properly ensure providers are not paid in excess of their approved contract limits.

2. CFSA Fiscal Officer, C&P Administrator, and CFSA IT Technicians within 30 days develop a means to properly account for payments by contract number within FACES, as well as develop a monthly report which details each payment made to a provider by contract number, invoice number, invoice date, check number, payment type (scheduled or demand payment), type of service, per diem, and service date.

3. CFSA provide this report to the Auditor by the 15th of each month, in hard copy and electronic format, until further notice.

4.    CFSA's Fiscal Officer provide documentation supporting the $43,000 overpayment, within 10 days of this report. If substantiated, the Auditor will make further recommendations regarding the recovery of these overpayments.

## CONCLUSION

The Auditor's examination found that CFSA's Fiscal Officer and other CFSA Administrators failed to establish adequate internal controls to prevent errors and potential improprieties in payments made to congregate care providers. The Auditor's review found that CFSA's invoice files lacked evidence that Fiscal Office staff consistently verified contracted per diem rates with CFSA's Office of Licensing and Monitoring or Contracting and Procurement Administration personnel, and handwritten changes to invoiced per diem rates were not adequately explained, justified, or documented in the paid invoice files.

The Auditor also found that since August 31, 2006 CFSA made improper payments totaling $1,985,690.88 to a provider without a valid executed contract that were not ratified by the District's Chief Procurement Officer, as required. The Auditor further found that neither CFSA's Fiscal Officer nor Contracting and Procurement Administrator (C&P Administrator) properly monitored contract cost to ensure that payments did not exceed contract cost limits.

Finally, the Auditor found that neither CFSA's Fiscal Officer nor the C&P Administrator were able to identify and provide complete actual payments made to each of the 5 providers by contract number. The Auditor believes these are unacceptable business practices that undermine the integrity of CFSA's fiscal and procurement operations.

Respectfully submitted,

Deborah K. Nichols
District of Columbia Auditor

13

# APPENDIX

PROVIDER LINE ITEM BUDGETS AND PER DIEM RATES

**APPENDIX I**

BASE YEAR BUDGET

| Line Item /Expense Category | Echelon Community Services | % of Total Budget | Fihankra Place, Inc. | % of Total Budget | Jones & Associates | % of Total Budget | TERRIFIC, Inc. | | % of Total Budget | Umbrella, inc. | % of Total Budget |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Salaries | $ 826,880.00 | 63.6% | $ 759,202.00 | 46.6% | $ 1,162,750.00 | 41.7% | $ 604,664.00 | | 57.7% | $ 590,078.00 | 43.2% |
| Fringe Benefits | 147,312.32 | 11.3% | 172,319.00 | 10.6% | 289,067.00 | 10.4% | 125,020.00 | | 11.9% | 150,539.00 | 11.0% |
| Consultants/Experts | 79,560.00 | 6.1% | 18,200.00 | 1.1% | 124,067.00 | 4.4% | 4,500.00 | | 0.4% | 44,200.00 | 3.2% |
| Occupancy | 131,120.00 | 10.1% | 279,406.00 | 17.1% | 269,708.00 | 9.7% | 49,538.00 | | 4.7% | 216,000.00 | 15.8% |
| Travel and Transportation | 21,700.00 | 1.7% | 33,008.00 | 2.0% | 62,448.00 | 2.2% | 13,998.00 | | 1.3% | - | 0.0% |
| Supplies and Minor Equipment | 29,500.00 | 2.3% | 70,098.00 | 4.3% | 81,500.00 | 2.9% | 11,700.00 | | 1.3% | 51,600.00 | 3.8% |
| Capital Equipment & Outlays | - | 0.0% | - | 0.0% | - | 0.0% | 3,500.00 | | 0.3% | - | 0.0% |
| Client Costs | 48,130.00 | 3.7% | 289,888.00 | 17.8% | 503,475.00 | 18.0% | 44,876.00 | | 4.3% | 158,880.00 | 11.6% |
| Communications | 11,562.00 | 0.9% | 30,996.00 | 1.9% | 24,600.00 | 0.9% | 6,790.00 | | 0.6% | 5,100.00 | 0.4% |
| Other Direct Costs | 3,549.00 | 0.3% | 99,804.00 | 6.1% | 69,909.00 | 2.5% | 17,000.00 | | 1.6% | 52,434.00 | 3.8% |
| Indirect Costs/Overhead | - | 0.0% | 189,377.00 | 11.6% | 131,735.00 | 4.7% | 164,347.00 | | 15.7% | 58,825.00 | 4.3% |
| Subtotal Before Fees | 1,299,313.32 | 100.0% | 1,582,312.00 | 97.1% | 2,710,259.00 | 97.1% (a) | 1,047,933.00 | | 100.0% | 1,327,657.00 | 97.1% |
| Fee | - | 0.0% | 47,469.00 | 2.9% | 81,308.00 | 2.9% | - | | 0.0% | 39,830.00 | 2.9% |
| Total Budget | $ 1,299,313.32 | 100.0% | $ 1,629,781.00 | 100.0% | $ 2,791,567.00 (c) | 100.0% (a) | $ 1,047,933.00 (b) | | 100.0% | $ 1,367,487.00 | 100.0% |

| Per Diem Rates: | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Base Year | $ 200.00 | | $ 186.05 | | $ 139.06 | | $ 241.08 | $ 237.42 | | $ 294.00 | |
| Option Year 1 | $ 231.70 | | $ 191.47 | | $ 139.06 | | $ 246.55 | $ 244.21 | | $ 302.00 | |
| Option Year 2 | $ 224.00 | | $ 196.89 | | $ 143.22 | | $ 250.97 | $ 248.96 | | $ 311.00 | |
| Option Year 3 | $ 224.00 | | $ 202.30 | | $ 143.22 | | $ 258.95 | $ 256.43 | | $ 319.00 | |
| Option Year 4 | $ 247.00 | | $ 207.72 | | $ 147.51 | | $ 265.47 | $ 261.35 | | $ 328.00 | |
| | | | | | | | Females | Males | | | |

(a) The amount appears as shown in contractor's budget. Subtotal should be $2,719,259 and the total budget, including fee should be $2,800,567.

(b) TERRIFIC, Inc. was paid two different rates for male and female youth clients. The amount shown is the combined rate for both males and females.

(c) Jones and Associates totals per the providers' original FRP CFSA-03-005 Budget for October 1, 2003 to September 30, 2004. Revised Budegt for RFP, not retained by CFSA.

Source:  Budgets retained by CFSA's Contracting and Procurement Administration

PROVIDER PROPORTIONED PER DIEM RATES
BASED ON LINE ITEM BUDGETS

# APPENDIX I

| Line Item /Expense Category | Echelon Community Services | | Fihankra Place, Inc. | | Jones & Associates | | TERRIFIC, Inc. | | Umbrella, Inc. | |
|---|---|---|---|---|---|---|---|---|---|---|
| Base Year Per Diem Amount | $ | 200.00 | $ | 186.05 | $ | 139.06 | $ | 478.50 | $ | 294.00 |
| Salaries | $ | 127.28 | $ | 86.67 | $ | 57.88 | $ | 276.10 | $ | 126.86 |
| Fringe Benefits | $ | 22.68 | $ | 19.67 | $ | 14.35 | $ | 57.09 | $ | 32.36 |
| Consultants/Experts | $ | 12.25 | $ | 2.08 | $ | 6.14 | $ | 2.05 | $ | 9.50 |
| Occupancy | $ | 20.18 | $ | 31.90 | $ | 13.39 | $ | 22.62 | $ | 46.44 |
| Travel and Transportation | $ | 3.34 | $ | 3.77 | $ | 3.07 | $ | 6.39 | $ | - |
| Supplies and Minor Equipment | $ | 4.54 | $ | 8.00 | $ | 4.06 | $ | 6.26 | $ | 11.09 |
| Capital Equipment & Outlays | $ | - | $ | - | $ | - | $ | 1.60 | $ | - |
| Client Costs | $ | 7.41 | $ | 33.09 | $ | 25.04 | $ | 20.49 | $ | 34.16 |
| Communications | $ | 1.78 | $ | 3.54 | $ | 1.18 | $ | 3.10 | $ | 1.10 |
| Other Direct Costs | $ | 0.55 | $ | 11.39 | $ | 3.44 | $ | 7.76 | $ | 11.27 |
| Indirect Costs/Overhead | $ | - | $ | 21.62 | $ | 6.52 | $ | 75.04 | $ | 12.65 |
| Subtotal Before Fees | $ | 200.00 | $ | 221.73 | $ | 135.01 | $ | 478.50 | $ | 285.44 |
| Fee | $ | - | $ | 5.42 | $ | 4.05 | $ | - | $ | 8.56 |
| Total Budget | $ | 200.00 | $ | 227.14 | $ | 139.06 | $ | 478.50 (a) | $ | 294.00 |
| Less Reimbursable Client Costs: | | | | | | | | | | |
| Supplies and Minor Equipment | $ | - | $ | 8.00 (b) | $ | - | $ | - | $ | - |
| Client Costs | | - | | 33.09 (b) | | - | | - | | - |
| Female | | | | | | | $ | 241.08 | | |
| Male | | | | | | | $ | 237.42 | | |
| Reconciled Per Diem | $ | 200.00 | $ | 186.05 | $ | 139.06 | $ | 478.50 | $ | 294.00 |

(a) TERRIFIC, Inc. was paid two different rates for male and female youth clients. The amount shown is the combined rate for both males and females
(b) TERRIFIC, Inc. supplies, minor equipment, and client costs were deducted from the per diem rate because these expenses were included
within the providers' Budgeted reimbursable amount (as referenced in Table 1 of the Report). Supplies and Minor Equipments cover expenses
such as household supplies and furnishing, and office supplies and equipment. Client Costs include expenses such as food, clothing,
allowances, toiletries, and transportation.

PROVIDER ANNUAL BUDGET BREAKDOWN
BASED ON CONTRACTED NUMBER OF CLIENTS

**APPENDIX I**

Echelon Community Services, Inc.

| Line Item /Expense Category | Apportioned Per Diem | | Number of Clients (Base Year) | Annual Amount | |
|---|---|---|---|---|---|
| Salaries | $ | 127.27 | 9 | $ | 418,081.95 |
| Fringe Benefits | $ | 22.68 | 9 | $ | 74,503.80 |
| Consultants/Experts | $ | 12.25 | 9 | $ | 40,241.25 |
| Occupancy* | $ | 20.18 | 9 | $ | 66,291.30 |
| Travel and Transportation | $ | 3.34 | 9 | $ | 10,971.90 |
| Supplies and Minor Equipment | $ | 4.54 | 9 | $ | 14,913.90 |
| Capital Equipment & Outlays | $ | - | 9 | $ | - |
| Client Costs | $ | 7.41 | 9 | $ | 24,341.85 |
| Communications | $ | 1.78 | 9 | $ | 5,847.30 |
| Other Direct Costs | $ | 0.55 | 9 | $ | 1,806.75 |
| Indirect Costs/Overhead | $ | - | 9 | $ | - |
| Subtotal Before Fees | $ | 200.00 | | $ | 657,000.00 |
| Fee | $ | - | | | - |
| Total Budget | $ | 200.00 | | $ | 657,000.00 |

Fihankra Place, Inc.

| Line Item /Expense Category | Apportioned Per Diem | | Number of Clients (Base Year) | Annual Amount | |
|---|---|---|---|---|---|
| Salaries | $ | 86.66 | 24 | $ | 759,141.60 |
| Fringe Benefits | $ | 19.67 | 24 | $ | 172,309.20 |
| Consultants/Experts | $ | 2.08 | 24 | $ | 18,220.80 |
| Occupancy* | $ | 31.90 | 24 | $ | 279,444.00 |
| Travel and Transportation | $ | 3.77 | 24 | $ | 33,025.20 |
| Supplies and Minor Equipment | $ | 8.00 | 24 | $ | 70,080.00 |
| Capital Equipment & Outlays | $ | - | 24 | $ | - |
| Client Costs | $ | 33.09 | 24 | $ | 289,868.40 |
| Communications | $ | 3.54 | 24 | $ | 31,010.40 |
| Other Direct Costs | $ | 11.39 | 24 | $ | 99,776.40 |
| Indirect Costs/Overhead | $ | 21.62 | 24 | $ | 189,391.20 |
| Subtotal Before Fees | $ | 221.72 | | $ | 1,942,267.20 |
| Fee | $ | 5.42 | 24 | | 47,479.20 |
| Total Budget | $ | 227.14 | | $ | 1,989,746.40 |
| Amount To Be Paid As Reimbursable Expenses: | | | | | |
| Supplies and Minor Equipment | $ | 8.00 | 24 | $ | 70,080.00 |
| Client Costs | $ | 33.09 | 24 | $ | 289,868.40 |
| Amount Paid To be Paid As Scheduled Per Diem Payment | $ | 186.05 | | $ | 1,629,798.00 |

* Occupancy cost includes living expense such as trash, maintenance and repair, pest control, rent, utilities, and security.

PROVIDER ANNUAL BUDGET BREAKDOWN
BASED ON CONTRACTED NUMBER OF CLIENTS

APPENDIX I

Jones & Associates, Inc.

| Line Item /Expense Category | Apportioned Per Diem | | Number of Clients (Base Year) | Annual Amount | |
|---|---|---|---|---|---|
| Salaries | $ | 57.82 | • 55 | $ | 1,160,736.50 |
| Fringe Benefits | $ | 14.35 | 55 | $ | 288,076.25 |
| Consultants/Experts | $ | 6.14 | 55 | $ | 123,260.50 |
| Occupancy* | $ | 13.39 | 55 | $ | 268,804.25 |
| Travel and Transportation | $ | 3.07 | 55 | $ | 61,630.25 |
| Supplies and Minor Equipment | $ | 4.06 | 55 | $ | 81,504.50 |
| Capital Equipment & Outlays | $ | - | 55 | $ | - |
| Client Costs | $ | 25.04 | 55 | $ | 502,678.00 |
| Communications | $ | 1.18 | 55 | $ | 23,688.50 |
| Other Direct Costs | $ | 3.44 | 55 | $ | 69,058.00 |
| Indirect Costs/Overhead | $ | 6.52 | 55 | $ | 130,889.00 |
| Subtotal Before Fees | $ | 135.01 | | $ | 2,710,325.75 |
| Fee | $ | 4.05 | 55 | | 81,303.75 |
| Total Budget | $ | 139.06 | | $ | 2,791,629.50 |

TERRIFIC, Inc.

| Line Item /Expense Category | Apportioned Per Diem | | Number of Clients (Base Year) | Annual Amount | |
|---|---|---|---|---|---|
| Salaries | $ | 276.10 | 6 | $ | 604,659.00 |
| Fringe Benefits | $ | 57.09 | 6 | $ | 125,027.10 |
| Consultants/Experts | $ | 2.05 | 6 | $ | 4,489.50 |
| Occupancy* | $ | 22.62 | 6 | $ | 49,537.80 |
| Travel and Transportation | $ | 6.39 | 6 | $ | 13,994.10 |
| Supplies and Minor Equipment | $ | 6.26 | 6 | $ | 13,709.40 |
| Capital Equipment & Outlays | $ | 1.60 | 6 | $ | 3,504.00 |
| Client Costs | $ | 20.49 | 6 | $ | 44,873.10 |
| Communications | $ | 3.10 | 6 | $ | 6,789.00 |
| Other Direct Costs | $ | 7.76 | 6 | $ | 16,994.40 |
| Indirect Costs/Overhead | $ | 75.04 | 6 | $ | 164,337.60 |
| Subtotal Before Fees | $ | 478.50 | | $ | 1,047,915.00 |
| Fee | $ | - | 6 | | - |
| Total Budget | $ | 478.50 | | $ | 1,047,915.00 |

* Occupancy cost includes living expense such as trash, maintenance and repair, pest control, rent, utilities, and security

PROVIDER ANNUAL BUDGET BREAKDOWN
BASED ON CONTRACTED NUMBER OF CLIENTS
Umbrella, Inc.

**APPENDIX I**

| Line Item /Expense Category | Apportioned Per Diem | | Number of Clients (Base Year) | Annual Amount | |
|---|---|---|---|---|---|
| Salaries | $ | 126.87 * | 5 | $ | 231,537.75 |
| Fringe Benefits | $ | 32.36 | 5 | $ | 59,057.00 |
| Consultants/Experts | $ | 9.50 | 5 | $ | 17,337.50 |
| Occupancy* | $ | 46.44 | 5 | $ | 84,753.00 |
| Travel and Transportation | $ | - | 5 | $ | - |
| Supplies and Minor Equipment | $ | 11.09 | 5 | $ | 20,239.25 |
| Capital Equipment & Outlays | $ | - | 5 | $ | - |
| Client Costs | $ | 34.16 | 5 | $ | 62,342.00 |
| Communications | $ | 1.10 | 5 | $ | 2,007.50 |
| Other Direct Costs | $ | 11.27 | 5 | $ | 20,567.75 |
| Indirect Costs/Overhead | $ | 12.65 | 5 | $ | 23,086.25 |
| Subtotal Before Fees | $ | 285.44 | | $ | 520,928.00 |
| Fee | $ | 8.56 | 5 | | 15,622.00 |
| Total Budget | $ | 298.09 | | $ | 544,014.25 |

* Occupancy cost includes living expense such as trash, maintenance and repair, pest control, rent, utilities, and security.

PROVIDER ANNUAL BUDGET BREAKDOWN
BASED ON CONTRACTED NUMBER OF CLIENTS
Umbrella, Inc.

**APPENDIX I**

| Line Item /Expense Category | | Apportioned Per Diem | Number of Clients (Base Year) | | Annual Amount |
|---|---|---|---|---|---|
| Salaries | $ | 126.87 * | 5 | $ | 231,537.75 |
| Fringe Benefits | $ | 32.36 | 5 | $ | 59,057.00 |
| Consultants/Experts | $ | 9.50 | 5 | $ | 17,337.50 |
| Occupancy* | $ | 46.44 | 5 | $ | 84,753.00 |
| Travel and Transportation | $ | - | 5 | $ | - |
| Supplies and Minor Equipment | $ | 11.09 | 5 | $ | 20,239.25 |
| Capital Equipment & Outlays | $ | - | 5 | $ | - |
| Client Costs | $ | 34.16 | 5 | $ | 62,342.00 |
| Communications | $ | 1.10 | 5 | $ | 2,007.50 |
| Other Direct Costs | $ | 11.27 | 5 | $ | 20,567.75 |
| Indirect Costs/Overhead | $ | 12.65 | 5 | $ | 23,086.25 |
| Subtotal Before Fees | $ | 285.44 | | $ | 520,928.00 |
| Fee | $ | 8.56 | 5 | | 15,622.00 |
| Total Budget | $ | 298.09 | | $ | 544,014.25 |

* Occupancy cost includes living expense such as trash, maintenance and repair, pest control, rent, utilities, and security.

# AGENCY COMMENTS

## AGENCY COMMENTS

On March 13, 2008, the District of Columbia Auditor (Auditor) submitted this report in draft to the Child and Family Services Agency (CFSA), the Office of the Chief Financial Officer, and the Office of Contracting and Procurement (OCP) for review and comment. An exit conference was held with CFSA representatives on March 19, 2008.

The Auditor received written comments from the Office of the Chief Financial Officer and the Office of Contracting and Procurement. Where appropriate, the Auditor made changes to the final report in light of these comments. All agency comments are appended in their entirety to this final report. However, the Auditor offers an analysis addressing certain agency comments.

## AUDITOR'S RESPONSE TO AGENCY COMMENTS

The Auditor appreciates the comments on this report that were provided by the Office of the Chief Financial Officer (OCFO) and the Office of Contracting and Procurement (OCP). All comments are appended in their entirety to this final report. The Auditor made revisions to the final report, based on these comments, and also offers the following analysis and response to certain agency comments.

Office of the Chief Financial Officer Comments

1.   **CFSA's Fiscal Officer and Other CFSA Administrators Failed to Establish Adequate Internal Controls to Prevent Errors and Other Improprieties**   The OCFO's response stated that, "in August of 2006, CFSA Fiscal Office engaged a consultant to work with the accounts payable and document control staff to assess the functions within Fiscal Operations related to the processing and payment of provider invoices and the subsequent retention of invoices through a central filing system. CFSA Fiscal Office did locate two of the 13 missing invoices. Of the remaining 11 invoices, 5 invoices had been taken off-site as part of CFSA's Fiscal Office project to image older financial documents, 5 invoices are from FY 2006 and one is from FY 2007."

**Auditor's Analysis:** The Auditor reiterates that the Document Control Unit (DCU)  needs to further strengthen its central filing system to properly account for invoices which CFSA's Fiscal Office has approved and paid.

2.   **CFSA's Fiscal Officer and Other CFSA Administrators Failed to Establish Adequate Internal Controls to Prevent Errors and Other Improprieties**   The OCFO's response stated that, "The first invoice is the same one as referenced in the first response. The second invoice was for an invoice that was paid in full and included a vendor-signed invoice, date stamp and payment sign-off signatures. The third payment did lack proper supporting documentation."

**Auditor's Analysis:** The Auditor's finding that three invoices totaling $206,532.22 lacked proper supporting documentation remains unchanged. The referenced "first" invoice totaling $101,360.70 included additional documentation which was not provided to the Auditor when the invoices were requested and reviewed on January 28, 2008. Further, CFSA's Fiscal Officer failed to provide ODCA a copy of the second invoice which contained the vendor-signed invoice, date stamp and payment authorizing signatures.

3. **CFSA's Fiscal Officer and Other CFSA Administrators Failed to Establish Adequate Internal Controls to Prevent Errors and Other Improprieties** The OCFO's response stated, "CFSA Fiscal Office was unable to ascertain from this finding which invoices the Auditor identified as not having the required certifying signature. As part of the design of the Provider Placement Web (PPW) system, in lieu of a signature, the approval of the MPUR to an invoice serves as the formal transmission of a vendor invoices."

**Auditor's Analysis:** The Auditor provided CFSA's Fiscal Office with a detailed listing of the 100 invoices reviewed during the audit. Some of the invoices reviewed in 2007 after the implementation of the PPW were in fact signed by the provider. If electronic transmission takes the place of the vendors' actual signature certifying the invoice, CFSA's Fiscal Office should retain documentation when the electronic MPUR invoice is printed by the DCU to substantiate proper review by the vendor and certification of accuracy.

4. **CFSA's Fiscal Officer and Other CFSA Administrators Failed to Establish Adequate Internal Controls to Prevent Errors and Other Improprieties** The OCFO's response stated, "CFSA Fiscal Office was unable to ascertain from this finding which invoices the Auditor identified as not having the CFSA document tracking control number. Any invoices reviewed by the Auditor prior to the implementation of ITS will not have an assigned ITS number. Therefore prior to September 2006, CFSA Fiscal Officer had no reference system in place to track the process and payment of invoices."

**Auditor's Analysis:** Again, the Auditor provided CFSA's Fiscal Office with a detail listing of the 100 invoices reviewed during the audit.

5. **CFSA's Fiscal Staff Failed to Document Their Verification of Contracted per Diem Rates Prior to Paying Provider Invoices** The OCFO's response noted that contract price schedules are forwarded by the Contracts Specialists to the Program Monitor and the Fiscal Office. The Accounts Payable staff then compares the rates entered into FACES with the price schedules. Accounts Payable staff will be re-trained on this procedure, with an emphasis on reviewing these documents prior to making payments. Contract Specialists are responsible for entering the contract rates into FACES.

**Auditor's Analysis:** As noted by the Auditor's finding, invoices were paid without a valid contract in place and invoices were paid with inaccurate per diem rates. As such, it is evident that Accounts Payable staff did not routinely review Schedule B of the contract or document their communication with CFSA's Contracts and Procurement Administration. Proper review and monitoring of vendors' per diem rates is especially critical, because as CFSA's Fiscal Officer stated, "vendor placement contracts are not managed with a purchase order

system and funds supporting these contracts are not obligated or encumbered through the District's SOAR system." CFSA's Fiscal Officer is responsible for oversight and direct supervision of the financial functions of CFSA, and therefore is ultimately responsible for ensuring that payments are properly reviewed and approved prior to payment.

6.   **CFSA's Fiscal Staff Made Payments to a Provider in the Absence of a Valid Executed Contract That Were Not Ratified by the District's Chief Procurement Officer**  The OCFO's response states that, "CFSA is required to use a federally approved Statewide Automated Child Welfare System (SACWIS) known as "FACES" to document all placement and payment information for children that enter into the District's child welfare system. Vendor placement contracts are not managed with a purchase order system and funds supporting these contracts are not obligated or encumbered through the District's SOAR system. The Auditor's draft report notes payments made through the FACES system are interfaced with SOAR to generate payment checks. There are several administration's within the CFSA organization that are responsible for ensuring that payments are made accurately and in conformance with the terms of the vendor contracts. Each level of administrations responsibilities are segregated within FACES and are based on the employees' work and security levels provided by FACES internal security staff."

**Auditor's Analysis:**  CFSA's federal requirement to utilize FACES has nothing to do with ensuring payments are not made in the absence of a valid executed contract or purchase order, and that payments made without a valid executed contracts are properly authorized through the District's procurement ratification process. Fiscal oversight of these types of transactions should be further heightened because these vendor placement contracts are not managed with a purchase order system and funds supporting these contracts are not obligated or encumbered through the District's SOAR system.

7.   **CFSA's Fiscal Officer and Contracting Officer Have Not Properly Monitored and Accounted for Contract Cost Resulting in Payments That May Have Exceeded Contract Cost Limits**  The OCFO's response states the scope of the audit covered 5 contracts, each with a base year and 3 option years, for a total of 20 contract years and $33,183,825. Of the 20 contract actions, one contract action, the base contract year for Echelon (June 1, 2004 through June 30, 2005), appears to have had payments made in excess of its contract by $43,400 for services provided to children.

**Auditor's Analysis:** In interviews with the Audit Team, CFSA's Fiscal Officer and the Contracting and Procurement Administrator stated they do not monitor payments issued to the providers, therefore, the Auditor has no assurance that the payment information provided by CFSA's Fiscal Officer on March 21, 2008 is complete, accurate, or reliable. The payment

data lacked basic financial audit trail information such as the clients' name and the per diem rates used to arrive at the total payments. Additionally, the payment information provided did not include cost reimbursable payment information for all applicable providers.

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
OFFICE OF CONTRACTING AND PROCUREMENT





Office of the Director

RECEIVED
MAR 2 7 2008
OFFICE OF THE
DC AUDITOR

March 24, 2008

Ms. Deborah K. Nichols
District of Columbia Auditor
Office of the DC Auditor (ODCA)
717 14ᵗʰ Street, N.W., Suite 900
Washington, D.C. 20005

**RE: Review and Comment by the Chief Procurement Officer of Draft Report
entitled "Audit of Child and Family Services Agency's Congregate Care Contract
Expenditures."**

Dear Ms. Nichols:

I appreciate the opportunity to respond to the draft report entitled "Audit of Child and
Family Services Agency's Congregate Care Contract Expenditures" (Attachment 1),
dated March 13, 2008. In reviewing the draft report, I did not comment on fiscal
recommendations, but limited my detailed review to the one matter that is clearly a
contract issue.

**Recommendation #1:**

1. "CFSA established standard operating policies and procedures for the
   review and verification of charges invoiced by contractors/vendors prior to
   certification of payment. In doing so, CFSA also include compliance with
   the OCFO's internal control policies and procedures related to invoice
   review and certification as a performance measure for employee
   performance evaluation purposes.

2. CFSA actively enforce the OCFO's guidelines regarding the effective
   review and certification of invoices and supporting documentation before
   authorizing payment. CFSA employees violating the OCFO's guidelines
   must be immediately held accountable under the appropriate applicable
   personnel rules and procedure to the fullest extent permitted.

3. CFSA's Fiscal Officer review the current filing and records retention
   system to identify needed improvements and implement policies and

---

procedures to ensure adequate and effective financial accountability and records management.

4.  CFSA's Fiscal Officer and Accounts Payable Supervisor immediately locate the 13 missing invoices totaling $1,125,315.51 to substantiate their proper payment.

5.  The Accounts Payable Supervisor develop and implement procedures to ensure that Accounts Payable Technicians adhere to CFSA's invoice payment policies and procedures and always utilize the CFSA Payment Short/Adjustment forms when altering or adjusting monthly invoices.

6.  The Accounts Payable Supervisor ensure that Document Control Technicians assign an Invoice Tracking System number to all invoices prior to forwarding them to Accounts Payable Technicians for processing. Accounts Payable Technicians must be required to return all invoices not bearing a tracking number to the Document Control Technician for assignment of a tracking number."

**Response:**    No comment.

**Recommendation #2:**

1.  "CFSA's Contract Specialists and Program Monitors should communicate with CFSA's Accounts Payable Technicians routinely and regularly and provide supporting documentation regarding specific contract terms including per diem rates that directly affect provider payments. Proper and current documentation should be retained by CFSA's Fiscal Office of a minimum of five years.

2.  After contract award, the assigned Contract Specialist immediately forward a copy of the contract's Price Schedule to the assigned Program Monitor and Accounts Payable Technician as notification of the contracted per diem rates. Whenever per diem rate adjustments are negotiated and approved, the Contract Specialist should immediately notify the Program Monitor and Accounts Payable Technician of the revised rates, provide a new Price Schedule and retain documentation of negotiated changes in the contract file.

3.  When reviewing invoices for payment approval, the Program Monitor and Contract Specialist verify the accuracy of per diem rates by reviewing the contract and certify their review by initialing the rate shown on the provider's invoice.

4. Accounts Payable Technicians verify the accuracy of the per diem rate by comparing the invoiced per diem rate to the most recent rate documentation received from the Contract Specialist. All differences should be resolved with the Contract Specialist based on documented evidence.

5. CFSA's Fiscal Officer require Accounts Payable Technicians to verify the existence of a valid contract prior to processing provider payments. No services should be ordered or accepted from contractors or vendor and no payments should be made in the absence of a valid executed contract."

Response:    No comment.

Recommendation #3:

1. "CFSA Fiscal Officer require Accounts payable Technicians to verify the existence of a valid contract prior to processing provider payments. No services should be ordered and no payments should be made in the absence of a contract.

