JONES AND ASSOCIATES

COMPLAINT

EXHIBITS ELEVEN (A) THROUGH EIGHTEEN (B)

JONES AND ASSOCIATES

EXHIBITS:

ELEVEN (A) THROUGH ELEVEN (E)

CORRESPONDENCE

John F. Mercer, Esq.,
1629 K Street, N.W.
Suite 300
Washington, D.C. 20036
Office: 202.349.1686
Cell: 240.535.8758
Fax: 240.206.8486
Email:jmjmercer@aol.com

**MERCER LAW ASSOCIATES, PLLC.**

July 20, 2008

$E \times \# \ 11(a)$

**BY DELIVERY AND US MAIL**

Hon. Peter J. Nickles, Esq.
Attorney General,
Office of the Attorney General
District of Columbia
441 4th Street NW, Suite 1060 N.
Washington, DC 20001

Re:   Jones & Associates, Inc.
      Auditor's Report
      Resolution of Outstanding contract Issues

Dear Mr. Nickels:

I represent Jones & Associates, Inc., ("JA"). As you may know, JA, is a contractor with D.C Child & Family Services (the "Agency") providing an Independent Living Program ("ILP") for children under the foster care jurisdiction of D.C. Child & Family Services (the "Agency").

Notwithstanding its record of service of over twenty years, during the last five years, JA has suffered from unreasonable, and at times, unconscionable contracting practices of the Agency. These practices have had substantial negative impact. But for JA's resolute commitment to provide very necessary services to its young clientele, the aforementioned practices of the Agency might have diminished the quality of JA's efforts, rendering JA ineffective or inoperable.

Due to radically untenable payment schemes forced upon JA by the Agency, JA has been systematically underpaid by way of unilaterally imposed and inexplicably depressed per diem payments, denial of reimbursements for proper and undisputed reimbursable expenses[1], forced depletion of JA's mandated reserve

---

[1] Though there is no dispute that reimbursable items claimed and presented by JA are legitimate and verifiable, the Agency has inexplicably refused to pay. There is no dispute as to the viability of the reimbursable items, their cost (at or below market), quality, and the nature of the transactions (all documented and arms length).

Hon. Peter J. Nickles, Esq.
Attorney General,
Office of the Attorney General
District of Columbia
Re: Jones & Associates, Inc., ILP
July 20, 2008

3.  Damages (including attorney fees and costs) accumulating from the Agency's by the Agency's acts of intimidation, delay, avoidance causing intentional and negligent delay in payments and other similar costs and other breaches on contract.

Again, the Agency neither responded nor acknowledged receipt thereof.

In March 2008 the District of Columbia Auditor (the "Auditor") conducted an audit of the Agency. On April 1, 2008 the Auditor issued its findings. Among those findings were specific recommendations, including the following:

*"The C&P Administrator, CFSA Placement Staff, and [JA] representatives immediately identify and address all issues that have prevented successful negotiation of a contract. The CFSA Director should consult with the Office of the Attorney General and other legal advisors to the extent necessary to resolve all outstanding issues.*

*If determined to be in the best interest of the District and the youth to be served, the C&P Administrator and CFSA placement staff immediately negotiate a reasonable and legally binding contract with [JA] within 30 days of the date of this report, and provide a copy of the contract to the Office of the D.C. Auditor immediately after execution.*

Based upon the audit findings and the recommendations therein, in May, 2008, the Agency hastily arranged for "negotiation" of a short term contract to carry the parties from May 31, 2008 through December 31, 2008.[5] As to the recommendation to "identify and address all issues that have prevented successful negotiations of a contract," unfortunately, it was tabled by the Agency and has remained unaddressed by the Agency to date.

Notwithstanding the Agency's failure to proceed with JA in a manner consistent with the Auditor's advice, JA entered into another "interim contract" presented by the Agency so as to (once again) maintain the continuity of its services. Placed again in the same financial dilemma, JA was advised by its

---

[5] JA has no information as to participation in this matter by the Office of the Attorney General.

3

Hon. Peter J. Nickles, Esq.
Attorney General,
Office of the Attorney General
District of Columbia
Re: Jones & Associates, Inc., ILP
July 20, 2008

counsel to comply with the recommendations of the Auditor and in good faith to extend every effort to maintain the level of its services through December 31, 2008 even though that might mean operating under no contract or operating (as had been done for four years) under a deficient contract. It was believed by JA and counsel that the Agency would, in accordance with the Auditors' recommendations, address the outstanding financial shortcomings.

Unfortunately, the Agency did not address the outstanding issues of underpayment or its failure to adhere to applicable contracting processes and procedures. Instead, literally at the eleventh hour, the Agency presented an interim contract containing several provisions substantially different from those discussed by the parties. Indeed, the new interim contract included provisions which had not been discussed by the parties. JA, in order to stay within the framework of time recommended by the Auditor, had absolutely no choice but to sign the interim contract.

## BRIEF BACKGROUND FACTS

In point of fact, JA was the original model for the development of the ILP program. JA is the longest continuing contractor having operated without a break of service for more than twenty years. JA's performance has been recognized by third parties[6] and peers as exceptional. Despite having been impeded in its mission by the Agency's failure to adhere to reasonable and legal contract practices (described herein), JA has accomplished unparalleled success. In June, 2008, the 12th grade high school residents of JA's ILP graduated and received high school diplomas at a rate substantially higher than the statistical average for non foster care twelfth grade students in D.C.

## ORIGIN OF PAYMENT AND CONTRACT DISCREPANCIES

After establishing a competitive negotiating bid process in 2002, the Agency entered into a series of comprehensive "option contracts" beginning with the contract of 2003, "Contract CFSA-04—C0076 (The "Base Competitive Bid

---

[6] In 2006, the Agency brought in an outside contractor from Illinois to evaluate the performance of its ILP contractors. JA was lauded by the contractor for its operational proficiency and service under difficult circumstances created by Agency shortcomings.

4

Hon. Peter J. Nickles, Esq.
Attorney General,
Office of the Attorney General
District of Columbia
Re: Jones & Associates, Inc., ILP
July 20, 2008

Contract".) The Base Competitive Bid Contract was entered into between JA and the Agency, December 1, 2003. It included a provision for consecutive option extensions through December 2006, creating a series of successor contracts emanating from the original bidding process. These successor contracts replicated virtually all the Base Competitive Bid Contract terms.[7]

In 2004, without negotiating with the ILP contractors, the Agency surreptitiously changed the financial terms of payment of successor contracts from a "fixed fee system cost reimbursement" to a "unit cost" payment system. Essentially, the unit cost system, to which JA had never acceded, required that JA be perpetually capable of accommodating forty residents notwithstanding that the number of residents assigned to JA could immediately be reduced by the Agency, at will. Such reductions would then cause a reduction in the number of could reduce the number of per diems payable JA for services. Fundamental operating costs would remain constant due to the requirement that JA be always capable of providing for forty residents. Consequently JA could be (and was) placed in a financial nightmare.

The unit cost system has caused havoc in JA's financial planning and practical day-to-day operations. The gross fluctuation in the number of residents required to be provided for by JA at any given time could be (and most often has been) negatively disproportionate to the staff, facilities and other constant operating features and costs JA was required to maintain. JA vigorously protested the new payment system.[8] JA's protests were never seriously addressed.

At the expiration of the 2004 contract, the Agency arbitrarily refused to renew the option for 2005 contract period. At that point, the comprehensive competitively bid contract relationship between JA and the Agency effectively ended.[9] However, the services and obligations required of JA by the Base Competitive Bid Contract of 2003, continued. Upon expiration of the *2004* contract, the Agency again withheld exercising the option to extend JA's contract.

---

[7] Most of the material terms had been incorporated into regulations codified as Chapter 63 Title 29 DCMR.

[8] JA protested the arbitrary change in payment system, forewarning the Agency of the endemic flaws.

[9] JA protested the refusal of the Agency to exercise the 2004 contract option 2004 and has continued to do so.

5

Hon. Peter J. Nickles, Esq.
Attorney General,
Office of the Attorney General
District of Columbia
Re: Jones & Associates, Inc., ILP
July 20, 2008

Instead, the Agency unilaterally imposed upon JA the first of a series of "no-bid" "sole source" "interim contracts" (the "sole source contract"). The sole source contract incorporated the core duties and obligations of the original open bid contract practically word for word" [10]

Thereafter, consecutive and continuous sole source "interim" contracts were imposed upon JA and have continued to the present.[11]  These interim sole source contracts, (which as a practical matter are not really contracts but "service orders") have become perpetual and a policy used to circumvent scrutiny and oversight. Rather than taking heed to JA's protests, the Agency has engaged in avoidance, resistance and in some instances, hostility and retaliation.[12]

## CONCLUSION

Accordingly, JA seeks the following immediate action from the Office of the General Counsel of the District of Columbia:

1. To instruct the Agency that JA be made whole for all unpaid reimbursement due and owing;
2. To instruct the Agency to immediately disburse to JA annual "Cost of Living" payments owed JA since 2004;
3. To instruct the Agency to replace JA's regulation required "reserve" spent on operational costs resulting from gross underpayment by the Agency resulting in financial deficit;

---

[10] This is an important feature. By not exercising the extension, the agency was able to avoid its commitments made in the original bid contract while continuing to impose upon JA the obligations of the original contract.

[11] In November, 2005, the Agency scheduled what was to be a "negotiating meeting." Rather than negotiate the Agency forced upon JA "take it or leave style" an "interim sole source agreement" under the threat of termination of was imposed upon JA. Rather than engaging in actual negotiations the Agency brow beat JA regarding reimbursement for necessaries and wrongly accused JA of "conflicts of interest."  JA protested the interim contract and requested a "fair hearing" challenging the Agency's rationale for commencing "interim " contracts as a substitute for exercising the option.

[12] In response to JA's protest the Agency has withheld assignment of resident educing JA's per diem payments.

6

Hon. Peter J. Nickles, Esq.
Attorney General,
Office of the Attorney General
District of Columbia
Re: Jones & Associates, Inc., ILP
July 20, 2008

4. To instruct the Agency to pay to JA lost revenue caused by the Agency's failure to exercise options to renew JA's contracts in 2004, 2005, 2006, 2007 and 2008.
5. To involve the Office of the Attorney General (as was recommended by the Office of the D.C. Auditor) directly in negotiating a long term contract with JA for institution on January 1, 2009.

We look forward to discussing with you the matters we have raised herein. Thank you.

Very truly,


John F. Mercer
Counsel for Jones & Associates, Inc.


Cc:   Deborah K. Nichols,
       District of Columbia Auditor

       David Gragan,
       Chief Procurement Officer
       Office of Contracting & Procurement

       Jones & Associates, Inc.

7

John F. Mercer, Esq.,
Of Counsel
1629 K Street, N.W.
Suite 300
Washington, D.C. 20036
202.466.3830
Cell: 240.535.8758
Fax: 301.249.4604
Email:jmjmercer@aol.com



**TEC LAW GROUP, PLLC.**

March 25, 2008

## BY U.S. MAIL OVERNIGHT DELIVERY

Dr. Sharlynn Bobo,
Director,
Government of the District of Columbia
Child and Family Services Agency
400 Sixth Street, S.W.
Suite 5039
Washington, D.C. 20024



Ex # 11 (b)

> Re:   Jones & Associates ILP
> Notice of Multiple Contract Breaches
> Failure to Pay

Dear Ms. Bobo:

As you know, I represent Jones & Associates, ILP ("JA"), a contractor, Child & Family Services Agency of the District of Columbia (the "Agency"). In a letter dated August 7, 2007, you requested that JA identify "...all outstanding payment issues pending between the Agency and JA" so that such issues might be resolved. Thereafter, JA identified in detail the specific omissions and errors of the Agency with respect to payment.

At the invitation of the Agency's General Counsel, Donald Terrell, Esq., Dr. Jones, Mr. Barnes of JA and JA's legal counsel met with Mr. Terrell on November 14, 2007. At that meeting the outstanding payment issues were discussed. Thereafter, on December 13, 2008, JA followed-up correspondence further articulating its position. On December 28, 2007, JA delivered to Mr. Terrell comprehensive supportive documents and as contract information.

After Mr. Terrell had an opportunity to review the correspondence and materials provided by JA, he sent a letter to JA's counsel dated January 14, 2008. In that letter, with respect to one of the issues (JA's assertions of unpaid claims for reimbursements dating back to 2005) he wrote,

Dr. Sharlynn Bobo,
Director,
D.C. Child & Family Services Agency
Re: Notice of Multiple Contract Breaches
March 25, 2008

" I have asked our Acting Contracts Administrator and our consultant from the Office of Contracting and Procurement to review these items to advise me on this matter." He concluded this letter with the following, "In the mean time it will be helpful if you can provide written explanation of the issues I have outlined in this letter, with an eye toward a fair, equitable and expeditious resolution….. I continue to be willing to meet with you and your client if you think it necessary."

Subsequent to his letter, counsel for JA attempted to arrange two meetings with Mr. Terrell. We were unable to meet as Mr. Terrell as he was apparently overwhelmed with other Agency matters.

In a letter dated January 24, 2008, we reiterated our respective assertions as to the "outstanding payment issues" including: arbitrary contract payment irregularities, failure to pay reimbursements, failure of the Agency to pay annual increases, unilateral modification of the Agency's payment system, unlawful use of "short term," "no bid," "sole-source" contracts.

JA demanded payment satisfying all deficiencies within thirty (30) days from the date of the January 24th letter. There has been no response from Mr. Terrell regarding JA's demands. Indeed, there has been no acknowledgment of JA's letter. Unfortunately, JA has no indication whether the Agency intends to make payment or not. Therefore, through this letter we are formally notifying the Agency of the following breaches of contract;

1.  Failure to pay reimbursement for reimbursable items in the amount of $250, 000.00 plus interest and recovery and legal costs.

2.  Failure to pay for services rendered under contract in the amount of Five Million Dollars plus interest legal recovery costs.[1]

3.  Damages (including attorney fees and costs) accumulating from the Agency's by the Agency's acts of intimidation, delay, avoidance causing intentional and negligent delay in payments and other similar costs and other breaches on contract in the approximate amount of Five million Dollars.

JA has acknowledged its duty to informally resolve the forgoing matters. In that regard, JA has made continuing and extraordinary efforts to do so. As recently as January, 2008, it appeared that the Agency also had an interest in an informal resolution. We are confounded and bewildered by the Agency's sudden discontinuation of its participation in informal efforts towards resolution.

---

[1] JA arrives at this figure by calculating compensation at the proper and applicable rate rather than the artificially depressed rate of $139.06 received by JA from the Agency for its services from 2004 to date.

2

Dr. Sharlynn Bobo,
Director,
D.C. Child & Family Services Agency
Re: Notice of Multiple Contract Breaches
March 25, 2008

      Absent a good faith effort on the part of the Agency, we must take action to vindicate JA's rights and to have the Agency compelled to fulfill its contractual obligations. If the breaches are not cured we must pursue the aforementioned matters by way of litigation in the appropriate venues.  Thank you.

Very truly,

John F. Mercer, Esq.
Counsel for Jones & Associates, Inc.

cc:    Donald Terrell, Esq.
      Dr. James L. Jones, Esq.
      Sylvester Barnes

3

MARCH 25, 2008

JONES & ASSOC.

OVERNIGHT LETTER OF BREACH

EB 902465236 US

**EXPRESS MAIL**
UNITED STATES POSTAL SERVICE ®

**Customer Copy**
Label 11-B, March 2004

**Post Office To Addressee**

**DELIVERY (POSTAL USE ONLY)**

| Delivery Attempt | Time | | Employee Signature |
|---|---|---|---|
| Mo. Day | | ☐ AM ☐ PM | |
| Delivery Attempt | Time | | Employee Signature |
| Mo. Day | | ☐ AM ☐ PM | |
| Delivery Date | Time | | Employee Signature |
| Mo. Day | | ☐ AM ☐ PM | |

**ORIGIN (POSTAL SERVICE USE ONLY)**

| PO ZIP Code | Day of Delivery | Postage |
|---|---|---|
| | ☐ Next ☐ 2nd ☐ 2nd Del. Day | $ |
| Date Accepted | Scheduled Date of Delivery | Return Receipt Fee |
| | Month        Day | $ |
| Mo. Day Year | Scheduled Time of Delivery | COD Fee | Insurance Fee |
| Time Accepted | ☐ Noon ☐ 3 PM | $ | $ |
| ☐ AM ☐ PM | Military | Total Postage & Fees |
| | ☐ 2nd Day ☐ Int'l Day | $ |
| Flat Rate ☐ or Weight | Int'l Alpha Country Code | Acceptance Emp. Initials |
| lbs. ozs. | | |

**CUSTOMER USE ONLY**

PAYMENT BY ACCOUNT
Express Mail Corporate Acct. No.

Federal Agency Acct. No. or
Postal Service Acct. No.

☐ WAIVER OF SIGNATURE (Domestic Mail Only)
Additional merchandise insurance is void if
customer requests waiver of signature.
I wish delivery to be made without obtaining signature
of addressee or addressee's agent (if delivery employee
judges that article can be left in secure location) and I
authorize that delivery employee's signature constitutes
valid proof of delivery.

**NO DELIVERY**
☐ Weekend   ☐ Holiday

**FROM:** (PLEASE PRINT)   PHONE (        )

**TO:** (PLEASE PRINT)   PHONE (        )

ZIP + 4 (U.S. ADDRESSES ONLY. DO NOT USE FOR FOREIGN POSTAL CODES)

FOR INTERNATIONAL DESTINATIONS, WRITE COUNTRY NAME BELOW.

**FOR PICKUP OR TRACKING**
Visit **www.usps.com**
Call 1-800-222-1811

John F. Mercer, Esq.
1629 K Street, N.W., Suite 300
Washington, D.C. 20036
202.466.3830
240.535.8758
301.249.4604
jmjmercer@aol.com



**TEC LAW GROUP, PLLC.**

# Fax

RE-SENT 3/31/08

**To:**

**Dr. James Jones, Esq.**

**From:** John F. Mercer, Esq.



**Fax: 202.332.5412**

**Pages: 4**

**Phone: 202.462.1117**

**Date :** March 25, 2008

**Re:**
**Contract**

**CC:** Don Terrell

☐ **Urgent**   ☐ **For Review**   ☐ **Please Comment**   ☐ **Please Reply**   ☐ **Please Recycle**

● **Comments:**

Letter to Bobo  re: Notice of Multiple Contract Breaches

Johnny

**John F. Mercer, Esq.**
OF COUNSEL*

1000 Connecticut Avenue, N.W., Suite 600
Washington, D.C. 20036
Telephone: 202.465.3830 • Mobile: 240.535.8758
Fax: 301.249.4604
Email: jmjmercer@aol.com

**TEC LAW GROUP,** PLLC

March 21, 2007

**BY FACSIMILE 202.727.5883**
**U.S. MAIL**
Jimmy Moye, Esq.
Agency Chief Contracting Officer
And Contracts and Procurement Administrator
Child and Family Service Agency
Contracts and Procurement Administration
955 L'Enfant Plaza, S.W., 5th Floor
Washington, D.C. 20024

$Ex \# 11(c)$

Re:   Contract No.: CFSA -07-C-0093
Effective Date: Date of Execution
Notice of Continuing Protest

Dear Mr. Moye:

This letter refers to the Contract No.: CFSA-07-0093 (the "Contract") between Jones & Associates Inc., ("JA") and the Child and Family Service Agency ("CFSA") of the District of Columbia. The Contract was executed by JA on March 21, 2006. The services pursuant to the Contract shall are to commence on the "Date of Execution."

In entering the Contract, we acknowledge our acceptance of the obligations, performances, rights and benefits described therein. In addition, by entering the Contract we have consented to fully perform the services described therein.

Notwithstanding the foregoing, based upon continuous objections made by JA during the contracting process and over the past several contract periods, we advise you herein that we have executed the Contract "under protest" and with "continuing objections."

JA has consistently maintained that services and obligations provided in the Contract are identical to those contained in Contract CFSA-04—C0076 (the "Base Contract") entered into between JA and the Agency, December 1, 2003. Further, it has been and continues to be the position of JA that rather than engagement of our services by the Agency under a series of interim "sole source contracts" (inclusive of the current Contract) the Agency wrongfully refused to exercise the option provision (the "Option") contained in the Base Contract.

*Licensed in District of Columbia and Federal Courts

Jimmy Moye, Esq.
Agency Chief Contracting Officer
Child and Family Services Agency
Letter of Protest
Contract #CFSA -07-C-0093
March 21, 2007

We believe refusal of the Agency to exercise the Option was improper and was done so as to circumvent the normal contracting process. Because of the foregoing and the Agency's persistence in circumventing normal contracting procedures the Agency has been able to impose policies and procedures upon JA and impose unfair conditions which they would have not been possible under fair contract bargaining conditions.

We have found that use of the contracting policies of which we complain, we have been materially harmed in several ways. First, we have suffered financial ongoing financial loses and income we would have fairly received but for unilateral modification of payment and reimbursement terms provided for in the base contract. Second, we have lost the fair and meaningful bargaining opportunities. We have explained many times that bargaining allows us to create and maintain better conditions for the community we serve. Third, our independence shall be gradually eroded so that we are no longer treated as contractors but as *de facto* extension of the Agency rendering the District Government increasingly more vulnerable to unintended consequences including ambiguity of structural separation.

As we also said a year ago and now reiterate, JA has executed the Contract in good faith in order to continue, uninterrupted important and critical services required for the safety and welfare of youth of the District of Columbia whom we serve. However, we emphasize, in executing the Contract, we waive no rights nor forfeit any benefits to which we may be entitled under the Base Contract had its appropriate method of extension been implemented.

Our protest and objection to the Contract is continuing as the harm we have been caused is perpetual and cumulative until properly mitigated. Based upon the foregoing, all objections, protests, arguments and objections previously made by us regarding these matters are incorporated by reference herein. Therefore, we reserve the right to pursue all appropriate remedies through all processes and forums available.

Very truly,

John F. Mercer, Esq.
Counsel for
Jones & Associates, Inc.

Cc:     Dr. James L. Jones, Esq
        Dr. Sharlyn Bobo,
        Director
        CFSA
        Donald B. Terrell, Esq.
        General Counsel
        CFSA

2

Jimmy Moye, Esq.
Agency Chief Contracting Officer
Child and Family Services Agency
Letter of Protest
Contract #CFSA -07-C-0093
March 21, 2007

We believe refusal of the Agency to exercise the Option was improper and was done so as to circumvent the normal contracting process. Because of the foregoing and the Agency's persistence in circumventing normal contracting procedures the Agency has been able to impose policies and procedures upon JA and impose unfair conditions which they would have not been possible under fair contract bargaining conditions.

We have found that use of the contracting policies of which we complain, we have been materially harmed in several ways. First, we have suffered financial ongoing financial loses and income we would have fairly received but for unilateral modification of payment and reimbursement terms provided for in the base contract. Second, we have lost the fair and meaningful bargaining opportunities. We have explained many times that bargaining allows us to create and maintain better conditions for the community we serve. Third, our independence shall be gradually eroded so that we are no longer treated as contractors but as *de facto* extension of the Agency rendering the District Government increasingly more vulnerable to unintended consequences including ambiguity of structural separation.

As we also said a year ago and now reiterate, JA has executed the Contract in good faith in order to continue, uninterrupted important and critical services required for the safety and welfare of youth of the District of Columbia whom we serve. However, we emphasize, in executing the Contract, we waive no rights nor forfeit any benefits to which we may be entitled under the Base Contract had its appropriate method of extension been implemented.

Our protest and objection to the Contract is continuing as the harm we have been caused is perpetual and cumulative until properly mitigated. Based upon the foregoing, all objections, protests, arguments and objections previously made by us regarding these matters are incorporated by reference herein. Therefore, we reserve the right to pursue all appropriate remedies through all processes and forums available.

Very truly,

John F. Mercer, Esq.
Counsel for
Jones & Associates, Inc.

Cc:   Dr. James L. Jones, Esq.
      Dr. Sharlyn Bobo,
      Director
      CFSA
      Donald B. Terrell, Esq.
      General Counsel
      CFSA

2

FROM :MERCER                    FAX NO. :3012494604              Apr. 26 2006 01:40PM  P2

**John F. Mercer, Esq.**
OF COUNSEL·

1000 Connecticut Avenue, N.W., Suite 600
Washington, D.C. 20036
Telephone: 202.466.3830 • Mobile: 240.535.8758
Fax: 301.249.4604
Email: jmjmercer@aol.com

**TEC LAW GROUP,** PLLC

April 21, 2006

**Ex.# 11 (d)**

**BY FAX AND DELIVERY**
202.727.7700
Uma S. Ahluwalia, Director
Child and Family Services Agency
Government of the District of Columbia
400 Sixth Street, S.W., 5ᵗʰ Floor
Washington, DC 20024

RE:   Fair Hearing Request

Dear Ms. Ahluwalia:

Pursuant to DCMR Title 29 Chapter 59 § 5903.2, Jones & Associates (J&A), hereby appeals decisions of the Child and Family Services Agency ("CFSA") and therefore requests a Fair Hearing.

On or about July 15, 2005, CFSA revoked/suspended Jones & Associates' (JA's) license as an Independent Living Program ("ILP") contractor and issued JA a provisional license. This action was precipitated by alleged performance deficiencies and a rating of 1.3 on the "quality assurance/performance evaluation" conducted by CFSA's monitoring unit. JA requested a Fair Hearing challenging the foregoing actions alleging unfairness and continuing harm to its current and future licensing, perpetual and unfair prejudice to the ongoing licensing process and its future licensing and continuing adverse affects upon its operations due to CFSA's actions. JA was denied a Fair Hearing.

As a direct result of continuing denial of a Fair Hearing and failure to remedy damages and repercussions precipitated by licensing actions, JA has suffered the following and other consequences of CFSA's actions: CFSA's refusal to exercise its option to continue JA's competitive bid contract; CFSA's unilateral determination that JA be relegated to a series of sole source contracts vitiating significant benefit it would have been entitled under the competitive bid contract which existed before the wrongful licensing actions were executed, CFSA's refusal to remove from JA's administrative record false and unjustified documentation of alleged deficiencies; CFSA's failure to remove from its administrative record false and unjustified documentation alleging JA's "unsatisfactory performance;" CFSA's refusal to reverse other wrongful actions we shall detail at a Fair Hearing;

*Licensed in District of Columbia and Federal Courts.

FP"JM :MERCER          FAX NO. :3012494604          Apr. 26 2006 01:41PM P3

Uma S. Ahluwalia
Interim Director
Child and Family Services Agency
Fair Hearing Request
Jones & Associates, Inc.
April 21, 2006

JA also complains that CFSA failed to use discernable criteria to gauge JA's compliance with licensing and monitoring requirements. A "substantial compliance" standard was not used in compliance evaluations and no discernable standards were applied in determining when an alleged act or omission on the part of JA amounted to a deficiency. In addition CFSA has provided JA no criteria for determining whether (and when) a deficiency (or multiple deficiencies) is sufficient to cause a contractor disqualification from licensing. JA requested this information on numerous occasions prior to and after the July 2005 evaluation. CFSA was either non-responsive or simply failed to supply the information being requested. Thus, CFSA's inspections based upon which it effected licensing actions were arbitrary and capricious.

Once JA licensing application was approved and it received annual license renewal in November 2005, CFSA issued JA a "sole source contract" rather than exercising the option that existed under CFSA-04-C-0350. In doing so, CFSA unilaterally excluded from the sole source contract terms which would have been favorable to JA. These exclusions caused JA financial harm. At the same time the scope of the work required of JA remained the same.

JA's wrongful deficiency and performance rating continue to have a negative impact. If JA is not granted a Fair Hearing, its record will be permanently tainted by erroneous findings from a flawed and legally unsound inspection.

DCMR makes allowances for the contractor to request and receive a Fair Hearing under such circumstances. The regulations require CFSA to grant a Fair Hearing when a contractor appeals a decision that denies, modifies, suspends, converts, revokes or takes another action concerning the contractor's application or license. CFSA's actions have violated the JA's right to due process by continuously failing and or refusing to grant JA a Fair Hearing. In fact, CFSA was clearly in error regarding its interpretation of the regulations, when its response indicated that it had not taken an action that warranted JA a Fair Hearing.

JA has attended meetings conferences with CFSA concerning the above-described adverse and harmful actions. These meetings have not lead to resolution of the wrongs of which we complain herein. In a letter to JA from Ms. Uma Ahluwalia, dated March 22, 2006, CFSA notified JA of final administrative action denying JA's demand for relief from the above adverse licensing actions and their repercussions.

In consideration of the aforementioned, and other related actions not specified in particularity, this letter serves as a request for a Fair Hearing. The DCMR, laws of the District of Columbia and due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution support our position that CFSA's actions warrant a Fair Hearing. As such, we will await your acknowledgment of this request.

FPOM :MERCER                    FAX NO. :3012494604          Apr. 26 2006 01:41PM  P4

Uma S. Ahluwalia
Interim Director
Child and Family Services Agency
Fair Hearing Request
Jones & Associates, Inc.
April 21, 2006

Notwithstanding our representations and requests for relief herein, JA does not waive its rights to any other remedies to which it may be entitled to pursue relief or remedies, including other administrative, legal or equitable actions.


Regards,


John F. Mercer, Esq.
Of-Counsel


Dr. James L. Jones, Esq.
Michael Mitchell, Esq.
Donald Terrell, Esq.

**John F. Mercer, Esq.**
OF COUNSEL

1000 Connecticut Avenue, N.W., Suite 600
Washington, D.C. 20036
Telephone: 202.466.3830 • Mobile: 240.535.8758
Fax: 301.249.4604
Email: jmjmercer@aol.com

**TEC LAW GROUP**, PLLC

April 20, 2006

**BY FAX AND U.S.MAIL**
**202.727.6333**
Donald B. Terrell, Esq.
General Counsel
Child and Family Services Agency
District of Columbia Government
4th Street S.W.
5th Floor
Washington, D.C. 20006

>    Re:    Your Letter Dated March 8, 2006
>           Sole Source Contract #
>           Jones &Associates, Inc. ILP

Dear Mr. Terrell:

I received a letter dated March 8, 2006, from you explaining the basis for the decision by DC
Child and Family Services Agency (the "Agency") to tender to Jones and Associates ("JA") a
"single source non-competitive bid" contract (the "Sole Source Contract") for the continuation of
its services to the Agency as an Independent Living Program ("ILP") for children under the
foster care custody of the District of Columbia. We had a brief telephone conversation
subsequent my receipt of your letter.

As counsel for JA, I instructed Dr. Jones, Esq., JA's Director to execute the Single Source
Contract "under protest." In our judgment, refusal by JA to execute the Single Source Contract
not only would have been a "futile act" (in view of JA's desire to continue providing services)
but would have irreparably harmed the young people whom JA has passionately and responsibly
served for more than twenty consecutive years. We strongly disagree with your explanation of
the circumstances which precipitated the Agency's substituting the Single Source Contract for
the competitively bid contract under which JA's services had been previously engaged.

In 2003, pursuant to an RFP and negotiations, JA and the Agency entered into a competitive bid
contract for services an ILP provider (the "Base Contract"). The Base Contract contained an
option provision (the "Option") allowing the Agency to continue its contractual relationship with
JA for a period of one year renewable by the exercise of three consecutive options. The Option
was to be exercised prior to the end of the Base Contract (the "Option Period") in order to

*Licensed in District of Columbia and Federal Courts.

Donald R. Terrell, Esq.
General Counsel
Child And Family Services
D.C. Government
April 20, 2006

continue successive one year renewable terms.   The last of the three Options was to be exercised
in 2006 to continue the Base Contract through 2007.

The Option was designed to benefit the Agency (and the District) in several ways, the most
important of which were the following: (1) to guarantee the District continuity as to scope and
consistency of services to be provided; (2) to provide an opportunity for a continuous
relationship with contractors; (3) to "lock in" the method of compensation and amount of
compensation to be paid to the contractor through 2007;(4) to allow the Agency to budget
appropriately on a long term basis; However, the Option also benefits the ILP's by confirming
bargained for conditions throughout the entire period of their services.

 Exercise of the Option has been the clear method of continuing the Contractor's services from
year to year. The reason being that ILP services remain the same from year to year.
Consequently, it has been anticipated by both parties (and the City Government) the Base
Contract shall continue the services of the Contractor from year to year until a new competitive
bid request for proposals ("RFP"). Accordingly, the only reason for the Agency not to exercise
the Option would be to discontinue the services of the Contractor.

The Agency exercised the Option to continue JA's services in 2004. However, in exercising the
Option, the Agency surreptitiously and without prior notice to JA, modified the language in the
Contract describing the method of payment.  The new proposed language provided for payment
based upon a "fixed unit rate with an indefinite quantity" rather than the "cost plus fixed fee"
method provided for in Base Contract.

The proposed change in the Base Contract language was not evident to JA. This was because
the proposed new language was not "redlined"[1] or discussed by the parties as is customarily done
when a party is proposing the insertion of a significant modification into a comprehensive
contract. Specific notice by "redlining" was even more important here because there was no
discussion of the proposed change prior to issuance by the Agency JA of the final document. In
addition, the Agency was aware that once implemented, the change was not likely to be noticed
because JA's payments from the Agency would remain substantially the same as under the Base
Contract as long as JA's ILP remained at full client occupancy. Consequently, JA experienced
no immediate adverse financial impact as a result of the change in payment method.  JA was not
aware of the change until advised by its accountants in October 2005. JA was never formally
notified of the change in payment method by the Agency.

The Agency did not exercise the 2005 Option. The Agency cites two principal reasons for not
doing so. First, it claims that JA failed to submit a completed and acceptable budget before
expiration of the 2005 Option Period. However, this is factually incorrect. JA made every
possible effort to provide the proper budget information and to follow-up. The Agency, on the

---

[1] The term "redlining refers to the common practice of using a distinguishing font, color or style to bring direct of
attention of the reader of the document to the particular clause or term which has been

2

Donald R. Terrell, Esq.
General Counsel
Child And Family Services
D.C. Government
April 20, 2006

other hand, failed to promptly respond to JA's follow-up submissions causing inordinate delay.[2] Seeond, the Agency claims it could not have exercised the Option because JA was issued and still held a "provisional license" at the time the Option should have been exercised. The Agency maintains that the provisional license had been issued to JA rather than the "annual license" because inspection of JA's ILP s revealed operating "deficiencies" and because JA's Base Contract performance had been rated as unsatisfactory (as documented by a "Quality Assurance rating" of 1.3 in July 2005). As you are aware, JA has contested the licensing inspection "deficiencies" and denies its serviees have ever been unsatisfactory. JA maintains that the "Quality Assurance Rating" was unfair, unwarranted and manipulated.[3]

JA has demanded that the Agency exercise the Option, the exercise of which it contends was wrongfully withheld. Exereise of the Option performs a critical role in the on-going relationship between ILP Contractors and the Agency. Moreover, JA takes the position that failure of the Agency to exercise the Option was part of a conscious decision by the Agency to materially change the relationship between the parties. The Agency's decision not to exercise the Option allowed the Agency to force JA to enter a series of interim sole source contracts. By doing so, the Agency vitiated JA's bargaining position and subjected JA to unilateral changes in payment methodology. These actions seriously threaten JA's ability to provide services.

The use by the Ageney of Sole Source Contract has allowed the Agency to radically modify the relationship between the parties. For example, recently the Agency engaged an outside private third party organization to conduct monitoring and inspections. This was done without prior notice or consultation as to scope of the organization's services, the weight and impact of the use of its work product or the contractual authority for its engagement. In addition, the sole source contracting process has vitiated JA's right under the Base Contract to receive budget increases as would have been required by exercise of the Options. Finally, it is likely that by use of the Sole Source Contract, the Agency will be able to unilaterally make any contract changes it desires, "at will."

JA has reiterated its demand that the withholding of its annual license in 2005, the issuance of a "provisional license" in 2005, the documentation of alleged performance "deficiencies," issuance of a "Quality Assurance Rating" of "unsatisfactory" and other continuing harm caused by the aforementioned actions be reversed, nullified and expunged.

---

[2] In fact, it was fully within the power of the Agency to ensure that all questions regarding the budget were resolved timely. The Agency has provided no reason or defense for its weeks of delay.

[3] JA has made continuing complaints concerning both the licensing inspection and the Quality Assurance Rating procedures and results. An inspection in October 2005 fully vindicated JA and resulted in the issuance of a License. All budget matters were resolved once the Agency responded with appropriate follow-up information.

Donald R. Terrell, Esq.
General Counsel
Child And Family Services
D.C. Government
April 20, 2006

In a letter dated March 22, 2006 (enclosed herewith), Uma Ahluwalia, the Agency's Interim Director, denied JA's demand for nullification and expunging of records of licensing deficiencies and the invalid Quality Assurance Rating of which we complain herein. We view the Interim Director's actions as final Agency action on these matters. As such, we shall petition the Agency via the "Fair Hearing" process.[4] Having stated the foregoing, we reserve our rights to any other appropriate and further remedies. Thank you.

Very truly,

John F. Mercer

cc:     Dr. J. L. Jones, Esq.
        S. Barnes
        M. Mitchell, Esq.

Encl.

---

[4] JA has previously demanded a Fair Hearing on all or some of the foregoing issues previously. The Agency has denied JA a Fair Hearing. We do not believe the Agency's actions were proper in those denials. Accordingly, we do not waive the right to full consideration of all issues that might have been resolved pursuant to those previous demands.

4

## THOMPSON, COBB, BAZILIO & ASSOCIATES, PC
*Certified Public Accountants and Management, Systems, and Financial Consultants*

| ■ Main Office: | □ Regional Office: | □ Regional Office: |
|---|---|---|
| 1101 15th Street, N.W. | 100 Pearl Street | 21250 Hawthorne Boulevard |
| Suite 400 | 14th Floor | Suite 500 |
| Washington, DC 20005 | Hartford, CT 06103 | Torrance, CA 90503 |
| (202) 737-3300 | (860) 249-7246 | (310) 792-7901 |
| (202) 737-2684 Fax | ● (860) 275-6504 Fax | (310) 792-7004 Fax |

October 25, 2005

Dr. James L. Jones, President
Jones & Associates
1454 Corcoran St., NW
Washington, DC 20009

Ex. 11 (e)

Dear Mr. Jones:

In the process of performing the audit of Jones & Associates for the year 2004, we noticed a significant change in the way your company is compensated by the District of Columbia government. Specifically, your company was compensated on a cost plus fixed fee basis until May 31, 2004, after which date it was changed to a per diem rate basis plus reimbursement for other direct client costs. Kindly provide all contract documents supporting this change.

Sincerely,

Ralph B. Bazilio

Jones & Associates Inc.
Financial Audit as at 12/31/2004.

1. Revenue of the contract.

**Contract Pricing**
- This is a Cost plus fixed fee contract. (Ref PF 09 -12/47).
- The cost shall not exceed 1,135,667.50, which includes fixed fee of 246,759.20.
- Cost for transition period (for 61 days) is 570,493.15, which includes fixed fee of 126,034.00. (Ref PF 09-30/47)

| Letter Contract No. or Modification No. | Period Covered | Contract Price | Remarks |
|---|---|---|---|
| CFSA-04-C-0076 | 12/01/03-03/31/04 | 1,135,677.50 | Cost +fixed fee contract |
| CFSA-04-C-0076 | 04/01/04-05/31/04 | 570,493.15 | |
| LC No- CFCA-04-C-0350 | 07/01/04-06/30/05 | 3,376,604.50 | If not definitize within 92 days or extended thereafter-Maximum of 1,688,302.25-(50% Contact price).No indication whether this contract was defunitized. |
| LC No- CFCA-04-C-0350 | 07/01/04-09/30/04 | 849,886.34 | If not definitize within 92 days |
| Modi. No 1 to LC-CFSA-04-C-0403 | 10/01/04-10/10/04 | 125,230.91 | LC CFSA-04-C-0403 is not available |
| Modi. No 3 to Letter Contract No –CFSA-04-C-0403 | 11/10/04-11/30/04 | 160,614.30 | Ref.PF-09 |
| | | | |

JONES AND ASSOCIATES

COMPLAINT

EXHIBITS:

EXHIBIT TWELVE (CORRESPONDENCE D.C. AUDITOR)



# OFFICE OF THE DISTRICT OF COLUMBIA AUDITOR

717 14TH STREET N.W., SUITE 900
WASHINGTON, D.C. 20005
TEL. 202-727-3600 • FAX: 202-724-8814

**Deborah K. Nichols**
**District of Columbia Auditor**
08:125:DKN:CTA:gk

January 24, 2008

EX. #12

Dr. James L. Jones, President
Jones & Associates, Inc.
1454 Corcoran Street, N.W.
Washington, D.C. 20009

Dear Dr. Jones:

Pursuant to section 455 of the District of Columbia Home Rule Act, as amended, Pub.L.No. 93-198,[1] and the District of Columbia Standard Contract Provisions,[2] the District of Columbia Auditor (Auditor) is conducting an audit of the Child and Family Services Agency's (CFSA) contracting and procurement procedures and CFSA's quality assurance procedures relating to congregate care contracts. In connection with this audit, an audit team will visit Jones & Associates, Inc. to examine program activities, expenditures and supporting documents relating to contract number CFSA-04-C-0350. Within the next several days, a member of my staff, Ms. Cassandra Alexander, Senior Financial Auditor, will contact you to schedule a date and time for this visit.

At the time of the scheduled visit, please have the following items available for our review:

- Organizational chart and mission statement;
- Most recently issued audited financial statements;
- Most recent Daily and Weekly Census Reports;
- Most recent Monthly Monitoring Report/Statement of Findings (Prepared by CFSA's Program Monitor); and
- A report listing all amounts invoiced to and paid by CFSA from inception of the contract through December 31, 2007. (The report should include the following information: Invoice Number, Invoice Period, Invoice Amount, Date Submitted to CFSA, Date Paid by CFSA, Amount Paid by CFSA, and Unpaid Balance Owed.)

---

[1] *See* section 455 of the District of Columbia Home Rule Act ("Home Rule Act"), approved December 24, 1973 (Pub.L.No. 93-198; 87 Stat. 803; D.C. Code § 1-204.55 (2001)). D.C. Code § 1-204.55 (b) states. "The District of Columbia Auditor shall each year conduct a thorough audit of the accounts and operations of the government of the District in accordance with such principles and procedures and under such rules and regulations as he [she] may prescribe." *See also* D.C. Code § 1-204.55 (c) which states: "The District of Columbia Auditor shall have access to all books, accounts, records, reports, findings, and all other papers, things, or property belonging to or in use by any department, agency, or other instrumentality of the District government and necessary to facilitate the audit."

[2] *See* Government of the District of Columbia Standard Contract Provisions For Use With District of Columbia Government Supplies and Services Contracts, March 2007, Section 18. Retention and Examination of Records, p. SCP 14, which states: "The Contracting Officer, the Inspector General, and the District of Columbia Auditor, or any of their duly authorized representatives shall, until three years after final payment, have the right to examine any directly pertinent books, documents, papers, and records of the Contractor involving transactions related to the contract."

In addition, please make staff with following responsibilities available for interview, as may be needed: intake, youth care counseling; coordination of youth support services, program quality control and assurance, programmatic and financial reporting, and invoicing.  Moreover, we will interview administrative personnel, including the Executive Director/President, as deemed necessary and appropriate.

Thank you in advance for your assistance and cooperation in this matter.  Should you have questions or require additional information, please contact me, or Ms. Alexander on (202) 727-3600.

Respectfully,

Deborah K. Nichols
District of Columbia Auditor

JONES AND ASSOCIATES

COMPLAINT

EXHIBITS:

EXHIBIT THIRTEEN: D.C. AUDITOR'S TESTIMONY

BEFORE THE CITY COUNCIL (DVD) APRIL 12, 2008



JONES AND ASSOCIATES

COMPLAINT

EXHIBITS:

EXHIBIT FOURTEEN:

EVALUATION OT THREE INDEPENDENT LIVING AND/OR GROUP HOMESOPERATING UNDER CONTRACT WITH CFSA BY CHILD WELFARE ASSOCIATES

Ex.# 14

# Evaluation of
# Three Independent Living and/Or Group
# Home Service Agencies Operating Under
# Contracts with CFSA

*Jones and Associates Agency Report*

Submitted by:

**Child Welfare Associates, LLC**
**20 Danada SquareWest, Suite 308**
**Wheaton, Illinois 60187**

# TABLE OF CONTENTS

•

**Executive Summary**                                                    **Page 3**

**Jones and Associates Agency Specific Report**                          **Page 18**

**Appendix A – Literature Review & Standards Crosswalk**                  **Page 49**

**Appendix B – Interview & Focus Group Questions**                       **Page 75**

**Appendix C – Facility Checklist**                                       **Page 80**

**Appendix D – Case Record Review Tool/Youth Interview Guide**            **Page 87**

**Appendix E – CFSA Staff Focus Group Feedback**                          **Page 110**

<u>**Executive Summary**</u>
<u>**Evaluation of Independent Living and Group Home Services of Three Private**</u>
<u>**Agencies**</u>

# I. INTRODUCTION

## A. Purpose of the evaluation:

The CFSA contracted with Child Welfare Associates, LLC (CWA) to perform an evaluation of three independent living and/or group home services agencies under contract with CFSA. CWA was to determine the performance of these agencies with regard to safety and quality of care offered to youth under the care of CFSA. This included a comparison of provider performance to current industry and best practice standards. CWA was to also test the validity of the last Contractor Annual Performance Evaluation pertaining to these agencies. The three agencies reviewed by CWA were Fihankra, NAFFCCA and Jones and Associates.

Based upon census information provided by the CFSA from October 31,2005, the three providers serve 129 minors and young adults ranging in age from sixteen to twenty-one, with the vast majority falling between eighteen and twenty-one.

CFSA provides case management of all children and youth in these programs, licenses and monitors the agency programs, and controls referrals to the programs. The agencies operate under the <u>LaShawn</u> court order and CFSA Rules 62 and 63 that establish the criteria and procedures for the licensure of youth residential facilities and independent living programs. Agencies are required by contract to accept all children referred to them by the CFSA placement unit.

## B. Methodology of the review:

The evaluation process utilized by CWA and approved by CFSA prior to the initiation of the review, included an examination of current information pertinent to each of the three providers; Industry Standards for Independent Living Programs; interviews and focus groups with provider staff, clients, management and CFSA staff; client and personnel record reviews; and an on-site appraisal of the provider's client housing facilities.

The purpose of examining various current provider information was to ensure the evaluation was grounded in the requirements set forth by the CFSA as well as Industry Standards. The CFSA provided to CWA the provider's contract; Request for Proposal Response; most recent Annual Performance Evaluation; documentation in support of the evaluation findings; the agency response to the Annual Evaluation, if any; Rule 62; and Rule 63.

CWA also undertook a literature review on Independent Living Services. The literature review (Appendix Executive Summary) was used to provide an informed context for the evaluation. The review focused on three key questions: the characteristics and needs of youth preparing to exit foster care; the outcome measures used to determine program effectiveness; and promising practices that lead to positive outcomes.

Upon review of the information provided by the CFSA, CWA completed a cross walk of selected Industry Standards from the Child Welfare League of America (CWLA) and Council on Accreditation (COA) against Rules 62 and 63 (Appendix Executive Summary). It should be noted that much of the content found in Rules 62 and 63 is reflected in the agency contract.

Using this information, CWA then developed a record review tool aligned with the CFSA requirements and Industry Practice Standards. This information was also used to frame some of the inquiry that occurred during interviews and focus groups. Interviews and focus groups were conducted to glean pertinent information regarding the program's internal and external perception of its efficacy, challenges, and strengths. These discussions occurred throughout the evaluative process, and information gleaned in one venue was often used to inform upcoming discussions. Interviews and focus groups were conducted with individuals both internal and external to the organization, including Agency Presidents, managers and staff from various specialties, youth and young adults served by the agencies, and CFSA staff such as Youth Development Workers (OYD), Managers and Supervisors of OYD and Program Monitors.

CWA reviewed both client and personnel records maintained by each of the three providers on-site. A sample of client records was drawn from the census data provided by CFSA who then identified a subset of the sample. To ensure adequate representation of the type of programs run by the three agencies (e.g. Teen Living Program, Group Home, etc.) the samples were further stratified by program type. The sub-sample identified cases of clients whom evaluators would also interview. A total of 64 client records out of the 129 cases being served by the three agencies were reviewed as part of this evaluation.

It should be noted that a limitation to the methodology of this review is that no comparison data was made available by CFSA to CWA relative to the performance of other agencies providing ILP services under contract to CFSA. The results of this evaluation therefore do not provide insight into whether the three agencies evaluated are performing consistent with, below or above the level of agencies providing similar services for CFSA.

## C. About this report:

This report is composed of four primary parts; this Executive Summary Report, comprehensive individual agency reports on each of the three agencies reviewed, and various appendices that include a literature review, crosswalk, review tools and other supporting material. Results specific to prior evaluation findings by CFSA's Office of Licensing and Monitoring regarding

the three agencies reviewed can be found in the agency specific reports, as can the findings regarding the agency personnel files and facility related reviews. Feedback that was gleaned from focus groups conducted with CFSA Contract and Monitoring staff and staff from the Office of Youth Development appears as an additional addenda to this report. This same feedback is also contained in each of the three separate agency reports since the information contributed to the individual agency review findings. Drafts of the individual agency reports were shared with the three agencies following the review in May 2006. At the same time, a draft that included some overall preliminary findings following the on-site review was also shared with CFSA. Agencies and CFSA were then given an opportunity to review and comment on the draft reports. CWA has taken into consideration the feedback and comments provided by CWA and the three agencies in compiling this final report.

## II.    OVERALL REVIEW FINDINGS

This section of the report will provide overall findings and central themes gathered as the result of the review of the three agency programs, CFSA rules, procedures and practices as it relates to functioning of the agencies reviewed, as well as industry and best practice standards specific to the preparation of youth exiting foster care for independence.

### A. Eligibility and Intake – Who Do You Serve?

One of the primary focus areas of the evaluation through interviews and focus groups with CFSA and agency staff as well as case record reviews was regarding the appropriateness of the placement of youth into the agencies reviewed and the provision of critical youth and family information by CFSA to the agencies upon intake.

In regards to the eligibility of the youth placed in the agencies, interviews with management from the three agencies revealed a consensus belief that CFSA requires that they accept any youth referred and that there is conflict between the rules for the programs which define eligibility (i.e. a youth must be employed or in a education or vocational program) and the contracts which require the agencies to accept all referrals. Agency management and staff indicated there is simply no place to put youth who are not enrolled in school or working, and OYD staff interviewed also expressed their belief that the agencies reviewed were the ones that "take the kids others refuse to take." One agency executive referred to instances where they accepted children in an emergency even as CFSA was developing a placement packet for another provider. CFSA and agency staff agreed that these agencies are often last ILP placement options for youth who have disrupted from other programs.

CFSA Program Monitors who were interviewed stated CFSA often places children with specialized needs into agencies that are not designed to handle them. For example, delinquent kids have to "co-mingle" with abused or neglected children, and youth with substance abuse or dual diagnosis mental health issues are placed into these agencies regardless of whether the resources are available to serve them.

Regarding some of the characteristics of the youth being served in these programs, results from 64 case files reviewed (see Table A) indicated the majority of the youth (80%) were enrolled in some type of educational program, vocational program or were employed. Several youth both attended school and were employed. Of those who were enrolled in school (secondary, college or GED) however, only 51% were regularly attending. Youth in many of the cases reviewed suffered from a wide range of emotional and/or mental health disorders, the most common identified emotional/mental health needs being substance abuse (34%) and defiant/oppositional behavior (37.5%). A high percentage of youth (45%) have a history of absconding and a notable percentage of youth (23%) have a history of involvement with law enforcement.

**Table A**

| Characteristics of Youth Cases Reviewed (64 Total Case Records Reviewed) | | |
|---|---|---|
| Characteristics | # | |
| Gender: Female | 36/64 | 56% |
| Gender: Male | 28/64 | 44% |
| Race: African American | 60/64 | 94% |
| Race: Latino/Hispanic | 4/64 | 6% |
| Pregnant/Parenting Teen Mothers | 17/64 | 27% |
| Parenting Teen Fathers | 1/64 | 2% |
| Gay/Lesbian/Bi-Sexual/Transgender Youth | 4/64 | 6% |
| Enrolled in School (secondary/college/GED) | 39/64 | 61% |
| *Attending* School | 20/39 | 51% |
| Employed or enrolled in Vocational Program | 24/64 | 37.5% |
| *Attending* Employment or Vocational Program | 21/24 | 87.5% |
| Enrolled in School *and/or* Employed/in Vocational Program | 51/64 | 80% |
| *Not* Enrolled in School, Employed *or* in Vocational Program | 13/64 | 20% |
| Current Identified Emotional/Mental Health Needs | 41/64 | 64% |
| Substance Abuse | 22/64 | 34% |
| Defiant/Oppositional Behavior | 24/64 | 37.5% |
| Developmental Disability | 6/64 | 9% |
| Serious Persistent Mental Illness | 9/64 | 14% |
| Domestic Violence | 4/64 | 6% |
| Criminality | 9/64 | 14% |
| Post Traumatic Stress Disorder | 5/64 | 8% |
| ADD/ADHD | 4/64 | 6% |
| Medication Management | 11/64 | 17% |
| History of Absconding | 29/64 | 45% |
| Law Enforcement History | 15/64 | 23% |

The case record review portion of the evaluation looked at whether required intake documentation such as placement histories, current medical screens, physical and mental health histories, educational/vocational histories, current case plans, etc. were made available to the youth within 5 days of placement as required. Review results indicated that most such required information was evident in the case files reviewed, however, current medical screens were missing in many cases and there was a notable lack of current case plans provided by CFSA to

the agency upon intake (56%).  Agency staff confirmed via focus groups and interviews that CFSA rarely provides the agency upon intake with the youth's current case plan from which they can then be expected to develop a five-day plan.  According to staff interviewed, it is very difficult to get information from CFSA for the five-day and thirty-day ITILP.

Reviewers also noted the lack of a comprehensive and up to date social assessment in the files reviewed.  While individual areas of the clients' case histories were found at the point of intake into the program, there was no document submitted by CFSA to the agency that compiled all this fragmented information into one congruent document such as a social history or comprehensive assessment. Court reports were generally present and while their content summarized some of the salient history of the client's experiences during the years of placement with the CFSA, they did not provide the level of information needed to inform well-defined intervention strategies. This indicates that more often than not, youth are having initial five-day plans developed by the provider without the benefit of knowledge of critical current conditions and past histories.

CFSA Youth Development Workers who were interviewed indicated there is no established guideline or protocol for the completion of either a social history or client assessment that should be provided to the agency upon intake.  Instead, the court report is generally used to provide information regarding the youth's needs upon placement.

**B. Case Planning:**

The review of case records focused on the inclusion of CFSA case plans in the agency case files consistent with rule and contractual timeframe requirements, specifically at the 5-day and 30-day marks in addition to the inclusion of a current (no more than 6-months old) CFSA case plan. The review also focused on the inclusion of a current agency Individual Transitional Independent Living Plan (ITILP) in the agency case file.  Both the current CFSA and current agency ITILP were also evaluated as to the content and quality of the information contained within the plans.

*Compliance/Timeliness:* There was a notable lack of CFSA case plans found in the case files of all three agencies reviewed.  There was virtually no evidence of 5-day or 30-day CFSA case plans found and only 25% contained a *current* CFSA case plan (see Table B).  From a compliance perspective, the agencies fared much better in terms of the percentage of case files that contained a current agency ITILP (86%).  There was however wide variance in terms of the types of ITILPs found in the agency files reviewed and the frequency in which they were developed.  Some were developed every two weeks, with others being completed on a monthly, quarterly or semi-annual basis.

**Table B**

| Inclusion of Current Case Plans/ITILPs in Agency Files *Agency Specific Results* | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Total | Fihankra | | Jones | | NAFFCCA | |
| | % | # | % | # | % | # | % |
| Inclusion of Current *CFSA* Case Plan/ITILP in Agency file | 25% | 4/19 | 21% | 2/20 | 10% | 10/25 | 40% |
| Inclusion of Current *Agency* ITILP in case file | 86% | 16/19 | 84% | 17/20 | 85% | 22/25 | 88% |

***Content/Quality:*** As was the case with the compliance issues in case planning, there were deficiencies (sometimes significant) noted in terms of the inclusion within current case plans (both CFSA and the agency's plans) of various youth needs, such as:

- Physical health needs: 22%
- Health education needs: 10.5%
- Emotional/Mental health needs: 22.5%
- Educational needs: 16.7%
- Employment/Vocational needs: 32%
- Un-enrolled/Unemployed youth needs: 46%
- Life Skills education needs: 23%
- Life Skills service needs: 22%
- Family visitation: 22%

Current agency ITILPs were also found to be deficient in several key areas, such as containing current family social information, an evaluation of the youth's skill levels and documentation of goal ratings and goal achievement (see Table C). Still, it is important to note that agency ITILPs fared much better in terms of overall compliance than CFSA case plans which were notably lacking in the 64 files reviewed (see Table B).

**Table C**

| Content of Case Plans by Agencies<br>*Agency Specific Results Current Case Plans/ITILPs*<br>*(64 Total Case Records Reviewed)* | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Case Planning Indicators** | Total | Fihankra | | Jones | | NAFFCCA | |
| | % | # | % | # | % | # | % |
| Current youth/family social information included in plan | 28% | 5/19 | 26% | 3/20 | 15% | 10/25 | 40% |
| Plan includes an evaluation of the youth's skill levels | 34% | 9/19 | 47% | 3/20 | 15% | 10/25 | 40% |
| Plan reflects documentation of goal ratings and goal achievement | 32% | 8/18 | 44% | 5/20 | 25% | 7/25 | 28% |
| Plan reflects actions needed in order to achieve goals | 78% | 16/19 | 84% | 12/20 | 60% | 22/25 | 88% |
| Plan provides projected time frames for goal achievement | 61% | 6/19 | 32% | 14/20 | 70% | 19/25 | 76% |
| Plan identifies persons responsible for action/task achievement | 86% | 16/19 | 84% | 17/20 | 85% | 22/25 | 88% |
| Documentation reflects plan was developed by planning team | 47% | 10/19 | 53% | 4/20 | 20% | 16/25 | 64% |
| Agency efforts to engage planning team members are evident | 45% | 9/19 | 47% | 5/20 | 25% | 15/25 | 60% |
| Documentation reflects youth participation in plan development | 56% | 11/19 | 58% | 8/20 | 40% | 17/25 | 68% |

Lack of communication and coordination between CFSA and the agencies reviewed regarding case planning was also evident. There appears to be two separate and often times parallel case planning processes that youth in independent living programs must navigate. Youth are sometimes transported to the CFSA office for their six month case plan reviews, however, it was evident in the case files reviewed that critical agency planning information is not being integrated into the broader CFSA case planning process. In addition, there was little evidence to suggest that agency staff are involved in the CFSA case planning process, or that CFSA staff are engaged in the agency ITILP case planning process. This appears to result in agency efforts being directed at addressing the more immediate service needs of the youth they serve, with less strategic and long term planning efforts being made to address the lasting skills that youth will need to employ in order to successfully achieve independence.

**C. Service Provision:**

The review of records and interviews with staff and youth also sought to determine whether youth being served by the three agencies were receiving the necessary services to meet their needs and also whether services being provided were aiding in the successful transition of youth towards independence. Questions were specifically geared towards the provision of services in the following areas:

- Physical Health Care

Child Welfare Associates, LLC – Jones and Associates Agency Report                    9

- Health Education
- Mental Health and Developmental Disabilities
- Teen Parenting and Early Childhood •
- Educational, Vocational and Employment
- Life Skills Education and Monitoring
- Family and Community Ties
- Youth Rights and Safety
- Discharge Planning

Agency management and staff who participated in interviews and focus groups gave their perceptions regarding what youth who are placed in their agencies need and the successes and barriers they face in trying to meet those needs.  They spoke of their desire to see youth "advance" while in their care, be successful upon emancipation, and of wanting to set outcomes based on the individual needs of the youth served.  Among the specific areas of need that staff raised as part of the interview process included:

- Youth need life skills in order to successfully emancipate from care, including education and training in such areas as housing and household management, finances, legal issues, community accessibility, job readiness, communication skills, trust, and team building
- A support system besides the agency and CFSA
- Agency guidance regarding employment and education.  Youth need to complete high school, be introduced to and supported in attaining higher education, trades and employment
- Mental Health – Youth need to be mature and capable of handling responsibilities once they have left the program. Youth who have mental health issues need services to address these problems prior to leaving.  Youth need access to substance abuse services.
- Teen parents need parenting programs and day care services
- Leadership – Youth need to learn how to lead while in the independent living program.
- Mental toughness – Youth need to learn while in the program how to handle problems when on their own so that they remain confident that they have the ability to make it.

Staff and youth who participated in interviews then spoke to the types of services that were being provided or facilitated by the agencies.  These included but were not limited to such services as life skills education, educational support (e.g. tutoring), parenting programs, mental health services, stipends and access to setting up bank accounts, education regarding budgeting, access to health care,

The review of case records and interviews with staff and youth indicated that the agencies are overall doing an acceptable to above average job in providing the services required under existing rules and agency contracts.  The results of the review of agency case files relative to the provision of key services are delineated in the following table (see Table D).

**Table D**

| *Agency Specific* Service Provision to Youth (61 Total Case Records Reviewed) | Total | Fihanka | | Jones | | NAFFCCA | |
|---|---|---|---|---|---|---|---|
| | % | # | % | # | % | # | % |
| Ensuring provision of routine med. exams | 75% | 13/19 | 68% | 17/20 | 85% | 17/24 | 71% |
| Provision of services for physical health needs | 83% | 9/12 | 75% | 10/12 | 83% | 11/12 | 92% |
| Provision of general health education services | 73% | 17/19 | 89.5% | 15/20 | 75% | 15/25 | 60% |
| Service prov. to youth with sub. abuse needs | 64% | 7/9 | 78% | 4/10 | 40% | 3/3 | 100% |
| Service prov. to youth with defiant/opp. beh. | 74% | 9/9 | 100% | 3/7 | 43% | 5/7 | 71% |
| Agencies support youth's ed. goals/needs | 86% | 12/13 | 92% | 11/15 | 73% | 13/14 | 93% |
| Agencies support youth's employ/voc. needs | 92% | 9/9 | 100% | 4/5 | 80% | 10/11 | 91% |
| Agencies provide services to youth who are unemployed/enrolled in ed. programs | 85% | 1/2 | 50% | 2/3 | 67% | 8/8 | 100% |
| Agencies provide Life Skills *Education* (Range %) | 67 – 85 % | 89% - 100% | | 55% - 70% | | 50% - 76% | |
| Agencies provide Life Skills *Services* (Range %) | 68 – 91% | 84% - 100% | | 60% - 70% | | 58% - 100% | |
| Provision of community based resources | 98% | 18/18 | 100% | 19/20 | 95% | 25/25 | 100% |
| Provision of services that support youth's cultural identity | 95% | 19/19 | 100% | 17/20 | 85% | 25/25 | 100% |
| Provision of monthly stipends to youth | 95% | 18/18 | 100% | 20/20 | 100% | 22/25 | 88% |

Among the areas noted by reviewers as strengths in terms of service provision included the following:

- Provision of routine medical exams (75%), keeping in mind that the provision of health care requires a level of cooperation and follow-through on the behalf of the youth served given their age (older adolescents)
- Approximately 52% of the youth reviewed had some type of physical health condition warranting follow-up or treatment (i.e. asthma). File reviews indicated that most of these youth (83%) were provided with the appropriate services for their health care needs.
- There were 13 youth cases reviewed where testing and/or treatment for sexually transmitted diseases was warranted. 85% of these youth received appropriate testing and/or treatment.
- Of the 22 youth cases reviewed who required the administration of some type of medication; all but one (95%) appeared to be having their medication needs met.
- Support for educational goals (86%)
- Support for employment/vocational related needs (92%)
- Provision of community based services (98%)

In regards to the area of life skills, there was some variance among the three agencies in terms of how well case records documented the provision of specific areas of life skills education versus the provision of specific life skills services. Overall, agencies did a better job of documenting in case records the provision of life skills *services* (e.g. residence upkeep – 91%) than in the

provision of life skills *education* (e.g. housing – 69%). Still, the review of case records and information gathered from interviews with staff and youth support that youth served by the agencies are provided with life skills services that prepare them for independence. Youth served by one of the agencies spoke to how supportive the agency was in helping them attain their educational goals, specifically in insuring that tuition gets paid on time and in the way that staff accompany the youth to school to ensure they are getting what they need and to make sure they are taken care of properly. CFSA and agency staff also referenced the Keys of Life program as a support to youth in attaining independent living skills.

Some youth spoke to how they believed that agency staff did things for them that their parents should have done and that they felt that staff helped them work toward emancipation. Most youth interviewed stated they had bank accounts, received their monthly stipends and had access to health care. They felt that life skills services helped them in many areas, such as in budgeting, knowing the various government agencies and how to access needed services from them.

Agency management and staff as well as CFSA staff interviewed were asked about barriers or services that needed to be enhanced. Among those mentioned was that more funding was needed for in-house therapeutic services for the youth served. Staff also specified that greater access to services were needed in the following areas: Substance abuse, peer relationships, anger management, stress, schizophrenia, depression and ADHD.

A specific area of service provision that was also evaluated as part of the review process was in regards to supporting teen parents. A total of 18 cases were reviewed that involved teen parents (17 were pregnant or parenting teen mothers placed with two of the agencies; one was a parenting teen father placed at the other agency). The review focused on specific types of services or supports that were required as part of rules and/or agency contracts. The following table (Table E) delineates the record review results specific to servicing pregnant and/or parenting teens.

**Table E**

| Agency Service Provision to Pregnant Teen Mothers and/or Parenting Teen Parents * (18 applicable cases) | | |
|---|---|---|
| Agency provision as associated indicators | # | % |
| Agency provision of pre-natal care | 13/17 | 76.5% |
| Agency provision of post-natal care | 12/15 | 80% |
| Agency provision/facilitation of infant/child health care | 12/15 | 80% |
| Agency provision of health education services re: early childhood development | 6/18 | 33% |
| Agency provision of health education services re: medical issues in early childhood | 7/18 | 39% |
| Agency provision of health education services re: child discipline issues | 7/18 | 39% |
| Agency provision of health education services re: child care provider issues | 4/18 | 22% |
| Agency provision of health education services re: family planning issues | 7/18 | 39% |
| Agency provision of health education services re: parental rights/responsibilities | 5/18 | 28% |

Overall, agency provision of physical health services to pregnant or parenting mothers was notably better than the agency's provision of parenting related health education services based on the case records reviewed.

Virtually all of the cases reviewed indicated that youth were being provided with community based services (98%) and all 64 cases reviewed (100%) indicated that youth were given the opportunity to participate in recreational activities. Documentation indicates that youth are provided with monthly stipends (95%), but documentation could be enhanced regarding the appropriateness of fines (73%). Another area that could be enhanced based on case record documentation is in regards to documenting youth opportunities for family visitation.

In regards to the documentation and follow-up on youth with unusual incident reports (UIRs), while the documentation of the UIR was generally strong (96%), there was notable room for improvement in terms of how the dispositions of UIRs were documented (57%), though there was considerable variance in the individual performance of the three agencies reviewed, ranging from 100% compliance to 29% (see individual agency reports for specific results).

## III.   CENTRAL THEMES/SUMMARY OF FINDINGS

CFSA and its provider network face many challenges in administering and delivering independent living services. Few jurisdictions are required to offer services to child welfare populations between the ages of eighteen and twenty-one as is CFSA. Additionally, youth may not always respond to the offer of services in a manner that ensures their success. In addition to understanding the performance of these three provider agencies, the review of the three private agencies surfaced observations concerning larger system issues in which these organizations must operate. These issues have impacted and continue to impact these providers. Most professionals in the system are aware of these conditions and appear to be interested in resolving them.

## 1. Youth benefit from the independent living programs in which they participate

80% of youth cases reviewed were enrolled in some type of educational program, vocational program or were employed based on the case files reviewed. Several youth were both attending school and employed. Youth in focus groups unanimously stated that the ILP helped them become more independent.

## 2. Evidence from case readings, observations and interviews support that the programs are providing the required services for which CFSA contracts

Data from the agency file reviews suggests that the provider agencies are providing or facilitating the provision of health services, substance abuse treatment, life skills training, and

employment and vocational services to youth enrolled in their programs.   These agencies are doing so despite having to take the hard-to-place youth and without the benefit of collaboration or additional information to support the case planning process.

## 3. Widespread use of evaluated agencies as temporary or emergency placements for hard to place youth

CFSA, as the contracting entity, is required under Rule 6339.5 and the LaShawn Consent Decree to "determine and document in writing that the services, activities, and programs provided by the independent living program adequately can meet the needs of the adolescent or young adult, and that the independent living program is the least restrictive, most home-like environment for the *adolescent or young adult that is clinically appropriate.*"

The providers subject to this evaluation assist CFSA in the placement of youth with significant needs that exceed the eligibility requirements established by CFSA rule 62 and 63.

They often serve as an emergency placement resource for youth who otherwise are denied admission elsewhere in the system. This practice, while temporarily meeting CFSA placement needs, is not consistent with the contract and rule expectations.   The providers under review adhere to the "no reject" requirement outlined in CFSA policy and accept referrals of youth who may have significant mental health and behavioral needs. It appears that other ILP providers are able to refuse admission of a youth to their program if the eligibility requirements per CFSA rules are not met.

## 4. Serious case planning issues exist between CFSA and these providers

The issue of collaboration in the service planning and delivery process surfaced time and again in the file reviews, focus groups and interviews with CFSA and provider personnel.   Key indicators of collaboration between CFSA and provider agencies include the:

- Use of planning teams to coordinate, implement and monitor services at prescribed intervals mandated by CFSA rules; and

- Extent to which CFSA and provider communicate regarding the exchange of information regarding the needs of youth.

CFSA policy requires that members of the planning team participate in the development of the ITILP during prescribed intervals.   However, data from the case file reviews shows that collaboration in the planning process is limited. In only 17% of the 64 cases reviewed was there evidence of a current CFSA case plan that was developed by a planning team.

From the provider standpoint, roughly one of every two cases reviewed had evidence that members of the planning team (including CFSA representatives) were involved in developing the case plans for youth.  Further analysis revealed that only 25% of the cases reviewed across the three agencies contained a current CFSA plan as required by rule 6318.3.  Current provider plans were evidenced in 86% of the records reviewed.

Despite the apparent low rate of coordination, evidence suggests that programs are providing the services for which CFSA contracts.

Current industry standards suggest that planning for transitioning youth should be collaborative and involve all parties responsible for the youth's development.  The lack of collaboration in the service planning process may be attributable to the lack of clear guidance in CFSA policy. While CFSA policy recognizes collaboration in the planning process, it does not stipulate which agency is responsible for coordinating this component.

There was also little evidence that communication between CFSA and the provider agencies occurred on a regular basis.  Evidence from focus groups with providers and case readings suggest that communication between CFSA and provider agencies needs attention.  Providers reported difficulty in obtaining necessary case referral information.

CFSA Rule 6339.7 states that programs shall provide program staff with information to facilitate the resident's placement. This information is to include the resident's medical condition, any prescribed medications, behavioral issues and any necessary instructions related to the resident's individual needs. The lack of information provided at intake and coordinated planning between CFSA and providers are issues in need of immediate attention. Required joint planning activities appear not to take place perhaps due to the emergency nature of many of the placements. Youth also report limited contact by CFSA staff after placement and there was limited evidence of CFSA participation in post placement case planning activities.

The lack of collaboration between CFSA and agency providers also impacts the ability to ensure continuity in the service delivery process. The Child Welfare League of America Standards of Excellence for Transition, Independent Living, and Self Sufficiency Services, 2004, and COA Standards address service continuity and coordination.   The need for consistency in the planning, implementation and monitoring of services for transitioning youth is critical if positive outcomes are to be achieved for this at-risk population.  Ensuring service continuity becomes even more critical when youth move to different ILP programs within the District's system. While data on the number of placement moves in the District's system was not available for this review, it can provide critical insights as to the degree to which this is a problem and the factors contributing to the frequency of moves.   An examination of this data may also spotlight the appropriateness of placement into an ILP.

## 5. There are serious communication issues between CFSA operating units as pertains to oversight and utilization of ILP programs

Based on information obtained through focus groups and interviews with staff, supervisors, and managers it appears that CFSA operating units, such as OYD, OLM, the placement unit and contracts have limited communications with each other regarding the status of these provider programs. The placement unit relies on these programs and makes constant referrals to them, OYD has a limited awareness of contract or OLM licensing concerns about these providers, and OLM provides limited information to placement and OYD units that might guide placement or utilization decisions.

Providers find themselves operating "in a bind", as they respond to the CFSA placement unit referrals as required under the contract, while other CFSA units either fail to comply with their obligations to these providers or overlook the real reason these providers might be facing regulatory or financial hardships.

## 6. There are serious communication issues between the providers and CFSA

Problems previously referenced regarding case collaboration and internal CFSA communication problems illustrate the difficulties in communication between CFSA and the provider agencies.

## 7. Licensing Standards Do Not Fully Reflect Best Practices

CFSA Rules 62 and 63 represent the regulations that determine the parameters for issuing and monitoring a provider license. As such, they only minimally address practice standards that are widely accepted throughout the industry. The Best Practice Industry Standards crosswalk table illustrates the extent to which current CFSA policy aligns with industry standards. CFSA policy is fairly congruent with industry standards in the arenas of assessment and case planning. Contract provisions and CFSA policy in concert with the array of services that fall under the independent responsibility of CFSA or the provider suggests a model of team delivered service. CFSA policy does not currently reflect industry standards for team delivered service, particularly as it relates to service coordination and continuity. As the various review results illustrate, there are significant omissions with respect to aftercare planning and education. These areas, in addition to employment, have a strong association with youth success post emancipation.

## 8. Lack of Standardization in Key Tools used in ILP Programs

Based on case file reviews and an examination of CFSA policy, it does not appear that CFSA prescribes the use of standardized assessment tools or training curricula for use among all contract providers. The use of standardized assessment and training tools would help ensure

that contract providers are assessing the same, relevant areas and offering training that is consistent with industry standards.

While agencies appeared to be providing the required life skills training and other services, there was significant variance in terms of the life skills topics offered. In addition, a standardized agency ITILP plan would greatly eliminate the variance witnessed in case plans that were reviewed.

**Conclusion: Youth served by these three agencies are benefiting from services offered. The CFSA remains reliant on these programs for emergency placement of youth with special needs and who may not meet the eligibility requirements of rule 62 and 63.**

A major concern reflected by the majority of staff who participated in interviews or focus groups is the need to improve communications within CFSA and between CFSA and the provider agencies. It is clear to CWA, LLC that there are significant areas of case coordination and information sharing for which there must be significant improvement if youth are to be better served. It was also clear to CWA LLC that all parties are intent on improving services to youth and that the potential for a healthy and successful partnership on behalf of youth is necessary and possible.

# Evaluation of

# Jones and Associates - Independent Living

**Submitted by**
**Child Welfare Associates, L.L.C.**

### Jones and Associates - Independent Living

•

At the request of the Director and Deputy Director of the District of Columbia Child and Family Service Agency (CFSA), the consultant firm of the Child Welfare Associates L.L.C. (CWA) was contracted by CFSA to conduct an evaluation to test the CFSA's findings regarding the safety and quality of care of the Jones and Associates (Jones) Independent Living Programs. Additionally, the CFSA requested that CWA test the validity of the last Contractor Annual Performance Evaluation completed by CFSA on J & A ILP for confirmation or modification.

## I. Evaluation Methodology

The evaluation process included an examination of current information pertinent to the provider; industry standards for Independent Living Programs; interviews and focus groups with provider staff, clients, management and CFSA staff; client and personnel record reviews; and an on-site appraisal of the provider's client housing facilities.

***Examination of Current Information:*** The purpose of examining the following information was to ensure the evaluation was grounded in the requirements set forth by the CFSA and Industry Standards. The CFSA provided to CWA the provider's contract; Request for Proposal Response; most recent Annual Performance Evaluation; documentation in support of the evaluation findings; the agency response to the Annual Evaluation, if any; Rule 62; and Rule 63.

CWA undertook a literature review on Independent Living Services. The literature review (Appendix – Executive Summary), was used to provide an informed context for the evaluation. The review focused on three key questions: the characteristics and needs of youth preparing to exit foster care; the outcome measures used to determine program effectiveness; and promising practices that lead to positive outcomes.

Upon review of the information provided by the CFSA, CWA completed a cross walk of selected Industry Standards from the Child Welfare League of America (CWLA) and Council on Accreditation (COA) against Rules 62 and 63 (Appendix – Executive Summary). It should be noted that much of the content found in Rules 62 and 63 is reflected in the agency contract.

Using this information, CWA then developed a record review tool aligned with the CFSA requirements and Industry Practice Standards. This information was also used to frame some of the inquiry that occurred during interviews and focus groups.

***Interviews and Focus Groups:*** Interviews and focus groups were conducted to glean pertinent information regarding the program's internal and external perception of its efficacy, challenges, and strengths. These discussions occurred throughout the evaluative process, and information gleaned in one venue was often used to inform upcoming discussions.

**Interviews and focus groups were conducted with the following, both internal and external to the organization:**

- ➢ Agency President and Managers
- ➢ Youth and Young Adults Served by Jones
- ➢ Jones' Counselors, Case Managers, Social Worker and Education Coordinator
- ➢ CFSA Youth Development Workers (OYD)
- ➢ CFSA Program Monitors
- ➢ CFSA Managers and Supervisors of OYD and Program Monitors

The information gleaned from these discussions was used to inform the results of the evaluation and are found later in this report. Another purpose of these discussions was to ensure that Jones was amply informed of the evaluation process and given a full opportunity to provide input. Jones management was also extended the opportunity to identify any other community partners or individuals that they would like to have the evaluators interview.

*Client and Personnel Record Reviews:* CWA reviewed both client and personnel records maintained by Jones. The review of records was conducted at Jones' main facility on April 17, 2006. A sample of client records was drawn from the census data provided by CFSA. They then identified a subset of the sample. The sub-sample identified cases of clients whom evaluators would interview.

At the time of the evaluation census information provided by the CFSA identified 40 youth and young adults served by the agency's main facility program. CWA was committed to drawing, at minimum, a 50% sample at each agency identified for evaluation. A 50% sample (20 cases) was drawn at Jones. On the day of the review all client cases selected for review were available.

A subset of five clients and two alternates were identified for an individual interview. The primary purpose of the interviews was to determine if client input altered any particular findings of their record review or expanded upon the records' content. Additionally, it provided an opportunity to gain consumer satisfaction information and insight into programmatic strengths, challenges, and opportunities for improvement.

Eight personnel files were also selected for review. These files were reviewed utilizing selected contract requirements and Industry Standards articulated by COA and CWLA. Observance of the standards reduces organizational risk and demonstrates the organization's commitment to the professional development of their staff. The files were reviewed for the presence of information that ensures client safety, i.e., employee background checks (criminal records and abuse registry); valid driving licenses and driving records; pertinent health information and emergency medical training; ongoing and current evaluations; proof of credentials; basic required employment information; emergency information; and proof of training.

*Housing Facility Tours:* Jones was requested to provide a tour of its main facility. An evaluation tool was utilized for each unit seen. The results of the on-site visits are found later in this report.

The units were evaluated using safety as the primary focus consistent with the CFSA charge to CWA.

## II. Evaluation Results   •

### A. Prior Evaluation Findings

CWA was provided Jones' last annual performance evaluations completed by the CFSA Office of Licensing and Monitoring. A "Final" evaluation was provided for the Main Facility program. The evaluation reported on performance from July 1, 2004 to June 30, 2005. Program Monitors evaluated the following six domains in each program.

- ➤ Adherence to Specific Contract Requirement
- ➤ Overall Effectiveness in Service Delivery
- ➤ Consistency and Timeliness of Responses to the CFSA's Requests
- ➤ Accuracy, Timeliness, and Completeness of Documentation
- ➤ Condition of Facilities
- ➤ Compliance with Safety Standards

Each domain was rated using a three-point scale. A rating of "Strong Performance" received three points; a rating of "Acceptable Performance" received two points; and a rating of "Deficient Performance" received one point. Averaging the scores from each domain then arrived at an overall performance rating, suggesting that each domain is of equal significance.

The Main Facility Program received an overall "Deficient" rating by CFSA as part of their annual performance evaluations. The program scored 1.3, with four areas of "deficient performance" and two of "acceptable performance."

### Performance by Domain of Jones Main Facility ILP Program
#### *Per CFSA Performance Evaluations*

Table 1

| Evaluation Domain | Acceptable Performance Rating | Deficient Performance Rating |
|---|---|---|
| **Adherence to Contract Requirements** | | • Main Facility |
| **Overall Effectiveness in Service Delivery** | | • Main Facility |
| **Consistent/ Timely Responses to CFSA's Requests** | | • Main Facility |
| **Complete, Accurate, & Timely Documentation** | • Main Facility | |
| **Condition of Facilities** | • Main Facility | |
| **Compliance with Safety Standards** | | • Main Facility |

Child Welfare Associates, LLC

21

CWA reviewed these documents to identify the methodology used in the annual evaluation process by the CFSA Program Monitors, and identify the individual measures that influence performance in each domain. A part of the purview of the overall evaluation included input on the annual performance evaluation process; therefore, a degree of alignment between the measures used for the CFSA Annual Performance Evaluations and the evaluation process used by CWA was necessary.

## B. Interviews and Focus Groups

### 1. Jones Management

The interviews of the CEO's and management staff offered the agency leadership the opportunity to comment on themes of the review and offer points of view they felt were relevant. The questions directed to the CEO's focused on four themes:

- ➢ Who Do You Serve
- ➢ Outcomes, Services and Barriers to Serving Youth
- ➢ Licensing and Contracting Requirements
- ➢ Quality Assurance/Improvement Issues that Surfaced from Case Readings

The agency was encouraged to raise all issues they believed relevant to the conditions of providing services to youth under these contracts.

Staff present:

- ➢ Dr. James J. Jones, Director
- ➢ Diane Twyman, Medical Technician
- ➢ Morinne Hardy, Education Specialist
- ➢ Van Vranken Mathews, Education Specialist
- ➢ Linda Lyles, Social Worker
- ➢ Helen Jackson, Facility Coordinator
- ➢ Eleanor Cox, Counselor
- ➢ Abdnastir McIntyre, Education Specialist
- ➢ Sylvester L. Barnes, Administrator
- ➢ Timothy L. Jenkins, Consulting Psychologist

Dr. Jones led off the discussion with the issue of the basic conflict between the rules for the programs which define eligibility and the contract which requires the agencies to accept all referrals. He believes the conflict in these requirements often mean youth are sent to programs where they don't fit in or where it is not possible to meet their needs. He mentioned an example of a young person they had to accept at the request of the placement unit who had been discharged from what appeared to be a psychiatric facility. He was identified as a "sexual predator" and needed constant observation. The Jones program is not set up to have single occupancy for individuals so staff had to check every 15 minutes throughout the night. This

Child Welfare Associates, LLC

22

activity impacted three other youth who resided in the apartment used as an emergency setting. He committed to placing this particular youth at their program for only one night. The emergency stretched to one week until Dr. Jones went to court to seek a more appropriate placement for the youth. The court ordered CFSA to move the youth but CFSA appeared to have no alternative resources.

Dr. Jones offered this as an example of the conflict between the rules and demands CFSA places on their program. In addition, the emergency situations often creep into longer placements. Dr. Jones believes the CFSA staff needs his program based on the constant referrals from the placement unit. In effect, Jones serves as an emergency shelter and one that serves youth who do not meet Rule 63 eligibility requirements. The CFSA placement unit appears to ignore these requirements when it comes to referrals and expectations of the Jones program, something they do not expect of other ILP programs. Another conflict within the rule is the lack of any expectation of responsibility by youth to meet the requirements to be in school or in employment.

Dr. Jones identified a number of concerns about CFSA practice and policy that impact the ILP programs. Following is a partial list.

> CFSA does not provide required case related information when they place children. The required case plan is the responsibility of CFSA staff and is rarely available. CFSA hangs its hat on the provision that it is shared "if available."
> The required pre-placement conference is not always done.
> CFSA has no performance standards. "Substantial performance" is what Dr. Jones recommends as the CFSA standard, consistent with prevailing legal and contractual requirements as reflected in CFSA Rules 62 and 63.
> The licensing requirements lack flexibility, there is little technical assistance and there is an "us versus them" attitude by CFSA licensing staff.
> CFSA offers no exit conferences when they do reviews. The reviews often lack balance reporting only deficiencies and passing over strengths.
> There are discrepancies between the rules, contracts, and practices of CFSA. The provider is put in the middle of this CFSA administrative and practice confusion.
> Court reports are not shared with the provider in advance of court which often leads to the program correcting the CFSA staff person in court. This can and often leads to hard feelings between the CFSA staff and the program.

Dr. Jones expressed concerns that licensing staff were not qualified to read records and that there was not a balance to the reviews performed by OLM.

In previous administrations at CFSA he believed they worked with agencies to ensure a "complete package" for the programs for youth.

Dr. Jones and staff felt that CFSA does not appreciate their contributions from the past and present even though Jones ILP serves those no one else will accept and has sent many kids on to college.

Dr. Jones' staff identified case reviews as their primary QA approach. There was an unclear explanation about how this actually worked. This reviewer expressed the importance of Jones ILP developing a solid QA program as a basis for managing risk and improving outcomes.

## 2. Jones Staff Focus Group

A client served by Jones is assigned a case manager who interacts with various staff within the agency. Additionally, the client has an assigned worker from the CFSA Office of Youth Development (OYD) and may be receiving services from other community providers, District governmental agencies, and programs in the CFSA. Jones' staff maintains a record for each client and the OYD worker maintains the client's "legal record." This multiple assignment of workers suggests a team delivered service approach for the client that should enhance the client's opportunity for success. Such models are traditionally built upon a consistent and well-defined collaborative approach for serving each client through assessment, case planning, service delivery, discharge, and aftercare planning. Therefore, as part of the evaluative model, Jones' staff was invited to participate in a focus group. Jones' management identified staff, with eight individuals having participated.

On Thursday May 11, 2006 CWA met with eight staff from Jones.

In response to the question regarding what youth need to successfully leave an independent living program the responses were as follow:

- ➢ Youth need to complete high school.

- ➢ They need to be introduced to trades.

- ➢ They must have housing and a support system after they leave the program. The staff explained that in their program when youth leave and have a crisis or need help of any kind they call Dr. Jones. The call could come in at any time of day or night and the youth will be taken care of. Jones is a family setting where they become significant others to all of the youth who leave. Dr. Jones brings all the youth back for holidays so they always have a place to go. At Jones they treat the youth like their own.

- ➢ Life skills are important for the youth to learn to be successful when they leave: Emergence assistance, how to apply, and how to dress.

- ➢ There is a transition plan for each youth completed by the CFSA social worker with the participation of Jones' staff who work with each individual toward emancipation.

- ➢ When children emancipate from Jones they receive $1800.00 plus their escrow money.

ITILP discussion with the Jones' staff revealed that the case plan that should accompany each youth to their program should have a social history, goal, objectives and prior history. This

frequently does not come with the children. It is very difficult to get information for the five-day and thirty-day ITILP. Sometimes social workers show up at court with incorrect information and want Jones' staff to bring them up to date with everything. Some times youth get dropped off at Jones and they never see their social worker. Most of the recommendations at court come from the staff at Jones & Associates.

When the youth are fined at Jones they can appeal the fine. Frequently they do not appeal because they know they are wrong. However, there have been times when a youth appealed and Jones rescinded the fine.

Most children that Jones & Associates accept into their program are qualified for the program in some way and not in others. The CFSA feels that Jones & Associates have many resources and can help children get back in school. The staff went on to say that they just accepted a child who they did not have good information on who is a sexual predator. Jones went into court to state this child is not appropriate for their program. The social worker at CFSA and her supervisor felt the Jones' program was an appropriate placement. Jones' staff stated they can not meet the needs of this child. One of the concerns regarding intake at Jones with CFSA is they do not always get all of the information regarding the child even when it is not an emergency placement. The child then arrives and they find out things they should have been told by the social worker prior to Jones accepting the child. The staff feel that the CFSA social worker does not give them all of the information because they fear Jones will not take the child.

Training of the staff at Jones is twice a month in a round table discussion forum. The topic can be on mental health issues, gay/lesbian issues, and/or current issues staff are dealing with.

The youth all receive medical treatment. It starts prior to acceptance into their program and is ongoing for each youth.

Of concern to the Jones staff is difficulty receiving information from the social worker at CFSA that needs to be in the youth file. Case plans are an example of this. They are not sent over when the child arrives and when the staff calls for the plans they are not sent.

Jones' staff feel they have created a family environment for the youth and treat each of them like their own children. They understand the needs of their youth and make sure even when emancipated from their program they still have a place to go for holidays.

### 3. CFSA Program Monitor Focus Group

A focus group was conducted with seven Contract Monitors from the CFSA. The purpose was to gain insight into the contract monitoring process and to understanding the nature of the annual evaluation process. The following information was gleaned from the session that was conducted on Wednesday, March 29, 2006.

Program monitoring was first.   Over the last year they have been talking about contract monitoring.  Program monitoring uses rules 62 and 63.  Contract deliverables and budget is now just monitoring contract compliance.

Staff reported that every monitor does monitoring of agencies their own way and there are no specific tools.  They state they are program monitors who monitor licensing standards.  They indicated they received no instructions on how to use tools and also that there were no specific tools used between July 2004 to June 2005 prior to evaluate performance.  They relied heavily on licensing.  On the most recent evaluation, the monitors wrote the evaluations using the evaluation tools and gave them to their supervisors who re-wrote the evaluations and changed some ratings. There has been inconsistency over a period of time in the evaluating the providers. The inconsistency with the monitoring process makes it difficult to expect accountability from the providers.

Staff stated that things are getting better now.   There are tools under development for site inspections, record review, and interview tools. The contract monitors, as a team, are developing the tools for the process measures. Right now some monitors use the new tools, while others use their own way.  There is no written procedure (directions) and this has led to mixed messages at CFSA.

The group also indicated there is a difference in monitoring between monitoring units. All four evaluations for the agencies being reviewed came from the same unit which is unit two.  The contracts that the agencies have are not specific – "very generic."  The contracts do not always reflect the content of the RFP. For a long time agencies were not expected to perform what was in the contract.  Staff stated their belief that many contractors do not read their contracts and that they just sign them.

The CFSA Program Monitors interviewed expressed that they feel some staff in the agencies do not know what they are supposed to do. They are not trained to deal with the behaviors of the children in their programs and some of the staff inappropriately relates with the children and at times the monitors cannot distinguish between the child in the program and the staff member working with the child.

The agency providers have been told that there would be changes in the monitoring process but not what it would look like or when the change would come. Staff interviewed indicated they feel CFSA needs to do more to help the providers. The agencies that have been contracting with CFSA for one to five years perform better and are more capable of achieving compliance with rule 62 and 63 for several reasons: (1) They are not familiar with the old way of doing business; (2) They have more experienced staff, (3) They have smaller programs which means less children, and (4) They have newer buildings.

Conversely, the agencies that have been contracting with CFSA for 6 years or longer are more comfortable with the old way of doing business. This presents a problem for these agencies for a number of reasons. (1) The have a core group of people who have been with them for many

years. (2) They do not understand rule 62 and 63. (3) They have a history of no accountability or penalties.

Staff interviewed stated that the one consistent monitoring expectation that all of the agencies have is the agency monthly meeting and agenda.

They believe CFSA places children who are specialized into agencies that do not have specialized programs and that the children fail because the agency cannot handle the child/children.

The program monitors stated that the pressing problems of youth who are 18 to 21 years old are: (1) constant running, and (2) curfew violations. Children are put into ILO sites whether they have earned it or not and they are not ready to deal with the responsibility. The children must have maturity to go into one of the ILO sites. However, the program monitors expressed that they feel children see getting into ILO programs as an entitlement to them and some simply cannot deal with it. Some of the children are dual diagnosed and they are raising babies. Some are addicted to drugs and their babies are getting sick. Delinquent kids are co-mingled with abused and neglected kids. The agencies cannot handle this population. There are also children with alternative life styles being placed as well. The staff stated that another problem for the agencies is that when children are 18 or older, there is no curfew for children who are not a part of CFSA. Therefore a child has to be gone for 24 hours before the police will do anything to find them.

The program monitors also indicated the provider cannot access the Health Services Network. They must go through the youth development workers. If a youth development worker does not get back to the agency the child may not get the attention they need and the provider cannot control that issue.

Another concern raised by staff is that stipends are difficult to monitor. They try to, but it is hard. This is in regulations, but not in the contract. At this point some agencies give Safeway cards to the children.

The QA systems in the agencies are not good or necessarily what the monitors think they should look like. Monitors requested that we focus recommendations for specific programs

## 4. CFSA Youth Development Worker Focus Groups

As previously indicated the multiple involvement of workers suggests a team delivered service approach for the client that should enhance the client's opportunity for success. Therefore, as part of the evaluative model, OYD workers were invited to participate in two focus groups. CFSA management identified the OYD workers. Eighteen OYD workers participated and were queried regarding the following seven domains.

> ➢ The Role of OYD Workers with Private Agencies
> ➢ OYD Workers' Needs
> ➢ Client Needs

Child Welfare Associates, LLC

> Private Provider Responsibilities
> Private Provider Needs
> OYD Perspectives Regarding Private Providers
> Intake and Ongoing Planning •

The group contained workers who had direct experience with Jones and other private providers. The following seven sections provide information obtained during the discussion of each domain. Themes reported are those found to be consistent across both focus groups.

*The Role of the CFSA OYD Workers with Private Agencies:* OYD workers stated that they are responsible for the placement of the client at the agency and any placement moves the client may experience. They indicated that they are responsible for obtaining all pertinent information regarding the client and communicating the appropriate information to providers.

OYD workers identified two primary areas of responsibility, one as a service coordinator and another as service monitor. Regarding the former, OYD workers in the focus group stated that they provide service by making referrals and appointments for clients; transporting clients, if necessary; ensuring tuition needs of clients are met; providing life skill training, and acting as client mentors. As to the latter role as monitor, both groups identified a responsibility to monitor the services and the client's progress, specifically focusing on the youth's application of learned life skills. Both groups said that they were responsible for making their expectations known to both the agency staff and the client. OYD workers added that the case manager at the private agency independent living program is the client's primary worker and responsible for meeting the client's individual needs. If the private agency case manager cannot meet the identified need, then the OYD worker does. The OYD workers felt that the ideal was for the private agency case manager to complete the tasks.

*CFSA OYD Workers' Needs:* Three primary needs were identified by both focus groups: consistency, contractual expectations, and resources. Both groups identified a broader array of resources as their first need, both placement options and service resources. A particular need identified was for high-end therapeutic resources that would address the needs of clients with mild to severe mental health issues and those with mild retardation.

The second and third issues identified involved consistency and contract expectations. As the discussions among the OYD workers progressed through both focus group sessions it became apparent among the participants that they did not necessarily have consistent expectations about how their work was to be carried out. When discussing case planning, which follows later in this section, OYD workers articulated various expectations from differing supervisors regarding the timing, frequency, and level of participation as it relates to the process. OYD staff said that they had no hand book, manual, or policies that they could refer to that clearly outlined what they were required to do and when. A member of one group stated "it may be out there, but it doesn't get filtered down." Other members of that group echoed consensus with that statement, while a member of the second group said that "someplace in the agency there is someone who deals with policy, but we don't know where." When asked if they used the requirements contained in the contract to monitor or leverage service for their clients all members of both groups indicated that

they were not familiar with the content of any of the provider contracts. One participant voiced this by stating "we have no information on the terms of the contracts." There was a consensus among both groups that if they had a basic knowledge of the contract requirements, they would feel more secure in their dealings with the private providers. Both groups suggested that knowing what their responsibilities are plus those of the private providers were important for them. They reflected that this would bring clarity both to them and to the private agency worker. Several senior workers indicated that while they were not familiar with the contracts or the requirements, they have approached program monitors they personally know to obtain specific information that might help them in serving their client.

Both groups felt that training regarding both their own expectations and requirements for servicing youth in ILP programs and contract requirements of ILP providers would lessen confusion and better serve their clients.

*Client Needs:* OYD workers were asked to identify what their clients needed to achieve independence successfully. Both groups identified the need for structure; caring, as one group stated it - "unconditional love"; direction; trust; and consistency.

When asked to identify specific client characteristic of youth they currently work with that need to be addressed in ILP programs for youth in the District the groups identified the following:

- ➤ Behavioral Issues, e.g., Truancy, Anger Management, Curfew Violations, Absconding, etc.
- ➤ Moderate Mental Retardation
- ➤ Moderate to Severe Mental Health Issues, e.g., Bi-Polar, PTSD, Psychotropic medication management, etc.
- ➤ Substance Abuse
- ➤ Teen Pregnancy
- ➤ STD's/HIV
- ➤ Arrests/Criminality
- ➤ Fire Setting
- ➤ Depression
- ➤ Lesbian/Gay/Bi-Sexual/Trans-Gender Youth

The groups indicated that while the list did not reflect all the presenting characteristics of youth, they reflected the most challenging either for obtaining placement or identifying supportive services. The groups both indicated that for clients age 18 and over getting the client's cooperation was sometimes more difficult as they see themselves as adults and not responsible to the CFSA or private agency. One group said that some youth saw entering an ILP program as a right, although they may not have the skills to manage within the less restrictiveness of the placement. Some OYD workers stated that the youth tell their GAL that they want in the program and it is subsequently ordered.

*Private Provider Responsibilities:* The discussion in this area was limited in both groups, possibly as result of the discussion that had taken place regarding the OYD workers lack of

knowledge of contract content. The groups indicated that the providers are responsible for providing and monitoring skill sets needed for independent living. They specifically identified the need for establishing client individual checking and saving accounts. They said private providers were responsible for knowing clients' whereabouts, ensuring clients are receiving educational and/or vocational services, and supported in employment, if appropriate.

*Private Provider Needs:* OYD workers were asked to identify what they felt the private provider agencies or workers needed to serve the youth and young adults under their care and supervision better. The first theme that surfaced dealt with consistency and concerned job titles within the private agency organizations. OYD staff stated that agencies use various job titles for staff, and the titles are not consistent across agencies. They indicated that this leads to their confusion about who is responsible at each agency. They indicated that confusion would be eliminated with consistent titles and associated job responsibilities. They would then know who to contact for what.

A second emerging theme concerned staffing and training. OYD workers voiced concerns that providers need training to deal with client behaviors, particularly de-escalating conflict and maintaining appropriate client/staff boundaries. They indicated that some private agency staff appear committed and capable of meeting clients' needs, others did not. They stated, on occasion, they "cannot tell the staff from the client."

The final theme that emerged in this area concerned the availability of therapeutic resources on-site at the provider agencies that could successfully address some clients more intensive needs.

*OYD Perspectives Regarding Private Providers:* In this domain of the discussions that occurred with the OYD workers three themes from other areas reemerged: lack of knowledge of ILP responsibilities under the contract, inconsistencies across programs, and a lack of placement resource options.

When asked to differentiate between Jones and other ILP programs, both groups said that Jones and only a few other agencies would "take the kids that the others refuse to take." The Jones' program was often some clients' last placement options for an ILP, having disrupted from other placements. Both groups indicated that if the program was not available, they would be at a "dead-end."

OYD workers identified another issue they believe impedes the providers' performance, rapid and high turnover within provider organizations. They stated this delayed clients progress and caused inconsistency and instability for the client

When asked to provide specific impressions regarding Jones, the OYD workers who had clients at that facility felt that the apartments were overcrowded, housing four instead of two youth. They felt this increased roommate conflicts and that the facility appeared to function more like a group home than an ILP. They also felt that additional training on establishing and maintaining client boundaries would improve staff interactions with youth and improve the clients' perceptions and interactions with staff.

*Intake and Ongoing Planning:* Industry Standards identified by the Child Welfare League of America and the Council on Accreditation identify that clearly defined assessment and service planning activities should occur. These activities inform the identification of appropriate service goals and support the client in obtaining positive outcomes. Given the impact of these activities to achieving successful client outcomes, OYD workers were asked to elaborate on their process and that of the private agency as it relates to these activities, including the intake process with the ILP providers.

OYD workers indicated that placement packets are provided to the private agencies. These packets include any IEP's psychological testing results, and the court report. They stated that the private provider, on acceptance of the client, completes an ITILP case plan within 30 days of admission and then every 90 days. The groups indicated that OYD workers complete a case plan for the client every six months. When asked if the client participates in the development of their plan with the OYD worker, the consensus voiced was that it was done in their office and given to the client. Several workers in each group said they completed a transition plan 12 to 18 months before the client's discharge and some complete additional ones every three months after, although this process did not appear standard among either group.

When questions regarding social histories and client assessment were raised to the group, they indicated there was no established guideline or protocol for completion of either. The group was asked if the ILP provider was given a current assessment of the youth entering their program that identified the current service needs and past services received, including training or skill building required for independent living. The questioners were informed that the providers received the last court report.

### 5. Jones Youth and Young Adults

On Wednesday, May 10, 2006 CWA conducted a focus group with six youth from Jones. All youth focus groups were asked the same set of standardized questions.

All of the youth attending this focus group were either in school or working. One youth was about to be emancipated and stated he was ready to leave. He had been working and saving money for leaving. He plans to attend a two-year program in criminal justice. Another youth was in college at Howard University for Communication and Public Relations. He decided on this Major as it was an area that he struggled with and wanted to improve. One individual in the group had gone away to college and came back because she was homesick and too far away. She is currently working and will be going back to college.

The barriers preventing youth from being prepared to emancipate were discussed by the group. Immaturity and lack of willingness to work to get what you need to succeed were first discussed. Other barriers mentioned were poor response time from CFSA on paying tuition for youth in college. The college program was much better when it was handled by Jones. Tuition was paid on time and Jones staff made a big deal of the youth going to college and many staff accompanied the youth to ensure they were getting what they needed and to make sure they were

taken care of properly.  This was a big deal for the youth and they felt they were much supported.  They felt the Jones staff did things for them that their parents should have done. The youth felt that the staff at Jones helped them work toward emancipation.

All of the youth liked living at Jones ILP but felt it could have larger rooms. There is not enough room for your personal things.  Another concern raised was having four youth to a room which the youth said is difficult because of the different personalities you have to deal with and the problems the youth come into the program to work on which can be very severe.

All of the youth had bank accounts with the exception of two. The two who did not have bank accounts had legal problems and could not get a bank account.  They all received their money minus any fines they may have incurred.

All of the youth stated they had access to health care.  They made and kept their appointment.

They felt that life skills helped them in many areas.  Budgeting, communicating with each other, knowing the government agencies and how to access what they needed were some of the areas that were mentioned.

The youth were not sure anything could or should be improved with the Jones program.

## C.  Client Record Reviews

At the time of the evaluation census information provided by the CFSA identified 40 youth and young adults served by the agency's program. Jones served all youth in an ILP Main Facility Program. Five were identified as being in residence at college. A 50% sample (20 cases) was drawn at Jones.

A subset of five clients and two alternates were identified for an individual interview. The primary purpose of the interviews was to qualify information contained in the case record. Additionally, it provided an opportunity to gain consumer satisfaction information and insight into programmatic strengths, challenges, and opportunities for improvement.

Agency case records were examined in the following 12 domains:

- ➢   Admission and Intake
- ➢   Case Planning - Content and Quality
- ➢   Case Planning - Engagement
- ➢   Service Provision - Physical Health Care and Education
- ➢   Service Provision - Mental Health and Developmental Disabilities
- ➢   Service Provision - Education/Vocational/Employment
- ➢   Service Provision - Life Skills
- ➢   Family and Community Ties
- ➢   Youth Rights
- ➢   Youth Safety

Child Welfare Associates, LLC

32

> ➢ Record Maintenance
> ➢ Discharge Planning

*Admission and Intake:* Records were reviewed to determine if all required intake information was available to the private provider within the 5-day required time frame. The intake information comprised such items as client identifying information; family and placement histories; current medical screens; physical, mental health, and education/vocational histories; the most current case plan prior to entering the program; clothing inventories; and the clients' acknowledgments of their rights.

Acknowledgment of the receipt by the client of their rights, education/vocational histories, basic identifying information, and physical health histories were evident in all the cases reviewed. Records contained family histories and current medical screens at a level of 95%. Initial clothing inventories were also found in 95% of the records. Mental Health histories were found in 85% of the records and previous placement histories in 90% of the records.

The most recent case plan for the client that was in effect at the time of placement was lacking in 55% of the case records. This lack of information impedes the ability to provide a seamless continuum of service. Tasks from the current plan are not available to have progress evaluated or echoed in the initial five day and 30 day plan, if appropriate.

While individual areas of the clients' case histories were found at the point of intake into the program, there was no document submitted by CFSA to the agency that compiled all this fragmented information into one congruent document such as a social history or comprehensive assessment. Such histories or assessments provide a more complete profile of the client identifying the efficacy of past service interventions, presenting service needs, and underlying conditions. While court reports were found, their content summarized some of the salient history of the client's experiences during the years of placement with the CFSA, but does not provide the level of information needed that informs well defined intervention strategies.

In none of the cases (0 %) did the provider receive all required intake information from CFSA within the designated five-day time frame. This indicates that all the cases reviewed had initial five-day plans developed by the provider without knowledge of critical current conditions and past histories. The high presence of the majority of the intake information being obtained reflects a level of tenacity on the providers' part.

*Case Planning - Content and Quality:* The review focused on the most recent case plan developed by the agency. Seventeen of the 20 case records reviewed contained current service plans. The content and quality of the case plans was determined by using the 16 measures located in the table below. No measure achieved a rating of 90% or higher. 15% of the case plans contained all the required elements set forth in the CFSA Rule and provider contracts.

**Table 2**

| Case Planning Evaluation Measures | Compliance |
|---|---|
| Current Youth and Family Social Information | 15% |
| List of Assessments Given - Recommendations and Outcomes | 25% |
| Evaluation of Youth's Current Skill Levels | 15% |
| Goal Ratings and Concerns Regarding Goal Achievement | 25% |
| Actions to Insure Goal Achievement | 70% |
| Timeframes for Goal Achievement | 70% |
| Identification of Persons and Resources Needed for Goal Achievement | 85% |
| Family Involvement with the Client - Visitation and Communication | 17% |
| Describes Discharge or Aftercare Planning | 10% |
| Identifies Criteria to be Used to Evaluate Goal Achievement | 20% |
| Consistent with any Court Orders | 25% |
| Plans Signed by Involved Parties | 25% |
| Plan Developed by a Planning Team | 20% |
| Efforts to Engage Planning Team Members Documented | 25% |
| Client's Participation in Plan Development | 40% |
| Client's Parent Involvement in Plan Development | 0% |

Case plans are traditionally used as road maps to goal achievement, defining for the client and the worker the tasks and behaviors that need to be achieved and demonstrated to ensure a successful self-sufficient independence. 70% of the plans identified the actions needed to obtain the goal and timeframes for individual task and goal achievement.   85% identified the individuals responsible for implementing and supporting each identified action.

Plans were extremely deficient in reflecting the youth and family social information, assessments provided, evaluation of youth's skill level, and planning for discharge that should begin at the point of intake. A quarter or less of the cases contained this information. This lack of information may be partly due to the failure of the agency being provided comprehensive social histories or assessments at the point of intake.

20% of the plans reflected the criteria to evaluate the goal achievement, while 25% were found to be consistent with any current court orders. Plans for contact between the clients and family members were found in 17% of the applicable cases

While the records reflected that the agency made efforts to engage members of the planning team in one-quarter of the cases, 20% of planning team members and 40% of youth participated in the current plans found in the files reviewed.

Child Welfare Associates, LLC

While the level of client participation demonstrated in planning is far from optimal, the youth's family involvement in planning is particularly lacking. However, from a practical operational viewpoint the participation of parents in some cases is precluded by countervailing circumstances that might reasonably prevent such participation, such as parental disinterest, mutual hostilities, or forced unavailability due to incarceration or protective court order. While the literature review indicates (Bart, 1990, Westat, 1991; Courtney and Piliavin, 1998) that youth leaving care not only reconnect with family members, but consider this connection to be a significant source of strength and support, the DC Code only requires that an independent living program "encourage a resident's parent(s) to participate on the planning team. As previously noted 17% of the plans reviewed, where family contact was appropriate, contained visitation and communication plans for the youth and their family (3 of 18). In 17 of the 20 files reviewed it could be determined that parent's were still actively involved with the child at some level. In none of those 17 cases was parental involvement in case planning found.

Two of the records reviewed (10%) contained current CFSA plans found for the youth. Both plans reflected that the plans were developed by a planning team, signed by participants, and reflected participation of the client.

***Service Provision - Physical Health and Education:*** This portion of the review determined, based upon the case record, if youths' basis health needs were being met, and if health needs were identified, were services either arranged or provided. Secondly, it determined if health education was provided and augmented for teen parents. Lastly, it determined if the ITILP addressed any current health needs or services that the client required.

Of the 20 youth identified, 19 were enrolled in D.C. Kids. Seventeen records contained evidence of routine medical examinations (85%). Eight records (40%) contained documentation of routine dental exams and ten (50%) documented vision screening and/or care. Documentation of immunizations was present in 95% of the files reviewed. In seven of the records there was documentation of ongoing communication between the CFSA and agency staff regarding the provision of health care records and medical needs of clients.

In 12 instances where the need for additional health services was identified, ten of the records reflected they were arranged or provided. This included such things as prosthetic or corrective devices, medication administration, and testing and/or treatment for STD's.

Fourteen cases evidenced that the client needed to obtain some type of routine medical, dental, vision, specialized care, or follow-up. Of the 14, two (14%) had the need included in the current service plan.

The records indicated that youth were educated regarding the following: general health management - 75%, reproductive health - 75%, sexual relations - 75%, HIV/AIDS/STD awareness - 70%, and pregnancy prevention - 65%. Slightly less than three-quarters (70%) had been documented as receiving first aid training.

While the level of client participation demonstrated in planning is far from optimal, the youth's family involvement in planning is particularly lacking. However, from a practical operational viewpoint the participation of parents in some cases is precluded by countervailing circumstances that might reasonably prevent such participation, such as parental disinterest, mutual hostilities, or forced unavailability due to incarceration or protective court order. While the literature review indicates (Bart, 1990, Westat, 1991; Courtney and Piliavin, 1998) that youth leaving care not only reconnect with family members, but consider this connection to be a significant source of strength and support, the DC Code only requires that an independent living program "encourage a resident's parent(s) to participate on the planning team. As previously noted 17% of the plans reviewed, where family contact was appropriate, contained visitation and communication plans for the youth and their family (3 of 18). In 17 of the 20 files reviewed it could be determined that parent's were still actively involved with the child at some level. In none of those 17 cases was parental involvement in case planning found.

Two of the records reviewed (10%) contained current CFSA plans found for the youth. Both plans reflected that the plans were developed by a planning team, signed by participants, and reflected participation of the client.

***Service Provision - Physical Health and Education:*** This portion of the review determined, based upon the case record, if youths' basis health needs were being met, and if health needs were identified, were services either arranged or provided. Secondly, it determined if health education was provided and augmented for teen parents. Lastly, it determined if the ITILP addressed any current health needs or services that the client required.

Of the 20 youth identified, 19 were enrolled in D.C. Kids. Seventeen records contained evidence of routine medical examinations (85%). Eight records (40%) contained documentation of routine dental exams and ten (50%) documented vision screening and/or care. Documentation of immunizations was present in 95% of the files reviewed. In seven of the records there was documentation of ongoing communication between the CFSA and agency staff regarding the provision of health care records and medical needs of clients.

In 12 instances where the need for additional health services was identified, ten of the records reflected they were arranged or provided. This included such things as prosthetic or corrective devices, medication administration, and testing and/or treatment for STD's.

Fourteen cases evidenced that the client needed to obtain some type of routine medical, dental, vision, specialized care, or follow-up. Of the 14, two (14%) had the need included in the current service plan.

The records indicated that youth were educated regarding the following: general health management - 75%, reproductive health - 75%, sexual relations - 75%, HIV/AIDS/STD awareness - 70%, and pregnancy prevention - 65%. Slightly less than three-quarters (70%) had been documented as receiving first aid training.

Teen parents' cases were also assessed to determine if additional health education had been received. Of the twenty cases reviewed, only one was identified as a teen parent who in this instance was a male. The client received education on medical issues in early childhood, and more specific family planning beyond pregnancy prevention. The client had not received education regarding parental rights and responsibilities and discipline.

Four cases in the sample reflected that the youth was Lesbian, Gay, Bi-sexual, or Transgender (LGBT). Of the four, one case reflected that the youth had been provided or linked to health education and support services tailored to LGBT youth.

Seventeen cases evidenced that the client needed to be educated on a particular health education topic or topics. Of those 17, one had the need included in the current service plan.

*Service Provision - Mental Health and Developmental Disabilities:* This portion of the review focused on clients who presented with emotional/mental health or developmental disability needs. The areas of focus were to determine what needs the client had and if the need was being met through an appropriate intervention. Additionally, it determined if the ITILP addressed the current emotional/mental health or developmental disability needs and services that the client required.

Of the 20 cases in the sample reviewed, 14 records reflected that the client had current emotional or mental health needs and there was evidence that these needs were being assessed on an on-going basis.

A wide range of emotional/mental health needs requiring intervention were identified, many of the 14 clients presented with dual or multiple diagnoses. The most prevalent needs were substance abuse (10) and defiant/oppositional behavior (7). The following table reflects the number of clients that presented with each need and whether services were provided to address each need.

Table 3

| Emotional/Mental Health Evaluation Measures | # Need Identified | # Need Serviced | % Compliance |
|---|---|---|---|
| Substance Abuse | 10/20 | 4/10 | 40% |
| Defiant/Oppositional Behavior | 7/20 | 3/7 | 43% |
| Developmental Disability | 1/20 | 1/1 | 100% |
| Serious Persistent Mental Illness | 3/20 | 1/3 | 33% |
| Criminality | 3/20 | 1/3 | 33% |
| PTSD | 1/20 | 1/1 | 100% |
| ADD/ADHD | 1/20 | 1/1 | 100% |
| Medication Management | 3/20 | 1/3 | 33% |
| Other | 2/20 | 1/2 | 50% |

Fourteen clients presented with 31 identified emotional/mental health or developmental disability needs, averaging approximately two needs per client. Documentation in the case records failed to address that services were provided in 18 of the 31 identified areas, while 42% of the needs were addressed and documented.

None of the case plans of youth with these needs reflected the need or the service that the client was to be provided or participate in.

*Service Provision - Education/Vocational/Employment:* Of the 20 youth cases reviewed, 17 youth were enrolled in school, GED program, college, vocational program and/or employed. Three were neither enrolled in any type of educational program nor employed.

Fifteen youth were enrolled in secondary school (9), college (4), or GED programs (2). Six of the 15 youth were regularly attending their program while nine were not. The agency had documented interventions with six of the youth who were not attending, while the remaining three records contained no documentation of interventions to improve attendance. Six youth were in special education programs. There was evidence that four of the youth had current IEP's and that services were being delivered consistent with the IEP's. Ten youth were identified as needing some type of additional educational supports or services, e.g., tutoring. In four instances the documentation in the case record did not reflect that the youth was getting the additional service they needed. In 11 of the 15 cases documentation reflected that the agency was supporting the youths' educational goals (73%).

Five youth were employed and/or enrolled in vocational programs. Four of the youth were maintaining regularly attendance at their job and/or vocational program while one was not. Documentation was not found in the record of the agency's intervention to improve attendance with regards to this particular youth. In four of the five cases there was evidence that the agency was supporting the youths' goals as it related to maintaining employment or obtaining vocational skills.

Three youth were not enrolled in an educational program or employed. Two of the cases contained documentation of consistent and regular efforts to address the youth's status. These strategies were not found in the current ITILP including the youth's responsibilities. In the other case there was no documentation found of the efforts to address the youth's status, nor did the ITILP reflect any strategies or youth responsibilities related to obtaining employment or education.

As with other areas of the review, case plans did not consistently reflect the youths' educational, vocational, and/or employment needs and/or responsibilities. Only 2 (10%) of the plans reflected needs and responsibilities related to education or employment. While these needs are not being reflected in the plans the data shows that the needs are still being identified and addressed. 65% of the cases contained documentation that all educational, vocational, and employment needs are being addressed and supported by the agency.

*Service Provision - Life Skills Education and Monitoring:* This portion of the review focused on the delivery of Life Skills Training to clients and the subsequent actions undertaken by the agency to monitor the desired implementation of the skill sets. The review also determined if life skills were being assessed in an ongoing manner and if the current ITILP included the youths' and agency's responsibilities, needs, and services regarding independent living skills implementation, monitoring, and support.

It was determined that there was evidence of ongoing assessments of the youth's Independent Living skills, needs, and abilities in 55% of the cases reviewed. In 85% of the cases reviewed the services provided were consistent with the youth's social and developmental needs.

In the literature review Westat, 1991 and Scannapieco et al, 1995 found that life skills training can result in better outcomes for youth in the areas of education, employment, and the ability to be quasi-self-supportive at case closing. The review of Industry Standards indicate that the program should implement a clearly defined life skills component that contains specific training on a core set of skills and provides opportunities to assess mastery of skills (CWLA, COA, and Westat, 1991). The table below identifies those areas of life skills training that evaluators looked for each client to receive based on presenting ability. It also identifies those areas where the agency documented in the clients' records ongoing assessment of the mastery of the skills or support in maintaining educational and vocational goals.

**Table 4**

| Education Provided – Level of Compliance | | Ongoing Assessment/Services – Level of Compliance | |
|---|---|---|---|
| Money Management/Consumer Awareness | 70% | Money Management | 70% |
| | | Bank Account Maintenance | 65% |
| Household Management | 65% | Residence Upkeep | 70% |
| Meal Planning/Preparation | 65% | Maintenance of Food/Supplies | 65% |
| Personal Care/Hygiene | 70% | Maintenance of Clothing | 65% |
| | | Personal Care/Hygiene | 70% |
| Interpersonal/Legal Skills | 65% | Legal Needs | 60% |
| | | Identification Documents | 70% |
| Accessing Community Services | 70% | Accessing Community Resources | 70% |
| | | Public Transportation | 70% |
| Personal/Family Safety | 65% | Fire/Emergency Awareness | 70% |
| Problem Solving | 70% | | |
| Employment Seeking/Maintenance Skills | 65% | Support of Employment | 80% |
| Education/Career Planning | 65% | Support of Education Goals | 75% |
| Seeking/Securing/Maintaining Housing | 55% | | |

Jones is required to provide life skills training in a multitude of domains to the clients identified in the sample. Each of the 20 clients is to be taught topics from 11 domains resulting in 220 instructional units. Of the 220 instructional units that are required to be delivered for the sample, 159 units were delivered. Indicating an overall performance level of 72%.

Jones monitors, assesses skill mastery, and supports life skills in 13 performance areas. Each of the 20 clients is monitored and/or supported in 13 areas resulting in 260 aggregate client areas

being addressed. Of the 260 aggregate areas Jones' staff demonstrated they assessed, monitored and supported 184 on an ongoing basis, indicating an overall performance level of 71%.

***Family and Community Ties:*** This element of the review looked again at the presence of family visitation in ITILP's, where appropriate, and at parent or extended family participation in case planning. It also determined if the youth have opportunities to participate in activities in their community and are provided with recreational opportunities and linked to community based services, when possible.

As identified in the case planning section of this report, 17% of the ITILP's reflected family visitation (3 of 18). While parental involvement was identified in the case planning section of this report, it was at this time also identified if other extended family members were appropriate for inclusion in the ITILP process. As previously reported, none of the parents were involved in the planning process.

Documentation in 95% of the files reviewed indicated that the youth were linked to community-based services, when appropriate. All files (100%) reflected that the youth were provided with recreational activities and opportunities to participate in activities within their community.

***Youth Rights:*** This area of the review focused on services being delivered in the client's language of preference and supportive of their ethnic, cultural, and sexual identity. The focus also covered the appropriateness of any behavior management, the use of fines, restrictions, and the disbursement of stipends. Client consent for release of information and grievances were also examined.

95% of the sample reflected that services were delivered in accordance with the client's language preference. 85% of the files reflected that the services provided by the agency, and those that the client was referred to outside the agency, were supportive of the client's ethnic, cultural and sexual identity. The three cases that did not reflect this element were those of LGBT youth.

Eighteen of the 20 cases reflected that the agency had to intervene due to a client's mal-adaptive behavior. In two instances it was determined that the intervention may not have been appropriate, based on the file documentation or lack there of. Nineteen records reflected that fines had been assessed for rule infractions. In 12 of the 19 files the fines appeared appropriate (63%). One case indicated that the youth's visitation, mail, or telephone contact was restricted. The documentation in the case file justified the need for the restriction. There was documentation in 100% of the files of the youth receiving monthly stipends.

Reviewers identified 16 cases where there was a need for consents that were signed and witnessed. Additionally, the reviewers sought to determine if the client was fully informed of the reason for the consent and services being provided. Seven of the 16 cases (44%) contained consents that were signed and appropriately witnessed. Nine cases contained documentation that the client was fully informed of the reason for the consent and services being provided, but two

of these cases did not have appropriately completed consents. The records reviewed contained no evidence of client grievances.

***Youth Safety:*** This section of the review examined youth safety which encompassed several areas: Ongoing assessments of safety, UIR's and Abuse/Neglect reports, absconding, and law enforcement involvement.

Five of fifteen of the cases (25%) contained evidence of ongoing safety assessment. Eighteen of the cases contained UIR's and none contained abuse/neglect reports. In 11 cases there was evidence that the agency took appropriate steps to ensure the safety of the youth. Dispositions for five of the UIR's were found in the record. Nine of the youth reviewed had a history of absconding. In five of the nine cases (56%) there was documentation that the agency attempted to intervene with the client to diminish the behavior, four of the cases did not contain this documentation. Six cases reflected that the youth had involvement with law enforcement. Four of the cases (67%) reflected that the agency had provided services to the youth to ameliorate any current behaviors that resulted in the involvement.

***Record Maintenance:*** Complete and timely case entries; maintenance of health records, mental health records; and educational/vocational records; and social histories and updates were elements that were gleaned for in this domain.

35% of the cases contained entries that provided a rationale for the entry and completely explored and reported on the information obtained. Entries were found to be made in a timely manner in 25% of the cases.

Health records were found on file in 90% of the case records. 71% of the applicable case records contained mental health, counseling, and treatment records. Educational and vocational records were present in 90% of the applicable files.

***Discharge Planning:*** The final section of the record review determined if the record reflected that discharge planning commenced at the point of intake and was coordinated with the CFSA Clinical Support Division. It also determined if the ITILP's and the case record content reflected that the youth are receiving services that support their transition to independence.

Twelve of the 20 cases (60%) reflected that discharge planning was commenced at intake; this process was reflected in only two clients' ITILP's. The evidence in the other ten records took its form in other case record documentation. One record reflected coordination of discharge planning and aftercare with the CFSA Clinical Support Division.

Of the 20 cases reviewed 7 (35%) reflected that the youth were getting the full array of services necessary to support a transition to independence. Thirteen of the cases were identified as requiring additional interventions and/or services. In some of these instances the client was non-compliant and there was little documentation that addressed the efforts to ameliorate the behavior. A few clients had such high-end service needs that the viability of independence may

not have been a realistic goal. In other instances the records merely lacked sufficient documentation that supported a positive finding.

**D. Personnel Record Review**

Eight agency personnel files were also selected for review. These files were reviewed utilizing selected contract requirements and Industry Standards articulated by COA and CWLA. Observance of the standards reduces organizational risk and demonstrates the organization's commitment to the professional development of their staff. The files were reviewed for the presence of information that ensures client safety, i.e., employee background checks (criminal records and abuse registry); valid driving licenses and driving records; pertinent health information and emergency medical training; ongoing and current evaluations; proof of credentials; basic required employment information; emergency information; and proof of training.

All the files reviewed contained current criminal and abuse/neglect background checks. Copies of Drivers' Licenses and checks of driving records were found in 6 of the eight records. Evidence of medicals were found in 4 of 8 files; TB tests in 6 of 8 files; and drug tests in 7 of 8 files.

All records contained documentation of current CPR certification. Evidence of current Fist Aid training was also found in all of the files reviewed. Staff development training was documented in five of the eight files reviewed, and reflected the required number of hours.

Seven of the eight records contained employment applications, and emergency contact information. Proof of education was found in all the files. Current evaluations were found in half the files.

**E. Facility Review**

Jones was requested to provide a tour of its housing units. An evaluation tool was utilized for each unit seen. The units were evaluated using safety as the primary focus consistent with the CFSA charge to CWA.

On April 17, 2006 CWA toured the Jones Main Facility. The facility met safety standards of rule 63. This facility had two bedroom units with four youth to a unit. The required furniture was in all of the units and well maintained.   The staff at Jones appear dedicated to creating an environment that is home like and gives youth a sense of family. The reviewers noted no safety concerns.

## Summary of Findings

The following findings reflect information that was obtained from case record reviews and interviews and focus groups that were conducted as part of the evaluation process. These findings relate to both Jones and the CFSA.

### Intake - Strengths

Clients are fully informed of the rights when they enter the program

Identifying information; medical screens; histories of prior placements; and family, health, and mental health histories were found in 90% or more of the case records. Interviews with management and Jones' staff indicate that they are diligent in their efforts to obtain this information from the CFSA.

90% of youth obtained a comprehensive medical examination with 72 hours of entry into the Jones program.

### Intake - Opportunities

Current case plans are not provided to the provider. 55% of the case records did not include the clients' plans that were in effect at their time of entry into the Jones program. Both Jones' staff and management spoke to the difficulty of obtaining these plans from the CFSA worker. CFSA requires in the contract that the current plan is to be provided to the agency as part of the intake packet.

Five-day plans are not able to be adequately developed. None of the cases reviewed reflected that all the intake information was received from the CFSA within five days, as required by the contract. This impedes Jones' ability to develop five day plans that adequately reflect the client's current conditions and past histories.

Some youth placed in the program are inappropriate. Program Monitors indicated that youth who need specialized ILP programs are often placed in traditional programs. Jones' management and staff echoed that they often get clients who have more complex needs than those their program is fashioned to meet. Staff indicated this is partly due to not receiving all the client information in a timely manner at the point of intake. Several youth in the program, who were individually interviewed as part of the record review and youth in the focus group, stated that some of their peers in the program "should not be here," and they "can't handle the freedom." Additionally, three records were identified where the client had a Serious Persistent Mental Illness (SPMI). Based on the sample, if this incidence rate is broadened to the entire agency population, 15% of the census at Jones would have a SPMI.

Complete Social Histories or Comprehensive Assessments are not provided at intake. Assessment information is not provided within the timeframe required, as evidence in record

reviews and echoed in Jones' management and staff focus group. Record review assessment information that is provided appears fragmented and does not provide a complete picture of the client to be served.

Entry into the ITILP is seen as an entitlement by some youth. Both the CFSA OYD staff and Program Monitors indicated that some youth perceive entering an ILP as a right. Jones' management indicated that there is a lack of any expectation that the youth has the responsibility to be in school or employed.

### Case Planning - Strengths

A sufficient number of current Jones agency case plans were contained in the files reviewed. The plans identified the individuals responsible for implementing and supporting each task; the actions necessary to achieve the goals; and timeframes for achieving the goals.

### Case Planning - Opportunities

Participation by planning team members, youth, and youth's family members, when appropriate could be cultivated. Plans would be enhanced by ensuring they reflect that those youth who have contact with family members have that contact reflected in their case plans. Involvement of family, when appropriate, in the planning team may enhance the youth's ability to achieve successful self-sufficiency, as identified in the literature review.

The youth's CFSA plans should be provided to the agency. Only 10% of the records contained the client's current CFSA plan. Knowledge of the contents of these plans may enhance the planning ability of the provider agency.

Service plans could be enriched by inclusion of service needs related to physical health care and education; mental health services; educational, vocational, and/or employment; and ILP education.

### Service Provision - Physical Health and Education - Strengths

Youth have routine medical examinations. A substantial number of cases reflected that the youth have regular medical exams. Youth from focus groups and independent interviews indicated the majority of the youth make their own appointments. Youth appear compliant in providing documentation of their exams to Jones for inclusion in their files. Staff indicated that clients receive medical care.

The one male teen parent's own educational needs as it related to family planning and medical issues in early childhood were being met, this in light of the fact that often the needs of male teen parents are overlooked.

### Service Provision - Physical Health and Education - Opportunities

Documentation of dental exams and vision care could be improved. Documentation regarding vision care exceeded that of dental exams, suggesting a documentation issue. Communication regarding attempts by the agency to obtain medical records was evident in some records. Program Monitors and some OYD staff indicated that the provider agencies cannot access health care services directly suggesting a strong dependence by the provider on the CFSA in order to be compliant with the contract.

If Lesbian, Gay, Bi-Sexual or Transgender youth are linked to health services and supports that are tailored to their needs, documentation could be enhanced.

### Service Provision - Mental Health and Developmental Disabilities - Strengths

Clients with developmental disabilities, PTSD, and ADD/ADHD appeared to be having their service needs met.

Clients who had current emotional or mental health needs were being assessed on an ongoing basis.

### Service Provision - Mental Health and Developmental Disabilities - Opportunities

Documentation could be enhanced of all clients who have needs of substance abuse treatment or assessments; professional intervention for defiant or oppositional behavior; or SPMI.

### Service Provision - Education/Vocational/Employment - Strengths

Youth who were enrolled in Special Education Programs, who had IEP's in their case record, were receiving services consistent with the IEP.

86% of the youth enrolled in educational programs were in need of additional educational supports e.g., tutoring, mentoring, etc. Of those, 70% were identified, via documentation, as receiving the service.

### Service Provision - Education/Vocational/Employment - Opportunities

Evidence of the agencies interventions with youth, who demonstrate truant behavior or poor job attendance, were found in 60% of the case records review. The opportunity exists to build on the current performance level.

### Service Provision - Life Skills Education and Monitoring - Strengths

A large portion of the cases reflected that the services provided were consistent with the youth's social and developmental needs.

Youth in the focus group and individual client interviews indicated they feel supported by the agency, and that life skills helped them in may areas including budgeting, interpersonal communication, knowledge of community resources, and accessing services.

### Service Provision - Life Skills Education and Monitoring - Opportunities

Documentation of various domains of life skill education was found in 55% to 70% of the cases sampled. Monitoring of mastery of the skills and support of the skills in various domains ranged from 60% to 80%. Given the current level of documentation expansion of 20% - 40% appears attainable.

### Family Community Ties - Strengths

Records reflected that youth are provided with recreational activities and opportunities to participate in activities within their community, this was also reported in case related client interviews.

95% of clients were linked to community-based services.

### Family Community Ties - Opportunities

See case planning opportunities regarding family involvement as members of the planning team.

### Youth Rights - Strengths

95% of cases reflected that services were delivered in accordance with the client's language of preference.

Services the client was referred to were supportive of their ethnic and cultural identity.

89% of the cases reflected age-appropriate and practice based interventions with youth displaying inappropriate behavior.

Restrictions on visitation, mail, or telephone contact were justified in the client file.

Documentation of receipt of monthly stipends was contained in all files.

### Youth Rights - Opportunities

If the services provided or arranged for youth who are Lesbian, Gay, Bi-Sexual or Transgender are sensitive to and supports the clients sexual identity, documentation could be enhanced.

Documentation in 63% of the files indicated that the fines assessed appeared appropriate.
The CFSA may wish to clarify issues surrounding the completion of consents for clients, particularly regarding releases related to mental health and those for clients 18 to 21 years of age.

Slightly more than 50% of the clients were fully informed regarding the reason for the consent and services being provided.

### Youth Safety - Strengths

The agency made efforts in the majority of cases to address youths' patterns of absconding.

The agency made efforts in the majority of cases to address youths' involvement with law enforcement and to provide services to correct the behaviors which initiated the involvement.

### Youth Safety - Opportunities

Dispositions for 28% of the UIR's were found in the case files.

### Record Maintenance - Strengths

Health records were found in 90% of the records reviewed.

Educational/vocational records were found in 90% of the records reviewed.

A large majority of mental health records (71%) were found in the files reviewed.

### Record Maintenance - Opportunities

Timely case record entries were found in 25% of the files reviewed.

35% of the cases contained case entries that provided a rationale for the entry and completely explored and reported on the information obtained.

### Discharge Planning - Opportunities

Records reflected that discharge planning was ongoing in 60% of the files but reflected in two ITILP's.

Coordination between the agency and the CFSA Clinical Support Division was present in one record.

While youth and staff focus groups and management and youth interviews reflect that clients are receiving service to successfully achieve independence, 35% of the files reflected the full array of services provided.

### Personnel Records - Strengths

All required background checks were contained in the files.

All records contained current CPR certifications and training in First Aid.

Proof of education was found in all files reviewed.

All records that documented staff development training reflected that the appropriate number of hours had been accrued.

88% of files reflected that employees had undergone drug testing.

All employees requiring a valid driver's license had a copy on file including a check of their driving record.

All records requiring employment applications had one contained in the file.

### Personnel Record - Opportunities

Current medicals and TB test were on file in the majority of records.

Current employee evaluations were contained in half of the files.

### Facility - Strengths

The facility was found to meet all safety standards on April 17, 2006.

The staff and management appears dedicated to creating an environment that is home-like and gives the youth a sense of family, this was reflected in interviews of both clients and staff.

### Facility - Opportunities

Youth in the focus group and the CFSA OYD staff indicated that youth seem crowded, four in a two-bedroom apartment. CFSA OYD staff viewed this as problematic in terms of increasing conflict among residents in the apartment. Youth saw it as a space concern for personal belongings and also potential personality conflicts. These observations were made in spite of Jones & Associate's compliance with the space requirements as set out in the DC Code and Regulations Sec 6328.7(c)(5).

### Additional Findings

### Training Opportunity

Staff from Jones, CFSA OYD, and CFSA Program Monitoring in concert with Jones' management team and individual clients interviewed reflected on the complex needs and behaviors of some of the residents. Additionally, the record review determined that 70% of the sample presented with some type of mental health need, some being dual or multiply diagnosed.

CFSA OYD workers and Program Monitors both observed that agency staff might benefit from training in de-escalating conflict and client boundaries.

### Communication - Youth, Agency Staff, and CFSA OYD

The record reviews indicate that there was little involvement of a planning team in the development of the service plan. This team would include the youth, agency staff and the youth's CFSA worker, at minimum. In the CFSA OYD focus groups it was stated that often the CFSA ITILP is written in the office, and then later given to the client. The level of client involvement in the most current agency ITILP was 40%. The focus group of Jones' staff stated that some OYD workers drop the youth off at the program, and the youth does not see the worker again until court. Evidence in the records of ongoing collaboration after intake appears less than optimum.

### Client Service Planning

The client service planning process with youth in the ITILP seems multi-layered, creating redundancy. According to policy, case records, focus groups, and interviews, the youth often times have multiple plans e.g., an ITILP by the private agency worker, a service plan by the CFSA worker, an Individual Health Plan, an Individual Treatment Plan, and when determined a Transition Plan.

Given the characteristics of the clients as identified in the case records and from youth, CFSA staff, Jones staff, and Jones' management, a number of youth may not have the sophistication level needed to perhaps navigate five separate plans. This potentially negates the planning process with these clients instead making it a rote exercise, which may elucidate the 47% level of participation.



# APPENDIX A

# LITERATURE REVIEW
# &
# STANDARDS CROSSWALK

# Review of Literature on Independent Living Programs

This review of the research literature on independent living programs serving foster youth was prepared to provide an informed context for the evaluation of three agencies under review. The key questions that this literature review addresses are: (1) What are the characteristics and needs of youth preparing to exit foster care via IL programs? (2) What outcome measures are used to determine program effectiveness? and (3) What are promising practices lead to positive outcomes for youth?

## Background

Each year approximately 20,000 children leave the formal foster care system without having achieved a permanent living arrangement. Research studies on youth aging out of the child welfare system have shown that youth experience unemployment, homelessness, periods of dependency on public support systems, problems accessing mental health and health services, and poorer educational outcomes. (Courtney et al., 2004; Barth, 1990; Lohman and Siegel, 2002) Concerned about youth leaving care without the necessary skills to live independently, Congress amended Title IV-E of the Social Security Act to provide funding to assist youths age 16 and older in making the important transition to independence. The Title IV-E Independent Living Program was created in 1985 to prepare adolescents to live self-sufficiently once they exited foster care.

In 1999, Congress passed the Foster Care Independence Act (FCIA) and created the John H. Chafee Foster Care Independence Program (Chafee). The main goal of the Chafee Program is to provide flexible funding to states to design and implement an array of services to assist youth in the transition process from foster care to independent living. Chafee further requires that the Department of Health and Human Services develop outcome measures to assess state performance in the areas of educational attainment, employment, avoidance of dependency, homelessness, non-marital childbirth, high-risk behaviors and incarceration.

## Characteristics and Needs of Youth

Foster youth faced with leaving the formal child welfare system are required to do something that very few 18 to 21 year-olds in the general population are prepared to do: be self-sufficient. They are expected to have completed their education, secure employment that pays a living wage and provides health insurance, manage their monthly finances, and secure and maintain safe and stable housing. In this pursuit of self-sufficiency foster youth face significant challenges that can potentially hamper the transition process from adolescence to adulthood. This section will explore some of the key needs and issues of current and former foster youth.

*Social Support Networks:* Few adolescents are able to achieve self-sufficiency by their eighteenth birthday without some source of help. Social supports in the form of family, friends and mentors provide the safety net that youth can rely on for financial, emotional, and other types of assistance. Children in long-term out-of-home care are at a marked disadvantage when

it comes to the social support networks available to them. For most children in the general population the foundational supportive network is the family of origin. It is within this structure that children learn a variety of social, self help and daily living skills. Because most children are in foster care as a result of a breakdown in the immediate family, drawing support from the family unit and the community of origin can be quite complicated (Lohman and Siegel 2000). Yet, several studies have shown that youth leaving care not only reconnect with family members, but they consider this connection to be a significant source of strength and support (Barth, 1990; Westat, 1991; Courtney and Piliavin, 1998). Lohman and Siegel (2000) suggest that by encouraging visitation with relatives, developing alternative support systems and recruiting and maintaining specialized foster homes for transitioning youth, IL programs can help foster youth leave care with social support networks that are critical for a successful transition into adulthood.

*Emotional and Behavioral Issues:* A high number of children in foster care have behavioral and emotional health issues. Many foster children exhibit behaviors such as truancy, running away from home, dropping out of school, risky sexual activity, and alcohol and drug abuse. Often these behaviors are indicative of underlying emotional problems. In their study of youths formerly in foster care, Westat (1991) found that 38 percent of youths were clinically diagnosed as emotionally disturbed. Fifty percent reported using illegal drugs since discharge; 25 percent reported having trouble with the law, and about half of these said the problem involved drugs or alcohol. Researchers in Washington State found that youth preparing to exit care scored very high on a depression scale and for those youth participating in counseling, 42% had indicators for depression (OCAR, 2004). Courtney and Piliavin (1998) administered a standardized mental health scale to youths who had aged out of foster care and found that scores were significantly lower than those youths in the general population.

*Non-marital Births and Parenthood:* In both the Barth (1990) and Westat (1991) studies, birth rates among females leaving foster care were high. Barth noted that forty percent of females had a pregnancy shortly after leaving out-of-home care. The Westat study found that sixty percent of the females had given birth and that becoming a mother was associated with dependency on public assistance. Twenty four percent of males in the Westat study had fathered a child within two and a half to four years after leaving care (Westat, 1991).

*Education:* Children in out-of-home care face a number of educational challenges. As a result of abuse and neglect and subsequent placement moves it is quite common for children in care to lag behind their peers in attaining key educational milestones. Several studies suggest that a high proportion of children in out-of-home care: have a learning disability; receive special education services; have repeated grades; and drop out of school (Courtney, Terao,& Bost, 2004; Percora et.al. 2003) As the age of discharge from care approaches, many have not reached their final year of high school. A national evaluation by Westat (1991) found that 46% of youth aging out of foster care did so without a high school diploma. Even more strikingly, 40% were dependent on some form of public assistance 2.5 to 4 years after discharging from care.

Mech (1994) makes this poignant observation: "An economy saturated with low paying jobs, part-time service jobs together with the changing nature of employment structure in the United States holds important implications for the world-of-work preparation of foster system graduates. Possessing less than a high school diploma is a serious, perhaps insurmountable barrier. A GED

only is insufficient and may be a deterrent to stable employment, and by itself, a high school diploma no longer assures employment beyond a poverty level wage" (citation).

Early results from the Casey National Alumni Study (Pecora et al. 2003) suggest that completing high school and participating in post secondary educational opportunities are two major predictors of future success for emancipated foster youth.

*Employment*: In a study on the employment outcomes of youth aging out of foster care, researchers at Chapin Hall found that youth have very low levels of employment and earnings. They noted that youth across three states (Illinois, Wisconsin and South Carolina) during the three year study, had earnings that were at or substantially below the poverty level (Courtney, Terao,& Bost, 2004).  . The Casey National Alumni study found that while 80% of Casey foster care alumni ages 25-34 were employed, most had difficulty earning a living wage. Approximately thirty percent of this population had no health insurance (Pecora, et al. 2003).

*Life Skills Training:* IL programs typically contain some element of formal classroom training on money management, cooking, locating and sustaining housing, learning to drive, consumer skills managing credit, etc. Researchers have found that life skills training can result in better outcomes for foster youth in the areas of education, employment and the ability to be quasi-self supportive at case closing. (Westat, 1991; Scannapieco et al. 1995). However, Loman and Siegel point out that as of 2000 no state required youth to complete life skills training. Youth surveyed in Ohio indicated that formal classroom training contributes very little to their acquisition of daily living skills.   The youth surveyed were much more likely to rely on a significant adult/mentor to provide informal instruction in these areas (Loman and Siegel, 2000).

### Industry Standards for Independent Living Programs

The Child Welfare League of America first published Best Practice Standards for Independent Living Programs in 1989. The CWLA standards can best be described as goal standards. As such, they broadly outline the principles that are reflective of sound practices for working with transitioning youth. CWLA released a revised set of standards that were approved by its board in 2004.   The *Standards of Excellence for Transition, Independent Living, and Self Sufficiency (TISS) Services* include important themes such as:   the need for a youth development philosophy that guides programming and service delivery; permanent connections for youth preparing for adulthood; and interdependence as a developmental goal for all youth in care (instead of independence).

The CWLA *Standards of Excellence* (2004) suggest that service providers:

- Adopt a youth development philosophy to guide programmatic and policy decisions;
- Collaborate with the larger community to address the multi-faceted needs of youth and to provide additional opportunities for youth development;
- Develop and implement programs that are culturally competent.
- Develop strategies that help youth establish life long relationships with other adults.

These core areas of program development are also reflected in other bodies of research that preceded the CWLA's Standards of Excellence (2004) including the Westat study (1991) and in a promising practices monograph published by the National Resource Center for Organizational Improvement in concert with Casey Family Programs. The other prominent set of industry standards are found in the Council on Accreditation for Children and Family Services self-study manual. The guiding principles of the COA standards comport with the CWLA's Standards of Excellence. In particular, the COA standards emphasize services that are community-based, coordinated, culturally competent, individualized, and strength-based. Organizations receiving accreditation from this body publicize to the larger community that their agency's policies and practices conform to national best practice standards. A comparison table of CWLA, COA standards and CFSA Rules 62 and 63 can be found following this literature review.

**Promising Practices Leading to Positive Outcomes for Youth**

The National Child Welfare Resource Center for Organizational Improvement published a compilation of promising practices for Independent Living programs. Based on its research findings, the Center developed a list of promising practices criteria that may be characteristic of effective independent living programs. The Center cautions that while the suggested promising practices build on current research on youth development and practice standards published by the Council on Accreditation and CWLA, the suggested promising practice criteria have not been rigorously evaluated. Still, the criteria have merit in that they are aligned with fundamentally sound social work and clinical practice.

***Promising Practice Criteria:***

1. The program employs a youth development philosophy.
2. The program has a clearly defined life skills instruction component.
3. The program has access to educational supports aimed at helping youth achieve educational goals.
4. The program has an employment component.
5. The program has services that help youth establish the necessary community linkages for life after foster care.
6. The program has a supervised independent living component.
7. The program has or is connected to a program that has health services that prepare youth to manage their own medical, dental and mental health needs.
8. The program prepares youth for adult counseling activities.
9. The program has clearly defined youth development activities.
10. The program has developed a comprehensive set of aftercare services.
11. The program maintains a regular and on-going training component for program staff.
12. The program has an on-going evaluation component.

The promising practice criteria are operationalized in the following chart:

| Practice Criteria for Program Components | Factors to Consider |
|---|---|
| **Clearly Defined Life Skills Component** | Does the program: <br> ▪ Provide training material that contains specific information core <br> • life skills: <br>    o Assessment of youths' strengths and needs <br>    o Learning to identify and define his/her problems <br>    o Learning to how to perceive options and make choices <br>    o Stress management <br>    o Planning for the future <br>    o Completing a personal social history (how to do it) <br>    o Coping skills <br>    o Personal care <br>    o Forming meaningful relationships <br>    o Financial management <br>    o Housing (how to obtain and maintain it) <br> ▪ Provide opportunities to practice skills in real world environment |
| **Educational Supports** | Does the program: <br> ▪ Provide access to necessary education resources (e.g. educational advocates, tutoring, etc.) <br> ▪ Target increasing the literacy of youth <br> ▪ Help youth select career fields <br> ▪ Provide assistance to begin an educational or vocational program <br> ▪ Help youth complete an educational/vocational program |
| **Community Linkages** | Does the program: <br> ▪ Connect youth with community resources <br> ▪ Connect youth with adult mentors <br> ▪ Create job and career opportunities for youth <br> ▪ Create leadership opportunities for youth |
| **Supervised Independent Living** | Does the program allow youth to: <br> ▪ Select their own housing? <br> ▪ Pay their own bills and maintain their own budget <br> ▪ Work out landlord and roommate disputes <br> ▪ Assume the lease or establish their own housing arrangement at the end of the program |
| **Health Care Services** | Does the program: <br> ▪ Prepare youth to manage their own medical and dental needs <br> ▪ Connect youth with appropriate health resources in their community |
| **Preparation for Adult Counseling Activities** | Does the program help youth: <br> ▪ Make peace with the past (e.g. provide trauma counseling) <br> ▪ Re-unite with family members <br> ▪ Return to their own communities <br> ▪ Consider and prepare youth for adoption <br> ▪ Develop personal support systems <br> ▪ Work through the emotional stages of transition to adulthood <br> ▪ Promote cultural and identity development <br> ▪ Work on substance abuse youth issues |

| Practice Criteria for Program Components | Factors to Consider |
|---|---|
| Youth Development | Does the program: <br>• Have activities that increase cultural awareness <br>• Have activities that challenge youth to develop personal confidence <br>• Have programs that allow the youth to contribute to the community (i.e. programs that provide opportunities for youth to help other youth and other advocacy programs) |
| Aftercare Services | Does the IL program provide: <br>• Temporary medical coverage and/or healthcare <br>• Temporary financial assistance <br>• Temporary housing <br>• Help in establishing and maintaining own living arrangements <br>• Peer support <br>• Crisis counseling <br>• Information and referral <br>• Opportunities to share transition experiences with younger youth <br>• Support for youth during the transition to permanency |
| Ongoing Training for Staff | Does the program offer a training component that: <br>• Orients new staff and care providers to Independent Living and Youth Development philosophy <br>• Provide continuing education for experienced staff and care providers <br>• Encourage staff and care providers to develop new knowledge and skills <br>• Educates the community (schools, employers, etc.) about the needs of youth while in transition |
| Program Evaluation | Does the program examine: <br>• Immediate outcomes (results at the end of the program) <br>• Short-term outcomes (6-12 months after program completion) <br>• Long term outcomes (12+months after program completion) |

**Outcome Measures Used to Gauge Program Effectiveness**

The Foster Care Independence Act of 1999 stipulates the following regarding data collection and performance measurement:

"The Secretary, in consultation with State and local public official responsible for administering independent living and other child welfare programs, child welfare advocates, Members of Congress, youth service providers and researchers shall - Develop outcome measures of educational attainment, high school diploma, employment, avoidance of dependency, homelessness, non marital child birth, incarceration, and high risk behaviors that can be used to assess the performance of State in operating independent living programs." (P.L. 106-169)

Under the FCIA, states are required to submit program plans annually to HHS that outline the scope of the IL programs offered and progress in achieving positive outcomes for youth. However, a GAO report issued in 1999 revealed that HHS had not succeeded in establishing a

method to review the states' progress in helping youths make the transition to self-sufficiency. In fact, states report on IL program effectiveness without using any standardized method to determine progress. The GAO report noted that the quality of the information contained in the reports varies by state and contain almost no information on program effectiveness (GAO, 1999). In a subsequent report in 2004, the GAO reported that while:

> "States and HHS have taken action to fulfill the accountability provision of FCIA, little information is available to assess the effectiveness of independent living services. All states have developed multiyear plans for their programs in compliance with FCIA and submitted annual reports to ACF, but using these plans and the reports to assess state performance is hindered by inconsistencies between the plans and reports, an absence of goal and baseline information to use in measuring progress, and incomplete information on outcomes for all youth who received services". (GAO 2004 p.4)

The U.S. Department of Health and Human Services has commissioned a multi site evaluation of independent living programs to determine the effects of the programs in achieving positive outcomes for youth. The types of programs under investigation include an employment services program in Kern County, California; an intensive case management and mentoring program in Massachusetts; and a tutoring/mentoring program and an intensive life skills training program in L.A. County, California. The study will include an outcome and process level evaluation. Evaluation results are expected by 2007.

To date, the only national study of IL service effectiveness is the National Evaluation of Title IV-E Foster Care Independent Living Programs for Youth conducted by Westat in 1991. The study had two main foci: the impact of P.L. 99-272 on States' development of programs, policies and services; and the impact of those services on outcomes for youth discharged from foster care (Westat, 1991). The outcome measures identified in the study include the following:

- Ability to Maintain Employment for One Year
- Educational Status (those youth who had obtained a high school diploma and those with less than a high school education)
- Ability to Access Healthcare
- Cost to the Community
- Avoiding Young Parenthood
- Overall Life Satisfaction
- Availability of a Social Support Network
- Composite Measure of Independent Living

Researchers found that independent living services have the potential to improve outcomes for youth and that comprehensive effects were achieved when skill training included a combination of money management, consumer skills, obtaining credit skills, using educational opportunities and finding and maintaining employment. (Westat, 1991)

Other key findings from the Westat study worth noting are outlined below:

- High school graduation prior to emancipation from foster care led to better outcomes for youth regardless of life skill training completed.
- Youth discharged from foster care need supportive services in order to improve outcomes.
- Extended family members played a significant role in lives of youth prior to discharge from care and after discharge.
- Young women who birthed a child experienced poorer outcomes with respect to completing high school, furthering school after discharge, maintaining employment, and dependency on public forms of assistance.
- Accessing medical care presented challenges for discharged youth

**Best Practice/Industry Crosswalk Table**

| PRACTICE DOMAIN | BEST PRACTICE STANDARD | COA STANDARD | RULE 62 | RULE 63 |
|---|---|---|---|---|
| ASSESSMENT | **Point-in-time skill assessments in multiple domains should anchor the case planning process and help "customize" the case plan for transitioning youth.**<br><br>Lohman and Siegel, 2000<br><br>National Child Welfare Resource Center for Organizational Improvement—Promising Practices<br><br>CWLA Standards of Excellence for Transition, Independent Living and Self Sufficiency Services, 2004) | G.8.2 All persons and families served receive an intake assessment, a basic, or comprehensive psychosocial assessment according to their needs and the services provided.<br><br>G.8.2.02 Assessments are tailored to individual need and service objectives and the organization collects only such information as is necessary to provide the requested service.<br><br>G.8.2.04 Each assessment appropriately considers unique personal characteristics that shape service approaches, including aspects of the person's racial, ethnic, and cultural background and the need for special service approaches as a result.<br><br>G.8.3.02 The assessment of person with special needs is expanded to include: (a) health and safety issues, (b) supervision needed, (c)independent living skills and skills in the activities of daily living (d) nutritional/dietary needs, (e) leisure interests, aptitudes and the need for greater social inclusion, (f) other services and resources | 6258.1 The facility and contracting agency jointly assess the resident's strengths and needs and develop an individual service plan (ISP).<br><br>6260.3 The facility shall review the resident's comprehensive ISP, reassess the resident's strengths and needs and revise the comprehensive ISP as often as necessary and, except for residential treatment center, emergency care facilities and runaway shelter, no less than every 3 months. | 6341.5 An ITILP shall be: (a) based on and describe the resident's physical, mental, emotional, academic, social, familial, recreational, and life skills needs and strengths relative to the resident's age, level of development, cultural background and impairments; (b) list each assessment given, the date and describe the recommendations and outcomes.<br><br>6341.6 The planning team shall and, as needed, revise the ITILP at least every 6 months |

**Best Practice/Industry Crosswalk Table – continued**

| PRACTICE DOMAIN | BEST PRACTICE STANDARD | COA STANDARD | RULE 62 | RULE 63 |
|---|---|---|---|---|
| CASE PLANNING | **Assessment based case plans should be developed and implemented by a planning team for all youth.**<br><br>**CWLA Standards of Excellence for TISS Services**<br><br>National Child Welfare Resource Center for Organizational Improvement—Promising services | G8. 4 The organization develops written service plans in a timely manner for each person, family or group served that is based on the findings of the assessment and involves to the fullest extent possible, the participation of the person, family or group served. | 6258.6 The resident's physical, psychosocial, academic, recreational. Life skills needs and strengths will be considered, at a minimum, in the developing the initial and comprehensive ISP.<br><br>6258.4 Planning team members develop the comprehensive ISP | 6341.5 An ITILP shall be (A) based on and describe the resident's physical, mental, emotional, academic, social, familial, recreational, and life skills needs and strengths relative to the resident's age, level of development, cultural background and impairments; (b) list each assessment given, the date and describe the recommendations and outcomes. |
| | **Youth should be involved in every phase of the planning process**<br><br>**CWLA Standards of Excellence for TISS Services**<br><br>National Child Welfare Resource Center for Organizational Improvement—Promising Practices. | G8.4.02 The service plan is developed with the full participation of the person served or his/her parent or legal guardian, as appropriate, and the organization:  helps the person understand available option, benefits and consequences of different service alternatives and the ways that the organization can support desired outcomes. | 6258.5 The resident will be invited to participate in the planning process if age and developmentally appropriate. | 6341 Development and review of plans conducted by members of the planning team (includes youth). |
| | **The youth's family or significant adult in the youth's life needs to be invited to participate in the planning process.**<br>**CWLA Standards of Excellence for TISS Services**<br><br>National Child Welfare Resource Center for Organizational Improvement—Promising Practices. | G8.4  (see full citation above)<br><br>G9.1.04 When residential services or other out-of-home services cannot be provided close to a person's home, the organization makes efforts to maintain family ties and involve the family in service planning and delivery…. | 6258.4 Planning team members develop the comprehensive ISP.<br><br>6258.5 The resident's parent(s) or guardian(s) and those persons invited by the resident who are significant to the resident's life, shall, where feasible, be invited to participate in developing the comprehensive ISP… | 6341.3 An ILP shall document efforts to include all members of the planning team in the ITILP process (both initial and current)<br><br>6341.7 An ILP shall encourage parental involvement as a member of the planning team. |

**Best Practice/Industry Crosswalk Table – continued**

| PRACTICE DOMAIN | BEST PRACTICE STANDARD | COA STANDARD | RULE 62 | RULE 63 |
|---|---|---|---|---|
| SERVICES AND SERVICE MANAGEMENT | **Services for transitioning youth should be tailored to the abilities and needs of children and youth at different ages and developmental levels.**<br><br>**CWLA Standards of Excellence for TISS Services**<br><br>National Child Welfare Resource Center for Organizational Improvement—Promising Practices. | G9. 1.01 With full participation of the person or family served, the organization (a) prioritizes among service goals;(b) establishes time frames for achieving goals; (c) regularly reviews progress toward the achievement of goals<br><br>G9.10.01 When independence is a service goal, the organization directly provides or arranges services to help the person served make a successful transition to independence.<br><br>G9.10.03 The services provided or coordinated for the person transitioning to independence include life skills training, human sexuality education, vocational/technical training, housing during transition and after discharge, legal services, support services and social/cultural/religious and recreational activities. | See Rule 6258.1 | See Rule 6341 |
| | **Community based systems of services that address a wide spectrum of needs (health, education, mental health, employment, housing etc.) should be employed on behalf of youth in preparation for adulthood.**<br>**CWLA Standards of Excellence for TISS Services**<br><br>National Child Welfare Resource Center for Organizational Improvement—Promising Practices. | COA standards do not address the use of community-based system of services specifically. | Rule does not address the use of community-based system of services. | Rule does not address the use of community-based system of services. |

## Best Practice/Industry Crosswalk Table – continued

| PRACTICE DOMAIN | BEST PRACTICE STANDARD | COA STANDARD | RULE 62 | RULE 63 |
|---|---|---|---|---|
| SERVICES AND SERVICE MANAGEMENT (continued) | Case management should include a comprehensive assessment of strengths and needs, an assessment of service effectiveness, advocacy, and ongoing monitoring of the case plan.<br><br>CWLA Standards of Excellence for TISS Services<br><br>National Child Welfare Resource Center for Organizational Improvement—Promising Practices. | G.9.6.05 (implies best practice standard) Service goals and/or plans are modified when indicated by changing needs or circumstances, progress toward achievement or service goals, or at the request of the person, family or group served.<br><br>G.9.1.01 would also apply here. See above | BP criteria can be implied in 6260.3 (see citation on pg.1) | BP criteria can be implied in 6341.6 (see citation pg.1) |
| CONTINUITY AND COORDINATION | The ILP program should ensure linkage with key services including, education, employment, any related assessments, health and mental health services, etc.<br><br>CWLA Standards of Excellence for TISS Services<br><br>National Child Welfare Resource Center for Organizational Improvement—Promising Practices. | G9.4.01 The organization coordinates service provision among different providers when one or more of the following conditions exist:<br>a. the need for coordination has been identified<br>b. no other organization has assumed responsibility<br>c. the type of service, or lack of service coordination by multiple providers necessitates that the organization assume a central coordinating role<br>d. it is not contractually prohibited from doing so<br>e. the organization is the most appropriate entity to assume such a role | Coordination and continuity of services is implied in:<br><br>6258 – Development of the ISP<br>6259 - Contents of the ISP<br>6260 – Review of the ISP | 6341.5 The ITILP shall identify the person responsible for coordinating and implementing the initial ITILP. |

## Best Practice/Industry Crosswalk Table – continued

| PRACTICE DOMAIN | BEST PRACTICE STANDARD | COA STANDARD | RULE 62 | RULE 63 |
|---|---|---|---|---|
| CONNECTIONS WITH THE COMMUNITY | **Preparation should be comprehensive in nature; teaching youth how to locate and use a variety of community services.**<br>CWLA Standards of Excellence for T155 Services<br>National Child Welfare Resource Center for Organizational Improvement—Promising Practices.<br>Lohman & Siegel, 2000 | G9.10.08 The organization provides basic data and assistance with job information and community resources.<br><br>G9.10.03 Services provided or coordinated by the program for the person transitioning to adulthood includes training on identifying and navigating an array of community services. | Rule does not address this standard specifically. This may be contained in sections **6268**-Recreational Activities and **6270** Life Skills | 6330.7 The ILP program shall educate youth concerning life skills including knowledge of public and private community resources. |
| | **Participation of the larger community in the development and support of youth should be encouraged.**<br><br>CWLA Standards of Excellence for T155 Services<br>National Child Welfare Resource Center for Organizational Improvement—Promising Practices.<br>Lohman & Siegel, 2000 | G9.9 The organization supports community approaches to addressing community problems including, as is appropriate to it size, expertise and mission. | **6231.1 –6231.4** The facility is encouraged to establish positive relationships with members of the community (via volunteer opportunities within the agency and conducting open community meetings.<br><br>**6218.1-6218.6** Each facility has a local advisory committee that meets regularly to discuss various aspects of the program. The advisory committee makes a formal report to the contracting agency on program components. | 6314.1- 6314.7 Each ILP shall have an advisory committee that has at least one representative from the community. The committee must meet regularly with the administrator to review program, policies and other issues and provide a report annually to CFSA on a number of programmatic areas. |

**Best Practice/Industry Crosswalk Table – continued**

| PRACTICE DOMAIN | BEST PRACTICE STANDARD | COA STANDARD | RULE 62 | RULE 63 |
|---|---|---|---|---|
| AFTERCARE | **Preparation for aftercare must include ongoing assessment, planning, individual and group instruction and practice.** CWLA Standards of Excellence for TISS Services<br><br>National Child Welfare Resource Center for Organizational Improvement—Promising Practices.<br><br>Lohman & Siegel, 2000 | G9.8.02 The after care plan is developed with the person served or his/her parent or legal guardian sufficiently in advance of termination to ensure that an orderly termination process takes place. | Discharge planning occurs only for residents in emergency care facilities and runaway shelters. | Discharge planning summarizes general information as to the services provided to youth and future services and supports to be provided prior to discharge.  Section of Rule stipulates that for residents who will turn 21 upon discharge date, an after care or self care plan is to be developed. |
|  | **Preparation for aftercare must occur over years and involve several modalities.** CWLA Standards of Excellence for TISS Services<br><br>National Child Welfare Resource Center for Organizational Improvement—Promising Practices.<br><br>Westat, 1991<br><br>Lohman & Siegel, 2000 |  | Rule 62 does not address aftercare in this context. | See above note about discharge planning.  Rule 63 does not specifically address aftercare activities or at what point they are to be initiated for youth. |

**Best Practice/Industry Crosswalk Table – continued**

| PRACTICE DOMAIN | BEST PRACTICE STANDARD | COA STANDARD | RULE 62 | RULE 63 |
|---|---|---|---|---|
| AFTERCARE (continued) | Aftercare planning should involve the development of aftercare and safety nets for youth consisting of mentors, program staff, and family members etc., which spell out how each member of the network can support the youth upon discharge.<br><br>CWLA Standards of Excellence for TISS Services<br><br>National Child Welfare Resource Center for Organizational Improvement—Promising Practice.<br><br>Lohman & Siegel, 2000 | COA does not address the best practice standard specifically. However, this can be inferred from G9.8.03, G9.8.05. | Rule 62 does not address aftercare planning in this context. | Rule 63 does not address the specific after activities that are to occur. |
| | Maintaining an "open door" policy for emancipated youth provides critical linkage and supportive services that contribute to positive outcomes.<br><br>CWLA Standards of Excellence for TISS Services<br><br>National Child Welfare Resource Center for Organizational Improvement—Promising Practice.<br><br>Lohman & Siegel, 2000 | G9.10.09 The organization serves as a continuing resource for information, crisis management, referral and counseling to persons who have made the transition to independence.<br>G9.8.06 The organization follows up on the after care plan….<br><br>G9.8.06 The organization follows up on the aftercare plan, as appropriate, when possible, and with the permission of the persons served. | Rule does not address open door policy. | Rule does not address open door policy for emancipated youth. |

## Best Practice/Industry Crosswalk Table – continued

| PRACTICE DOMAIN | BEST PRACTICE STANDARD | COA STANDARD | RULE 62 | RULE 63 |
|---|---|---|---|---|
| LIFE SKILLS TRAINING | The program should implement a clearly defined life skills component that contains specific training on a core set of skills and provides opportunities to assess mastery of skills<br><br>CWLA Standards of Excellence for TISS Services<br><br>Westat, 1991 (Implied) | G9.10.03 The services provided or coordinated for the person transitioning to independence include life skills training, human sexuality education, vocational/technical training, housing during transition and after discharge, legal services, support services and social/cultural/religious and recreational activities. | Rule 6270 outlines life skills training topics but does not specifically address methods of assessing skill mastery. | 6330.1-6330.9 Life skills training topics are outlined. While assessment and mastery of skills are not addressed in this section, both appear to be covered in 6341.5 (ITILP planning section) |
| | Life skills training should be offered to youth based on assessed learning/skill need. (The implication here is not all youth need the same training)<br><br>CWLA Standards of Excellence for TISS Services<br><br>National Child Welfare Resource Center for Organizational Improvement—Promising Practices.<br><br>Westat, 1991. | | Rule 6270 outlines life skills training topics but does not specifically address methods of assessing skill mastery. | Section 6341.5 indicates that skills of youth will be assessed and services/training will be offered accordingly. |

**Best Practice/Industry Crosswalk Table – continued**

| PRACTICE DOMAIN | BEST PRACTICE STANDARD | COA STANDARD | RULE 62 | RULE 63 |
|---|---|---|---|---|
| HOUSING | The attainment of safe, stable and affordable housing for transitioning youth should be a condition of discharge from the agency.<br><br>CWLA Standards of Excellence for TLSS Services<br><br>National Child Welfare Resource Center for Organizational Improvement—Providing Practices.<br><br>Wertat, 1991. | G.9.10.05 During the transition process, and prior to discharge, the organization explores a range of housing options with the person served and engages him/her in an evaluation of the risks and benefits of different living situations and degrees of independence from the organization. | Rule would not be applicable for this BP criterion. | Rule addresses how to maintain current residence via training.  It does not speak to the attainment of housing post discharge. |
| EDUCATION | Each youth in care should have a designated adult who monitors educational progress and advocates for needs. | G9.11.04 The organization provides or arranges, as necessary: tutoring; mentoring; preparation for GED diploma; college preparation; and parent/teacher meetings. | 6261.1 Within 72 hours of admission, the contracting entity and, where applicable, the CSSD shall provide the facility with the information and documentation necessary for the facility to arrange for and ensure that each school-aged resident attends school or an educational program in accordance with applicable laws.<br><br>6261.2 The facility shall encourage residents to participate in community, school, recreational, and cultural activities as appropriate to the resident's age and level of development. | Rule 63 does not specifically address the education component. Education is more likely contained within the ILP case plan but the rules governing the development of the case plan do not address specifically. (6341.5) |

**Best Practice/Industry Crosswalk Table – continued**

| PRACTICE DOMAIN | BEST PRACTICE STANDARD | COA STANDARD | RULE 62 | RULE 63 |
|---|---|---|---|---|
| PROGRAM EVALUATION | The program should track immediate, short and long-term outcomes for youth.<br><br>National Child Welfare Resource Center for Organizational Improvement—Promising Practices.<br>Wesru, 1991. | | 6223.1 Each facility shall cooperate with the licensing agency or contracting entity's monitoring or evaluation efforts and provide or assist in obtaining any information requested to evaluate the facility's operation and services for adequacy, appropriateness, effectiveness, cost-effectiveness, and quality or programs. | 6317.1 An independent living program shall cooperate with monitoring and evaluation efforts undertaken by CFSA or the contracting entity, including by providing or assisting in obtaining any information requested to evaluate the adequacy appropriateness, effectiveness, cost-effectiveness, and quality of the program's operation and services. |

## Summary of ILP Crosswalk and Site Visit Observations

Researchers have consistently shown that youth leaving foster care face severe challenges in their efforts to function "independently" of the child welfare system.   Youth leaving care experience poorer outcomes in regards to health, education, employment, and housing, when compared to their counterparts in the general population.   While research on programmatic effectiveness is scant, current practice wisdom embodied in industry standards for independent living programs suggests that service providers need to structure programs in ways that, at a minimum, ensure that: (1) the planning process is collaborative and driven by individualized assessment of youth competence; (2) services are tailored to meet individualized needs of youth; (3) youth have strong connections with the community and that there is community involvement in the youth development process (provision of services); (4) continuity and collaboration in the service delivery process; (5) aftercare planning begins at intake and involves the active participation of a team of adults committed to the youth's success; and (6) life skills training is clearly defined and provides practice opportunities that gauge competency.

In addition, the literature review points to additional "critical" needs of this population that should be supported by ILP programming.  These "critical" need areas include education and employment.  This section provides a summary of observations from the ILP industry standards/CFSA rule crosswalk and general impressions from the site visit conducted in April 2006.

### Collaborative Planning Process Driven by Individualized Youth Assessments

As highlighted in the ILP crosswalk table, current industry standards suggest that planning for youth should be driven by an assessment of the youth's strengths and needs and that it should be collaborative, involving all parties responsible for the youth's development. CFSA Rule 62 and 63 contain provisions for collaborative planning and assessment.  However, the rule does not stipulate which agency, CFSA or provider, is responsible for coordinating this important component.  CFSA rule does not prescribe a standardized assessment tool for use among all contract providers.  Agencies are free to develop their own assessment tools and protocols.  A standardized tool would be beneficial in several ways.  First, it will help ensure that contract providers are assessing the same, relevant areas.  Second, a standardized tool such as the Ansell-Casey or Daniel Memorial Assessment requires active youth involvement in the assessment process.   Lastly, the use of a standardized tool can yield data that can inform future programmatic decision-making.

While Rules 62 and 63 address collaboration and individualized assessments of youth, the review of case files yielded little evidence that coordination between CFSA, contract providers and any other members of the planning team occurs on a consistent basis.

### Tailor Services to Meet Individualized Needs of Youth

According to both Rule 62 and 63 the development of the ITILP and ISP is to be based on the youth's strengths and needs that are assessed at different points while youth are in care.  This is consistent with best practice and industry standards.  However, while the assessments and recommendations may address individual needs, the services offered to youth may not. From the

file review, it appeared as if the services offered were of a one-size-fits-all caliber. For example, a review of three files for youth attending college prescribed services that were more appropriate for youth just entering independent living. There were no services that addressed the specific needs of youth attending college (e.g. developing study habits, time management, etc.)

## Fostering Connections with the Community and Community Involvement in the Youth Development Process

The CWLA Standards suggest that the larger community play a role in the development of youth. Examples of this kind of community involvement include partnerships with community organizations to provide mentoring, employment internships, social gatherings, etc. According to researchers and best practice wisdom, these types of connections provide additional supports for youth that can be accessed post-emancipation.

CFSA Rules require agencies to "establish positive relationships with members of the community" and to develop a local advisory committee that report on programmatic areas of the provider. Neither rule emphasizes community involvement to the extent that would be needed for meaningful input into the youth development process.

### Continuity and Collaboration in the Service Delivery Process

The CWLA Standards of Excellence for TISS Services and COA Standards address service continuity and coordination. The need for consistency in the planning, implementation and monitoring of services for transitioning youth is critical if positive outcomes are to be achieved for this at-risk population. Surprisingly, these two aspects of the service delivery process are either weakly implied or not evident in CFSA rule or procedure. Rules 62 and 63 could be strengthened to prescribe the activities that both CFSA and the contract providers should engage in.

The file reviews of the three agencies revealed two barriers that impeded service continuity and collaboration: (1) youth moving to different ILP providers and (2) the lack of communication between CFSA and private agency providers.

### *1. Youth moving to different programs:*

During the case file review, the team saw evidence of youth who had moved to different ILP providers within the District's system. While it was difficult to determine what impact the moves had on the youth, what is known from mounds of research is this: youth need stability. Data on the number of placement moves in the District's system was not available for this review. It can provide critical insights as to the degree to which this is a problem and the factors contributing to the frequency of moves. An examination of this data may also spotlight appropriateness of placement into an ILP.

### *2. Lack of communication between CFSA and contacting agency:*

When youth do move from one agency to another, communication between CFSA, the "old" agency and the receiving agency becomes even more critical. In general, reviewers saw little

evidence of regular communication between CFSA and the contracting agency. For youth who had experienced a disruption in their ILP placement, reviewers were unable to determine: (1) what contributed to the youth changing placements; (2) whether a planning conference between CFSA, the "old" agency and the receiving agency occurred; (3) what progress the youth had made towards goals in the former placement; (4) whether new issues requiring attention had surfaced and the plan for addressing those issues; and (5) how the new agency will support important life connections of the youth (school, work, family ties, etc.). As the entity with "legal" responsibility for youth, there was little evidence from the file review that suggested that CFSA took an active role in planning and coordinating services for transitioning youth.

**Aftercare Planning**

Planning for when youth leave the formal foster care system should be a coordinated and comprehensive series of events and activities that have prepared the youth to function in society. CWLA and Casey both agree that at a minimum, aftercare planning should: occur over a period of years (not just six months prior to the youth's discharge date); involve ongoing assessment to gauge youth competence in core areas; include the development of formal safety nets/networks consisting of adults committed to the youth's success; and ensure that the young person has a viable housing plan upon discharge. CFSA Rules 62 and 63 address *discharge planning* and call for the following:

> - Involvement of the planning team in the discharge process
> - Supports and resources to be supplied the resident
> - Recommendations for aftercare and the entity responsible for aftercare (if the youth will be 21)
> - Initiation of the planning process sufficiently in advance of the discharge

While many aftercare planning activities may be subsumed in the ITILP or ISP development process, CFSA rules governing ILPs and group homes are silent on this most important process.

CFSA does use a document called the Transition Plan that guides the discharge planning process for youth set to emancipate from care. However, transition plans were not found consistently in the files of private agencies. The lack of transition plans and other documents in files points again to the need to strengthen communication between CFSA and its provider agencies.

**Life Skills Training**

Provider agencies are required to offer independent living skills training to youth. Transitioning youth also receive training through the Center for Keys for Life. CFSA Rules 62 and 63 stipulate the topical areas that are to be present in curricula. At present, CFSA does not require providers to use a standardized training curriculum. Agencies are free to develop their own training materials. CFSA has no way to determine whether the training content is appropriate. Casey has developed a competency-based training curriculum that has been rigorously field tested. CFSA could explore adopting either the Casey training model or another competency-based curriculum that can be used among provider agencies.

## Education

Programs at a minimum should include educational supports (tutoring, GED preparation, college preparation or other skills/vocational training) that help youth to achieve educational goals. The level of education is strongly associated with self-sustainability and therefore should be an integral part of ILP programming. Ideally, every youth leaving care should leave with a minimum of a GED or vocational training that can increase their potential employability in the real world.

Beyond ensuring that youth are enrolled in school, CFSA does not require ILP contracting agencies to provide educational support to foster youth in ILP programs. Coordination, implementation and monitoring of educational services/programs for youth are not addressed in CFSA's rules. It may be that these areas receive attention during the ISP or ITILP planning process but the rule does not stipulate expectations of service providers with respect to education.

## Employment

Employment is another element strongly associated with youth sustainability post emancipation and is inextricably linked to education. The review of literature suggests however, that even with a GED, youth leaving care will struggle finding employment that pays a living wage and health insurance.

Several research findings highlight the extent to which youth are behind the eight ball with regards to obtaining and maintaining employment that pays a living wage. ILP programs with an employment component that builds partnerships with local businesses and other corporations to provide youth with vocational training, internships, other skills training, and most importantly, mentors who can provide the all important network that youth will need post emancipation may positively impact outcomes for this population. Again, CFSA rules are silent on the employment issue.

# References

Anchorage Independent Living Youth Task Force (2001). Anchorage Youth Independent Living Strategic Plan.

Barth, R.P. 1990. On their own: The experiences of youth after foster care. *Child and Adolescent Social Work, v7, (5) 419-441.*

Blome, W.W. (1997). What happens to foster kids: Educational experience of a random sample of foster youth and a matched group of non-foster youth. *Child and Adolescent Social Work Journal, 14,-41-53.*

Child Welfare League of America (2004). Standards of Excellence for Transition, Independence, and Self Sufficiency Services.

Council on Accreditation for Children and Family Services. Standards and Self-Study Manual. 7th edition: version 1.0.

Courtney, M., TerraoTerao, S., & Bost, N. (2004). Midwest Evaluation of the Adult Functioning of Former Foster Youth: Conditions of Youth Preparing to Leave State Care. Chapin Hall Center for Children.

George, R., Bilaver, L., Lee, B.J. (2002). Employment outcomes for youth aging out of foster care: Final report. University of Chicago—Chapin Hall Center for Children.

Government Accountability Office (1999). Effectiveness of independent living services unknown.

Government Accountability Office (2004). HHS actions could improve coordination and monitoring of states' independent living programs.

Kessler, M. (2204). The Transition Years: Serving Current and Former Foster Youth Aged Eighteen to Twenty One.

Lohman, L.A., & Siegel, G. (2000). An Evaluation of Independent Living Services in Ohio: Digest of Findings and Conclusions. *(A report of the Institute of applied Research, St. Louis, MO).*

Massachusetts Society for the Prevention of Cruelty to Children (2005). 18 and out: life after foster care in Massachusetts.

Mech, E.V. (1988a). Preparing foster adolescents for self support: A new challenge for child welfare services. *Child Welfare, 67, 487-495.*

Mech, E.V. (1994). Preparing foster youth for adulthood: A knowledge-building perspective. *Children and Youth Services Review, 16, 141-146.*

National Child Welfare Resource Center for Organizational Improvement. Promising Practices: Supporting transition of youth served by the foster care system.

Office of Children's Administration Research (2004). Foster Youth Transition to Independence Study Final Report: Seattle, Washington.

Pecora, P., Williams, J., Kessler, R., Downs, C., O'Brien, K., Hiripi, E., Morello, S. (2003). *Assessing the Effects of Foster Care: Early Results From the National Casey Alumni Study.*

Scannapieco, M., Schagrin, J., Scannapieco, T. (1995). Independent living programs: Do they make a difference? *Child and Adolescent Social Work Journal 12:381-389.*

Westat Inc. (1990). A national evaluation of Title IV-E foster care independent living programs for youth Phase1 final report. Washington, D.C.

Westat Inc. (1991). A national evaluation of Title IV-E foster care independent living programs for youth Phase 2 final report. Washington, D.C.



# APPENDIX B


# INTERVIEW
# &
# FOCUS GROUP QUESTIONS

| CFSA Interview/Focus Group Questions | | |
|---|---|---|
| **Manager of Contract Monitors** | **Contract Monitors** | **Youth Development Workers** |
| Describe process of contract monitoring and what they are expected to know about an agency to do their job.<br><br>1. What is the functional role of the administrator and two supervisors?<br>2. How do they monitor the activities of their staff?<br>3. Review tool for record review that monitors use. How do they like it? How reliable is it? How useful is it? What do staff think of it? Strengths and needs of their staff<br>4. Strengths and needs of their staff<br>5. How do they ensure consistency among all providers? And among staff?<br>6. How do they like the tool?<br>7. Consistency in evaluating can be difficult; do you see this as a problem? If so can you elaborate?<br>8. How do you share information that pertains to the same program with other people responsible for the agency?<br>9. Nepotism issue. Relative supervising a relative? Is this an issue?<br>10. Strengths and Weakness of the four agencies? What are they?<br>11. Based on your knowledge of all of the agencies what do you believe are the most serious safety issues for all agencies and the four under evaluation?<br>12. What are the high-risk behaviors of the kids you serve in your program?<br>13. What are the expectations around monitoring of action plan? What happens if they do not implement? | 1. What are the strengths and weaknesses of the ILP programs?<br><br>2. What is your role in ensuring that youth placed in the facility are prepared for independence?<br><br>3. What problems prevent youth from being prepared to leave?<br><br>4. How useful is this program in preparing youth for independence?<br><br>5. Are the agencies complying with the no reject, no eject policy?<br><br>6. How do they receive information about problems with the provider? How do problems surface?<br><br>7. What are the activities you conduct to monitor during the course of a year? Talking with kids, reading records, meeting with administration, attending community meetings.<br><br>8. What do they do when an agency does not cooperate?<br><br>9. How do the monitoring staff and licensing staff work together? How often do they meet? | 1. What is your role with the private agency?<br>2. What do they know about the kids that disrupt? What are they expected to know?<br>3. What do they see as the kid's most pressing needs? What would they identifying as the things that are hard for the kids to meet and those things the kids do well on?<br>4. What are their caseload numbers?<br>5. How frequently do they visit their kids and do they see them individually?<br>6. How is the decision made to send a child into an ILP?<br>7. What do they think it takes for a child to be prepared for independence?<br>8. Do they monitor the ILP plan that is required of the facility? If so how do they do it? Are they a part of it?<br>9. How do they document each child has a bank account?<br>10. How far below the poverty line are the kids who leave the program?<br>11. Why do kids disrupt out of ILP programs? Why are the kids running away? What is done to deal with this issue?<br>12. Who ultimately makes decisions about which kids go where?<br>13. How do licensing, contract monitors and office of youth development make sure everyone is on the same page? |

| CFSA Interview/Focus Group Questions (continued) | | |
|---|---|---|
| **Manager of Contract Monitors** | **Contract Monitors** | **Youth Development Workers** |
| 14. Why do kids leave? <br> 15. Why do records show NO REASON with discharge of kids? <br> 16. Any satisfaction survey's? <br> 17. Youth stipends.  How do you monitor and protect? <br> 18. Role of the board of directors? <br> 19. How well do all of the CFSA units work together to monitor these programs?  What could be improved? <br> 20. How do you ensure the quality of apartments? Are there landlord issues that have developed? | | • |



# APPENDIX C

# FACILITY CHECKLIST

Child Welfare Associates, LLC

## FACILITY PHYSICAL PLANT CHECKLIST
## SHELTERS, EMERGENCY CARE, GROUP HOMES

Facility Name: _____

Addr: _____

Facility Type: _____

## BUILDING, GROUNDS AND EQUIPMENT

Facility is in compliance with all local and federal laws, including but not limited to laws relating to construction, electrical and lead paint standards

Yes _____ No _____ Comment _____

Facility maintains all grounds, structures and equipment free from any hazard to the staff or residents' health or safety

Yes _____ No _____ Comment _____

Facility has railings on all stairways containing more than four steps that are accessible to residents

Yes _____ No _____ Comment _____

Facility has a gate on all stairways accessible to residents aged three (3) and under

Yes _____ No _____ Comment _____

Facility has locks on all door to any room or storage area in which a resident could be locked are of the type which permit the door to be unlocked from either side of the door

Yes _____ No _____ Comment _____

Facility has doors on toilet stalls and bathtub or shower stalls which permit the door to be unlatched from either side of the door unless the stall is of such construction as to permit emergency access by climbing over or crawling under the partitions

Yes _____ No _____ Comment _____

Facility maintains all exits and exit accesses and exit discharge areas free from obstructions or impediments and clearly marked to facilitate ingress and egress

Yes _____ No _____ Comment _____

Facility assures that all areas accessible to residents age three (3) and under shall be child-proofed appropriately, including but not limited to covering electrical outlets, latching or locking cabinets, protecting sharp corners and keeping poisonous plants, cosmetics, appliances and small items that could be swallowed outside a resident's reach

Yes _____ No _____ Comment _____

Facility maintains screens in good repair for all windows

Yes _____ No _____ Comment _____

Facility providing care for residents with disabilities shall accommodate the needs of residents with disabilities to the extent that is otherwise required by Section 504 of the Rehabilitation Act of 1973. Pub. L. 93 -112, 29 U.S.C. – 794, and the Americans with Disabilities Act, Pub. L. 101-336, 42 U. S. C. – 12101, et seq.

Yes _____ No _____ Comment _____

## FIRE AND CARBON MONOXIDE PROTECTION AND PREVENTION

Facility has an approved fire inspection prior to the effective date of licensure

Yes _____ No _____ Date of Inspection _____

Facility has posted throughout the building a fire safety and evacuation plan which is approved by the Department of Fire and Emergency Medical Services and readily available to staff and residents at all times

Yes _____ No _____ Comments _____

Facility conducts a minimum of one (1) fire drill each month and maintains a record of each drill

Yes _____ No _____
Date & Time of Drills _____

Facility conducts a minimum of one (1) fire extinguisher and one (1) smoke detector inspection each month and maintains a record

Yes _____ No _____
Date & Time of Inspections _____

Facility maintains at least one (1) working smoke detector on each floor and at least one (1) additional smoke detector for each separate sleeping area not connected by a common hallway

Yes _____ No _____ Working Condition: Yes __ No __

Child Welfare Associates, LLC

82

Facility maintains a working fire extinguisher, subject to annual inspection, for each cooking area and wing of the facility, and all areas used for electrical, gas, or other heating equipment
Yes _____ No _____ Date of Inspection _____

Facility has at least one (1) working carbon monoxide detector on each floor and at least one (1) additional carbon monoxide detector for each sleeping area not connected by a common hallway.
Yes _____ No _____ Working Condition: Yes __ No __

## SANITATION

Facility and its grounds are maintained in a sanitary, comfortable and safe condition free from rodent and insect infestation, and in accordance with applicable law.
Yes _____ No _____ Comment _____

Facility keeps trash in kitchens and bathroom in covered receptacles that prevent the penetration of insects and rodents
Yes _____ No _____ Comment _____

Facility keeps trash outside the facility in secure, non-combustible, covered receptacles that prevents the penetration of insects and rodents. Trash is removed at least once a week
Yes _____ No _____ Comment _____

Facility stores cleaning equipment, cleaning agents, aerosol cans, or other chemical substances in the original or other clearly labeled containers, in a place which is inaccessible to residents
Yes _____ No _____ Comment _____

## REPAIRS AND MAINTENANCE

Facility has records of routine maintenance and cleaning in all areas
Yes _____ No _____ Comment _____

Facility replaces or repairs broken, run-down or defective furnishing, carpeting and equipment.
Yes _____ No _____ Comment _____

Facility repairs outside doors, windows, and other feature of the structure necessary for security within twenty-four (24) hours.
Yes _____ No _____ Comment

Child Welfare Associates, LLC

## BATHROOMS

Facility provides bathrooms with a minimum of one (1) sink with hot and cold water, one (1) flush toilet, and (1) bath or shower with hot and cold water for every 6 residents.

Yes _____ No _____ Comment _____

Facility maintains bathing and toilet facilities in good repair and in clean condition in accordance with applicable laws

Yes _____ No _____ Comment _____

Facility ensures potty-chairs shall not be located in areas used for food preparation or serving

Yes _____ No _____ Comment _____

Facility disinfects toilets at least once daily or more often as needed using an appropriate germicidal agent

Yes _____ No _____ Comment _____

Facility provides privacy by partitions or doors for toilets, showers and bathtubs, unless there is a clinical justification for their removal

Yes _____ No _____ Comment _____

Facility ensures bathrooms are situated so as to allow direct access to them without the necessity of passing through a bedroom, except when a bedroom has an attached bathroom used only for the residents who reside in that bedroom\

Yes _____ No_____ Comment _____

Facility has bathtubs and showers with nonskid surfaces

Yes _____ No _____ Comment _____

## BEDROOMS

Facility ensures that no more than (4) four residents may occupy a single bedroom without prior approval from the District of Columbia of Consumer and Regulatory Affairs and the licensing agency

Yes _____ No _____ Comment _____

Facility ensures residents four (4) years of age and over sharing a bedroom are of the same sex

Yes _____ No _____ Comment _____

Facility provides bedrooms with
(a) Direct outside ventilation
Yes _____ No _____ Comment _____
(b) At least (1) one operable window with a source of natural light
Yes _____ No _____ Comment _____
(c) A mechanical light
Yes _____ No _____ Comment _____
(d) At least (70) square feet of space for a single bedroom and (50) square feet per person in bedrooms for two (2) or more residents
Yes _____ No _____ Comment _____
(e) Appropriate individual furniture, and an individual closet or a designated section of a closet with clothes racks and shelves in or near the bedroom
Yes _____ No _____ Comment _____
(f) A separate bed or crib of sufficient size to accommodate each individual resident comfortable        Yes _____ No _____ Comment _____

Facility ensures each bed or crib shall have a clean, comfortable, non-toxic and fire retardant mattress that complies with all applicable federal and local laws and regulations
Yes _____ No _____ Comment _____

Facility ensures each bed shall be at least three (3) feet from any other beds and any unprotected radiator        Yes _____ No _____ Comment _____

Facility provides adequate separate bedroom space for those staff that lives at the facility
Yes _____ No _____ Comment _____

Facility ensures that bunk beds allow enough space in between each bed and the ceiling to allow a resident to sit up in bed and are equipped with safety rails on the top bunk and securely attached ladders capable of supporting an adult
Yes _____ No _____ Comment _____

## NUTRITION

Facility maintains copies of menus for thirty (30) calendar days and records of food purchased for ninety (90) calendar days
Yes _____ No _____ Comment _____

Facility provides each resident at least (3) three regularly-scheduled meals per day and snacks that meet the National Research Council's recommended dietary allowance
Yes _____ No _____ Comment _____

**KITCHEN**

Facility provides all necessary equipment for the preparation, storage, and service and clean up of all meals for all of the residents and staff regularly served by the facility

Yes __•__ No _____ Comment _____

Facility stores, prepares, serves and transport food, in a manner ensuring protection from contamination

Yes_____ No _____ Comment _____

**NON-MEDICAL EMERGENCY PLAN**

Facility shall develop and follow a plan for meeting potential emergencies, such as fire, power outage, sever weather conditions and staff problems including individual staff person's duties, systems for notification of appropriate persons and specification of evacuation routes and procedures, with clearly marked diagrams

Yes _____ No _____ Comment _____

**TOXIC AND POISONOUS SUBSTANCES**

Facility shall maintain onsite only those poisonous, toxic or flammable substances which are required to maintain the facility and store all such substances in accordance with the manufacturer's instructions in locked storage areas.

Yes _____ No _____ Comment_____

Facility shall label all containers containing toxic or poisonous substances with descriptive information, including the contents and antidote

Yes _____ No _____ Comment _____

# APPENDIX D

## CASE RECORD
## REVIEW TOOL

## &

## RELATED
## CASE SPECIFIC YOUTH
## INTERVIEW QUESTIONS

**Youth Interviewed**
☐ Y ☐ N

| ILP REVIEW PROTOCOL – FACE SHEET |
|---|

| IDENTIFYING CASE INFORMATION |
|---|

| YOUTH'S NAME: | | D.O.B. | ___ / ___ / ___ | SEX: | ☐ F   ☐ M |
|---|---|---|---|---|---|

| **REASON FOR CASE OPENING:** | ☐ Abuse   ☐ Neglect   ☐ Dependency   ☐ Delinquency ☐ Other | | **LEGAL STATUS:** | |
|---|---|---|---|---|
| **DATE OF CASE OPENING:** | ___ / ___ / ___ | **PERMANENCY GOAL:** | **DATE OF GOAL:** | ___ / ___ / ___ |

| RACE: | ☐ African American   ☐ Caucasian   ☐ Latino   ☐ Asian   ☐ Native American   ☐ Multi-Racial   ☐ Other |
|---|---|

| **AGENCY:** | | **LIVING ARRANGEMENT CODE:** | **FACILITY LOCATION:** | |
|---|---|---|---|---|
| **AGENCY CASEWORKER:** | | **CFSA CASEWORKER:** | | |

| REVIEWER INFORMATION |
|---|

| **REVIEWER NAME:** | | **DATE OF REVIEW:** | ___ / ___ / ___ |
|---|---|---|---|

## SECTION I.  ADMISSION AND INTAKE

**Comments**
*(Comments needed for all "N" responses)*

**1.   Is there evidence upon the youth's admission into the program
of the following information?**

| | | |
|---|---|---|
| a. | Basic Identifying/Demographic Case Information? | Y ____ N ____ |
| b. | Previous placement history? | Y ____ N ____ |
| c. | Family history? | Y ____ N ____ |
| d. | Current medical screen? | Y ____ N ____ |
| e. | Physical health history? | Y ____ N ____ |
| f. | Mental health history? | Y ____ N ____ |
| g. | Educational/Vocational history? | Y ____ N ____ |
| h. | Initial clothing inventory? | Y ____ N ____ |
| i. | Current case plan? | Y ____ N ____ |
| j. | Resident's acknowledgment of rights and grievance procedures? | Y ____ N ____ |

**Comments**
*(Comments needed for " N" response)*

**2.   Is there evidence that the above information was obtained
within 5 days of the youth's placement into the program?**        Y ____ N ____

## SECTION II - CASE PLANNING
### Meeting Timelines

| | | Comments – Section II |
|---|---|---|
| | | *(Comments needed for all "N" responses)* |

3. Is there evidence that an Initial ITILP was developed within 5 days of youth's admission into the program?    Y _____ N _____

4. Is there evidence that a subsequent ITILP was developed within 30 days of youth's admission into the program?    Y _____ N _____

5. Is there evidence of on-going ITILP's being developed at minimum every 6 months?    Y _____ N _____

5.a. Is there a current (i.e. not more than 6 months old) ITILP in the case file?    Y _____ N _____    •

## SECTION III - CASE PLANNING
### Content and Quality

| 6. Does the ITILP include the following information? | Initial (5 Day) ITILP | 30 Day ITILP | Current ITILP |
|---|---|---|---|
| a. Current youth and family social information? | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ |
| b. A list of assessments given, including recommendations and outcomes? | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ |
| c. An evaluation of the youth's current skill levels? | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ |
| d. Goal ratings and documentation of any concerns re: goal achievement? | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ |
| e. Actions needed in order to insure goal achievement? | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ |
| f. Projected timeframes for the achievement of goals? | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ |
| g. Identification of persons responsible and resources needed to achieve goals? | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ |
| h. Proposed family involvement including visitation and communication plan? | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ |

| SECTION III - CASE PLANNING | | |
|---|---|---|
| *Content and Quality - Continued* | | |
| **6. Does the ITILP include the following information?** (continued) | **Initial (5 Day) ITILP** | **30 Day ITILP** | **Current ITILP** |
| i.   Describe discharge, transfer, or aftercare planning? | Y ____ N ____ NA ____ | Y ____ N ____ NA ____ | Y ____ N ____ NA ____ |
| j.   Describe criteria used to evaluate goal achievement? | Y ____ N ____ NA ____ | Y ____ N ____ NA ____ | Y ____ N ____ NA ____ |
| k.   Ensures consistency between plan and court orders? | Y ____ N ____ NA ____ | Y ____ N ____ NA ____ | Y ____ N ____ NA ____ |
| l.   Signatures by each participant in the plan's development? | Y ____ N ____ NA ____ | Y ____ N ____ NA ____ | Y ____ N ____ NA ____ |

**Comments – Section III**

*(Comments needed for all "N" or NA" responses)*

| SECTION IV - CASE PLANNING | | | |
|---|---|---|---|
| Engagement | Initial (5 Day) ITILP | 30 Day ITILP | Current ITILP |
| 7. Is there evidence that the ITILP was developed by members of the planning team? | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ |
| 8. Is there documentation of agency efforts to engage all members of the planning team in the development of the ITILP? | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ |
| 9. Is there evidence that the youth participated in the development of his/her ITILP? | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ |
| 10. Is there evidence that youth's parents were encouraged to participate in case planning? | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ | Y ___ N ___ NA ___ |

**Comments – Section IV**
*(Comments needed for all "N" or NA" responses)*

## SECTION V – SERVICE PROVISION
### *PHYSICAL HEALTH CARE*

|  |  | **Comments** |
|---|---|---|
|  |  | *(Comments needed for all "N" or NA" responses)* |

**11. Is there evidence that the youth received a comprehensive medical examination within 72 hours of admission or no less than 30 days prior to admission into the program?**     Y \_\_\_\_ N \_\_\_\_

**12. Have the youth's basic physical health needs been met through?**

    a.  Use of the D.C. KIDS program?     Y \_\_\_\_ N \_\_\_\_ NA \_\_\_\_

    b.  Routine medical examinations?     Y \_\_\_\_ N \_\_\_\_ NA \_\_\_\_

    c.  Routine dental examinations?     Y \_\_\_\_ N \_\_\_\_ NA \_\_\_\_

    d.  Vision screening/care?     Y \_\_\_\_ N \_\_\_\_ NA \_\_\_\_

    e.  Current immunizations?     Y \_\_\_\_ N \_\_\_\_ NA \_\_\_\_

**13. If youth physical health needs were identified, were all needed services arranged/provided? *(If no, comment)***     Y \_\_\_\_ N \_\_\_\_ NA \_\_\_\_

**14. Have the youth's identified physical health needs been met through?**

    a.  Provision of prosthetic or corrective devices?     Y \_\_\_\_ N \_\_\_\_ NA \_\_\_\_

    b.  Administration of medication?     Y \_\_\_\_ N \_\_\_\_ NA \_\_\_\_

    c.  Provision of testing/treatment for sexually transmitted diseases?     Y \_\_\_\_ N \_\_\_\_ NA \_\_\_\_

    d.  Other: _____     Y \_\_\_\_ N \_\_\_\_ NA \_\_\_\_

| SECTION V – SERVICE PROVISION | |
|---|---|
| *PHYSICAL HEALTH CARE (CONTINUED)* | |
| Additional Review Elements for Female Teen Parents Only (continued from question 14 above): | **Comments** *(Comments needed for all "N" or NA" responses)* |

    e.   Pre-Natal Care ?        Y \_\_\_ N \_\_\_ NA \_\_\_

    f.   Post-Natal Care?        Y \_\_\_ N \_\_\_ NA \_\_\_

    g.   Infant/Child Health Care?        Y \_\_\_ N \_\_\_ NA \_\_\_

**15. Is there evidence of the inclusion of physical health records in the case record?**    Y \_\_\_ N \_\_\_

**16. Is there evidence of the provision of health records and ongoing communication between CFSA and agency staff?**    Y \_\_\_ N \_\_\_

**17. If current health needs are identified, are the needs incorporated into the current ITILP?**    Y \_\_\_ N \_\_\_ NA \_\_\_

| SECTION VI – SERVICE PROVISION | |
|---|---|
| *HEALTH EDUCATION* | |
| **18. Have the following health education services been provided?** | **Comments** *(Comments needed for all "N" or NA" responses)* |

    a.   General health and health management?        Y \_\_\_ N \_\_\_ NA \_\_\_

    b.   First Aid?        Y \_\_\_ N \_\_\_ NA \_\_\_

    c.   Reproductive health?        Y \_\_\_ N \_\_\_ NA \_\_\_

    d.   Sexual relations?        Y \_\_\_ N \_\_\_ NA \_\_\_

    e.   HIV/AIDs/STD awareness?        Y \_\_\_ N \_\_\_ NA \_\_\_

| SECTION VI – SERVICE PROVISION HEALTH EDUCATION (CONTINUED) | Comments *(Comments needed for all "N" or NA" responses)* |
|---|---|
| **18. Have the following health education services been provided?** (continued)<br><br>f.   Pregnancy prevention/contraception?   Y ____ N ____ NA ____<br><br>**Additional Review Elements for Teen Parents Only (continued from question 18 above):**<br><br>g.   Early childhood development?   Y ____ N ____ NA ____<br><br>h.   Medical issues in early childhood?   Y ____ N ____ NA ____<br><br>i.   Discipline?   Y ____ N ____ NA ____<br><br>j.   Choosing and monitoring child care providers?   Y ____ N ____ NA ____<br><br>k.   Family planning?   Y ____ N ____ NA ____<br><br>l.   Parental rights and responsibilities (e.g. child support)   Y ____ N ____ NA ____<br><br>**Additional Review Elements for Gay, Lesbian, Bi-sexual, and Transgender (GLBT) Youth (continued from question 18 above):**<br><br>m.   Provision of/or linkage to education and support services tailored to GLBT youth?   Y ____ N ____ NA ____<br><br>**19. If health education needs are identified, are the needs incorporated into the current ITILP and are the youth's and agency's responsibilities delineated?**   Y ____ N ____ NA ____ | |

## SECTION VII – SERVICE PROVISION

## MENTAL HEALTH AND DEVELOPMENTAL DISABILITIES

| | | **Comments**<br>*(Comments needed for all "N" or NA" responses)* |
|---|---|---|
| **20. Is there evidence that the youth received a mental health screen within 3 days of admission or no more than 3 days prior to admission?** | Y ____ N ____ | |
| **21. Was a diagnostic mental health assessment completed by a licensed practitioner within 15 days of admission?** | Y ____ N ____ NA ____ | |
| **22. Is the youth's emotional/mental health assessed on an ongoing basis?** | Y ____ N ____ | |
| **23. Does the youth have current emotional/mental needs requiring intervention?** | Y ____ N ____ | |

| **24. Does the youth have any of the following current emotional/mental health needs requiring intervention?** | *Identified Needs* | *Receiving Services* | *Comments*<br>*(Comments needed for all "N" or NA" responses)* |
|---|---|---|---|
| a.  Substance Abuse? | Y ____ N ____ | Y ____ N ____ NA ____ | |
| b.  Defiant/Oppositional Behavior? | Y ____ N ____ | Y ____ N ____ NA ____ | |
| c.  Developmental Disability? | Y ____ N ____ | Y ____ N ____ NA ____ | |
| d.  Serious Persistent Mental Illness?<br>(Identify): _____ | Y ____ N ____ | Y ____ N ____ NA ____ | |
| e.  Domestic Violence? | Y ____ N ____ | Y ____ N ____ NA ____ | |
| f.  Criminality? | Y ____ N ____ | Y ____ N ____ NA ____ | |
| g.  Post Traumatic Stress Disorder? | Y ____ N ____ | Y ____ N ____ NA ____ | |
| h.  ADD/ADHD? | Y ____ N ____ | Y ____ N ____ NA ____ | |
| i.  Medication Management | Y ____ N ____ | Y ____ N ____ NA ____ | |
| j.  Other (Identify): _____ | Y ____ N ____ | Y ____ N ____ NA ____ | |

Child Welfare Associates, LLC

96

## SECTION VII – SERVICE PROVISION
## MENTAL HEALTH AND DEVELOPMENTAL DISABILITIES (CONTINUED)

| | | **Comments** *(Comments needed for all "N" or NA" responses)* |
|---|---|---|
| **25.** Is the youth registered with the D.C. Department of Mental Health (DC-DMH) and a Core Service Agency? | Y ____ N ____ NA ____ | |
| **26.** Does the case record contain documentation from the prescriber of the necessity for any medication? | Y ____ N ____ NA ____ | |
| **27.** Does the youth and staff attend all Multi-Agency Planning Team (MAPT) meetings? | Y ____ N ____ NA ____ | |
| **28.** Are the clinical/therapeutic service provided to or linked to for the youth, consistent with the Individual Health Plan (IHP), Individual Treatment Plan (ITP) or ITILP? | Y ____ N ____ NA ____ | |
| **29.** Are identified mental health needs incorporated into the current ITILP, and are the youth's and agency's responsibilities clearly delineated? | Y ____ N ____ NA ____ | |

## SECTION VIII – SERVICE PROVISION
## EDUCATION/VOCATIONAL/EMPLOYMENT
## SERVICES TO IN-SCHOOL YOUTH

| | | **Comments** *(Comments needed for all "N" or NA" responses)* |
|---|---|---|
| **30.** Is the youth enrolled in? | | |
| a.   Secondary school? | Y ____ N ____ NA ____ | |
| b.   College? | Y ____ N ____ NA ____ | |
| c.   GED Program? | Y ____ N ____ NA ____ | |

## SECTION VIII – SERVICE PROVISION
## EDUCATION/VOCATION/EMPLOYMENT (CONTINUED)
### SERVICES TO IN-SCHOOL YOUTH

| | | Comments<br>*(Comments needed for all "N" or NA" responses)* |
|---|---|---|
| 31. Is the youth attending school as required? | Y \_\_\_\_ N \_\_\_\_ NA \_\_\_\_ | |
| 32. If the youth is not attending as required, is there evidence the agency has developed an intervention (e.g. mentor, educational, re-assessment, transportation, etc.) that addresses the youth's needs? | Y \_\_\_\_ N \_\_\_\_ NA \_\_\_\_ | |
| 33. Is the youth in a Special Education program? | Y \_\_\_\_ N \_\_\_\_ NA \_\_\_\_ | |
| 34. Does the youth have a current Individual Education Program (IEP)? | Y \_\_\_\_ N \_\_\_\_ NA \_\_\_\_ | |
| 35. Are all services identified in the IEP that are the responsibility of the agency being delivered? | Y \_\_\_\_ N \_\_\_\_ NA \_\_\_\_ | |
| 36. Does the youth have educational needs that require additional services/supports? (Identify): _____ | Y \_\_\_\_ N \_\_\_\_ NA \_\_\_\_ | |
| 37. Is there evidence the youth is receiving needed additional services? | Y \_\_\_\_ N \_\_\_\_ NA \_\_\_\_ | |

## SECTION VIII – SERVICE PROVISION
### EDUCATION/VOCATIONAL/EMPLOYMENT (CONTINUED)

#### SERVICES TO IN-SCHOOL YOUTH (Continued)

| | Comments<br>*(Comments needed for all "N" or NA" responses)* |
|---|---|
| 38. Are the youth's educational needs, responsibilities, and services included in the current ITILP?   Y ____ N ____ NA ____ | |
| 39. Is there case record evidence that the agency is supporting the youth's educational goals?   Y ____ N ____ NA ____ | |

#### SERVICES TO YOUTH EMPLOYED AND/OR IN VOCATIONAL PROGRAMS

| | Comments<br>*(Comments needed for all "N" or NA" responses)* |
|---|---|
| 40. Youth is:   ☐ Employed   ☐ In Vocational Program | |
| 41. Is the youth consistent in attending his/her program or job? Y ____ N ____ NA ____ | |
| 42. If the youth is not attending as required, is there evidence the agency has developed a strategy that addresses the youth's absenteeism (e.g. mentors, vocational re-assessment, transportation, etc.)?   Y ____ N ____ NA ____ | • |
| 43. Are the youth's employment and/or vocational responsibilities, needs and services included in the current ITILP?   Y ____ N ____ NA ____ | |
| 44. Is there evidence in the case record that the agency is supporting the youth's employment/vocational goals?   Y ____ N ____ NA ____ | |

#### SERVICES TO UNENROLLED AND UNEMPLOYEED YOUTH

| | Comments<br>*(Comments needed for all "N" or NA" responses)* |
|---|---|
| 45. Does the current ITILP include strategies to address youth's status (e.g. vocational assessment, mentoring, etc.)?   Y ____ N ____ NA ____ | |
| 46. Is there evidence that the agency has made consistent and regular efforts to address the youth's status?   Y ____ N ____ NA ____ | |
| 47. Does the current ITILP address the youth's responsibilities to obtain employment or education?   Y ____ N ____ NA ____ | |

## SECTION IX – SERVICE PROVISION
### LIFE SKILLS
### LIFE SKILLS EDUCATION

| | Comments<br>(Comments needed for all "N" or "NA" responses) |
|---|---|
| **48. Has the youth been referred to the Center for Keys of Life program?**   Y ____ N ____ NA ____ | |
| **49. Has the youth received education in the following areas?** | |
| a.  Money management/consumer awareness   Y ____ N ____ NA ____ | |
| b.  Household management   Y ____ N ____ NA ____ | |
| c.  Meal planning/preparation   Y ____ N ____ NA ____ | |
| d.  Personal care/hygiene   Y ____ N ____ NA ____ | |
| e.  Problem solving   Y ____ N ____ NA ____ | |
| f.  Interpersonal/legal skills   Y ____ N ____ NA ____ | |
| g.  Accessing community resources   Y ____ N ____ NA ____ | |
| h.  Personal/family safety   Y ____ N ____ NA ____ | |
| i.  Employment seeking and maintenance skills   Y ____ N ____ NA ____ | |
| j.  Education/career planning   Y ____ N ____ NA ____ | |
| k.  Seeking, securing and maintaining housing   Y ____ N ____ NA ____ | |
| **50. Does the current ITILP reflect the youth's and agency's responsibilities, needs, and services for life skills education?**   Y ____ N ____ NA ____ | |

| SECTION IX – SERVICE PROVISION | | |
|---|---|---|
| *LIFE SKILLS* | | |
| **LIFE SKILLS – MONITORING AND SUPPORT** | | |
| | | **Comments** *(Comments needed for all "N" or "NA" responses)* |
| 51. Is there evidence of ongoing assessment of the youth's Independent Living skills/needs/abilities? | Y ____ N ____ NA ____ | |
| 52. Are the Independent Living services provided consistent with the youth's social and developmental abilities? | Y ____ N ____ | |
| 53. Is the agency providing support and development of Independent Living services to the youth in the following areas? | | |
| a.  Residence upkeep? | Y ____ N ____ NA ____ | |
| b.  Money management? | Y ____ N ____ NA ____ | |
| c.  Maintenance of adequate food and supplies? | Y ____ N ____ NA ____ | |
| d.  Maintenance of clothing? | Y ____ N ____ NA ____ | |
| e.  Maintenance of personal care/hygiene? | Y ____ N ____ NA ____ | |
| f.  Residence awareness of fire/emergency plans? | Y ____ N ____ NA ____ | |
| g.  Accessing community services? | Y ____ N ____ NA ____ | |
| h.  Accessing public transportation? | Y ____ N ____ NA ____ | |
| i.  Maintenance of bank accounts? | Y ____ N ____ NA ____ | |
| j.  Legal Needs? | Y ____ N ____ NA ____ | |
| k.  Procurement and maintenance of necessary identity documents and history? | Y ____ N ____ NA ____ | |
| 54. Does the current ITILP reflect the youth's and agency's responsibilities, needs and services re: Independent Living skills implementation, monitoring, and support? | Y ____ N ____ | |

## SECTION X – FAMILY AND COMMUNITY TIES

| | | Comments<br>*(Comments needed for all "N" or NA" responses)* |
|---|---|---|
| 55. Does the current ITILP reflect opportunities for family visitation, as appropriate? | Y ____ N ____ NA ____ | |
| 56. Does the youth's family participate, or are they encouraged to participate in the development of the ITILP? | Y ____ N ____ NA ____ | |
| 57. Is the youth provided with opportunities to participate in activities within their community? | Y ____ N ____ | |
| 58. Is the youth provided with community based services, when possible? | Y ____ N ____ NA ____ | |
| 59. Is the youth provided with recreational opportunities? | Y ____ N ____ | |

## SECTION XI – YOUTH'S RIGHTS

| | | Comments<br>*(Comments needed for all "N" or NA" responses)* |
|---|---|---|
| 60. Is the youth provided with services in the language of his/her preference? | Y ____ N ____ | |
| 61. Do the services provided/arranged by the Agency support the ethnic, cultural, and sexual identity of the youth? | Y ____ N ____ | |
| 62. Does the agency handle any inappropriate behavior by the youth in a way that is age-appropriate and demonstrates good social work practice? | Y ____ N ____ NA ____ | |
| 63. Are any fines which the youth has incurred documented in the case file, include the rationale for the fine and are appropriate for the incident/offense? | Y ____ N ____ NA ____ | |

## SECTION XI – YOUTH'S RIGHTS (CONTINUED)

| | | Comments *(Comments needed for all "N" or NA" responses)* |
|---|---|---|
| 64. Is any restriction of the youth's visitation, mail or telephone contact documented in the case file and includes an appropriate justification for the restriction? | Y ____ N ____ NA ____ | |
| 65. Is there evidence that the youth receives a monthly stipend and weekly allowance, as appropriate? | Y ____ N ____ NA ____ | |
| 66. Does the youth's case record contain all necessary consents and are they signed and witnessed, as appropriate? | Y ____ N ____ NA ____ | |
| 67. Is there evidence in the youth's case file that he/she has been fully informed of the reason for consents and services being provided? | Y ____ N ____ NA ____ | |
| 68. Does the case record contain all youth grievances? | Y ____ N ____ NA ____ | |
| 69. Does the case record contain dispositions of all youth grievances? | Y ____ N ____ NA ____ | |
| 70. Do the dispositions of the youth's grievances appear appropriate, given information contained in the case record? | Y ____ N ____ NA ____ | |

## SECTION XII – YOUTH'S SAFETY

| | | Comments *(Comments needed for all "N" or NA" responses)* |
|---|---|---|
| 71. Is there evidence in the case file of on-going assessment of the youth's safety? | Y ____ N ____ | |
| 72. Are UIRs involving the youth contained in the case record? | Y ____ N ____ NA ____ | |
| 73. Are child abuse/neglect reports involving the youth contained in the case record? | Y ____ N ____ NA ____ | |

## SECTION XII – YOUTH'S SAFETY  (CONTINUED)

| | Comments |
|---|---|
| | *(Comments needed for all "N" or NA" responses)* |
| 74. Are dispositions of UIR's documented in the case record?   Y ____ N ____ NA ____ | |
| 75. Are dispositions of child abuse/neglect reports documented in the case record?   Y ____ N ____ NA ____ | |
| 76. Is there evidence that the youth's safety was ensured during the course of and subsequent to disposition?   Y ____ N ____ NA ____ | |
| 77. Does the youth have a history of absconding?   Y ____ N ____ | |
| 78. Does the case record reflect interventions with the youth that address the youth's runaway behavior upon his/her return to the facility?   Y ____ N ____ NA ____ | |
| 79. Does the youth have a history of involvement with law enforcement?   Y ____ N ____ | |
| 80. Is there evidence that services have been provided to the youth to ameliorate any current behaviors that have/may have resulted in law enforcement/justice system involvement?   Y ____ N ____ NA ____ | |

## SECTION XIII – RECORD MAINTENANCE

| | Comments |
|---|---|
| | *(Comments needed for all "N" or NA" responses)* |
| 81. Are case entries made in the case file timely?   Y ____ N ____ | |
| 82. Do case entries provide a rationale for the entry and completely explores and/or reports on the information obtained?   Y ____ N ____ | |

Child Welfare Associates, LLC

## SECTION XIII – RECORD MAINTENANCE (CONTINUED)

| | | Comments |
|---|---|---|
| | | *(Comments needed for all "N" or NA" responses)* |
| 83. Are health records contained in the case record? | Y ____ N ____ NA ____ | |
| 84. Are mental health records, counseling, and/or treatment records contained in the case record? | Y ____ N ____ NA ____ | |
| 85. Are educational/vocational records/reports contained in the case record? | Y ____ N ____ NA ____ | |
| 86. Is there evidence in the case record of a comprehensive Assessment/social history for the youth? | Y ____ N ____ | |
| 87. Is the assessment/social history updated as needs/new events have occurred or information is received suggesting the youth's status has changed (e.g. pregnancy, involvement with justice system, etc.)? | Y ____ N ____ NA ____ | |

## OVERALL CASE FILE COMMENTS

## OVERALL CASE FILE COMMENTS - CONTINUED

Child Welfare Associates, LLC

## Case Specific Youth Interview Questions

Have you participated in the development of your most recent ITILP?

Have your parent(s) been encouraged to participate in case planning?

Have your basic physical health care needs been met via use of the D.C. KIDS program?

Have you received routine medical examinations?

Have you received routine dental examinations?

Have you received regular vision screenings and vision care?

Do you have current immunizations?

Have you been provided with health education re: general health and health management?

Have you been provided with health education re: first aid?

Have you been provided with health education re: reproductive health?

Have you been provided with health education re: sexual relations?

Have you been provided with health education re: HIV/AIDs/STD awareness?

Have you been provided with health education re: pregnanacy prevention/contraception?

---

***Teen Parents Only:***

Have you been provided with health education re: early childhood development?

Have you been provided with health education re: medical issues in early childhood?

Have you been provided with health education re: the use of discipline with children?

Have you been provided with health education re: choosing and monitoring child care providers?

Have you been provided with health education re: family planning?

Have you been provided with health education re: parental rights and responsibilities (i.e. child support)?

---

Child Welfare Associates, LLC

107

Have you been provided with health education and support services tailored towards GLBT youth (if applicable)?

Do you receive services for special needs such as substance abuse, mental health issues, etc. (if applicable)?

Do you receive services for medication management (if applicable)?

Do you receive services for domestic violence (if applicable)?

Do you attend and participate in Multi-Agency Planning meetings (MAPT)?

Are you enrolled in secondary school, college or a GED program?

If yes, are you receiving services to meet your educational needs?

Are you employed or in a vocational program?

If yes, is the agency supporting your employment/vocational goals?

If you are both un-enrolled in an educational program and unemployed, is the agency making consistent efforts to address this issue with you?

Have you received life skills education? What topic areas were covered? *(i.e. money management/consumerism, household management, meal planning/preparation, personal care/hygiene, interpersonal/legal skills, accessing community resources, personal/family safety, employment seeking and maintenance skills, education/career planning, seeking, securing and maintaining housing)?*

Does the agency provide you with IL support and services? *(i.e. residence upkeep, money management, maintenance of food and clothing, awareness of fire/emergency plans, accessing public transportation, maintaining bank account, securing necessary identification and security documents)*

Are you provided with services in the language of your preference?

Are you informed as to the reason for any fines that you incur and are the rationales generally appropriate?

Do you receive a monthly stipend and weekly allowance, as appropriate?

Have you been fully informed as to the reason for any consents and services being provided?

Have dispositions of any grievances you've filed been handled appropriately (if applicable)?

Child Welfare Associates, LLC

Does the agency provide appropriate interventions that address runaway behavior (if applicable)?

Are you receiving services that will support your transition towards independence?

Child Welfare Associates, LLC

109



# APPENDIX E

# CFSA STAFF

# FOCUS GROUP FEEDBACK

Child Welfare Associates, LLC

## CFSA Staff Focus Group Feedback

As part of the evaluative process, reviewers conducted focus groups not only with agency provider staff, but also with CFSA staff charged with interacting with and monitoring the three agencies that were the focus of the review. Specifically, CFSA Contract Monitors and staff from the CFSA Office of Youth Development were queried regarding the contracting monitoring process, perceptions regarding their role with the agencies and the performance of the agencies in meeting the needs of the youth they serve, in addition to other areas of relevance to the evaluative process.

### *I. CFSA Program Monitor Focus Group*

A focus group was conducted with seven Contract Monitors from the CFSA. The purpose was to gain insight into the contract monitoring process and to understanding the nature of the annual evaluation process. The following information was gleaned from the session that was conducted on Wednesday, March 29, 2006.

Program monitoring was first. Over the last year they have been talking about contract monitoring. Program monitoring uses rules 62 and 63. Contract deliverables and budget is now just monitoring contract compliance.

Staff reported that every monitor does monitoring of agencies their own way and there are no specific tools. They state they are program monitors who monitor licensing standards. They indicated they received no instructions on how to use tools, and also that there were no consistent tools used between July 2004 and June 2005 to evaluate performance. They relied heavily on licensing. On the most recent evaluation the monitors wrote the evaluations using evaluations tools and gave them to their supervisors who re-wrote the evaluations and changed some ratings. There has been inconsistency over a period of time in the evaluating the providers. The inconsistency with the monitoring process makes it difficult to expect accountability from the providers.

Staff stated that things are getting better now. There are tools under development for site inspections, record review, and interview tools. The contract monitors, as a team, are developing the tools for the process measures. Right now some monitors use the new tools, while others use their own way. There is no written procedure (directions) and this has led to mixed messages at CFSA.

The group also indicated there is a difference in monitoring between monitoring units. All four evaluations for the agencies being reviewed came from the same unit, which is unit two. The contracts that the agencies have are not specific – staff stated they are "very generic." The contracts do not always reflect the content of the RFP. For a long time agencies were not expected to perform what was in the contract. Staff stated their belief that many contractors do not read their contracts and that they just sign them.

The CFSA Program Monitors interviewed expressed that they feel some staff in the agencies do not know what they are supposed to do. They are not trained to deal with the behaviors of the children in their programs and some of the staff inappropriately relates with the children. At times the monitors cannot distinguish between the child in the program and the staff member working with the child.

The agency providers have been told that there would be changes in the monitoring process but not what it would look like or when the change would come. Staff interviewed indicated they feel CFSA needs to do more to help the providers. The agencies that have been contracting with CFSA for one to five years perform better and are more capable of achieving compliance with rule 62 and 63 for several reasons: (1) They are not familiar with the old way of doing business; (2) They have more experienced staff, (3) They have smaller programs which means less children, and (4) They have newer buildings.

Conversely, the agencies that have been contracting with CFSA for 6 years or longer are more comfortable with the old way of doing business. This presents a problem for these agencies for a number of reasons. (1) The have a core group of people who have been with them for many years. (2) They do not understand rule 62 and 63. (3) They have a history of no accountability or penalties.
Staff interviewed stated that the one consistent monitoring expectation that all of the agencies have is the agency monthly meeting and agenda.

They believe CFSA places children who are specialized into agencies that do not have specialized programs and that the children fail because the agency cannot handle the child/children.

The Program Monitors stated that the pressing problems of youth who are 18 to 21 years old are: (1) constant running, and (2) curfew violations. Children are put into ILO sites whether they have earned it or not and they are not ready to deal with the responsibility. The children must have maturity to go into one of the ILO sites. However, the program monitors expressed that they feel children see getting into ILO programs as an entitlement to them and some simply cannot deal with it. Some of the youth placed are dual diagnosed and they are raising babies. Some are addicted to drugs and their babies are getting sick. Delinquent kids are co-mingled with abused and neglected kids. The agencies cannot handle this population. There are also children with alternative life styles being placed as well. The staff also stated that another problem for the agencies is that when children are 18 or older, there is no curfew for children who not a part of CFSA. Therefore a child has to be gone for 24 hours before the police will do anything to find them.

The program monitors also indicated the provider cannot access the Health Services Network. They must go through the youth development workers. If a youth development worker does not get back to the agency the child may not get the attention they need and the provider cannot control that issue.

Another concern raised by staff is that stipends are difficult to monitor. They try to, but it is hard. This is in regulations, but not in the contract. At this point some agencies give Safeway cards to the children.

The QA systems in the agencies are not good or necessarily what the monitors think they should look like. Monitors requested that we focus recommendations for specific program.

### II. CFSA Youth Development Worker Focus Groups

As previously indicated the multiple involvement of workers suggests a team delivered service approach for the client that should enhance the client's opportunity for success. Therefore, as part of the evaluative model, OYD workers were invited to participate in two focus groups. CFSA management identified the OYD workers. Eighteen OYD workers participated and were queried regarding the following seven domains.

- ➢ The Role of OYD Workers with Private Agencies
- ➢ OYD Workers' Needs
- ➢ Client Needs
- ➢ Private Provider Responsibilities
- ➢ Private Provider Needs
- ➢ OYD Perspectives Regarding Private Providers
- ➢ Intake and Ongoing Planning

The focus group contained workers who had direct experience with the three agencies being evaluated as part of this review as well as other private providers. The following seven sections provide information obtained during the discussion of each domain. Themes reported are those found to be consistent across both focus groups.

***The Role of the CFSA OYD Workers with Private Agencies:*** OYD workers stated that they are responsible for the placement of the client at the agency and any placement moves the client may experience. They indicated that they are responsible for obtaining all pertinent information regarding the client and communicating the appropriate information to providers.

OYD workers identified two primary areas of responsibility, one as a service coordinator and another as service monitor. Regarding the former, OYD workers in the focus group stated that they provide service by making referrals and appointments for clients; transporting clients, if necessary; ensuring tuition needs of clients are met; providing life skill training, and acting as client mentors. As to the latter role as monitor, both groups identified a responsibility to monitor the services and the client's progress, specifically focusing on the youth's application of learned life skills. Both groups said that they were responsible for making their expectations known to both the agency staff and the client. OYD workers added that the case manager at the private agency independent living program is the client's primary worker and responsible for meeting the client's individual needs. If the private agency case manager cannot meet the identified need, then the OYD worker does. The OYD workers felt that the ideal was for the private agency case manager to complete the tasks.

Child Welfare Associates, LLC

113

*CFSA OYD Workers' Needs:* Three primary needs were identified by both focus groups: consistency, contractual expectations, and resources. Both groups identified a broader array of resources as their first need, both placement options and service resources. A particular need identified was for high-end therapeutic resources that would address the needs of clients with mild to severe mental health issues and those with mild retardation.

The second and third issues identified involved consistency and contract expectations. As the discussions among the OYD workers progressed through both focus group sessions it became apparent among the participants that they did not necessarily have consistent expectations about how their work was to be carried out. When discussing case planning, which follows later in this section, OYD workers articulated various expectations from differing supervisors regarding the timing, frequency, and level of participation as it relates to the process. OYD staff said that they had no hand book, manual, or policies that they could refer to that clearly outlined what they were required to do and when. A member of one group stated "it may be out there, but it doesn't get filtered down." Other members of that group echoed consensus with that statement, while a member of the second group said that "someplace in the agency there is someone who deals with policy, but we don't know where." When asked if they used the requirements contained in the contract to monitor or leverage service for their clients all members of both groups indicated that they were not familiar with the content of any of the provider contracts. One participant voiced this by stating "we have no information on the terms of the contracts." There was a consensus among both groups that if they had a basic knowledge of the contract requirements, they would feel more secure in their dealings with the private providers. Both groups suggested that knowing what their responsibilities are plus those of the private providers were important for them. They reflected that this would bring clarity both to them and to the private agency worker. Several senior workers indicated that while they were not familiar with the contracts or the requirements, they have approached program monitors they personally know to obtain specific information that might help them in serving their client.

Both groups felt that training regarding both their own expectations and requirements for servicing youth in ILP programs and contract requirements of ILP providers would lessen confusion and better serve their clients.

*Client Needs:* OYD workers were asked to identify what their clients needed to achieve independence successfully. Both groups identified the need for structure; caring, as one group stated it - "unconditional love"; direction; trust; and consistency.

When asked to identify specific client characteristic of youth they currently work with that need to be addressed in ILP programs for youth in the District the groups identified the following:

- ➢ Behavioral Issues, e.g., Truancy, Anger Management, Curfew Violations, Absconding, etc.
- ➢ Moderate Mental Retardation
- ➢ Moderate to Severe Mental Health Issues
- ➢ Substance Abuse

> Teen Pregnancy
> STD's/HIV
> Arrests/Criminality
> Fire Setting
> Depression
> Lesbian/Gay/Bi-Sexual/Trans-Gender Youth

The groups indicated that while the list did not reflect all the presenting characteristics of youth, they reflected the most challenging either for obtaining placement or identifying supportive services. The groups both indicated that for clients age 18 and over getting the client's cooperation was sometimes more difficult as they see themselves as adults and not responsible to the CFSA or private agency. One group said that some youth saw entering an ILP program as a right, although they may not have the skills to manage within the less restrictiveness of the placement. Some OYD workers stated that the youth tell their GAL that they want in the program and it is subsequently ordered.

*Private Provider Responsibilities:* The discussion in this area was limited in both groups, possibly as result of the discussion that had taken place regarding the OYD workers lack of knowledge of contract content. The groups indicated that the providers are responsible for providing and monitoring skill sets needed for independent living. They specifically identified the need for establishing client individual checking and saving accounts. They said private providers were responsible for knowing clients' whereabouts, ensuring clients are receiving educational and/or vocational services, and supported in employment, if appropriate.

*Private Provider Needs:* OYD workers were asked to identify what they felt the private provider agencies or workers needed to serve the youth and young adults under their care and supervision better. The first theme that surfaced dealt with consistency and concerned job titles within the private agency organizations. OYD staff stated that agencies use various job titles for staff, and the titles are not consistent across agencies. They indicated that this leads to their confusion about who is responsible at each agency. They indicated that confusion would be eliminated with consistent titles and associated job responsibilities. They would then know who to contact for what.

A second emerging theme concerned staffing and training. OYD workers voiced concerns that providers need training to deal with client behaviors, particularly de-escalating conflict and maintaining appropriate client/staff boundaries. They indicated that some private agency staff appear committed and capable of meeting clients' needs, others did not. They stated, on occasion, they "cannot tell the staff from the client."

The final theme that emerged in this area concerned the availability of therapeutic resources on-site at the provider agencies that could successfully address some clients more intensive needs.

*OYD Perspectives Regarding Private Providers:* In this domain of the discussions that occurred with the OYD workers three themes from other areas reemerged: lack of knowledge of ILP

responsibilities under the contract, inconsistencies across programs, and a lack of placement resource options.

When asked to differentiate between NAFFCCA and other ILP programs, both groups said that NAFFCCA and only a few other agencies would "take the kids that the others refuse to take." NAFFCCA's programs were often some clients' last placement options for an ILP, having disrupted from other placements. Both groups indicated that if these programs were not available, they would be at a "dead-end."

OYD workers identified another issue they believe impedes the providers' performance, rapid and high turnover within provider organizations. They stated this delayed clients progress and caused inconsistency and instability for the client

***Intake and Ongoing Planning:*** Industry Standards identified by the Child Welfare League of America and the Council on Accreditation identify that clearly defined assessment and service planning activities should occur. These activities inform the identification of appropriate service goals and support the client in obtaining positive outcomes. Given the impact of these activities to achieving successful client outcomes, OYD workers were asked to elaborate on their process and that of the private agency as it relates to these activities, including the intake process with the ILP providers.

OYD workers indicated that placement packets are provided to the private agencies. These packets include any IEP's psychological testing results, and the court report. They stated that the private provider, on acceptance of the client, completes an ITILP case plan within 30 days of admission and then every 90 days. The groups indicated that OYD workers complete a case plan for the client every six months. When asked if the client participates in the development of their plan with the OYD worker, the consensus voiced was that it was done in their office and given to the client. Several workers in each group said they completed a transition plan 12 to 18 months before the client's discharge and some complete additional ones every three months after, although this process did not appear standard among either group.

When questions regarding social histories and client assessment were raised to the group, they indicated there was no established guideline or protocol for completion of either. The group was asked if the ILP provider was given a current assessment of the youth entering their program that identified the current service needs and past services received, including training or skill building required for independent living. The questioners were informed that the providers received the last court report.

JONES AND ASSOCIATES

COMPLAINT

EXHIBITS:

EXHIBIT FIFTEEN:

RESPONSE TO RFP BY JONES AND ASSOC. / CFSA-03-R-0005

SEPT.17, 2003

RESPONSE   TO

# RFP # :  CFSA – 03 – R – 0005
## CONGREGATE CARE SERVICES
## INDEPENDENT LIVING
## MAIN FACILITY PROGRAM

# PART TWO

# PRICE PROPOSAL

Ex. #15

FROM

# JONES AND ASSOCIATES, INC.
## 1454 CORCORAN STREET, NW
## WASHINGTON, DC, 20009

SUBMITTED: SEPTEMBER 17, 2003



**Jones & Associates**

*Independent Living Project*
1454 Corcoran Street, N.W. Suite 101
Washington, D.C. 20009
(202) 462-1117

# FILE



CFSA/OFFICE OF
CONTRACTING & PROCUREMENT

2003 SEP 17   AM 11: 32

## RECEIPT OF INFORMATION

This text is to record the receipt of the following documentation:

DATE:          September 17, 2003

TIME:          11:32A

TO:            CFSA – Office of Contracting and Procurement

FROM:          Jones & Associates

DOCUMENT/S:

Proposal in Response to Solication No. CFSA-03-R-0005   Congregate Services

1 – Orginal and 12 copies   "Management/Technical Proposal"

1 – Orginal and 12 copies   "Price Proposal"


☐   Mailed          ☐   Faxed          ☒   Hand-Delivered


SIGNATURE:    _____
                          (DISTRIBUTOR)

SIGNATURE:    Pamela Glover (a) CFSA
                          (RECEIVER)

*2003*

CHILD AND FAMILY SERVICES AGENCY

# BUDGET PACKAGE COVER MEMO

•

PROVIDER:  **JONES AND ASSOCIATES, INC.**

MAILING ADDRESS:  1454 CORCORAN STREET, NW
WASHINGTON, DC 20009

CONTACT NAME:  Dr. James L. Jones, Esq.
(202) 462 – 1117

SERVICE:  INDEPENDENT LIVING SERVICES – MAIN FACILITY

ORIGINAL SUBMISSION

RFP#:  **CFSA – 03 – R – 0005**

FOR PERIOD FROM :  OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

---

DATE DELIVERED / MAILED TO CFSA:  September 17, 2003

APPROVED BY AUTHORIZED PROVIDER OFFICIAL:

Dr. James L. Jones, Esq., President

SIGNATURE _____  DATE  9/17/03

RECEIVED IN CFSA / CONTRACTS ADMINISTRATION:  ____/____/_____

[   ]  BUDGET PACKAGE COMPLETED
(ALL SCHEDULES COMPLETED, INCLUDING ALL REQUIRED
ATTACHMENTS)

[   ]  ADEQUATE NUMBER OF COPIES SUBMITTED
NUMBER SUBMITTED  =  _____

[   ]  COPIES DISTRIBUTED ACCORDING TO INSTRUCTIONS

## CHILD AND FAMILY SERVICES AGENCY

## UNIT - COST AND REIMBURSEMENT RATE WORKSHEET

•

PROVIDER:    JONES AND ASSOCIATES, INC.

SERVICE:    INDEPENDENT LIVING SERVICES – MAIN FACILITY

ORIGINAL  SUBMISSION

RFP#:    CFSA – 03 – R- 0005

FOR PERIOD FROM:   OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| | | |
|---|---|---|
| (A.) | TOTAL BUDGET FOR PROVIDING SERVICE: | $ 3,852,356.84 |
| (B.) | CFSA SHARE OF TOTAL BUDGET: | $ 3,792,356.84 |
| (C.) | TOTAL NUMBER OF SERVICE UNITS:   365 days x 55 clients = 20,075 | |
| | SERVICE UNIT:   A Client/ Day | |

PROJECTED COST PER UNIT OF SERVICE:    $ 191.90 / day

PROJECTED CFSA SHARE OF COST OER UNIT:    $ 188.91/ day

FACILITY ADDRESS:    MAIN FACILITY:

    1819 – 1821 EAST CAPITOL STREET, SE
    WASHINGTON, DC 20003

CHILD AND FAMILY SERVICES AGENCY
BUDGET SUMMARY FORM

PROVIDER NAME:  JONES AND ASSOCIATES, INC.
1819 -1821 East Capitol Street, SE
Washington, DC 20003

SERVICE:  INDEPENDENT LIVING SERVICES - MAIN FACILITY
ORIGINAL  -  RFP # : CFSA-03-R-0005

FOR PERIOD FROM OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004
**BASE YEAR**

| BUDGET LINE ITEMS | CFSA FUNDS | OTHER FUNDS | TOTAL COST | |
|---|---|---|---|---|
| SALARIES AND WAGES | $ 1,535,415.00 | | $ 1,535,415.00 | Schedule 1 |
| FRINGE BENEFITS | $ 378,328.57 | | $ 378,328.57 | Schedule 2 |
| CONSULTANTS / EXPERTS | $ 220,960.00 | | $ 220,960.00 | Schedule 3 |
| OCCUPANCY | $ 279,500.00 | | $ 279,500.00 | Schedule 4 |
| TRAVEL & TRANSPORTATION | $ 66,448.00 | | $ 66,448.00 | Schedule 5 |
| SUPPLIES & EQUIPMENT | $ 69,500.00 | | $ 69,500.00 | Schedule 6 |
| CAPITAL EQUIPMENT / OUTLAYS | $ - | | $ - | Schedule 7 |
| CLIENT COSTS | $ 639,750.00 | $ 60,000.00 | $ 699,750.00 | Schedule 8 |
| COMMUNICATIONS | $ 36,600.00 | | $ 36,600.00 | Schedule 9 |
| OTHER DIRECT COSTS | $ 60,909.00 | | $ 60,909.00 | Schedule 10 |
| INDIRECT / OVERHEAD | $ 394,489.27 | | $ 394,489.27 | Schedule 11 |

| | | | |
|---|---|---|---|
| SUB-TOTAL | $ 3,681,899.84 | $ 60,000.00 | $ 3,741,899.84 |
| FEE - 3.0% | $ 110,457.00 | | $ 110,457.00 |
| TOTAL BUDGET | $ 3,792,356.84 | $ 60,000.00 | $ 3,852,356.84 |

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 1: SALARY AND WAGE JUSTIFICATION

PROVIDER NAME: JONES AND ASSOCIATES, INC.    SERVICE: INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:   1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL        -       RFP # : CFSA-03-R-0005
FOR PERIOD FROM:        OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| POSITION | NAME | SAL. | HR. | BASE | % of Time | TOTAL | Other CFSA |
|----------|------|------|-----|------|-----------|-------|------------|
| Director/ Clinical Director | Dr. James L. Jones, Esq. | x | | $ 85,000.00 | 75% | $ 63,750.00 | N |
| Assistant Director/ Administrator | S.L. Barnes, M.A. | x | | $ 65,000.00 | 100% | $ 65,000.00 | N |
| Office Manager | M. Piper | x | | $ 40,000.00 | 100% | $ 40,000.00 | N |
| Secretary/ Clerk | C. Smith | x | | $ 25,000.00 | 100% | $ 25,000.00 | N |
| Program Development Coordinator | TBD | x | | $ 45,000.00 | 100% | $ 45,000.00 | N |
| Facility Coordinator/ Counselor | M. McGaha | x | | $ 50,000.00 | 100% | $ 50,000.00 | N |
| Ed./ College Coordinator | H. Jackson, M.A. | x | | $ 46,000.00 | 100% | $ 46,000.00 | N |
| HS, GED, Training Counselor | V.V. Mathews | x | | $ 42,000.00 | 100% | $ 42,000.00• | N |
| Health Services Coord./ Couns. | D. Twyman | x | | $ 45,385.00 | 100% | $ 45,385.00 | N |
| Social Worker | TBD | x | | $ 45,385.00 | 100% | $ 45,385.00 | N |
| Social Worker | TBD | x | | $ 45,385.00 | 100% | $ 45,385.00 | N |
| Social Worker | TBD | x | | $ 45,385.00 | 100% | $ 45,385.00 | N |
| Records & Reports Coord./ Couns. | E. Cox, M.A. | x | | $ 34,345.00 | 100% | $ 34,345.00 | N |
| Recreation Coord./ Couns. | A. McIntyre | x | | $ 34,345.00 | 100% | $ 34,345.00 | N |
| Certified Food Handler | M. Johnson | x | | $ 34,345.00 | 100% | $ 34,345.00 | N |
| Computer Specialist | D. Rogers | x | | $ 32,500.00 | 100% | $ 32,500.00 | N |
| Word Processor | TBD | x | | $ 24,000.00 | 100% | $ 24,000.00 | N |
| Maintenance Specialist | R. Whisenton | x | | $ 27,000.00 | 100% | $ 27,000.00 | N |
| Custodian | M. Pannell | x | | $ 22,000.00 | 100% | $ 22,000.00 | N |
| Custodian | S. Parmer | x | | $ 22,000.00 | 100% | $ 22,000.00 | N |

TOTAL ENTRIES ON THS PAGE              $   788,825.00

TOTAL ALL SCHEDULE 1 PAGES             $ 1,535,415.00
Page 1 of 3

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 1:  SALARY AND WAGE JUSTIFICATION

PROVIDER NAME:  JONES AND ASSOCIATES, INC.   SERVICE:  INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:  1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL      -      RFP # : CFSA-03-R-0005
FOR PERIOD FROM:            OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| POSITION | NAME | SAL. | HR. | BASE | % of Time | TOTAL | Other CFSA |
|---|---|---|---|---|---|---|---|
| Senior Counselor | A. Miles | x | | $ 35,913.00 | 100% | $ 35,913.00 | N |
| Senior Counselor | R. Parker | x | | $ 35,913.00 | 100% | $ 35,913.00 | N |
| Senior Counselor | D. Perry | x | | $ 35,913.00 | 100% | $ 35,913.00 | N |
| Counselor | K. Green | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |
| Counselor | C. Brown | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |
| Counselor | H. Carter | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |
| Counselor | J. Handy | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |
| Counselor | E. DuVall | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |
| Counselor | V. Jones | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |
| Counselor | E. Twyman | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |
| Counselor | R. Hart | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |
| Counselor | D. Daniels | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |
| Counselor | J. Hughes | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |
| Counselor | S. Burney | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |
| Counselor | TBD | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |
| Counselor | TBD | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |
| Counselor | TBD | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |
| Counselor | TBD | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |
| Counselor | TBD | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |
| Counselor | TBD | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |

TOTAL ENTRIES ON THS PAGE          $  638,632.00

TOTAL ALL SCHEDULE 1 PAGES          $  1,535,415.00
Page 2 of 3

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 1: SALARY AND WAGE JUSTIFICATION

PROVIDER NAME: JONES AND ASSOCIATES, INC.   SERVICE: INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:   1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL        -        RFP #: CFSA-03-R-0005
FOR PERIOD FROM:        OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| POSITION | NAME | SAL. | HR. | BASE | % of Time | TOTAL | Other CFSA |
|----------|------|------|-----|------|-----------|-------|------------|
| Counselor | TBD | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |
| Counselor | TBD | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |
| Security Chief | TBD | x | | $ 24,500.00 | 100% | $ 24,500.00 | N |
| Security Aide | TBD | x | | $ 21,000.00 | 100% | $ 21,000.00 | N |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

TOTAL ENTRIES ON THS PAGE            $   107,958.00

TOTAL ALL SCHEDULE 1 PAGES            $  1,535,415.00
Page 3 of 3

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 2:  FRINGE BENEFIT JUSTIFICATION

PROVIDER NAME:  JONES AND ASSOCIATES, INC.   SERVICE:  INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:   1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL      -     RFP #: CFSA-03-R-0005
FOR PERIOD FROM:         OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

EMPLOYER PAYMENTS ON BEHALF OF EMPLOYEES TO WORK ON THIS CONTRACT

| BENEFIT CATEGORY | SALARIED - FULL TIME | SALARIED - PART TIIME | HOURLY | TOTAL PAYMENTS |
|---|---|---|---|---|
| SOCIAL SECURITY    (.0765) | $           117,459.24 | | | $           117,459.24 |
| INSURANCE     (.08) | $           122,833.20 | | | $           122,833.20 |
| WORKER'S COMP.    (.035) | $             53,739.53 | | | $             53,739.53 |
| UNEMPLOYMENT COMP. (.065) | $             22,880.00 | | | $             22,880.00 |
| OTHER BENEFITS     (.04) | $             61,416.60 | | | $             61,416.60 |
| | | | | |

TOTAL BENEFITS                  $           378,328.57

Fringe Benefits as a percentage of Salaries & Wages            24.64%

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 3:  CONSULTANTS / EXPERTS COST JUSTIFICATION

PROVIDER NAME:  JONES AND ASSOCIATES, INC.   SERVICE:  INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:   1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL        -     RFP # : CFSA-03-R-0005
FOR PERIOD FROM:        OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| POSITION TITLE | NAME | BASE WAGE/ HOUR | NO. OF HOURS FOR PERIOD | TOTAL COST | Other CFSA Contracts |
|---|---|---|---|---|---|
| Certified Addictions Counselor | TBD | $ 19.23 | 2080 | $ 40,000.00 | N |
| Licensed Practical Nurse | TBD | $ 20.10 | 2080 | $ 41,800.00 | N |
| Licensed Practical Nurse | TBD | $ 20.10 | 2080 | $ 41,800.00 | N |
| Financial Mgmt. Consultant | TBD | $ 40.00 | 250 | $ 10,000.00 | N |
| Employment/Plcment. Cons. | TBD | $ 20.00 | 2080 | $ 41,600.00 | N |
| Educational Consultant | TBD | $ 22.00 | 1040 | $ 22,880.00 | N |
| Rehab. Consultant | TBD | $ 22.00 | 1040 | $ 22,880.00 | N |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

TOTAL COSTS - CONSULTANTS & EXPERTS         $     220,960.00

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 4:  OCCUPANCY COST JUSTIFICATION

PROVIDER NAME:  JONES AND ASSOCIATES, INC.   SERVICE:  INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:  1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL       -       RFP # : CFSA-03-R-0005
FOR PERIOD FROM:         OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| EXPENSE CATEGORY | COST FOR FACILITY # 1 | COST FOR FACILITY # 2 | COST FOR FACILITY # 3 | TOTAL COST |
|---|---|---|---|---|
| RENT  ($16,200 x 12) | $          194,400.00 | | | $          194,400.00 |
| GAS/ ELECT/ OIL/ WATER | $           26,400.00 | | | $           26,400.00 |
| TRASH  ($825 x  12) | $            9,900.00 | | | $            9,900.00 |
| MAINTENANCE  ($1,400 x 12) | $           16,800.00 | | | $           16,800.00 |
| INSURANCE | $            8,000.00 | | | $        •   8,000.00 |
| PEST CONTROL   ($500 x 12) | $            6,000.00 | | | $            6,000.00 |
| REPAIRS   ($1,000 x 12) | $           12,000.00 | | | $           12,000.00 |
| OTHER  (Mics. $500 x 12) | $            6,000.00 | | | $            6,000.00 |
| | | | | |

TOTAL OCCUPANCY COSTS            $          279,500.00

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 5:  TRAVEL AND TRANSPORTATION COST JUSTIFICATION

PROVIDER NAME:  JONES AND ASSOCIATES, INC.   SERVICE:  INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:  1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL      -      RFP # : CFSA-03-R-0005
FOR PERIOD FROM:        OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| EXPENSE CATEGORY | VEHICLE COSTS | NON-VEHICLE COSTS | TOTAL TRAVEL AND TRANSPORTATION |
|---|---|---|---|
| VEHICLE LEASES (4 x $300mo) | $14,400.00 | | $14,400.00 |
| VEHICLE DEPRECIATION | | | |
| GAS/ OIL/ SUPPLIES | $9,600.00 | | $9,600.00 |
| TIRES/ BATTERIES | | | |
| MAINTENANCE/ REPAIRS | | | |
| INSURANCE | $26,448.00 | | $26,448.00 |
| REGISTRATION | | | |
| MILEAGE/ FARES | | $     16,000.00 | $     16,000.00 |
| OTHER | | | |
| | | | |

TOTAL TRAVEL AND TRANSPORTATION COSTS            $66,448.00

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 6:  SUPPLIES AND EQUIPMENT COST JUSTIFICATION

PROVIDER NAME: JONES AND ASSOCIATES, INC.   SERVICE:  INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:  1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL     -     RFP # : CFSA-03-R-0005
FOR PERIOD FROM:        OCTOBER 1, 2003  TO   SEPTEMBER 30, 2004

| EXPENSE CATEGORY | COST FOR FACILITY # 1 | COST FOR FACILITY # 2 | COST FOR FACILITY # 3 | TOTAL SUPPLIES |
|---|---|---|---|---|
| OFFICE SUPPLIES | $          5,000.00 | | | $          5,000.00 |
| HOUSEHOLD SUPPLIES | $         18,000.00 | | | $         18,000.00 |
| HOUSEHOLD FURNISHINGS | $         25,000.00 | | | $         25,000.00 |
| OFFICE EQUIPMENT | $         10,000.00 | | | $         10,000.00 |
| OTHER SUPPLIES | $          7,500.00 | | | $          7,500.00 |
| OTHER EQUIPMENT | $          4,000.00 | | | $          4,000.00 |
| OTHER | | | | |
| | | | | |

| TOTAL SUPPLIES AND EQUIPMENT | $         69,500.00 |
|---|---|

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 7 : CAPITAL EQUIPMENT AND OUTLAYS COST JUSTIFICATION

PROVIDER NAME: JONES AND ASSOCIATES, INC.   SERVICE:  INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:  1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL        -        RFP # : CFSA-03-R-0005
FOR PERIOD FROM:              OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| EXPENSE CATEGORY | COST FOR FACILITY # 1 | COST FOR FACILITY # 2 | COST FOR FACILITY # 3 | TOTAL COST |
|---|---|---|---|---|
| VEHICLE PURCHASE | | | | |
| MAJOR REPAIRS | | | | |
| MAJOR EQUIPMENT | | | | • |
| OTHER CAPITAL OUT LAYS | | | | |
| OTHER | | | | |
| | | | | |

TOTAL CAPITAL EQUIPMENT AND OUTLAYS                    NONE

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 8:  CLIENT EXPENSE COST JUSTIFICATION

PROVIDER NAME:  JONES AND ASSOCIATES, INC.   SERVICE:  INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:  1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL      -      RFP # : CFSA-03-R-0005
FOR PERIOD FROM:        OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| EXPENSE CATEGORY | COST FOR FACILITY # 1 | COST FOR FACILITY # 2 | COST FOR FACILITY # 3 | TOTAL COST |
|---|---|---|---|---|
| FOOD  ($200 x 55 x 12) | $         132,000.00 | | | $         132,000.00 |
| CLOTHING  ($120 x 55 x 12) | $          79,200.00 | | | $          79,200.00 |
| ALLOWANCES/ STIPENDS | $         184,800.00 | | | $         184,800.00 |
| MEDICAL | | | | • |
| DENTAL | | | | |
| TRAINING | | | | |
| COLLEGE PROGRAM | $         120,000.00 | | | $         120,000.00 |
| OTHER - Educational Functions | $          24,750.00 | | | $          24,750.00 |
| Apts. - Furnishings & Supplies  ($1,800 x 55) | | $          99,000.00 | | $          99,000.00 |

TOTAL CLIENT EXPENSES          $         639,750.00

Allowance/ Stipends: $280 x 55 x 12 mos.  =  $184,800.
(Trans. $90; Toiletries $30.; Incidentals $60.; Allowance $100.)

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 9 : COMMUNICATIONS COST JUSTIFICATION

PROVIDER NAME: JONES AND ASSOCIATES, INC.   SERVICE:  INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:   1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL      -    RFP # : CFSA-03-R-0005
FOR PERIOD FROM:        OCTOBER 1, 2003  TO   SEPTEMBER 30, 2004

| EXPENSE CATEGORY | COST FOR FACILITY # 1 | COST FOR FACILITY # 2 | COST FOR FACILITY # 3 | TOTAL COST |
|---|---|---|---|---|
| TELEPHONE | $         24,000.00 | | | $         24,000.00 |
| POSTAGE | $           2,400.00 | | | $           2,400.00 |
| DELIVERY | $           1,200.00 | | | $      •   1,200.00 |
| COPYING | $           9,000.00 | | | $           9,000.00 |
| OTHER | | | | |
| | | | | |
| TOTAL THIS PAGE | $         36,600.00 | | | $         36,600.00 |

TOTAL COMMUNICATION COSTS          $         36,600.00

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 10 : OTHER DIRECT COST JUSTIFICATION

PROVIDER NAME:  JONES AND ASSOCIATES, INC.   SERVICE:  INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:   1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL      -      RFP # :  CFSA - 03 - R - 0005
FOR PERIOD FROM:        OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| EXPENSE CATEGORY | COST FOR FACILITY # 1 | COST FOR FACILITY # 2 | COST FOR FACILITY # 3 | TOTAL COST |
|---|---|---|---|---|
| IN-SERVICE TRAINING | $          20,000.00 | | | $          20,000.00 |
| Profesional Liability Insurance | $          40,909.00 | | | $          40,909.00 |
| | | | | • |
| | | | | |
| | | | | |
| | | | | |
| TOTAL THIS PAGE | $          60,909.00 | | | $          60,909.00 |

TOTAL COMMUNICATION COSTS          $          60,909.00

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 11 :  INDIRECT / OVERHEAD COST JUSTIFICATION

PROVIDER NAME:  JONES AND ASSOCIATES, INC.   SERVICE:  INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:   1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL       -       RFP # : CFSA -03 - R - 0005
FOR PERIOD FROM:         OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| EXPENSE CATEGORY | COST FOR FACILITY # 1 | COST FOR FACILITY # 2 | COST FOR FACILITY # 3 | TOTAL COST |
|---|---|---|---|---|
| ADMINISTRATION  (12.0% TDC) | $          394,489.27 | | | $        3,941,489.27 |
| FINANCIAL MANAGEMENT | | | | |
| AUDIT | | | | • |
| OTHER INDIRECT / OVERHEAD | | | | |
| | | | | |
| | | | | |

TOTAL INDIRECT / OVERHEAD COSTS          $          394,489.27

CHILD AND FAMILY SERVICES AGENCY

# BUDGET PACKAGE COVER MEMO

•

PROVIDER:               **JONES AND ASSOCIATES, INC.**

MAILING ADDRESS:        1454 CORCORAN STREET, NW
                        WASHINGTON, DC 20009

CONTACT NAME:           Dr. James L. Jones, Esq.
                        (202) 462 – 1117

SERVICE:                INDEPENDENT LIVING SERVICES – MAIN FACILITY

ORIGINAL SUBMISSION

RFP#:                   **CFSA – 03 – R – 0005**

FOR PERIOD FROM :       OCTOBER 1, 2004  TO  SEPTEMBER 30, 2005

---

DATE DELIVERED / MAILED TO CFSA:        <u>September 17, 2003</u>

APPROVED BY AUTHORIZED PROVIDER OFFICIAL:

Dr. James L. Jones, Esq., President

_____            _9/17/63_
SIGNATURE                                   DATE

---

RECEIVED IN CFSA / CONTRACTS ADMINISTRATION:        _____/_____/_____

[   ]        BUDGET  PACKAGE COMPLETED
             (ALL SCHEDULES COMPLETED, INCLUDING ALL REQUIRED
             ATTACHMENTS)

[   ]        ADEQUATE NUMBER OF COPIES SUBMITTED
             NUMBER SUBMITTED   =   _____

[   ]        COPIES DISTRIBUTED ACCORDING TO INSTRUCTIONS

**CHILD AND FAMILY SERVICES AGENCY**

## UNIT - COST AND REIMBURSEMENT RATE WORKSHEET

•

PROVIDER:      JONES AND ASSOCIATES, INC.

SERVICE:        INDEPENDENT LIVING SERVICES – MAIN FACILITY

ORIGINAL  SUBMISSION

RFP#:           CFSA – 03 – R- 0005

FOR PERIOD FROM:    OCTOBER 1, 2004  TO  SEPTEMBER 30, 2005

(A.)   TOTAL BUDGET FOR PROVIDING SERVICE:        $ 3,852,356.84

(B.)   CFSA SHARE OF TOTAL BUDGET:              $ 3,792,356.84

(C.)   TOTAL NUMBER OF SERVICE UNITS:  365 days x 55 clients = 20,075

         SERVICE UNIT:        A Client/ Day

PROJECTED COST PER UNIT OF SERVICE:             $ 191.90 / day

PROJECTED CFSA SHARE OF COST PER UNIT:          $ 188.91/ day

FACILITY ADDRESS:        MAIN FACILITY:

                          1819 – 1821 EAST CAPITOL STREET, SE
                          WASHINGTON, DC 20003

CHILD AND FAMILY SERVICES AGENCY
BUDGET SUMARY FORM

PROVIDER NAME:  JONES AND ASSOCIATES, INC.
1819 -1824 East Capitol Street, NE
Washington, DC 20003

SERVICE:  INDEPENDENT LIVING SERVICES - MAIN FACILITY
ORIGINAL  -  RFP # : CFSA-03-R-0005

FOR PERIOD FROM OCTOBER 1, 2004  TO  SEPTEMBER 30, 2005
**OPTION YEAR 1**

| BUDGET LINE ITEMS | CFSA FUNDS | OTHER FUNDS | TOTAL COST | |
|---|---|---|---|---|
| SALARIES AND WAGES | $ 1,535,415.00 | | $ 1,535,415.00 | Schedule 1 |
| FRINGE BENEFITS | $ 378,328.57 | | $ 378,328.57 | Schedule 2 |
| CONSULTANTS / EXPERTS | $ 220,960.00 | | $ 220,960.00 | Schedule 3 |
| OCCUPANCY | $ 279,500.00 | | $ 279,500.00 | Schedule 4 |
| RAVEL & TRANSPORTATION | $ 66,448.00 | | $ 66,448.00 | Schedule 5 |
| SUPPLIES & EQUIPMENT | $ 69,500.00 | | $ 69,500.00 | Schedule 6 |
| CAPITAL EQUIPMENT / OUTLAYS | $ - | | $ - | Schedule 7 |
| CLIENT COSTS | $ 639,750.00 | $ 60,000.00 | $ 699,750.00 | Schedule 8 |
| COMMUNICATIONS | $ 36,600.00 | | $ 36,600.00 | Schedule 9 |
| OTHER DIRECT COSTS | $ 60,909.00 | | $ 60,909.00 | Schedule 10 |
| INDIRECT / OVERHEAD | $ 394,489.27 | | $ 394,489.27 | Schedule 11 |

| | | | |
|---|---|---|---|
| SUB-TOTAL | $ 3,681,899.84 | $ 60,000.00 | $ 3,741,899.84 |

| | | | |
|---|---|---|---|
| FEE - 3.0% | $ 110,457.00 | | $ 110,457.00 |

| | | | |
|---|---|---|---|
| OTAL BUDGET | $ 3,792,356.84 | $ 60,000.00 | $ 3,852,356.84 |

CHILD AND FAMILY SERVICES AGENCY

# BUDGET PACKAGE COVER MEMO

•

PROVIDER:               **JONES AND ASSOCIATES, INC.**

MAILING ADDRESS:        1454 CORCORAN STREET, NW
                        WASHINGTON, DC 20009

CONTACT NAME:           Dr. James L. Jones, Esq.
                        (202) 462 – 1117

SERVICE:                INDEPENDENT LIVING SERVICES – MAIN FACILITY

ORIGINAL SUBMISSION

RFP#:                   **CFSA – 03 – R – 0005**

FOR PERIOD FROM :       OCTOBER 1, 2005  TO  SEPTEMBER 30, 2006

---

DATE DELIVERED / MAILED TO CFSA:        September 17, 2003

APPROVED BY AUTHORIZED PROVIDER OFFICIAL:

Dr. James L. Jones, Esq., President

_____          9/17/03
SIGNATURE                                DATE

---

RECEIVED IN CFSA / CONTRACTS ADMINISTRATION:        ____ / ____ / _____

[  ]     BUDGET  PACKAGE COMPLETED
         (ALL SCHEDULES COMPLETED, INCLUDING ALL REQUIRED
         ATTACHMENTS)

[  ]     ADEQUATE NUMBER OF COPIES SUBMITTED
         NUMBER SUBMITTED  =  _____

[  ]     COPIES DISTRIBUTED ACCORDING TO INSTRUCTIONS

## CHILD AND FAMILY SERVICES AGENCY

## UNIT - COST AND REIMBURSEMENT RATE WORKSHEET

•

PROVIDER:        JONES AND ASSOCIATES, INC.

SERVICE:         INDEPENDENT LIVING SERVICES – MAIN FACILITY

ORIGINAL  SUBMISSION

RFP#:         CFSA – 03 – R- 0005

FOR PERIOD FROM:    OCTOBER 1, 2005  TO  SEPTEMBER 30, 2006

(A.)   TOTAL BUDGET FOR PROVIDING SERVICE:        $ 3,966,127.53

(B.)   CFSA SHARE OF TOTAL BUDGET:        $ 3,906,127.53

(C.)   TOTAL NUMBER OF SERVICE UNITS:   365 days x 55 clients = 20,075

SERVICE UNIT:        A Client/ Day

PROJECTED COST PER UNIT OF SERVICE:        $ 197.57 / day

PROJECTED CFSA SHARE OF COST PER UNIT:        $ 194.58/ day

FACILITY ADDRESS:        MAIN FACILITY:

1819 – 1821 EAST CAPITOL STREET, SE
WASHINGTON, DC 20003

CHILD AND FAMILY SERVICES AGENCY
BUDGET SUMMARY FORM

PROVIDER NAME:   JONES AND ASSOCIATES, INC.
1819 -1821 East Capitol Street, NE
Washington, DC 20003

SERVICE:   INDEPENDENT LIVING SERVICES - MAIN FACILITY
ORIGINAL   -   RFP # : CFSA-03-R-0005

FOR PERIOD FROM OCTOBER 1, 2005  TO  SEPTEMBER 30, 2006
**OPTION YEAR 2**

| BUDGET LINE ITEMS | CFSA FUNDS | OTHER FUNDS | TOTAL COST | |
|---|---|---|---|---|
| SALARIES AND WAGES | $ 1,581,477.45 | | $ 1,581,477.45 | Schedule 1 |
| FRINGE BENEFITS | $ 389,678.42 | | $ 389,678.42 | Schedule 2 |
| CONSULTANTS / EXPERTS | $ 227,588.80 | | $ 227,588.80 | Schedule 3 |
| OCCUPANCY | $ 287,885.00 | | $ 287,885.00 | Schedule 4 |
| RAVEL & TRANSPORTATION | $ 68,441.44 | | $ 68,441.44 | Schedule 5 |
| SUPPLIES & EQUIPMENT | $ 71,585.00 | | $ 71,585.00 | Schedule 6 |
| CAPITAL EQUIPMENT / OUTLAYS | $ - | | $ - | Schedule 7 |
| CLIENT COSTS | $ 658,942.50 | $ 60,000.00 | $ 718,942.50 | Schedule 8 |
| COMMUNICATIONS | $ 37,698.00 | | $ 37,698.00 | Schedule 9 |
| OTHER DIRECT COSTS | $ 62,736.27 | | $ 62,736.27 | Schedule 10 |
| INDIRECT / OVERHEAD | $ 406,323.95 | | $ 406,323.95 | Schedule 11 |

| | | | |
|---|---|---|---|
| SUB-TOTAL | $ 3,792,356.83 | $ 60,000.00 | $ 3,852,356.83 |
| FEE - 3.0% | $ 113,770.70 | | $ 113,770.70 |
| TAL BUDGET | $ 3,906,127.53 | $ 60,000.00 | $ 3,966,127.53 |

CHILD AND FAMILY SERVICES AGENCY

# BUDGET PACKAGE COVER MEMO

•

PROVIDER:               **JONES AND ASSOCIATES, INC.**

MAILING ADDRESS:        1454 CORCORAN STREET, NW
                        WASHINGTON, DC 20009

CONTACT NAME:           Dr. James L. Jones, Esq.
                        (202) 462 – 1117

SERVICE:                INDEPENDENT LIVING SERVICES – MAIN FACILITY

ORIGINAL SUBMISSION

RFP#:                   **CFSA – 03 – R – 0005**

FOR PERIOD FROM :        OCTOBER 1, 2006  TO  SEPTEMBER 30, 2007

---

DATE DELIVERED / MAILED TO CFSA:        September 17, 2003

APPROVED BY AUTHORIZED PROVIDER OFFICIAL:

Dr. James L. Jones, Esq., President

_____                          _9/17/83_
SIGNATURE                                         DATE

---

RECEIVED IN CFSA / CONTRACTS ADMINISTRATION:        ____ / ____ / _____

[  ]        BUDGET  PACKAGE COMPLETED
            (ALL SCHEDULES COMPLETED, INCLUDING ALL REQUIRED
            ATTACHMENTS)

[  ]        ADEQUATE NUMBER OF COPIES SUBMITTED
            NUMBER SUBMITTED  =  _____

[  ]        COPIES DISTRIBUTED ACCORDING TO INSTRUCTIONS

CHILD AND FAMILY SERVICES AGENCY
BUDGET SUMMARY FORM

PROVIDER NAME:   JONES AND ASSOCIATES, INC.
1819 -1821 East Capitol Street, NE
Washington, DC 20003

SERVICE:   INDEPENDENT LIVING SERVICES - MAIN FACILITY
ORIGINAL   -   RFP # : CFSA-03-R-0005

FOR PERIOD FROM OCTOBER 1, 2006  TO  SEPTEMBER 30, 2007
**OPTION YEAR 3**

| BUDGET LINE ITEMS | CFSA FUNDS | OTHER FUNDS | TOTAL COST | |
|---|---|---|---|---|
| SALARIES AND WAGES | $ 1,581,477.45 | | $ 1,581,477.45 | Schedule 1 |
| FRINGE BENEFITS | $ 389,678.42 | | $ 389,678.42 | Schedule 2 |
| CONSULTANTS / EXPERTS | $ 227,588.80 | | $ 227,588.80 | Schedule 3 |
| OCCUPANCY | $ 287,885.00 | | $ 287,885.00 | Schedule 4 |
| RAVEL & TRANSPORTATION | $ 68,441.44 | | $ 68,441.44 | Schedule 5 |
| SUPPLIES & EQUIPMENT | $ 71,585.00 | | $ 71,585.00 | Schedule 6 |
| CAPITAL EQUIPMENT / OUTLAYS | $ - | | $ - | Schedule 7 |
| CLIENT COSTS | $ 658,942.50 | $ 60,000.00 | $ 718,942.50 | Schedule 8 |
| COMMUNICATIONS | $ 37,698.00 | | $ 37,698.00 | Schedule 9 |
| OTHER DIRECT COSTS | $ 62,736.27 | | $ 62,736.27 | Schedule 10 |
| INDIRECT / OVERHEAD | $ 406,323.95 | | $ 406,323.95 | Schedule 11 |

| | | | |
|---|---|---|---|
| SUB-TOTAL | $ 3,792,356.83 | $ 60,000.00 | $ 3,852,356.83 |
| FEE - 3.0% | $ 113,770.70 | | $ 113,770.70 |
| TOTAL BUDGET | $ 3,906,127.53 | $ 60,000.00 | $ 3,966,127.53 |

CHILD AND FAMILY SERVICES AGENCY
BUDGET SUMMARY FORM

PROVIDER NAME:   JONES AND ASSOCIATES, INC.
1819 -1821 East Capitol Street, NE
Washington, DC 20003

SERVICE:   INDEPENDENT LIVING SERVICES - MAIN FACILITY
ORIGINAL   -   RFP # : CFSA-03-R-0005

FOR PERIOD FROM OCTOBER 1, 2006  TO  SEPTEMBER 30, 2007
**OPTION YEAR 3**

| BUDGET LINE ITEMS | CFSA FUNDS | OTHER FUNDS | TOTAL COST | |
|---|---|---|---|---|
| SALARIES AND WAGES | $  1,581,477.45 | | $  1,581,477.45 | Schedule 1 |
| FRINGE BENEFITS | $  389,678.42 | | $  389,678.42 | Schedule 2 |
| CONSULTANTS / EXPERTS | $  227,588.80 | | $  227,588.80 | Schedule 3 |
| OCCUPANCY | $  287,885.00 | | $  287,885.00 | Schedule 4 |
| RAVEL & TRANSPORTATION | $  68,441.44 | | $  68,441.44 | Schedule 5 |
| SUPPLIES & EQUIPMENT | $  71,585.00 | | $  71,585.00 | Schedule 6 |
| CAPITAL EQUIPMENT / OUTLAYS | $  - | | $  - | Schedule 7 |
| CLIENT COSTS | $  658,942.50 | $  60,000.00 | $  718,942.50 | Schedule 8 |
| COMMUNICATIONS | $  37,698.00 | | $  37,698.00 | Schedule 9 |
| OTHER DIRECT COSTS | $  62,736.27 | | $  62,736.27 | Schedule 10 |
| INDIRECT / OVERHEAD | $  406,323.95 | | $  406,323.95 | Schedule 11 |

| | | | | |
|---|---|---|---|---|
| SUB-TOTAL | $  3,792,356.83 | $  60,000.00 | $  3,852,356.83 | |
| FEE - 3.0% | $  113,770.70 | | $  113,770.70 | |
| OTAL BUDGET | $  3,906,127.53 | $  60,000.00 | $  3,966,127.53 | |

CHILD AND FAMILY SERVICES AGENCY
BUDGET SUMMARY FORM

PROVIDER NAME:   JONES AND ASSOCIATES, INC.
1819 -1821 East Capitol Street, NE
Washington, DC 20003

SERVICE:   INDEPENDENT LIVING SERVICES - MAIN FACILITY
ORIGINAL   -   RFP # : CFSA-03-R-0005

FOR PERIOD FROM OCTOBER 1, 2007  TO  SEPTEMBER 30, 2008
**OPTION YEAR 4**

| BUDGET LINE ITEMS | CFSA FUNDS | OTHER FUNDS | TOTAL COST | |
|---|---|---|---|---|
| SALARIES AND WAGES | $ 1,628,921.77 | | $ 1,628,921.77 | Schedule 1 |
| FRINGE BENEFITS | $ 401,368.77 | | $ 401,368.77 | Schedule 2 |
| CONSULTANTS / EXPERTS | $ 234,416.40 | | $ 234,416.40 | Schedule 3 |
| OCCUPANCY | $ 296,521.55 | | $ 296,521.55 | Schedule 4 |
| .RAVEL & TRANSPORTATION | $ 70,494.68 | | $ 70,494.68 | Schedule 5 |
| SUPPLIES & EQUIPMENT | $ 73,732.55 | | $ 73,732.55 | Schedule 6 |
| CAPITAL EQUIPMENT / OUTLAYS | $ - | | $ - | Schedule 7 |
| CLIENT COSTS | $ 678,710.78 | $ 60,000.00 | $ 738,710.78 | Schedule 8 |
| COMMUNICATIONS | $ 38,828.94 | | $ 38,828.94 | Schedule 9 |
| OTHER DIRECT COSTS | $ 64,618.36 | | $ 64,618.36 | Schedule 10 |
| INDIRECT / OVERHEAD | $ 418,513.67 | | $ 418,513.67 | Schedule 11 |

SUB-TOTAL                $ 3,906,127.47 | $ 60,000.00 | $ 3,966,127.47

FEE - 3.0%                $ 116,771.82 | | $ 116,771.82

'OTAL BUDGET            $ 4,022,899.29 | $ 60,000.00 | $ 4,082,899.29

**B.9     PRICE SCHEDULE  (REVISED)**
**B.9.1    BASE PERIOD: 10/1/03 THROUGH 9/30/04 (For Pricing Purposes).**

| Item No. | Supply/Services | Maximum Quantity to be Contracted by CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0001AA | Diagnostic and Emergency Care<br>Aged 12 and Younger.<br><br>(See Section Paragraph C.5.2 )<br><br><br><br>**Guaranteed Minimum Amount is $1000.00** | 50 | _____<br><br>*(Offeror shall propose no fewer than 4 slots and no more than 50 slots)* | ____ | ___ |
| 0001AB | Diagnostic and Emergency Care:<br>Aged 13 and Older<br><br>(See Section C Paragraph C.5.3)<br><br><br><br>**Guaranteed Minimum Amount is $1000.00** | 50 | _____<br><br>*(Offeror shall propose no fewer than 4 slots and no more than 16 slots)* | ____ | ___ |

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offeror's Proposed Quantity | Unit Price (Child per day | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0001BA | Traditional Group Home Care<br><br>(See Section C Paragraph C.5.4)<br><br>Maximum residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots) | | |
| 0001BB | Specialized Group Home Care (Level III)<br><br>(See Section C Paragraph C.5.5)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 42 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots) | | |
| 0001CA | Independent Living Main Facility Programs<br><br>(See Section C Paragraph C.5.6)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | 55<br>*(Offeror shall propose no fewer than 4 slots and no more than 56 slots) | $ 188.91 | $ 3,792,356.84 |
| 0001CB | Independent Living Residential Units<br><br>(See Section C paragraph C.5.7)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | *(Offeror shall propose no fewer than 4 slots and no more than 56 slots) | | |

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0001CC | Assisted Living (Level III) (See Section C Paragraph C.5.8) **Guaranteed Minimum Amount is $1000.00** | 16 | *(Offeror shall propose no fewer than 4 slots and no more than 16 slots) | _____ | _____ |
| 0001CD | Teen Parent Programs Maximum # of Teen Residents: 8 (See Section C Paragraph C.5.9) **Guaranteed Minimum Amount is $1000.00** | 80 | *(Offeror shall propose no fewer than 4 slots and no more than 24 slots) | _____ | _____ |
| 0001CE | Community Based Return Diversion (See Section C Paragraph C.5.10) **Guaranteed Amount is $1000.00** | 50 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots) | _____ | _____ |
| 0001CF | Specialized Group Home Care (Level IV) (See Section C Paragraph C.5.5) Maximum Residents: 8 **Guaranteed Minimum Amount is $1000.00** | 8 | *(Offeror shall propose no fewer than 4 slots and no more than 8 slots) | | _____ |
| 0001CG | Assisted Living (Level IV) (See Section C Paragraph C.5.8) **Guaranteed Minimum Amount is $1000.00** | 4 | *(Offeror shall propose no fewer than 4 slots | _____ | |

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offerors' Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0002BB | Specialized Group Home Care (Level III)<br><br>(See Section C Paragraph C.5.5)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 38 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots)* | ___ | ___ |
| 0002CA | Independent Living Main Facility Programs<br><br>(See Section C Paragraph C.5.6)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | 55<br><br>*(Offeror shall propose no fewer than 4 slots and no more than 56 slots)* | $ 188.91 | $ 3,792,356.84 |
| 0002CB | Independent Living Residential Units<br><br>(See Section C Paragraph C.5.7)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | *(Offeror shall propose no fewer than 4 slots and no more than slots)* | ___ | ___ |
| 0002CC | Assisted Living (Level III)<br><br>(See Section C Paragraph C.5.8)<br><br>**Guaranteed Minimum Amount is $1000.00** | 16 | *(Offeror shall propose no fewer than 4 slots and no more than 16 slots)* | ___ | ___ |

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0002CD | Teen Parent Programs<br><br>(See Section C Paragraph C.5.9)<br><br>Maximum # of Teen Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 72 | *(Offeror shall propose no fewer than 4 slots and no more than 24 slots) | | |
| 0002CE | Community Based Return Diversion.<br><br>(See Section C. Paragraph C.5.10)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 45 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots) | | |
| 0002CF | Specialized Group Home Care (Level IV)<br><br>(See Section  C Paragraph C.5.5)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 7 | *(Offeror shall propose no fewer than 4 slots and no more than 7 slots) | | |
| 0002CG | Assisted Living (Level IV)<br><br>(See Section  C Paragraph C.5.8)<br>**Guaranteed Minimum Amount is $1000.00** | 4 | *(Offeror shall propose no fewer than 4 slots | | |

B.9.3   **OPTION PERIOD 2: 10/1/05 THROUGH 9/30/06**

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0003AA | Diagnostic and Emergency Care: Aged 12 and Younger<br><br>(See Section C Paragraph C.5.2)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 20 | *(Offeror shall propose no fewer than 4 slots and no more than 20 slots) | ___ | ___ |
| 0003AB | Diagnostic and Emergency Care: Aged 13 and Older.<br><br>(See Section C Paragraph C.5.3)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 40 | *(Offeror shall propose no fewer than 4 slots and no more than 16 slots) | ___ | ___ |
| 003BA | Traditional Group Home Care<br><br>(See Section C Paragraph C.5.4)<br><br>Maximum residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 81 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots) | ___ | |

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0003BB | Specialized Group Home Care (Level III)<br><br>(See Section C Paragraph C.5.5)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 34 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots) | | |
| 0003CA | Independent Living Main Facility Programs<br><br>(See Section C Paragraph C.5.6)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | 55<br>*(Offeror shall propose no fewer than 4 slots and no more than 56 slots) | $194.58 | $3,906,127.53 |
| 0003CB | Independent Living Residential Units<br><br>(See Section C Paragraph C.5.7)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | *(Offeror shall propose no fewer than 4 slots and no more than 56 slots) | | |
| 0003CC | Assisted Living (Level III)<br><br>(See Section C Paragraph C.5.8)<br><br>**Guaranteed Minimum Amount is $1000.00** | 16 | *(Offeror shall propose no fewer than 4 slots and no more than 16 slots) | | |
| 0003CD | Teen Parent Programs<br><br>(See Section C Paragraph C.5.9)<br>Maximum # of Teen Residents: 8<br>**Guaranteed Minimum Amount is $1000.00** | 65 | *(Offeror shall propose no fewer than 4 slots and no more than 24 slots) | | |

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0003BB | Specialized Group Home Care (Level III)<br><br>(See Section C Paragraph C.5.5)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 34 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots) | | |
| 0003CA | Independent Living Main Facility Programs<br><br>(See Section C Paragraph C.5.6)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | 55<br>*(Offeror shall propose no fewer than 4 slots and no more than 56 slots) | $194.58 | $3,906,127.53 |
| 0003CB | Independent Living Residential Units<br><br>(See Section C Paragraph C.5.7)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | *(Offeror shall propose no fewer than 4 slots and no more than 56 slots) | | |
| 0003CC | Assisted Living (Level III)<br><br>(See Section C Paragraph C.5.8)<br><br>**Guaranteed Minimum Amount is $1000.00** | 16 | *(Offeror shall propose no fewer than 4 slots and no more than 16 slots) | | |
| 0003CD | Teen Parent Programs<br><br>(See Section C Paragraph C.5.9)<br>Maximum # of Teen Residents: 8<br>**Guaranteed Minimum Amount is $1000.00** | 65 | *(Offeror shall propose no fewer than 4 slots and no more than 24 slots) | | |

| | | | | | |
|---|---|---|---|---|---|
| 0003CE | Community Based Return Diversion.<br>(See Section C. Paragraph C.5.10) 0<br><br>Maximum Residents: 8<br>**Guaranteed Minimum Amount is $1000.00** | 45 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots) | | |
| 0003CF | Specialized Group Home Care (Level IV)<br><br>(See Section  C Paragraph C.5.5)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 6 | *(Offeror shall propose no fewer than 4 slots and no more than 6 slots) | | |
| 0003CG | Assisted Living (Level IV)<br><br>(See Section  C Paragraph C.5.8)<br>**Guaranteed Minimum Amount is $10000.00** | 4 | *(Offeror shall propose no fewer than 4 slots | | |

**B.9.4   OPTION PERIOD 3: 10/1/06 THROUGH 9/30/07**

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0004AA | Diagnostic and Emergency Care: Aged 12 and Younger. (See Section C Paragraph C.5.2) Maximum Residents: 8 **Guaranteed Minimum Amount is $1000.00** | 20 | *(Offeror shall propose no fewer than 4 slots and no more than 20 slots)* | | |
| 0004AB | Diagnostic and Emergency Care: Aged 13 and Older. (See Section C Paragraph C.5.3) Maximum residents: 8 **Guaranteed Minimum Amount is $1000.00** | 36 | *(Offeror shall propose no fewer than 4 slots and no more than 16 slots)* | | |
| 004BA | Traditional Group Home Care (See Section C Paragraph C.5.4) Maximum residents: 8 **Guaranteed Minimum Amount is $1000.00** | 81 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots)* | | |

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0004BB | Specialized Group Home Care (Level III) (See Section C Paragraph C.5.5) Maximum Residents: 8 **Guaranteed Minimum Amount is $1000.00** | 30 | *(Offeror shall propose no fewer than 4 slots and no more than 30 slots) | ___ | ___ |
| 0004CA | Independent Living Main Facility Programs (See Section C Paragraph C.5.6) **Guaranteed Minimum Amount is $1000.00** | 100 | 55 *(Offeror shall propose no fewer than 4 slots and no more than 56 slots | 194.58 | $3,906,127.53 |
| 0004CB | Independent Living Residential Units (Sec Section C Paragraph C.5.7) **Guaranteed Minimum Amount is $1000.00** | 100 | *(Offeror shall propose no fewer than 4 slots and no more than 56 slots | ___ | ___ |

| Item No. | Supply/Services | <u>Maximum Quantity to be Contracted By CFSA</u> | <u>Offeror's Proposed Quantity</u> | <u>Unit Price</u> (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0004CC | Assisted Living (Level III)<br><br>(See Section C Paragraph C.5.8)<br><br>**Guaranteed Minimum Amount is $1000.00** | 16 | *(Offeror shall propose no fewer than 4 slots and no more than <u>16</u> slots | | |
| 0004CD | Teen Parent Programs<br><br>(See Section C Paragraph C.5.9)<br><br>Maximum # of Teen Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 59 | *(Offeror shall propose no fewer than 4 slots and no more than <u>24</u> slots | | |
| 0004CE | Community Based Return Diversion.<br><br>(See Section C. Paragraph C.5.10)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 36 | *(Offeror shall propose no fewer than 4 slots and no more than <u>32</u> slots | | |

B.9.5   OPTION PERIOD 4: 10/1/07 THROUGH 9/30/08

| Item No. | Supply/Services | Maximum Quantity to be Contracted by CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0005AA | Diagnostic and Emergency Care:<br>Aged 12 and Younger.<br><br>(See Section C Paragraph C.5.2)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 20 | *(Offeror shall propose no fewer than 4 slots and no more than20 slots* | | |
| 0005AB | Diagnostic and Emergency Care:<br>Age 13 and Older<br><br>(See Section C Paragraph C.5.3)<br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 32 | *(Offeror shall propose no fewer than 4 slots and no more than 16 slots* | | |
| 005BA | Traditional Group Home Care<br><br>(See Section C Paragraph C.5.4)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 72 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots* | | |
| 0005BB | Specialized Group Home Care (Level III)<br><br>(See Section C Paragraph C.5.5)<br><br>Maximum Residents: 8<br>**Guaranteed Minimum Amount is $1000.00** | 27 | *(Offeror shall propose no fewer than 4 slots and no more than 27 slots* | | |

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0005CA | Independent Living Main Facility Program<br><br>(See Section C Paragraph C.5.6)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | 55<br>*(Offeror shall propose no fewer than 4 slots and no more than 56 slots | 200.39 | $4,022,899.53 |
| 0005CB | Independent Living Residential Units<br><br>(See Section C Paragraph C.5.7)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | *(Offeror shall propose no fewer than 4 slots and no more than 56 slots | | |
| 0005CC | Assisted Living (Level III)<br><br>(See Section C Paragraph C.5.8)<br><br>**Guaranteed Minimum Amount is $1000.00** | 16 | *(Offeror shall propose no fewer than 4 slots and no more than 16 slots | | |
| 0005CD | Teen Parent Programs<br><br>(See Section C Paragraph C.5.9)<br><br>Maximum # of Teen Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 53 | *(Offeror shall propose no fewer than 4 slots and no more than 24 slots | | |

**Attachment J.4**



**Office of Contracting**
**& Procurement**
**Government of the**
**District of Columbia**

## COST / PRICE DISCLOSURE CERTIFICATION

RFP Number: __CFSA-03-R-0005__          Closing Date: __September 17, 2003__

Caption: _____ Total Proposed Amount: __$3,852,356.84__

The undersigned __Dr. James L. Jones, Esq.   President, Jones & Associates, Inc.__

(please print name and title of offeror's authorized signatory) hereby certifies that, to the best of my knowledge, the cost and pricing data (i.e. at the time of price agreement this certification represents that all material facts of which prudent buyers and sellers would reasonably expect to affect price negotiations in any significant manner) submitted was accurate, complete, and current as of __September 17, 2003__          (date of RFP closing or conclusion of negotiations as appropriate). The undersigned further agrees that it is under a continuing duty to update cost or pricing data through the date that negotiations, if any, with the District are completed. The undersigned further agrees that the price, including profit or fee, will be adjusted to exclude any significant price increases occurring because the cost or pricing data was inaccurate, incomplete or not current. (See D.C. Procurement Regulations, 27 DCMR, Chapter 6, Section 699, Chapter 16, Section 1624; and Section 32 of the Standard Contract Provisions for Use with District of Columbia Government Supply and Services Contracts, October 1, 1999, as amended).

Signed: _____ .          Date: __September 17, 2003__

Title: __President__

Company: __Jones & Associates, Inc.__

Address: __1454 Corcoran Street, N.W.__
                __Suite 101__
                __Washington, D.C.   20009__

DUNS #: __11-26-28516__

Phone: __202-462-1117__

Fax: __202-332-5412__

JONES AND ASSOCIATES

COMPLAINT

EXHIBITS:

EXHIBIT SIXTEEN:

BUDGET PACK COVER MEMO, 2003 TO 2004

CHILD AND FAMILY SERVICES AGENCY
UNDER CONTROL OF
LASHAWN GENERAL RECEIVER

BUDGET PACKAGE COVER MEMO

PROVIDER: College Options/DY (Jones & Associates)

MAILING ADDRESS: 1454 Corcoran Street, N.W., Washington, DC  20009

CONTACT NAME: Dr. James L. Jones, Esq    PHONE #: (202)462-1117

SERVICE: Independent Living Services

ORIGINAL [X]    REVISION [ ] (NUMBER _____ )

RFP/CONTRACT NO:  CFSA-01-R-0023-EK

CONTRACT AMENDMENT / REVISION (NUMBER____2____)

FOR PERIOD FROM  04 / 01 / 03  TO 03 / 31 / 04

DATE DELIVERED / MAILED TO CFSA: 03 /19 / 01

APPROVED BY AUTHORIZED PROVIDER OFFICIAL:

Dr. James L. Jones, Esq., President
_____
TITLE

_____   3/19/01
SIGNATURE

RECEIVED IN CFSA / CONTRACTS AND ADMINISTRATION:
_____ /____ / 9____

RECEIVED BY: _____
NAME

_____
TITLE

[ ]    BUDGET PACKAGE COMPLETED
(ALL SCHEDULES COMPLETED, INCLUDING
ALL REQUIRED ATTACHMENTS)

[ ]    ADEQUATE NUMBER OF COPIES SUBMITTED
(PER INSTRUCTIONS OR RFP)
NUMBER SUBMITTED    = _____

[ ]    COPIES DISTRIBUTED ACCORDING TO
INSTRUCTIONS (ATTACH DISTRIBUTION LIST)

CFSA - 10 / 96            Ex.# 16

Attachment J-2

2

CHILD AND FAMILY SERVICES AGENCY
UNDER CONTROL OF
LASHAWN GENERAL RECEIVER

## UNIT - COST AND REIMBURSEMENT RATE WORK SHEET

PROVIDER        College Options/DY (Jones & Associates)

SERVICE         1454 Corcoran Street, N.W., Washington, DC   20009

ORIGINAL  [ X ]      REVISION  [  ]  (NUMBER _____ )

RFP/CONTRACT NO:    CFSA-01-R-0023-EK

FOR PERIOD FROM      04 / 01 / 03  TO 03 / 31 / 04

(A) TOTAL BUDGET FOR PROVIDING SERVICE:        $2,736,232

(B) CFSA SHARE OF TOTAL BUDGET:        $2,671,232

(C) TOTAL NUMBER OF SERVICE UNITS TO BE DELIVERED:        55 clients X 365 = 20,075
                                                                                    Client days

SERVICE UNIT:    A Client/Day

PROJECTED COST PER UNIT OF SERVICE:
        ({A} DIVIDED BY {C})        $136.30

PROJECTED CFSA SHARE OF COST PER UNIT:
        (PROPOSED REIMBURSEMENT RATE)        $133.06
        ( {B} DIVIDED BY {C} )

NAMES / ADDRESSES OF FACILITIES TO BE USED IN DELIVERING THE PROPOSED SERVICE:

FACILITY      #1 1819-1821 East Capitol Street, S.E., Washington, DC   20003

FACILITY      #2 _____

FACILITY      #3 _____

FACILITY      #4 _____

FACILITY      #5 _____

FACILITY      #6 _____

        * Facilities must Correspond to the Columns Used in
        Schedules 4 Through 11.

CFSA - 10 / 96                                                                    2

NAME OF OFFEROR OR CONTRACTOR
College Options/DY (Jones & Associates)

| IN | SUPPLIES OR SERVICES | QUANTITY SERVED | NUMBER OF DAYS | UNIT PRICE | EXTENDED AMOUNT |
|---|---|---|---|---|---|
| | SECTION B<br><br>SUPPLIES OR SERVICES<br>AND PRICES/COSTS *<br><br>OPTION YEAR TWO (2)<br><br>The Contractor shall provide all labor, management, supervisors, counselors, consultants, facilities, transportation, equipment, and supplies necessary to provide Independent Living Preparation Services in accordance with the specifications contained in Section C and at the prices stated herein.<br><br>The period of performance is from ~~01 October 2002~~ 01 April 2003 through ~~30 September 2003~~. 31 March 2004 | | | | |
| | | Number of youth to be served | Number of days | Daily rate per youth | Extended amount |
| 0003 | OPTION YEAR TWO (2) PRICING<br><br>INDEPENDENT LIVING PREPARATION SERVICES | 55 | 365 Days | $ 133.06 | $ 2,671,232 |
| | **TOTAL AMOUNT** | | | | $ 2,671,232 |

CFSA CONTINUATION SHEET FORM 002 5/00

CHILD AND FAMILY SERVICES AGENCY

BUDGET SUMMARY FORM

PROVIDER NAME:   College Options/DY (Jones & Associates)   SERVICE Independent Living Services

ORIGINAL [ X ]   REVISION [  ] (NUMBER _____ )   RFP/CONTRACT NO: CFSA-01-R-000 EK

23

FOR PERIOD FROM ___04/01___, 2003 ___ TO __03/31__, 2004

| | (1)<br>CFSA FUNDS | (2)<br>OTHER FUNDS | (3)<br>TOTAL COST | |
|---|---|---|---|---|
| 1 SALARIES | 1,073,512 | | 1,073,512 | ATTACH SCHEDULE 1 |
| 2 FRINGE BENEFITS | 267,108 | | 267,108 | ATTACH SCHEDULE 2 |
| 3 CONSULTANTS / EXPERTS | 121,197 | | 121,197 | ATTACH SCHEDULE 3 |
| 4 OCCUPANCY | 296,521 | | 296,521 | ATTACH SCHEDULE 4 |
| 5 TRAVEL AND TRANSPORTATION | 38,617 | | 38,617 | ATTACH SCHEDULE 5 |
| 6 SUPPLIES & MINOR EQUIPMENT | 57,289 | | 57,289 | ATTACH SCHEDULE 6 |
| 7 CAPITAL EQUIPMENT & OUTLAYS | 0 | 0 | 0 | ATTACH SCHEDULE 7 |
| 8 CLIENT COSTS Includes college &<br>training (See Schedule 8 Justification) | 463,571 | 65,000 | 528,571 | ATTACH SCHEDULE 8 |
| 9 COMMUNICATIONS | 23,934 | | 23,934 | ATTACH SCHEDULE 9 |
| 10 OTHER DIRECT COSTS | 15,914 | | 15,914 | ATTACH SCHEDULE 10 |
| 11 INDIRECT COST / OVERHEAD | 235,766 | | 235,766 | ATTACH SCHEDULE 11 |
| SUBTOTAL BEFORE FEE | 2,593,429 | 65,000 | 2,658,429 | |
| 12 FEE (--3 % OF SUBTOTAL) | 77,803 | | 77,803 | |
| 13 TOTAL BUDGET | 2,671,232 | 65,000 | 2,736,232 | |

CFSA - 10 / 96

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE **1**: SALARY AND WAGE JUSTIFICATION

PAGE __1__ OF __4__

PROVIDER NAME: __College Options/DY (Jones & Associates)__ SERVICE __Indpendent Living Services__

FACILITY NAME / ADDRESS: __1819-1821 East Capitol Street, S.E., Washington, DC  20003__

ORIGINAL [ X ]   REVISION [ ](NUMBER _____ )   RFP/CONTRACT NO: __CFSA-01-R-0000 EK__

FOR PERIOD FROM __04/01__ , __2003__ TO __03/31__ __2004__ __:23__

| (1) POSITION TITLE | (2) NAME* | 3 S A L A R Y | 4 H O U R L Y | (5) BASE SALARY / YEAR OR WAGE / HOUR | (6) % OF TIME OR # OF HRS ON THIS SERVICE | (7) TOTAL SALARY / WAGES COST | (8) OTHER CFSA (Y / N) |
|---|---|---|---|---|---|---|---|
| Director | Dr. James L. Jones, Esq. | X | | 85,570 | 75% | 64,178 | |
| Assistant Director | Sylvester L. Barnes, M.A. | X | | 56,945 | 100% | 56,945 • | |
| Office Manager | Monicalouise Piper | X | | 38,743 | 100% | 38,743 | |
| Program Develop. Coord. | TBA | X | | 41,007 | 100% | 41,007 | |
| Facility Supervisor | Marjorie McGaha | X | | 41,320 | 100% | 41,320 | |
| College Coordinator | Helen Jackson, M.A. | X | | 38,743 | 100% | 38,743 | |
| Sr. Counselor (Educ. Spec) | Van Vranken Mathews | X | | 31,153 | 100% | 31,153 | |
| Senior Counselor | Robert Parker | X | | 31,153 | 100% | 31,153 | |
| Senior Counselor | Alberta Miles | X | | 31,153 | 100% | 31,153 | |
| Senior Counselor | Denise Perry | X | | 31,153 | 100% | 31,153 | |

* USE " TBF" FOR POSITIONS TO BE FILLED AND ENTER PLANNED DATE FOR FILLING THE POSITION.   ATTACH JOB ANNOUNCEMENT AND COMMITMENT LETTER STATING   OFFEROR'S INTENT TO HIRE CONTINGENT UPON CONTRACT AWARD

TOTAL OF ENTRIES ON THIS PAGE          | 405,548 |

TOTAL OF ALL SCHEDULE 1 PAGES
( ENTER ON PAGE 1 ONLY )          | 1,073,512 |

CFSA - 10 / 96

4

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 1: SALARY AND WAGE JUSTIFICATION

PAGE 2 OF 4

PROVIDER NAME: College Options/DY (Jones & Associates)   SERVICE Indpendent Living Services

FACILITY NAME / ADDRESS: 1819-1821 East Capitol Street, S.E., Washington, DC  20003

ORIGINAL [ X ]   REVISION [  ] (NUMBER _____ )   RFP/CONTRACT NO: CFSA-01-R-00__-EK

FOR PERIOD FROM 04/01 , 2003 TO 03/31 , 2004     23

| (1) POSITION TITLE | (2) NAME* | (3) SALARY | (4) HOURLY | (5) BASE SALARY / YEAR OR WAGE / HOUR | (6) % OF TIME OR # OF HRS ON THIS SERVICE | (7) TOTAL SALARY / WAGES COST | (8) OTHER CFSA (Y / N) |
|---|---|---|---|---|---|---|---|
| Senior Counselor | Anthony McIntyre | X | | 31,153 | 100% | 31,153* | |
| Counselor | Denise Daniels | X | | 28,592 | 100% | 28,592 | |
| Counselor | Loretta Carry | X | | 28,592 | 100% | 28,592 | |
| Counselor | Eleanor Cox | X | | 28,592 | 100% | 28,592 | |
| Counselor | Mary Johnson | X | | 28,592 | 100% | 28,592 | |
| Counselor Aide | Carolyn Bellamy | X | | 25,948 | 100% | 25,948 | |
| Counselor Aide | James Hughes | X | | 25,948 | 100% | 25,948 | |
| Counselor Aide | Morlai Kamara | X | | 25,948 | 100% | 25,948 | |
| Counselor Aide | Louise Green | X | | 25,948 | 100% | 25,948 | |
| Counselor Aide | Cassaundra Donaldson | X | | 25,948 | 100% | 25,948 | |

* USE " TBF" FOR POSITIONS TO BE FILLED AND ENTER PLANNED DATE FOR FILLING THE POSITION.   ATTACH JOB ANNOUNCEMENT AND COMMITMENT LETTER STATING   OFFEROR'S INTENT TO HIRE CONTINGENT UPON CONTRACT AWARD

TOTAL OF ENTRIES ON THIS PAGE    275,261

TOTAL OF ALL SCHEDULE 1 PAGES    1,073,512
( ENTER ON PAGE 1 ONLY )

CFSA - 10 / 96

4

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 1: SALARY AND WAGE JUSTIFICATION

PAGE 3 OF 4

PROVIDER NAME: College Options/DY (Jones & Associates) SERVICE Indpendent Living Services

FACILITY NAME / ADDRESS: 1819-1821 East Capitol Street, S.E., Washington, DC 20003

ORIGINAL [ X ]   REVISION [ ](NUMBER _____ )   RFP/CONTRACT NO: CFSA-01-R-0002-EK

FOR PERIOD FROM 04/01 , 2003 TO 03/31 , 2004   23

| (1) POSITION TITLE | (2) NAME* | (3) SALARY | (4) HOURLY | (5) BASE SALARY / YEAR OR WAGE / HOUR | (6) % OF TIME OR # OF HRS ON THIS SERVICE | (7) TOTAL SALARY / WAGES COST | (8) OTHER CFSA (Y/N) |
|---|---|---|---|---|---|---|---|
| Counselor Aide | Alberta Morrison | X | | 25,948 | 100% | 25,948 | |
| Counelor Aide | Clarence Brown | X | | 25,948 | 100% | 25,948 | |
| Counselor Aide | James Quander | X | | 25,948 | 100% | 25,948 | |
| Counselor Aide | Dominique Graham | X | | 25,948 | 100% | 25,948 | |
| Counselor Aide | Ralph Henry | X | | 25,948 | 100% | 25,948 | |
| Counselor Aide | James Hughes | X | | 25,948 | 100% | 25,948 | |
| Counselor Aide | Mattie Nichols | X | | 25,948 | 100% | 25,948 | |
| Records & Reports Spec. | Mary B. Jones | X | | 31,153 | 100% | 31.153 | |
| Word Processor | Cynthia Smith | X | | 25,948 | 100% | 25,948 | |
| Computer Specialist | Darnell Rogers | X | | 25,948 | 100% | 25,948 | |

* USE " TBF" FOR POSITIONS TO BE FILLED AND ENTER PLANNED
DATE FOR FILLING THE POSITION. ATTACH JOB ANNOUNCEMENT AND
COMMITMENT LETTER STATING OFFEROR'S INTENT TO HIRE
CONTINGENT UPON CONTRACT AWARD

TOTAL OF ENTRIES ON THIS PAGE   264,685

TOTAL OF ALL SCHEDULE 1 PAGES   1,073.512
( ENTER ON PAGE 1 ONLY )

CFSA - 10 / 96

4

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 1: SALARY AND WAGE JUSTIFICATION

PAGE _4_ OF _4_

PROVIDER NAME: College Options/DY (Jones & Associates)  SERVICE  Indpendent Living Services

FACILITY NAME / ADDRESS: 1819-1821 East Capitol Street, S.E., Washington, DC 20003

ORIGINAL [ X ]

REVISION [ ] (NUMBER _____ )  RFP/CONTRACT NO: CFSA-01-R-00__-EK

FOR PERIOD FROM _04/01_ , _2003_  TO _03/31_ , _2004_    23

| (1) POSITION TITLE | (2) NAME* | S A L A R Y | H O U R L Y | (5) BASE SALARY / YEAR OR WAGE / HOUR | (6) % CF TIME OR # OF HRS ON THIS SERVICE | (7) TOTAL SALARY / WAGES COST | (8) OTHER CFSA (Y / N) |
|---|---|---|---|---|---|---|---|
| Maintenace Spec. | Anthony Brown | X | | 25,948 | 100% | 25,948. | |
| Custodian | Anthony Jones | X | | 19,554 | 100% | 19,554 | |
| Custodian | Mark Pannell | X | | 19,554 | 100% | 19,554 | |
| Clerk/Secretary | TBA * | X | | 21,704 | 100% | 21,704 | |
| Security Specialist | TBA * | X | | 21,704 | 100% | 21,704 | |
| Security Aide | TBA * | X | | 19,554 | 100% | 19,554 | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| *WITHIN 30 DAYS OF CONTRACT AWARD | | | | | | | |

* USE " TBF" FOR POSITIONS TO BE FILLED AND ENTER PLANNED DATE FOR FILLING THE POSITION.   ATTACH JOB ANNOUNCEMENT AND COMMITMENT LETTER STATING   OFFEROR'S INTENT TO HIRE CONTINGENT UPON CONTRACT AWARD

TOTAL OF ENTRIES ON THIS PAGE

128,018

TOTAL OF ALL SCHEDULE 1 PAGES ( ENTER ON PAGE 1 ONLY )

1,073,512

CFSA - 10 / 96

4

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 2: FRINGE BENEFIT JUSTIFICATION

PAGE 1 OF 1

PROVIDER NAME: College Options/DY (Jones & Associates) SERVICE Independent Living Services

FACILITY NAME / ADDRESS: 1819-1821 East Capitol Street, S.E., Washington, DC 20003

ORIGINAL [ X ]     REVISION [   ](NUMBER _____ )     RFP/CONTRACT NO: CFSA-01-R-0002-EK

FOR PERIOD FROM 04/01 , 2003   TO 03/31 , 2004     23

| (1) BENEFIT CATEGORY | EMPLOYER PAYMENTS ON BEHALF OF EMPLOYEES TO WORK ON THIS CONTRACT | | | (5) TOTAL EMPLOYER PAYMENTS FOR BENEFIT |
| --- | --- | --- | --- | --- |
| | (2) SALARIED - FULL-TIME | (3) SALARIES - PART-TIME | (4) HOURLY | |
| SOCIAL SECURITY (FICA) .0765 | | | | 82,124 |
| INSURANCE .08 | | | | 85,881 |
| WORKER'S COMPENSATION .035 | | | | 37,573 |
| UNEMPLOYMENT INSURANCE .065 | | | | 18,590 |
| OTHER BENEFITS .04 | | | | 42,940 |
| TOTAL BENEFITS | | | | 267,108 |

ATTACH JUSTIFICATION FOR ALL BENEFITS

FRINGES AS A PERCENT OF SALARIES & WAGES   24.88%

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 3: CONSULTANTS / EXPERTS JUSTIFICATION

PAGE _1_ OF _1_

PROVIDER NAME: College Options/DY (Jones & Associates)   SERVICE   Independent Living Services

FACILITY NAME / ADDRESS: 1819-1821 East Capitol Street, SE, Washington, DC  20003

ORIGINAL [ X ]   REVISION [ ](NUMBER _____ )   RFP/CONTRACT NO: CFSA-01-R-00__-EK

FOR PERIOD FROM __04/01__ · _2003_ TO __03/31__ , _2004_   23

| (1) POSITION TITLE | (2) NAME* | (3) BASE WAGE / HOUR | (5) NO. OF HOURS FOR PERIOD | (7) TOTAL COST | (8) OTHER CFSA CONTRACTS (Y / N) |
|---|---|---|---|---|---|
| Rehab. Counselor | TBF* | 23.34 | 1040 hrs. | 24,273 | |
| Educational Specialist | TBF* | 23.34 | 1040 | 24,273 | |
| Financial Consultant | TBF* | 21.22 | 200 | 4,244 | |
| Employment/Plcmt. Specialist | TBF* | 21.22 | 2080 | 44,134 | |
| Rehab. Counselor | TBF* | 23.34 | 1040 | 24,273 | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

* USE TBF FOR POSITIONS TO BE FILLED AND ENTER
PLANNED DATE FOR FILLING THE POSITION.  ATTACH JOB
ANNOUNCEMENT AND COMMITMENT LETTER STATING INTENT
TO HIRE CONTINGENT UPON CONTRACT AWARD

*ATTACH SIGNED COPIES OF CONSULTANT AGREEMENT (S)

TOTAL OF ENTRIES ON THIS PAGE   121,197

TOTAL OF ALL SCHEDULE 3 PAGES   121,197
( ENTER ON PAGE 1 ONLY )

CFSA - 10 / 96

6

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 4: OCCUPANCY COST JUSTIFICATION

PAGE 1 OF 2

PROVIDER NAME: __College Options/DY (Jones & Associates)__   SERVICE __Independent Living Services__

ORIGINAL [ X ]   REVISION [  ](NUMBER _____ )   RFP/CONTRACT NO: __CFSA-01-R-00~~23~~-EK__
FOR PERIOD FROM   __04/01__ , __2003__   TO __03/31__ , __2004__                     23

| (1)<br>EXPENSE CATEGORY | (2)<br>COST FOR FACILITY #1 | (3)<br>COST FOR FACILITY #2 | (4)<br>COST FOR FACILITY #3 | (5)<br>TOTAL OCCUPANCY<br>FOR ALL FACILITIES |
|---|---|---|---|---|
| RENT Apt. & Office Space<br>$1432.21/mo X 12 units | 206,239 | | | 206,239 |
| GAS / ELECT / OIL / WATER | 28,008 | | | 28,008 |
| TRASH<br>$875.24/mo | 10,503 | | | 10,503 • |
| MAINTENANCE<br>$1485.26/mo | 17,823 | | | 17,823 |
| INSURANCE | 8,487 | | | 8,487 |
| PEST CONTROL<br>$530.45/mo | 6,365 | | | 6,365 |
| REPAIRS<br>$1060.90/mo | 12,731 | | | 12,731 |
| OTHER<br>$550.45/mo | 6,365 | | | 6,365 |

USE ADDITIONAL PAGES IF MORE THAN THREE FACILITIES ARE INCLUDED IN
ONE BUDGET

ATTACH COPIES OF AGREEMENT (S) FOR ALL RENTED OR LEASED
FACILITIES

TOTAL OF ENTRIES ON THIS PAGE   | 296,521 |

TOTAL OF ALL SCHEDULE 4 PAGES
(ENTER ON PAGE 1 ONLY)   | 296,521 |

CFSA - 10 / 96

## Schedule 4
## Occupancy  Cost Justification

Jones & Associates has leased the facility for the Jones & Associates Independent Living Program for the last eighteen (18) years.  For about the last seven (7) years there has not been any rent increase.  For this contract period the rent will not be increased and will remain at the current note.

In recent years property values have increased greatly in the district of Columbia.  The rental rate for the facility is justified by the fact that comparable property in the Capital Hill area is about the same or slightly higher.

In addition the special population of fifty-five (55) teenagers with problems with problems as described in the CFSA RFP contributes to unusual maintenance problems of the facility.

**CHILD AND FAMILY SERVICES AGENCY**
**SCHEDULE 5:  TRAVEL AND TRANSPORTATION COST JUSTIFICATION**

PAGE __1__ OF __1__

PROVIDER NAME: College Options/DY (Jones & Associates)    SERVICE    Independent Living Services

ORIGINAL [ X ]    REVISION [ ](NUMBER _____ )    RFP/CONTRACT NO: CFSA-01-R-00__-EK _23_

FOR PERIOD FROM __04/01__ , __2003__   TO __03/31__ , __2004__

| (1) EXPENSE CATEGORY | (2) VEHICLE COSTS | (3) NON - VEHICLE COSTS | (4) TOTAL TRAVEL AND TRANSPORTATION COST |
|---|---|---|---|
| VEHICLE LEASES Vans & other vehicles as required | 15,277 | | 15,277 |
| VEHICLE DEPRECIATION | | | |
| GASOLINE / OIL / SUPPLIES | 10,185 | | 10,185 |
| TIRES / BATERIES | | | |
| MAINTENANCE / REPAIRS | | | |
| INSURANCE | 2,546 | | 2,546 |
| REGISTRATION | | | |
| MILEAGE FARES | | | |
| OTHER | | 10,609 | 10,609 |
| TOTAL OF ALL ENTRIES ON THIS PAGE | 28,008 | 10,609 | 38,617 |

ATTACH DESCRIPTION OF ALL VEHICLES AND COPIES OF  FINANCING

ARRANGEMENTS

TOTAL OF ALL SCHEDULE **5** PAGES
( ENTER ON PAGE **1** ONLY)

| 38,617 |
|---|

ATTACH EXPLANATION OF ANY OTHER TRAVEL OR TRANSPORTATION COSTS,
INCLUDING JUSTIFICATION OF ANY OUT - OF - TOWN TRAVEL

FSA - 10 / 96

8

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 6:   SUPPLIES AND MINOR EQUIPMENT COST JUSTIFICATION

PAGE _1_ OF _2_

PROVIDER NAME:   College Options/DY (Jones & Associates)   SERVICE   Independent Living Services

ORIGINAL [ X]   REVISION [ ](NUMBER _____ )   RFP/CONTRACT NO: CFSA-01-R-00___-EK
FOR PERIOD FROM _____04/01___, 2003____ TO ___03/31___, 2004____   *23*

| (1) EXPENSE CATEGORY | (2) COST FOR FACILITY #1 | (3) COST FOR FACILITY #2 | (4) COST FOR FACILITY #3 | (5) TOTAL SUPPLIES |
|---|---|---|---|---|
| OFFICE SUPPLIES | 5,305 | | | 5,305 |
| HOUSEHOLD SUPPLIES | 19,096 | | | 19,096 |
| HOUSEHOLD FURNISHINGS | 15,914 | | | 15,914 |
| OFFICE EQUIPMENT | 5,305 | | | 5,305 |
| OTHER SUPPLIES | 7,957 | | | 7,957 |
| OTHER EQUIPMENT | 3,712 | | | 3,712 |
| TOTAL THIS PAGE | 57,289 | | | 57,289 |

ATTACH EXPLANATION OF ANY OTHER SUPPLIES OR
OTHER EQUIPMENT COSTS, WITH ITEMIZED LISTS

TOTAL OF ALL SCHEDULE 6 PAGES
(ENTER ON PAGE 1 ONLY)

| 57,289 |

CFSA - 10 / 96

9

**Schedule 6**
**Supplies and Minor Equipment Cost Justification**
**Itemized List**

| | | |
|---|---|---|
| Other Supplies | 7,957 | 7,957 |
|    -Educational | | |
|    -Recreational | | |
|    -Kitchen | | |
| | | |
| Other Equipment | | |
|    -TV Video Equipment | 1,419 | |
|    -Rec./Educational | 950 | |
|    -Video Educational | <u>1,343</u> | <u>3,712</u> |

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 7: CAPITAL EQUIPMENT AND OUTLAYS COST JUSTIFICATION

PAGE __1__ OF __1__

PROVIDER NAME: __College Options/DY (Jones & Associates)__ SERVICE __Independent Living Services__

ORIGINAL [X]  REVISION [ ](NUMBER _____ )  RFP/CONTRACT NO: __CFSA-01-R-00~~00~~-EK__
_23_

FOR PERIOD FROM __04/01__ , __2003__  TO __03/31__ , __2004__

| (1)<br>EXPENSE CATEGORY | (2)<br>COST FOR FACILITY #1 | (3)<br>COST FOR FACILITY #2 | (4)<br>COST FOR FACILITY #3 | (5)<br>TOTAL FOR ALL<br>FACILITIES |
|---|---|---|---|---|
| VEHICLE PURCHASE* | N/A | | | |
| MAJOR REPAIRS | N/A | | | |
| MAJOR EQUIPMENT | N/A | | | |
| OTHER CAPITAL OUTLAYS** | N/A | | | |
| TOTAL THIS PAGE | N/A | | | |

USE ADDITIONAL PAGES IF MORE THAN THREE FACILITIES ARE INCLUDED IN ONE BUDGET.

* ATTACH ITEMIZED LISTS

**ATTACH EXPLANATION OF ANY OTHER CAPITAL
OUTLAYS ANTICIPATED, WITH ITEMIZED LISTS

TOTAL OF ALL SCHEDULE 7 PAGES
(ENTER ON PAGE 1 ONLY)

| N/A |
|---|

CFSA - 10 / 96

10

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 8: CLIENT EXPENSE COST JUSTIFICATION

PROVIDER NAME: College Options/DY (Jones & Associates)   SERVICE Independent Living Services

ORIGINAL [ X ] REVISION [ ]   (NUMBER _____ )   RFP/CONTRACT NO: CFSA-01-R-0002-EK   23

FOR PERIOD FROM _____ 04/01 _____ 2003 _____ TO _____ 03/31 _____ , _____ 2004 _____

| (1)<br>EXPENSE CATEGORY | (2)<br>COST FOR FACILITY #1 | (3)<br>COST FOR FACILITY #2 | (4)<br>COST FOR FACILITY #3 | (5)<br>TOTAL FOR ALL FACILITIES |
|---|---|---|---|---|
| FOOD<br>$10.61 X 55 X 365 | 212, 976 | | | 212,976 |
| CLOTHING<br>$ 63.65 X 12 X 55 | 42,012 | | | 42,012 |
| ALLOWANCES / STIPENDS<br>$27.58/wk X 52 X 55 | 78,888 | | | 78,888 |
| MEDICAL | | | | |
| DENTAL | | | | |
| TRAINING*<br>  College Program | 103,438 | | | 103,438 |
| OTHER **<br>  Educational Functions | 26,257 | | | 26,257 |
| TOTAL THIS PAGE | 463,571 | · | | 463,571 |

* ATTACH ITEMIZED LISTS

** ATTACH DETAILED EXPLANATION OF ANY OTHER
CLIENT COSTS ANTICIPATED.

TOTAL OF ALL SCHEDULE 8 PAGES
(ENTER ON PAGE 1 ONLY)

| 463,571 |
|---|

CFSA-10-96

# Schedule 8
# Client Expense Cost Justification

An initial clothing allowance does not last during all the child's various growth periods, that is infancy, childhood, adolescence, young adulthood and adulthood. As a result other funds are necessary to defray these clothing costs. The amount in the line item is for clothing for clients, especially during the winter and school months, winter boots, sports activity dress, dress clothing for ceremonies, etc., overcoats need replacement and repairs. Hats, gloves, scarfs, long johns, winter scarfs are high cost items that must be replaces immediately.

Training-College Option- Approximately $4,000 is secured by the Jones ILP Program for grants, work study, scholarships and student savings. CFSA provides other funds for college.

The- line items "Other" is for graduation activities. The graduation activities is a highly motivational factor for client in Junior High Schools. In some cases it may determine whether or not a client completes school. The cost of client graduations include such items as pictures, rings, class trip, cap & gown, yearbook, prom dresses, shoes, slips, pocketbooks, transportation, sending money, tuxedos for males, flowers.

Clothing :
    Clothing Allowance
        55 x 12 x $63.65        $42,012

Allowance/Stipend:
    $27.58/wk x 52 x 55        $78,888

Other: School functions, graduations,
    Yearbook, etc:
        30 clients x $875.23        $26,257

CFSA COST
College Program, training, other client educational costs:
        15 clients x $6,895.86        $103,438

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 9: COMMUNICATIONS COST JUSTIFICATION

PAGE __1__ OF _1_

PROVIDER NAME: __College Options/DY (Jones & Associates)__ SERVICE __Indpendent Living Services__

ORIGINAL [ X ] REVISION [ ]   (NUMBER _____ )   RFP/CONTRACT NO: __CFSA-01-R-00~~00~~-EK__

FOR PERIOD FROM __04/01__, __2003__ TO __03/31__, __2004__

| (1) EXPENSE CATEGORY | (2) COST FOR FACILITY #1 | (3) COST FOR FACILITY #2 | (4) COST FOR FACILITY #3 | (5) TOTAL COMMUNICATIONS COST |
|---|---|---|---|---|
| TELEPHONE $1060.90/mo | 12,731 | | | 12,731 |
| POSTAGE $137.92/mo | 1,655 | | | 1,655 |
| DELIVERY | | | | |
| COPYING $795.68/mo | 9,548 | | | 9,548 |
| OTHER | | | | |

| TOTAL THIS PAGE | 23,934 | | | 23,934 |
|---|---|---|---|---|

USE ADDITIONAL PAGES IF MORE THAN THREE FACILITIES ARE INCLUDED IN ONE BUDGET

ATTACH ITEMIZED LISTS

ATTACH EXPLANATION OF ANY OTHER COMMUNICATIONS COST ANTICIPATED, WITH ITEMIZED LISTS

TOTAL OF ALL SCHEDULE 9 PAGES (ENTER ON PAGE 1 ONLY)   | 23,934 |

CFSA - 10/96

12

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 10: OTHER DIRECT COST JUSTIFICATION

PAGE _1_ OF _2_

PROVIDER NAME: _College Options/DY (Jones & Associates)_ SERVICE _Independent Living Services_

ORIGINAL [ X ] REVISION [ ]   (NUMBER _____ )   RFP/CONTRACT NO: _CFSA-01-R-00_ _-EK_ _23_

FOR PERIOD FROM _04/01_ , _2003_ TO _03/31_ , _2004_

| (1) EXPENSE CATEGORY | (2) COST FOR FACILITY #1 | (3) COST FOR FACILITY #2 | (4) COST FOR FACILITY #3 | (5) TOTAL OTHER DIRECT COST |
|---|---|---|---|---|
| In-Service Training 20 Employees X $795.68/yr | 15,914 | | | 15,914 |
| | | | | • |
| | | | | |
| | | | | |
| | | | | |

| TOTAL THIS PAGE | 15,914 | | | 15,914 |
|---|---|---|---|---|

USE CATEGORIES OF OTHER DIRECT COSTS NOT COVERED ON SCHEDULES 1 THROUGH 9

* ATTACH ADDITIONAL PAGES IF MORE THAN THREE
FACILITIES ARE USED

TOTAL OF ALL SCHEDULE 10 PAGES
(ENTER ON PAGE 1 ONLY)   | 15,914 |

CFSA - 10/96

13

## SCHEDULE 10
## OTHER DIRECT COST JUSTIFICATION

The In-Service training cost of $15,914 includes staff conferences related to Foster Care and Independent Living Programs.  In-house training sessions using outside resources include such areas as counseling, teen pregnancy, drug abuse and discipline.  These funds also cover various training.

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE **11**: INDIRECT / OVERHEAD COST JUSTIFICATION

PAGE _1_ OF _1_

PROVIDER NAME: _College Options/DY (Jones & Associates)_ SERVICE _Independent Living Services_

ORIGINAL [ X ] REVISION  [   ](NUMBER _____   )   RFP/CONTRACT NO: CFSA-01-R-0002-EK
:23

FOR PERIOD FROM _____04/01__, _2003_ TO __03/31__, _2004_

| (1)<br><br>EXPENSE CATEGORY | (2)<br><br>COST FOR FACILITY **#1** | (3)<br><br>COST FOR FACILITY **#2** | (4)<br><br>COST FOR FACILITY **#3** | (5)<br>TOTAL OTHER<br>INDIRECT COST |
|---|---|---|---|---|
| ADMINISTRATION<br> 10% of Total Direct Cost | 235,766 | | | 235,766 |
| FINANCIAL MANAGEMENT | | | | • |
| AUDIT | | | | |
| OTHER INDIRECT /OVERHEAD | | | | |
| | | | | |
| | | | | |

IF A PERCENTAGE IS USED, ATTACH APPROVAL LETTER FOR INDIRECT COSTS RATE OR PRIOR AUDITED FIGURES THAT JUSTIFIES THE PERCENTAGE USED .

TOTAL OF ALL SCHEDULE 11 PAGES
(ENTER ON PAGE 1 ONLY)

235,766

ATTACH EXPLANATION OF ANY OTHER INDIRECT OR OVERHEAD EXPENSES, WITH DETAILED COST JUSTIFICATION

CFSA - 10  96

14

CHILD AND FAMILY SERVICES AGENCY

UNDER CONTROL OF

LASHAWN GENERAL RECEIVER

## BUDGET PACKAGE COVER MEMO

PROVIDER.           College Options/DY (Jones & Associates)

MAILING ADDRESS     1454 Corcoran Street, N.W., Washington, DC  20009

CONTACT NAME.       Dr. James L. Jones, Esq      PHONE # (202)462-1117

SERVICE·            Independent Living Services

ORIGINAL [X]     REVISION [ ] (NUMBER _____ )

RFP/CONTRACT NO:     CFSA-01-R-0023-EK

CONTRACT AMENDMENT / REVISION  (NUMBER___ 2 __ )

FOR PERIOD FROM          04 / 01 / ⬛ 04 TO 03 / 31 / ⬛ 05

DATE DELIVERED / MAILED TO CFSA: 03 / 19 / ⬛ 01

APPROVED BY AUTHORIZED PROVIDER OFFICIAL:

    Dr. James L. Jones, Esq., President
_____
                     TITLE
_____ _____
                   SIGNATURE      3/19/01

RECEIVED IN CFSA / CONTRACTS AND ADMINISTRATION:
                    ___ / ___ / 9 ___

RECEIVED BY:      _____
                              NAME

                  _____
                              TITLE

[ ]               BUDGET PACKAGE COMPLETED
                  (ALL SCHEDULES COMPLETED, INCLUDING
                  ALL REQUIRED ATTACHMENTS)

[ ]               ADEQUATE NUMBER OF COPIES SUBMITTED
                  (PER INSTRUCTIONS OR RFP)
                  NUMBER SUBMITTED    = _____

[ ]               COPIES DISTRIBUTED ACCORDING TO
                  INSTRUCTIONS (ATTACH DISTRIBUTION LIST)

CFSA - 10 / 96

CHILD AND FAMILY SERVICES AGENCY
UNDER CONTROL OF
LASHAWN GENERAL RECEIVER

## UNIT - COST AND REIMBURSEMENT RATE WORK SHEET

PROVIDER     College Options PY (Jones & Associates)

SERVICE     1454 Corcoran Street, N.W., Washington, DC  20009

ORIGINAL  [ X ]     REVISION  [  ]  (NUMBER _____ )

REP/CONTRACT NO     CFSA-01-R-0023-EK

FOR PERIOD FROM     04 / 01 / 04  to 03 / 31 / 05

(A) TOTAL BUDGET FOR PROVIDING SERVICE     $2,815,725

(B) CFSA SHARE OF TOTAL BUDGET:     $2,750,725

(C) TOTAL NUMBER OF SERVICE UNITS TO BE DELIVERED.     55 clients X 365 = 20,075
                                                            Client days

    SERVICE UNIT:     Client/Day

PROJECTED COST PER UNIT OF SERVICE.
        ({A} DIVIDED BY {C})     $140.26

PROJECTED CFSA SHARE OF COST PER UNIT.
        (PROPOSED REIMBURSEMENT RATE)     $137.02
        ( {B} DIVIDED BY {C} )

NAMES / ADDRESSES OF FACILITIES TO BE USED IN DELIVERING THE PROPOSED SERVICE:

FACILITY     #1 1819-1821 East Capitol Street, S.E., Washington, DC  20003

FACILITY     #2 _____

FACILITY     #3 _____

FACILITY     #4 _____

FACILITY     #5 _____

FACILITY     #6 _____

        * Facilities must Correspond to the Columns Used in
        Schedules 4 Through 11.

CFSA - 10 / 96                                                       2

NAME OF OFFEROR OR CONTRACTOR

College Options/DY (Jones & Associates)

| IN | SUPPLIES OR SERVICES | QUANTITY SERVED | NUMBER OF DAYS | UNIT PRICE | EXTENDED AMOUNT |
|---|---|---|---|---|---|
| | SECTION B | | | | |
| | SUPPLIES OR SERVICES AND PRICES/COSTS • | | | | |
| | OPTION YEAR THREE (3) | | | | |
| | The Contractor shall provide all labor, management, supervisors, counselors, consultants, facilities, transportation, equipment, and supplies necessary to provide Independent Living Preparation Services in accordance with the specifications contained in Section C and at the prices stated herein | | | | |
| | The period of performance is from ~~01 October 2003~~ 01 April 2004 through ~~30 September 2004~~ 31 March 2005. | | | | |
| | | Number of youth to be served | Number of days | Daily rate per youth | Extended amount |
| | OPTION YEAR THREE (3) PRICING | | | | |
| 0004 | INDEPENDENT LIVING PREPARATION SERVICES | 55 | 365 Days | $ 137.02 | $2,750,725 |
| | TOTAL AMOUNT | | | | $2,750,725 |

CHILD AND FAMILY SERVICES AGENCY
BUDGET SUMMARY FORM

PROVIDER NAME: College Options/DY (Jones & Associates)   SERVICE Independent Living Services

ORIGINAL [ X ]   REVISION [ ] (NUMBER _____)   RFP/CONTRACT NO: CFSA-01-R-0001-EK
FOR PERIOD FROM 04/01 , 2004 TO 03/31 , 2005        23

| | (1) CFSA FUNDS | (2) OTHER FUNDS | (3) TOTAL COST | |
|---|---|---|---|---|
| 1 SALARIES | 1,105,710 | | 1,105,710 | ATTACH SCHEDULE 1 |
| 2 FRINGE BENEFITS | 274,562 | | 274,562 | ATTACH SCHEDULE 2 |
| 3 CONSULTANTS / EXPERTS | 124,833 | | 124,833 | ATTACH SCHEDULE 3 |
| 4 OCCUPANCY | 305,417 | | 305,417 | ATTACH SCHEDULE 4 |
| 5 TRAVEL AND TRANSPORTATION | 39,775 | | 39,775 | ATTACH SCHEDULE 5 |
| 6 SUPPLIES & MINOR EQUIPMENT | 59,007 | | 59,007 | ATTACH SCHEDULE 6 |
| 7 CAPITAL EQUIPMENT & OUTLAYS | 0 | | 0 | ATTACH SCHEDULE 7 |
| 8 CLIENT COSTS Includes college & training (See Schedule 8 justification) | 477,478 | 65,000 | 542,478 | ATTACH SCHEDULE 8 |
| 9 COMMUNICATIONS | 24,652 | | 24,652 | ATTACH SCHEDULE 9 |
| 10 OTHER DIRECT COSTS | 16,391 | | 16,391 | ATTACH SCHEDULE 10 |
| 11 INDIRECT COST / OVERHEAD | 242,782 | | 242,782 | ATTACH SCHEDULE 11 |
| SUBTOTAL BEFORE FEE | 2,670,607 | 65,000 | 2,735,607 | |
| 12 FEE (~3 % OF SUBTOTAL) | 80,118 | | 80,118 | |
| 13 TOTAL BUDGET | 2,750,725 | 65,000 | 2,815,725 | |

CFSA-10-96

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 1: SALARY AND WAGE JUSTIFICATION

PAGE 1 OF 4

PROVIDER NAME: College Options/DY (Jones & Associates)   SERVICE   Indpendent Living Services

FACILITY NAME / ADDRESS: 1819-1821 East Capitol Street, S.E., Washington, DC 20003

ORIGINAL [ X ]   REVISION [ ](NUMBER _____ )   RFP/CONTRACT NO: CFSA-01-R-0006-EK 23

FOR PERIOD FROM 04/01 , 2004 TO 03/31 , 2005

| (1) POSITION TITLE | (2) NAME* | SALARY | HOURLY | (5) BASE SALARY / YEAR OR WAGE / HOUR | (6) % OF TIME OR # OF HRS ON THIS SERVICE | (7) TOTAL SALARY / WAGES COST | (8) OTHER CFSA (Y / N) |
|---|---|---|---|---|---|---|---|
| Director | Dr. James L. Jones, Esq. | X | | 88,137 | 75% | 66,103 | |
| Assistant Director | Sylvester L. Barnes, M.A. | X | | 58,653 | 100% | 58,653 • | |
| Office Manager | Monicalouise Piper | X | | 39,905 | 100% | 39,905 | |
| Program Develop. Coord. | TBA | X | | 42,237 | 100% | 42,237 | |
| Facility Supervisor | Marjorie McGaha | X | | 42,559 | 100% | 42,559 | |
| College Coordinator | Helen Jackson, M.A. | X | | 39,905 | 100% | 39,905 | |
| Sr. Counselor (Educ. Spec) | Van Vranken Mathews | X | | 32,088 | 100% | 32,088 | |
| Senior Counselor | Robert Parker | X | | 32,088 | 100% | 32,088 | |
| Senior Counselor | Alberta Miles | X | | 32,088 | 100% | 32,088 | |
| Senior Counselor | Denise Perry | X | | 32,088 | 100% | 32,088 | |

* USE " TBF" FOR POSITIONS TO BE FILLED AND ENTER PLANNED DATE FOR FILLING THE POSITION.   ATTACH JOB ANNOUNCEMENT AND COMMITMENT LETTER STATING     OFFEROR'S INTENT TO HIRE CONTINGENT UPON CONTRACT AWARD

TOTAL OF ENTRIES ON THIS PAGE    417,714

TOTAL OF ALL SCHEDULE 1 PAGES    1,105,710
( ENTER ON PAGE 1 ONLY )

CFSA - 10 / 96

4

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 1: SALARY AND WAGE JUSTIFICATION

PAGE 2 OF 4

PROVIDER NAME:  College Options/DY (Jones & Associates)   SERVICE   Independent Living Services

FACILITY NAME / ADDRESS:   1819-1821 East Capitol Street, S.E., Washington, DC  20003

ORIGINAL [ X ]        REVISION [  ](NUMBER _____ )    RFP/CONTRACT NO:  CFSA-01-R-00__-EK
FOR PERIOD FROM   04/01 _____ , 2004  TO  03/31 _____ , 2005 _____      23

| (1)<br>POSITION TITLE | (2)<br>NAME* | 3<br>S<br>A<br>L<br>A<br>R<br>Y | 4<br>H<br>O<br>U<br>R<br>L<br>Y | (5)<br>BASE<br>SALARY / YEAR OR<br>WAGE / HOUR | (6)<br>% OF TIME<br>OR # OF HRS<br>ON<br>THIS SERVICE | (7)<br>TOTAL<br>SALARY / WAGES<br>COST | (8)<br>OTHER<br>CFSA<br>(Y / N) |
|---|---|---|---|---|---|---|---|
| Senior Counselor | Anthony McIntyre | X | | 32,088 | 100% | 32,088 | |
| Counselor | Denise Daniels | X | | 29,450 | 100% | 29,450 | |
| Counselor | Loretta Carry | X | | 29,450 | 100% | 29,450 | |
| Counselor | Eleanor Cox | X | | 29,450 | 100% | 29,450 | |
| Counselor | Mary Johnson | X | | 29,450 | 100% | 29,450 | |
| Counselor Aide | Carolyn Bellamy | X | | 26,726 | 100% | 26,726 | |
| Counselor Aide | James Hughes | X | | 26,726 | 100% | 26,726 | |
| Counselor Aide | Morlai Kamara | X | | 26,726 | 100% | 26,726 | |
| Counselor Aide | Louise Green | X | | 26,726 | 100% | 26,726 | |
| Counselor Aide | Cassaundra Donaldson | X | | 26,726 | 100% | 26,726 | |

* USE " TBF" FOR POSITIONS TO BE FILLED AND ENTER PLANNED
DATE FOR FILLING THE POSITION.   ATTACH JOB ANNOUNCEMENT AND
COMMITMENT LETTER STATING     OFFEROR'S INTENT TO HIRE
CONTINGENT UPON CONTRACT AWARD

TOTAL OF ENTRIES ON THIS PAGE            283,518

TOTAL OF ALL SCHEDULE 1 PAGES          1,105,710
( ENTER ON PAGE 1 ONLY )

CFSA - 10 / 96

4

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 1: SALARY AND WAGE JUSTIFICATION

PAGE 3 OF 4

PROVIDER NAME: College Options/DY (Jones & Associates)   SERVICE  Indpendent Living Services

FACILITY NAME / ADDRESS:   1819-1821 East Capitol Street, S.E., Washington, DC  20003

ORIGINAL [ X ]      REVISION [  ](NUMBER _____ )   RFP/CONTRACT NO:  CFSA-01-R-0008-EK

FOR PERIOD FROM  04/01    , 2004    TO  03/31    2005

| (1)<br>POSITION TITLE | (2)<br>NAME* | S A L A R Y (3) | H O U R L Y (4) | (5)<br>BASE<br>SALARY / YEAR OR<br>WAGE / HOUR | (6)<br>% OF TIME<br>OR # OF HRS<br>ON<br>THIS SERVICE | (7)<br>TOTAL<br>SALARY / WAGES<br>COST | (8)<br>OTHER<br>CFSA<br>(Y / N) |
|---|---|---|---|---|---|---|---|
| Counselor Aide | Alberta Morrison | X | | 26,726 | 100% | 26,726 | |
| Counelor Aide | Clarence Brown | X | | 26,726 | 100% | 26,726 • | |
| Counselor Aide | James Quander | X | | 26,726 | 100% | 26,726 | |
| Counselor Aide | Dominique Graham | X | | 26,726 | 100% | 26,726 | |
| Counselor Aide | Ralph Henry | X | | 26,726 | 100% | 26,726 | |
| Counselor Aide | James Hughes | X | | 26,726 | 100% | 26.726 | |
| Counselor Aide | Mattie Nichols | X | | 26,726 | 100% | 26,726 | |
| Records & Reports Spec. | Mary B. Jones | X | | 32,088 | 100% | 32,088 | |
| Word Processor | Cynthia Smith | X | | 26,726 | 100% | 26,726 | |
| Computer Specialist | Darnell Rogers | X | | 26,726 | 100% | 26,726 | |

* USE " TBF" FOR POSITIONS TO BE FILLED AND ENTER PLANNED
DATE FOR FILLING THE POSITION.   ATTACH JOB ANNOUNCEMENT AND
COMMITMENT LETTER STATING    OFFEROR'S INTENT TO HIRE
CONTINGENT UPON CONTRACT AWARD

TOTAL OF ENTRIES ON THIS PAGE       222,622

TOTAL OF ALL SCHEDULE 1 PAGES
( ENTER ON PAGE 1 ONLY )       1,105,710

CFSA - 10 / 96

4

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 1: SALARY AND WAGE JUSTIFICATION

PAGE _4_ OF _4_

PROVIDER NAME: College Options/DY (Jones & Associates)   SERVICE   Indpendent Living Services

FACILITY NAME / ADDRESS: 1819-1821 East Capitol Street, S.E., Washington, DC 20003

ORIGINAL [ X ]

FOR PERIOD FROM 04/01 , 2004

REVISION [ ](NUMBER _____ )

RFP/CONTRACT NO: CFSA-01-R-0001-EK   23

TO 03/31 , 2005

| (1) POSITION TITLE | (2) NAME* | SALARY | HOURLY | (5) BASE SALARY / YEAR OR WAGE / HOUR | (6) % OF TIME OR # OF HRS ON THIS SERVICE | (7) TOTAL SALARY / WAGES COST | (8) OTHER CFSA (Y / N) |
|---|---|---|---|---|---|---|---|
| Maintenace Spec. | Anthony Brown | X | | 26,726 | 100% | 26,726 | |
| Custodian | Anthony Jones | X | | 20,140 | 100% | 20,140. | |
| Custodian | Mark Pannell | X | | 20,140 | 100% | 20,140 | |
| Clerk/Secretary | TBA * | X | | 22,355 | 100% | 22,355 | |
| Security Specialist | TBA * | X | | 22,355 | 100% | 22,355 | |
| Security Aide | TBA * | X | | 20,140 | 100% | 20,140 | |
| | | | | | | | |
| | | | | | | | |
| * WITHIN 30 DAYS OF CONTRACT AWARD | | | | | | | |

* USE " TBF" FOR POSITIONS TO BE FILLED AND ENTER PLANNED DATE FOR FILLING THE POSITION.   ATTACH JOB ANNOUNCEMENT AND COMMITMENT LETTER STATING   OFFEROR'S INTENT TO HIRE CONTINGENT UPON CONTRACT AWARD

TOTAL OF ENTRIES ON THIS PAGE

131,856

TOTAL OF ALL SCHEDULE 1 PAGES
( ENTER ON PAGE 1 ONLY )

1,105,710

CFSA - 10 / 96

4

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 2: FRINGE BENEFIT JUSTIFICATION

PAGE 1 OF 1

PROVIDER NAME: College Options/DY (Jones & Associates) SERVICE Independent Living Services

FACILITY NAME / ADDRESS: 1819-1821 East Capitol Street, S.E., Washington, DC 20003

ORIGINAL [ X ]   REVISION [ ](NUMBER _____) RFP/CONTRACT NO: CFSA-01-R-0008-EK

FOR PERIOD FROM 04/01 , 2004 TO 03/31 , 2005   23

| (1) BENEFIT CATEGORY | EMPLOYER PAYMENTS ON BEHALF OF EMPLOYEES TO WORK ON THIS CONTRACT | | | (5) TOTAL EMPLOYER PAYMENTS FOR BENEFIT |
| --- | --- | --- | --- | --- |
| | (2) SALARIED - FULL-TIME | (3) SALARIES - PART-TIME | (4) HOURLY | |
| SOCIAL SECURITY (FICA) .0765 | | | | 84,587 |
| INSURANCE .08 | | | | 88,457 |
| WORKER'S COMPENSATION .035 | | | | 38,700 |
| UNEMPLOYMENT INSURANCE .065 | | | | 18,590 |
| OTHER BENEFITS .04 | | | | 44,228 |
| TOTAL BENEFITS | | | | 274,562 |

ATTACH JUSTIFICATION FOR ALL BENEFITS

FRINGES AS A PERCENT OF SALARIES & WAGES   24.83%

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 3: CONSULTANTS / EXPERTS JUSTIFICATION

PAGE __1__ OF __1__

PROVIDER NAME: College Options/DY (Jones & Associates)   SERVICE   Independent Living Services

FACILITY NAME / ADDRESS: 1819-1821 East Capitol Street, SE, Washington, DC  20003

ORIGINAL [ X ]   REVISION [  ](NUMBER _____ )   RFP/CONTRACT NO: CFSA-01-R-00??-EK

FOR PERIOD FROM   04/01, 2004   TO   03/31 , 2005   i23

| (1) POSITION TITLE | (2) NAME* | (3) BASE WAGE / HOUR | (5) NO. OF HOURS FOR PERIOD | (7) TOTAL COST | (8) OTHER CFSA CONTRACTS (Y / N) |
|---|---|---|---|---|---|
| Rehab. Counselor | TBF* | 24.04 | 1040 hrs. | 25,002 | |
| Educational Specialist | TBF* | 24.04 | 1040 | 25,002 | |
| Financial Consultant | TBF* | 21.85 | 200 | 4,370 | |
| Employment/Plcmt. Specialist | TBF* | 21.85 | 2080 | 45,457 | |
| Rehab. Counselor | TBF* | 24.04 | 1040 | 25,002 | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

* USE TBF FOR POSITIONS TO BE FILLED AND ENTER
PLANNED DATE FOR FILLING THE POSITION.  ATTACH JOB
ANNOUNCEMENT AND COMMITMENT LETTER STATING INTENT
TO HIRE CONTINGENT UPON CONTRACT AWARD

*ATTACH SIGNED COPIES OF CONSULTANT AGREEMENT (S)

TOTAL OF ENTRIES ON THIS PAGE   124,833

TOTAL OF ALL SCHEDULE 3 PAGES
( ENTER ON PAGE 1 ONLY )   124,833

CFSA - 10 / 96

6

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 4: OCCUPANCY COST JUSTIFICATION

PAGE 1 OF 2

PROVIDER NAME: College Options/DY (Jones & Associates) SERVICE Independent Living Services

ORIGINAL [X]   REVISION [ ](NUMBER _____ )   RFP/CONTRACT NO: CFSA-01-R-000~-EK 23
FOR PERIOD FROM 04/01 , 2004 TO 03/31 , 2005

| (1)<br>EXPENSE CATEGORY | (2)<br>COST FOR FACILITY #1 | (3)<br>COST FOR FACILITY #2 | (4)<br>COST FOR FACILITY #3 | (5)<br>TOTAL OCCUPANCY<br>FOR ALL FACILITIES |
|---|---|---|---|---|
| RENT Apt. & Office Space<br>$1475.18/mo X 12 units | 212,426 | | | 212,426 |
| GAS / ELECT / OIL / WATER | 28,848 | | | 28,848 |
| TRASH<br>$901.50/mo | 10,818 | | | 10,818 |
| MAINTENANCE<br>$1529.82/mo | 18,358 | | | 18,358 |
| INSURANCE | 8,742 | | | 8,742 |
| PEST CONTROL<br>$546.36/mo | 6,556 | | | 6,556 |
| REPAIRS<br>$1092.75/mo | 13,113 | | | 13,113 |
| OTHER $546.36/mo | 6,556 | | | 6,556 |

USE ADDITIONAL PAGES IF MORE THAN THREE FACILITIES ARE INCLUDED IN ONE BUDGET

ATTACH COPIES OF AGREEMENT (S) FOR ALL RENTED OR LEASED FACILITIES

TOTAL OF ENTRIES ON THIS PAGE   305,417

TOTAL OF ALL SCHEDULE 4 PAGES
(ENTER ON PAGE 1 ONLY)   305,417

CFSA - 10 / 96

7

# Schedule 4
## Occupancy Cost Justification

      Jones & Associates has leased the facility for the Jones & Associates Independent Living Program for the last eighteen (18) years.  For about the last seven (7) years there has not been any rent increase.  For this contract period the rent will not be increased and will remain at the current note.

      In recent years property values have increased greatly in the district of Columbia.  The rental rate for the facility is justified by the fact that comparable property in the Capital Hill area is about the same or slightly higher.

      In addition the special population of fifty-five (55) teenagers with problems with problems as described in the CFSA RFP contributes to unusual maintenance problems of the facility.

**CHILD AND FAMILY SERVICES AGENCY**
**SCHEDULE 5:  TRAVEL AND TRANSPORTATION COST JUSTIFICATION**

PAGE __1__ OF __1__

PROVIDER NAME:    College Options/DY (Jones & Associates)    SERVICE   Independent Living Services

ORIGINAL [ X ]    REVISION [  ](NUMBER _____ )    RFP/CONTRACT NO:  CFSA-01-R-00**_**-EK
FOR PERIOD FROM    __04/01__ , __2004__    TO  __03/31__ , __2005__        *23*

| (1)<br>EXPENSE CATEGORY | (2)<br>VEHICLE COSTS | (3)<br>NON - VEHICLE COSTS | (4)<br>TOTAL TRAVEL AND<br>TRANSPORTATION COST |
|---|---|---|---|
| VEHICLE LEASES  Vans & other vehicles as required | 15,735 | | 15,735 |
| VEHICLE DEPRECIATION | | | |
| GASOLINE / OIL / SUPPLIES | 10,490 | | 10,490 |
| TIRES / BATERIES | | | |
| MAINTENANCE / REPAIRS | | | |
| INSURANCE | 2,622 | | 2,622 |
| REGISTRATION | | | |
| MILEAGE FARES | | | |
| OTHER | | 10,928 | 10,928 |
| **TOTAL OF ALL ENTRIES ON THIS PAGE** | 28,847 | 10,928 | 39,775 |

ATTACH DESCRIPTION OF ALL VEHICLES AND COPIES OF  FINANCING

ARRANGEMENTS

ATTACH EXPLANATION OF ANY OTHER TRAVEL OR TRANSPORTATION COSTS,
INCLUDING JUSTIFICATION OF ANY OUT - OF - TOWN TRAVEL

TOTAL OF ALL SCHEDULE **5** PAGES
( ENTER ON PAGE **1** ONLY)

39,775

FSA - 10 / 96

8

## CHILD AND FAMILY SERVICES  AGENCY
## SCHEDULE 6:   SUPPLIES AND MINOR EQUIPMENT COST JUSTIFICATION

PAGE  1   OF  2

PROVIDER NAME:        College Options/DY (Jones & Associates)   SERVICE   Independent Living Services

ORIGINAL [ X]      REVISION  [  ](NUMBER _____ )      RFP/CONTRACT NO:   CFSA-01-R-0082-EK
FOR PERIOD FROM      04/01     2004    TO    03/31     2005                            :Z3

| ( 1 )<br>EXPENSE CATEGORY | (2)<br>COST FOR FACILITY #1 | (3)<br>COST FOR FACILITY #2 | (4)<br>COST FOR FACILITY #3 | (5)<br>TOTAL SUPPLIES |
|---|---|---|---|---|
| OFFICE SUPPLIES | 5,464 | | | 5,464 |
| HOUSEHOLD SUPPLIES | 19,669 | | | 19,669 |
| HOUSEHOLD FURNISHINGS | 16,390 | | | 16,390 |
| OFFICE EQUIPMENT | 5,464 | | | 5,464 |
| OTHER SUPPLIES | 8,195 | | | 8,195 |
| OTHER EQUIPMENT | 3,825 | | | 3,825 |
| TOTAL THIS PAGE | 59,007 | | | 59,007 |

ATTACH EXPLANATION OF ANY OTHER SUPPLIES OR
OTHER EQUIPMENT COSTS, WITH ITEMIZED LISTS

TOTAL OF ALL SCHEDULE 6 PAGES
(ENTER ON PAGE 1 ONLY)        59,007

CFSA - 10 / 96

9

# Schedule 6
## Supplies and Minor Equipment Cost Justification
### Itemized List

| | | |
|---|---|---|
| Other Supplies | 8,195 | 8,195 |
|    -Educational | | |
|    -Recreational | | |
|    -Kitchen | | |
| | | |
| Other Equipment | | |
|    -TV Video Equipment | 1,462 | |
|    -Rec./Educational | 979 | |
|    -Video Educational | 1,384 | 3,825 |

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 7:  CAPITAL EQUIPMENT AND OUTLAYS COST  JUSTIFICATION

PAGE __1__ OF __1__

PROVIDER NAME      College Options/DY (Jones & Associates)   SERVICE   Independent Living Services

ORIGINAL [ X ]      REVISION  [   ](NUMBER  _____  )      RFP/CONTRACT NO:  CFSA-01-R-0082-EK 23

FOR PERIOD FROM  __04/01__ , 2004  TO  __03/31__ , 2005

| ( 1 )<br>EXPENSE CATEGORY | (2)<br>COST FOR FACILITY #1 | (3)<br>COST FOR FACILITY #2 | (4)<br>COST FOR FACILITY #3 | (5)<br>TOTAL FOR ALL FACILITIES |
|---|---|---|---|---|
| VEHICLE PURCHASE* | N/A | | | |
| MAJOR REPAIRS | N/A | | | |
| MAJOR EQUIPMENT | N/A | | | |
| OTHER CAPITAL OUTLAYS** | N/A | | | |
| TOTAL THIS PAGE | N/A | | | |

USE ADDITIONAL PAGES IF MORE THAN THREE FACILITIES ARE INCLUDED IN ONE BUDGET

* ATTACH ITEMIZED LISTS

**ATTACH EXPLANATION OF ANY OTHER CAPITAL
OUTLAYS ANTICIPATED, WITH ITEMIZED LISTS

TOTAL OF ALL SCHEDULE 7 PAGES
(ENTER ON PAGE 1 ONLY)            N/A

CFSA - 10 / 96

10

# CHILD AND FAMILY SERVICES AGENCY

## SCHEDULE 8: CLIENT EXPENSE COST JUSTIFICATION

PROVIDER NAME:     College Options/DY (Jones & Associates)     SERVICE     Independent Living Services

ORIGINAL [ X ] REVISION  [  ]     (NUMBER _____ )     RFP/CONTRACT NO: CFSA-01-R-0002-EK
23

FOR PERIOD FROM     04/01  , 2004     TO   03/31  , 2005

| ( 1 )<br>EXPENSE CATEGORY | (2)<br>COST FOR FACILITY #1 | (3)<br>COST FOR FACILITY #2 | (4)<br>COST FOR FACILITY #3 | (5)<br>TOTAL FOR ALL FACILITIES |
|---|---|---|---|---|
| FOOD<br>$10,93 X 55 X 365 | 219,365 | | | 219,365 |
| CLOTHING<br>$ 65.56  X 12 X 55 | 43,272 | | | 43,272 . |
| ALLOWANCES / STIPENDS<br>$28.41/wk X 52 X 55 | 81,255 | | | 81,255 |
| MEDICAL | | | | |
| DENTAL | | | | |
| TRAINING*<br>College Program | 106,541 | | | 106,541 |
| OTHER **<br>Educational Functions | 27,045 | | | 27,045 |
| TOTAL THIS PAGE | 477,478 | . | | 477,478 |

\* ATTACH ITEMIZED LISTS

\*\*ATTACH DETAILED EXPLANATION OF ANY OTHER
CLIENT COSTS  ANTICIPATED.

TOTAL OF ALL SCHEDULE 8 PAGES
(ENTER ON PAGE 1 ONLY)

| 477,478 |
|---|

CFSA - 10 / 96

# Schedule 8
## Client Expense Cost Justification

An initial clothing allowance does not last during all the child's various growth periods, that is infancy, childhood, adolescence, young adulthood and adulthood. As a result other funds are necessary to defray these clothing costs. The amount in the line item is for clothing for clients, especially during the winter and school months, winter boots, sports activity dress, dress clothing for ceremonies, etc., overcoats need replacement and repairs. Hats, gloves, scarfs, long johns, winter scarfs are high cost items that must be replaces immediately.

Training-College Option- Approximately $4,000 is secured by the Jones ILP Program for grants, work study, scholarships and student savings. CFSA provides other funds for college.

The- line items "Other" is for graduation activities. The graduation activities is a highly motivational factor for client in Junior High Schools. In some cases it may determine whether or not a client completes school. The cost of client graduations include such items as pictures, rings, class trip, cap & gown, yearbook, prom dresses, shoes, slips, pocketbooks, transportation, sending money, tuxedos for males, flowers.

Clothing :
    Clothing Allowance
        55 x 12 x $65.56                $43,272

Allowance/Stipend:
        $28.41/wk x 52 x 55         $81,255

Other: School functions, graduations,
    Yearbook, etc:
        30 clients x $901.50          $27,045

CFSA COST
College Program, training, other client educational costs:
        15 clients x $7,102.73        $106,541

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 9: COMMUNICATIONS COST JUSTIFICATION

PAGE __1__ OF __1__

PROVIDER NAME: College Options/DY (Jones & Associates)   SERVICE   Indpendent Living Services

ORIGINAL [ X ] REVISION [ ]   (NUMBER _____ )   RFP/CONTRACT NO: CFSA-01-R-0062-EK 23
FOR PERIOD FROM   04/01 , 2004   TO   03/31 , 2005

| ( 1 )<br><br>EXPENSE CATEGORY | (2)<br><br>COST FOR FACILITY #1 | (3)<br><br>COST FOR FACILITY #2 | (4)<br><br>COST FOR FACILITY #3 | (5)<br>TOTAL COMMUNICATIONS COST |
|---|---|---|---|---|
| TELEPHONE<br>$1092.73/mo | 13,113 | | | 13,113 |
| POSTAGE<br>142.06/mo | 1,704 | | | 1,704 |
| DELIVERY | | | | |
| COPYING<br>$819.55/mo | 9,835 | | | 9,835 |
| OTHER | | | | |
| TOTAL THIS PAGE | 24,652 | | | 24,652 |

USE ADDITIONAL PAGES IF MORE THAN THREE FACILITIES ARE INCLUDED IN ONE BUDGET

ATTACH ITEMIZED LISTS

ATTACH EXPLANATION OF ANY OTHER COMMUNICATIONS
COST ANTICIPATED, WITH ITEMIZED LISTS

TOTAL OF ALL SCHEDULE 9 PAGES
(ENTER ON PAGE 1 ONLY)   | 24,652 |

CFSA - 10 / 96

12

CHILD AND FAMILY SERVICES AGENCY

SCHEDULE 10: OTHER DIRECT COST JUSTIFICATION

PAGE _1_ OF _2_

PROVIDER NAME: _College Options/DY (Jones & Associates)_ SERVICE _Independent Living Services_

ORIGINAL [ X ] REVISION [ ]   (NUMBER _____ )   RFP/CONTRACT NO: _CFSA-01-R-00__-EK_

FOR PERIOD FROM ____04/01____, 2004 TO __03/31__, 2005

| (1)<br><br>EXPENSE CATEGORY | (2)<br><br>COST FOR FACILITY #1 | (3)<br><br>COST FOR FACILITY #2 | (4)<br><br>COST FOR FACILITY #3 | (5)<br>TOTAL OTHER<br>DIRECT COST |
|---|---|---|---|---|
| In-Service Training<br>20 Employees X $819.55/yr | 16,391 | | | 16,391 |
| | | | | • |
| | | | | |
| | | | | |
| | | | | |
| **TOTAL THIS PAGE** | 16,391 | | | 16,391 |

USE CATEGORIES OF OTHER DIRECT COSTS NOT COVERED ON SCHEDULES 1 THROUGH 9

* ATTACH ADDITIONAL PAGES IF MORE THAN THREE
FACILITIES ARE USED

TOTAL OF ALL SCHEDULE 10 PAGES
(ENTER ON PAGE 1 ONLY) | 16,391 |

CFSA - 10/96

13

# SCHEDULE 10
## OTHER DIRECT COST JUSTIFICATION

The In-Service training cost of $16,391 includes staff conferences related to Foster Care and Independent Living Programs.  In-house training sessions using outside resources include such areas as counseling, teen pregnancy, drug abuse and discipline.  These funds also cover various training.

## CHILD AND FAMILY SERVICES AGENCY

### SCHEDULE 11: INDIRECT / OVERHEAD COST JUSTIFICATION

PAGE 1 OF 1

PROVIDER NAME: College Options/DY (Jones & Associates) SERVICE Independent Living Services

ORIGINAL [ X ] REVISION [ ](NUMBER _____ ) RFP/CONTRACT NO: CFSA-01-R-0002-EK
23

FOR PERIOD FROM 04/01 , 2004 TO 03/31 , 2005

| (1)<br>EXPENSE CATEGORY | (2)<br>COST FOR FACILITY #1 | (3)<br>COST FOR FACILITY #2 | (4)<br>COST FOR FACILITY #3 | (5)<br>TOTAL OTHER<br>INDIRECT COST |
|---|---|---|---|---|
| ADMINISTRATION<br>10% of Total Direct Cost | 242,782 | | | 242,782 |
| FINANCIAL MANAGEMENT | | | | • |
| AUDIT | | | | |
| OTHER INDIRECT /OVERHEAD | | | | |
| | | | | |
| | | | | |

IF A PERCENTAGE IS USED, ATTACH APPROVAL LETTER FOR
INDIRECT COSTS RATE OR PRIOR AUDITED FIGURES THAT JUSTIFIES
THE PERCENTAGE USED .

ATTACH EXPLANATION OF ANY OTHER INDIRECT OR OVERHEAD
EXPENSES, WITH DETAILED COST JUSTIFICATION

TOTAL OF ALL SCHEDULE 11 PAGES
(ENTER ON PAGE 1 ONLY)

| 242,782 |
|---|

CFSA - 10 / 96

14

JONES AND ASSOCIATES

COMPLAINT

EXHIBITS:

EXHIBIT SEVENTEEN:

CORRESPONDENCE: LINDA FULLER, CONTRACT SPECIALIST

2004 RE: CHANGES TO CFSA-04-C-0076



**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Child and Family Services Agency**



## Office of Contracting and Procurement

Jones & Associates, Inc.
1454 Corcoran Street, NW
Washington, DC  20009

Ex. # 17

Subject: Cost reimbursement

Dear Dr. Jones:

Please be advised that on December 5, 2003 the Contracting Officer approved the following contract type changes for the contract CFSA-04-C-0076.

**Contract Type change from:** Fixed Price with cost reimbursement components
*Reason:* The previous contract type for Jones & Associates, Inc. was issued as a Fixed Price contract with cost reimbursable components.  The D.C. Procurement Regulation 2499.1 27 DCMR §2400.1, defines a "fixed price" contract as a "contract that provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract.

**Contract Type change to:** Cost-plus-fixed-fee contract – 27 DCMR Chapter 2405.7
*Reason:* A Cost-plus-fixed-fee contract is a cost reimbursement type contract that provides for the payment of a fixed fee to the Contractor. The fixed fee, once negotiated, does not vary with actual costs, but may be adjusted as a result of any subsequent changes in the work or services to be performed under the contract. In accordance with 27 DCMR § 2405.7, it is recommended that the Contracting Officer use a cost-plus-fixed-fee contract

Should you have any questions please contact Ms. O'Linda Fuller, Contract Specialist at 202-724-7642 or Mr. Roscoe Wade, Contracts Officer at 202-724-7580.

Sincerely,

O'Linda Fuller
Contract Specialist

*TRANSITION PERIOD APRIL 1, 2004 TO March 31 2004*

# DISTRICT OF COLUMBIA, CHILD AND FAMILY SERVICES AGENCY (CFSA)
## AWARD/CONTRACT
## FOR SUPPLIES OR SERVICES
## SECTION A

| 1. ISSUED BY: | |
|---|---|
| District of Columbia, Child and Family Service Agency(CFSA)<br>400 6th Street, S. W., 5th Floor<br>Washington, D. C. 20024<br><br>Office of Contracting and Procurement<br>955 L'Enfant Plaza SW, Suite 5200<br>Washington, DC 20024<br>(202) 724-7510 | **2. PAGE OF PAGES**<br>1          39 |
| | **3. CONTRACT NUMBER:**<br>CFSA-04-C-0076 |
| | **4. EFFECTIVE DATE:**<br>DECEMBER 1, 2003 |
| | **5. DELIVERY:**<br>[ X ] FOB DESTINATION      [ ] OTHER |
| | **6. DISCOUNT FOR PROMPT PAYMENT:**<br>NET 45 DAYS |

**7. NAME AND ADDRESS OF CONTRACTOR (No., street, city, county, State and ZIP code)**

Jones & Associates, Inc.
1454 Corcoran Street, NW
Washington, DC 20009
TELEPHONE NO. (202) 462-1117
FAX NO.          (202) 332-5412
TIN : 52--1311038

### 8. TABLE OF CONTENTS

| (☆) | SEC. | DESCRIPTION | PAGE(S) | (☆) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | **PART 1 – The Schedule** | | | | **PART II – Contract Clauses** | |
| X | A | Solicitation/Contract Form | | X | I | Contract Clauses | N/A |
| X | B | Supplies/Services and Price/Costs | | | | **PART III – List of Documents, Exhibits and Other Attach** | |
| X | C | Description/Specs/Work Statement | | X | J | List of Attachments | |
| X | D | Packaging and Marking | | | | **PART IV – Representations and Instructions** | |
| X | E | Inspection and Acceptance | | X | K | Representations, Certifications and other Statements of Offerors | |
| X | F | Deliveries or Performance | | | | | |
| X | G | Contract Administration | | X | L | Instrs. Conds., & Notices to Offerors | IBR |
| X | H | Special Contract Requirements | | X | M | Evaluation Factors for Award | IBR |

**9. TOTAL AMOUNT OF CONTRACT**     $1,135,667.50

### CONTRACTING OFFICER WILL COMPLETE BLOCKS 10 OR 11 AS APPLICABLE

| 10. [ ]   AWARD (Contractor is not required to sign this) | 11. [ X ] **CONTRACTOR'S NEGOTIATED AGREEMENT** |
|---|---|
| Your offer on Solicitation Number _____<br>Including the additions or changes made by you which additions or changes are set forth in this award/contract, is hereby accepted. This award consummates the contract which consists of the following documents: (a) CFSA's Solicitation and your offer, and (b) this award/contract. No further contractual documents are necessary. | (Contractor is required to sign this document and return __2__ copies to the Issuing office)<br>The Contractor agrees to furnish and deliver all items or perform all services set forth or otherwise identified on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provision, representations, certifications, specifications and any other documents as are attached or incorporated by reference in Section J. |
| 12A. NAME AND TITLE OF SIGNER (Type or print) | 13A. NAME OF CONTRACTING OFFICER: |
| 12B. NAME OF CONTRACTOR<br><br>BY _____<br>(Signature of person authorized to sign) | 13B. District of Columbia, Child and Family Services Agency (CFSA)<br><br>BY _____<br>( Signature of Contracting Officer) |
| 12C. DATE SIGNED<br>12/1/03 | 13C. DATE SIGNED |

CFSA AWARD/CONTRACT FORM 26 (REV. 01-01)

*Note The TRANSITION PERIOD OF PERFORMANCE April 4 2004 ... 31 2004*

*March 31, 04*

JONES AND ASSOCIATES

COMPLAINT

EXHIBITS:

EXHIBIT EIGHTEEN (A) & (B):

BEST AND FINAL OFFER: CFSA-03-R-005



**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**CHILD & FAMILY SERVICES AGENCY**



### OFFICE OF CONTRACTING AND PROCUREMENT

February 18, 2004

Jones & Associates
1454 Corcoran Street, NW
Washington, DC  20009

**Ex. 18 (a)**

Subject:      Request for Best & Final Offer for Congregate Care Services
              For Independent Living Main Facilities Programs

Reference:    Request for Proposal No. CFSA-03-R-0005

Dear Offeror:

Child and Family Services Agency is in receipt of your draft comments dated February 4, 2004 however, your firm is hereby requested to submit a Best & Final Offer ("BAFO") in response to the reference Request for Proposal ("RFP"). Your proposal shall be submitted in accordance with the proposal submittal instructions that are set forth in Section L of this Request for BAFO. You are request to complete and return the following items with your BAFO:

1. Complete and submit Daily Rate/Price for the Base Period and four (4) Option Periods for Congregate Care Services as set forth in Section B of this BAFO Request.
2. Submit the Certified Cost and Pricing Data /CFSA Budget Package (Attachment J.4) to support the Daily Rate/Price for the Base Period and for Option Periods for Congregate Care Services.
3. Complete and sign all Representations & Certifications in Section K and the Certifications set forth in Attachments J.3 First Source Employment Agreement, J.5 Tax Certification Affidavit and J.7 EEO Compliance Document.
4. Have a duly Authorized Official of your firm to sign and date the SF-33 "Solicitation, Offer and Award, Section A.

The Parts I, II and III of this Request for BAFO will become the contract resulting from this solicitation should your firm be selected for a contract award.

Your BAFO shall be submitted by **no later than 4:00PM on February 23, 2004 to the location set forth is Section L.4** of this Request for BAFO. CFSA wishes you the best in your pursuit of this opportunity. All Offerors will be promptly notified of CFSA selections for award from this solicitation.

Sincerely,

Roscoe Wade
Contracting Officer

Enclosures

2003

# BEST AND FINAL OFFER

RESPONSE TO

## RFP#: CFSA-03-R-0005
## CONGREGATE CARE SERVICES
## INDEPENDENT LIVING
## MAIN  FACILITY PROGRAM

### PART TWO       Ex.# 18(b)

## PRICE PROPOSAL

FROM

## JONES AND ASSOCIATES, INC.
## 1454 CORCORAN STREET, NW
## WASHINGTON, DC, 20009

SUBMITTED: FEBRUARY 23, 2004

CHILD AND FAMILY SERVICES AGENCY

## BUDGET PACKAGE COVER MEMO

PROVIDER:             **JONES AND ASSOCIATES, INC.**

MAILING ADDRESS:      1454 CORCORAN STREET, NW
                      WASHINGTON, DC 20009

CONTACT NAME:         Dr. James L. Jones, Esq.
                      (202) 462-1117

SERVICE:              INDEPENDENT LIVING SERVICES-MAIN FACILITY

BEST AND FINAL OFFER SUBMISSION

RFP#:                 **CFSA - 03 - R- 0005**

FOR PERIOD FROM:      OCTOBER 1, 2003 TO SEPTEMBER 30, 2004

DATE DELIVERED/MAILED TO CFSA:        <u>February 23, 2004</u>

APPROVED BY AUTHORIZED PROVIDER OFFICIAL:

Dr. James L. Jones, Esq., President

SIGNATURE _____          DATE  <u>2/23/04</u>

RECEIVED IN CFSA/CONTRACTS ADMINISTRATION:       ____/____/____

[  ]     BUDGET PACKAGE COMPLETED
         (ALL SCHEDULES COMPLETED, INCLUDING ALL REQUIRED
         ATTACHMENTS

[  ]     ADEQUATE NUMBER OF COPIES SUBMITTED
         NUMBER SUBMITTED = _____

[  ]     COPIES DISTRIBUTED ACCORDING TO INSTRUCTIONS

2

CHILD AND FAMILY SERVICES AGENCY

## UNIT - COST AND REIMBURSEMENT RATE WORKSHEET

•

PROVIDER:        JONES AND ASSOCIATES, INC.

SERVICE:         INDEPENDENT LIVING SERVICES - MAIN FACILITY

BEST AND FINAL OFFER SUBMISSION

RFP#:            CFSA - 03 - R -0005

FOR PERIOD FROM:   OCTOBER 1, 2003 TO SEPTEMBER 30, 2004

(A.)   TOTAL BUDGET FOR PROVIDING SERVICE:        $3,852,356.84

(B.)   CFSA SHARE OF TOTAL BUDGET:               $ 3,792,356.84

(C.)   TOTAL NUMBER OF SERVICE UNITS:   365 days x 55 clients = 20,075

       SERVICE UNIT:  A Client/Day

PROJECTED COST PER UNIT OF SERVICE:              $ 191.90 / day

PROJECTED CFSA SHARE OF COST PER UNIT:           $ 188.91 / day

FACILITY ADDRESS        MAIN FACILITY:

                        1819-1821 EAST CAPITOL STREET, SE
                        WASHINGTON, DC 20003

CHILD AND FAMILY SERVICES AGENCY
BUDGET SUMMARY FORM

PROVIDER NAME:  JONES AND ASSOCIATES, INC.
1819 -1821 East Capitol Street, SE
Washington, DC 20003

SERVICE:  INDEPENDENT LIVING SERVICES - MAIN FACILITY
ORIGINAL  -  RFP # : CFSA-03-R-0005

FOR PERIOD FROM OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004
**BASE YEAR**

| BUDGET LINE ITEMS | CFSA FUNDS | OTHER FUNDS | TOTAL COST | |
|---|---|---|---|---|
| SALARIES AND WAGES | $ 1,535,415.00 | | $ 1,535,415.00 | Schedule 1 |
| FRINGE BENEFITS | $ 378,328.57 | | $ 378,328.57 | Schedule 2 |
| CONSULTANTS / EXPERTS | $ 220,960.00 | | $ 220,960.00 | Schedule 3 |
| OCCUPANCY | $ 279,500.00 | | $ 279,500.00 | Schedule 4 |
| TRAVEL & TRANSPORTATION | $ 66,448.00 | | $ 66,448.00 | Schedule 5 |
| ..PPLIES & EQUIPMENT | $ 69,500.00 | | $ 69,500.00 | Schedule 6 |
| CAPITAL EQUIPMENT / OUTLAYS | $ - | | $ - | Schedule 7 |
| CLIENT COSTS | $ 639,750.00 | $ 60,000.00 | $ 699,750.00 | Schedule 8 |
| COMMUNICATIONS | $ 36,600.00 | | $ 36,600.00 | Schedule 9 |
| OTHER DIRECT COSTS | $ 60,909.00 | | $ 60,909.00 | Schedule 10 |
| INDIRECT / OVERHEAD | $ 394,489.27 | | $ 394,489.27 | Schedule 11 |

| | | | |
|---|---|---|---|
| SUB-TOTAL | $ 3,681,899.84 | $ 60,000.00 | $ 3,741,899.84 |
| FEE - 3.0% | $ 110,457.00 | | $ 110,457.00 |
| TOTAL BUDGET | $ 3,792,356.84 | $ 60,000.00 | $ 3,852,356.84 |

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 1: SALARY AND WAGE JUSTIFICATION

PROVIDER NAME: JONES AND ASSOCIATES, INC.   SERVICE: INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:  1819 - 1821 East Capitol Street, SE   Washington, DC 20003
ORIGINAL     -     RFP # : CFSA-03-R-0005
FOR PERIOD FROM:        OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| POSITION | NAME | SAL. | HR. | BASE | % of Time | TOTAL | Other CFSA |
|---|---|---|---|---|---|---|---|
| Director/ Clinical Director | Dr. James L. Jones, Esq. CS 16 | x | | $    85,000.00 | 75% | $    63,750.00 | N |
| Assistant Director/ Administrator | S.L. Barnes, M.A.    GS 15 | x | | $ 70,000.00 | 100% | $    65,000.00 | N |
| Office Manager | M. Piper    GS  12 | x | | $    40,000.00 | 100% | $    40,000.00 | N |
| Secretary/ Clerk | C. Smith    GS-7 | x | | $    25,000.00 | 100% | $    25,000.00 | N |
| Program Development Coordinator | TBD    CS 11 | x | | $40 45,000.00 | 100% | $    45,000.00 | N |
| Facility Coordinator/ Counselor | M. McGaha    GS 12 | x | | $45 50,000.00 | 100% | $    50,000.00 | N |
| Ed./ College Coordinator | H. Jackson, M.A.    GS 12 | x | | $45 46,000.00 | 100% | $    46,000.00 | N |
| HS, GED, Training Counselor | V.V. Mathews    GS 11 | x | | $45 42,000.00 | 100% | $    42,000.00 | N |
| Health Services Coord./ Couns. | D. Twyman    GS 11 | x | | $40 45,385.00 | 100% | $    45,385.00 | N |
| Social Worker · | TBD    GS 11 | x | | $45 45,385.00 | 100% | $    45,385.00 | N |
| Social Worker · | TBD    GS 12 | x | | $45 45,385.00 | 100% | $    45,385.00 | N |
| Social Worker · | TBD    CS 12 | x | | $ 45 45,385.00 | 100% | $    45,385.00 | N |
| Records & Reports Coord./ Couns. | E. Cox, M.A. | x | | $ 35 34,345.00 | 100% | $    34,345.00 | N |
| Recreation Coord./ Couns. | A. McIntyre    GS-9 | x | | $ 30 34,345.00 | 100% | $    34,345.00 | N |
| Certified Food Handler | M. Johnson    GS-9 | x | | $ 30 34,345.00 | 100% | $    34,345.00 | N |
| Computer Specialist | D. Rogers    CS-9 | x | | $ 30 32,500.00 | 100% | $    32,500.00 | N |
| Word Processor | TBD    CS-9 | x | | $ 30 24,000.00 | 100% | $    24,000.00 | N |
| Maintenance Specialist | R. Whisenton    CS-6 | x | | $ 25 27,000.00 | 100% | $    27,000.00 | N |
| Custodian | M. Pannell    CS-5 | x | | $    22,000.00 | 100% | $    22,000.00 | N |
| Custodian | S. Parmer    GS-5 | x | | $    22,000.00 | 100% | $    22,000.00 | N |

TOTAL ENTRIES ON THS PAGE   | $    788,825.00 |

TOTAL ALL SCHEDULE 1 PAGES   | $ 1,535,415.00 |
Page 1 of 3

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 1: SALARY AND WAGE JUSTIFICATION

PROVIDER NAME: JONES AND ASSOCIATES, INC.   SERVICE: INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS: 1819 - 1821 East Capitol Street, SE   Washington, DC 20003
ORIGINAL    -    RFP # : CFSA-03-R-0005
FOR PERIOD FROM:       OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| POSITION | NAME | SAL. | HR. | BASE | % of Time | TOTAL | Other CFSA |
|---|---|---|---|---|---|---|---|
| Senior Counselor | A. Miles  GS - 9 | x | | $ 35,913.00 | 100% | $    35,913.00 | N |
| Senior Counselor | R. Parker  GS - 9 | x | | $ 35,913.00 | 100% | $    35,913.00 | N |
| Senior Counselor | D. Perry  GS - 9 | x | | $ 35,913.00 | 100% | $    35,913.00 | N |
| Counselor | K. Green  GS - 8 | x | | $ 31,229.00 | 100% | $    31,229.00 | N |
| Counselor | C. Brown  GS- 8 | x | | $ 31,229.00 | 100% | $    31,229.00 | N |
| Counselor | H. Carter  GS - 8 | x | | $ 31,229.00 | 100% | $    31,229.00 | N |
| Counselor | J. Handy  GS - 8 | x | | $ 31,229.00 | 100% | $    31,229.00 | N |
| Counselor | E. DuVall  GS - 8 | x | | $ 31,229.00 | 100% | $    31,229.00 | N |
| Counselor | V. Jones  GS - 8 | x | | $ 31,229.00 | 100% | $    31,229.00 | N |
| Counselor | E. Twyman  GS - 8 | x | | $ 31,229.00 | 100% | $    31,229.00 | N |
| Counselor | R. Hart  GS - 8 | x | | $ 31,229.00 | 100% | $    31,229.00 | N |
| Counselor | D. Daniels  GS - 8 | x | | $ 31,229.00 | 100% | $    31,229.00 | N |
| Counselor | J. Hughes  GS - 8 | x | | $ 31,229.00 | 100% | $    31,229.00 | N |
| Counselor | S. Burney  GS - 8 | x | | $ 31,229.00 | 100% | $    31,229.00 | N |
| Counselor | TBD  GS - 8 | x | | $ 31,229.00 | 100% | $    31,229.00 | N |
| Counselor | TBD  GS - 8 | x | | $ 31,229.00 | 100% | $    31,229.00 | N |
| Counselor | TBD  GS - 8 | x | | $ 31,229.00 | 100% | $    31,229.00 | N |
| Counselor | TBD  GS - 8 | x | | $ 31,229.00 | 100% | $    31,229.00 | N |
| Counselor | TBD  GS - 8 | x | | $ 31,229.00 | 100% | $    31,229.00 | N |
| Counselor | TBD  GS - 8 | x | | $ 31,229.00 | 100% | $    31,229.00 | N |

TOTAL ENTRIES ON THS PAGE    $    638,632.00

TOTAL ALL SCHEDULE 1 PAGES    $  1,535,415.00
Page 2 of 3

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 1: SALARY AND WAGE JUSTIFICATION

PROVIDER NAME: JONES AND ASSOCIATES, INC.   SERVICE: INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:  1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL        -       RFP #: CFSA-03-R-0005
FOR PERIOD FROM:        OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| POSITION | NAME | SAL. | HR. | BASE | % of Time | TOTAL | Other CFSA |
|----------|------|------|-----|------|-----------|-------|------------|
| Counselor` | TBD  G9-8 | x | | $ 31,229.00 | 100% | $ 31,229.00 | N |
| Counselor | TBD  G5-8 | x | | $ 31,228.00 | 100% | $ 31,229.00 | N |
| Security Chief | TBD | x | | $ 24,500.00 | 100% | $ 24,500.00 | N |
| Security Aide | TBD | x | | $ 21,000.00 | 100% | $ 21,000.00 | N |
| | | | | | | | |
| | | | | | | | |
| | | | | | | • | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

TOTAL ENTRIES ON THS PAGE                    $   107,958.00

TOTAL ALL SCHEDULE 1 PAGES          $  1,535,415.00
Page 3 of 3

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 2: FRINGE BENEFIT JUSTIFICATION

PROVIDER NAME: JONES AND ASSOCIATES, INC.   SERVICE: INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:  1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL        -      RFP #: CFSA-03-R-0005
FOR PERIOD FROM:        OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

EMPLOYER PAYMENTS ON BEHALF OF EMPLOYEES TO WORK ON THIS CONTRACT

| BENEFIT CATEGORY | SALARIED - FULL TIME | SALARIED - PART TIIME | HOURLY | TOTAL PAYMENTS |
|---|---|---|---|---|
| SOCIAL SECURITY    (.0765) | $        117,459.24 | | | $        117,459.24 |
| INSURANCE    (.08) | $        122,833.20 | | | $        122,833.20 |
| WORKER'S COMP.   (.035) | $         53,739.53 | | | $         53,739.53 |
| UNEMPLOYMENT COMP. (.065) | $         22,880.00 | | | $         22,880.00 |
| OTHER BENEFITS    (.04) | $         61,416.60 | | | $         61,416.60 |
| | | | | |

TOTAL BENEFITS           $        378,328.57

Fringe Benefits as a percentage of Salaries & Wages           24.64%

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 3:  CONSULTANTS / EXPERTS COST JUSTIFICATION

PROVIDER NAME: JONES AND ASSOCIATES, INC.   SERVICE: INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:  1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL        -     RFP # : CFSA-03-R-0005
FOR PERIOD FROM:           OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| POSITION TITLE | NAME | BASE WAGE/ HOUR | NO. OF HOURS FOR PERIOD | TOTAL COST | Other CFSA Contracts |
|---|---|---|---|---|---|
| Certified Addictions Counselor | TBD | $    19.23 | 2080 | $    40,000.00 | N |
| Licensed Practical Nurse | TBD | $    20.10 | 2080 | $    41,800.00 | N |
| Licensed Practical Nurse | TBD | $    20.10 | 2080 | $    41,800.00 | N |
| Financial Mgmt. Consultant | TBD | $    40.00 | 250 | $    10,000.00 | N |
| Employment/Plcment. Cons. | TBD | $    20.00 | 2080 | $    41,600.00 | N |
| Educational Consultant | TBD | $    22.00 | 1040 | $    22,880.00 | N |
| Rehab. Consultant | TBD | $    22.00 | 1040 | $    22,880.00 | N |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

TOTAL COSTS - CONSULTANTS & EXPERTS        $     220,960.00

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 4: OCCUPANCY COST JUSTIFICATION

PROVIDER NAME: JONES AND ASSOCIATES, INC.   SERVICE: INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:  1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL        -        RFP # : CFSA-03-R-0005
FOR PERIOD FROM:        OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| EXPENSE CATEGORY | COST FOR FACILITY # 1 | COST FOR FACILITY # 2 | COST FOR FACILITY # 3 | TOTAL COST |
|---|---|---|---|---|
| RENT  ($16,200 x 12) | $          194,400.00 | | | $          194,400.00 |
| GAS/ ELECT/ OIL/ WATER | $            26,400.00 | | | $            26,400.00 |
| TRASH  ($825 x  12) | $              9,900.00 | | | $              9,900.00 |
| MAINTENANCE  ($1,400 x 12) | $            16,800.00 | | | $            16,800.00 |
| INSURANCE | $              8,000.00 | | | $              8,000.00 |
| PEST CONTROL   ($500 x  12) | $              6,000.00 | | | $              6,000.00 |
| REPAIRS   ($1,000 x 12) | $            12,000.00 | | | $            12,000.00 |
| OTHER  (Mics. $500 x 12) | $              6,000.00 | | | $              6,000.00 |
| | | | | |

TOTAL OCCUPANCY COSTS          $          279,500.00

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 5:  TRAVEL AND TRANSPORTATION COST JUSTIFICATION

PROVIDER NAME:  JONES AND ASSOCIATES, INC.   SERVICE:  INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:  1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL        -        RFP # : CFSA-03-R-0005
FOR PERIOD FROM:        OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| EXPENSE CATEGORY | VEHICLE COSTS | NON-VEHICLE COSTS | TOTAL TRAVEL AND TRANSPORTATION |
|---|---|---|---|
| VEHICLE LEASES (4 x $300mo) | $14,400.00 | | $14,400.00 |
| VEHICLE DEPRECIATION | | | |
| GAS/ OIL/ SUPPLIES | $9,600.00 | | $9,600.00 |
| TIRES/ BATTERIES | | | |
| MAINTENANCE/ REPAIRS | | | |
| INSURANCE | $26,448.00 | | $26,448.00 |
| REGISTRATION | | | |
| MILEAGE/ FARES | | $    16,000.00 | $    16,000.00 |
| OTHER | | | |
| | | | |

TOTAL TRAVEL AND TRANSPORTATION COSTS          $66,448.00

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 6:  SUPPLIES AND EQUIPMENT COST JUSTIFICATION

PROVIDER NAME:  JONES AND ASSOCIATES, INC.   SERVICE:  INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:  1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL       ·       RFP # : CFSA-03-R-0005
FOR PERIOD FROM:         OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| EXPENSE CATEGORY | COST FOR FACILITY # 1 | COST FOR FACILITY # 2 | COST FOR FACILITY # 3 | TOTAL SUPPLIES |
|---|---|---|---|---|
| OFFICE SUPPLIES | $          5,000.00 | | | $          5,000.00 |
| HOUSEHOLD SUPPLIES | $         18,000.00 | | | $         18,000.00 |
| HOUSEHOLD FURNISHINGS | $         25,000.00 | | | $         25,000.00 |
| OFFICE EQUIPMENT | $         10,000.00 | | | $    ·    10,000.00 |
| OTHER SUPPLIES | $          7,500.00 | | | $          7,500.00 |
| OTHER EQUIPMENT | $          4,000.00 | | | $          4,000.00 |
| OTHER | | | | |
| | | | | |

TOTAL SUPPLIES AND EQUIPMENT            $         69,500.00

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 7 : CAPITAL EQUIPMENT AND OUTLAYS COST JUSTIFICATION

PROVIDER NAME:  JONES AND ASSOCIATES, INC.   SERVICE:  INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:  1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL         -        RFP # : CFSA-03-R-0005
FOR PERIOD FROM:            OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| EXPENSE CATEGORY | COST FOR FACILITY # 1 | COST FOR FACILITY # 2 | COST FOR FACILITY # 3 | TOTAL COST |
|---|---|---|---|---|
| VEHICLE PURCHASE | | | | |
| MAJOR REPAIRS | | | | |
| MAJOR EQUIPMENT | | | | |
| OTHER CAPITAL OUT LAYS | | | | |
| OTHER | | | | |
| | | | | |

TOTAL CAPITAL EQUIPMENT AND OUTLAYS

| NONE |
|---|

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 8:  CLIENT EXPENSE COST JUSTIFICATION

PROVIDER NAME:  JONES AND ASSOCIATES, INC.    SERVICE:  INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:  1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL      -      RFP # : CFSA-03-R-0005
FOR PERIOD FROM:        OCTOBER 1, 2003  TO   SEPTEMBER 30, 2004

| EXPENSE CATEGORY | COST FOR FACILITY # 1 | COST FOR FACILITY # 2 | COST FOR FACILITY # 3 | TOTAL COST |
|---|---|---|---|---|
| FOOD  ($200 x 55 x 12) | $          132,000.00 | | | $          132,000.00 |
| CLOTHING  ($120 x 55 x 12) | $           79,200.00 | | | $           79,200.00 |
| ALLOWANCES/ STIPENDS | $          184,800.00 | | | $          184,800.00 |
| MEDICAL | | | | • |
| DENTAL | | | | |
| TRAINING | | | | |
| COLLEGE PROGRAM | $          120,000.00 | | | $          120,000.00 |
| OTHER - Educational Functions | $ *(pmt'g +d'in)*          24,750.00 | | | $           24,750.00 |
| Apts. - Furnishings & Supplies  ($1,800 x 55) | *reduce* | $           99,000.00 | | $           99,000.00 |

TOTAL CLIENT EXPENSES

| | |
|---|---|
| $          639,750.00 |

Allowance/ Stipends: $280 x 55 x 12 mos.  =  $184,800.
(Trans. $90; Toiletries $30.; Incidentals $60.; Allowance $100.)

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 9 : COMMUNICATIONS COST JUSTIFICATION

PROVIDER NAME: JONES AND ASSOCIATES, INC.   SERVICE: INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:  1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL      -    RFP # : CFSA-03-R-0005
FOR PERIOD FROM:        OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| EXPENSE CATEGORY | COST FOR FACILITY # 1 | COST FOR FACILITY # 2 | COST FOR FACILITY # 3 | TOTAL COST |
|---|---|---|---|---|
| TELEPHONE | $        24,000.00 | | | $        24,000.00 |
| POSTAGE | $          2,400.00 | | | $          2,400.00 |
| DELIVERY | $          1,200.00 | | | $          1,200.00 |
| COPYING | $          9,000.00 | | | $          9,000.00 |
| OTHER | | | | |
| | | | | |
| TOTAL THIS PAGE | $        36,600.00 | | | $        36,600.00 |

TOTAL COMMUNICATION COSTS

| | |
|---|---|
| $        36,600.00 | |

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 10 : OTHER DIRECT COST JUSTIFICATION

PROVIDER NAME: JONES AND ASSOCIATES, INC.   SERVICE: INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:  1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL     -     RFP # : CFSA - 03 - R - 0005
FOR PERIOD FROM:        OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| EXPENSE CATEGORY | COST FOR FACILITY # 1 | COST FOR FACILITY # 2 | COST FOR FACILITY # 3 | TOTAL COST |
|---|---|---|---|---|
| IN-SERVICE TRAINING | $        20,000.00 | | | $        20,000.00 |
| Profesional Liability Insurance | $        40,909.00 | | | $        40,909.00 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| TOTAL THIS PAGE | $        60,909.00 | | | $        60,909.00 |

| | |
|---|---|
| TOTAL COMMUNICATION COSTS | $        60,909.00 |

CHILD AND FAMILY SERVICES AGENCY
SCHEDULE 11 :  INDIRECT / OVERHEAD COST JUSTIFICATION

PROVIDER NAME: JONES AND ASSOCIATES, INC.   SERVICE: INDEPENDENT LIVING - MAIN FACILITY
FACILITY NAME/ ADDRESS:  1819 - 1821 East Capitol Street, SE    Washington, DC 20003
ORIGINAL      -      RFP # : CFSA -03 - R - 0005
FOR PERIOD FROM:         OCTOBER 1, 2003  TO  SEPTEMBER 30, 2004

| EXPENSE CATEGORY | COST FOR FACILITY # 1 | COST FOR FACILITY # 2 | COST FOR FACILITY # 3 | TOTAL COST |
|---|---|---|---|---|
| ADMINISTRATION  (12.0% TDC) | $          394,489.27 | | | $      3,941,489.27 |
| FINANCIAL MANAGEMENT | | | | |
| AUDIT | | | | • |
| OTHER INDIRECT / OVERHEAD | | | | |
| | | | | |
| | | | | |

TOTAL INDIRECT / OVERHEAD COSTS       | $          394,489.27 |

CHILD AND FAMILY SERVICES AGENCY

## BUDGET PACKAGE COVER MEMO

•

PROVIDER: **JONES AND ASSOCIATES, INC**.

MAILING ADDRESS: 1454 CORCORAN STREET, NW
WASHINGTON, DC 20009

CONTACT NAME: Dr. James L. Jones, Esq.
(202) 462-1117

SERVICE: INDEPENDENT LIVING SERVICES-MAIN FACILITY

BEST AND FINAL OFFER SUBMISSION

RFP#: **CFSA - 03 - R- 0005**

FOR PERIOD FROM: OCTOBER 1, 2004 TO SEPTEMBER 30, 2005

DATE DELIVERED/MAILED TO CFSA: <u>February 23, 2004</u>

APPROVED BY AUTHORIZED PROVIDER OFFICIAL:

Dr. James L. Jones, Esq., President

_____                    <u>2/23/04</u>
SIGNATURE                                   DATE

RECEIVED IN CFSA/CONTRACTS ADMINISTRATION:     ____/____/____

[  ]     BUDGET PACKAGE COMPLETED
         (ALL SCHEDULES COMPLETED, INCLUDING ALL REQUIRED
         ATTACHMENTS

[  ]     ADEQUATE NUMBER OF COPIES SUBMITTED
         NUMBER SUBMITTED = _____

[  ]     COPIES DISTRIBUTED ACCORDING TO INSTRUCTIONS

.8

CHILD AND FAMILY SERVICES AGENCY

**UNIT - COST AND REIMBURSEMENT RATE WORKSHEET**

•

PROVIDER:       JONES AND ASSOCIATES, INC.

SERVICE:        INDEPENDENT LIVING SERVICES - MAIN FACILITY

BEST AND FINAL OFFER SUBMISSION

RFP#:           CFSA - 03 - R -0005

FOR PERIOD FROM:   OCTOBER 1, 2007 TO SEPTEMBER 30, 2008

(A.)   TOTAL BUDGET FOR PROVIDING SERVICE:        $4,082,899.29

(B.)   CFSA SHARE OF TOTAL BUDGET:               $ 4,022,899.53

(C.)   TOTAL NUMBER OF SERVICE UNITS:   365 days x 55 clients = 20,075

       SERVICE UNIT:  A Client/Day

PROJECTED COST PER UNIT OF SERVICE:              $ 203.38 / day

PROJECTED CFSA SHARE OF COST PER UNIT:           $ 200.39 / day

FACILITY ADDRESS        MAIN FACILITY:

                        1819-1821 EAST CAPITOL STREET, SE
                        WASHINGTON, DC 20003

,

28

CHILD AND FAMILY SERVICES AGENCY
BUDGET SUMMARY FORM

PROVIDER NAME:   JONES AND ASSOCIATES, INC.
1819 -1821 East Capitol Street, NE
Washington, DC 20003

SERVICE:   INDEPENDENT LIVING SERVICES - MAIN FACILITY
ORIGINAL  -  RFP # : CFSA-03-R-0005

FOR PERIOD FROM OCTOBER 1, 2007  TO  SEPTEMBER 30, 2008
**OPTION YEAR 4**

| BUDGET LINE ITEMS | CFSA FUNDS | OTHER FUNDS | TOTAL COST | |
|---|---|---|---|---|
| SALARIES AND WAGES | $ 1,628,921.77 | | $ 1,628,921.77 | Schedule 1 |
| FRINGE BENEFITS | $ 401,368.77 | | $ 401,368.77 | Schedule 2 |
| CONSULTANTS / EXPERTS | $ 234,416.40 | | $ 234,416.40 | Schedule 3 |
| OCCUPANCY | $ 296,521.55 | | $ 296,521.55 | Schedule 4 |
| TRAVEL & TRANSPORTATION | $ 70,494.68 | | $ 70,494.68 | Schedule 5 |
| SUPPLIES & EQUIPMENT | $ 73,732.55 | | $ 73,732.55 | Schedule 6 |
| CAPITAL EQUIPMENT / OUTLAYS | $ - | | $ - | Schedule 7 |
| CLIENT COSTS | $ 678,710.78 | $ 60,000.00 | $ 738,710.78 | Schedule 8 |
| COMMUNICATIONS | $ 38,828.94 | | $ 38,828.94 | Schedule 9 |
| OTHER DIRECT COSTS | $ 64,618.36 | | $ 64,618.36 | Schedule 10 |
| INDIRECT / OVERHEAD | $ 418,513.67 | | $ 418,513.67 | Schedule 11 |

SUB-TOTAL         $ 3,906,127.47   $ 60,000.00   $ 3,966,127.47

FEE - 3.0%        $ 116,771.82                   $ 116,771.82

TOTAL BUDGET      $ 4,022,899.29   $ 60,000.00   $ 4,082,899.29

29

**B.9    PRICE SCHEDULE (REVISED)**
**B.9.1    BASE PERIOD: 10/1/03 THROUGH 9/30/04 (For Pricing Purposes).**

| Item No. | Supply/Services | Maximum Quantity to be Contracted by CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0001AA | Diagnostic and Emergency Care Aged 12 and Younger.<br><br>(See Section Paragraph C.5.2 )<br><br><br>**Guaranteed Minimum Amount Is $1000.00** | 50 | *(Offeror shall propose no fewer than 4 slots and no more than 50 slots) | | |
| 0001AB | Diagnostic and Emergency Care: Aged 13 and Older<br><br>(See Section C Paragraph C.5.3)<br><br><br>**Guaranteed Minimum Amount is $1000.00** | 50 | *(Offeror shall propose no fewer than 4 slots and no more than 16 slots) | | |

30

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offeror's Proposed Quantity | Unit Price (Child per day | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0001BA | Traditional Group Home Care<br><br>(See Section C Paragraph C.5.4)<br><br>Maximum residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | *(Offeror shall propose no fewer than 4 slots and no more than <u>32</u> slots) | | |
| 0001BB | Specialized Group Home Care (Level III)<br><br>(See Section C Paragraph C.5.5)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 42 | *(Offeror shall propose no fewer than 4 slots and no more than <u>32</u> slots) | | |
| 0001CA | Independent Living Main Facility Programs<br><br>(See Section C Paragraph C.5.6)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | <u>55</u><br>*(Offeror shall propose no fewer than 4 slots and no more than <u>56</u> slots) | $ 188.91 | $ 3,792,356.84 |
| 0001CB | Independent Living Residential Units<br><br>(See Section C paragraph C.5.7)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | *(Offeror shall propose no fewer than 4 slots and no more than <u>56</u> slots) | | |

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0001CC | Assisted Living (Level III) (See Section C Paragraph C.5.8) **Guaranteed Minimum Amount is $1000.00** | 16 | *(Offeror shall propose no fewer than 4 slots and no more than 16 slots) | | |
| 0001CD | Teen Parent Programs  Maximum # of Teen Residents: 8  (See Section C Paragraph C.5.9) **Guaranteed Minimum Amount is $1000.00** | 80 | *(Offeror shall propose no fewer than 4 slots and no more than 24 slots) | | |
| 0001CE | Community Based Return Diversion  (See Section C Paragraph C.5.10) **Guaranteed Amount is $1000.00** | 50 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots) | | |
| 0001CF | Specialized Group Home Care (Level IV) (See Section C Paragraph C.5.5)  Maximum Residents: 8 **Guaranteed Minimum Amount is $1000.00** | 8 | *(Offeror shall propose no fewer than 4 slots and no more than 8 slots) | | |
| 0001CG | Assisted Living (Level IV) (See Section C Paragraph C.5.8) **Guaranteed Minimum Amount is $1000.00** | 4 | *(Offeror shall propose no fewer than 4 slots | | |

32

B.9.2    OPTION PERIOD 1: 10/1/04 THROUGH 9/30/05

| Item No. | Supply/Services | Maximum Quantity to be Contracted by CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0002AA | Diagnostic and Emergency Care: Age 12 and Younger. (See Section C Paragraph C.5.2) Maximum Residents: 8 **Guaranteed Minimum Amount is $1000.00** | 20 | *(Offeror shall propose no fewer than 4 and no more than 20 slots) | | |
| 0002AB | Diagnostic and Emergency Care: Aged 13 and Older. (See Section C Paragraph C.5.3) Maximum Residents: 8 **Guaranteed Minimum Amount is $1000.00** | 45 | *(Offeror shall propose no fewer than 4 slots and no more than 16 slots) | | |
| 002BA | Traditional Group Home Care (See Section C Paragraph C.5.4) Maximum residents: 8 **Guaranteed Minimum Amount is $1000.00** | 90 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots) | | |

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offerors' Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0002BB | Specialized Group Home Care (Level III)<br><br>(See Section C Paragraph C.5.5)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 38 | _____<br><br>*(Offeror shall propose no fewer than 4 slots and no more than 32 slots)* | _____ | _____ |
| 0002CA | Independent Living Main Facility Programs<br><br>(See Section C Paragraph C.5.6)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | 55<br><br>*(Offeror shall propose no fewer than 4 slots and no more than 56 slots)* | $ 188.91 | $ 3,792,356.84 |
| 0002CB | Independent Living Residential Units<br><br>(See Section C Paragraph C.5.7)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | _____<br><br>*(Offeror shall propose no fewer than 4 slots and no more than 56 slots)* | _____ | _____ |
| 0002CC | Assisted Living (Level III)<br><br>(See Section C Paragraph C.5.8)<br><br>**Guaranteed Minimum Amount is $1000.00** | 16 | _____<br><br>*(Offeror shall propose no fewer than 4 slots and no more than 16 slots)* | _____ | _____ |

34

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0002CD | Teen Parent Programs<br><br>(See Section C Paragraph C.5.9)<br><br>Maximum # of Teen Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 72 | *(Offeror shall propose no fewer than 4 slots and no more than 24 slots)* | | |
| 0002CE | Community Based Return Diversion.<br><br>(See Section C. Paragraph C.5.10)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 45 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots)* | | |
| 0002CF | Specialized Group Home Care (Level IV)<br><br>(See Section C Paragraph C.5.5)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 7 | *(Offeror shall propose no fewer than 4 slots and no more than 7 slots)* | | |
| 0002CG | Assisted Living (Level IV)<br><br>(See Section C Paragraph C.5.8)<br>**Guaranteed Minimum Amount is $1000.00** | 4 | *(Offeror shall propose no fewer than 4 slots* | | |

35

B.9.3   **OPTION PERIOD 2: 10/1/05 THROUGH 9/30/06**

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0003AA | Diagnostic and Emergency Care: Aged 12 and Younger (See Section C Paragraph C.5.2) Maximum Residents: 8 **Guaranteed Minimum Amount is $1000.00** | 20 | *(Offeror shall propose no fewer than 4 slots and no more than 20 slots) | | |
| 0003AB | Diagnostic and Emergency Care: Aged 13 and Older. (See Section C Paragraph C.5.3) Maximum Residents: 8 **Guaranteed Minimum Amount is $1000.00** | 40 | *(Offeror shall propose no fewer than 4 slots and no more than 16 slots) | | |
| 003BA | Traditional Group Home Care (See Section C Paragraph C.5.4) Maximum residents: 8 **Guaranteed Minimum Amount is $1000.00** | 81 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots) | | |

36

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0003BB | Specialized Group Home Care (Level III)<br><br>(See Section C Paragraph C.5.5)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 34 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots) | | |
| 0003CA | Independent Living Main Facility Programs<br><br>(See Section C Paragraph C.5.6)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | 55<br>*(Offeror shall propose no fewer than 4 slots and no more than 56 slots) | $194.58 | $3,906,127.53 |
| 0003CB | Independent Living Residential Units<br><br>(See Section C Paragraph C.5.7)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | *(Offeror shall propose no fewer than 4 slots and no more than 56 slots) | | |
| 0003CC | Assisted Living (Level III)<br><br>(See Section C Paragraph C.5.8)<br><br>**Guaranteed Minimum Amount is $1000.00** | 16 | *(Offeror shall propose no fewer than 4 slots and no more than 16 slots) | | |
| 0003CD | Teen Parent Programs<br><br>(See Section C Paragraph C.5.9)<br>Maximum # of Teen Residents: 8<br>**Guaranteed Minimum Amount is $1000.00** | 65 | *(Offeror shall propose no fewer than 4 slots and no more than 24 slots) | | |

37

| | | | | | |
|---|---|---|---|---|---|
| 0003CE | Community Based Return Diversion. (See Section C. Paragraph C.5.10) 0<br><br>Maximum Residents: 8<br>**Guaranteed Minimum Amount is $1000.00** | 45 | *(Offeror shall propose no fewer than 4 slots and no more than _32_ slots) | | |
| 0003CF | Specialized Group Home Care (Level IV)<br><br>(See Section C Paragraph C.5.5)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 6 | *(Offeror shall propose no fewer than 4 slots and no more than 6 slots) | | |
| 0003CG | Assisted Living (Level IV)<br><br>(See Section C Paragraph C.5.8)<br>**Guaranteed Minimum Amount is $10000.00** | 4 | *(Offeror shall propose no fewer than 4 slots | | |

58

B.9.4   OPTION PERIOD 3: 10/1/06 THROUGH 9/30/07

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0004AA | Diagnostic and Emergency Care: Aged 12 and Younger. (See Section C Paragraph C.5.2) Maximum Residents: 8 **Guaranteed Minimum Amount is $1000.00** | 20 | *(Offeror shall propose no fewer than 4 slots and no more than 20 slots)* | | |
| 0004AB | Diagnostic and Emergency Care: Aged 13 and Older. (See Section C Paragraph C.5.3) Maximum residents: 8 **Guaranteed Minimum Amount is $1000.00** | 36 | *(Offeror shall propose no fewer than 4 slots and no more than 16 slots)* | | |
| 004BA | Traditional Group Home Care (See Section C Paragraph C.5.4) Maximum residents: 8 **Guaranteed Minimum Amount is $1000.00** | 81 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots)* | | |

39

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0004BB | Specialized Group Home Care (Level III)<br><br>(See Section C Paragraph C.5.5)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 30 | *(Offeror shall propose no fewer than 4 slots and no more than _30_ slots) | | |
| 0004CA | Independent Living Main Facility Programs<br><br>(See Section C Paragraph C.5.6)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | 55<br>*(Offeror shall propose no fewer than 4 slots and no more than _56_ slots | 194.58 | $3,906,127.53 |
| 0004CB | Independent Living Residential Units<br><br>(See Section C Paragraph C.5.7)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | *(Offeror shall propose no fewer than 4 slots and no more than _56_ slots | | |

40

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0004CC | Assisted Living (Level III)<br><br>(See Section C Paragraph C.5.8)<br><br>**Guaranteed Minimum Amount is $1000.00** | 16 | *(Offeror shall propose no fewer than 4 slots and no more than 16 slots | | |
| 0004CD | Teen Parent Programs<br><br>(See Section C Paragraph C.5.9)<br><br>Maximum # of Teen Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 59 | *(Offeror shall propose no fewer than 4 slots and no more than 24 slots | | |
| 0004CE | Community Based Return Diversion.<br><br>(See Section C. Paragraph C.5.10)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 36 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots | | |

| 0004CF | Specialized Group Home Care (Level IV)<br><br>(See Section C Paragraph C.5.5)<br><br>Maximum Residents: 8<br><br>Guaranteed Minimum Amount is $1000.00 | 5<br><br>• | *(Offeror shall propose no fewer than 4 slots and no more than 5 slots) | _____ | _____ |
| 0004CG | Assisted Living (Level IV)<br><br>(See Section C Paragraph C.5.8)<br>**Guaranteed Minimum Amount is $1000.00** | 4 | *(Offeror shall propose no fewer than 4 slots | _____ | _____<br><br><br>_____ |

42

B.9.5   OPTION PERIOD 4: 10/1/07 THROUGH 9/30/08

| Item No. | Supply/Services | Maximum Quantity to be Contracted by CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0005AA | Diagnostic and Emergency Care: Aged 12 and Younger. (See Section C Paragraph C.5.2) Maximum Residents: 8 **Guaranteed Minimum Amount is $1000.00** | 20 | *(Offeror shall propose no fewer than 4 slots and no more than 20 slots* | | |
| 0005AB | Diagnostic and Emergency Care: Age 13 and Older (See Section C Paragraph C.5.3) Maximum Residents: 8 **Guaranteed Minimum Amount is $1000.00** | 32 | *(Offeror shall propose no fewer than 4 slots and no more than 16 slots* | | |
| 005BA | Traditional Group Home Care (See Section C Paragraph C.5.4) Maximum Residents: 8 **Guaranteed Minimum Amount is $1000.00** | 72 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots* | | |
| 0005BB | Specialized Group Home Care (Level III) (See Section C Paragraph C.5.5) Maximum Residents: 8 **Guaranteed Minimum Amount is $1000.00** | 27 | *(Offeror shall propose no fewer than 4 slots and no more than 27 slots* | | |

113

| Item No. | Supply/Services | Maximum Quantity to be Contracted By CFSA | Offeror's Proposed Quantity | Unit Price (Child Per Day) | Not to Exceed Amount |
|---|---|---|---|---|---|
| 0005CA | Independent Living Main Facility Program<br><br>(See Section C Paragraph C.5.6)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | 55<br>*(Offeror shall propose no fewer than 4 slots and no more than 56 slots* | 200.39 | $4,022,899.53 |
| 0005CB | Independent Living Residential Units<br><br>(See Section C Paragraph C.5.7)<br><br>**Guaranteed Minimum Amount is $1000.00** | 100 | *(Offeror shall propose no fewer than 4 slots and no more than 56 slots* | | |
| 0005CC | Assisted Living (Level III)<br><br>(See Section C Paragraph C.5.8)<br><br>**Guaranteed Minimum Amount is $1000.00** | 16 | *(Offeror shall propose no fewer than 4 slots and no more than 16 slots* | | |
| 0005CD | Teen Parent Programs<br><br>(See Section C Paragraph C.5.9)<br><br>Maximum # of Teen Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 53 | *(Offeror shall propose no fewer than 4 slots and no more than 24 slots* | | |

44

| 0005CE | Community Based Return Diversion.<br><br>(See Section C. Paragraph C.5.12)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 32 | *(Offeror shall propose no fewer than 4 slots and no more than 32 slots* | | |
| 0005CF | Specialized Group Home Care (Level IV)<br><br>(See Section C Paragraph C.5.5)<br><br>Maximum Residents: 8<br><br>**Guaranteed Minimum Amount is $1000.00** | 4 | *(Offeror shall propose no fewer than 4 slots* | | |
| 0005CG | Assisted Living (Level IV)<br><br>(See Section C Paragraph C.5.8)<br>**Guaranteed Minimum Amount is $1000.00** | 4 | *(Offeror shall propose no fewer than 4 slots* | | |

**\*\*\*\*END OF SECTION B\*\*\*\***

# - - - - - - - - END PART II - - - - - - - - -

45