2. Since there is no valid contract between CFSA and Jones and Associates, goods and services provided by the vendor to CFSA were improper and therefore must immediately cease until a valid written contract is awarded to this vendor. Further, all payments made to or owed to Jones and Associates are improper in the absence of a valid written contract and must first be authorized through the District's procurement ratification process.

3. CFSA personnel authorizing the delivery of goods and services and payments to a vendor in the absence of a valid written contract must be held accountable to the fullest extent permissible including termination, under the provisions of applicable District personnel law and rules."

Response:    Concur.

Recommendation #4:

1. "CFSA Fiscal Officer, C&P Administrator, and CFSA IT Technicians within 30 days develop a means to properly account for payments by contract number within FACES, as well as develop a monthly report which details each individual payment made to provider by contract number, type of service, per diem, and service date.

2. CFSA provide this report to the Auditor each month, in hard copy and electronic format, until further notice.

3. CFSA Fiscal Officer and CFSA IT Technicians within 10 days of this draft report provide the Auditor a listing of all scheduled and demand payments approved and issued through FACES for each of the providers by **contract number** from July 1, 2004 to December 31, 2007."

**Response:**   No comment.

I appreciate the opportunity to provide responses to the recommendations made by your office. Although CFSA is exempt from the authority of the District's Office of Contracting and Procurement (OCP) pursuant to the Procurement Reform Amendment Act of 1996, effective April 9, 2007 (D.C. Law 11-259; D.C. Code §§ 2-301.01 *et seq.*), it has been my experience that the agency is open to seeking procurement best practices. I am committed to working with this, and all other independent procurement agencies to bring consistency and a single public view of procurement in the District.

Sincerely

David P. Gragan, CPPO
Chief Procurement Officer

Cc:   Dan Tangherlini, City Administrator
Sharlynn Bobo, Director, CFSA
Wilbur Giles, Chief of Staff, OCP
Nancy Hapeman, General Counsel, OCP
Sheila Mobley, Assistant Director for Procurement Support, OCP

Attachment: Letter by the DC Auditor dated March 13, 2008 with Enclosure - Draft Report entitled "Audit of Child and Family Services Agency's Congregate Care Contract Expenditures."

JONES AND ASSOCIATES

COMPLAINT EXHIBITS

EXHIBIT **TWO**: LASHAWN A MODIFIED FINAL ORDER, NOV. 18, 1993


EXHIBIT **THREE**: LASHAWN A, IMPLEMENTATION PLAN,

APRIL 2003


EXHIBIT **FOUR**: LASHAWN A, AMENDED IMPLEMENTATION PLAN,

FEBRUARY, 2007

JONES AND ASSOCIATES

COMPLAINT EXHIBITS

EXHIBITS FIVE (A) **(B) (C) (D)**



# Congressional Record

United States of America

**PROCEEDINGS AND DEBATES OF THE 106ᵗʰ CONGRESS, SECOND SESSION**

*Vol. 146*  WASHINGTON, THURSDAY, APRIL 13, 2000  *No. 47*

## *Senate*

# COMMENDATION FOR
# DR. JAMES BROWNFOX JONES, ESQ.

MR. CAMPBELL: Mr. President, I take this opportunity today to call my colleagues' attention to the extraordinary efforts of Dr. James Brownfox Jones who has made countless contributions to his profession and to the community at large. Recently, Dr. Jones was selected as an inductee in the Washington D.C. Hall of Fame in the area of education. Dr. Jones' selection to the Hall of Fame is a testament to his dependable and consistent standard of excellence as an educator and participant in his community. His career reflects his respect and affection for the young people who are our future leaders. And, his record reflects his predominate concern for the more vulnerable youth in this city.

Dr. Jones has distinguished himself in the District of Columbia as an educator and community activist with the mission of helping young people reach their full potential. At the Washington School of Psychiatry, Dr. Jones developed and operated an experimental educational program designed to address the educational needs of "hard core" juvenile delinquents. And, as a public school teacher, he developed a unique program for special education students.

With a distinguished career spanning more than 30 years, Dr. Jones assisted the mayor in initiating a wide range of innovative programs for the children and youth of the city. These included a mobile recreation wagon, a hot lunch program, a neighborhood youth corps, and the building of go-kart tracks on lots left vacant by the 1968 riots.

Since 1983, Dr. Jones has designed and operated an Independent Living Program for abused and neglected youth in foster care in the District of Columbia. As part of this program, he has sent over 250 young people to college.

Education is a top priority for this Congress, and for me personally. I have served as a tutor and my wife Linda has dedicated her career to teaching in public schools. Both of us have always been strong supporters of public education. It is with that background that I want to express my support for the work of Dr. Jones and to congratulate him on his selection for the Washington D. C. Hall of Fame.

Thank you, Mr. President.

I yield the floor.



Ex 5(a)
Congressional
Record



Case 1:10-cv-00465-JDB   Document 1-1   Filed 03/19/10   Page 110 of 227

# The Washington Post



Ex. 5(b)

3 Post Articles

At the Washington, D.C., Hall of Fame awards banquet at the Washington Hilton are, from upper left, D.C. Superior Court Chief Judge Eugene N. Hamilton; the Rev. Lewis M. Anthony, an inductee; Hall of Fame President Janette Hoston Harris; and inductees Jack H. Olender, James L. Jones and Patricia Morris. The inductees are part of the first group of 11 to be honored for their service to their communities or professions.

# A Salute to Those Who Serve

# D.C. Hall of Fame Inducts Its First Class of Honorees

*By J.A. Kelly*
*Special to The Washington Post*

Janette Hoston Harris noticed that many small groups of professionals honored members of their own organizations, but "rarely do you have a broad spectrum of people recognized."

Harris, who works in the D.C. historian's office, wanted to change all that.

About a year and a half ago, she began organizing a committee of experts in a number of fields, including community development, religion, law and education, to choose people from their professions or communities to be honored for outstanding service. The result was the Washington, D.C., Hall of Fame, and on April 30, the first 11 inductees were honored.

The criteria for honorees were simple: They had to have lived in the District for more than 10 years, have several years of community service and have innovative approaches to assisting their professions and their community. Judges who selected the inductees also had to exemplify high standards in their areas of expertise and live in the District. They were selected from the areas of business, community development, religion, technology, cultural arts, education, politics, law, communication, young achievers and health.

Among the judges were, for community development, Louis Wassel, a programmer analyst at Edison Electric Institute; health, Sheree Johnson, a biomedical research specialist at the National Institutes of Health in Bethesda; and politics, William Light-

foot, a lawyer and former at-large D.C. Council member.

Harris, 60, who received her doctorate in history from Howard University in 1975, said the Hall of Fame wanted to recognize the legacies of those who have made major, but sometimes unsung, contributions to the District.

Drawing on her knowledge of history, Harris was able to assemble pictures, videos and memorable events to show to the 420 people who attended the induction ceremony.

"It's humbling," said lawyer Jack H. Olender, who was saluted for his almost 40 years of service in law. He has been president of the D.C. Bar Association, on the Greater Washington Urban League board of advisers and, with his wife, created the Jack and Lovell Olender Foundation, which annually awards local and national Peacemaker Awards.

"I was elated," Olender said. "It's not something that you think, 'Gee! I would like to be inducted in the Hall of Fame some day.' But I was very appreciative about being selected."

Others echoed Olender's sentiments on being among the first group ushered into the Hall of Fame.

"I think it was a very good idea," said inductee Sterling Tucker, who was chairman of the first D.C. Council. "[The Hall of Fame] is a part of the history of the District; that's what is its value."

Also honored were the Rev. James E. Coates, a member of the first D.C. school board, and Walter E. Washington, the city's first elected mayor under home rule.

"It had to be a heck of a lot of work," said inductee Nadine Winter, a member of the first D.C. Council. She also was saluted for 20 years of service at Hospitality House, which was one of the first shelters during the 1960s to house entire families. Hospitality House had five locations in the District—two in Southeast and three in Northeast—but only the Hospitality Credit Union in Northeast exists today.

Winter, who has lived in the District for 50 years



Cardiologist Patricia Davidson, top, and former D.C. Council member Hilda H.M. Mason were also inducted into the Washington, D.C., Hall of Fame.

and has seen administrations come and go, recalled the feelings that washed over her as a video of the late John Wilson, a former member and chairman of the D.C. Council, was shown.

"It was very special," she said. "It was a time for reflection. Seeing [the video of Wilson] and some of the people who hadn't seen each other since they left their office was very wonderful."

Said Patricia Morris, 69, who received the Legacy

Award for 25 years of community development, "I think that I'm still on cloud nine." Morris volunteered at the D.C. Congress of Parents and Teachers from 1979 to 1981, then for 10 years was chairman of the Shoe and Rubber Fund, a United Way agency. She currently gives much of her time to the Mental Health Association of the District of Columbia.

"There were those who were prominent, along with those who were not as prominent, like me," she added modestly. "Young and old . . . all were recognized."

Morris said she is looking forward to next year, when she and the other inductees will judge the next group of nominees.

"It was an affirmation that the work I've been doing in my career has been important," said cardiologist Patricia Davidson, who has worked to inform women and African Americans about the dangers of heart disease and some of the preventive steps that each group can take.

"It was a great honor," Davidson said.

Harris was overwhelmed by the response to this year's ceremony. She had expected a crowd of 200 to 300, not the 420 who arrived.

"It was a very emotional thing," Harris said. "It was beyond what I envisioned."

Next year, she hopes to expand the number of inductees to 12 and to do a better job of advertising the event, because this year's turnout was the result, essentially, of word of mouth.

The ceremony "was special. It was special because we gave everyone their day in the sun," Harris said.

Said Winter: "The seed is planted. I'd like to salute her because Janette brought her vision into fruition. I even heard some people say that they wished that they had thought of it."

When asked whether she thought she would ever be inducted, Harris replied, "It will be way down the line. . . . We got a lot of people to honor before we get to me."

WASHINGTON POST Oct 5, 1996

Colbert I. King

# A Helping Hand From Jimmy Jones

The writer is a member of the editorial page staff.

# A Helping Hand From Jimmy Jones

It was a day he thought would never come: high school graduation. When you've been in foster care, shuttled from family to family, now living in a group home and facing an uncertain future, to get handed something with the permanence of a diploma is overwhelming. Now he looked out into the audience for the sweetener: His birth mother had promised to come from Philadelphia to see him walk across the stage.

Soon the ceremony was over, and the crowds began to thin. Kids in caps and gowns were walking off with family members and friends, laughing, looking forward to the evening ahead. Finally, he was alone.

It was only at that moment that James "Jimmy" Jones stepped forward, put his arm around the youngster and said, "C'mon, man. Let's go get something to eat."

Jones tells that story to make a larger point. He estimates that he or one of his colleagues with his nonprofit agency, Jones and Associates, has attended more than 200 graduation exercises, usually remaining in the background but always ready to stand in for the family member who reneges on a promise.

In a city of institutionalized indifference and mediocrity, Jimmy Jones is a reassuring example of your tax dollars at work.

Jones and his staff of 40 operate a city-funded independent living program

for teenagers in foster care. The aim is to help youngsters, generally described as abused and neglected, make a smooth and successful transition from the foster care system to self-sufficiency and independence. During a meeting this week at the program's 40-bed, 12-unit apartment building on East Capitol Street across from Eastern High School, Jones put it another way: "We try to teach them all those things that we somehow learned from our parents."

It's not as easy as it may sound. Jones's efforts pick up where our news stories leave off.

For many of us—readers and reporters alike—the story ends when the drug-addicted mother who abandoned her young children is hauled off for observation, or when the father who raped his young daughter is arrested, or when the judge commits the withdrawn and emotionally scarred youngster with an arrest record to the city's care. But those children don't stop living.

They eventually grow up and leave the city's custody. Many, however, are not ready to take care of themselves. And that's usually when we in the press pick up their stories again. A fortunate few—or as many as the cash-strapped District can afford—receive a helping hand from Jones, through the courts.

The independent living program gets the neglected youngsters who watched their mothers slide downhill. It gets the

agreements, and where they learn to make mistakes and experience failure without having the world come down on them.

Until they are 21 and must leave the program, Jones is there for them. No birthday passes without a celebration. No prom goes unattended. Everyone has a good graduation outfit to wear.

When they go off to college—and Jones's students have attended more than 50, mostly historically black colleges and universities—they are sent fully prepared with paid-for clothes, books and tuition and with two 1-800 phone numbers—one connected to the East Capitol Street program, the other to his home.

There's one condition: They must return during the holidays and summer vacations to help motivate other youngsters.

There you have it, a positive District-supported program. So why, you may ask, is there so much low-grade rage against the city's leaders?

Every time I think of the mayor trying to give an undeserved $235,000 tax break to a friend and political supporter who already is $90,000 *delinquent* in property taxes, or come across cases of spectacularly unqualified pals of pols getting lucrative city contracts, I'm sorry, but I go off.

I go off because hard-earned tax dol-

girls who were violated, the school drop-outs, the emotionally and physically banged up who may have done some banging up of their own. Jones takes in the teenagers who have been harmed by the actions or the inaction of adults who should have been looking out for them. Jones gets the boys who never had the firm hand of a father.

Since 1983, when the District finally accepted the idea of creating a group home for youngsters to learn life skills in a real-life setting, nearly 600 young people have passed through the independent living program. About 50 have been lost. Some, said Jones, reverted to drugs. Others were locked up; a few were killed.

But what spells success? If kids enter the program without a high school diploma, they leave with one, or at least a GED. They also are encouraged to complete at least one semester of college "to find out what it's about and to make an informed decision whether they want to continue," Jones says. Now he has an important ally, President Clinton also wants to make two years of college "as universal as a high school diploma." But Jones, a District native and a star athlete at Dunbar High School in the early '50s, was there first. And he brings especially strong feelings to the subject.

"If you are a middle-class kid in a family with money," he says, "there's a college for you somewhere in America."

lars are being wasted on wannabe big shots who trade on their connections, color or both to get city contracts they don't deserve to do work they can't perform.

I go off because contract hustlers are living it up off money that Jimmy Jones could use to take in a few more abused and neglected kids, because D.C. government-created "entrepreneurs" are driving fine cars with money that the schools need to hire a few more teachers or buy a few more books. I go off because they are outfitting themselves, their offices and their significant others with funds that foster care could use to hire more social workers, because they are out "stylin' and profilin' " at clubs, bars and big benefit dinners with city money that could be used to fill potholes, fix street lights or clean the curbs. Pardon me, but that's why I have this tendency to go off on the crowd that's running this city.

There are, o weary hearts, plenty of unsung men and women who are trying to rescue this city's endangered children. They are the real pillars of our community. Remember and respect them. After all, it's not just for the kids that Jones is there on graduation day; he's also standing in for us.

*The writer is a member of the editorial page staff.*

It's the youngsters without parents and money who are out of luck. And Jones wants as many inner-city youth as possible to have that exposure, too. Having been told time and again that "you're not college material," Jones scoffs at the words. "I was a C student who wasn't supposed to go to college," he said. "Now I have more degrees than I can use."

Oops, my fault. Let me properly introduce James L. Jones, BS, Howard University, 1956; MA, secondary school administration, George Washington University, 1964; EdD, guidance and counseling, George Washington University, 1969; Juris Doctoris, Howard University School of Law, 1973—and a fellow member of Kappa Alpha Psi fraternity, which I know from firsthand experience afforded him an uninhibited insight into the fun that goes with college life.

But there's nothing happy-go-lucky about his professional staff. They've been a team for years, learning to make it on dedication rather than salary. There is, however, a sure-fire way to get fired: Get caught not treating the kids as one of your own.

Tough love is practiced at 1819 East Capitol St. That's where youngsters learn how to shop and prepare meals, practice proper hygiene and grooming, keep appointments on time, maintain their apartments, handle personal dis-

D.C.

# The Washington Post

# DISTRICT
## WEEKLY

THE NO.41, DECEMBER 25, 1986

## Program Gives Youths
## The Ability to Succeed

**STUDENTS, From Page 1**



## Fostering Success
## In Foster Children

*District Program Helps Young Adults
Broaden Horizons to Include College*

By Pierre Gaines Carter



Independent Living Program Director James Jones with staff members, clockwise from left, Calvin McClelland, De Ann Alphers, H. Lisa Pender, LaWilson Moss, DA and Barbara Simmons, Jr.

"All the News That's Fit to Print"

# The New York Times

**Late Edition**

New York: Today, sun then clouds. Highs 53-65. Tonight, cloudy, showers by morning. Lows 43-49. Tomorrow, periods of rain. Highs 47-53. Yesterday: High 73, low 55. Details are on page B7.

# Youths Leave Foster Care For Campus

### By LEE A. DANIELS

In his first semester at Langston University in Oklahoma last year Peter Blackwell, a criminal justice major, struggled to a 2.4 grade point average, on a scale of 4. He raised his average to 2.7 in the second semester and to 3.5 last fall. Now he says with quiet confidence, "I'm ready to really do well this semester."

Mr. Blackwell's might be a typical story of a student sloughing off a tentative beginning and living up to his academic potential, except that his background is significantly different from that of most college students: He grew up a foster child in Washington, and an innovative municipal program is paying for his education.

Mr. Blackwell and 34 other young adults from Washington's foster care program, all of whom are black, are beneficiaries of the College Options Program, under which the city pays for their college education and finds summer jobs for them with city agencies or private businesses.

### Enthusiastic Support

The four-year-old program is still small. But city officials intend to expand it substantially next fall, a plan that has received enthusiastic support from the presidents of the nation's traditionally black colleges, which most of the College Options students attend.

Furthermore, officials of the 298-member National Conference of Black Mayors have asked Mayor Marion Barry of Washington to discuss the plan at the group's national convention in Philadelphia in June.

Mr. Barry said that while the youths in foster care get a paid college education, the city also gains because the annual cost is generally half the $26,000 a year of foster care for one youth. And, he said, black colleges gain by increasing their student enrollments after years of struggling to recruit and retain students.

The Children's Defense Fund, a Washington advocacy group, estimates there are 276,000 foster children nationwide, one-third of whom are black.

"We deliberately started very slowly and have kept it small," said Mr. Barry. "But we believe we've proved this idea can work to everyone's good, and we're ready to start pushing it agressively. By September 1989 we hope to have 40 cities with similar programs."

VOL. CXXXVII ... No. 47,467    Copyright © 1988 The New York Times

NEW YORK

WEDNESDAY, APRIL 6, 1988

### No Special Preference

Washington officials hope to send as many as 100 young people to college through the program next September.

Because the students apply through the schools' regular admissions process, their foster-care background is generally known only to a few college administrators and no special preference is given them.

Mr. Barry added that the program works closely with black colleges because "they have a track record of educating black youngsters from poor or difficult circumstances."

Prospective collegians receive extensive counseling in choosing schools. In summer, they live together in a dormitory at Howard University in Washington "to keep them in a college environment and a more independent-living arrangement," said James Jones, who directs a foster-care group home and who conceived the college project idea.

The college project grew out of a program to prepare those in foster care to live on their own, Mr. Jones said. "One year of college makes a great difference on them," he remarked. "They come back talking not about finding a job in a fast-food joint, but going to graduate school or going into business."

50 cents beyond 75 miles from New York City, except on Long Island.

**30 CENTS**

Ex. 5(c)

NYTimes

JONES AND ASSOCIATES

COMPLAINT EXHIBITS

EXHIBIT **SIX**:

LASHAWN: AN ASSESSMENT OF THE DISTRICT OF COLUMBIA'S CHILD WELFARE SYSTEM (AS OF JANUARY 31, 2009)

APRIL 302009

Center for the Study of Social Policy 1575 Eye Street, N.W. Suite 500, Washington, D.C.20005

JONES AND ASSOCIATES

COMPLAINT EXHIBITS

EXHIBIT **SEVEN**:

REQUEST FOR PROPOSALS ("RFP")

CFSA 03-R-0005, JULY 28, 2003

JONES AND ASSOCIATES

COMPLAINT EXHIBITS

EXHIBIT **EIGH**T **(A)**

 CFSA CONTRACT # -04-C-0076

DEC.1, 2003

DISTRICT OF COLUMBIA, CHILD AND FAMILY SERVICES AGENCY (CFSA)
AWARD/CONTRACT
FOR SUPPLIES OR SERVICES **2003**
SECTION A

 FILE COPY

| 1. ISSUED BY | |
|---|---|
| ...ct of Columbia, Child and Family Service Agency(CFSA) 400 6th Street, S W., 5th Floor Washington, D C  20024 | **2. PAGE  OF  PAGES** 1      39 |
| | **3. CONTRACT NUMBER:** CFSA-04-C-0076 |
| Office of Contracting and Procurement 955 L'Enfant Plaza SW, Suite 5200 Washington, DC 20024 (202) 724-7510 | **4. EFFECTIVE DATE:** DECEMBER 1, 2003 |
| | **5. DELIVERY:** [ X ] FOB DESTINATION      [  ] OTHER |
| | **6. DISCOUNT FOR PROMPT PAYMENT:** NET 45 DAYS |

7  NAME AND ADDRESS OF CONTRACTOR (No., street, city, county, State and ZIP code)

Jones & Associates, Inc.
1454 Corcoran Street, NW
Washington, DC  20009
TELEPHONE NO. (202) 462-1117
FAX NO.        (202) 332-5412
TIN : 52--1311038

### 8. TABLE OF CONTENTS

| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | **PART 1 – The Schedule** | | | | **PART II – Contract Clauses** | |
| X | A | Solicitation/Contract Form | | X | I | Contract Clauses | N/A |
| X | B | Supplies/Services and Price/Costs | | | | **PART III – List of Documents, Exhibits and Other Attach** | |
| X | C | Description/Specs/Work Statement | | X | J | List of Attachments | |
| X | D | Packaging and Marking | | | | **PART IV – Representations and Instructions** | |
| | E | Inspection and Acceptance | | X | K | Representations, Certifications and other Statements of Offerors | |
| | F | Deliveries or Performance | | | | | |
| X | G | Contract Administration | | X | L | Instrs. Conds.. & Notices to Offerors | IBR |
| X | H | Special Contract Requirements | | X | M | Evaluation Factors for Award | IBR |

9. TOTAL AMOUNT OF CONTRACT        $1,135,667.50

**CONTRACTING OFFICER WILL COMPLETE BLOCKS 10 OR 11 AS APPLICABLE**

| 10. [  ]  AWARD (Contractor is not required to sign this) | 11. [ X ]  **CONTRACTOR'S NEGOTIATED AGREEMENT** (Contractor is required to sign this document and return ___2___ copies to the issuing office) |
|---|---|
| Your offer on Solicitation Number ____ including the additions or changes made by you which additions or changes are set forth in this award/contract, is hereby accepted. This award consummates the contract which consists of the following documents: (a) CFSA's Solicitation and your offer, and (b) this award/contract. No further contractual documents are necessary. | The Contractor agrees to furnish and deliver all items or perform all services set forth or otherwise identified on any continuation sheets for the consideration stated herein  The rights and obligations of the parties to this contract shall be subject to and governed by the following documents:  (a) this award/contract, (b) the solicitation, if any, and (c) such provision, representations, certifications, specifications and any other documents as are attached or incorporated by reference in Section J. |
| 12A. NAME AND TITLE OF SIGNER (Type or print) | 13A. NAME OF CONTRACTING OFFICER: |
| 12B. NAME OF CONTRACTOR BY _____ (Signature of person authorized to sign) | 13B. District of Columbia, Child and Family Services Agency (CFSA) BY _____ (Signature of Contracting Officer) |
| 12C. DATE SIGNED  12/1/03 | 13C. DATE SIGNED  1/22/04 |

C. ... AWARD/CONTRACT FORM 26 (REV. 01-01)

Ex. # 8(a)
"Contract-1"
0076

FILE COPY

| CONTINUATION SHEET | | | PAGE 2 OF 39 |
|---|---|---|---|
| | CFSA-04-C-0076 | | |

NAME OF OFFEROR OR CONTRACTOR
Jones & Associates, Inc.

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT COST | AMOUNT |
|---|---|---|---|---|---|
| | **SECTION B**<br>**SUPPLIES/SERVICES** | | | Monthly cost | Total amount |
| | | | | | |
| | **GENERAL CONDITIONS** | | | | |
| | The Contractor shall provide all direct and indirect resources necessary to provide Independent Living Services in accordance with the specifications contained in Section C and at the prices stated herein. The Contractor shall assure that it has the capacity to serve up to 55 youths, which CFSA may refer to the Contractor at any time during the term of this contract | | | | |
| | **PERIOD OF PERFORMANCE** | | | | |
| | The letter contract dated December 1, 2003, merges with this definitized contract. The period of performance under this contract shall be December 1, 2003 through March 31, 2004 | | | | |
| | **TYPE OF CONTRACT** | | | | |
| | This is a Cost Plus fixed fee contract. | | | | |
| | **COSTS AND INVOICING** | | | | |
| | The Contractor shall be paid for services provided accordance with the specifications contained in Section B and at the costs stated herein. The contractor shall not exceed the amounts listed herein without the written approval of the Contracting Officer. No term or condition of this contract shall be changed without the written approval of the Contracting Officer. "See section G5 of this contract " | | | | |
| 0001A<br>AA<br>AB<br>AC<br>AD<br>AE<br>AF<br>AG<br>AH<br>AI<br>AJ<br>AK | **COST:**<br>Salaries And Wages<br>Fringe Benefits<br>Consultants/Experts<br>Gas/Electric/Oil/Water<br>Gasoline/Oil/Supplies<br>Out Of Town Travel/Other Transportation Cost<br>Client Expense Cost<br>Other Educational Cost<br>Communication Costs<br>Postage<br>Copying | | | | $380,236.52<br>$ 64,317.36<br>$ 36,400.00<br>$ 4,720.00<br>$ 3,700.00<br>$ 48,168.00<br>$200,000.00<br>$119,176.42<br>$ 30,000.00<br>$ 200.00<br><u>$ 2,000.00</u><br>$888,918.30 |
| 0002B<br>BA<br>BB<br>BC<br>BD<br>BE | **FIXED FEE:**<br>-   Occupancy Cost (rents)<br>-   Insurance Cost<br>-   Other Direct/Indirect/Overhead Cost<br>-   Maintenance/Repairs Cost<br>-   Trash/Pest Control Cost | months | 4 | $63,017.00 | <u>$246,759.20</u> |
| | TOTAL CEILING: | | | | $1,135,677.50 |

CFSA CONTINUATION SHEET FORM 002 5/00

| CONTINUATION SHEET | CFSA-04-C-0076 | PAGE 2A OF 39 |
|---|---|---|

NAME OF OFFEROR OR CONTRACTOR

Jones & Associates, Inc.

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT COST | AMOUNT |
|---|---|---|---|---|---|
| | **SECTION B**<br>**SUPPLIES/SERVICES** | | | Monthly cost | Total amount |
| | | | | | |
| | **GENERAL CONDITIONS** | | | | |
| | The Contractor shall provide all direct and indirect resources necessary to provide Independent Living Services in accordance with the specifications contained in Section C and at the prices stated herein. The Contractor shall assure that it has the capacity to serve up to 55 youths, which CFSA may refer to the Contractor at any time during the term of this contract. | | | | |
| | **PERIOD OF PERFORMANCE** | | | | |
| | The TRANSITION PERIOD of PERFORMANCE under this contract shall be April 1, 2004 through May 31, 2004 | | | | |
| | **TYPE OF CONTRACT** | | | | |
| | This is a Cost Plus fixed fee contract. | | | | |
| | **TRANSITION COSTS AND INVOICING** | | | | |
| | Transition Period shall be for a set number of days as designated by the District, but shall not exceed 61 days. The Contractor shall be paid for services provided accordance with the specifications contained in Section B and at the costs stated herein. The contractor shall not exceed the amounts listed herein without the written approval of the Contracting Officer. No term or condition of this contract shall be changed without the written approval of the Contracting Officer. "See section B-2 of this contract." | | | | |
| 001A<br>A<br>B<br>C<br>D<br>E<br>F<br>G<br>H<br>I<br>J<br>K | **COST:**<br>Salaries And Wages<br>Fringe Benefits<br>Consultants/Experts<br>Gas/Electric/Oil/Water<br>Gasoline/Oil/Supplies<br>Out Of Town Travel/Other Transportation Cost<br>Client Expense Cost<br>Other Educational Cost<br>Communication Costs<br>Postage<br>Copying | | | | $190,118.26<br>$ 32,158.68<br>$ 18,200.00<br>$ 2,360.00<br>$ 1,850.00<br>$ 24,084.00<br>$100,000.00<br>$ 59,588.21<br>$ 15,000.00<br>$ 100.00<br>$ 1,000.00<br>$444,459.15 |
| 002B<br>A<br>B<br>C<br>D<br>E | **FIXED FEE:**<br>-  Occupancy Cost (rents)<br>-  Insurance Cost<br>-  Other Direct/Indirect/Overhead Cost<br>-  Maintenance/Repairs Cost<br>-  Trash/Pest Control Cost | months | 2 | $63,017.00 | $126,034.00 |
| | **TOTAL CEILING:** | | | | $570,493.15 |

## PART I - THE SCHEDULE

### SECTION B

### SUPPLIES OR SERVICES AND PRICE

### TABLE OF CONTENTS

| CLAUSE NO. | CLAUSE TITLE | PAGE NO. |
|---|---|---|
| ---- | PRICING SCHEDULE | 2 |
| B-1 | PRICING | 4 |
| B-2 | TRANSITION | 4 |
| B-3 | OPTION TO EXTEND THE TERM OF THE CONTRACT | 4 |

## SECTION B - SUPPLIES OR SERVICES AND PRICE

B-1   **TYPE OF CONTRACT**   •

This is a Cost-plus-fixed-fee contract. CFSA shall remunerate Contractor according to the terms and conditions outlined in the schedule, page 2 of the contract, and Section G.

B-2   **TRANSITION**

B-2.1   The contract, the Contractor shall assist CFSA in the smooth and orderly transition of the children in its care to a new Contractor. This time period shall be identified as the Transition Period.

B-2.2   The Program Monitor shall provide the Contractor a Transition Plan either prior to, or during the Transition Period. The Transition Plan shall, at a minimum, list all children to be moved, with anticipated moving dates.

B-2.3   During the Transition Period, the Contractor shall cooperate with the Program Monitor to ensure that all children and families continue to be provided services as directed by CFSA.

B-2.4   The Contractor shall provide the services as described in this contract during the Transition Period. The Contractor shall follow the billing procedures outlined in Section G of this contract.

B-2.5   The Transition Period shall within 61 days to ensure that all children in the care of the contractor are found suitable placements. The District may exercise the option to extend the contract for the transition period in accordance with section B-3.1, for a period of up to sixty-one days, and the District shall cite section B-3.1 as authority to exercise the contract extension for the transition period. All terms and conditions of the contract shall remain in full force and effect during the Transition Period.

B-3   **OPTION TO EXTEND THE TERM OF THE CONTRACT**

B-3.1   The District may extend the contract for a period not exceed sixty-one 61 days to provide for a transition period. Contractor may waive the preliminary notice requirement by providing a written waiver to the Contracting Officer prior to expiration of the contract.

B-3.2   **RESERVED**

B-3.3   The ceiling for costs for the Transition period and the fixed monthly fee for the Transition period are included in section B, Supplies and Services, page 2A of the contract.

B-3.4   The total duration of this contract, including the exercise of any options under this clause, shall not exceed one hundred eighty-three (183) days, which includes the Transition Period.

### ****END OF SECTION B****

## PART I - THE SCHEDULE

## SECTION C

## DESCRIPTION/SPECIFICATIONS/ STATEMENT OF WORK

## TABLE OF CONTENTS

| CLAUSE NO | CLAUSE TITLE | PAGE NO |
|-----------|--------------|---------|
| C-1 | SCOPE OF SERVICES | |
| C-2 | STANDARD OF PERFORMANCE | |
| C-3 | ADVERTISING AND PUBLICITY | |
| C-4 | CONFIDENTIALITY | |
| C-5 | SUBCONTRACTING | |
| C-6 | TARGET POPULATION | |
| C-7 | LOCATION OF SERVICES | |
| C-8 | SPECIFIC REQUIREMENTS | |

Jones and Associates, Inc.                                                      CFSA-04-C-0076
Independent Living Services - Main Facility                                       Page 7 of 39

C-3          **ADVERTISING AND PUBLICITY**

C-3.1        The Contractor shall not issue or sponsor any advertising or publicity that states or
             implies, either directly or indirectly, that the CFSA endorses, recommends or prefers the
             Contractor's services. The Contractor shall not use CFSA's logo in any fashion without
             CFSA's prior written approval.

C-3.2        The Contractor shall not use or release information, photographs or other depictions of
             CFSA projects for publication, advertising or otherwise without the Contracting Officer's
             prior written approval. The provisions of this paragraph apply also to any subcontractors
             under this contract.

C-4          **CONFIDENTIALITY**

C-4.1        The Contractor shall follow the procedures and requirements outlined in 29 DCMR
             § 6320, as supplemented by Section C-4.2.

C-4.2        The Contractor recognizes that all information regarding client care is confidential and
             constitutes valuable, special and unique property of CFSA. The Contractor shall not at
             any time, either during or subsequent to the term of this contract, disclose to others, use,
             copy or permit to be copied, any CFSA client information without CFSA's express prior
             written consent, except as required by Contractor's duties as outlined in this contract, and
             applicable law.

C-5          **SUBCONTRACTING**

C-5.1        Contractor shall not engage subcontractors to perform any of its responsibilities under
             this contract without the prior written approval of the Contracting Officer.

C-5.2        Consent by CFSA to any proposed subcontractor shall not: (1) constitute a determination
             of the acceptability of any subcontract terms or conditions; (2) constitute a determination
             of the acceptability of any amount paid under any subcontract; or (3) relieve Contractor
             of any of its responsibilities under the contract.

C-5.3        Contractor shall assure that all subcontracts approved by CFSA shall be consistent with
             the terms of this contract, including, but not limited to, certifications and licenses of staff,
             safeguarding of confidential information, and insurance coverage.

C-5.4        **RESERVED**

C-6          **TARGET POPULATION**

             The Contractor shall provide services to youth between the ages of 16 and 21 who are
             wards of the District and who are preparing for emancipation from the child welfare
             system. The youth may suffer from various emotional/behavioral problems brought on or
             exacerbated by abuse and/or neglect, multiple placements or numerous traumatic life
             hardships. They may have special needs, such as cognitive disorders, psychiatric and/or
             psychological diagnoses, developmental disabilities, learning or school adjustment
             problems, behavioral or emotional problems, social attachment issues, or medical and
             substance abuse problems.

## PART I - THE SCHEDULE

## SECTION C

## DESCRIPTION/SPECIFICATIONS/ STATEMENT OF WORK

C-1 **SCOPE OF SERVICES**

C-1.1    Jones and Associates, Inc. (Contractor), shall provide to the District of Columbia, Child and Family Services Agency (CFSA or the Agency), Independent Living Services for wards of the District between the ages of 16 and 21, who are preparing for emancipation from the child welfare system. The Contractor shall provide these youth an opportunity to live in the community and learn and practice skills in preparation for successful adult independence.

C-1.2    The Contractor shall provide such services with the goal of providing a happy and homelike experience for youth, helping youth successfully prepare for and achieve emancipation, achieving stability in placement, reducing the number of re-placements for any reason other than emancipation, achieving stability in youth's educational placements, assisting all able youth in attending college, and accommodating the distinct and varying level of youth through a step-down program, which takes into consideration regressive or accelerated maturational changes of the youth. The setting for these services shall be residential units, as outlined in Section C-7 below.

C-2 **STANDARD OF PERFORMANCE**

C-2.1    The Contractor shall comply with all federal, state and local laws governing the health, safety and care of youth currently in effect, or in effect during the period of the contract, including, but not limited to Chapter 63 of Title 29, District of Columbia Municipal Regulations (DCMR), Licensing of Independent Living Programs for Adolescents and Young Adults, the LaShawn A. v. Williams Implementation Plan, approved on May 15, 2003, the Youth Residential Facilities Licensure Act of 1986, D.C. Code Official § 7-2101 *et seq.*, the Child Abuse and Prevention Treatment Act, 42 U.S.C. § 5101 *et seq.*, the Prevention of Child Abuse and Neglect Act of 1977, D.C. Official Code § 16-2351-2365, the Adoption Assistance and Child Welfare Act of 1997, 42 U.S.C. § 620 *et seq.*, the Adoption and Safe Families Act of 1997, 42 U.S.C. § 1305 *et seq.*, the Multiethnic Placement Act of 1994, 42 U.S.C. § 1996b, Title IV, Part B of the Social Security Act , 42 U.S.C. § 620 *et seq.*, the Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978, D.C. Official Code §7-1301.02 *et seq.*, the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. §§ 1320d *et seq.*, and the Individuals with Disabilities Education Act , 20 U.S.C. § 1400 *et seq.*

C-2.2    The Contractor shall ensure that all staff (employees, volunteers, consultants), subcontractors, if any, and agents of the Contractor comply with the respective laws, regulations and standards when providing services under this contract. The Contractor shall act at all times in good faith and in the best interests of CFSA, use its best efforts, and exercise all due care and sound business judgment in performance of its duties under the contract.

**C-7**  **LOCATION OF SERVICES**

The Contractor shall provide services in the main facility identified on the license issued by the CFSA Office of Licensing and Monitoring.

**C-8**  **SPECIFIC REQUIREMENTS**

**C-8.1**  **Reserved**

**C-8.2**  **Compliance with regulatory requirements**

**C-8.2.1**  The Contractor shall operate at all times in compliance with, and according to all of the dictates of, Title 29, Chapter 63 of the District of Columbia Municipal Regulations, Licensing of Independent Living Programs for Adolescents and Young Adults (Attachment J-3), all of the provisions which are hereby incorporated by reference into this contract, and incorporated by reference wherever they appear in this contract.

**C-8.2.2**  The Contractor shall at all times maintain its residential facilities according to the license issued by the CFSA Office of Licensing and Monitoring, and shall comply with all instructions from the Office of Licensing and Monitoring regarding the requirements of its license.

**C-8.3**  **Admission and Placement/Intake Services**

**C-8.3.1**  The Contractor shall follow the procedures and requirements outlined in 29 DCMR §§ 6339-6340, as supplemented by Sections C-8.3.2 through C-8.3.6.

**C-8.3.2**  The Contractor shall accept for placement only those youths that are referred to the Contractor by CFSA's placement office. Pursuant to the LaShawn A. v. Williams Implementation Plan (Attachment J-4), no youth may be refused placement except for lack of a vacancy.

**C-8.3.3**  Contractor shall ensure that all youth placed are enrolled in the Center for Keys for Life (CFSA's Independent Living program).

**C-8.3.4**  Contractor shall ensure that orientation of youth includes a pre-placement visit to the facility, tour of the living space and introduction to staff and other youth in the facility, as applicable.

**C-8.3.5**  As part of its explanation to the youth of the community resources available to them, the Contractor shall provide the address and phone number of the Healthy Families/Thriving Communities Collaborative that services the area of the District in which they will be residing.

**C-8.3.6**  The Contractor shall ensure that each youth is assigned a primary Senior Counselor who shall be responsible for the direct supervision of that youth in conjunction with other assigned qualified staff, such as counselors and aides possessing the required specialized expertise as appropriate.

C-8.4        **Individual Transitional Independent Living Plans (ITILPs)**

C-8.4.1      The Contractor shall follow the procedures and requirements outlined in 29 DCMR §
             6341, as supplemented by Section C-8.4.2.

C-8.4.2      The planning team for the Initial ITILP and the ITILP shall consist of the Contractor, the
             youth, the youth's parent/guardian if deemed appropriate by CFSA, the youth's attorney
             and/or guardian ad litem, the CFSA Social Worker, a representative from the Center of
             Keys for Life and other individuals as deemed necessary and appropriate by CFSA. A
             copy of the Initial ITILP and the ITILP shall be made available to all of the parties who
             have participated in its development, as well as copies of all changes or updates.

C-8.5        **Life Skills**

C-8.5.1      The Contractor shall follow the procedures and requirements outlined in 29 DCMR §
             6330, as supplemented by Sections C-8.5.2 through C-8.5.3.

C-8.5.2      The Contractor shall endeavor to place the youth in living situations that are conducive to
             encouraging and promoting successful semi-independent functioning. The Contractor
             shall provide youth with adult supervision, general physical and emotional care,
             guidance, and individual and/or group counseling, which shall assist them in acquiring
             controls, self respect and abilities necessary to function as independent adults. The
             Contractor shall promote each youth's personal growth and development to provide them
             with activities, experiences which will assist in the development of self confidence, a
             realistic self-image, self determination and interpersonal skills that shall aide them in
             competing for employment, tolerating setbacks and sustaining relationships in which
             support can be provided and given.

C-8.5.3      The Contractor shall provide the opportunity for each youth to attend or not attend
             religious services at the youth's discretion.

C-8.6        **Reserved**

C-8.7        **Case Record**

C-8.7.1      The Contractor shall follow the procedures and requirements outlined in 29 DCMR §
             6318, as supplemented by Section C-8.7.2.

C-8.7.2      The case record shall include information on staff interaction with the youth's family
             where the youth is not present.

C-8.8        **Staff Daily Log**

C-8.8.1      If services are provided in a group living facility, the Contractor shall maintain a daily log
             where staff shall sign in, record arrival and departure of youth, visits of friends and
             family members, appointments and illnesses, unusual incidents, and other daily events

C-8.8.2      The staff daily logs are the property of CFSA and shall revert to CFSA immediately upon
             termination of this contract.

C-8.9        **Education**

C-8.9.1     The Contractor shall ensure that each youth is enrolled in an educational program, high school or General Equivalency Degree (GED) Program. The Contractor shall provide youth with assistance including, but not limited to, tutoring, scheduled homework hours and review sessions.     •

C-8.9.2     The Contractor shall maintain space for youth that depart the District of Columbia or its surrounding suburbs to attend a higher education institution or vocational training institution. The Contractor shall also assist youth in obtaining necessary services during those times that the youth is back in the District of Columbia during a break in their academic or vocational schedule.

C-8.10     **Pre-Emancipation**

C-8.10.1     The Contractor shall assist youth in making the transition to emancipation without undue discouragement or risk of jeopardizing future chances for self-sufficiency, due to initial mistakes or setbacks. The Contractor shall provide support and guidance throughout the pre-emancipation phase.

C-8.10.2     CFSA will determine that a youth is eligible for pre-emancipation based in part on whether the youth is at least 16 years old; is employed at least part-time; is either near completion of high school degree or GED or is actively engaged in a vocational training program; has had his/her plan for self-sufficiency approved at least sixty (60) days prior to moving into the pre-emancipation phase; and is free of substance abuse problems or is an active participant in a substance abuse abatement program certified by CFSA.

C-8.11     **Emancipation**

CFSA shall determine the youth's readiness for emancipation. After an affirmative determination of readiness for emancipation has been communicated in writing by CFSA to the Contractor, the Contractor shall prepare an agreement to be signed by the youth, the CFSA Social Worker, and the Contractor that outlines the facts that support CFSA's determination. Contractor shall assist CFSA as necessary in preparing all legal documents related to emancipation and separation from the child welfare system.

C-8.12     **Visitation**

C-8.12.1     The Contractor shall follow the procedures and requirements outlined in 29 DCMR § 6346 and the LaShawn Implementation Plan (Attachment J-4).

C-8.13     **Reserved**

C-8.14     **Transportation**

C-8.14.1     The Contractor shall follow the procedures and requirements outlined in 29 DCMR § 6343 and the LaShawn Implementation Plan (Attachment J-4), as supplemented by Section C-8.14.2

C-8.14.2     The Contractor shall not be responsible for meeting the transportation needs of the youth in its care when the District of Columbia Public Schools (DCPS) or another entity is required by law or otherwise mandated to provide such transportation.

C-8.15        Cooperation with CFSA

C-8.15.1      The Contractor shall facilitate visits between youth and family, including court-ordered visits.

C-8.15.2      The Contractor shall provided guidance and supervision, policies and protocols, and shall collaborate with CFSA staff and remain in compliance with existing CFSA policies and procedures.  These areas shall include, but not be limited to, the implementation of services and programs for youth, the referral, placement and discharge of youth, court and administrative reviews, the development and updating of case plans and service plans, and permanency planning for youth.

C-8.15.3      The Contractor shall prepare reports for courts and administrative reviews and arrange for the youth and other resource persons to attend as requested.

**\*\*\*\*END OF SECTION C\*\*\*\***

Jones and Associates, Inc.
Independent Living Services - Main Facility

CFSA-04-C-0076
Page 12 of 39

# PART I - THE SCHEDULE

## SECTION D

## PACKAGING AND MARKING

## TABLE OF CONTENTS

| CLAUSE NO. | CLAUSE TITLE | PAGE NO. |
|---|---|---|
| D-1 | CONTRACT NUMBER | 13 |
| D-2 | MAILING FEES | 13 |

## SECTION F - DELIVERIES OR PERFORMANCE

F-1        **CONTRACT TERM**

           The term of the contract is from the December 1, 2003 through March 31, 2004 with a
           transition period, for a total contract term not to exceed one hundred eighty-three 183
           days if the District exercises the transition period. The price for the Transition Period
           shall be as specified in section B.

F-2        **DELIVERABLES**

F-2.1      The Contractor shall submit a Daily Census Report form for each facility by 7:30 am
           Monday through Friday, for the duration of the contract period. The Contractor shall use
           the "Revised 6/03" version or any subsequent version issued by CFSA. The form shall be
           submitted to the Office of Licensing and Monitoring by fax to (202) 727-5627. If fax
           service is not available, the information required by the form may be submitted by e-mail
           to Mildred Young-Franze, Supervisory Social Worker, at **myoungfran@cfsa-dc.org**
           with a copy to Rula Swann, Social Work Program Manager at **rswann@cfsa-dc.org**, but
           the e-mail **must** contain all of the information that would be required by the form. Verbal
           reporting of this information is not acceptable.

F-2.2      The Contractor shall submit a monthly report to the Program Monitor and Contract
           Administrator by the 10th day after the end of each month of service regarding its
           progress towards completion of tasks requirements in the scope of services and each
           youth's progress toward the attainment goals set forth in the ITILP and their adjustment
           in placement.  Should the youth show any digression, a similar report shall be issued
           outlining a plan for improvement, identifying which specific areas of behavior need
           improvement and a recommendation as to action. Such reports must contain the
           following information in a format approved by the Program Monitor: (a) total number of
           children currently placed in Contractor's facilities: (b) types of services and activities and
           the number of person involved in each; (c) total number of admissions to and
           terminations from service during the month.

F-2.3      The Contractor shall submit a written final report to the Program Monitor and Contract
           Administrator no later than thirty (30) days after the end of the contract period,
           summarizing all service delivery data, accomplishments, issues, and recommendations.

F-2.4      **Unusual Incidents**

F-2.4.1    The Contractor shall follow the procedures and requirements outlined in 29 DCMR
           § 6319, as supplemented by Section F-2.4.2.

F-2.4.2    Additional examples of unusual incidents include complaints from clients, their families,
           their attorneys, or others regarding client services or treatments; or request(s) for
           information or visits from the news media, attorneys, or non-CFSA Government officials.

F-2.5      The Contractor shall assist the assigned CFSA Social Worker in preparing court reports
           and when requested shall appear at court hearings and administrative reviews.

F-2.6      The Contractor shall submit to the Contract Administrator a Certified Audit report no
           later than 90 days after the end of the contract period or ninety days after the end of the

contractor's fiscal year, whichever is later.   The report shall be prepared by an independent Certified Public Accountant.

F-2.7        When the last day that a report/deliverable is due falls on a weekend, holiday, or day when the District government is closed, the report/deliverable is due the next working day. Where the method of delivery required is by fax, the Contractor has the option of delivering hard copies by hand delivery, but must obtain confirmation of receipt; regular mail is **not** acceptable.

Ms.O'Linda Fuller, Contract Specialist/Administrator
Child and Family Services Agency
955 L'Enfant Plaza North SW
Suite 5200
Washington, DC 20024
Main number: 202-724-5300

Ms. Kristina Chatykra, Monitor
Child and Family Services Agency
955 L'Enfant Plaza North SW
Suite P101
Washington, DC 20024
Main number: 202-442-6100

# [THIS SECTION INTENTIONALLY LEFT BLANK]

Jones and Associates, Inc.
Independent Living Services - Main Facility

F-2.8                    Chart of Deliverables

| REPORT NO. | DELIVERABLE | QTY | FORMAT/ METHOD OF DELIVERY | DUE DATE | DELIVER TO |
|---|---|---|---|---|---|
| 1 | Daily Census Report (Section F-2.1) | 1 | Fax or e-mail | Every weekday by 7:30 am | Program Monitoring Unit |
| 2 | Monthly Report (Section F-2.2) | 1 | Written/ Faxed | By 10th day of each month following months in which services are provided | Program Monitor and Contract Administrator |
| 3 | Initial Report/Plan of Service (Section C-8.3.1) | As required | Written/ Faxed | Within 5 days of placement | Program Monitor and Contract Administrator |
| 4 | Final Report (Section F-2.3) | 1 | Written/ Faxed | Within 30 days of end of contract period | Program Monitor and Contract Administrator |
| 5 | Unusual Incident Reports (Section F-2.4) | As required | Telephone or e-mail, followed by written /faxed report | Phone or e-mail within 24 hours, and follow up written report by next business day | Program Monitor |
| 6 | Court Reports (Section F-2.5) | As requested | Written | As requested | Social Worker |
| 7 | Certified Audit (Section F-3.6) | 1 | Written | 90 days after end of contract period or Contractor's fiscal year, if later | Contract Administrator |
| 8 | Child Protection Register results, criminal background checks and drug and alcohol test results (Sections H-1.1, 1.3 and 1.4) | 1 | Written/ Faxed | Prior to employment | Program Monitor and Contract Administrator |
| 9 | Current health certificates (Sections H-1.1 and 1.5) | 1 | Written/ Faxed | Prior to employment | Program Monitor |
| 10 | Certificates of Occupancy and leases (Section H-5) | 1 | Written/ Faxed | Within 30 days of contract execution | Program Monitor and Contract Administrator |
| 11 | Resumes, References, et al. (Section H-1.6) | 1 | Written/faxed | Within 30 days of commencement of employment | Program Monitor and Contract Administrator |
| 11 | Compliance with First Source Agreement (Section I-9) | As required | Written/faxed | Monthly | DOES |

**\*\*\* END OF SECTION F \*\*\***

Jones and Associates, Inc.
Independent Living Services - Main Facility

CFSA-04-C-0076
Page 20 of 39

## PART I - THE SCHEDULE

### SECTION G

### CONTRACT ADMINISTRATION DATA

### TABLE OF CONTENTS

| CLAUSE NO. | CLAUSE TITLE | PAGE NO. |
|---|---|---|
| G-1 | CONTRACT ADMINISTRATOR | 21 |
| G-2 | PROGRAM MONITOR | 21 |
| G-3 | MODIFICATIONS | 21 |
| G-4 | SUBMISSION OF INVOICES | 21-22 |
| G-5 | CERTIFICATION OF INVOICES/RECEIPTS | 22-23 |
| G-6 | PAYMENT | 23 |

## SECTION G - CONTRACT ADMINISTRATION DATA

G-1          **CONTRACT ADMINISTRATOR**

The Contract Administrator shall be responsible for all matters of contract administration that do not deal with the monitoring of performance of services, for which the CFSA Program Monitor is responsible. Correspondence or inquiries related to this contract shall be addressed to:

O'Linda Fuller, Contract Specialist
Child and Family Services Agency
Office of Contracting and Procurement
955 L'Enfant Plaza, SW
Suite 5200
Washington, DC 20024
(202) 724-7642 (phone-direct line)
(202) 724-5300 (phone-main number)
(202) 727-5883 (fax)

G-2          **PROGRAM MONITOR**

The CFSA Program Monitor, the person designated by CFSA to monitor all aspects of contract performance/delivery of services, will be assigned at the time of contract execution, and the Contractor shall be provided with the name(s) and telephone number(s). Contractor shall provide the Program Monitor and other authorized representatives of CFSA access to its facilities, clients and staff as may be necessary for monitoring and inspection purposes. Visits to the Contractor's facility may be announced or unannounced. Authorized visits by CFSA staff regarding the health, welfare or safety of a youth may be conducted at any time.

G-3          **MODIFICATIONS**

Any changes, additions or deletions to this contract shall be made by written modification by the **Contracting Officer only and no other**.

G-4          **SUBMISSION OF INVOICES/CERTIFICATION**

G-4.1        CFSA will send an invoice to the Contractor on a monthly basis in a format prescribed by CFSA's FACES information system. The Contractor shall review the FACES invoice, make revisions as appropriate, and return the signed invoice no later than five (5) business days following the receipt of the invoice. Invoices should be returned to the address listed below.

Accounts Payable
Child & Family Services Agency
Fiscal Operations Administration
400 Sixth Street, SW
Washington, DC 20024
(202) 727-7464 (phone)

G-4.2          Upon receipt of a properly signed invoice, the invoice shall be forwarded to the Program
               Monitor for verification and approval of services rendered. The Program Monitor will
               then certify the invoice and return it to the Fiscal Operations Administration for payment.

               In accordance with the Title 29 Chapter 63 section 6332.1 through 6332.7 regulations.
               The Contractor shall submit copies of the original receipts for cost incurred (cost plus
               fixed fee) for client expenses (food, utilities, rents, transportation, recreation, clothing,
               toiletries, incidentals and allowance) salaries, fringe benefits, consultant services,
               travel/transportation, supplies/minor equipment, communications, copying, postage and
               other educational functions cost (tuition- including: books, dormitory and transportation)
               line items. Contractor shall submit a roster of the children residing in the (ILP) main
               facilities and off site facilities with original signatures for monthly stipends received.

G-4.3          The Contractor shall submit one (1) original and two (2) copies of its invoice for any
               items identified in the Pricing Schedule as cost-reimbursement items. The invoice shall
               be submitted at the same time and to the same office as the FACES invoice. The invoice
               shall include the Contractor's name and address, invoice date, contract number, contract
               line items numbers, description of items to be reimbursed, appropriate supporting
               documentation, name and address of the official to whom payment is to be sent and the
               name, title, and phone number of the person to be notified in the event of a defective
               invoice. Upon receipt of a properly signed invoice with all appropriate supporting
               documentation attached, the invoice shall be forwarded to the Contract Price/Cost
               Analyst for review and recommendation. Only those costs that are identified in writing by
               the Contracting Officer as reimbursable under this contract shall be reimbursed. After the
               Contract Price/Cost Analyst has recommended payment, the Contract Administrator shall
               certify approval of the invoice, and return it to the Fiscal Operations Administration for
               payment.

G-5            **COST CEILING**

               a)   The cost for performing this contract shall not exceed $1,135,667.50, which includes
                    a fixed fee of $246,759.20. The cost for performing the transition period is
                    $570,493.15, which includes a fixed fee of $126,034.00.

               b)   The contractor shall notify the contracting officer, in writing, whenever it has reason
                    to believe that the total cost for the performance of this contract will be either greater
                    or substantially less than the cost ceiling.

               c)   As part of the notification, the contractor shall provide the contracting officer a
                    revised estimate for performing the contract.

               d)   The District is not obligated to reimburse the contractor for amounts incurred in
                    excess of the cost ceiling and the contractor is not obligated to continue performance
                    under this contract (including actions under the termination clauses of this contract)
                    or otherwise incur amounts in excess of the cost ceiling, until the contracting officer
                    notifies the contractor, in writing, that the cost ceiling has been increased and
                    provides a revised cost ceiling for performing this contract.

e) No notice, communication, or representation in any form from any person other than the contracting officer shall change the cost ceiling. In the absence of the specified notice, the District is not obligated to pay the contractor for any amounts in excess of the cost ceiling, whether such amounts were incurred during the course of contract performance or as a result of termination.

f) If the cost ceiling specified in this contract is increased, any amount the contractor incurs before the increase that is in excess of the cost ceiling specified in the contract shall be allowable to the same extent as if incurred afterward, unless the contracting officer issues a termination or other notice directing that the increase is solely to cover termination or other specified expenses.

g) A change order shall not be considered an authorization to exceed the applicable cost ceiling specified in this contract, unless the change order specifically increases the cost ceiling.

h) At any time or times before final payment and three (3) years thereafter, the contracting officer may have the contractor's invoices or vouchers and statements audited. Any payment may be reduced by amounts found by the contracting officer not to constitute allowable payment as adjusted for prior overpayments or underpayments.

G-6      **PAYMENT**

In accordance with the Quick Payment Act, D.C. Official Code § 2-221.01 *et seq.*, payment for completed services that have been accepted by CFSA shall be made within thirty (30) days from the date of receipt. CFSA will only pay the Contractor for performing the services under this contract at the prices and cost ceilings stated in Section B.

**\*\*\* END OF SECTION G \*\*\***

Jones and Associates, Inc.  
Independent Living Services - Main Facility

CFSA-04-C-0076  
Page 24 of 39

## PART I - THE SCHEDULE

### SECTION H

### SPECIAL CONTRACT REQUIREMENTS

### TABLE OF CONTENTS

| CLAUSE No. | CLAUSE TITLE | PAGE NO. |
|---|---|---|
| H-1 | PERSONNEL | 25-26 |
| H-2 | COST OF OPERATION | 26 |
| H-3 | INSURANCE | 26 |
| H-4 | RESERVED | 26 |
| H-5 | FACILITY REQUIREMENTS | 26 |
| H-6 | RESERVED | 27 |
| H-7 | HIPAA PRIVACY COMPLIANCE | 27-30 |

PART I - THE SCHEDULE

## SECTION H

## SPECIAL CONTRACT REQUIREMENTS

H-1         **PERSONNEL**

H-1.1       The Contractor shall follow the procedures and requirements outlined in 29 DCMR
            §§ 6323-6327, as supplemented by Section H-1.2 through Section H-1.13.

H-1.2       For purposes of this contract, "staff" shall include employees, consultants and volunteers.

H-1.3       The Contract must obtain a criminal background check pursuant to 29 DCMR § 6324
            from the police departments in jurisdictions in which staff have resided for the five years
            prior to employment under this contract, as well as the jurisdictions in which they will be
            providing services, and the District of Columbia.

H-1.4       Contractor shall comply with the requirements for drug and alcohol testing for staff as
            outlined in 29 DCMR § 6228.7.

H-1.5       For all new employees, the Contractor shall, prior to employment under this contract,
            provide to the Program Monitor and the Contract Administrator copies of the results of
            all Child Protection Register and criminal background checks, and the results of all drug
            and alcohol tests. The Deputy Director of Licensing and Monitoring, or her designee,
            shall have sole discretion to permit or prohibit any person with a criminal record from
            working for the Contractor on this contract, except that persons having criminal
            convictions for felony crimes of violence, or crimes involving sexual assault, rape, child
            abuse/molestation, or drug distribution shall not under any circumstances perform
            services or be employed by Contractor under this contract. Persons having criminal
            convictions for drug possession shall not have direct contact with children under this
            contract.

H-1.6       The Contractor must provide the results of the health examinations required by 29
            DCMR §§ 6323.20 and 6323.21 to the Program Monitor and Contract Administrator
            within thirty (30) days of contract execution.

H-1.7       The Contractor shall make available to CFSA at CFSA's request copies of resumes
            and/or employment history, professional and/or personal references, applicable
            credentials/ certifications, records of required medical examinations, notation of any
            allegations of professional or other misconduct and subsequent actions to the allegations
            and date and reason(s) if terminated from employment.

H-1.8       The Contractor shall employ and maintain staff as specified in its approved budget. Any
            changes in staffing patterns or budget line items funded by this contract shall be reported
            to the Contract Administrator, who shall submit the proposed change to the Contracting
            Officer. All such changes must be approved in writing in advance by the Contracting
            Officer.

H-1.9       All staff who are required by 29 DCMR § 6323 to hold degrees in social work shall be
            licensed as social workers in the jurisdictions in which the residences or facilities in
            which they will be providing services are located; if working solely from the Contractor's
            corporate offices, they shall be licensed in the jurisdiction in which the office is located.

## SECTION D - PACKAGING AND MARKING

D-1          **CONTRACT NUMBER**

All packages, letters, documents, correspondence and other data or matter relating to this contract must be marked with the corresponding contract number.

D-2          **MAILING FEES**

All postage and or mailing fees connected with performance of this contract shall be the responsibility of the contractor.

**\*\*\*END OF SECTION D\*\*\***

PART I - THE SCHEDULE

SECTION E

INSPECTION AND ACCEPTANCE

TABLE OF CONTENTS

| CLAUSE NO. | CLAUSE TITLE | PAGE NO. |
|---|---|---|
| E-1 | INSPECTION AND ACCEPTANCE | 15 |
| E-2 | QUALITY ASSURANCE | 15 |

## SECTION E - INSPECTION AND ACCEPTANCE

E-1          **INSPECTION AND ACCEPTANCE**

Inspection and Acceptance of services provided under this contract shall be performed by the Program Monitor, in accordance with Clause 7, Inspection of Services, of the Standard Contract Provisions for Use with District of Columbia Government Supply and Services Contracts, dated April 2003, which is incorporated by reference into this contact.

E-2          **QUALITY ASSURANCE**

The Contractor shall follow the procedures and requirements outlined in 29 DCMR § 6317.

**\*\*\* END OF SECTION E \*\*\***

## PART I - THE SCHEDULE

### SECTION F

### DELIVERIES OR PERFORMANCE

### TABLE OF CONTENTS

| CLAUSE NO. | CLAUSE TITLE | PAGE NO. |
|------------|--------------|----------|
| F-1 | CONTRACT TERM | 17 |
| F-2 | DELIVERABLES | 17 |

H-1.10    The Contractor shall maintain complete written job descriptions covering all positions funded through the contract, which must be included in the project files and be available for inspection on request by CFSA. Job descriptions will include education, experience, and/or licensing/certification criteria, a description of duties and responsibilities, hours of work, salary range and performance evaluation criteria. When hiring staff for this contract, the Contractor shall obtain written documentation of education, work experience and personal references, as well as any current licenses and certifications that are applicable.

H-1.11    In addition to the contents of the individual personnel files required by 29 DCMR § 6327.3, the personnel file shall also contain an employment history and/or resume, professional and personal references, personnel actions, time and attendance records, notation of any substantiated professional or other misconduct and the Contractor's response, and the reason for any suspension or termination of employee by Contractor. All personnel materials shall be made available to CFSA upon request.

H-1.12    The Contractor shall provide orientation sessions for each staff member with respect to administrative procedures, program goals, and policies and practices to be adhered to under this contract.

H-1.13    The Contractor shall maintain a current organizational chart, which displays organizational relationships and demonstrates who has responsibility for administrative oversight and supervision over each activity required under this contract.

H-2       **RESERVED**

H-3       **INSURANCE**

          The Contractor shall obtain insurance in accordance with 29 DCMR § 6316. The Contractor shall maintain such insurance throughout the contract period, and each insurance policy shall provided for written notice to the District at least thirty (30) days prior to any termination or material alteration.

H-4       **RESERVED**

H-5       **FACILITY REQUIREMENTS**

H-5.1     The Contractor's facility used during the performance of this contract will meet all applicable federal and District regulations for their intended use, including but not limited to 29 DCMR, Chapter 63. The facility shall at all times be operated pursuant to the terms of the license issued by the CFSA Office of Licensing and Monitoring.

H-5.2     Within thirty (30) days of contract execution, the Contractor shall provide to the Program Monitor and Contract Administrator copies of its Certificate of Occupancy permits, and leases for the facility, as required by 29 DCMR § 6315.4

H-5.3     The Contractor shall provide an emergency site facility to be used should the primary facility experience a catastrophe and become uninhabitable for services for the youths. The Contractor shall ensure that this facility be accessible to persons with mobility limitations consistent with the Americans with Disabilities Act.

| H-6 | **RESERVED** |

| H-7 | **HIPAA PRIVACY COMPLIANCE** |

| H-7.1 | **Definitions** |

| H-7.1.1 | "Contractor" shall mean Jones and Associates, Inc. |

| H-7.1.2 | "CFSA" shall mean the District of Columbia, Child and Family Services Agency. |

| H-7.1.3 | "Designated Record Set" means: |

(a) A group of records maintained by or for CFSA that is:

(i) The medical records and billing records about individuals maintained by or for a covered health care provider;

(ii) The enrollment, payment, claims adjudication, and case or medical management record systems maintained by or for a health plan; or

(iii) Used, in whole or in part, by or for CFSA to make decisions about individuals.

(b) For purposes of this paragraph, the term record means any items, collection, or grouping of information that includes Protected Health Information and is maintained, collected, used, or disseminated by or for CFSA.

| H-7.1.4 | Individual shall have the same meaning as the term "individual" in 45 CFR 164.501 and shall include a person who qualifies as a personal representative in accordance with 45 CFR 164.502(g). |

| H-7.1.5 | Privacy Rule. "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR part 160 and part 164, subparts A and E. |

| H-7.1.6 | Protected Health Information. "Protected Health Information" shall have the same meaning as the term "protected health information" in 45 CFR 164.501, limited to the information created or received by Contractor from or on behalf of CFSA. |

| H-7.1.7 | Required By Law. "Required By Law" shall have the same meaning as the term "required by law" in 45 CFR 164.501. |

| H-7.1.8 | Secretary. "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee. |

| H-7.2 | **Obligations and Activities of Contractor** |

| H-7.2.1 | Contractor agrees to not use or disclose Protected Health Information other than as permitted or required by this HIPAA Privacy Compliance Clause (this Clause) or as Required By Law. |

| H-7.2.2 | Contractor agrees to use appropriate safeguards to prevent use or disclosure of the Protected Health Information other than as provided for by this Clause. |

| H-7.2.3 | Contractor agrees to mitigate, to the extent practicable, any harmful effect that is known to Contractor of a use or disclosure of Protected Health Information by Contractor in violation of the requirements of this Clause. |

| H-7.2.4 | Contractor agrees to report to CFSA any use or disclosure of the Protected Health Information not provided for by this Clause of which it becomes aware. |

| H-7.2.5 | Contractor agrees to ensure that any agent, including a subcontractor, to whom it provides Protected Health Information received from, or created or received by Contractor on behalf of CFSA, agrees to the same restrictions and conditions that apply through this Agreement to Contractor with respect to such information. |

H-7.2.6     Contractor agrees to provide access, at the request of CFSA, and in the time and manner
            prescribed by the Contracting Officer, to Protected Health Information in a Designated
            Record Set, to CFSA or, as directed by CFSA, to an Individual in order to meet the
            requirements under 45 CFR 164.524.

H-7.2.7     Contractor agrees to make any amendment(s) to Protected Health Information in a
            Designated Record Set that CFSA directs or agrees to pursuant to 45 CFR 164.526 at the
            request of CFSA or an Individual, and in the time and manner prescribed by the
            Contracting Officer.

H-7.2.8     Contractor agrees to make internal practices, books, and records, including policies and
            procedures and Protected Health Information, relating to the use and disclosure of
            Protected Health Information received from, or created or received by Contractor on
            behalf of, CFSA, available to the CFSA, or to the Secretary, in a time and manner
            prescribed by the Contracting Officer or designated by the Secretary, for purposes of the
            Secretary determining CFSA's compliance with the Privacy Rule.

H-7.2.9     Contractor agrees to document such disclosures of Protected Health Information and
            information related to such disclosures as would be required for CFSA to respond to a
            request by an Individual for an accounting of disclosures of Protected Health Information
            in accordance with 45 CFR 164.528.

H-7.2.10    Contractor agrees to provide to CFSA or an Individual, in time and manner prescribed by
            the Contracting Officer, information collected in accordance with Section (i) above, to
            permit CFSA to respond to a request by an Individual for an accounting of disclosures of
            Protected Health Information in accordance with 45 CFR 164.528.

### H-7.3        Permitted Uses and Disclosures by Contractor

H-7.3.1     Refer to underlying services agreement. Except as otherwise limited in this Clause,
            Contractor may use or disclose Protected Health Information to perform functions,
            activities, or services for, or on behalf of, CFSA as specified in this contract, provided
            that such use or disclosure would not violate the Privacy Rule if done by CFSA or the
            minimum necessary policies and procedures of CFSA.

H-7.3.2      Except as otherwise limited in this Clause; Contractor may use Protected Health
            Information for the proper management and administration of the Contractor or to carry
            out the legal responsibilities of the Contractor.

H-7.3.3     Except as otherwise limited in this Clause, Contractor may disclose Protected Health
            Information for the proper management and administration of the Contractor, provided
            that disclosures are Required By Law, or Contractor obtains reasonable assurances from
            the person to whom the information is disclosed that it will remain confidential and used
            or further disclosed only as Required By Law or for the purpose for which it was
            disclosed to the person, and the person notifies the Contractor of any instances of which it
            is aware in which the confidentiality of the information has been breached.

H-7.3.4     Except as otherwise limited in this Clause; Contractor may use Protected Health
            Information to provide Data Aggregation services to CFSA as permitted by 42 CFR
            164.504(e)(2)(i)(B).

H-7.3.5     Contractor may use Protected Health Information to report violations of law to
            appropriate Federal and State authorities, consistent with § 164.502(j)(1).

### H-7.4        Obligations of CFSA

H-7.4.1     CFSA shall notify Contractor of any limitation(s) in its notice of privacy practices of
            CFSA in accordance with 45 CFR 164.520, to the extent that such limitation may affect
            Contractor's use or disclosure of Protected Health Information.

Jones and Associates, Inc.                                                                      CFSA-04-C-0076
Independent Living Services - Main Facility                                                  Page 29 of 39

H-7.4.2    CFSA shall notify Contractor of any changes in, or revocation of, permission by
           Individual to use or disclose Protected Health Information, to the extent that such changes
           may affect Contractor's use or disclosure of Protected Health Information.

H-7.4.3    CFSA shall notify Contractor of any restriction to the use or disclosure of Protected
           Health Information that CFSA has agreed to in accordance with 45 CFR 164.522, to the
           extent that such restriction may affect Contractor's use or disclosure of Protected Health
           Information.

H-7.5      **Permissible Requests by CFSA**

           CFSA shall not request Contractor to use or disclose Protected Health Information in any
           manner that would not be permissible under the Privacy Rule if done by CFSA.

H-7.6      **Term and Termination**

H-7.6.1    Term. The requirements of this HIPAA Privacy Compliance Clause shall be effective as
           of the date of contract award, and shall terminate when all of the Protected Health
           Information provided by CFSA to Contractor, or created or received by Contractor on
           behalf of CFSA, is destroyed or returned to CFSA, or, if it is infeasible to return or
           destroy Protected Health Information, protections are extended to such information, in
           accordance with the termination provisions in this Section.

H-7.6.2    Termination for Cause. Upon CFSA's knowledge of a material breach of this Clause by
           Contractor, CFSA shall either:

           (a) Provide an opportunity for Contractor to cure the breach or end the violation and
               terminate the contract if Contractor does not cure the breach or end the violation
               within the time specified by CFSA;

           (b) Immediately terminate the contract if Contractor has breached a material term of this
               HIPAA Privacy Compliance Clause and cure is not possible; or

           (c) If neither termination nor cure is feasible, CFSA shall report the violation to the
               Secretary.

H-7.6.3    Effect of Termination

           (a) Except as provided in Section H-7.6.3 (b), upon termination of the contract, for any
               reason, Contractor shall return or destroy all Protected Health Information received
               from CFSA, or created or received by Contractor on behalf of CFSA. This provision
               shall apply to Protected Health Information that is in the possession of subcontractors
               or agents of Contractor. Contractor shall retain no copies of the Protected Health
               Information.

           (b) In the event that Contractor determines that returning or destroying the Protected
               Health Information is infeasible, Contractor shall provide to CFSA notification of the
               conditions that make return or destruction infeasible. Upon determination by the
               Contracting Officer that return or destruction of Protected Health Information is
               infeasible, Contractor shall extend the protections of this Agreement to such
               Protected Health Information and limit further uses and disclosures of such Protected
               Health Information to those purposes that make the return or destruction infeasible,
               for so long as Contractor maintains such Protected Health Information.

H-7.7          **Miscellaneous**

H-7.7.1        Regulatory References. A reference in this Clause to a section in the Privacy Rule means the section as in effect or as amended.

H-7.7.2        Amendment. The Parties agree to take such action as is necessary to amend this Clause from time to time as is necessary for CFSA to comply with the requirements of the Privacy Rule and the Health Insurance Portability and Accountability Act of 1996, Public Law No. 104-191.

H-7.7.3        Survival. The respective rights and obligations of Contractor under Section H-7.6 of this Clause and Sections 9 and 20 of the Standard Contract Provisions for use with District of Columbia Government Supply and Services Contracts, effective April 2003, shall survive termination of the contract.

H-7.7.4        Interpretation. Any ambiguity in this Clause shall be resolved to permit CFSA to comply with the Privacy Rule.

### *** END OF SECTION H ***

## PART II - CONTRACT CLAUSES

### SECTION I

·

### CONTRACT CLAUSES

### TABLE OF CONTENTS

| CLAUSE NO. | CLAUSE TITLE | PAGE NO. |
|---|---|---|
| I-1 | GOVERNING LAW | 32 |
| I-2 | APPLICABILITY OF STANDARD CONTRACT PROVISIONS | 32 |
| I-3 | RESERVED | 32 |
| I-4 | TIME | 32 |
| I-5 | RIGHTS IN DATA | 32-34 |
| I-6 | SUSPENSION OF WORK | 35 |
| I-7 | STOP-WORK ORDER | 35-36 |
| I-8 | CONTINUITY OF SERVICES | 36 |
| I-9 | FIRST SOURCE EMPLOYMENT AGREEMENT | 37 |
| I-10 | ANTI-KICKBACK PROCEDURES | 37-38 |
| I-11 | ORDER OF PRECEDENCE | 38 |

## SECTION I – CONTRACT CLAUSES

I-1      **GOVERNING LAW**

This contract shall be governed by and construed in accordance with the laws applicable in the District of Columbia.

I-2      **APPLICABILITY OF STANDARD CONTRACT PROVISIONS**

The Standard Contract Provisions for Use with District of Columbia Government Supply and Services Contracts, dated April 2003 (Attachment J-2), are incorporated by reference into this contract.

I-3      **RESERVED**

I-4      **TIME**

Time, if stated in a number of days, includes all calendar days unless otherwise stated.

I-5      **RIGHTS IN DATA**

I-5.1      "Data," as used herein, means recorded information, regardless of form or the media on which it may be recorded. The term includes technical data and computer software. The term does not include information incidental to contract administration, such as financial, administrative, cost or pricing, or management information.

I-5.2      The term "Technical Data", as used herein, means recorded information, regardless of form or characteristic, of a scientific or technical nature. It may, for example, document research, experimental, developmental or engineering work, or be usable or used to define a design or process or to procure, produce, support, maintain, or operate material. The data may be graphic or pictorial delineations in media such as drawings or photographs, text in specifications or related performance or design type documents or computer print outs. Examples of technical data include research and engineering data, engineering drawings and associated lists, specifications, standards, process sheets, manuals, technical reports, catalog item identifications, and related information, and computer software documentation. Technical data does not include computer software or financial, administrative, cost and pricing, and management data or other information incidental to contract administration.

I-5.3      The term "Computer Software", as used herein means computer programs and computer databases. "Computer Programs", as used herein means a series of instructions or statements in a form acceptable to a computer, designed to cause the computer to execute an operation or operations. "Computer Programs" include operating systems, assemblers, compilers, interpreters, data management systems, utility programs, sort merge programs, and automated data processing equipment maintenance diagnostic programs, as well as applications programs such as payroll, inventory control and engineering analysis programs. Computer programs may be either machine-dependent or machine-independent, and may be general purpose in nature or designed to satisfy the requirements of a particular user.

I-5.4      The term "computer databases", as used herein, means a collection of data in a form capable of being processed and operated on by a computer.

Jones and Associates, Inc.                                                    CFSA-04-C-0076
Independent Living Services - Main Facility                                   Page 33 of 39

I-5.5      All data first produced in the performance of this Contract shall be the sole property of
           the District.  The Contractor hereby acknowledges that all data, including, without
           limitation, computer program codes, produced by the Contractor for the District under
           this contract, are works made for hire and are the sole property of the District; but, to the
           extent any such data may not, by operation of law, be works made for hire, Contractor
           hereby transfers and assigns to the District the ownership copyright in such works,
           whether published or unpublished.  The Contractor agrees to give the District all
           assistance reasonably necessary to perfect such rights including, but not limited to, the
           works and supporting documentation and the execution of any instrument required to
           register copyrights.  The Contractor agrees not to assert any rights in common law or in
           equity in such data.  The Contractor shall not publish or reproduce such data in whole or
           in part or in any manner or form, or authorize others to do so, without written consent of
           the District until such time as the District may have released such data to the public.  The
           District shall not unreasonable withhold consent to the Contractor's request to publish or
           reproduce data in professional and scientific publications.

I-5.6      The District shall have restricted rights in data, including computer software and all
           accompanying documentation, manuals and instructional materials, listed or described in
           a license or agreement made a part of this contract, which the parties have agreed will be
           furnished with restricted rights, provided however, not withstanding any contrary
           provision in any such license or agreement, such restricted rights shall include, as a
           minimum the right to:

I-5.6.1    Use the computer software and all accompanying documentation and manuals or
           instructional materials with the computer for which or with which it was acquired,
           including use at any District installation to which the computer may be transferred by
           the District;

I-5.6.2    Use the computer software and all accompanying documentation and manuals or
           instructional materials with a backup computer if the computer for which or with
           which it was acquired is inoperative;

I-5.6.3    Copy computer programs for safekeeping (archives) or backup purposes; and

I-5.6.4    Modify the computer software and all accompanying documentation and manuals or
           instructional materials, or combine it with other software, subject to the provision
           that the modified portions shall remain subject to these restrictions.

I-5.7      The restricted rights set forth in section I-5.6 are of no effect unless

I-5.7.1    The data is marked by the Contractor with the following legend:

                              **RESTRICTED RIGHTS LEGEND**

           Use, duplication, or disclosure is subject to restrictions stated in Contract
           No. _____
           With _____(Contractor's Name); and

I-5.7.2    If the data is computer software, the related computer software documentation includes a
           prominent statement of the restrictions applicable to the computer software.  The
           Contractor may not place any legend on the computer software indicating restrictions on
           the District's rights in such software unless the restrictions are set forth in a license or
           agreement made a part of the contract prior to the delivery date of the software.  Failure

of the Contractor to apply a restricted rights legend to such computer software shall relieve the District of liability with respect to such unmarked software.

I-5.8    In addition to the rights granted in Section I-5.9 below, the Contractor hereby grants to the District a nonexclusive, paid-up license throughout the world, of the same scope as restricted rights set forth in Section I-5.9 below, under any copyright owned by the Contractor, in any work of authorship prepared for or acquired by the District under this contract. Unless written approval of the Contracting Officer is obtained, the Contractor shall not include in technical data or computer software prepared for or acquired by the District under this contract any works of authorship in which copyright is not owned by the Contractor without acquiring for the District any rights necessary to perfect a copyright license of the scope specified in this paragraph.

I-5.9    Whenever any data, including computer software, are to be obtained from a subcontractor under his contract, the Contractor shall use Section I-2 in the subcontract, without alteration, and no other clause shall be used to enlarge or diminish the District's or the Contractor's rights in that subcontractor data or computer software which is required for the District.

I-5.10   For all computer software furnished to the District with the rights specified in Section I-5.5, the Contractor shall furnish to the District, a copy of the source code with such rights of the scope specified in Section I-5.5. For all computer software furnished to the District with the restricted rights specified in Section I-5.6, the District, if the Contractor, either directly or through a successor or affiliate shall cease to provide the maintenance or warranty services provided the District under this contract or any paid-up maintenance agreement, or if Contractor should be declared bankrupt or insolvent by a court of competent jurisdiction, shall have the right to obtain, for its own and sole use only, a single copy of the then-current version of the source code supplied under this contract, and a single copy of the documentation associated therewith, upon payment to the person in control of the source code the reasonable cost of making each copy.

I-5.11   The Contractor shall indemnify and save and hold harmless the District, its officers, agents and employees acting within the scope of their official duties against any liability, including costs and expenses:

I-5.11.1  For violation of proprietary rights, copyrights, or rights of privacy, arising out of the publication, translation, reproduction, delivery, performance, use or disposition of any data furnished under this contract, or

I-5.11.2  Based upon any data furnished under this contract, or based upon libelous or other unlawful matter contained in such data.

I-5.12   Nothing contained in this clause shall imply a license to the District under any patent, or be construed as affecting the scope of any license or other right otherwise granted to the District under any patent.

I-5.13   Sections I-5.6, I-5.7, I-5.8, I-5.11 and I-5.13 in this clause are not applicable to material furnished to the Contractor by the District and incorporated in the work furnished under contract, provided that such incorporated material is identified by the Contractor at the time of delivery of such work.

| I-6 | **SUSPENSION OF WORK** |
|---|---|

I-6.1      The Contracting Officer may order the Contractor, in writing, to suspend, delay, or interrupt all or any part of the work of this contract for the period of time that the Contracting Officer determines appropriate for the convenience of CFSA. If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed or interrupted by an act of the Contracting Officer in the administration of this contract, or by the Contracting Officer's failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly.

I-6.2      No adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this contract.

I-6.3      A claim under this clause shall not be allowed for any costs incurred more than twenty (20) days before the Contractor shall have notified the Contracting Officer in writing of the act or failure to act involved (but this requirement shall not apply as to a claim resulting from a suspension order); and unless the claim, in an amount stated, is asserted in writing as soon as practicable after the termination of the suspension, delay, or interruption, but not later than the date of final payment under the contract.

| I-7 | **STOP-WORK ORDER** |
|---|---|

I-7.1      The Contracting Officer may, at any time, by written order to the Contractor, require the Contractor to stop all, or any part, of the work called for by this contract for a period of ninety (90) days after the order is delivered to the Contractor, and for any further period to which the parties may agree.

I-7.2      The order shall be specifically identified as a stop-work order issued under this clause. Upon receipt of the order, the Contractor shall immediately comply with its terms and take all reasonable steps to minimize the incurring of costs allocable to the work covered by the order during the period of work stoppage. Within a period of ninety (90) days after a stop-work is delivered to the Contractor, or within any extension of that period to which the parties shall have agreed, the Contracting Officer shall either cancel the stop-work order; or terminate the work covered by the order as provided in the Default or Termination for Convenience clauses in the Standard Contract Provisions (Attachment J-2).

I-7.3      If a stop-work order issued under this clause is canceled or the period of the order or any extension thereof expires, the Contractor shall resume work. The Contracting Officer shall make an equitable adjustment in the delivery schedule or contract price, or both, and the contract shall be modified, in writing, accordingly.

I-7.4      If the stop-work order results in an increase in the time required for, or in the Contractor's cost properly allocable to, the performance of any part of this contract; and the Contractor asserts its right to the adjustment within thirty (30) days after the end of the period of work stoppage; provided, that, if the Contracting Officer decides the facts justify the

Jones and Associates, Inc.
Independent Living Services - Main Facility

CFSA-04-C-0076
Page 36 of 39

action, the Contracting Officer may receive and act upon the claim submitted at any time before final payment under this contract.

I-7.5      If a stop-work order is not canceled and the work covered by the order is terminated for the convenience of CFSA, the Contracting Officer shall allow reasonable costs resulting from the stop-work order in arriving at the termination settlement.

I-7.6      If a stop-work order is not canceled and the work covered by the order is terminated for default, the Contracting Officer shall allow, by equitable adjustment or otherwise, reasonable costs resulting from the stop-work order.

I-8        **CONTINUITY OF SERVICES**

I-8.1      The Contractor recognizes that the services under this contract are vital to CFSA and must be continued without interruption and that, upon contract expiration, a successor, either CFSA or another contractor, may continue them. The Contractor agrees to furnish phase-in training during any Transition Period as outlined in Section B-2, and exercise its best efforts and cooperation to effect an orderly and efficient transition to a successor.

I-8.2      The Contractor shall, upon the Contracting Officer's written notice, furnish transition services as outlined in Section B-2 and negotiate in good faith a plan with a successor to determine the nature and extent of transition services required.

I-8.3      The plan shall specify a training program and a date for transferring responsibilities for each division of work described in the plan, and shall be subject to the Contracting Officer's approval. The Contractor shall provide sufficient experienced personnel during the transition period to ensure that the services called for by this contract are maintained at the required level of proficiency.

I-8.4      The Contractor shall allow as many personnel as practicable to remain on the job to help the successor maintain the continuity and consistency of the services required by this contract. "With the permission of the personnel of the Contractor" The Contractor also shall disclose to the successor contractor personnel records and allow the successor to conduct on-site interviews with these employees. If selected employees are agreeable to the change, the Contractor shall release them at a mutually agreeable date and negotiate transfer of their earned fringe benefits to the successor.

Jones and Associates, Inc.
Independent Living Services - Main Facility

CFSA-04-C-0076
Page 38 of 39

I-10.2.3   Including, directly or indirectly, the amount of any kickback in the contract price charged by a prime Contractor to CFSA or in the contract price charged by a subcontractor to a prime Contractor or higher tier subcontractor.

I-10.3     The Contractor shall have in place and follow reasonable procedures designed to prevent and detect possible violations described in paragraph I-10.2 of this clause in its own operations and direct business relationships.

I-10.4     When the Contractor has reasonable grounds to believe that a violation described in

I-9        **FIRST SOURCE EMPLOYMENT AGREEMENT**

The Contractor shall complete an approved First Source Employment Agreement with the Department of Employment Services (DOES) within thirty (30) days of contract execution. This agreement shall provide that 51% of the employees who are newly hired for this contract shall be sought by means of DOES agreement. The Contractor shall submit monthly compliance reports to DOES.

I-10       **ANTI-KICKBACK PROCEDURES**

I-10.1     Definitions:

I-10.1.1   "Kickback," as used in this clause, means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime Contractor, prime Contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

I-10.1.2   "Person," as used in this clause means a corporation, partnership, and business association of any kind, trust, joint-stock company, or individual.

I-10.1.3   "Prime contract," as used in this clause, means a contract or contractual action entered into by CFSA for the purpose of obtaining supplies, materials, equipment, or services of any kind.

I-10.1.4   "Prime Contractor" as used in this clause, means a person who has entered into a prime contract with CFSA.

I-10.1.5   "Prime Contractor employee," as used in this clause, means any officer, partner, employee, or agent of a prime Contractor.

I-10.1.6   "Subcontract," as used in this clause, means a contract or contractual action entered into by a prime Contractor or subcontractor for the purpose of obtaining supplies, materials, equipment, or services of any kind under a prime contract.

I-10.1.7   "Subcontractor," as used in this clause, means any person, other than the prime Contractor, who offers to furnish or furnishes any supplies, materials, equipment, or services of any kind under a prime contract or a subcontract entered into in connection with such prime contract, and includes any person who offers to furnish or furnishes general supplies to the prime Contractor or a higher tier subcontractor.

I-10.1.8   "Subcontractor employee, " as used in this clause, means any officer, partner, employee, or agent of a subcontractor.

I-10.2     The Anti-Kickback Act of 1986, 41 U.S.C. §§ 51-58 (the Act), prohibits any person from:

I-10.2.1   Providing or attempting to provide or offering to provide any kickback;

I-10.2.2   Soliciting, accepting, or attempting to accept any kickback; or

PART III – LIST OF DOCUMENTS, EXHIBITS, AND OTHER ATTACHMENTS

SECTION J

LIST OF EXHIBITS/DOCUMENTS INCORPORATED BY REFERENCE

| CLAUSE NO. | CLAUSE TITLE |
|---|---|
| J-1 | RESERVED |
| J-2 | STANDARD CONTRACT PROVISIONS FOR USE WITH DISTRICT OF COLUMBIA GOVERNMENT SUPPLY AND SERVICES CONTRACTS, DATED APRIL 2003 |
| J-3 | TITLE 29, CHAPTER 63, DISTRICT OF COLUMBIA MUNICIPAL REGULATIONS (LICENSING OF INDEPENDENT LIVING PROGRAMS FOR ADOLESCENTS AND YOUNG ADULTS) |
| J-4 | LASHAWN IMPLEMENTATION PLAN (AVAILABLE THOUGH THE CONTRACT ADMINISTRATOR) |
| J-5 | CHILD AND FAMILY SERVICES AGENCY GLOSSARY OF TERMS DEFINITIONS |
| J-6 | LETTER CONTRACT DATED DECEMBER 1, 2003 |

JONES AND ASSOCIATES

COMPLAINT EXHIBITS

EXHIBIT **NINE**:

CFSA CONTRACT # -04-C-0350

JULY 1, 2004

JONES AND ASSOCIATES

COMPLAINT EXHIBITS

EXHIBIT **TEN**:

CFSA CONTRACT # -04-C-0350

DEC. 7, 2004

2004

## DISTRICT OF COLUMBIA, CHILD AND FAMILY SERVICES AGENCY (CFSA)
### AWARD/CONTRACT
### FOR SUPPLIES OR SERVICES
# SECTION A

| ISSUED BY: | 2. PAGE OF PAGES |
|---|---|
| | 1       67 |

District of Columbia, Child and Family Service Agency(CFSA)
400 6th Street, S.W., 5th Floor
Washington, D.C 20024

Office of Contracting and Procurement
955 L'Enfant Plaza SW, Suite 5200
Washington, DC 20024
(202) 724-7542

**3 CONTRACT NUMBER:**
CFSA-04-C-0350

**4. EFFECTIVE DATE:**
July 1, 2004

**5. DELIVERY:**

[ X ] FOB DESTINATION      [ ] OTHER

**6 DISCOUNT FOR PROMPT PAYMENT**
NET 45 DAYS

**7. NAME AND ADDRESS OF CONTRACTOR** (No., street, city, county, State and ZIP code)

Jones & Associates, Inc.
1454 Corcoran Street, NW
Washington, DC 20009
TELEPHONE NO. (202) 462-1117
FAX NO.          (202) 332-5412
TIN : 52-1311038

### 8. TABLE OF CONTENTS

| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | **PART 1 – The Schedule** | | | | **PART II – Contract Clauses** | |
| X | A | Solicitation/Contract Form | | X | I | Contract Clauses | N/A |
| X | B | Supplies/Services and Price/Costs | | | | **PART III – List of Documents, Exhibits and Other Attach** | |
| X | C | Description/Specs/Work Statement | | X | J | List of Attachments | |
| X | D | Packaging and Marking | | | | **PART IV – Representations and Instructions** | |
| | E | Inspection and Acceptance | | X | K | Representations, Certifications and | |
| | F | Deliveries or Performance | | | | other Statements of Offerors | |
| | G | Contract Administration | | X | L | Instrs. Conds., & Notices to Offerors | ISR |
| X | H | Special Contract Requirements | | X | M | Evaluation Factors for Award | ISR |

**9. TOTAL AMOUNT OF CONTRACT**  $3,376,604.59

## CONTRACTING OFFICER WILL COMPLETE BLOCKS 10 OR 11 AS APPLICABLE

| 10 [ ]  AWARD (Contractor is not required to sign this) | 11. [ X ]  CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return __3__ copies to the issuing office) |
|---|---|
| Your offer on Solicitation Number _____ including the additions or changes made by you which additions or changes are set forth in this award/contract, is hereby accepted. This award consummates the contract which consists of the following documents: (a) CFSA's Solicitation and your offer, and (b) the award/contract. No further contractual documents are necessary. | The Contractor agrees to furnish and deliver all items or perform all services set forth or otherwise identified on any combination sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provision, representations, certifications, specifications and any other documents as are attached or incorporated by reference in Section J. |

| 12A. NAME AND TITLE OF SIGNER (Type or print) | 13A. NAME OF CONTRACTING OFFICER: |
|---|---|
| Dr. James L. Jones | Samuel J Feinberg CPPO CPPB |
| 12B  NAME OF CONTRACTOR | 13B. District of Columbia, Child and Family Services Agency (CFSA) |
| BY _____ (Signature of person authorized to sign) | BY _____ Samuel Feinberg CPPO CPPB ( Signature of Contracting Officer) |
| 12C  DATE SIGNED | 13C. DATE SIGNED |
| 12/7/04 | 12/7/04 |

CFSA AWARD/CONTRACT FORM 26 (REV. 01-01)

**Ex. #10**
"Disputed Contract - I"
Dec. 7, 2004

Jones & Associates, Inc
CFSA-04-C-0350

# SECTION B

## SUPPLIES OR SERVICES AND PRICE/COST

•

## TABLE OF CONTENTS

| CLAUSE NO. | CLAUSE TITLE | PAGE NO |
|---|---|---|
| B.1 | INCREMENTAL FUNDING | 2 |
| B.2 | INDEFINITE QUANTITY CONTRACT | 2 |
| B.3 | INCENTIVE CONTRACT | 2 |
| B.4 | CONTRACT LINE ITEMS | 2-3 |
| B.5, B.6, B.7, and B.8 | PRICE SCHEDULE, DEFINITIONS AND INSTRUCTIONS | 3 |
| B.9 | PRICE SCHEDULE | 4-5 |

Jones & Associates, Inc.
CFSA-04-C-0350

## SECTION B - SUPPLIES OR SERVICES AND PRICE/COST

B.1    This contract is incrementally funded in the amount of $3,376,604.50 for the
       period of performance beginning July 1, 2004 through June 30, 2005.

### B.2    INDEFINITE QUANTITY CONTRACT

B.2.1    This is a contract that provides for fixed unit rate with an indefinite quantity,
         within written stated limits, of specific supplies or services to be furnished during
         a fixed period. The contract requires the Agency to order and the Contractor to
         furnish at least a stated minimum of supplies or services. The maximum
         quantities of supplies and/or services that the Contractor is obligated to provide
         are specified in the Pricing Schedule. The guaranteed minimum quantities of
         services to be ordered are set forth below in Section B, Price Schedule.

B.2.2    Delivery or performance shall be made only as authorized by orders issued in
         accordance with the Ordering Clause stated at subsection or paragraphs in the
         contract. The Contractor shall furnish to the Agency, when and if ordered, the
         supplies and/or services specified in the Pricing Schedule, up to and including the
         maximum quantity. Through this type of contract, the Agency commits to
         payment for the minimum quantity specified in the contract, and for any
         additional amounts beyond the stated minimum, at the fixed price per unit as
         specified.

B.2.3    There is no limit on the number of orders that may be issued. The District
         Government may issue orders requiring delivery to multiple destinations or
         performance at multiple locations so long as the aggregate of all orders does not
         exceed the maximum.

## B.3    INCENTIVE CONTRACT

CFSA and the selected Contractor will form a task force to develop performance
measures and incentives for the Contractor's performance during contract year one (Base
Period). Upon mutual agreement of the parties, the Contracting Officer shall modify the
contract prospectively to provide performance measures concerning desired outcomes,
and by adding price incentives and disincentives based on the contractor's performance
as compared to the performance measures. If the parties are unable to agree on the
proposed modification, CFSA may either a) continue with the original contract without
the proposed modification, b) terminate the contract for convenience, or c) refuse to
exercise the next occurring option period.

## B.4    CONTRACT LINE ITEMS

The quantities specified in this Section B Price Schedule below shall be considered the
maximum capacity for each type of congregate care contracted. These numbers are
maximums, based on CFSA's actual congregate care population and plans to reduce the
number of children and youth placed in congregate care over the coming years. The
Contractor should consider these numbers in the context of the LaShawn A. Williams
Modified Final Order and Implementation Plan, and note that quantities may vary from
year to year depending upon the need for foster care, and CFSA's success in placing
more children and youth in family-based settings. The unit prices may be augmented by

2

Jones & Associates, Inc
CFSA-04-C-0350

incentives or disincentives based on the performance measures and objectives that are
mutually agreed to by the parties

**B.5**   **SECTION B, PRICE SCHEDULE - - DEFINITIONS AND INSTRUCTIONS.**

B.5.1   Item No : The specific congregate care service and the period of time (i.e. base period or
option period ) in which the service is to be provided

B.5.2   Supply/Service: Type of congregate care services (including a cross-reference to specific
sections of the RFP) that set forth details of the level of service, the age of the child or
youth, the number of days in which congregate care services shall be provided by the
Contractor.

B.5.3   Maximum Quantity: The maximum number of children for which CFSA will contract for
to provide congregate care services, as set forth by the Line Item No

B.5.4   Unit: Child per day

B.5.5   Unit Price: Price per child per day for congregate care services

B.5.6   Not-To-Exceed Amount: The extended price based on the Contractor's stated maximum
capacity times the price per child per day

B.5.7   Guaranteed Minimum: The minimum required quantity of service that the District shall
contract for under the contract during the performance period

**B.6**   **Cost Reimbursable Cost.** The Contractor will be reimbursed on a cost reimbursable
basis for all client specific cost that are supported and substantiated by the contractor
The Contract Line Item Numbers ("CLINs") for cost reimbursable costs are CLINs
0001CAA, 0002CAA, 0003CAA, 0004ABA and 0005CAA

B.7   RESERVED

B.8   In accordance with the requirement set forth in Section C.2.8, Facility and Licensing, and
effective during the base period, the Contractor shall not house more than eight (8)
children or youth in a single except Independent Living Main Facility, Independent
Living Residential Units and Assisted Living effective at the beginning of 07/01/2004)

3

Jones & Associates, Inc
CFSA-04-C-0350

B.9     PRICE SCHEDULE

B.9.1     BASE PERIOD: 07/1/04 THROUGH 06/30/05

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Quantity | Unit Price (Child per day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0001CA | Independent Living Main Facility Programs<br><br>(See Section C Paragraph C.5.6)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | 55<br><br>*(Contract shall not be awarded for more than 56 slots)* | $139.06 | $2,791,629.50 |
| 0001CAA | Independent Living Main Facility Programs<br><br>Client Specific Cost from Cost Schedule 6 and 8 | | 1 Lot | | $584,975.00 |

BASE PERIOD TOTAL NOT-TO-EXCEED AMOUNT: $3,376,604.50

B.9.2     OPTION PERIOD 1: 07/1/05 THROUGH 06/30/06

| Item No. | Supply/Services | Maximum Quantity to be Contracted by CFSA | Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0002CA | Independent Living Main Facility Programs<br><br>(See Section C Paragraph C.5.6)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | 55<br><br>*(Contract shall not be awarded for more than 56 slots)* | $139.06 | $2,791,629.50 |
| 0002CAA | Independent Living Main Facility Programs<br><br>Client Specific Cost from Cost Schedule 6 and 8 | | 1 Lot | | $584,975.00 |

OPTION PERIOD 1 TOTAL NOT-TO-EXCEED AMOUNT: $3,376,604.50

4

Jones & Associates, Inc.
CFSA-04-C-0350

B 9 3    OPTION PERIOD 2: 07/1/06 THROUGH 06/30/07

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0003CA | Independent Living Main Facility Programs<br><br>(See Section C Paragraph C.5 6)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | 55<br><br>*(Contract shall not be awarded for more than 56 slots)* | $143.22 | $2,875,141.50 |
| 0003CAA | Independent Living Main Facility Programs<br><br>Client Specific Cost from Cost Schedule 6 and 8 | | | | $602,525.00 |

OPTION PERIOD 2 TOTAL NOT-TO-EXCEED AMOUNT:  $3,477,666.50

B 9 4    OPTION PERIOD 3: 07/1/07 THROUGH 06/30/08

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0004CA | Independent Living Main Facility Programs<br><br>(See Section C Paragraph C 5.6)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | 55<br><br>*(Contract shall not be awarded for more than 56 slots)* | $143.22 | $2,875,141.50 |
| 0004CAA | Independent Living Main Facility Programs<br><br>Client Specific Cost from Cost Schedule 6 and 8 | | 1 Lot | | $602,525.00 |

OPTION PERIOD 3 TOTAL NOT-TO-EXCEED AMOUNT: $3,477,666.50

5

Jones & Associates, Inc.
CFSA-04-C-0350

B 9 5   OPTION PERIOD 4: 07/1/08 THROUGH 06/30/09

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0005CA | Independent Living Main<br><br>(See Section C Paragraph C 5 6)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | 55<br><br>*(Contract shall not be awarded for more than 56 slots)* | $147 51 | $2,961,263.25 |
| 0005CAA | Independent Living Main Facility Programs<br><br>Client Specific Cost from Cost Schedule 6 and 8 | | 1 Lot | | $620,691.00 |

OPTION PERIOD 4 TOTAL NOT-TO-EXCEED AMOUNT: $3,581,864.25

****END OF SECTION B****

Jones & Associates, Inc
CFSA-04-C-0350

PART I – SCHEDULE

SECTION C

DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK

TABLE OF CONTENTS

| CLAUSE NO | CLAUSE TITLE | PAGE NO |
|-----------|--------------|---------|
| C.1 | BACKGROUND | 7-8 |
| C.2 | SCOPE OF SERVICES | 8-15 |
| C.3 | TARGET POPULATION AND PROVISIONS OF CARE | 16 |
| C.4 | PROGRAM REQUIREMENTS | 16-24 |
| C.5 | CONGREGATE CARE POPULATION –SPECIFIC REQUIREMENTS | 24-26 |

Jones & Associates, Inc
CFSA-04-C-0350

# SECTION C

# DESCRIPTION/SPECIFICATIONS STATEMENT OF WORK

### C.1    BACKGROUND

C.1.1    The District of Columbia, Child and Family Services Agency (CFSA or the Agency) is charged with protecting children and youth from abuse and neglect, and ensuring a safe, permanent placement for those removed from their homes that can effectively support them in meeting their goals of well being. All children and youth deserve a permanent home and the nurture and support of a loving family. Therefore, diligent efforts shall be made to secure such settings for both children and youth, not excluding those with special needs such as medical and mental health conditions, behavioral and emotional problems, learning disabilities, and teen parenting responsibilities. CFSA strives toward placing all children and youth in family-based settings before seeking congregate care placement alternatives. CFSA's vision is to ensure that congregate care does not serve as a first placement setting, but as a response to specific needs of the child or youth under very limited circumstances.

C.1.2    In the upcoming years, CFSA will invest resources in preventing foster care placement to ensure more children can remain safely in their own families. For those who come into care, the expectation is that these children will move toward permanent living arrangements within established Adoption and Safe Families Act (ASFA) guidelines. CFSA envisions that fewer children and youth will be placed in congregate care. CFSA plans to increase its use of family-based care placements (both kin and unrelated foster homes) for all populations of children and youth. The Contractor should take this into consideration for their own planning purposes. CFSA expects that youth will reside in congregate care for limited periods of time, and under defined circumstances and services.

C.1.3    Congregate care shall be provided in the form of **"Independent Living Main Facility Programs"**. Details regarding these specific requirements are outlined in Section C.5 "Congregate Care Population-Specific Requirements"

C.1.4    In line with CFSA's goals, services should be integrated, family-centered, culturally and linguistically competent, and community-based. In addition, congregate care programs shall comply with the LaShawn A. v. Williams Implementation Plan. A performance-based system of evaluation shall be employed to ensure accountability, achievement of positive outcomes for youth and families, and cost-effectiveness of service provision

### C.2    SCOPE OF SERVICES

C.2.1  General Requirements

C.2.1.1  The Contractor shall be licensed as a youth residential facility in the District of Columbia in accord with the licensure regulations set forth by District of Columbia Municipal Regulations, Title 29, Chapters 62 and 63. The Contractor licensed in a jurisdiction other than the District of Columbia shall operate a program that meets all

Jones & Associates, Inc.
CFSA-04-C-0350

District of Columbia requirements. "Facility and Licensing Requirements" Section C.2.8 further explains these requirements.

C.2.1.2  The Contractor shall provide congregate care and supportive services in accordance with all existing federal and District of Columbia laws, rules, and regulations, including appropriate District licensure requirements, and consistent with policies, procedures and standards promulgated by the Child and Family Services Agency.

C.2.1.3  The Contractor shall meet general and program requirements applicable to all congregate care programs, as well as population-specific requirements unique to the form of congregate care set forth herein.

C.2.2   Service Integration/Linkage

The Contractor shall provide detailed plans to work with other providers to establish and maintain an effective and accessible continuum of care and constellation of services. The Contractor shall have service linkages with relevant, neighborhood-based service networks such as the Healthy Families/Thriving Communities Collaboratives, or similar networks.

C.2.2.1  Contractors shall develop an integrated service network with community-based service, foster care, and other treatment providers that establishes protocols for referral, communication, service planning and delivery, sub-contracting, communication, and data collection. Service provider contracts, formal service agreements, "letters of linkage", and memoranda of understanding among members of the service network may act as evidence of a formal agreement. See, also, C.2.7 "Mental Health Rehabilitative/Medicaid-Reimbursable Services" and C.2.5 "Community-Based Services".

C.2.2.2  An integrated service network will facilitate efficient access to services needed by youth and their families. Linkage across care providers will facilitate a smooth transition for youth from one level of care to another, and should include all types of congregate care programs outlined in this contract, as well as family-based providers (foster and kinship care). Such linkage meets CFSA expectations that the Contracters' programs support CFSA case manager activities in the achievement of safety, permanence, and well-being objectives.

C.2.3   Family-Centered Practice

The Contractor shall employ a family-centered approach to care that includes, when appropriate, the natural parents, family members and other significant individuals in the youth's life. The Contractor shall facilitate frequent visitation between the youth and family members (including siblings) and/or other significant individuals in the youth's life. These visits may occur in the youth's home community, in the homes of pertinent relatives and significant individuals and/or at the Contractor's site. Phone calls and other forms of communication will also be encouraged between the youth and relatives, as well as other significant individuals. The Contractor shall engage the youth's biological family immediately upon placement, and, as appropriate, shall encourage maximum family participation even when the youth's discharge goal is independent living. The Contractor shall link the family with effective services with the goal of strengthening family functioning.

9

Jones & Associates, Inc
CFSA-04-C-0350

C.2.4   Cultural and Linguistic Competence

C.2.4.1 The Contractor shall provide culturally competent services that ensure staff understand and are familiar with the family's culture, reinforce positive cultural practices, and acknowledge and build upon ethnic, socio-cultural and linguistic strengths. The Contractor shall make every effort to employ staff representative of the community served.

C.2.4.2 The Contractor shall provide linguistically competent services through staff that are fluent in the languages spoken by the children and families being served, or from another source providing such services. The Contractor shall have similar capacity to serve hearing impaired clients.

C.2.5   Community-Based Services

C.2.5.1

(a) A community-based system enhances the well-being of youth and their families by reducing the trauma of foster care separation, and increasing the potential for reunification with natural parents or kin. Congregate care programs shall endeavor to establish care sites within the youths' communities, or as close to their communities as possible, unless determined by the CFSA case manager that such proximity is not in the best interest of the youth. This is to ensure that youth in foster care can maintain connections with schools, churches, friends and families. If, for reasons deemed appropriate, a community-based placement is not possible, the Contractor shall develop and maintain linkages that strengthen the youth's relationship with his/her home communities and/or the community in which he/she will be residing upon discharge. To the extent possible, support services for youth and their families should similarly be provided in the youth's community of origin, community of placement, and/or community in which a potential kinship care or family-based provider resides.

(b) Additionally, youth shall be connected to, or involved in, the community in which they are residing while in congregate care. Contractors shall endeavor to create a community-based network of services and affiliations that will not only connect youth to the community, but the community to youth and congregate care programs located in their area. Required local advisory committees may serve as a vehicle by which to stimulate interest and support on the part of local citizens, service providers, businesses, religious groups, etc., to develop a community-based network. Such a network can be beneficial for assisting youth with tutoring, mentoring, jobs, guidance, and other services and supports. Youth shall become involved in the community through volunteer civic activities, attendance at religious services (if desired), use of public agencies/ services such as the local library and health clinic, and other similar activities.

C.2.5.2 Linkage to services provided in, or as close to, neighborhoods of origin and/or residence is also essential. This concept should be employed, to the extent possible, for all services and activities for youth and families. Linkage to service networks such as the Healthy Families/Thriving Communities Collaboratives, or similar community-based agencies, or network of service providers, shall be evaluated favorably. Additional information regarding mental health services is described in the previous Section C.2.2 "Service Integration/Linkage", as well as in the "Mental Health Services" Section C.4.7

10

Jones & Associates, Inc
CFSA-04-C-0350

C.2.6   Location of Services

C.2.6.1 CFSA is contracting for congregate care provided within the District of Columbia or within 25 miles of the District of Columbia. Facilities that are located within the District of Columbia are desired

C.2.6.2 Contractors shall ensure that youth maintain connections to their neighborhoods of origin, as well as their current neighborhoods of residence

C.2.6.3 If providing congregate care outside the District of Columbia, the Contractor shall meet the licensing standards applicable in the jurisdiction in which care is provided, as well as the District of Columbia's licensing standards. The District of Columbia has a number of standards more stringent than those of other jurisdictions, and these are outlined in section C.2.8 "Facility and Licensing Requirements". Contractors providing care in other jurisdictions must fully employ methods, strategies and resources that enable youth to maintain ties with their communities of origin

C.2.7   Mental Health Rehabilitative / Medicaid-Reimbursable Services. CFSA is committed to assuring that mental health services provided to children, youth and families without access to private health insurance are provided by agencies certified as Medicaid providers. The Contractor shall provide an existing or planned capacity to maximize financial and programmatic integrity through the utilization of funding streams other than CFSA. The Contractor shall strive to become a certified Medicaid providers, plan to become certified, or collaborate with subspecialty or subcontracted provider agencies that are certified Medicaid providers.

C.2.7.1 All youth with mental health needs shall be registered and connected with the District of Columbia's Department of Mental Health (DMH), and connected with a DMH-certified Core Service Agency to access needed services

C.2.7.2 Contractors providing care outside the District of Columbia shall fully collaborate with DMH and secure Medicaid-reimbursable mental health services. CFSA expectations regarding mental health services are further described in the "Mental Health Services" section C.4.2.6 and "Community-Based Services" Section C.2.5

C.2.8   Facility and Licensing Requirements. Congregate care facilities shall maintain compliance with all local and federal housing and building code regulations, as well as the requirements set forth by the District rules and regulations pertinent to the licensing and operation of youth residential facilities and independent living programs. See Section J, Attachments and Documents Incorporated By Reference, Nos. J.8 to J.22.

C.2.8.1 If providing care outside the District of Columbia, the facility must meet the licensing requirements for the jurisdiction in which the facility is operating, as well as the District of Columbia's licensing requirements. In certain instances, the District of Columbia's licensure requirements may be more stringent than those of other jurisdictions

C.2.8.2 The LaShawn A. v. Williams Implementation Plan (IP) requires CFSA to ensure that facilities serve youth in a more family-like manner by restricting the number of children and youth served in a single congregate care facility to not more than eight (8). The only permissible exception to placement of a child/youth in a facility serving more than eight (8) residents is if the individual needs of the child/youth require specialized care that can

11

Jones & Associates, Inc
CFSA-04-C-0350

only be provided in a larger facility. CFSA plans to phase out placement of children/youth in facilities serving more than eight (8) residents by the first option year of the contract. The eight (8) resident maximum shall take effect in the base contract year for group homes.

C.2.9   Organizational Requirements

C.2.9.1 The Contractor shall provide information regarding its organization including the mission, organizational structure, location, and services and programs offered.

C.2.9.2 The Contractor shall provide information regarding its contractual history with the District of Columbia and/or other jurisdictions, including the types of contracts, agencies contracted with, dates of contracts, and a copy of performance evaluations, if available, and a contact person.

C.2.9.3 The Contractor shall submit a current organizational chart that displays organizational relationships and demonstrates the staff member with responsibility for administrative oversight and supervision for each activity required under this contract, staff with training authority, staff with programmatic and clinical responsibility, and all other key staff, including main office and the congregate care facilities.

C.2.9.4 The Contractor shall submit a detailed work plan for the contract year, including all relevant action steps, responsible parties, outcomes and deliverables.

C.2.9.5 The Contractor shall maintain complete written job descriptions covering all positions funded through the contract in the files to be made available to CFSA for review. Job descriptions shall include required credentials, human care certifications, training certificates, description of duties and responsibilities, hours of work, salary range, and performance evaluation criteria.

C.2.9.6 The Contractor shall submit any changes in key staffing patterns to the Contracting Officer's Technical Representative not less than 30 days in advance of such changes.

C.2.9.7 The Contractor shall submit a copy of the policies and procedures relevant to its congregate care program(s). Policies should include (1) residents' rights and responsibilities, (2) behavior management techniques, and (3) all other pertinent descriptions of philosophy and approach to care.

C.2.10 Staff Qualifications and Requirements

C.2.10.1 The Contractors shall establish personnel guidelines that are in compliance with licensure regulations, as well as the CFSA guidelines outlined henceforth.

C.2.10.2 The Contractor shall ensure that all employees, consultants and sub-contractors have been cleared through the Child Protection Registry and the Police Department of the jurisdiction(s) in which the staff member resided during the five years prior to employment under this contract, as well as cleared through the District of Columbia Metropolitan Police Department, and the jurisdiction in which they will be providing services.

C.2.10.3 For all new employees, the Contractor shall, prior to employment under any contract

12

Jones & Associates, Inc.
CFSA-04-C-0350

resulting from this Solicitation, provide to the Contracting Officer's Technical Representative copies of the results of all Child Protection Register and criminal background checks, and the results of all drug and alcohol tests. The Deputy Director of Licensing and Monitoring, or her designee, shall have sole discretion to permit or prohibit any person with a criminal record from working for the Contractor on this contract, except that persons having criminal convictions for felony crimes of violence, or crimes involving sexual assault, rape, child abuse/molestation, or drug distribution shall not under any circumstances perform services or be employed by Contractor under this contract. Persons having criminal convictions for drug possession shall not have direct contact with children under this contract

C.2.10.4 The Contractor shall terminate any staff for whom allegations of any of the following has been substantiated by an investigation by CFSA's Institutional Abuse Unit

   (a)  Physical abuse of children, families or staff members,
   (b)  Sexual abuse or harassment of children, families or staff members,
   (c)  Verbal or emotional abuse of children, families or staff members,
   (d)  Drug or alcohol use on the premises or with children and families, or such that the
        staff is intoxicated while on duty,
   (e)  Failure to report any allegation of child abuse and/or neglect to CFSA and to the
        appropriate law enforcement or social service agency in the jurisdiction in which the
        allegation occurred

   Failure to dismiss employees for these conditions shall be sufficient cause for the contract termination under clause 9, Default, Standard Contract Provisions for Use with District of Columbia Supply and Services Contract, dated April 2003 (Attachment J.1)

C.2.10.5 The Contractor shall ensure that staff can provide services capable of meeting the cultural and linguistic needs of the participating youth and pertinent family members with whom visiting and planning for the youth must take place. To the extent possible, the Contractor shall comply with the First Source Employment Agreement, and recruit and hire appropriately qualified staff from the community served

C.2.10.6 In its work plan, The Contractor shall profile staff credentials, including, but not limited to, the number of staff, educational degrees, languages spoken and areas of specialization, and describe how these impact and address service needs of the targeted population.

C.2.10.7 The Contractor's congregate care staff shall collectively have experience and skill in adolescent development, behavior management, child abuse and neglect, family dynamics, psychotropic medication and medication management, and identification and treatment of alcohol and substance abuse

C.2.10.8 The Contractor's staff members and sub-contractors responsible for performing professional services, including psychological, psychiatric, medical, social work, nursing, dental, and education, shall have professional degrees from accredited colleges or universities and current license in their respective fields

Jones & Associates, Inc
CFSA-04-C-0350

C. 2.11  Staff Training and Development

C.2.11.1 The Contractor shall establish staff training and development policy and procedures that are in compliance with the licensure regulations, and CFSA guidelines outlined in this section

C.2.11.2 The Contractor shall provide training to congregate care staff on relevant child welfare topics including, but not limited to, child abuse and neglect, psychotropic medication and medication management, strength-based, family-centered practice, concurrent planning, domestic violence, teen relationship abuse, and HIV/AIDS

C.2.11.3 The Contractor shall also ensure that staff are trained on the provision of community-based services, including training on community characteristics, resources and needs and negotiating services for children within a community-based environment   Every effort shall be made by the Contractor to ensure that training incorporates and encourages the participation of representatives from community residents and community-based service providers, such as local hospitals, police precincts and drug treatment centers

C.2.11.4 The Contractor shall also provide training to congregate care staff on topics relevant to adolescent development.  Topics may include, but are not limited to, education and career development, life skills, health and pregnancy prevention, mental health, domestic violence and alcohol and substance abuse

C.2.11.5 The Contractor shall maintain training records, including attendance and copies of the curriculum

C.2.12   Information, Data Collection, Program Evaluation, and Quality Assurance

C.2.12.1 The Contractor and all subcontractors shall establish and submit, upon award, policies and procedures that ensure compliance with all District and federal privacy and confidentiality laws and polices

C.2.12.2 The Contractors shall submit a Daily Census Report form for each facility to the Licensing and Monitoring Administration by fax or e-mail as CFSA may direct

C.2.12.3 The Contractor shall ensure that congregate care staff and youth are actively involved in CFSA's Administrative Review and Case Practice Process.

C.2.12.4 The Contractor shall maintain adequate case files and fiscal records, and ensure that staff follow appropriate record-keeping practices and procedures, in a manner that is compliant with and supports all existing federal, state, and local laws, rules, and regulations, and is consistent with policies, procedures, and standards promulgated by CFSA

C.2.12.5 The Contractor shall comply with CFSA standards for reporting, monitoring activities, and performance reviews. CFSA shall offer technical assistance and a period of time for implementation of protocols in order to meet compliance standards

C.2.12.6 The Contractor shall develop and submit with the proposal their quality assurance systems for monitoring and reviewing program performance and designing and

14

Jones & Associates, Inc
CFSA-04-C-0350

implementing improvement strategies. The Contractor shall ensure participation in all CFSA Quality Improvement Processes that include, but may not be limited to, the following

(a) Administrative Reviews
(b) Case Practice Staffings
(c) Permanency Staffings

C 2.13  Outcome Measurement

C 2.13.1 A primary goal of CFSA's contract reform initiative is to develop a performance based system of evaluation that ensures accountability, cost-effectiveness of service provision, and achievement of positive outcomes for children, youth and families. CFSA plans to hold providers accountable for improving the quality of services delivered and, over time, for achieving selected outcomes for children's safety, permanence and well-being. CFSA expects to accomplish this through improved data collection and contract monitoring, establishment of financial incentives and disincentives for providers, and the development and implementation of a performance evaluation system. CFSA anticipates full achievement of this goal to be phased in over the first two contract years for congregate care.

C 2.13 2 In the first year, congregate care providers shall participate on a task force to assist CFSA in developing an effective approach to outcome measurement, accountability, and application of financial incentives and disincentives.  The Contractor will be asked to select a representative to serve on the task force, and task force objectives shall include, but not be limited to, the following

(a)   Identification of measures that capture significant youth and family outcomes
(b)   Identification and resolution of major issues in data reliability and timeliness
(c)   Development of an overall approach to performance accountability
(d)   Development of a system for applying financial incentives and disincentives

C 2.13.3 CFSA will take recommendations made by the task force into consideration in the development of protocols for performance accountability. See Section B.3 for the terms and conditions that will apply to the introduction of performance measures into contracts

C 2.13.4 While performance accountability shall be phased in during the first two years, CFSA expects congregate care providers to meet certain, basic requirements commencing the base contract year, as follows

(a) Licensure of the facility and program in accord with the requirements of the District of Columbia, and, if applicable, any other jurisdiction in which the facility is operating

(b) Quality service to youth and families via fulfillment of all licensing standards and RFP specifications for general, program and service delivery elements of the congregate care program

(c) Quarterly performance reviews that will provide an opportunity to discuss lessons learned and implementation of improvement strategies

C 2.13.5 The following shall serve as preliminary baseline indicators that the task force may

15

Jones & Associates, Inc
CFSA-04-C-0350

use as a framework from which to further develop performance and outcome measures, as well as pricing incentives and mechanisms

(a) Safety - Number of Critical/Unusual Incidents regarding care and supervision of youth that includes, but is not limited to, any Institutional Abuse/Neglect Investigations conducted.

•

(b) Permanence

(1) Length of stay in congregate care
(2) Number of disruptions in placement for youth served by the congregate care facility
(3) Percentage of youth who have regular contact with parents and extended family, where appropriate

(c) Well Being

(1) Percentage of youth receiving timely and community-based service linkages
(2) Percentage of youth meeting the mental health, health and other service objectives specified in case plan and/or ITILP
(3) Percentage of youth meeting educational, vocational, and independent living objectives specified in the IEP, case plan, and/or ITILP

C 2 14 Emergency Response and Plan

C 2 14 1 The Contractor shall have an emergency response plan that provides back-up power generators for the facility, and an alternate location for residents that can serve as temporary housing and care in the event of a natural or man-made disaster. The Contractor shall submit this plan within thirty (30) days of contract award

C 2 14 2 The Contractors shall submit training provisions for its emergency response plan within three (3) days of contract award

C.3   TARGET POPULATIONS AND PROVISION OF CARE

C 3 1   Consistent with the LaShawn A. v. Williams Implementation Plan, CFSA's priority is to place children and youth of all ages in family-based care and the least restrictive setting possible. As CFSA improves the capacity to place more children in family-based care, the Agency plans to reduce the level of congregate care for which it contracts. The following numbers for each type of congregate care population are based on CFSA's actual congregate care population, taking into consideration plans to reduce the number of children and youth placed in congregate care over the coming years. CFSA is currently in the process of developing its first needs assessment and resource development plan, and the Agency's capacity to project the congregate care needs of youth shall improve as these tools are developed, implemented, and further refined. Section C 5, "Congregate Care Population-Specific Requirements" further defines congregate care populations and requirements

C 3 1 1 The Contractor shall house male and female residents in separate, single sex facilities with the exception of Diagnostic and Emergency Care for children aged 12 and younger

16

Jones & Associates, Inc
CFSA-04-C-0350

C 3 1 2 Reserved.

C 3 1 3 Congregate care shall serve male and female youth unable to reside with family members, or in family-based care. The congregate care category are as follows

    (1) Independent Living Main Facility Programs

C 3 1 4 RESERVED

C 3 1 5 RESERVED

C.3 1 6 RESEVED

C 3 1 7 RESERVED.

C 3.1 8 The Contractor shall maintain an environment that is free of discrimination and harassment based on gender identity, sexual orientation, religious and racial/ethnic background, and/or disability.

## C.4      PROGRAM REQUIREMENTS

The Contractor shall provide a congregate care program that responds to rules and regulations outlined in DC Municipal Regulations Title 29, Chapters 62 or 63, as appropriate to the typed contract, as well as general, program and population-specific requirements. CFSA shall periodically monitor programs for compliance with all regulations and requirements.

C 4.1    Admission, Intake, Discharge and Aftercare Planning

C 4 1 1 The Contractors shall be equipped to admit youth into its congregate care program on a 24-hour, 7 day-a-week for each day of the year

C 4 1 2 The Contractors shall accept youth under the care of the Child and Family Services Agency for placement in its program. If the Contractors accepts non-CFSA youth into placement, the Contractor's shall provide a program description that shall include
    (a) The manner by which placement of CFSA and non-CFSA youth will be managed for the benefit of youth;
    (b) An adequate approach to confidentiality issues,
    (c) Assurance that the provisions of D C Code § 16-2320 are adhered to regarding "commingling of juveniles"

C.4 1 3 The Contractors shall accept for placement those youth under the care and legal custody of CFSA, and referred by CFSA's Placement Office The Contractor shall accept all youth referred if there is a vacancy in the program

C.4 1.4 The CFSA social worker shall coordinate the youth's placement with the Contractor by facilitating:

    (a) Completed and signed Board and Care Agreement Form

17

Jones & Associates, Inc
CFSA-04-C-0350

    b) Completion of medical screening prior to placement

    (c) Presentation of a copy of the medical examination at the time of placement

    (d) Exchange of the social security number, birth certificate, Medicaid number, school records, previous placement history, medical history, family history, and inventory of youth clothing.

C.4.1.5 The Contractor shall document and place in the resident's care record, within 24 hours of admission, all emergency medical and mental health needs, allergies, basic needs, and non-emergency medical and mental health conditions and physical infirmities, including all visible signs of illness or injury, as well as pre-admission medical screen information

C.4.1.6 The Contractor shall maintain copies of a document signed by the youth to be placed in his/her record that indicates he/she has received a resident orientation within 48 hours of admission

C.4.1.7 The Contractors shall pursue CFSA's dispute resolution process for cases of disagreement regarding placement decisions for CFSA youth

C.4.1.8 The Contractors shall not discharge youth from a congregate care program unless a CFSA Family Team Meeting has determined that one or more of the following

    (a) The youth requires a shift in level of care that is more or less restrictive and cannot be provided by the current congregate care program.

    (b) The youth is to be reunified with family or relatives.

    (c) The youth is to be placed in some other family-based foster care setting.

    (d) The youth is to be adopted.

    (e) The youth has adequately met his/her independent living goals and is ready to leave foster care.

C.4.1.9 When circumstances change for the youth such that a placement change is considered, Contractor shall retain the youth in his/her current foster care setting while immediately requesting a CFSA Family Team Meeting. If the Family Team Meeting determines that re-placement of the youth is necessary, the Contractor shall retain the youth in his/her current setting, and apply any recommended support services until an appropriate placement has been secured

C.4.1.10 The Contractor shall provide documentation to the Contracting Officer's Technical Representative and to Family Team Meeting attendees, that describes all efforts made by the Contractor to stabilize and sustain the youth's placement. Such documentation shall include, notice to the Contractor's representative of circumstantial changes, crisis intervention and support services applied, utilization of community-based services, and other pertinent documentation

C.4.1.11 Reserved

C.4.1.12 The Contractor shall ensure that discharge and aftercare planning commences at admission and is coordinated with the Clinical Support Division of the Office of Clinical Practice at CFSA

C.4.2  Case Planning, Staffings, and Case Responsibility

18

Jones & Associates, Inc
CFSA-04-C-0350

C.4.2.1 The Contractors and CFSA shall jointly develop an Individual Service Plan (or case plan) and Individual Transitional Independent Living Plan (ITILP), consistent with court orders. The Contractor shall ensure that group or independent living program staff and social workers involved with CFSA youth attend case planning conferences, staffings, and administrative reviews.

C.4.2.2 CFSA shall maintain case management responsibility for youth through a CFSA social worker. The Contractor shall provide supportive assistance to CFSA by working with the youth to meet his/her case plan and ITILP objectives, making service referrals and linkage, coordinating required family and sibling visits, and participating in case staffings, conferences and review.

C.4.2.3 The Contractors shall designate a primary youth care counselor, social worker, or other qualified staff member responsible for supportive assistance functions. The Contractor shall ensure these individuals attend pertinent case staffings, reviews, and conferences. Independent living programs shall employ at least one (1) social worker for every twenty (20) residents.

C.4.2.4 If a youth experiences an acute care episode, the Contractor shall send representatives to participate in treatment planning and care for the youth with the expectation that the youth will ultimately return to his/her placement.

C.4.3  Mandatory Reporting and Unusual Incidents

C.4.3.1 The Contractor shall follow the procedures and requirements outlined in the licensure regulations for mandatory reporting and unusual incidents. In addition to licensure regulations, the Contractor must file an unusual incident report any time the resident and/or staff has engaged in the an event that is significantly distinct from normal routine or procedure of the resident, the program, the staff, or any person relevant to the resident.

C.4.3.2 The Contractor must file an unusual incident report by fax or e-mail, as CFSA may direct, to the CFSA hotline, social worker, supervisory social worker, program monitor, and program manager of the Program Monitoring Division within 24 hours of knowledge of the incident. The facility must report any alleged child abuse, neglect or other risk to residents' health and safety to the CFSA hotline.

C.4.4  Local Advisory Committee

C.4.4.1 The Contractor are required under the licensure regulations to develop a local advisory committee that complies with licensure regulations. Proposals utilizing local advisory committees as a vehicle by which to stimulate interest and support on the part of local citizens, service providers, businesses, religious groups, and civic groups shall be evaluated favorably. Development of local support can be beneficial for assisting youth with tutoring, mentoring, jobs, guidance, and other services.

C.4.5  Service Provision

C.4.5.1 The Contractor shall provide an array of services and overall strategy for meeting the needs of youth that complies with licensure regulations and any additional CFSA guidelines outlined in this "Service Provision" Section. The services must be appropriate to the age, gender, sexual orientation, cultural heritage, developmental and functional

19

Jones & Associates, Inc.
CFSA-04-C-0350

level, as well as the learning ability of each youth. These shall include, but not be limited to, the following:

(a) Food, shelter, hygiene, and clothing;
(b) Health care;
(c) Mental health and alcohol, tobacco, and substance abuse services;
(d) Sex education and reproductive health services;
(e) Educational services and advocacy;
(f) Family Services/Visitation;
(g) Recreation, Community Connections, and Religion;
(h) Transportation services;
(i) Life skills training and age appropriate independent living skills training; and,
(j) Vocational services

C.4.6   Health Care

C.4.6.1 The Contractor shall develop and submit with proposals the policy and procedures for meeting the preventative, routine, and emergency health care of youth.

C.4.6.2 CFSA's Health Services Division will include in each youth's case plan a descriptive

health care plan of the services required to meet his/her unique health and mental health needs. The Contractor shall propose the methods for making service referrals with community-based providers, assuring youth utilize these services, and a standardized system for collecting, recording, and conveying health and mental health information to CFSA.

C.4.6.3 The Contractor shall establish methods for securing, in a timely manner, all medically recommended health and therapeutic services including, but not limited to, medication, physical and occupational therapy, glasses, hearing aids, prosthetic devices, and corrective physical and dental devices

C.4.6.4 The Contractors shall facilitate the provision of specialized health services such as

private duty nursing, medical respite care, homemaker services, among others, in accord with the case plan and Individualized Habilitation Plan and sanctioned by CFSA's Health Services Division.

C.4.6.5 Contractor shall utilize medical services provided by licensed doctors and agencies that accept Medicaid. Title IV-E eligible youth may receive Medicaid-covered services in the state in which they reside. DC KIDS and the Health Services Division of CFSA's Office of Clinical Practice will assist The Contractor in identifying Medicaid providers. Except in an emergency, the Health Services Division of CFSA shall approve any non-Medicaid vendor before the services are obtained.

C.4.6.6 Contractor shall develop a training plan that prepares staff on health issues. Caretakers shall be required to participate in a pre-service health care training program of 8 hours as a prerequisite to working with children in care. In addition, four hours per year of in-service health training shall be provided. Training on universal infection control precautions must be provided

C.4.6.7 The Contractor shall develop and submit with proposals the policy, procedures, and a care

20

Jones & Associates, Inc
CFSA-04-C-0350

plan for youth affected by HIV and AIDS. Policy and procedures must include risk assessment, evaluation and treatment, testing, disclosure, confidentiality, consent, counseling, permanency planning, and other topics. Practice must also be compliant with Section 504 of the Rehabilitation Act of 1973 that prohibits discrimination against individuals with handicaps. Universal infection control precautions shall be employed by caregivers.

C.4.6.7 The Contractor shall ensure on-call availability of a physician for urgent services and consultations.

C.4.7  Mental Health Services

C.4.7.1 The Contractor shall be responsible for meeting children and youth's mental health service needs through direct provision of, or linkage to, mental health services delivered by qualified professionals.  Mental health services include, but are not limited to

(a) Preliminary mental health screen within 3 business days after admission by a licensed mental health practitioner

(b) If indicated by the preliminary mental health screen, a mental health evaluation and assessment, including a standardized diagnostic mental health assessment completed within fifteen (15) calendar days of admission by a licensed mental health practitioner.

(c) Substance and alcohol abuse prevention, intervention, and treatment;

(d) Access to emergency mental health services on a 24 hour a day, 7 day per week basis

(e) Clinical consultation with residents, parent(s) or guardian(s), and staff;

(f) Individualized treatment, including therapy and counseling for individuals and groups.

(g) A standardized system for collecting, recording and conveying each resident's essential mental health information consistent with HIPAA, and;

(h) A standardized system for collecting and reviewing the resident's historical mental health records.

C.4.7.2 The Contractor shall ensure that all youth with mental health needs are registered and connected with the District of Columbia's Department of Mental Health (DMH), and connected with a DMH-certified Core Service Agency to access needed services. The Contractor shall also ensure that this information is provided to CFSA through its Health Services Division under the Office of Clinical Practice. CFSA prefers that mental health services are provided by DMH Core Service Agencies, subspecialty provider agencies, or subcontracted provider agencies that are certified Medicaid providers

C.4.7.3 The Contractor shall ensure that clinical and therapeutic services are provided to youth as recommended by the Individual Habilitation Plan (IHP), Individualized Treatment Plan (ITP), Individualized Education Plan (IEP), or CFSA case plan

C.4.7.4 The Contractor shall ensure youth and staff attendance at all relevant Multi-Agency Planning Team (MAPT) meetings that assess and make recommendations regarding mental health needs and services.

C.4.7.5 The Contractor shall ensure access to and/or provision of smoking cessation programs, weight reduction, and alcohol/substance abuse and domestic violence counseling services for youth.

C.4.7.6 The Contractor shall facilitate mental health service provision by agencies certified as Medicaid providers when individuals do not have access to private health insurance. Proposals that describe an existing or planned capacity to maximize financial and programmatic integrity through the utilization of funding streams other than CFSA shall be evaluated favorably. Preference shall be given to those programs that are certified Medicaid providers, or propose plans to become certified, or are collaborating with subspecialty or subcontracted provider agencies that are certified Medicaid providers.

C.4.8 Sex Education and Reproductive Health Services

C.4.8.1 The Contractor shall provide all youth in care aged 13 to 21 years with sex education and health services that include, among others, sexual relations, pregnancy prevention/contraception, and sexually transmitted diseases (STD).

C.4.8.2 The Contractor shall secure and/or provide high quality, community-based prenatal and postnatal counseling and services to pregnant teens, teen parents and to youth seeking to terminate pregnancies. The Contractor shall ensure care by a licensed obstetrician/gynecologist for all youth seeking access to such a provider.

C.4.8.3 The Contractor shall link with organizations that provide education and support services for gay, lesbian, bisexual, and transgendered youth.

C.4.9 Educational Services and Advocacy

C.4.9.1 The Contractor shall be responsible for the educational and vocational needs of all youth placed in its care. CFSA will provide the Contractor necessary educational information and documentation for the youth. Within 48 hours of receiving this information and documentation, the Contractor shall arrange for and ensure that each school-aged resident attends school or an educational program in accordance with all applicable federal, state and local laws and the youth's initial service plan.

C.4.9.2 The Contractor shall be responsible for enrolling and transporting all school age youth to any educational, vocational and/or mentoring activities, unless otherwise provided by the school district or another community-based service provider.

C.4.9.3 The Contractor shall ensure that youth who are no longer required to attend school under the District of Columbia's Compulsory Education Law receive directly, or are appropriately linked to, community-based services and providers to assist the youth transition to independence.

C.4.9.4 The Contractor shall maintain the youth's educational records, including, but not limited to, report cards, educational testing and Individualized Education Plans (IEP's) in the resident's case record.

C.4.9.5 The Contractor shall ensure that all youth in need of Special Education are appropriately assessed by the youth's local school or another authorized Special Education evaluator approved by the District of Columbia Public Schools (DCPS). The Contractor shall

Jones & Associates. Inc
CFSA-04-C-0350

describe its participation in all meetings held at the youth's local school in order to develop and/or enhance the youth's IEP

C.4.9.6 The Contractor shall comply with education policies set forth by DCPS and CFSA regarding the provision of special education services and other guidance on a variety of education-related topics. The CFSA Education Unit is available for consultation and assistance in this area

C.4.9.7 The Contractor shall provide educational enrichment programs and activities

C.4.9.8 The Contractor shall identify those educational duties and responsibilities for which congregate care staff and/or other contract staff will be accountable (e.g., attendance at school conferences, provision of school supplies, assistance with homework, regular contact with teachers). For independent living programs, this includes the role of the educational coordinator. The plan shall also include description of the educational equipment provided to youth to assist and enrich educational endeavors. Proposals indicating provision of computers, adequate study areas, in-home tutoring (paid or non-paid), and other assistance shall be favored

C.4.9.9 The Contractor shall identify and establish a network of paid or non-paid providers to which referrals may be made for tutoring, mentoring, and other remedial and advocacy services. The Contractor shall be responsible for linking the youth to the service provider as well as monitoring and ensuring the provision and quality of the service provided

C.4.9.10 One-on-one tutoring is available in limited circumstances to supplement DCPS services. The Contractor shall provide those youth presenting any of the following educational limitations with tutorial/remedial services

(a) Two or more grade levels behind age-appropriate academic performance,
(b) Reporting grades of D's or F's,
(c) Services are court ordered,
(d) Services recommended by IEP;
(e) Services recommended by school,
(f) Services recommended by a psychological evaluation, or
(g) Services recommended by the youth's service plan.

C.4.9.11 CFSA encourages the provision of mentoring services for all youth being cared for in congregate care. Contractors shall work to provide innovative provision of mentoring services that are community-based, linked to professional groups, and/or are on a volunteer basis. Mentoring services should be as supplemental activities to tutoring and recreational endeavors already provided by the congregate care program.

C.4.9.12 The Contractor shall provide CFSA with all pertinent educational information for the purposes of data collection and monitoring

C.4.10 Family Services/Visitation

C.4.10.1 The Contractor shall make efforts to involve the youth's family members and other significant persons in the youth's life, as appropriate, through facilitating visits and inclusion in case planning. The Contractor shall develop and submit policy and procedures for visitation that includes face-to-face visitation, mail correspondence, and

23

Jones & Associates, Inc.
CFSA-04-C-0350

telephone contact, supervision of visits, provision of adequate space for visits, and restriction of visits and contact

C 4.10 2 CFSA shall maintain primary case management responsibility, and the congregate care program is expected to provide supportive assistance in facilitating visits between the youth and his/her family in settings that are more conducive to positive family interaction. The Contractor shall establish the location to be utilized for visits and a sample schedule for visits

C 4.11  Recreation, Community Connections, and Religion

C 4.11 1 The Contractor shall develop recreational programming for youth that includes the types of family-oriented recreational and cultural/educational activities to be facilitated Programs that organize both group and individualized recreational outings, and describe a calendar of activities shall be viewed favorably

C 4.11 2 The Contractor shall nurture the development of hobbies, interests and other leisure time activities for youth. Youth shall be provided sufficient recreational supplies, equipment and activities

C 4.11 3 The Contractor shall include youth residents in the activities of their family's community and/or the community in which they reside while in congregate care Such involvement contributes to a youth's integration into a community and ability to tap into support mechanisms The Contractor shall endeavor to create a network of services and affiliations that will not only connect youth to the community, but the community to youth and congregate care programs located in their area

C 4.11 4 The Contractor shall promote youth involvement in the community through volunteer civic activities, attendance at religious services (if desired), use of public agencies/services    such as the local library and health clinic, and other similar activities

C 4.11 5 Proposals that describe a comprehensive plan to link youth with their communities shall be viewed favorably  Plans may include descriptions of community-based activities in which youth will become involved

C 4.11.6 The Contractor shall ensure that every youth has an opportunity to participate in religious services of his/her choice, or to refrain from religious practice if so desired.

C 4 12 Transportation

C 4.12.1 The Contractor shall provide transportation to all scheduled activities including, but not limited to

    (a) Medical and mental health appointments,
    (b) School/educational and vocational activities,
    (c) Recreational activities,
    (d) Community activities; and
    (e) Family activities and visits

Jones & Associates, Inc
CFSA-04-C-0350

C 4.13   Life Skills Training (Independent Living)

C 4.13.1 The Contractor shall develop and submit a plan for preparing age appropriate youth with life skills in accord with licensure regulations

C 4.13.2 The Contractor shall prepare teens fifteen years and older for independent living in addition to a referral to the CFSA Independent Living program, Center of Keys for Life The program shall include, at a minimum, money management/consumerism, meal planning and preparation, household management, personal care and hygiene, health and human sexuality, education, vocational planning and readiness, citizenship, interpersonal and legal skills, and using community resources   The Contractor shall assist youth to develop goals for transition from foster care to independence

C 4.13.3 The Contractor shall establish a daily routine/schedule of events and activities in the congregate care setting, and provide a sample of activities that will be provided on a daily weekly and monthly basis.

C 4.14  Employment and Vocational Services

C 4.14.1 The Contractor shall link youth to vocational services as per the service objectives set forth in the case plan and/or ITILP  Services shall include vocational assessment and training programs.

C 4.14.2 The Contractor shall secure employment assistance and job coaching for youth

## C.5  CONGREGATE CARE POPULATION-SPECIFIC REQUIREMENTS

C 5.1  CFSA contracts for various types of congregate care with unique staffing patterns and service requirements. General and program requirements previously described in Sections C.2.1 and C.4, respectively, apply to all congregate care programs  In addition to these requirements, The Contractor must meet the requirements specific to the congregate care populations for which care is being proposed  For example. The Contractor providing care for a special population such as the mentally retarded must meet all general and program requirements, as well as meet the population-specific requirements described in this section for specialized group home care or assisted living (depending upon the age of the population to be served).

C 5.1.1 CFSA shall contract for the following types of congregate care

1) Independent Living Main Facility Programs for youth aged 16 to 21,

C 5.1.2 RESERVED

C 5.1.3 RESERVED.

C 5.2  RESERVED

C 5.3  RESERVED

Jones & Associates, Inc
CFSA-04-C-0350

C.5.4  RESERVED

C.5.5  RESERVED

C.5.6    Independent Living Main Facility Programs

C.5.6.1 CFSA continues to recruit family-based care to meet the needs of children and youth. While expanding this capacity, independent living programs shall serve youth aged 16 to 21 through five types of programs: (1) "Independent Living Main Facility Programs" (2) Independent Living Residential Units" (3) "Assisted Living Level III" (4) "Assisted Living Level IV" (5)"Teen Parent Programs". CFSA is also committed to ensuring that youth placed in independent living programs receive care and services that prepare them to successfully live independently.

C.5.6.2 CFSA is contracting for a maximum of 100 units of "Independent Living Main Facility Programs" that provides care for youth aged 16 to 21 at a main facility. This number indicates maximum capacity for this type of care for which CFSA may ultimately contract for fewer youth.

C.5.6.3 The Contractor shall provide on-site, collective supervision of youth at a main facility that contains more than one residence. The Contractor shall comply with licensure regulations for independent living programs and main facility programs.

C.5.6.4 The Contractor shall provide a resident to counselor ratio of 10:1 during day hours, 6:1 during evening hours, and 15:1 during night hours, but in no event less than 2 staff members during evening and night hours any time a resident is present in the facility.

C.5.6.5 The Contractor shall provide Independent Living Main Facility Programs care for youth until the youth's case plan and ITILP objectives determine that the youth is developmentally ready for residence in "Independent Living Residential Units".

C.5.6.6 The Contractor may integrate "Independent Living Main Facility Programs" and "Assisted Living" care in a single facility provided the Contractor's program can meet the care needs of both populations.

C.5.6.7 As with all independent living programs, The Contractor must link residents with the Center of the Keys for Life and trained youth in all aspects of independent living.

C.5.7   RESERVED

C.5.8   RESERVED

C.5.9   RESERVED

C.5.10  RESERVED

26

Jones & Associates, Inc.
CFSA-04-C-0350

INTENTIONALLY LEFT BLANK

•

* * * END OF SECTION C * * * *

Jones & Associates, Inc
CFSA-04-C-0350

PART I – SCHEDULE

SECTION D

PACKAGING AND MARKING

TABLE OF CONTENTS

| CLAUSE NO | CLAUSE TITLE | PAGE NO |
|---|---|---|
| D 1 | PACKAGING AND MARKING | 28 |

Jones & Associates, Inc
CFSA-04-C-0350

## SECTION D:   PACKAGING AND MARKING

**D.1**

The packaging and marking requirements for the resultant contract shall be governed by clause
number (2), Shipping Instructions-Consignment, of the Government of the District of Columbia's
Standard Contract Provisions for use with Supplies and Services Contracts  dated April 2003,
Attachment J 1

INTENTIONALLY LEFT BLANK

****END OF SECTION D****

29

Jones & Associates, Inc.
CFSA-04-C-0350

PART I – SCHEDULE

SECTION E

INSPECTION AND ACCEPTANCE

TABLE OF CONTENTS

CLAUSE NO.                          CLAUSE TITLE                          PAGE NO

E 1                          INSPECTION AND ACCEPTANCE          30

30

Jones & Associates, Inc
CFSA-04-C-0350

## SECTION E:   INSPECTION AND ACCEPTANCE

The inspection and acceptance requirements for the resultant contract shall be governed by clause number seven (7), Inspection of Services, of the Government of the District of Columbia's Standard Contract Provisions for use with Supplies and Services Contracts, dated April 2003, Attachment J.1

### INTENTIONALLY LEFT BLANK

****END OF SECTION E****

31

Jones & Associates, Inc
CFSA-04-C-0350

PART I – SCHEDULE

SECTION F

**DELIVERIES OR PERFORMANCE**

TABLE OF CONTENTS

| CLAUSE NO | CLAUSE TITLE | PAGE NO |
|-----------|--------------|---------|
| F 1 | CONTRACT TYPE | 32 |
| F 2 | TERM OF CONTRACT | 32 |
| F 3 | OPTION TO EXTEND THE TERM OF CONTRACT | 32 |

Jones & Associates, Inc.
CFSA-04-C-0350

## SECTION F - DELIVERIES OR PERFORMANCE

**F.1    CONTRACT TYPE**

The contract is an indefinite quantity contract with payments based on fixed unit prices per child per day for each line item set forth in the Price Schedule Chart in Section B with a cost reimbursement element. The minimum guarantee for each item number for the contract year and each option period is $1000.00. The maximum quantity for each contract year, and each option is specified in the contract.

**F.2    TERM OF CONTRACT**

The term of the contract shall be for a period from 07/01/2004 through 06/30/2005, subject to the District's option to extend the term of the contract.

**F.3    OPTION TO EXTEND THE TERM OF THE CONTRACT**

**F.3.1**    The District may extend the term of this contract for a period of one (1) year, or any fraction thereof, or multiple successive fractions thereof, by written notice to the Contractor before the expiration of the contract; provided that the District shall give the Contractor a preliminary written notice of its intent to extend at least thirty (30) days before the contract expires. The preliminary notice does not commit the District to an extension. The exercise of this option is subject to the availability of funds at the time of the exercise of this option. The Contractor may waive the thirty (30) day preliminary notice requirement by providing a written waiver to the Contracting Officer prior to expiration of the contract. The total duration of all options shall not exceed four (4) years. The total duration of this contract, including the exercise of any options under this clause, shall not exceed five (5) years.

**F.3.2**    If the District exercises this option, the extended contract shall be considered to include this option provision.

**F.3.3**    The price for the option period shall be as specified in the contract.

**F.4**    This contract merges Letter Contract No.: CFSA-04-C-0350 dated to this contract, which definitized the Letter Contract and fully replaces the terms and conditions set forth in the Letter Contract.

**F.5    COST CEILINGS AND MAXIMUM CONTRACT AMOUNT**

a.    Section B.9 and Schedule 6 of the contract sets forth ceiling amounts for the cost element and maximum contract amount for each period of the contract ("ceilings").

b.    The amount for performing this contract shall not exceed the ceilings specified in Section B.9 and Schedule 8.

33

Jones & Associates, Inc.
CFSA-04-C-0350

c.      The contractor shall notify the contract administrator, in writing, whenever it has reason to believe that the total amount for the performance of this contract will be either greater or substantially less than the ceilings.

d.      As part of the notification, the contractor shall provide the contract administrator a revised estimate for the ceilings for performing the contract.

e.      The District is not obligated to pay the contractor for amounts incurred in excess of the ceilings specified in the contract and the contractor is not obligated to continue performance under this contract (including actions under the Termination clauses of this contract) or otherwise incur amounts in excess of the ceilings specified in the contract, until the contracting officer notifies the contractor, in writing, that the ceilings have been increased and provides revised ceilings for performing this contract.

f.      No notice, communication, or representation in any form from any person other than the contracting officer shall change the ceilings.  In the absence of the specified notice, the District is not obligated to pay the contractor for any amounts in excess of the ceilings, whether such amounts were incurred during the course of contract performance or as a result of termination.

g.      If the contracting officer increases the ceilings, any amount the contractor incurs before the increase that is in excess of the previous ceilings shall be allowable to the same extent as if incurred afterward, unless the contracting officer issues a termination or other notice directing that the increase is solely to cover termination or other specified expenses.

h.      A change order shall not be considered an authorization to exceed the applicable ceilings, unless the change order specifically increases the ceilings.

At any time or times before final payment and three (3) years thereafter, the contracting officer may have the contractor's invoices or vouchers and statements audited.  Any payment may be reduced by amounts found by the contracting officer (1) not to constitute allowable payment as adjusted for prior overpayments or underpayments, or (2) not to constitute allowable, allocable, or reasonable costs.

****END OF SECTION F****

34

Jones & Associates, Inc.
CFSA-04-C-0350

PART I – SCHEDULE

SECTION G

CONTRACT ADMINISTRATION DATA

TABLE OF CONTENTS

| CLAUSE NO. | CLAUSE TITLE | PAGE NO. |
|---|---|---|
| G.1 | INVOICE PAYMENT | 34 |
| G.2 | INVOICE SUBMITTAL | 34-35 |
| G.3 | METHOD OF PAYMENT | 35 |
| G.4 | ASSIGNMENT | 35 |
| G.5 | CONTRACTING OFFICER | 35 |
| G.6 | AUTHORIZED CHANES BY THE CONTRACTING OFFICER | 35-36 |
| G.7 | CONTRACTING OFFICER TECHNICAL REPRESENTATIVE | 36 |

Jones & Associates, Inc.
CFSA-04-C-0350

## SECTION G - CONTRACT ADMINISTRATION DATA

### G.1 INVOICE PAYMENT

G.1.1     The District will make payments to the Contractor upon the submission of proper invoices or vouchers, at the prices stipulated in this contract, for supplies delivered and accepted and/or services performed and accepted, less any discounts, allowances or adjustments provided for in this contract.

G.1.2     In accordance with the Quick Payment Act, D.C. Official Code 2-221.01 *et seq.* the District will pay the Contractor on or before the 30th day after receiving a proper invoice from the Contractor.

### G.2   INVOICE SUBMITTAL

G.2.1     The Contractor shall submit proper invoices on a monthly basis or as otherwise specified in this contract. Invoices shall be prepared in triplicate and submitted to the agency Chief Financial Officer (CFO) with concurrent copies to the Contracting Officer (CO) and the Contracting Officer's Technical Representative (COTR) specified in G.7 below. The name and address of the CFO is:

> **Name:** (Chief Financial Officer)
> Child & Family Services Agency
> **Address:** 400 Sixth Street, S.W., 2[nd] Floor
> Washington, D.C. 20024
> **Telephone:** (202) 724-7676

G.2.2   To constitute a proper invoice, the Contractor shall submit the following information on the invoice:

G.2.2.1     Contractor's name, Federal tax Identification number, DUNS number and invoice date (Contractors are encouraged to date invoices as close to the date of mailing or transmittal as possible.)

G.2.2.2     Contract number, and encumbrance number (block number twenty-one (21) of the Solicitation Cover Sheet)

G.2.2.3     Description, price, quantity and the date(s) that the supplies/services were actnally delivered and/or performed.

G.2.2.4     Other supporting receipts, documentation or information, as required by the Contracting Officer.

G.2.2.5     Name, title, telephone number and complete mailing address of the responsible official to whom payment is to be delivered

G.2.2.6     Name, title, telephone number of person preparing the invoice:

36

Jones & Associates, Inc.
CFSA-04-C-0350

G.2.2.7 Name, title. telephone number and mailing address of person  to be notified in the event of a defective invoice.

G.2.2.8 Authorized signature.

## G.3   METHOD OF PAYMENT

The District will pay the amount due the Contractor under this contract in accordance with the terms of the contract and upon presentation of a complete and properly executed invoice

## G.4   ASSIGNMENTS

G.4.1   In accordance with 27 DCMR § 3250, unless otherwise prohibited by this contract, the Contractor may assign funds due or to become due as a result of the performance of this contract to a bank, trust company, or other financing institution.

G.4.2   Any assignment shall cover all unpaid amounts payable under this contract, and shall not be made to more than one party.

G.4.3   Notwithstanding an assignment of money claims pursuant to authority contained in the contract, the Contractor, not the Assignee. is required to prepare invoices.  Where such an assignment has been made, the original copy of the invoice must refer to the assignment and must show that payment of the invoice is to be made directly to the assignee as follows:

Pursuant to the instrument of assignment dated _____,
make payment of this invoice to _____
(name and address of assignee).

## G.5   CONTRACTING OFFICER (CO)

Contracts may be entered into and signed on behalf of the District of Columbia only by Contracting Officers.  The address and telephone number of the Contracting Officer is:

Chief Contracting Officer
Child and Family Services Agency
400 Sixth Street, SW
Washington, D.C. 20024
(202) 727-7151

## G.6   AUTHORIZED CHANGES BY THE CONTRACTING OFFICER

G.6.1   The Contracting Officer is the only person authorized to approve changes in any of the requirements of this contract.

G.6.2   The Contractor shall not comply with any order, directive or request that changes or modifies the requirements of this contract, unless issued in writing and signed by the Contracting Officer.

37

Jones & Associates, Inc.
CFSA-04-C-0350

G.6.3    In the event the Contractor effects any change at the instruction or request of any person other than the Contracting Officer, the change will be considered to have been made without authority and no adjustment will be made in the contract price to cover any cost increase incurred as a result thereof.

## G.7 CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE (COTR)

G.7.1    The COTR is responsible for general administration of the contract and advising the Contracting Officer as to the Contractor's compliance or noncompliance with the contract. In addition, the COTR is responsible for the day-to-day monitoring and supervision of the contract, ensuring that the work conforms to the requirements of this contract and such other responsibilities and authorities as may be specified in the contract. The contract information for the COTR will be identified by CFSA upon the commencement of the contract.

G.7.2    It is understood and agreed that the COTR shall not have authority to make any changes in the specifications/scope of work or terms and conditions of the contract.

G.7.3    Contractor may be held fully responsible for any changes not authorized in advance, in writing, by the Contracting Officer, may be denied compensation or other relief for any additional work performed that is not so authorized, and may also be required, at no additional cost to the District, to take all corrective action necessitated by reason of the unauthorized changes.

****END OF SECTION G****

38

Jones & Associates, Inc.
CFSA-04-C-0350

PART I – SCHEDULE

SECTION H

SPECIAL CONTRACT REQUIREMENTS

TABLE OF CONTENTS

| CLAUSE NO. | CLAUSE TITLE | PAGE NO. |
|---|---|---|
| H.1 | DEPARTMENT OF LABOR WAGE DETERMINATION | 38 |
| H.2 | AUDITS, RECORDS AND RECORD RETENTION | 38 |
| H.3 | PUBLICITY | 39 |
| H.4 | CONFLICT OF INTEREST | 39 |
| H.5 | RESERVED | 39 |
| H.6 | CONTRACTOR RESPONSIBILITIES | 39-40 |
| H.7 | RESERVED | 40 |
| H.8 | AMERICANS WITH DISABILITIES ACT AND REHABILATATION ACT OF 1973 | 40 |
| H.9 | RESERVED | 40 |
| H.10 | QUALITY CONTROL | 40 |
| H.11 | PERFORMANCE EVALUATION MEETINGS | 41 |
| H.12 | RESERVED | 41 |
| H.13 | HIPPA PRIVACY COMPLIANCE | 41-44 |

## SECTION H - SPECIAL CONTRACT REQUIREMENTS

H.1   DEPARTMENT OF LABOR WAGE DETERMINATIONS

The Contractor shall be bound by the **Wage Determination No. 1994-2103 (Revision No. 31, dated April 21, 2004)** issued by the U.S. Department of Labor in accordance with and incorporated herein as Attachment J.2 of this solicitation. The Contractor shall be bound by the wage rates for the term of the Contract. If an option is exercised, the Contractor shall be bound by the applicable wage rate at the time of the option. If the option is exercised and the Contracting Officer for the option obtains a revised wage determination, that determination is applicable for the option periods; the Contractor may be entitled to an equitable adjustment.

H.2   AUDITS, RECORDS, AND RECORD RETENTION

H.2.1   At any time or times before final payment and three (3) years thereafter, the Contracting Officer may have the Contractor's invoices or vouchers and statements of cost audited. For cost reimbursement contracts, any payment may be reduced by amounts found by the Contracting Officer not to constitute allowable costs as adjusted for prior overpayment or underpayment. In the event that all payments have been made to the Contractor by the District Government and an overpayment is found, the Contractor shall reimburse the District for said overpayment within thirty (30) days after written notification.

H.2.2   The Contractor shall establish and maintain books, records, and documents (including electronic storage media) in accordance with generally accepted accounting principles and practices which sufficiently and properly reflect all revenues and expenditures of funds provided by the District under the contract that results from this solicitation.

H.2.3   The Contractor shall retain all records, financial records, supporting documents, statistical records, and any other documents (including electronic storage media) pertinent to the contract for a period of five (5) years after termination of the contract, or if an audit has been initiated and audit findings have not been resolved at the end of five (5) years, the records shall be retained until resolution of the audit findings or any litigation which may be based on the terms of the contract.

H.2.4   The Contractor shall assure that these records shall be available at all reasonable times to inspection, review, or audit by Federal, and District agencies, or other personnel duly authorized by the Contracting Officer.

H.2.5   Persons duly authorized by the Contracting Officer shall have full access to and the right to examine any of the Contractor's contract and related records and documents, regardless of the form in which kept, at all reasonable times for as long as records are retained.

H.2.6   The Contractor shall include these aforementioned audit and record keeping requirements in all approved subcontracts and assignments.

## H.3   PUBLICITY

The Contractor shall at all times obtain the prior written approval from the Contracting Officer before it, any of its officers, agents, employees or subcontractor, either during or after expiration or termination of the contract, make any statement, or issue any material, for publication through any medium of communication, bearing on the work performed or data collected under this contract. •

## H.4   CONFLICT OF INTEREST

**H.4.1**   No official or employee of the District of Columbia or the federal government who exercises any functions or responsibilities in the review or approval of the undertaking or carrying out of this contract shall, prior to the completion of the project, voluntarily acquire any personal interest, direct or indirect, in the contract or proposed contract. (DC Procurement Practices Act of 1985, D.C. Law 6-85, D.C. Official Code § 2-310.01and Chapter 18 of the DC Personnel Regulations).

**H.4.2**   The Contractor represents and covenants that it presently has no interest and shall not acquire any interest, direct or indirect, which would conflict in any manner or degree with the performance of its services hereunder. The Contractor further covenants not to employ any person having such known interests in the performance of the contract.

## H.5   RESERVED

## H.6   CONTRACTOR RESPONSIBILITIES

### H.6.1   NO REFUSAL TO PLACE AND PLANNED DISCHARGE

The Contractor shall accept any child that has been assigned by CFSA immediately for care. In addition, the Contractor shall not discharge any child assigned by CFSA from its care without the written permission of the Contracting Officer.

### H.6.2   ACCEPTANCE – 24-HOUR AVAILIBILITY

The Contractor shall have staff available 24 hours per day, 7 days per week, week for every calendar day of the contract period to accept children that may be assigned by CFSA on an emergency basis.

### H.6.3   TRANSPORTATION

The Contractor shall provide transportation for all children assigned by CFSA for routine and necessary activities.

### H.6.4   SIGN LANGUAGE INTERPRETER SERVICE

The Contractor shall provide sign language interpreter services for children requiring the communication of sign language assigned by CFSA.

Jones & Associates, Inc.
CFSA-04-C-0350

### H.6.5   FOREIGN LANGUAGE INTERPRETER SERVICES

The Contractor shall provide foreign language interpreter services for children, as required

### H.6.6   GEOGRAPHICAL PROXIMITY FACTORS

The Contractor shall have facilities or placement capabilities for children assigned by CFSA in the District of Columbia or within 25 miles of the District of Columbia.

### H.6.7   EMERGENCY RESPONSE / EMERGENCY PLAN

The Contractor at a minimum shall have the following to address emergency requirements:

1) Facilities – address the requirement for back-up power generators; address a back-up location in case clients need to be re-directed for temporary housing and/or care;  address training provisions in case of natural or man-made disasters.
2) Clients – address back-up actions in case of natural or man-made disasters where children could be unable to go to primary locations; address back-up locations to gather; address alternate phone numbers for children to call; address alternate trusted individuals that children can reach in be cared for; address training on all these aspects for CFSA, administrators, parents and children.
3) Plan – ask for a plan on conducting all of this, including the written plan, training, and CFSA's role.

### H.7   RESERVED

### H.8   AMERICANS WITH DISABILITIES ACT AND REHABILITATION ACT OF 1973

The Contractor and any of its subcontractors shall comply with all provisions of Section 504 of the Rehabilitation Act of 1973, as amended, and the Americans with Disabilities Act, as amended.

### H.9   RESERVED

### H.10   QUALITY CONTROL

The Contractor is responsible for controlling the quality of services that conform to the contract specifications.  The Contractor shall establish procedures and processes that  include, but are not limited to inspections to ensure that all contract requirements are met.

Jones & Associates, Inc.
CFSA-04-C-0350

## H.11 PERFORMANCE EVALUATION MEETINGS

During the performance of this contract, the Contractor's Project Manager will meet weekly with the Contracting Officer's Technical Representative (COTR) at a time and place specified by the COTR. Meetings will be held as often as necessary after the 1st month as determined by the COTR. A mutual effort will be made to resolve all problems identified.

## H.12     RESERVED

## H.13   HIPAA PRIVACY COMPLIANCE

### H.13.1 Definitions

H.13.1.1"Contractor" shall mean the Business Associates.

H.13.1.2 "CFSA" shall mean the District of Columbia, Child and Family Services Agency

H.13.1.3 "Designated Record Set" means:

H.13.1.3.1    A group of records maintained by or for CFSA that is:

H.13.1.3.1.1 The medical records and billing records about individuals maintained by or for a covered health care provider;

H.13.1.3.1.2 The enrollment, payment, claims adjudication, and case or medical management record systems maintained by or for a health plan; or

H.13.1.3.1.3 Used, in whole or in part, by or for CFSA to make decisions about individuals.

H.13.1.3.2    For purposes of this paragraph, the term record means any items, collection, or grouping of information that includes Protected Health Information and is maintained, collected, used, or disseminated by or for CFSA.

H.13.1.4 Individual shall have the same meaning as the term "individual" in 45 CFR 164.501 and shall include a person who qualifies as a personal representative in accordance with 45 CFR 164.502(g).

H.13.1.5 Privacy Rule. "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR part 160 and part 164, subparts A and E.

H.13.1.6 Protected Health Information. "Protected Health Information" shall have the same meaning as the term "protected health information" in 45 CFR 164.501, limited to the information created or received by Contractor from or on behalf of CFSA.

H.13.1.7 Required By Law. "Required By Law" shall have the same meaning as the term "required by law" in 45 CFR 164.501.

H.13.1.8 Secretary. "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.

43

Jones & Associates, Inc.
CFSA-04-C-0350

**H.13.2  Obligations and Activities of Contractor**

**H.13.2.1**  Contractor agrees to not use or disclose Protected Health Information other than as permitted or required by this HIPAA Privacy Compliance Clause (this Clause) or as Required By Law.

**H.13.2.2**  Contractor agrees to use appropriate safeguards to prevent use or disclosure of the Protected Health Information other than as provided for by this Clause.

**H.13.2.3**  Contractor agrees to mitigate, to the extent practicable, any harmful effect that is known to Contractor of a use or disclosure of Protected Health Information by Contractor in violation of the requirements of this Clause.

**H.13.2.4**  Contractor agrees to report to CFSA any use or disclosure of the Protected Health Information not provided for by this Clause of which it becomes aware.

**H.13.2.5**  Contractor agrees to ensure that any agent, including a subcontractor, to whom it provides Protected Health Information received from, or created or received by Contractor on behalf of CFSA, agrees to the same restrictions and conditions that apply through this Agreement to Contractor with respect to such information.

**H.13.2.6**  Contractor agrees to provide access, at the request of CFSA, and in the time and manner prescribed by the Contracting Officer, to Protected Health Information in a Designated Record Set, to CFSA or, as directed by CFSA, to an Individual in order to meet the requirements under 45 CFR 164.524.

**H.13.2.7**  Contractor agrees to make any amendment(s) to Protected Health Information in a Designated Record Set that CFSA directs or agrees to pursuant to 45 CFR 164.526 at the request of CFSA or an Individual, and in the time and manner prescribed by the Contracting Officer.

**H.13.2.8**  Contractor agrees to make internal practices, books, and records, including policies and procedures and Protected Health Information, relating to the use and disclosure of Protected Health Information received from, or created or received by Contractor on behalf of, CFSA, available to the CFSA, or to the Secretary, in a time and manner prescribed by the Contracting Officer or designated by the Secretary, for purposes of the Secretary determining CFSA's compliance with the Privacy Rule.

**H.13.2.9**  Contractor agrees to document such disclosures of Protected Health Information and information related to such disclosures as would be required for CFSA to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR 164.528.

**H.13.2.10**  Contractor agrees to provide to CFSA or an Individual, in time and manner prescribed by the Contracting Officer, information collected in accordance with Section (i) above, to permit CFSA to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR 164.528.

**H.13.3  Permitted Uses and Disclosures by Contractor**

**H.13.3.1**  Refer to underlying services agreement:

44

Jones & Associates, Inc.
CFSA-04-C-0350

> Except as otherwise limited in this Clause, Contractor may use or disclose Protected Health Information to perform functions, activities, or services for, or on behalf of, CFSA as specified in this contract, provided that such use or disclosure would not violate the Privacy Rule if done by CFSA or the minimum necessary policies and procedures of CFSA.

**H.13.3.2** Except as otherwise limited in this Clause, Contractor may use Protected Health Information for the proper management and administration of the Contractor or to carry out the legal responsibilities of the Contractor.

**H.13.3.3** Except as otherwise limited in this Clause, Contractor may disclose Protected Health Information for the proper management and administration of the Contractor, provided that disclosures are Required By Law, or Contractor obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the person, and the person notifies the Contractor of any instances of which it is aware in which the confidentiality of the information has been breached.

**H.13.3.4** Except as otherwise limited in this Clause, Contractor may use Protected Health Information to provide Data Aggregation services to CFSA as permitted by 42 CFR 164.504(e)(2)(i)(B).

**H.13.3.5** Contractor may use Protected Health Information to report violations of law to appropriate Federal and State authorities, consistent with § 164.502(j)(1).

## H.13.4 Obligations of CFSA

**H.13.4.1** CFSA shall notify Contractor of any limitation(s) in its notice of privacy practices of CFSA in accordance with 45 CFR 164.520, to the extent that such limitation may affect Contractor's use or disclosure of Protected Health Information.

**H.13.4.2** CFSA shall notify Contractor of any changes in, or revocation of, permission by Individual to use or disclose Protected Health Information, to the extent that such changes may affect Contractor's use or disclosure of Protected Health Information.

**H.13.4.3** CFSA shall notify Contractor of any restriction to the use or disclosure of Protected Health Information that CFSA has agreed to in accordance with 45 CFR 164.522, to the extent that such restriction may affect Contractor's use or disclosure of Protected Health Information.

## H.13.5 Permissible Requests by CFSA

CFSA shall not request Contractor to use or disclose Protected Health Information in any manner that would not be permissible under the Privacy Rule if done by CFSA.

## H.13.6 Term and Termination

**H.13.6.1** Term. The requirements of this HIPAA Privacy Compliance Clause shall be effective as of the date of contract award, and shall terminate when all of the Protected Health Information provided by CFSA to Contractor, or created or received by Contractor on behalf of CFSA, is destroyed or returned to CFSA, or, if it is infeasible to return or destroy Protected Health Information,

protections are extended to such information, in accordance with the termination provisions in this Section.

**H.13.6.2** Termination for Cause. Upon CFSA's knowledge of a material breach of this Clause by Contractor, CFSA shall either:

**H.13.6.2.1** Provide an opportunity for Contractor to cure the breach or end the violation and terminate the contract if Contractor does not cure the breach or end the violation within the time specified by CFSA;

**H.13.6.2.2** Immediately terminate the contract if Contractor has breached a material term of this HIPAA Privacy Compliance Clause and cure is not possible; or

**H.13.6.2.3** If neither termination nor cure are feasible, CFSA shall report the violation to the Secretary.

**H.13.6.3** Effect of Termination.

**H.13.6.3.1** Except as provided in Section H.13.6.3.2, upon termination of the contract, for any reason, Contractor shall return or destroy all Protected Health Information received from CFSA, or created or received by Contractor on behalf of CFSA. This provision shall apply to Protected Health Information that is in the possession of subcontractors or agents of Contractor. Contractor shall retain no copies of the Protected Health Information.

**H.13.6.3.2** In the event that Contractor determines that returning or destroying the Protected Health Information is infeasible, Contractor shall provide to CFSA notification of the conditions that make return or destruction infeasible. Upon determination by the Contracting Officer that return or destruction of Protected Health Information is infeasible, Contractor shall extend the protections of this Agreement to such Protected Health Information and limit further uses and disclosures of such Protected Health Information to those purposes that make the return or destruction infeasible, for so long as Contractor maintains such Protected Health Information.

**H.13.7  Miscellaneous**

**H.13.7.1** Regulatory References. A reference in this Clause to a section in the Privacy Rule means the section as in effect or as amended.

**H.13.7.2** Amendment. The Parties agree to take such action as is necessary to amend this Clause from time to time as is necessary for CFSA to comply with the requirements of the Privacy Rule and the Health Insurance Portability and Accountability Act of 1996, Public Law No. 104-191.

**H.13.7.3** Survival. The respective rights and obligations of Contractor under Section H-7.6 of this Clause and Sections 9 and 20 of the Standard Contract Provisions for use with District of Columbia Government Supply and Services Contracts, effective April 2003, shall survive termination of the contract.

**H.13.7.4** Interpretation. Any ambiguity in this Clause shall be resolved to permit CFSA to comply with the Privacy Rule.

****END OF SECTION H****

46

Jones & Associates, Inc.
CFSA-04-C-0350

## PART II – CONTRACT CLAUSES

### SECTION I

### CONTRACT CLAUSES

#### TABLE OF CONTENTS

| CLAUSE NO. | CLAUSE TITLE | PAGE NO. |
|---|---|---|
| I.1 | APPLICABILITY OF STANDARD CONTRACT PROVISIONS | 46 |
| I.2 | CONTRACTS THAT CROSS FISCAL YEAR | 46 |
| I.3 | CONFIDENTIALITY OF INFOR- MATION | 46 |
| I.4 | TIME | 46 |
| I.5 | RISTRICTION OF DISCLOSURE AND USE OF DATA | 46-47 |
| I.6 | RIGHTS IN DATA | 47-49 |
| I.7 | OTHER CONTRACTOR | 50 |
| I.8 | FIRST SOURCE EMPLOYMENT AGREEMENT | 50 |
| I.9 | SUBCONTRACTS | 50 |
| I.10 | CONTINUITY OF SERVICES | 50 |
| I.11 | INSURANCE | 50-53 |
| I.12 | EQUAL EMPLOYMENT OPPORTUNITY | 53 |
| I.13 | PRE-AWARD APPROVAL | 53 |

47

Jones & Associates, Inc.
CFSA-04-C-0350

## SECTION I: CONTRACT CLAUSES

I.1   **APPLICABILITY OF STANDARD CONTRACT PROVISIONS**

The Standard Contract Provisions for use with District of Columbia Government Supply and Services Contracts dated April 2003, (Attachment J.1), the District of Columbia Procurement Practices Act of 1985, as amended, and Title 27 of the District of Columbia Municipal Regulations, as amended, are incorporated as part of the contract resulting from this solicitation.

I.2   **CONTRACTS THAT CROSS FISCAL YEARS**

Continuation of this contract beyond the fiscal year is contingent upon future fiscal appropriations.

I.3   **CONFIDENTIALITY OF INFORMATION**

All information obtained by the Contractor relating to any employee of the District or customer of the District shall be kept in absolute confidence and shall not be used by the Contractor in connection with any other matters, nor shall any such information be disclosed to any other person, firm, or corporation, in accordance with the District and Federal laws governing the confidentiality of records.

I.4   **TIME**

Time, if stated in a number of days, will include Saturdays, Sundays, and holidays, unless otherwise stated herein.

I.5   **RESTRICTION ON DISCLOSURE AND USE OF DATA**

The Contractor who include in their proposal data that they do not want disclosed to the public or used by the District Government except for use in the procurement process shall:

1.5.1   Mark the title page with the following legend:

"This proposal includes data that shall not be disclosed outside the District Government and shall not be duplicated, used or disclosed in whole or in part for any purpose except for use in the procurement process.

If however, a contract is awarded to this Contractor as a result of or in connection with the submission of this data, the District Government shall have the right to duplicate, use, or disclose the data to the extent consistent with the District's needs in the procurement process. This restriction does not limit the District's rights to use, without restriction, information contained in this data if it is obtained from another source. The data subject to this restriction are contained in sheets (insert numbers or other identification of sheets)."

15.2   Mark each sheet of data it wishes to restrict with the following legend:

48

Jones & Associates, Inc.
CFSA-04-C-0350

> "Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this proposal."

## I.6   RIGHTS IN DATA

**I.6.1**   "Data," as used herein, means recorded information, regardless of form or the media on which it may be recorded. The term includes technical data and computer software. The term does not include information incidental to contract administration, such as financial, administrative, cost or pricing, or management information.

**I.6.2**   (a) The term "Technical Data", as used herein, means recorded information, regardless of form or characteristic, of a scientific or technical nature. It may, for example, document research, experimental, developmental or engineering work, or be usable or used to define a design or process or to procure, produce, support, maintain, or operate material. The data may be graphic or pictorial delineations in media such as drawings or photographs, text in specifications or related performance or design type documents or computer printouts.

(b) Examples of technical data include research and engineering data, engineering drawings and associated lists, specifications, standards, process sheets, manuals, technical reports, catalog item identifications, and related information, and computer software documentation. Technical data does not include computer software or financial, administrative, cost and pricing, and management data or other information incidental to contract administration.

**I.6.3**   The term "Computer Software", as used herein means computer programs and computer databases. "Computer Programs", as used herein means a series of instructions or statements in a form acceptable to a computer, designed to cause the computer to execute an operation or operations. "Computer Programs" include operating systems, assemblers, compilers, interpreters, data management systems, utility programs, sort merge programs, and automated data processing equipment maintenance diagnostic programs, as well as applications programs such as payroll, inventory control and engineering analysis programs. Computer programs may be either machine-dependent or machine-independent, and may be general purpose in nature or designed to satisfy the requirements of a particular user.

**I.6.4**   The term "computer databases", as used herein, means a collection of data in a form capable of being processed and operated on by a computer.

**I.6.5**   All data first produced in the performance of this Contract shall be the sole property of the District. The Contractor hereby acknowledges that all data, including, without limitation, computer program codes, produced by Contractor for the District under this Contract, are works made for hire and are the sole property of the District; but, to the extent any such data may not, by operation of law, be works made for hire, Contractor hereby transfers and assigns to the District the ownership of copyright in such works, whether published or unpublished. The Contractor agrees to give the District all assistance reasonably necessary to perfect such rights including, but not limited to, the works and

49

Jones & Associates, Inc.
CFSA-04-C-0350

supporting documentation and the execution of any instrument required to register copyrights. The Contractor agrees not to assert any rights in common law or in equity in such data. The Contractor shall not publish or reproduce such data in whole or in part or in any manner or form, or authorize others to do so, without written consent of the District until such time as the District may have released such data to the public.

**I.6.6**   The District shall have restricted rights in data, including computer software and all accompanying documentation, manuals and instructional materials, listed or described in a license or agreement made a part of this contract, which the parties have agreed will be furnished with restricted rights, provided however, not withstanding any contrary provision in any such license or agreement, such restricted rights shall include, as a minimum the right to:

**I.6.6.1**   Use the computer software and all accompanying documentation and manuals or instructional materials with the computer for which or with which it was acquired, including use at any District installation to which the computer may be transferred by the District;

**I.6.6.2**   Use the computer software and all accompanying documentation and manuals or instructional materials with a backup computer if the computer for which or with which it was acquired is inoperative;

**I.6.6.3**   Copy computer programs for safekeeping (archives) or backup purposes; and

**I.6.6.4**   Modify the computer software and all accompanying documentation and manuals or instructional materials, or combine it with other software, subject to the provision that the modified portions shall remain subject to these restrictions.

**I.6.7**   The restricted rights set forth in section I.6.6 are of no effect unless

(i) the data is marked by the Contractor with the following legend:

### RESTRICTED RIGHTS LEGEND

Use, duplication, or disclosure is subject to restrictions stated in Contract No._____
With _____(Contractor's Name) and

(ii)   If the data is computer software, the related computer software documentation includes a prominent statement of the restrictions applicable to the computer software. The Contractor may not place any legend on the computer software indicating restrictions on the District's rights in such software unless the restrictions are set forth in a license or agreement made a part of the contract prior to the delivery date of the software. Failure of the Contractor to apply a restricted rights legend to

50

such computer software shall relieve the District of liability with respect to such unmarked software.

**I.6.8**   In addition to the rights granted in Section I.6.9 below, the Contractor hereby grants to the District a nonexclusive, paid-up license throughout the world, of the same scope as restricted rights set forth in Section I.6.9 below, under any copyright owned by the Contractor, in any work of authorship prepared for or acquired by the District under this contract. Unless written approval of the contracting Officer is obtained, the Contractor shall not include in technical data or computer software prepared for or acquired by the District under this contract any works of authorship in which copyright is not owned by the Contractor without acquiring for the District any rights necessary to perfect a copyright license of the scope specified in the first sentence of this paragraph.

**I.6.9**   Whenever any data, including computer software, are to be obtained from a subcontractor under this contract, the Contractor shall use Section I.6 in the subcontract, without alteration, and no other clause shall be used to enlarge or diminish the District's or the Contractor's rights in that subcontractor data or computer software which is required for the District.

**I.6.10**   For all computer software furnished to the District with the rights specified in Section I.6.5, the Contractor shall furnish to the District, a copy of the source code with such rights of the scope specified in Section I.6.5. For all computer software furnished to the District with the restricted rights specified in Section I.6.6, the District, if the Contractor, either directly or through a successor or affiliate shall cease to provide the maintenance or warranty services provided the District under this contract or any paid-up maintenance agreement, or if Contractor should be declared bankrupt or insolvent by the court if competent jurisdiction, shall have the right to obtain, for its own and sole use only, a single copy of the then current version of the source code supplied under this contract, and a single copy of the documentation associated therewith, upon payment to the person in control of the source code the reasonable cost of making each copy.

**I.6.11**   The Contractor shall indemnify and save and hold harmless the District, its officers, agents and employees acting within the scope of their official duties against any liability, including costs and expenses, (i) for violation of proprietary rights, copyrights, or rights of privacy, arising out of the publication, translation, reproduction, delivery, performance, use or disposition of any data furnished under this contract, or (ii) based upon any data furnished under this contract, or based upon libelous or other unlawful matter contained in such data.

**I.6.12**   Nothing contained in this clause shall imply a license to the District under any patent, or be construed as affecting the scope of any license or other right otherwise granted to the District under any patent.

**I.6.13**   Paragraphs I.6.6, I.6.7, I.6.8, I.6.11 and I.6.13 above are not applicable to material furnished to the Contractor by the District and incorporated in the work furnished under contract, provided that such incorporated material is identified by the Contractor at the time of delivery of such work

51

Jones & Associates, Inc.
CFSA-04-C-0350

**I.7      OTHER CONTRACTORS**

The Contractor shall not commit or permit any act that will interfere with the
performance of work by another District Contractor or by any District employee.

**I.8      FIRST SOURCE EMPLOYMENT AGREEMENT**

The Contractor shall maintain compliance with the terms and conditions of the First
Source Employment Agreement, Attachment J.3, executed between the District of
Columbia and the Contractor throughout the entire duration of the contract, including
option periods if any.

**I.9       SUBCONTRACTS**

The Contractor hereunder shall not subcontract any of the Contractor's work or services
to any subcontractor without the prior, written consent of the Contracting Officer. Any
work or service so subcontracted shall be performed pursuant to a subcontract agreement,
which the District shall have the right to review and approve prior to its execution to the
Contractor. Any such subcontract shall specify that the Contractor and the subcontractor
shall be subject to every provision of this contract. Notwithstanding any such
subcontract approved by the District, the Contractor shall remain liable to the District
for all Contractor's work and services required hereunder.

**I.10    CONTINUITY OF SERVICES**

**I.10.1**   The Contractor recognizes that the services provided under this contract are vital
to the District of Columbia and must be continued without interruption and that,
upon contract expiration or termination, a successor, either the District
Government or another contractor, at the District's option, may continue to
provide these services. To that end, the Contractor agrees to:

**I.10.1.1** Furnish phase-out, phase-in (transition) training; and

**I.10.1.2** Exercise its best efforts and cooperation to effect an orderly and efficient
transition to a successor.

**I.11    INSURANCE**

The Contractor shall obtain the minimum insurance coverage set forth below prior to
award of the contract and within ten (10 ) calendar days after being called upon by the
District to do so and keep such insurance in force throughout the  contract period.

**I.11.1**   Contractor shall secure and maintain the insurance policies required in this
section. All policies shall be written by insurers which are licensed as regulated
insurers by the District of Columbia government and are in good standing under
such license, with a rating by the A.M. Best Company of A- or greater, and with
a financial class size of VIII or higher, or equivalent ratings from a recognized
insurance rating service which the licensing agency has approved in writing.

Jones & Associates, Inc.
CFSA-04-C-0350

  I.11.2  Contractor shall secure and maintain, and provide evidence that its staff members who are independent contractors secure and maintain (in the form of certificates complying with D.C. Mun. Regs., Titl. 29, §§ 6221.3, 6316.5, 6316.6, and 6316.7), commercial general liability insurance, containing contractual liability insurance, insuring the facility as named insured and naming the contracting entity, licensing agency and the District of Columbia government as additional insured, on an occurrence (not claims-made) basis, with per location or per project limits (exclusive of defense costs) of not less than:

   I.11.2.1 One million dollars ($ 1,000,000) per occurrence for bodily injury or death or property damage, combined single limit;

   I.11.2.2 One million dollars ($ 1,000,000) per occurrence for personal and advertising injury;

   I.11.2.3 One million dollars ($1,000,000) per occurrence for products-completed operations; and

   I.11.2.4 Subject to a general aggregate of two million dollars ($2,000,000) per policy year. All such policies shall be primary coverage and the Contractor's policies shall provide coverage for all staff members excluding independent contractors. Deductibles under commercial general liability insurance policies shall not exceed five thousand dollars ($5,000.00) per occurrence.

I.11.3 Contractor shall secure and maintain business automobile policy insurance for owned, non-owned and hired vehicles with a combined single limit (exclusive of defense costs) of not less than one million dollars ($1,000,000). All such policies shall be primary coverage and shall provide coverage for all staff members. Limits for uninsured and under-insured motorists shall be not less than one million dollars ($1,000,000). Physical damage deductibles under business automobile policies shall not exceed five thousand dollars ($5,000.00) per occurrence.

I.11.4 Contractor shall secure and maintain, and provide evidence that its staff members who are independent contractors secure and maintain:

  I.11.4.1 worker's compensation insurance with statutory worker's compensation limits.;

  I.11.4.2 professional liability insurance with limits (exclusive of defense costs) of not less than one million dollars ($1,000,000) per occurrence.

I.11.5 Contractor shall secure and maintain employer's liability insurance with limits of not less than one hundred thousand dollars ($ 100,000) per accident, five hundred thousand dollars ($ 500,000) disease policy limit, one hundred thousand dollars ($ 100,000) disease, each employee. All such policies shall be primary coverage and shall provide coverage for all staff members.

I.11.6 Contractor shall secure and maintain coverage of the building, improvements, furnishings, fixtures and equipment, inventory and other personal property by broad form ("all-risk") commercial property insurance on a full replacement cost, agreed amount basis, waiving subrogation against the licensing agency, the contracting entity and the District of Columbia government and containing an additional insured endorsement naming the licensing agency, the contracting entity and the District of Columbia government as additional insured. Contractor shall secure and maintain time value insurance coverage for one hundred percent (100%) of the loss of income/extra expense coverage incurred in occurrences covered by the facility's commercial property insurance policy. Deductibles under property insurance policies maintained by the

53

facility shall not exceed five thousand dollars ($ 5,000.00) per occurrence. All such policies shall be primary coverage. If all or a portion of the above coverages are maintained by the Contractor's landlord, the Contractor shall also provide evidence of the landlord's, which evidence shall include a waiver of subrogation against the licensing agency, the contracting entity and the District of Columbia government.

**I.11.7** Contractor shall secure and maintain excess or umbrella liability insurance with limits of not less than five million dollars ($ 5,000,000) per occurrence, subject to a general aggregate of five million dollars ($ 5,000,000) per policy year, and self-insured retention of no more ten thousand dollars ($ 10,000), covering not less than the same liabilities and coverages set forth in D.C. Mun. Regs, Titl. 29, § § 6221 and 6316, in excess of the limits specified in those policies.

**I.11.8** The insurance policies required by this section shall contain the following endorsement:

> "It is hereby understood and agreed that the insurer may not cancel, fail to renew, or reduce the coverage or liability limits of this policy unless the insurer provides the contacting entity, licensing agency, and the Office of the City Administrator with written notice of an intent to take such action at least ten (10) days in advance of cancellation for non-payment of premium and thirty (30) days in advance of any other such action. The insurer shall serve notice to the following persons by certified mail, return receipt requested:
>
> > Director
> > Child and Family Services Agency
> > 400 6th Street SW
> > Washington, D.C. 20024
> >
> > Office of the City Administrator
> > Attention Risk Management Officer
> > 441 4th Street, N.W.
> > Suite 1150
> > Washington, D.C. 20001"

**I.11.9** Contractor shall defend, indemnify and hold the contracting entity, licensing agency, and the District of Columbia government, and its elected and appointed officials and officers, employees, agents and representatives, harmless from and against any and all injuries, claims, demands, judgments, suits in law and equity (including without limitation, habeas corpus actions), actions before administrative tribunals, damages, losses and expenses, including reasonable attorney's fees and costs of suit or defense, that actually or allegedly, in whole or in part, arise out of, or result from:

**I.11.9.1** The operation of the facility;

**I.11.9.2** Performing or failing to perform duties required by or reasonably related to the requirements of the contract between the facility and the contracting entity; or

**I.11.9.3** Providing or offering services, whether or not caused by the facility or its affiliates, officers, employees, agents, contractors or subcontractors; whether or not such acts or omissions were alleged or proven to have been caused in whole or in part by the contracting entity, the licensing agency or the District of Columbia government, and whether or not such acts or

Jones & Associates, Inc.
CFSA-04-C-0350

omissions are authorized, allowed or prohibited by this Chapter. The facility's indemnity obligations under this section shall not apply to any injuries, claims, demands, judgments, damages, losses or expenses to the extent arising out of or resulting from the gross negligence or willful misconduct by the contracting entity; the licensing agency or the District of Columbia government, or their officials, officers, employees, agents or representatives, provided that no such gross negligence or willful misconduct, alleged or actual, shall affect the facility's obligation to defend the contracting entity, licensing agency, and the District of Columbia government.

**1.11.9.4** Contractors shall provide copies of the policies for any or all of the insurance required by this section to the contracting entity and licensing agency upon written request.

## I.12    EQUAL EMPLOYMENT OPPORTUNITY

In accordance with the District of Columbia Administrative Issuance System, Mayor's Order 85-85 dated June 10, 1985, the forms for completion of the Equal Employment Opportunity Information Report are incorporated herein as Attachment J4. An award cannot be made to any Contractor who has not satisfied the equal employment requirements as set forth by the Department of Human Rights and Local Business Development.

## I.13    PRE-AWARD APPROVAL

The award and enforceability of this contract is contingent upon Council Approval. In accordance with the Council Contract Review Criteria Amendment Act of 1999, D.C. Official Code 2-301.05(a).

****END OF SECTION 1****

## PART III – LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS

### SECTION J

### ATTACHMENTS AND DOCUMENTS INCORPORATED BY REFERENCE

**The following documents are attached, and incorporated by reference into the resulting contract:**

J.1     Standard Contract Provisions for Use with District of Columbia Government Supply and Services Contracts, dated April 2003 **(Attached)**

J.2     Wage Determination No. 1994-2103 **(Revision No. 31 April 21, 2004) (Attached)**

J.3     First Source Employment Agreement (Attached)

J.4     Glossary of Terms for CFSA (Attached)

J.5     Baseline Performance Indicators and Reporting Requirements **(Attached)**

J.6     RESERVED

J.7     RESERVED

**The following documents are incorporated by reference into the contract.**

J.8     Licensing of Youth Shelters, Runaway Shelters, Emergency Care Facilities and Youth Group Homes DCMR Title 29, Chapter 62

J.9     Licensing of Independent Living Programs for Adolescents and Young Adults, DCMR Title 29, Chapter 63

J.10    LaShawn A. v. Williams Modified Final Order dated November 18, 1993

J.11    RESERVED

J.12    Youth Residential Facilities Licensure Act of 1986, D.C. Code Official § 7-2101 *et seq.*

J.13    Child Abuse and Prevention Treatment Act, 42 U.S.C. § 5101 *et seq.*

J.14    Prevention of Child Abuse and Neglect Act of 1977, D.C. Official Code § 16-2351-2365

J.15    Adoption Assistance and Child Welfare Act of 1997, 42 U.S.C. § 620 *et seq.*

J.16    Adoption and Safe Families Act of 1997, 42 U.S.C. § 1305 *et seq.*

J.17    Multiethnic Placement Act of 1994, 42 U.S.C. § 1996b

J.18    Title IV, Part B of the Social Security Act , 42 U.S.C. § 620 *et seq.*

56

Jones & Associates, Inc.
CFSA-04-C-0350

J.19    Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978, D.C.
        Official Code §7-1301.02 *et seq.*

J.20    Health Insurance Portability and Accountability Act of 1996, 42 U.S.C.
        §§ 1320d *et seq.*

J.21    Individuals with Disabilities Education Act . 20 U.S.C. § 1400 *et seq.*

J.22    LaShawn A. v. Williams Implementation Plan, approved on May 15, 2003.

J.23    Associates for Renewal Technical Proposal

J.24    **ORDER OF PRECEDENCE**

        In case of a conflict between the contract clauses and Attachments to the contract the
        following is an order of precedence for the contract:

        **J.24.1** Attachments J.8 through J.23 in descending order
        **J.24.2** Sections A through I of the contract
                (including the Letter Contract dated July 1, 2004)
        **J.24.3** Attachments J.1 through J.5 in descending order

**\*\*\*END OF SECTION J\*\*\***

Jones & Associates, Inc
CFSA-04-C-0350

(Attachment J.4)

## CHILD AND FAMILY SERVICES AGENCY

## GLOSSARY OF TERMS

## DEFINITIONS

**OBJECTIVE / PURPOSE**

A. The acronyms, terms, and definitions collected here represent commonly used terminology for the social services industry in general and Child and Family Services Agency (CFSA) in particular.

B. It is the intent of CFSA to attain uniformity in the understanding and utilization of the verbal and written use of these terms by the various agency representatives, the contractor and client communities, as well as DC government officials and the general public.

C. Terms defined here may be applicable to other District Government agencies. However, the primary application of these terms is as used in CFSA operations and the legal and medical organizations associated with its mission.

**GLOSSARY**

A. Acronyms
 CFSA – Child and Family Services Agency
 DCMR – District of Columbia Municipal Regulations
 DOB – Date of Birth
 EAP – Emergency Assessment Program
 FIP – Family Intervention Program
 RFP – Request for Proposal

B. Definitions

Administrative Expenditures – Program costs expended for administrative purposes. Limitations are generally defined in the contractor's agreement with CFSA.

Administrative Review – Periodic review for children in foster care and placement alternative services involving all parties in the case to determine the appropriateness of the placement and/or case plan.

Adolescent – See Youth.

Advance Notice – A contractual or legal term signifying a written or verbal act between two or more parties that normally precedes a more formal notification.

Advocacy – The act or act of supporting or recommending a cause, plan, or course of action for a particular program, individual, or group.

Jones & Associates, In.
CFSA-04-C-0350

Assisted living - A residential, independent living program serving youth aged 16 to 21 that provides specialized care to meet the special needs of adolescents and young adults who are medically fragile, physically challenged, mentally retarded, or developmentally disabled through appropriate staffing, direct care and service provision.

Assignment - To give or transfer responsibility to another. Contractor cannot 'assign' responsibility for its contractual obligations with CFSA to another entity.

Background Check – In addition to a search of the subjects criminal records in state, District's, and Federal law enforcement agencies, a background check may include the search of driving records, former employer references, and character references check (Also see Criminal Records Check).

Behavior management - The use of specialized interventions to guide, supervise, and redirect client behaviors.

Capacity – The number of children a facility is entitled to serve as determined by the contract and/or the licensing worker (See also Units)

Caregiver – Individual primarily responsible for providing care to a child or youth.

Case Law – Law established by the history of judicial decisions in cases.

Case plan  - A written document that serves to guide the provision of services to a family and/or to a specific child. The case plan, developed with members of the family and/or the child, clearly identifies goals and objectives to be achieved and spells out tasks to be performed by the worker, adult family members and/or child.

Center for the Keys of Life - CFSA's independent living program that supports the primary goal of alternative planned living for youth.

Child Abuse – Physical or mental injury of a non-accidental nature, sexual abuse or sexual exploitation or negligent treatment or maltreatment of a child caused or allowed by a person responsible for his or her welfare under circumstances which indicate that the child's health or welfare is harmed or threatened with harm.

Child/Children - an individual under the age of 18 years. This term may be used interchangeably with youth.

Client – A term often used to refer to the recipient or requestor of CFSA services.

Clinical Services - the provision of evaluation, assessment or treatment of children youth or families for behavioral, medical or mental health issues.

59

Jones & Associates, Inc.
CFSA-04-C-0350

Clothing Allowance – For foster care cases, the child's clothing allowance is included in the monthly foster care payment. An initial clothing allowance is available when children first enter foster care.

Collaborative – any or all of the Healthy Families/Thriving Communities Collaboratives contracted with the Child and Family Service Agency.

Community Care Programs – services and or programs that are based in the neighborhoods and/or communities in which families, children and youth reside.

Competency Based – services or interventions that are focused on enhancing the strengths and competencies of families, youth or children in order to address the areas of concern, risk or safety.

Congregate Care - residential care provided to children or youth in a group setting that contains more than 6 persons who are not so related by blood, marriage, or adoption, and are living together as a single house-keeping unit, using certain rooms and housekeeping facilities in common.

Community Based Services – Services and/or programs that are based in the neighborhoods and/or communities in which families, children and youth reside.

Community Based Return Diversion Programs - residential programs serving those youth aged 13 through 18 with mental health challenges and severe behavior conditions requiring a closely supervised, highly structured environment.

Contract Management -- Includes activities that provide reasonable assurance that the provider agency/contractor complies with the terms, conditions, and other performance requirements of the contract; includes the monitoring and analysis of information to determine if performance is consistent with the contract provisions.

Contractor – An entity authorized to do business with CFSA and/or CFSA's service providers. The term is interchangeably used with 'vendor', 'supplier', or 'subcontractor'.

Contractor Fraud – The intentional misstatement(s) or the concealment(s) of facts or details by the contractor or authorized representative that creates a false impression. The following is a partial list of fraudulent conduct.

- Knowingly providing false information regarding a contractor's financial, medical, or functional status in order to be determined eligible for initiating or retaining services to CFSA.
- Withholding or concealing information pertaining to the contractor's financial, medical or functional status which may cause the applicant to be ineligible to initiate or provide services to CFSA.
- Knowingly receiving and billing for services from individuals or subcontractors/providers who do not have a proper license or who obtained a license under false pretenses.
- Knowingly misrepresenting CFSA client counts and/or services provided to clients
- Knowingly falsifying CFSA client records, documents, reports, and/or invoices.

Jones & Associates, Inc.
CFSA-04-C-0350

Contractor's Records – Licenses, books, individual service plans and reviews, financial documents, supporting documents, statistical data, and other records pertaining to the services provided.

Court Order – A legally binding edict issued by a court of law. Issued by a magistrate, judge, or properly empowered administrative officer.

Credentialing – Process that assures services provided by individuals, facilities, and programs are safe, of acceptable quality, and that the costs of services are justified and reasonable. Included in the process are licensure, certification, or registration of the services provided by an individual and/or facility; and the inspection or survey of facilities.

Criminal Clearance – See Criminal Records Check

Cultural Competence - The degree to which an organization modifies or tailors its entire system of service delivery, including personnel selection, training and development, assessment, service planning and implementation, and program evaluation and consumer care monitoring to the ethnic, racial, cultural, religious, and national diversity in its service population.

Cultural Responsiveness – The concept that children and families are to be understood within the context of their own family rules, traditions, history, language, and culture.

Daily Living Skills – The skills necessary for day-to-day living and are necessary for successful day-to-day functioning, an area in which individuals who have been abused and/or neglected may often experience deficits

Day hours - day hours generally refer to morning and afternoon hours when children and youth are awake.

District of Columbia Municipal Regulations (DCMR) – regulations issued by the District of Columbia.

Deficiency - generally applied to the provider's failure to comply with contractual requirements, deliverables, and/or other performance criteria of a contract.

Developmental Disability: a severe, chronic disability of a person five years of age or older that is attributable to a mental and/or physical impairment; manifested before age 22; likely to continue indefinitely; and results in substantial functional limitations in three or more of the following areas of major life activity:

- Self-care
- Receptive and expressive language
- Learning
- Mobility
- Self-direction
- Capacity for independent living
- Economic and self sufficiency

In addition, a developmental disability reflects the person's need for special, interdisciplinary or generic care, treatment, or other services on a life-long or extended basis. Examples of

61

developmental disabilities include children and adults with a wide range of diagnoses, including mental retardation, cerebral palsy, autism, spinal cord injury, and severed head injury. Also known as "Special Needs"

Diagnostic and Emergency Care (12 and Younger/13 and Older) - short-term, urgent care provided to a child or youth when a more permanent, family-based or congregate care placement cannot be secured immediately. Care shall be for thirty (30) days or less, and during this period the social worker and diagnostic and emergency care staff shall assess a child/youth's needs to include the propriety of continued placement.

Discharge - A voluntary or involuntary process describing the point when an organization no longer assumes responsibility for providing services to a particular individual, group, or family.

Disposition – The court's decision directing a course of action in response to a dispute brought to its attention.

Emergency Assessment Program (EAP) – An emergency response, crisis intervention program that provides time-limited services to increase placement options and to establish early intervention and linkages to families with children who are at risk of coming into care through CFSA.

Evaluation – A systematic and organized review of gathered documentation, details, evidence, and other information to determine the validity, accuracy, standing, and merits and/or deficiencies of its content.

Evening hours - Evening hours generally refer to late afternoon hours prior to traditional sleeping hours when children and youth are awake.

Family: one (1) or more persons related by blood, marriage, or adoption, or not more than six (6) persons who are not so related, including foster children, living together as a single house-keeping unit, using certain rooms and housekeeping facilities in common; provided, that the term family shall include a religious community having not more than fifteen (15) members (19 DCR 281).

Family-Based Care – Out-of-home care for children removed from biological parents that is provided in a family context offered by foster or kinship caregivers.

Family Centered Practice – the provision of services that are flexible to the unique needs of families and are focused on strengthening/enhancing a family's ability to provide a safe a nurturing home for children and youth.

Family Intervention Program (FIP) – CFSA program that conducts family group conferences and provides services to families at the time of removal of children due to abuse or neglect.

Fiscal Monitoring – A basic review of contracts to determine whether or not purchased services were in fact provided in accordance with the defined scope.

Group counseling – Psychotherapy services for 4 or more individuals at one time.

Jones & Associates, Inc
CFSA-04-C-0350

Harassment – Unsolicited words or conduct, which tend to annoy, alarm, or abuse another person. A course of vexatious comment or conduct that is known or ought reasonably to be known to be unwelcome.

He/his - "he/his" shall be considered gender neutral and serve to indicate both male and female children or youth in instances in which both he/his and she/her may not be indicated in the text.

Healthy Families/Thriving Communities Collaboratives – seven neighborhood-based support networks located throughout the District of Columbia contracted by CFSA to prevent child abuse and neglect, help families in need, and build a family support network through partnership of residents, community leaders, service providers and other community stakeholders.

Independent Living Main Facility Programs - a residential, independent living program serving youth aged 16 to 21 years that provides collectively supervised care in a main facility on a 24-hour basis. The program prepares the adolescent or young adult to live successfully, on his or her own, in the community

Independent Living Program - a residential program that provides monitored residence in a main facility program or residential units serving adolescent and young adults aged 16 to 21 years. The program prepares the adolescent or young adult to live successfully, on his or her own, in the community. Residents may include teen parents and their children.

Independent Living Residential Units - a residential, independent living program serving youth aged 18 to 21 who are developmentally appropriate for residence in monitored apartment settings.

Individual Habilitation Plan (IHP) – a written plan that describes current functioning of an individual and goals for functioning one year from the date the plan is designed. Plan must outline a prescribed course of intervention to achieve goals based on a comprehensive evaluation of the individual.

Individual Counseling - Psychological and counseling services provided to an individual. The services usually are provided for a period of time on a scheduled basis for approximately 45-60 minutes at a time.

Individual Service Plan (ISP) – A document that sets forth a facility's plan for the resident's health, safety, welfare, and general well-being. The ISP includes the individualized treatment plan, as provided in section 7 of the Act (D.C. Code § 3-806). Term is synonymous with case plan.

Individual Transitional Independent Living Plan (ITILP) – A written plan to be developed within 30 days of a resident' admission that states goals to be achieved by the individual and other elements (outlined in 29 DCMR Chapter 63). An evaluation of the youth's physical, mental, emotional, academic, social, familial, recreational, and life skills needs and strengths relative to the resident's age, level of development, cultural background, and impairments shall be taken into consideration. Assessments and their recommendations and outcomes shall be included. The plan shall be developed by the planning team consistent with the CFSA's written case plan for the individual and take into account the outcomes of the initial ITILP.

Initial Individual Transitional Independent Living Plan – A written plan that must developed within five days before and five days after a resident's admission that is consistent with the

63

current case plan and includes the elements outlined for an Individual Transitional Independent Living Plan (ITILP).

Individualized Education Plan (IEP) - a written plan for a student in special education describing the student's present levels of performance, annual goals including short-term objectives, specific special education and related services, dates for beginning and duration of services, and how the IEP will be evaluated.

Ineligible - The determination through law, regulations, or prescribed guidelines or criteria that requirements have not been sufficiently met that warrant further consideration.

Integrated Services - Behavioral, medical and/or mental health services that are coordinated, and integrate various child-serving agencies and systems to collaboratively provide special education, child welfare, health, and increasingly, juvenile justice services to meet the multiple needs of children, youth, and their families.

Intervention – The process whereby CFSA professionals and/or service providers intercede on behalf of their client(s) with actions that will decrease risk, provide for the safety, promote permanence, and establish well-being. Intervention may range from finding housing to changing a parent's pattern of thinking about their child.

Least Restrictive Environment - placement, residence, or location of treatment for consumers in situations that most closely meet their special needs in an environment that most closely approximates that of a person without the disability or condition.

Level III "Handicap" - a medical condition that includes substantial physical impairments. These impairments may include, but are not limited to, eye disorders resulting in complex conditions such as blindness; hearing impairments; paralysis that commits the individual to a wheelchair or other device that assists ambulating. A child or youth with Level III handicap is typically identified to have significant impairments, but does not require skilled nursing to assist in ongoing care.

Level IV "Multi-handicap" - a diagnosable, enduring, life-threatening condition. These conditions may include, but are not limited to, HIV/AIDS, respiratory disease, blood conditions such as sickle cell anemia, end stage failure of a major organ system, diabetes, congenital anomalies, cystic fibrosis, heart conditions, multiple sclerosis and cancer. Such multi-handicapped conditions also include dependence on mechanical ventilation for at least part of the day, and devices that compensate for vital body functions. Skilled nursing is required to assist in ongoing care.

Life Skills – see daily living skills

Main facility - the central independent living program edifice that provides on-site staff supervision and which has more than one residence.

Medically Fragile - children with significantly debilitating medical conditions that impair daily functioning and require close medical supervision.

Mental Retardation - As clinically diagnosed, significantly sub-average general cognitive and motor functioning existing concurrently with deficits in adaptive behavior manifested during the developmental period that adversely affect socialization and learning. (AFCARS, CFR 45 § 1355 Apps. A and B).

Jones & Associates, Inc.
CFSA-04-C-0350

Mentoring – Guidance, direction, and advice, applied in a trusting relationship, between trained mentors and wards of CFSA.

Multi-agency Planning Team (MAPT) – Multi-agency body designed to provide a forum to address the immediate service needs of multi-problem, multi-agency children and families who are at risk for out-of-home placement.

Night hours - night hours generally refer to hours traditionally dedicated for sleeping. The exact hours are not specified by CFSA, but shall be defined by the Contractor's program.

Neighborhood Collaborative – see Collaborative

Objective – Something worked toward; something one is trying to achieve or accomplish. Measurable objectives are typically time limited, observable, and have clear criteria for success.

Permanency - The provision of a permanent living arrangement for a child based on AFSA requirements. Also the process by which a child in CFSA foster care benefits from case planning, periodic reviews, and other procedural safeguards to ensure that the child enters care only when necessary and appropriately placed, and is returned home or to a permanent living situation in a timely fashion.

Physically Challenged - Impaired by physical disability preventing the individual from a full range of physical ability, and specialized care is required to enable completion of daily activities. Physical challenges shall be characterized as Level III handicap for purposes of financial rate reimbursement and specialized care requirements.

Practices – Generally accepted standards, processes, or procedures that provide for consistent and uniform operations.

Prevention - The creation of conditions, opportunities, and experiences that encourage and develop healthy, self-sufficient people.

Protection – Ensuring children are free from maltreatment by their parent(s) and/or caregiver(s).

Provider – An individual or organization that receives funds from CFSA for services provided to clients of CFSA through a program developed by CFSA.

Reunification – The positive conclusion of providing care and guidance to CFSA clients whereby they are reunited with their permanent living situation, family, or guardian.

Safety - Protection from or absence of imminent danger, harm, or injury.

Service Provider – See Provider

Service integration – See Integrated Services

Service Termination – Voluntary or involuntarily ordered cessation of contractually delivered services.

65

Jones & Associates, Inc.
CFSA-04-C-0350

Sleeping hours – Hours traditionally spent sleeping.

Slots – Otherwise interchangeable with capacity or number of individuals that are able to have contracted services provided for.

Specialized care - Care that is tailored to meet the needs of children and youth with conditions of medical fragility, physical challenges, mental retardation, and/or developmental disability via assistive technology, occupational or physical therapy, staffing patterns and credentials, or any other services that increase, maintain, or improve their functional capabilities.

Specialized Group Home Care - Care provided to youth aged 13 through 15 in a community based group home environment that is tailored to meet the special needs of those who are medically fragile, physically challenged, mentally retarded, or developmentally disabled through appropriate staffing, direct care, and service provision.

Special needs - Characteristics of an individual that require specialized care and attention due to mental and physical disabilities. See also "Developmental Disability".

Special services - Specific, time-limited services based on a child's specific special needs.

Subpoena – A process issued by a court compelling a witness to appear at a judicial proceeding. Sometimes the process will also direct the witness to bring documentary evidence to the court.

Supervised Visitation – visitation among family members that are arranged and supervised by a social worker or caregiver.

Target Population – Signifies a particular program's population to be served by that program's services. Established definitions or profiles of each type client requirement determine the content of the target population.

Teen Parent Programs - Residential, independent living programs serving adolescents and young adults aged 16 to 21 years old who are pregnant, or are parents caring for their own child or children. Teen parents who are between the ages of 18 and 21 may reside in independent living residential units if developmentally appropriate, and those under the age of 18 must reside in independent living main facility programs.

Teens – Synonymous with youth.

Traditional Group Home Care - Care provided to youth Aged 13 through 15, as well as youth aged 16 and 17 who are not ready for Independent Living programs nor have family-based care options available to them in a community based group home environment that meets the physical, emotional and developmental needs of youth though supervision, guidance, education and recreation.

Visitation - The arrangement for children and youth to visit with relatives, parents and siblings.

Well Being - The healthy physical, emotional, intellectual, and spiritual development and existence of a human being.

Youth - a youth is an individual aged 13 to 21 years old. In some instances, this term may be used generally to refer to children and youth of all ages.

66

Jones & Associates, Inc.
CFSA-04-C-0350

Therapy – Recurring treatment of a disorder that is remedial or rehabilitative in nature. A service generally procured from approved CFSA sources.

Transportation – When offered or specified as a service provider requirement, transportation means private vehicle conveyance, delivered in a safe and orderly manner by an authorized and licensed operator.

Treatment – the provision of services and intervention techniques to alleviate or address behavioral, medical or psychological problems

Tutoring – Contracted instructions or schooling provided to wards of CFSA as part of the core services available form agency contractors or specifically ordered for an individual.

Vendor – See Contractor

Waking hours – Day hours and evening hours, those hours not spent sleeping.

Ward – A ward is defined as a legally transferred by court ordered to the care of a guardian generally specified as CFSA.