## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**JONES AND ASSOCIATES, INC.**                     :
  d/b/a, JONES & ASSOCIATES ILP,            :
1454 Corcoran Street, N.W.                          :
Washington, D.C. 20004,                              :
          **On its own behalf and on behalf of** :
**youth, ages 16-21, placed in foster care**        :
**under the supervision of CFSA and**              :
**requiring congregate care in the category** :
**of independent living program.,**                :
                                                     :
**Dr. James Jones, CEO**                            :
**JONES AND ASSOCIATES, INC.**               :
**Individually and In Capacity as**                :
**CEO of Jones And Associates, Inc.,**             :
                                                     :
                                                     :
**PLAINTIFFS,**                                     :        Civil Action No:  **10-00461 (TFH)**
                                                     :
                                                     :
**v.**                                               :
                                                     :
**DISTRICT OF COLUMBIA,**                           :
A Municipal Corporation,                             :
1350 Penn. Ave, N.W., Suite 409                     :
Washington, D.C. 20004                               :
(Serve: D.C. Office of Attorney General)    :        **Judge:  The Honorable**
                                                             **Thomas F. Hogan**
**DEFENDANTS,**                                     :
                                                     :
**Serve:**                                           :
**Hon. Adrian Fenty,**                              :
**Mayor**                                            :
1350 Pennsylvania Ave., N.W.                         :
Suite 221                                            :
Washington D.C., 20014,                              :
                                                     :
**ROQUE R. GERALD, as, Director of**               :
**Child and Family Services Agency**                :
400 6th Street, S.W.                                 :
Washington, D.C. 20024                               :
                                                     :
**DEFENDANTS.**                                     :

1

**AMENDED COMPLAINT FOR:**
**QUANTUM MERUIT/UNJUST ENRICHMENT, DETRIMENTAL RELIANCE,**
**VIOLATION OF STATUTORY OR REGULATORY LAW, CIVIL CONSPIRACY,**
**VIOLATION OF FIFTH AMENDMENT RIGHTS AND TITLE 42 U.S.C. §1983,**
**PROCUREMENT FRAUD, AND DECLARATORY AND INJUNCTIVE RELIEF**

Come now the Plaintiff Corporation and Dr. James Jones, (hereinafter, Jones &
Associates, J&A, and / or the "Plaintiff") by counsel, John F. Mercer.

Jurisdiction of this Court is pursuant to 28 U. S. C. §1331, various federal statutes
enumerated herein, federal mandates of *LaShawn A. v. Fenty* (C.A. No. 89-1754, TH; June
20, 1989), and common law and statutory law. Plaintiffs bring suit against the Defendant
District of Columbia alleging the following:

## I. INTRODUCTION

This action by Jones & Associates, Inc. ("J & A") is brought on its behalf as a
congregate care independent living service provider, contracted by the District of
Columbia's Child and Family Services Agency ("Agency" or "CFSA") and brought on
behalf of foster care children who are placed or eligible for placement in an independent
living program facility and are under the supervision of the District's Child and Family
Services Agency.   J & A's status and relationship with the Agency as an independent
contractor, and its' *in loco parentis*-type relationship with youth in the child-welfare
system, grows out of judicial mandates imposed on the Agency pursuant to the Modified
Final Order ("MFO") dated November 18, 1993, and Amended Implementation Plan
("AIP"), dated April 2003, in *LaShawn A. v. Fenty*.   The Agency's adherence to sound
policies and procedures governing contract negotiation, screening, procurement, and

review is integrally connected to the Agency's ability to comply with its obligation to provide suitable and stable foster care placements and improved outcomes.[1]

Constitutional principles, federal statutes, and District of Columbia law mandate that the Agency provide appropriate care to children taken into foster care. The Agency receives funds pursuant to both the federal Adoption Assistance and Child Welfare Act of 1980 ("Adoption Act") contingent upon State plan approval, and the federal Child Abuse and Prevention Treatment Act ("CAPTA"). Both documents are incorporated by reference into the Agency's proposed, existing, and/or contested contracts.

A primary prerequisite for ensuring compliance with *LaShawn* mandates include the Agency's development, strict adherence to, and enforcement of fair, consistent, and high-functioning contracting, procurement, and fiscal operations. Notwithstanding, the Defendants have either deliberately and blatantly manipulated and/or disregarded established procurement and contracting policies and practices when dealing with J & A, while simultaneously expecting and receiving specific performance by J & A as an Independent Living Program ("ILP") congregate care provider for older foster care youth. These procurement practices with J & A demonstrate contempt toward the *LaShawn* MFO and AIP, the court monitor, D.C. auditors, applicable D.C. contract and procurement laws, and most importantly, the protected class of foster care children and D.C. residents who are the beneficiaries of the services provided by the effected contract-based negotiations and relationships. The resulting unreliable payment and procurement system has directly interfered with and barred J & A's receipt of fair treatment with respect to market rates and prices. Additionally, these business dealings jeopardize incentives, assurance of qualified service providers, and maintenance of program stability. Consequently, the procurement and contract practices imposed on J & A potentially exposes foster care children to

---

[1] Auditor's Report/ AIP p. 3.

increased irreparable and ongoing physical, mental, and emotional harm in violation of federal statutes, constitutional provisions, and the laws of the District of Columbia, including *LaShawn* standards.

The Agency's procurement, contracting, and fiscal operations scheme imposed on J & A appears also to be a means to: subvert City Council oversight of the Agency's spending, payment, and budget; and, avoid application of uniform procurement procedures in violation of the D. C. Procurement Act of 1985 and the Anti-Deficiency Act.   The Agency's illegal tactics amount to malicious abuse of process, abuse of authority, unconstitutional obstruction, poor professional judgment, arbitrariness, undue influence, duress, and bad faith.    Notwithstanding the financial devastation that the Agency's practices have subjected J & A to, J & A has remained open and committed to providing a home and quality services to older foster care children for whom the Agency is responsible, thereby resulting in unjust enrichment to Defendants and ongoing financial detriment to J & A.

During the past 4-5 years, the Agency, Court Monitor and Federal Children's Bureau ("DHHS") Annual Reports document high percentages of older D.C. foster care youth with alternative plans for permanent living arrangement ("APPLA") goals. Consequently, quality and stable "ILPs" have become increasingly critical to the District's child-welfare system's continuum of placements and services. In furtherance of its operational commitment and obligation to secure and maintain specialized placements for older foster youth, the Agency relies heavily on J & A placements, but at the same time abuses its authority and unfairly manipulates bid procurement, contract negotiation, and payment procedures imposed on J & A in violation of federal statutes, constitutional provisions, and the laws of the District of Columbia.  These violations result directly from

the Defendants' actions and inactions related to business transactions with J & A in its capacity as contractor.

Pursuant to a request by the D.C. City Council's Committee on Human Services, the D.C. Auditor examined the Agency's contracting and quality assurance procedures related to congregate care contracts covering period July 1, 2004 through December 31, 2007. J & A ILP was included in the Auditor's examination. The Auditor's Report was issued on April 1, 2008. The Auditor concluded that, "...CFSA's Director, Contracts and Procurement Administrator (C&P Administrator), Fiscal Officer, and other agency managers failed to develop and implement adequate internal controls to ensure efficient operations and compliance with applicable laws and regulations." Further, "… CFSA's contracting practices did not comply with Title 27 DCMR or the agency internal standard operating procedures…" **(See Exhibit #1 - The D.C. Auditor's Report on Child and Family Services Agency's Contract Assurance Procedure, dated, April 1, 2008.)**

The D.C. Auditor's Report on CFSA, dated April 1, 2008, is incorporated by reference into the Plaintiff's Complaint. **(See Exhibit #1.)**

## II. JURISDICTION AND VENUE

This is an action against the District of Columbia's on-going violations of federal judicially mandated requirements pursuant to the Modified Final Order ("MFO"), dated November 18, 1993; the Implementation Plan ("IP"), dated April 2003; and Amended Implementation Plan ("AIP"), dated February 2007 in *LaShawn A. v. Fenty.* [2] Additionally, this is an action pursuant to § 1983 of Title 42 of the United States Code

---

[2] **See Exhibits #2 - #4: Exhibit # 2 - (*LaShawn v. Dixon,* Modified Final Order,** ("MFO"), dated November 18, 1993); **Exhibit # 3 - (*LaShawn A. v. Williams,* Implementation Plan** ("IP"), dated April 2003); **Exhibit # 4(a) – (*LaShawn A. v. Fenty,* Amended Implementation Plan** ("AIP"), dated February 2007; **Exhibit # 4(b))- (Center for the Study of Social Policy Court Report**: *"An Assessment of the District of Columbia's Child Welfare System, (as of January 31, 2009"*, dated, April 30, 2009.) **Official Records of *LaShawn A. v. Fenty*** that can be located at the Child and Family Services Agency's website: *www.cfsa.dc.gov.*

alleging violations of federal statutes, as well as of the United States Constitution, and statutes of the District of Columbia. The district court has jurisdiction of federal claims pursuant to §§ 1331 and 1343(a)(3) of Title 28 of the United States Code, and it has pendent jurisdiction over the claims alleging violations of the statutes of the District of Columbia.

Venue in this district is proper pursuant to § 1391(b) of Title 28 of the United States Code because the claims arise in the District of Columbia.

## III. **THE PARTIES IN THIS ACTION**

1. That the Plaintiff Jones & Associates, Inc., ("J & A") is a corporation of the District of Columbia that contracts services to the District of Columbia and has done so since on or about 2003. J & A's chief executive officer ("CEO") and controlling principal is Dr. James L. Jones, Esq. ("Dr. Jones").

2. That the Plaintiff, Dr. James Jones is the chief executive officer ("CEO") and controlling principal of Jones and Associates, Inc., and has been throughout the time period associated with the claims in this complaint.

3. That the Defendant District of Columbia is a municipal corporation and is authorized to sue and be sued. In this matter, the District of Columbia has acted by, as, and through, the Child and Family Services Agency of the District of Columbia (the "Agency" or "CFSA") and its employees, managers, and/or agents.

4. That the Defendant Roque R. Gerald ("Gerald" or the "Director") is sued in his official capacity as the Director of the Child and Family Services Agency. As Director, Mr. Gerald is responsible for the policies, practices, and operation of the Child and Family Services Agency of the District of Columbia, including contract and procurement oversight and authority.

## IV. STATEMENT OF FACTS

### Background History of Jones and Associates, Inc.

5.  J & A specializes in providing services as an ILP for children under foster care supervision of the District of Columbia, and protected class members pursuant to *LaShawn A.v. Fenty.*   These are the District's most vulnerable and at-risk population of children. The director and staff of J & A have assumed and sustained *in loco parentis*-type responsibilities for older foster care children since 1983.  J & A exclusively provides independent living, transition, and related services to the Agency since the Agency began contracting such services in or around 2003.

6.  The targeted foster care youth placed and receiving services at J & A's independent living program are adolescents and young adults ranging from ages 16 –21 years. The District of Columbia is one of the few jurisdictions, which includes 18-21 year-olds as eligible for services under the child welfare system. The Agency and service providers alike, agree that this population within the foster care system is extremely hard-to-place for obvious reasons.  As these foster care youth age within the system, they suffer repeated incidents of abandonment, rejection, abuse, neglect, and years of foster care drift, in addition to the original family-based trauma and circumstances, which mandated child-welfare intervention.  By 16-18 years of age, the likelihood of incidences of drug and alcohol abuse, severity of behavior and mental health issues, limited success in school with identified education-related disabilities, truancy, dropout rates, teen pregnancy and parenting rates, arrests, and subsequent multiple diagnoses increase.  Anger management, curfew violations, and abscondence are high on the list of additional challenges reported by the Agency, older foster care youth, and service providers.  These factors, coupled with age, reduce the likelihood of family reunification or adoption.

7. In addition to providing services and interventions that address the aforementioned characteristics, behaviors, and habits (because of age and their proximity to emancipation), as an ILP, J & A is mandated by law to offer a variety of age-appropriate transitional and "life skills" services that support and prepare ILP residents for work, leaving the child-welfare system, adulthood, and independence.

8. Prior to contracting with the Agency in 2004, J & A had developed a successful "independent living program" ("ILP") for youth incorporating both a pre-college and college component for residents who had matriculated J & A's program upon reaching college age while under J & A's care. The J & A Program had significant impact. As a result, many elements of J & A's program emerged as prototypes for the Agency's ILP requirements. Ultimately, elements of J & A's program were replicated in the codification of District of Columbia Municipal Regulations ("DCMR") in 29 DCMR 6300, et. seq. Many of J & A's innovations were also replicated in ILP facilities throughout the United States. Such innovations exist at present in ILP regulations throughout the country. The achievements of the program have been recognized and well documented in the *U.S. Congressional Record, the New York Times,* and *The Washington Post.*[3] **(See Exhibits #5(a) – #5(g).)**

9. Despite J & A's commitment and substantiated success based on impressive percentages of student resident admission, attendance, and completion of college, the

---

[3] **See Exhibits #5(a) - #5(g)**: **Exhibit #5(a)** – (*Congressional Record 106th Congress* April 13, 2000 Senate "Commendation for Dr. Jones Brownfox Jones Esq." Senator Hon. Nighthorse Campbell); **Exhibit #5(b)** – (*The New York Times* April 6,1988 "Youth Leave for Campus" Lee Daniels); **Exhibit #5(c)** - (*The Washington Post* December 25, 1996 " Helping Hand from  Jimmy Jones " Colbert King); **Exhibit #5(d)** – (*The Washington Post* December 25, 1986 "Program Give Youths the Ability to Succeed, P.G. Carter); **Exhibit #5(e)** – (*The Washington Post* May 11, 2000 " A Salute to Those Who Serve by J.A. Kelly); **Exhibit #5(f)** – (*The Washington Observe* 1998 Child Watch by Marion Wright Edelman " Help Black Children Open Doors to College"); **Exhibit #5(g)** – (*DVD NBC Channel 4* Susan Kidd Special on Jones & Associates College Program).

Agency unilaterally decided not to fund the pre-college and college component of the J & A program. Instead, the Agency disrupted and shut down, what was a well-run, successful, and vital transition service for young adults in the foster care system by moving the program and funding to another provider with little to no experience with these responsibilities. The Agency's poor professional judgment and bad faith compromised the availability of pre-college remediation and stability of residential housing for these student residents during weekends, holidays, and summers, resulting in a significant reduction in the percentage of foster care youth preparing for and attending college. **(See Exhibit # 6-Photo Album of J & A Graduates: "JONES & ASSOCIATES LIVING & COLLEGE OPTION PROGRAM-MORE THAN 25 YEARS OF CONTINUOUS OPERATIONS".)**

10.  Prior to 2004, J & A's service provider contractual relationship with D.C. government resulted from a competitive bid process and required compensation on a "cost-plus-fixed-fee" basis with a reimbursable component to provide independent living services to foster care children. This contractual arrangement provided financial certainty for J & A to properly operate the program and provide all needed services to the resident youth. Starting in 2004 and subsequent thereto, the Defendant unilaterally, under persistent protest by J & A, manipulated and/or disregarded established contracting and procurement procedures and unilaterally imposed the payment system by which D.C. government compensated the Plaintiff for independent living services rendered to foster care youth.

11.  J & A has made ongoing financial and professional commitments to the Agency and on behalf of the children in its care to continue to operate a home away from home and stand in the shoes of parents and families, unable or unwilling to assume major

short and long-term parenting decisions and responsibilities for older foster care youth.[4]

**(See Exhibits # 7(a) - #7(c).)**

### Agency Contracting and Procurement Authority and History

12.   The Agency has independent procurement authority through the Procurement Reform Act of 1996, where D.C. City Council exempted it from the authority of the District's Office of Contracting and Procurement. (See D.C Code §§ 2-301.01 *et seq*.) Notwithstanding, the Agency's contracting practices must comply with D.C. contracting and procurement procedures as set forth in the Procurement Practices Act of 1985, as amended, pursuant to Title 27 of the DCMR.   (See D.C Code §§ 2-301.04 and 2-303.20(n)).   In addition to D.C. legislated contract and procurement policies and procedures, the *LaShawn A.* standards mandate that the Agency develop and sustain "high functioning contracting and fiscal operations," and that the Agency "shall have in place a functioning performance-based contracting system."

13.   From the Agency's creation until on or around July 2006, the Defendant had no formal written standard operating procedures ("SOPs") for contracting and procurement policies, despite D.C. law and *LaShawn* standards mandating such. Agency Contracting and Procurement SOPs were not written and compiled until July 2006

14.   The factual allegations set forth below are indicative of the Agency's deliberate misapplication of its own internal "SOPs" (after 2006), as well as its ongoing failure to comply with the Procurement Practices Act of 1985, Title 27 DCMR, the Anti-Deficiency

---

[4] **See Exhibits # 7(a)) – 7(c):   Exhibit #7(a) –** *Letter* from Thompson, Cobb, Brazilio and Associates PC Certified Public Accountant to Dr. Jones L. Jones of J&A October 25, 2005. **RE:** A significant change in the way J & A Compensated by the D.C. Government**; Exhibit #7(b) –** *Letter* from O'Linda Fuller CFSA Contract Official to Dr. Jones  of J&A, dated, December 5, 2003. **RE:** Recommending that J&A Contract should be Cost Plus Fixed Fee is a cost reimbursement type contract**); Exhibit # 7(c) – Letter** from John F. Mercer Esq. to Dr. Uma Ahluwalia CFSA Director, dated, December 7, 2005. **RE:** J & A's Opposition to Sole Source Agreement**).**

Act (D.C. Code § 47-335.01, *et seq.*), and *LaShawn A* standards and contracting and procurement mandates while doing business with J & A. These deficiencies are substantiated, beginning with the Agency's "Request for Proposals", **CFSA 03-R-OOO5,** (**"RFP I"**), dated July 28, 2003 and followed by a series of sequential transactions as listed below. **(See Exhibit # 8(a).)**

- **Letter from Mr. Wade, CFSA Contract Officer, to J&A, dated, February 18, 2004 RE**: Request for Best and Final Offer for Congregate Care Services for Independent Living Main Facility with the RFP CFSA-03-R-0005 enclosed with details. **(See Exhibit #8(b).)**

- **Jones & Associates' <u>Best and Final Offer</u> In Response to** CFSA-03-R-0005, **Submitted February 23, 2004. (See Exhibit # 8(c).)**

- **CFSA-04-C-0076 ("Contract-1"), effective December 1, 2003. (See Exhibit # 9.)**

- **CFSA-O4-CFCA-O350 ("Disputed Letter Contract-1"), effective July 1, 2004 to June 30, 2005 (See Exhibit # 10.)**

- **CFSA-04-CFCA-0350 ("Disputed Contract-1"), dated December 7, 2004 (See Exhibit # 11.)**

- **Discussion Paper on CFSA Contract Officer's Review Conference for Contracts with J & A for Year 2004. (See Exhibit # 12.)**

15.   From January 2004 through 2009 and into 2010, J & A has persistently and vehemently objected orally and in writing to the Agency about the illegal and inequitable contracting and procurement process and payment conditions imposed and demanded by the Agency.

## <u>DC Auditor's Report on CFSA dated April 1, 2008, and April 12, 2008 Testimony before City Council</u>

16.   The D.C. Auditor's Report on CFSA of April 1, 2008, (including Appendices and Agency Comments) is attached and incorporated by reference into the Plaintiff's Complaint herein. **(See Exhibit # 1 - D.C. Auditor's Report.)**

17.   On or about March 2008, the District of Columbia Auditor (the "Auditor") notified J & A that as part of an audit investigation of the Agency and its ILP contractors, J & A was requested to provide information concerning its Agency contracts.   **(See Exhibit #13- Letter to J & A from D.C. Auditor's Office, dated January 24, 2008.)** In response, J & A gathered financial records dating back to 2004 and made them available to the Auditor, as well as its management, staff, and residents for interviews by the D.C. Auditors. Additionally, J & A provided copies of the CWA Report (See factual pleading # 24) and correspondence with the Agency, including complaints of unfair Agency contract practices.[5]   **(See Exhibits # 14(a) - # 14(e).)**

18. On or around April 2008, the D.C. Auditor issued findings that the Agency's Contracts with J & A from 2004 through 2006 were invalid, violating D.C. Code §2-301.05, D.C Code §2-301.05(d)(2), and thereafter, violated Title 27 DCMR & 2425.9 by issuing J & A "short–term letter contracts."

19.   The Auditor recommended the following: "The C&P Administrator, CFSA Placement Staff, and [J & A] representatives immediately identify and address all issues

---

[5] **See Exhibits # 14(a)- 14(e): Exhibit # 14(a)** Letter from John F. Mercer Esq. to Mr. Terrell Esq. General Counsel D.C. CFSA April 20, 2006 Subject Sole Source Contract Objection; **Exhibit # 14(b)** Letter from John F. Mercer Esq. to Ms. Ahluwalia CFSA Director Date April 21, 2006 Subject Fair Hearing Request; **Exhibit # 14(c)** Letters from John F. Mercer Esq. and Dr. James Jones to Mr. Moye CFSA Contract Officer March 21, 2007 Subject Contract No. CFSA-07-C-0093 Effective Date of Execution Notice of Continuing Protest and Reimbursements; **Exhibit # 14(d)** Letter from John F. Mercer Esq. to Dr. Shalyn Bobo CFSA Director March 25, 2008 Subject J&A Notice of Multiple Contract Breaches Failure to pay; **Exhibit # 14(e)** Letter from John F. Mercer Esq. to Hon. Peter J. Nickles, Esq. D.C. Attorney General.

that have prevented successful negotiation of a contract. The CFSA Director should consult with the Office of the Attorney General and other legal advisors to the extent necessary to resolve all outstanding issues." Further, the Auditor condemned the Agency for its failure to adhere to financial and contracting practices with the ILP contractor.    The Auditor specifically referred to J & A in its report and in testimony before the DC City Council. In so doing, the Auditor reported that the Agency had compensated J & A improperly without adhering to appropriate standards. **(See Exhibit #1, pgs. 14-20.)**

20.   On April 12, 2008, during a transcribed, televised, and recorded City Council Hearing and in response to Council Member Tommy Wells' inquiries regarding a payment of Two Million Dollars ($2,000,000.00) to J & A for services without a contract, the Auditors, testified that: (1) "Jones [J & A] was likely to have been underpaid;" (2) "there were no indications that there had been significant problems with performance;" (3) "they were paid at a substantially lower rate because they had no valid contract in place and they were paid $139.00 for each child as opposed to $275-$300 per child for the contractors who had executed a contract. So, Jones was really going above and beyond by continuing to provide the services at the same quality for less money."[6]   **(See Exhibits # 15 (a) - # 15 (c).)**

21.   Council Member Wells concluded that not having a valid contract is indicative of a "bad business practice."   The Auditor continued, "That situation in some vendors' hands could have resulted in a decline in the quality of services being provided over a long period of time."   The Auditor concluded and shared that many others would take the

---

[6] **See Exhibits #15(a) - #15(c): Exhibit # 15(a) -** *Washington Post,* "Paper Trail for Contract Fall Short Auditor Says" dated April 13, 2008, by Sue A.P. Montes; **Exhibit #15(b) -** *Washington Post, Audit Faults City Agency on Monitoring Contracts*, dated, April 10, 2008, by Petala Dvorak;   **Exhibit #15(c) -** *Examiner, Child Welfare Agency Gave Million to Uncontracted CompanyAudit Finds*, dated, April 9, 2008,  by Dean Leuitz, Bill Myers.

attitude that since I receive less than others, I am going to change the quality of what I deliver, but in J & A's case, there was no evidence that this occurred.[7]

22.   The Auditor's final report recommended changes in the Agency's contract policies and practices. According to the Auditor: "…CFSA [the "Agency"] continues to conduct business in a manner that fails to comply with applicable District laws, regulations, and standards.   Additionally, Jones and Associates [J & A] continues to incur client specific costs (not included in the per diem rate) that are associated with services for which there is no valid contract."   The Auditor specifically recommended that "[the Agency] immediately negotiate a reasonable and legally binding contract with [J & A] within thirty ("30") days of [its] report…" The thirty days referred to in the Auditor's report expired on May 30, 2008.

23.   J & A's management met with Agency representatives during April and May 2008 with the intent and hope of resolving the outstanding "contract problems" as recommended by the D.C. Auditor. The Agency did not adhere to the Auditor's recommendation, but continued its pattern of failing to act in good faith to negotiate a contract with J & A.

**Plaintiff's (J & A's) Performance Vindicated by Outside Consultant Child Welfare Associates, LLC, Study of March 2006 Commissioned by Defendant (CFSA)**

24.   On or about March 2006, the Agency hired Child Welfare Associates, LLC ("CWA") of Illinois, based on its seasoned staff and well-known reputation, to perform an independent evaluation of J & A and two ("2") other agencies contracted under CFSA. The methodology used by CWA was approved by the Agency upfront and grounded in the requirements set forth by the Agency, as well as Industry Standards for Independent Living Programs.   The independent welfare experts reviewed documents, toured the facility, and

---

[7] **See Exhibit # 16: Digital Video (DVD) documenting D.C. Auditor's Testimony** before D.C City Council's Committee on Human Services Hearing on April 12, 2008. **Re**: J & A and the Audit of CFSA's Contracting and Quality Assurance Procedures.

conducted comprehensive interviews of staff, youth, Agency Contract Monitors, and Youth Development Workers assigned to J & A. The primary purpose imposed by the Agency was threefold: (1) performance of J & A with respect to safety and quality of care; (2) comparison between J & A's performance to current industry and best practices; and (3) review and test of the validity of the prior Contractor Annual Performance Evaluation done of J & A by CFSA.[8]  **(See Exhibit # 17- CWA Report.)**

25.  CWA's overall findings in the primary focus areas concluded that J & A: (1) is in "compliance with the space requirements set out in the D.C. Code and Regulations Sec. 6328(c)(5)"); (2) "the facility met safety standards of rule 63…. The reviewers noted no safety concerns"; (3) in all of the areas of "service provision," youth received quality services and benefited from the services offered which helped them move towards emancipation; and, (4) when compared to other ILP programs, Agency workers indicated that J & A would '"take kids that the others refuse to take"' and "if the program was not available, they would be at a 'dead-end'". CWA reported, "the agencies are overall doing an acceptable to above average job in providing services required under existing rules and agency contracts." **(See Exhibit # 17, "CWA Report", page 30.)**

26.  In response to the Agency's request to test the validity of its prior Contractor Annual Performance Evaluation of J & A, covering the period from July 2004 to June 30, 2005, CWA concluded that the Agency's evaluation process was problematic based on, but not limited to, the following flaws:  (1) the Agency contract, placement, and service monitors, through their own admissions, did not have access to any standardized tools or instructions for conducting performance evaluations from July 2004 through June 2005; (2) monitors used their own methods for conducting performance evaluations, and once written

---

[8] **See Exhibit # 17**: *Evaluation of Three Independent Living Program or Group Home Services Agencies Operating Under Contract with CFSA: Jones and Associates Agency Report,* 2006, prepared by Child Welfare Associates, LLC Wheaton Illinois. ("CWA Report", pages 10, 16 and 19-47).

and submitted, supervisors often rewrote and changed the ratings; (3) monitors relied heavily on licensing, but CWA concluded that Agency licensing standards did not reflect best practices;   (4) performance monitors were provided limited or no information regarding the contents of J & A's contract or licensing concerns; and (5) monitors did not have a handbook or manual documenting written Agency procedures, policies, or monitors' job expectations and responsibilities. (**See Exhibit # 17 – "CWA Report", pages 16 and 19-30.)**

27.     In contrast to the Agency's prior annual evaluation, CWA used specific standardized tools and protocol, which it outlined in its summary of findings that rated J & A's performance as acceptable or above average across the board, noting areas needing improvement.

### Monies Owed Plaintiff (J & A) by Defendant (CFSA) Amount to $1,770,450.99 for Contract Period 2004 to 2005 for Services Rendered to Youth In the D.C. CFSA Foster Care System

28.     That on or around September 2003, the Agency issued a "Request for Proposals" (**CFSA  03-R-0005, "RFP  1"**) seeking potential contractors to submit competitive proposals on Congregate Care, ILP services.  (**See Exhibit # 8(a).)**

29.     In response to "RFP-1," J & A submitted a competitive price proposal including pricing data based on a  $191.90 *per diem* rate on or around September 17, 2003, that met the required prerequisites and criteria. The period covering October 1, 2003 to September 30, 2004 was originally identified as the "Base Year," with budget summaries covering four ("4") "Option Years" ending September 30, 2008.[9] (**See  Exhibit # 18.)** At the time the Agency issued   "RFP 1", J & A was already providing ILP services pursuant to CFSA-01-R-0023-EK, "Contract Option 2003", an existing extended (Option Year 2) cost-plus-fixed-fee basis contract for the Agency covering period April 1, 2003 to

---

[9] **See Exhibit  # 18**, - J & A's Response to CFSA-03-R-0005 ("RFP-1"): *Part Two, Price Proposal,* submitted September 17, 2003.

March 31, 2004.[10]   Based on the pre-existing contractual relationship, the "accepted proposal pursuant to "RFP 1", and its established success as a quality ILP service provider, J & A expected continued receipt of long-term service contracts from the Agency on behalf of foster care children needing congregate care now and in the future.

30.  Based on "RFP 1", J & A and the Agency agreed that J & A would operate and maintain twenty-four hour residential facilities capable at all times for lodging and care of not fewer than forty ("40") foster care residents to be assigned by the Agency

31.  In addition, J & A was required to maintain "…[D] ocumentation of sufficient funds on hand to operate the independent program for at least three ("3") months (29 DCMR 6307(d), or the "reserve").  The amount on reserve had to cover operations for the agreed-upon full occupancy of forty ("40") residents at the J & A facility.

32.  The Agency executed Letter Contract (CFSA-04-C-0076 "LC-1") to J & A covering services to be provided by J & A for period December 1, 2003 through March 31, 2004. (See Title 27 DCMR § 2425 *Letter Contracts*).  The terms of LC-1 specified a fixed price contract with cost reimbursement components and included a reduced *per diem* rate of One Hundred Sixty Nine Dollars and Twenty Five Cents ($169.25) to be retroactively applied to the services J & A had provided since September 2003.  This amount and arrangement was contrary to J & A's belief and justifiable expectation that the *per diem* rate for its services agreed upon was One Hundred Ninety One Dollars and Ninety Cents ($191.90).

33.  The Agency by undated letter from then Contract Specialist, O'Linda Fuller, notified J & A of its approval by the Contracting Officer as of December 5, 2003, to changing the contract type of LC-1 from fixed price contract with cost reimbursement components to a cost-plus-fixed-fee payment scheme. **(See Exhibit # 7(b).)** The plaintiff

---

[10] **See Exhibit 19 - CFSA-01-R-0023-EK,** "Contract Option 2003", April 1, 2003 to March 31, 2004. (Previously existing Contract at time of "RFP-1" (CFSA-03-R-0005).

signed CFSA-04-C-0076 ("Contract-1") issued by CFSA in the amount of One Million, One Hundred Thirty Five Thousand, Six Hundred Sixty Seven Dollars and Fifty Cents ($1,135,667.50) covering the provision of services for the period December 1, 2003 through March 31, 2004 by J & A. The terms specified *inter alia*, that: "Contract-1" was a cost-plus-fixed-fee type contract; the letter contract "LC-1" merged with "Definitized Contract" ("Contract-1"); and, a Transition Period of Performance shall be in effect from April 1, 2004 through May 31, 2004. **(See Exhibit # 9.)**

34.    On or about January 26, 2004, at a conference to negotiate a "definitive contract," pursuant to RFP-1, the Defendant, without any discussion or meaningful input from the Plaintiff, arbitrarily and unequivocally demanded that J & A accept a *per diem* rate of One Hundred Thirty Nine Dollars and Six Cents ($139.06) with an indefinite quantity and fixed-unit price scheme.   In response to J & A's vehement objection, the Agency's representatives, without justification, retaliated by threatening to eliminate and disqualify J & A from current and future contract negotiations. The Plaintiffs sought reconsideration and consistently objected to the Defendant's demand.   Pending resolution, and not wanting to unduly impact the welfare of the youth reliant on its care, J & A continued to provide quality services to foster care youth placed at its facility.

35.    The Agency's unilateral actions threatening J & A with a "take it or leave it" deal, not only eviscerated the parties' business relationship, but the Agency's decision contradicted the Corporation Counsel's 2003 recommendation that the CFSA Contracting Office continue to include and implement a "cost-plus-fixed-fee" contract type with J & A. Subsequently, CFSA issued a request for Best and Final proposal dated, February 18, 2004 with closing date February 23, 2004.   J & A submitted a 'Best and Final Offer' price proposal, which mirrored its original response to the Agency's "RFP-1," on February 23, 2004. **(See Exhibit # 8(c).)**

36.   On or around May 20, 2004, the Agency, without notice, modified the terms of "Contract-1" and unilaterally put into effect the changed fixed-unit payment scheme with a reimbursable component and implemented the substantially reduced *per diem* rate paid for J & A's services from the agreed upon One Hundred Ninety One Dollars and Ninety Cents ($191.90) to One Hundred Thirty Nine Dollars and Six Cents ($139.06) with an indefinite quantity and low minimum of only One Thousand Dollars ($1,000.00). These series of changes subjected J & A to ongoing fluctuating and insufficient funds to properly operate the ILP on a monthly basis eventually creating the need for the Plaintiff to loan funds to the Agency in order to provide and ensure continued quality services to the foster care youth placed in the facility.

37.   On or around July 1, 2004, the Agency initially executed CFSA-04-CFCA-0350 as a letter contract, ("Disputed LC-2") **(See Exhibit # 10)**) pursuant to "RFP 1" awarding J & A an indefinite quantity contract covering July 1, 2004 through June 30, 2005 (base year) with four ("4") options, to be paid a fixed unit daily *per diem* rate based on actual number of youth served plus any allowable reimbursables, and authorizing J & A to continue services covering the period from July 1, 2004 through September 30, 2004, in the amount of Eight Hundred Forty Nine Thousand, Eight Hundred Eighty Six Dollars and Thirty Nine Cents ($849,886.39).  J & A was paid Four Hundred Twenty Nine Thousand, Three Hundred Forty Six Dollars and Seven Cents ($429,346.07).

38.   According to Auditor's Report of 2008, as a result of CFSA-03-R-0005, the contract requires the District to order and the contractor to furnish at least a stated minimum of supplies or services."   See 27 DCMR § 2499, which defines an indefinite quantity contract as a "contract that provides for an indefinite quantity, within written stated limits, of specific supplies or services, to be furnished during a fixed period, with deliveries to be scheduled by placing orders with the contractor.

39. On October 1, 2004, the Agency modified CFSA-04-CFCA-0350 ("Disputed LC-2") by extending it until October 25, 2004, and increasing the value by One Hundred Thirty Nine Thousand Sixty Dollars ($139,060.00). (See 27 DCMR §§ 2425 *et seq.*, and 3600 *et seq..*)

40. From October 25, 2004 through December 7, 2004, the Agency failed to negotiate or execute any instrument. Notwithstanding, J & A continued to provide quality services, expecting fair payment and reimbursement, and objecting to the contracting process, fixed-unit price approach, and the *per diem* amount.

41. On or about December 7, 2004, the Agency executed a definitive base year contract CFSA-04-CFCA-0350 ("Disputed Contract-1") **(See Exhibit # 11)**, extending from July 1, 2004 through June 30, 2005. The Plaintiff agreed with the services to be rendered, but continued to object to the fixed-unit price scheme and the unilaterally imposed *per diem* rate of One Hundred Thirty Nine Dollars and Six Cents ($139.06) instead of the *per diem* rate of One Hundred Ninety One Dollars and Ninety Cents ($191.90) for the base year. In light of investments made and Agency threats to discontinue contracting with J & A, the Plaintiff signed the "Disputed Contract-2" on December 7, 2004 under duress.

42. On behalf of J & A, Dr. James Jones protested to the Agency, rejecting CFSA-04-CFCA-0350 ("Disputed Contract-1") and demanding that it be modified to conform to the 'Best & Final Offer,' dated February 23, 2004 and the terms and conditions to which the parties agreed. The Agency failed to acknowledge its wrongfulness, lack of conformance with District of Columbia contracting and procurement standards, and damaging actions caused by its unilateral imposition of the payment terms of "Disputed-Contract-2" without negotiation with, or input by, the Plaintiff.

43.   Subsequent to its protest, and notwithstanding the Agency's actions, J & A, in accordance with its responsibilities, continued to provide all required ILP services from 2004 to the present. Such services as provided by J & A met and exceeded the applicable standards as required by 29 DCMR Chapter 63, *et.seq.* and the *LaShawn* standards, including but not limited to, transportation, substance abuse treatment, medical and medication-related services, emotional counseling, transportation, education and job-training guidance and services.   The Agency failed to respond to J & A's many requests for relief.

44.   Despite J & A's inquiries and on-going objections, the Agency refused to exercise the first "Option" year of CFSA-04-CFCA-0350 ("Disputed Contract-1").   The Option provided that the base year contract would be continued under the same terms and conditions excepting the institution of a cost of living ("COLA") increase to be negotiated by the parties. The Agency: (1) failed to follow the procedures pursuant to Title 27 DCMR that govern operating standards for when the Agency can or cannot exercise an option; and (2) refused to exercise both the Option and the COLA obligation.

45.   The Agency failed to issue a contract covering period June 30, 2005, to October 1, 2005, but continued to place youth at and rely on independent living services from J & A during that time period pursuant to RFP-1.

46.   The Agency raised various specious rationales for failing to activate the Option and implement a long-term bid contract. For example, the Agency accused J & A of: non-compliance with DC tax requirements; failure to produce requested documents; claims of conflict of interests; and suggestions that J & A had "inspection deficiencies" and, as a result, "could not meet the qualification for full licensing," and "could only be issued a provisional license". These allegations ceased and J & A was vindicated, subsequent to J & A providing documentation to refute each and every false claim by the Agency,

substantiating its compliance. The Agency's false allegations had no real connection to the Agency's contracting and licensure practices, and were intended to inflict stress and undue duress on J & A. The Agency's repeated false instigations and acts of bad faith put foster care youth in continuing jeopardy of abrupt, untimely, and unjustified removal from J & A, placing the residents at risk for unnecessarily interrupted and discontinued medical, emotional, educational and transitional services.[11]

47.    Instead, the Agency issued Sole Source Contract CFSA-06-C-0036, dated October 7, 2005 ("SSC-1") in the amount of Five Hundred Sixty Four Thousand Forty Two Dollars and Thirteen Cents ($564,042.13) for the period October 1, 2005 to November 30, 2005 for fixed rate unit with indefinite quantity.[12]

48.  On or about November 17, 2005, the Agency informed J & A that the acceptance of the Sole-Source Agreement operating under a 'unit cost-indefinite quantity" was a condition for J & A continuing as a contractor for ILP services. J & A notified the Agency of its objections.[13]

49. In the interim, CFSA issued Memorandum of Understanding ("MOU-1") dated, December 23, 2005 to J & A for services for the period December 1, 2005 through January 9, 2006; and ("MOU-2") dated, January 6, 2006 to J & A, for services period January 9, 2006 through March 16, 2006.[14]

---

[11] **See Exhibits # 20(a) - 20(c)**: **Exhibit #20(a)** CFSA Draft Quality Assurance/Performance Evaluation Report for Contract # CFSA-04-C-0350, dated July 15, 2005;  **Exhibit 20(b)** -  Email from N. Smith-Bilgen, CFSA Administrator to CFSA Staff RE: Removal of J&A residents, dated, December 20, 2005; **Exhibit (20)(c)**- J & A Response to CFSA Report Citing Deficiencies.

[12] **See Exhibit 21** - CFSA-06-C-0036, "SSC-1," dated October 7, 2005.

[13] **See Exhibit 22** - Letter from Attorney Mercer to Dr. Ahluwealia, dated December 7, 2005. Re: J & A Opposition to Sole Source Contract ("SSC-1").

[14] **See Exhibits #23 and #24**: **Exhibit #23** Memoranda of Understanding; "MOU-1," dated, December 23, 2005; **Exhibit #24** - "MOU-2," dated, January 6, 2006.

50.     From March 2006, the Agency continued issuing Sole Source Contracts instead of exercising option contract(s) for CFSA-04-CFCA-0350 ("Disputed Contract-2").

51.     The Agency issued the following Sole Source Contracts: (1) CFSA-06-C-0165 ("SSC-2") covering the period April 10, 2006 through March 31, 2007 in the amount of Three Million, Three Hundred Seventy Six Thousand, Six Hundred Four Dollars and Fifty Cents ($3,376,604.50) for a fixed unit price with an indefinite quantity contract; (2) Contract CFSA-07-C-0093 ("SSC-3") covering services for 365 days in the amount of Three Million, Three Hundred Seventy Six Thousand, Six Hundred Four Dollars and Fifty Cents ($3,376,604.50) for a  fixed unit price per child per day;  (3) Contract CFSA-07-C-0093 ("SSC-4")  covering services for ninety two ("92") days in the amount of Eight Hundred Fifty One Thousand, Eighty Nine  Dollars and Fifteen Cents, ($851,089.15) for an indefinite quantity with fixed price with a cost reimbursable component; and, (4) Contract CFSA-07-C-0093 ("SSC-5") covering services for ninety ("90") days in the amount of Eight Hundred Thirty Two Thousand, Five Hundred Eighty Seven  Dollars and Forty One Cents, ($832,587.41) for an indefinite quantity with fixed price with a cost reimbursable component.[15] **(See Exhibits # 25 - # 28: Sole Source Contracts.)**

52.     By letter dated March 21, 2007 to CFSA, J & A registered its continuing objection by stating that the sole source contracts were signed "under protest". J & A alleged that CFSA wrongfully refused to exercise the option provision in the base contract and instead engaged J & A through "Sole Source" contracts in order to circumvent normal

---

[15] **See Exhibits #25 - #28(Sole Source Contracts):  Exhibit # 25** - CFSA-06-C-0165 ("SSC-2"), April 10, 2006-March 31, 2007; **Exhibit # 26 -**  CFSA-07-C-0093 ("SSC-3") covering 365 days, dated March 31, 2007; **Exhibit # 27 -** CFSA-07-C-0093, extended ("SSC-4") covering 92 days; **Exhibit # 28 -** CFSA-07-C-0093, extended ("SSC-5") covering 90 days.

contracting procedures and impose unfair conditions on the contractor in violation of Title 27 DCMR.[16]

53.   The Agency, having knowledge of all *LaShawn A.* standards and D.C. Contract and Procurement legal mandates, knowingly and willfully disregarded normal contracting policies and procedures.   The Agency's frequent and fraudulent change of payment provisions imposed an inequitable and arbitrary treatment on J & A, to the Agency's benefit.

54.   Based on the foregoing actions and inactions, the Agency created a "*Quasi Contract*" relationship by implementing duress in negotiation of the contract markedly different from the contracts of other similarly situated congregate care contractors at the time and in violation of Title 27 DCMR. **(See Auditor's Report, Exhibit # 1, Appendix I, *Provider Line Item Budgets and Per Diem Rates*.)** The Plaintiff's best and final offer for the contract period included *per diem* rate of $191.90.  Notwithstanding, the Agency paid J & A the depressed and protested non-negotiated rate of $139.06, after J & A had already begun performance. **(See Title 27 DCMR §1003.5.)**

55.   Defendant (CFSA) began a "bait and switch" scheme, designed to deprive Plaintiff of the correct payment during the Contract Period 2004 to 2005 when it requested, in a RFP, for Plaintiff (J & A) to submit a proposal through the competitive bidding process for ILP Congregate Care Services.  The Agency accepted Plaintiff J & A's best and final offer with the unit cost of $191.90.   At the negotiation on the contract period 2004 to 2005, the Agency refused to engage in any negotiation and reduced the unit cost from $191.90, as set forth in the Plaintiff's best and final offer, to $139.06, demanding that Plaintiff (J & A) "take it or leave it," rather than honoring any aspect of J & A's best and final offer. In

---

[16] **See Exhibit 29** - Letter from J & A to Agency objecting to CFSA-07-C-0093, dated, March 21, 2007.

response, J & A signed the contract under protest and requested an immediate hearing on the matter.

56.   The Agency's computerized payment system could not pay the correct contract amount required as part of the agreed upon contract if the correct amount of the unit cost rate of $191.90 was not entered into the computerized payment system. Therefore, aware of this, CFSA entered the non-negotiated, unilaterally incorrect rate of $139.06 rather than the Plaintiff (J & A)'s best and final offer of $191.90.    The Defendant CFSA's computerized payment system will only generate the amount of payment to the Plaintiff (J & A) based upon the unit cost rate and the number of youth in the program during a particular month.

57.   J & A's rate of $191.90 was reasonable as J & A is required by ILP Regulations Chapter 63 of Title 29 DCMR to make ready the Resident Physical Plant, household supplies, furniture, furnishings and equipment, and personnel for pre-arranged reserved services exclusively for Defendant (CFSA) for forty ("40") residents. Whether the Agency sends one ("1") client or forty ("40") clients, J & A must stand ready to meet all the requirements established by law and the contract for immediate occupancy of youth sent to the program by the Defendant (CFSA). The contract is based on pre-arranged reserved services required by law for forty ("40") clients for the exclusive use of the Agency.

58.  Had the Agency entered into the computerized payment system J & A's best and final unit cost of $191.90 for this contract period of 2004 to 2005, J & A would have been paid the correct amount of money for the period in question, including client cost and reimbursement cost of Three Million, Eight Hundred Fifty Seven Thousand, Seventy One Dollars and Ninety Three Cents ($3,857,071.93).

59.   The Agency, by not entering the correct unit cost rate, but entering into the system the "switched" rate of $139.06, only paid J & A Two Million, Eighty Five Thousand, Six Hundred Twenty Dollars and Ninety Four Cents ($2,085,620.94).

60.   The difference between the correct payments J & A should have received, and the actual payment made by CFSA to Plaintiff (J & A) is One Million, Seven Hundred Seventy Thousand, Four Hundred Fifty Dollars and Ninety Four Cents ($1,770,450.94). This amount is what the Defendant owes the Plaintiff (J & A)..............**$1,770,450.94.** **(See Exhibit # 30 – J & A Analysis of Contract Budget with CFSA for Contract Period July 2004 to June 2005.)**

### Monies Owed Plaintiff (J&A) by Defendant (CFSA) in the Amount of $1,688,750.56 for Contract Period 2005 to 2006 for Services Rendered to Youth in the D.C. CFSA Foster Care System

61.   For the contract period 2005 to 2006, CFSA continued to unfairly and without basis apply the $139.06 *per diem* rate unilaterally established in the previous contract period in which J & A protested and requested a hearing that was never granted.  This was the second contract period that the Defendant did not provide J & A with a *per-diem*-per-child increase while providing other ILP contractors performing the same or similar services with increases of more than 200% (per cent). **(See Exhibit #1: Appendix I.)  (See DCMR 27-1003.5.)**

62.   Due to Defendants' failure to either negotiate Plaintiff's best and final offer or execute the option years in the 2004 contract period, in order to authorize and receive continued benefit from J & A placements and services, the Agency conspired to and did bypass legislated and sanctioned procurement and contracting procedures.  The Agency violated D.C Government policy and abused D.C. Contracting law and process, resulting in severe financial insufficiencies and unethical practices by instituting depressed *per diem*

compensation rates, non-negotiated changes in payment system, inconsistent reimbursement policies, and delays in payment, causing J & A severe and pervasive financial distress which in turn, potentially jeopardized continued placements and services for protected foster care youth pursuant to *LaShawn.*

63. To prevent termination of services and displacement of youth residents, J & A was forced to conduct business within a convoluted Agency-manufactured scheme that operated outside legitimate and established D.C. contracting procurement practices. Over J & A's vehement and on-going objection, the Agency abandoned the use of competitive bidding with substituted "short-term," "non bid," "sole source" instruments via execution of a series of short-term Memoranda of Understanding ("MOU") in a conspired contrivance to subvert legislative oversight and to manipulate and disadvantage J & A.

64. This draconian change forced J & A to satisfy its obligation to maintain services, including physical facilities, staff, transportation, emergency, and other features commensurate with perpetual and capable readiness to accommodate forty ("40") residents at all times. This was the case, despite assignments of fluctuating numbers of residents and continued funding at an already depress*ed per diem* rate. The demand, expectation, and financial implications for J & A were burdensome, oppressive, unreasonable, and unfair.

65. Even though the Agency was implementing the unilaterally imposed *per-diem*-per-child rate of $139.06 in MOUs, CFSA requested that J & A submit a budget for that service period covering July 2005 to June 2006. Based on calculations and best and final offer figures previously approved by the Agency, J & A submitted a budget and vouchers for services rendered to the Agency at the unit cost rate of One Hundred Ninety Seven Dollars and Fifty Seven Cents ($197.57). CFSA took no action on the budget it requested from the Defendant, and continued to pay the Plaintiff at the *per-diem*-per-child rate of $139.06. The low *per-diem*-per-child rate of $139.06, coupled with the uncertainty of the

monthly indefinite placement of youth in the program by Defendant, fluctuated in such a manner that sufficient funds were not generated to properly operate the program on a monthly basis.

66. The Agency had knowledge that its payment schemes caused immediate and ongoing financial hardship by placing J & A in continuing deficit per each resident under its care and at constant risk of not being able to pay all expenses, potentially jeopardizing the statutorily mandated facility's ability to remain open by maintaining a reserve of operating expenses. Given the fixed cost of such things as rent, insurance, and required staff, the Agency's manner of doing business was indicative of its willingness to gamble with accessibility and availability of a proven and stable ILP program with quality and essential services for present and future hard-to-place foster care youth and young adults. The Agency's unwillingness to engage in meaningful "negotiations" with J & A demonstrates a clear and peculiar arrogance toward ILP providers and suggests contempt toward the D.C. child welfare system, which still remains under court monitoring, and the very victims that the system is meant to protect.

67. To avoid reduction in mandated quantity and quality of services caused by insufficient monthly payments by the Agency, on or around May 15, 2006, J & A began loaning funds to the Agency by drawing down its reserve as required by 29 DCMR 6307(2)(d). This was done in order to: satisfy and maintain operational commitments, prevent the disruption or closure of a beneficial independent living program, and avoid both the interruption in services to the foster care youth residents and the need for replacement as required by 29 DCMR Chapter 63 *et seq.* and *LaShawn* obligations. **(See Plaintiff's Chart A, below.)**

68. Withholding funds and services was not an option for J & A in adhering to its obligation to provide a vital service without interruption. In addition, refusing placements

and shutting down would have been catastrophic for already-placed and prospective teen and young adult residents, resulting in yet another abandonment and postponement of major health, nurturing, and life skills interventions. Had J & A backed away, innocent and protected *LaShawn* class members in dire need of care and guidance would have suffered substantial harm. Also, had J & A backed away, its business reputation, earned by years of work with the District of Columbia would have been severely and fatally tarnished. Therefore, notwithstanding the wrongful and damaging actions of the Agency in reducing the negotiated compensation, J & A resolved in its commitment to foster care teens and young adults, to continue delivery of quality services to the Agency.

69. On or around 2005 to 2006, the Agency, without sufficient reason or cause, refused to reimburse J & A for justifiable, documented reimbursable costs incurred by J & A. Though these reimbursable costs met appropriate requirements, the Agency arbitrarily withheld payment. The Agency acknowledged the items to be reimbursed were provided by J & A and did not dispute the items' costs were lower than market value. The Agency objected to the rental of the items from a third party company, of which Dr. Jones was a principal. The Agency cited no rule violation prohibiting J & A's method of providing the reimbursable items. J & A protested non-payment of reimbursement and supported its protests with documentation disproving claims of conflicts of interests. Nevertheless, the Agency refused to issue payment. **(See Exhibit # 31– Ltr. from Dr. Jones to Mr. Moye, CFSA Chief Contract Officer, dated, October 15, 2007 with attachments RE: DCMR Title 37 Ch. 3302 and Reimbursement Costs.) (See Plaintiffs' Chart B, below.)**

70. For the contract period 2005 to 2006, the Defendant (CFSA) continued its "bait-and-switch" scheme initiated in the contract period 2004 to 2005 by agreeing to the new unit cost rate of One Hundred Ninety Seven Dollars and Fifty Seven Cents ($197.57) but not entering this new, agreed upon rate into its computerized payment system. Also,

CFSA did not delete the old unit cost rate of One Hundred Thirty Nine Dollars and Six Cents ($139.06). This caused J & A to receive incorrect payment each month during the contract period in question. Had the Defendant (CFSA) entered the agreed upon unit cost into the computerized payment system, the Plaintiff (J & A) would have received the correct payment for the contract period of Three Million, Nine Hundred Seventy Thousand, Two Hundred Sixteen Dollars and Seventy Five Cents ($3,970,216.75).

71. This scheme by CFSA of not using the correct unit cost and not using a realistic minimum of clients cost J & A, since the Plaintiff could not plan on a correct monthly rate because of an automatic   incorrect monthly payment by the Defendants.

72. CFSA was well aware that in order for J & A to operate the program properly; and, in order to comply with and retain its license, J & A was required to advance sufficient funds to the program each month. The Plaintiff (J & A) is required by law, especially ILP Regulations Chapter 63 of Title 29 DCMR, to make ready the Resident Physical Plant, household supplies, furniture, furnishings and equipment, and personnel for pre-arranged reserved services exclusively for the Defendant (CFSA) for forty ("40") residents. Whether the Agency sends one ("1") client or forty ("40") clients, J & A must stand ready to meet all the requirements established by law and the contract for immediate occupancy of youth sent to the program by the Defendant (CFSA). The solicitation is based on pre-arranged reserved services required by law for forty ("40") clients, not the uncertain number of clients occupying beds each day that fluctuate greatly each month causing uncertainty of cash flow to Plaintiff (J & A) that is currently in effect in its disputed contracts.

73. The Defendant (CFSA) did not enter the correct unit cost into the payment system and continued to pay the Plaintiff (J & A) at the incorrect unit cost of $139.06 amounting to an erroneous payment of Two Million, Two Hundred Eighty One Thousand,

Four Hundred Sixty Six Dollars and Nineteen Cents ($2,281,466.19). The difference between the agreed upon unit cost and what the Defendant (CFSA) actually paid to the Plaintiff (J & A) resulted in the amount owed to J & A of One Million, Six Hundred Eighty Eight Thousand, Seven Hundred Fifty Dollars and Fifty Six Cents ($1,688,750.56). This amount is what the Defendant owes the Plaintiff (J & A)..................**$1,688,750.56.** **(See Exhibit # 32 – J & A Analysis of Contract Budget with CFSA for Contract Period July 2005 to June 2006.)**

### Monies Owed Plaintiff (J&A) by Defendant CFSA in the Amount of $2,127,018.01 for Contract Period 2006-2007 for Services Rendered to a More Challenging and Difficult Population

74.   During the contract period 2006 to 2007, despite Plaintiff's best and final offer of $197.57 cost per unit, as requested by the Agency, the Defendant continued its unfair and illegal practice of issuing a series of MOUs and Letter Contracts with the same per-diem-per-child rate of $139.06 as it had done in the previous contracts involving the Plaintiff. This is the case, despite the fact that J & A made significant adjustments to its existing resource and service capacity to accommodate a documented increase in the number of youth placed at J & A with pending juvenile and adult criminal charges, adult records, and severe mental health and special education needs. Additionally, the Plaintiff's program was originally designed to prepare college-bound foster care youth for self-sufficiency and independence, but J & A made adjustments to provide the same quality of service to the changing and challenging population as it did to every youth in the program. The Defendant admits this fact, but there has been no additional monetary consideration to address this special population.

75.   For the contract period 2006 to 2007, the Defendant (CFSA) requested from the Plaintiff (J & A) a new best and final offer for the care of forty ("40") youth. The Plaintiff (J & A) responded with a new best and final offer unit cost of $197.57. Plaintiff (J & A) is

required by ILP Regulations Chapter 63 of Title 29 DCMR to make ready the Resident

Physical Plant, household supplies, furniture, furnishings and equipment, and personnel for

pre-arranged reserved services exclusively for the Defendant (CFSA) for forty ("40")

residents. Whether the Agency sends one ("1") client or forty ("40") clients, the Plaintiff (J

& A) must stand ready to meet all the requirements established by law and the contract for

immediate occupancy of youth sent to the program by the Defendant (CFSA). The contract

is based on pre-arranged reserved services required by law for forty ("40") clients. Both

parties agreed that the Plaintiff (J & A)'s new best and final offer unit cost of $197.57

would be accepted by CFSA. In order for Plaintiff (J & A) to receive the correct payment

at the agreed upon new rate of $197.57, the Defendant (CFSA) was required to remove the

old rate of $139.06 from the Defendant's computerized payment system and enter the new

agreed upon unit cost of $197.57. The Defendant (CFSA), with knowledge and intent,

failed to remove the old unit cost of $139.06 and enter the new agreed upon unit cost of

$197.57.

76. The ongoing requests by the Defendant (CFSA) for the Plaintiff (J & A) to

submit a new best and final offer each contract period wherein both parties agreed to the

new best and final offer and the Defendant (CFSA) failed to perform due diligence by

entering the new rate into the computerized pay system in order for Plaintiff (J & A) to

receive the correct monies owed can at best be described as a "bait-and-switch" scheme.

This is because the Defendant (CFSA) would agree to a new unit cost for the Plaintiff (J &

A), but fail to replace the old unit cost in the computerized payment system with the agreed

upon new unit cost. This consistent failure prevented Plaintiff (J & A) from successfully

submitting payment vouchers for actual costs incurred for services rendered during the

contract periods. This "bait-and-switch" scheme began during the 2004-2005 contract

period and continued until the 2007-2008.

77.  Had the Defendant performed due diligence and entered the agreed upon unit cost of $197.57 into the payment system for the contract period 2006 to 2007, Plaintiff would have received the correct payment for services rendered of Three Million, Nine Hundred Sixty Six Thousand, Two Hundred Seventeen Dollars and Seventy Five Cents ($3,966,217.75).

78.  That Defendant, by not entering the new agreed upon rate into its computer payment system for correct payment to the Plaintiff, and by not purging the system of the old rate of $139.06, only paid the Plaintiff a total of One Million, Eight Hundred Thirty Nine Thousand, One Hundred Ninety Nine Dollars and Seventy Four Cents ($1,839,199.74) for contract period 2006 to 2007.

79.  The difference between the correct payment the Plaintiff should have received and the actual payment to Plaintiff by Defendant amounts to Two Million, One Hundred Twenty Seven Thousand, Eighteen Dollars and One Cent ($2,127,018.01).  This amount is what the Defendant owes the Plaintiff (J & A)………………………...  **$2,127,018.01.**  **(See Exhibit # 33 – J & A Analysis of Contract Budget with CFSA for Contract Period July 2006 to June 2007.)**

**Monies Owed Plaintiff (J&A) by Defendant (CFSA) In the Amount of $1,092,763.74 For Services Rendered for Contract Period 2007 to 2008 Due to an Increase in the Number of Challenging and Difficult Youth Population to Be Served**

80. For contract period 2007 to 2008, J & A was again issued a series of Letter Contracts and Memoranda of Understanding (MOUs) to operate an Independent Living Program for that contract period which plaintiff protested and requested a hearing that was not granted.  However, these MOUs and Letter Contracts for Plaintiff to provide these services were found to be invalid and not legal by the D.C. Auditor's Report of May 16, 2008 in its *Auditor's Review of Quality Assurance Practices Related to Certain Congregate Care Providers*. **(See Exhibit # 1.)**

81.   For the contract period 2007 and part of 2008, CFSA instructed J & A to submit its best and final offer for the contract.  As in the previous contract periods, CFSA did not act on J & A's offer and continued to use the $139.06 rate. J & A's best and final offer for the 2007 to 2008 contract period was Two Hundred Seventy Dollars and Ninety Five Cents ($270.95).  The Best and Final Offer presented by J & A is a fair and proper rate for the services rendered to operate an Independent Living Program to provide the best service possible to the youth while complying with the ILP Regulations.

82.   J & A is required by ILP Regulations Chapter 63 of Title 29 DCMR to make ready the Resident Physical Plant, household supplies, furniture, furnishings and equipment, and personnel for prearranged reserved services exclusively for Defendant (CFSA) for forty ("40") residents.  Whether the Agency sends one ("1") client or forty ("40") clients, J & A must stand ready to meet all the requirements established by law and the contract for immediate occupancy of youth sent to the program by the Defendant (CFSA).  The contract is based on pre-arranged reserved services required by law for forty ("40") clients.  Both parties agreed that Defendant (CFSA) would accept J & A's new best and final offer unit cost of $270.95.

83.   As in previous contracts, the Defendant (CFSA) continued to engage in its "bait-and-switch" scheme by requesting a new unit cost of $270.95.  Both parties agreed to this new unit cost, but due to the Defendant (CFSA) not entering the new agreed upon unit cost of $270.95 into its computerized pay system, the system retained and failed to delete the old unit cost of $139.06 which was subsequently used to calculate the inaccurate amount paid to J & A, even though this was not the agreed upon amount or unit cost of $270.95.

84.   Had the Defendant (CFSA) entered the agreed upon unit cost of $270.95 into the computerized payment system, the Plaintiff (J & A) would have received the correct

payment for six ("6") months of the contract period in the amount of One Million, Nine Hundred Ninety Seven Thousand, One Hundred Ninety Two Dollars and No Cents. ($1,997,192.00).

85. The Defendant (CFSA) entered the incorrect unit cost into the payment system and continued to pay the Plaintiff (J & A) at the incorrect unit cost of $139.06, amounting to payments totaling Nine Hundred Thousand, Four Hundred Twenty Eight Dollars and Twenty Six Cents  ($904,425.26).

86. The difference between the agreed upon unit cost and the total the Defendant (CFSA) actually paid to J & A resulted in an amount owed to Plaintiff (J & A) of One Million, Ninety Two Thousand, Seven Hundred Sixty Three Dollars and Seventy Four Cents ($1,092,763.74). This amount is what the Defendant owes the Plaintiff (J & A)................................................................................... **$2,127,018.01.**

**(See Exhibit # 34 – J & A Analysis of Contract Budget with CFSA for Contract Period July 2007 to June 2008.)**

**Monies Owed Plaintiff (J & A) by Defendant (CFSA) In the Amount of $46,000.00 for Failing to Have In Place Any Type of Payment Documentation for Plaintiff (J & A) in the Computerized Payment System for Seven ("7") Days of Contract Period 2008 to 2009**

87. Several weeks before the Plaintiff (J & A)'s contract for the period 2007 to 2008 expired, J & A notified the Defendant (CFSA) that it was essential that the Defendant (CFSA) submit to Defendant's payment department, the necessary payment documents to ensure a continuum of services to the youth in J & A's ILP program.

88. The Defendant (CFSA) ignored and failed to heed the notice and advice of the Plaintiff (J & A).  Therefore, for seven ("7") days from January 1, 2009 to January 7, 2009, Plaintiff (J & A) was without a contract.

89.   J & A continued its delivery of high quality services to the youth in its program even though the Defendant (CFSA) did not send any contract documentation to its payment section that would enable J & A to receive payment for the seven days in question.

90.   When Plaintiff (J & A) requested its payment for the seven ("7") days in question, J & A was told by the Defendant (CFSA)'s payment department that there had been no contract documents sent to them by the Agency that would allow them to pay the Plaintiff (J & A) for the number of days in question.   As such, there was no contractual verification for Plaintiff (J & A)'s payment and, consequently, no legal substantiation for Plaintiff's compensation.   The Defendant (CFSA) refused payment.   Instead, the Defendant (CFSA)'s General Counsel advised the Plaintiff (J & A) and Assistant General Counsel to seek relief by filing a "friendly lawsuit" in the D.C. Superior Court demanding payment based upon "*quantum meruit*" and "*unjust enrichment*".[17]

91.   Consequently, the Plaintiff (J & A) is seeking payment of Forty Six Thousand Dollars and No Cents  ($46,000.00) for the seven ("7") days without a contract through no fault of its own.

### Monies Owed Plaintiff (J & A) in the Amount of $849,118.00 by Defendant (CFSA) for provision of Monies as Mandated by ILP Regulation Chapter 63, of Title 29 DCMR Section 6307.2(d)

92.   Section 6307.2(d) generally states that the Plaintiff (J & A) must have sufficient personal private funds on hand to operate the independent living program for at least three ("3") months.

93.   When the Defendant (CFSA) intentionally failed to provide the Plaintiff (J & A) with the correct amount of funds to operate the program while maintaining its high quality of service for the residents in the program, the Plaintiffs (J & A and Dr. Jones)

---

[17] **See Exhibit 35** -Letter from Howard Schwartz, CFSA Contract Office to Dr. Jones, dated January 21, 2009, Re: 'Contract period January 1-January 9, 2009.'

made a series of loans to Defendant (CFSA) as mandated by the regulations and to maintain a high quality program. **(See Plaintiff's Chart A, below.)**

94. Notwithstanding the shortfall in payment to the Plaintiff (J & A) by the Defendant (CFSA), the Plaintiffs (J & A and Dr. Jones) over the 2006 to 2007 contract period made personal loans to the Defendant (CFSA) in the amount of Eight Hundred Forty Nine Thousand, One Hundred Eighteen Dollars and No Cents ($849,118.00). J & A has made repeated requests to the Defendant (CFSA) for repayment of these loans. The Defendant (CFSA) owes the Plaintiff (J & A) $849,118.00 for services during contract period 2006 to 2007 as a result of the mandated requirement to make such loans. **(See Exhibit # 36 – Discussion Paper on Summary of Funds Loaned over Four (4) Year Period with attached Copies of Checks listed in Chart A, below.)**

### PLAINTIFFS' CHART A

### SUMMARY OF MONEY LOANED BY PLAINTIFFS, J & A AND DR. JAMESJONESTO DEFENDANT (AGENCY) AS MANDATED BY ILP REGULATIONS

| Loan To | Date | Check Number | Amount |
|---|---|---|---|
| J&A ILP Program | 5/15/06 | 101 | $100,000.00 |
| J&A ILP Program | 06/01/06 | 102 | 48,838.00 |
| J&A ILP Program | 06/09/06 | 103 | $100,000.00 |
| J&A ILP Program | 06/27/06 | 104 | $ 25,000,00 |
| J&A ILP Program | 07/24/06 | 105 | $90,000.00 |
| J&A ILP Program | 09/18/06 | 106 | $50,000.00 |
| J&A ILP Program | 11/27/06 | 108 | $45,000.00 |
| J&A ILP Program | 12/08/06 | 109 | $50,000.00 |
| J&A ILP Program | 12/27/06 | 110 | $26,000.00 |
| | | | |
| | **TOTAL 2006** | | **$534,838.00** |
| | | | |

| J&A ILP Program | 01/03/07 | 00324111 | $13,000.00 |
|---|---|---|---|
| J&A ILP Program | 01/03/07 | 00324113 | $25,000.00 |
| J&A ILP Program | 01/26/07 | 111 | $25,000.00 |
| J&A ILP Program | 04/16/07 | 112 | $60,000.00 |
| J&A ILP Program | 05/28/07 | 113 | $50,000.00 |
| J&A ILP Program | 04/30/07 | 114 | $10,000.00 |
| J&A ILP Program | 04/30/07 | 00411581 | $5,000.00 |
| J&A ILP Program | 04/30/07 | See Records | $10,000.00 |
| J&A ILP Program | 05/03/07 | See Records | $10,000.00 |
| J&A ILP Program | 05/28/07 | 4257 | $15,000.00 |
| J&A ILP Program | 05/29/07 | 115 | $35,000.00 |
| J&A ILP Program | 06/11/07 | See Records | $9,000.00 |
| J&A ILP Program | 06/13/07 | 116 | $15,000.00 |
| J&A ILP Program | 07/24/07 | 4293 | $20,000.00 |
| | | | |
| | **TOTAL 2007** | | **$314,280.00** |
| | | | |
| 2006 and 2007 | **TOTAL** | | **$849,118.00** |

## V.        CAUSES OF ACTION

### COUNT I

### PROCEDURAL DUE PROCESS UNDER the FIFTH AMENDMENT to the UNITED STATES CONSTITUTION (INCLUDING VIOLATION of 42 USC § 1983)

95.    That Count One incorporates by reference paragraphs One through Ninety Four.

96.    The foregoing policies and practices of the Defendants, who directly and indirectly control and are responsible for the policies and practices of the Agency (including procurement and contracting), deprived the Plaintiff of the rights conferred by

the due process clause of the Fifth Amendment to the United States Constitution resulting in the violation of the constitutionally protected property interests of the Plaintiff.

97. The foregoing policies and practices of the Defendants constitute a policy, pattern, custom, and/or practice of failing to exercise reasonable professional judgment and deliberate indifference to the constitutionally protected property interests of the Plaintiff. As a result, the Plaintiff has been harmed and deprived of both federal and state-created property rights without due process of law.

98. The foregoing policies and practices of the Defendants have resulted and are continuing to result in deprivation to the Plaintiff's constitutionally protected right to be free of contracting processes and decisions that are based upon bad faith, bias, retaliatory tactics, lack of impartiality and uniformity, improper motive, malicious interference, and manufactured false accusations.

99. J & A had a legitimate expectation and claim of entitlement to, and therefore, a property interest in the contracts stemming from the Agency's issuance of: (a) CFSA-04-C-0076 ("Contract-1"); and, (b) CFSA-04-CFCA-0350 ("Disputed LC-2"); pursuant to CFSA 03-R-0005 ("RFP 1") which authorized J & A to continue providing services pending execution of the definitive contract CFSA-04-CFCA-0350 ("Disputed Contract-1") signed, December 7, 2004 (effective July 2004) and including one ("1") Base and four ("4") Option years. The Plaintiff's entitlement stems from prior long-term contractual relationship with the District of Columbia for specific independent living services, a mutual understanding that the Plaintiff would continue to provide these services to the city, and the Agency's approval of the Plaintiff's Best and Final offer and award of the contract to J & A pursuant to its competitive bid proposal submitted on September 17, 2003.

100. In the alternative, J & A had a property interest in the use of the facilities, located at 1821 East Capitol Street, SE, Washington, D.C. 20003, and used by the Agency

to house and care for foster youth. By placing foster care youth in these facilities without just compensation for the use of the facilities, the Agency deprived J & A of the right to use the property for other legitimate business purposes.

101.    The foregoing policies and practices of the Defendants involving the Agency's ongoing noncompliance and unfair procurement and contracting process and practices, substantiated in the 2008 D.C. Auditor's Report, deprived J & A of its federally created property interest imposing detriment to both financial and reputation status. These policies continue and are pending at the time of filing this complaint against the Agency.

## COUNT II

## VIOLATION OF STATUTORY OR REGULATORY CRITERIA

102.    That Count Two incorporates by reference paragraphs One through One Hundred One.

103.   That the Agency, on or about May 20, 2004, unilaterally modified material terms of  "Contract-1" dated December 5, 2003, in willful and blatant disregard of the approval of the Contracting Officer of  "Contract-1" as a cost-plus-fixed-fee type, by implementing a fixed-unit payment scheme with a reimbursable component and substantially reduced *per diem* rate services from the agreed upon One Hundred Ninety One Dollars and Ninety Cents ($191.90) to One Hundred Thirty Nine Dollars and Six Cents ($139.06) paid for J & A's services, with an indefinite quantity and low minimum of only One Thousand Dollars ($1,000.00), resulting in reduced payments and financial loss to the Plaintiff.

104. That the Agency knowingly violated the applicable statutory and regulatory criteria of Title 27 DCMR § 1600, *et seq.* for competitive proposal procurement by the unilateral imposition of the price and contract type of "Disputed Letter Contract LC-2" and "Disputed Contract-1," issued and executed pursuant to "RFP 1" without negotiation or

input by the Plaintiff. These acts were: arbitrary, capricious abuses of discretion; without observance of procedure required by law; in excess of statutory jurisdiction, authority, or limitation; and/or short of statutory right; and otherwise not in accordance with law; resulting in duress, reduced payments, and financial loss to the Plaintiff.

105.    That the Agency knowingly violated the applicable statutory and regulatory criteria of Title 27 DCMR § 1003, *et seq.* by failure to exercise impartial, fair, and equitable treatment toward the Plaintiff by awarding other congregate care facility contractors pursuant to RFP-1, as much as a 344% (per cent) higher *per diem* rate over the amount the Plaintiff received for performing the same or similar work. The D.C. Auditor Report's Chart, *Provider Proportioned Line Item Budgets and Per-Diem Rates* (See Exhibit #1: APPENDIX 1) clearly demonstrates that the Agency imposed and applied per diem rates on J & A in an arbitrary and biased fashion, without regard to impartial, fair and equitable treatment. For the contract periods in question, Terrific Inc.'s *per-diem* rate was $478.50, which was 344% (per cent) more than J & A's.  Umbrella Inc's *per-diem* rate was $294.00, or 211% (per cent) above J & A's. Echelon Community Services *per-diem* rate was $200.00, or 144% (per cent) more than J & A's. And, Fihankra Place, Inc.'s *per-diem* rate was $186.05, or 134% (per cent) more than J & A's.

106.  The Agency materially violated the applicable statutory and regulatory criteria of Title 27 DCMR § 2008, *et seq.* during the performance of "Disputed Contract-1" by failing to extend the base year by exercising the first option year and all subsequent option years and increase of *per diem* rates with J & A pursuant to "RFP-1", and its failure and/or refusal to issue a contract to J & A covering period June 30, 2005, to October 1, 2005, while continuing to place youth at and rely on ILP services from, J & A during that time period.

107.   That the Agency materially violated applicable statutory and regulatory criteria of Title 27 DCMR § 2008, *et seq.* during the performance of "Disputed Contract-2" by failing to extend the base year by exercising the first option year and all subsequent option years for execution of valid contract or contracts and increase of *per diem* rates with J & A pursuant to "RFP-1" and instead, issued (1) "MOU-1" and "MOU-2" for services for the period December 1, 2005 through March 16, 2006; (2) "SSC-1" for the period October 1, 2005 to November 30, 2005, SSC-2" , "SSC-3", "SSC-4",  and "SSC-5" for services for the  period March 21, 2006  through March 31, 2007; and (3) Letter Contracts for the period January to April 2008, as: arbitrary, capricious, abuses of discretion without observance of procedure required by law; in excess of statutory jurisdiction, authority, or limitation; and otherwise not in accordance with law, resulting in duress, reduced payments, and financial loss to the Plaintiff.

108. That the Agency materially violated the applicable statutory and regulatory criteria by failing and refusing to exercise the COLA clause obligation at the end of the base year of "Disputed Contract-2," and for each subsequent option year resulting in reduced payments and financial loss to the Plaintiff.

109. That the Agency failed to compensate J & A sufficiently for mandatory ILP services over an extended period of time, requiring J & A to exhaust its reserve pursuant to Title 29 DCMR 6307(2)(d) by loaning the Agency funds for the period May 2006 to July 2007 to meet the needs of placed foster care resident youth per *LaShawn A.* mandates.

110.  That during the entire period of its services to the Agency, pursuant to Title 29 DCMR 6307.2(d), J & A was required to maintain a monetary reserve of not less than three ("3") months operational funds for coverage of 40 residents. During the period of May 6, 2006 through July 24, 2007, the Agency failed to adequately compensate J & A for its services.   However, during that period, the Plaintiff was required to fully execute its

obligations to ensure high quality services to the youth residents and owed to the Agency as mandated by statute. Consequently, in order to maintain continuity of services and prevent replacement of youth, J & A had to extinguish its reserve and loaned funds in the amount of Eight Hundred Forty Nine Thousand, One Hundred Eighteen Dollars  ($849,118.00) to the Agency.

111.    That J & A has made demands upon the Agency for payment and reimbursement, and the Agency has refused to provide such payment and restitution.

112.  The contract between the Agency and J & A,  " Contract-1" and "Disputed Contract-1", consisted of the articles of the contract as well as several other documents incorporated by reference, including the *LaShawn A. v. Williams'* Modified Final Order, November 18, 1993, and the Implementation Plan, May 15, 2003, Title 27 DCMR, and the D.C. Procurement Practices Act of 1985 as amended. Consequently, the terms of "Contract-1" and  "Disputed Contract-1" themselves mandated that the Agency develop, implement and maintain a full and high functioning procurement and contract system including, but not limited to: equitable and uniform application of rules pursuant to D.C. Code §§2-301.01 and 2-302.01; established written standards and expectations; restructuring of its Contracts Office; issuance of timely contracts; established performance-based contracting standards and language; and, ongoing contract standards that comply with D.C. laws and regulations.

113.   That the Agency failed to develop, implement and maintain a procurement and contract system that was fair and complied with *LaShawn A.* standards and D.C. laws and regulations, resulting in financial loss to the Plaintiff.  The aforementioned violations continue into 2010 and are pending at the time of filing this complaint against the Agency.

## COUNT III

## CIVIL CONSPIRACY

114.   That Count Three incorporates by reference paragraphs One through One Hundred Thirteen.

115.   That the Defendant Agency Director(s), C&P Administrator, and contract officers engaged in a predetermined plan to, and did, circumvent City Council authority and oversight by implementing a compromised process, issuing and imposing invalid procurement practices, contracting instruments and payment schemes onto J & A in violation of the Anti-Deficiency Act, Title 27 DCMR and the Procurement Practices Act of 1985 as amended.

116.   The Agency's failure to act until July 2006, despite knowledge of the mandate and need to draft and implement formal internal Agency Standard Operating Procedures (SOPs), is indicative and demonstrative of the Agency's intent to operate outside of District of Columbia procurement and contracting practices and procedures.

117.   The Agency engaged in a predetermined plan to and did use ongoing tactics to impose erratic procurement and contracting practices and lodge unfair and untrue allegations against Plaintiff for illegal reasons due to ongoing challenges made by the Plaintiff regarding Defendants' contracting practices.

118.   Agency Director(s), C & P Administrator, and contract officers contrived false claims and accusations regarding licensing, taxes, and equipment (all of which were dismissed and/or retracted), using them as reasons to interfere with and prevent negotiation of contracts and/or exercising "options," and resulting in J & A being unfairly and drastically underpaid as compared to all other similarly situated congregate care providers.

119.   Agency administrators, contracting officers, and specialists knowingly used and abused government contracting powers in an attempt to interfere with and undermine

the establishment of ongoing contractual relations with the Plaintiff to wrongfully reduce and under compensate J & A for services rendered on behalf of children in the foster care system.

120.   Subsequent to D.C. Auditors' April 1, 2008 Report and hearings before the City Council Committee on Human Services, the Agency ignored and failed to adhere to any of the Auditor's recommendations, and instead, deliberately continued violating D.C. procurement laws by failing to participate in good faith contract negotiations for the award of a contract affording reasonable contractor risk while offering the greatest incentive for efficient and economical performance, or meet to resolve and address back pay issues.  The Agency continues to be in noncompliance of the violations outlined and the recommendations made in the 2008 Auditor's Report.

121.   The Agency Director failed to trigger the ratification process at any time pursuant to D.C. Code § 2-301.05(d)(4) and OCP Directive 1800.04, effective August 9, 2006.

122.   The Agency intentionally manipulated the child welfare payment system using both D.C. budgeted and federal monies in an attempt: (1) to wrongly deprive J & A of a fair opportunity to compete as a congregate care provider; (2) to bypass established procurement practices in violation of Title 27 DCMR, the Procurement Reform Act of 1996 and the Office of Contracting & Procurement Standard Operating Procedures; and (3) to cover-up Agency errors and illegal contracting practices.  The aforementioned violations continue into 2010 and are pending at the time this complaint was filed against the Agency.

## COUNT IV

### UNJUST ENRICHMENT /QUANTUM MERUIT

123.   That Count Four incorporates by reference paragraphs One through One Hundred Twenty Two.

124.  On and during the period between January 1, 2009 and January 7, 2009, J & A provided services to the Agency as an ILP contractor pursuant to Title 29 DCMR Chapter 63, *et. seq.*. The services rendered by J & A benefited the Agency and children assigned to J & A's care and supervision and were to be compensated by the Agency. The fair amount of compensation to be paid amounted to Forty Four Thousand, Three Hundred Ninety Eight Dollars ($44,398.00).

125.  The Agency fully acknowledged it received the benefit of J & A's services provided between January 1, 2009 and January 7, 2009, and that the Agency was obligated to pay reasonable costs and verifiable reimbursable expenses made by J & A on behalf of the Agency in executing such services. The Agency accepted the forgoing and acknowledged that such services were adequately performed and delivered. The Agency did not and has not compensated J & A for the aforementioned services.

126.  That J & A during the period between 2004 through 2005, provided services pursuant to Title 29 DCMR, Chapter 63, et.seq., and as directed by the Agency to the Agency and children under its care. Based on "RFP-1" and the best and final offer, these services should have been compensated at the *per diem* rate of One Hundred Ninety One Dollars and Ninety Cents ($191.90).  That the Agency has acknowledged receiving the benefit of those services and reimbursable costs and that the Agency accepted the forgoing services as being adequately performed and delivered, but the Agency has not fully or adequately compensated J & A for the aforementioned services.  The Plaintiff submitted vouchers for payment for services rendered to the Defendant. The Agency was unjustly enriched in the amount of One Million, Seven Hundred Thousand Seventy One Thousand, Four Hundred Fifty Dollars and Ninety Four Cents ($1,771,450.94).

127.  That J & A on or during the period between 2005 and 2006 provided services pursuant to Title 29 DCMR, Chapter 63, et. seq., for the Agency and children under its

care, which, based on the best and final offer, should have been paid at a rate of One Hundred Ninety Seven Dollars and Fifty Seven Cents ($197.57) plus COLA. That the Agency has acknowledged it received the benefit of those services and reimbursable costs and that the Agency accepted the forgoing services as being adequately performed and delivered, but that the Agency has not fully or adequately compensated J & A for the aforementioned services. The Plaintiff submitted vouchers for payment for services rendered to the Defendant. The Agency was unjustly enriched in the amount of One Million, Six Hundred Eighty Eight Thousand, Seven Hundred Fifty Dollars and Fifty Six Cents ($1,688,750.56).

128. That J & A, on or during the period between 2006 and 2007, provided services pursuant to Title 29 DCMR Chapter 63, *et. seq.* for the Agency and foster care children under its care, which should have been paid at a *per diem* rate of One Hundred Ninety Seven Dollars and Fifty Seven Cents ($197.57) plus COLA. That the Agency has acknowledged it received the benefit of those services and reimbursable costs and the Agency accepted the forgoing services as being adequately performed and delivered. And yet, the Agency has not fully or adequately compensated Jones for the aforementioned services. The Plaintiff submitted vouchers for payment for services rendered to the Defendant. The Agency was unjustly enriched in the amount of Two Million, One Hundred Twenty Seven Thousand, Eighteen Dollars and One Cent ($2,127,018.01).

129. That J & A, on or during the period between 2007 and 2008, provided services pursuant to Title 29 DCMR Chapter 63, et seq., for the Agency and children under its care that should have been paid at a rate of Two Hundred Seventy Dollars and Ninety Five Cents ($270.95) plus COLA. That the Agency has acknowledged it received the benefit of those services and reimbursable costs, and the Agency accepted the forgoing services as being adequately performed and delivered.

130.  For the contract period during 2008, the Defendant continued the practice of not giving the Plaintiff a fair and proper *per-diem*-per-child increase and continued to set the rate at $139.06, while other contractors during this same contract period who were performing the same or similar services were compensated at a higher *per-diem*-per-child rate. The May 16, 2008 *D.C. Auditor's Report on Congregate Care Providers* identified the following contractors and their respective *per-diem*-per-child rates as:

| Contractor | Per-Diem Rate |
|---|---|
| Terrific, Inc…………………………………… | $478.50 |
| Umbrella, Inc…………………………………. | $294.00 |
| Echelon Community Service………………… | $200.00 |
| Fihankia Place, Inc………………………….. | $186.00 |
| Jones & Associates, Inc……………………… | $139.06 |

131.  That the Agency has not fully or adequately compensated J & A for the aforementioned services from which the Agency benefited.   The Plaintiff submitted vouchers for payment for services rendered to Defendant.   The Agency was unjustly enriched in the amount of One Million, Ninety Two Thousand, Seven Hundred Sixty Three Dollars and Seventy Four Cents ($1,092,763.74).

## COUNT V

## DETRIMENTAL RELIANCE

132.  That Count Five incorporates by reference paragraphs One through One Hundred Thirty One.

133.  That J & A, and the foster care youth within its care, has relied upon the good faith and fairness of the Agency through its business relationship with the Agency and, in doing so, has been vulnerable to the Agency's unfairness and inconsistency.

134.   That due to reliance upon the Agency, and in adhering to its obligation to provide a vital service without interruption, J & A has been caused damages and costs. This remains the case in 2010 and pending at the time this complaint was filed against the Agency.

**COUNT VI**

**PROCUREMENT FRAUD**

135.   That Count Six incorporates by reference paragraphs One through One Hundred Thirty Four.

136.  That the Agency on or about May 20, 2004, unilaterally modified material terms of  "Contract-1" dated December 5, 2003, in willful and blatant disregard of the approval of the Contracting Officer of  "Contract-1" as a cost-plus-fixed-fee type by implementing a fixed-unit payment scheme with a reimbursable component and substantially reduced *per diem* rate for services from the agreed upon One Hundred Ninety One Dollars and Ninety Cents ($191.90) to One Hundred Thirty Nine Dollars and Six Cents ($139.06), with an indefinite quantity and low minimum of only One Thousand Dollars ($1,000.00), resulting in reduced payments and financial loss to the Plaintiff.

137.  That the Agency willfully and unilaterally inserted terms and conditions in Letter Contract CFSA-04-CFCA-0350 effective July 1, 2004 ("LC-2") and CFSA-04-CFCA-0350  effective December 7, 2004 ("Disputed Contract-1") pursuant to the issuance of the RFP-1 solicitation and in the absence of negotiation with J & A, that the Defendant knew or ought to have known materially altered, manipulated, and and were inconsistent with the regulatory procedures of Title 27 DCMR.

138.   That the Agency willfully omitted to prepare or ensure adequate documentation and/or omitted or suppressed  documentation of  pre-award and post-award actions, including: memoranda of negotiations; verification of contracted per diem rates;

understandings or oral agreements between the Agency and the Plaintiff; J & A's original price proposal; unilateral and justification for failure to exercise the first option year in connection with the award of "LC-2" and "Disputed Contract-2", pursuant to the issuance of the RFP-1 solicitation.

139. That the Agency deliberately and blatantly manipulated and/or disregarded established procurement and contracting policies and practices during the first year of performance of "Disputed Contract-2" by failing to extend the base year by exercising the first option year and all subsequent option years, for the execution of valid contract or contracts and increase of per diem rates with J & A pursuant to "RFP-1' and instead issued: (1) "MOU-1" and "MOU-2" for services for the period December 1, 2005 through March 16, 2006; (2) "SSC-1" for the period October 1, 2005 to November 30, 2005, and "SSC-2", "SSC-3", "SSC-4", and "SSC-5" for services for the period March 21, 2006 through March 31, 2007; and (3) Letter Contracts for the period January to April 2008, that the Defendant knew or ought to have known was in violation of the provisions of Title 27 DCMR.

140. That the Agency: (1) willfully omitted to prepare or ensure adequate documentation and/or omitted or suppressed documentation of pre-award and post-award actions; and (2) deliberately and blatantly manipulated and/or disregarded established procurement and contracting policies and practices in dealing with J & A in connection with "Contract-1" and "Disputed Contract-1", and all related MOUs and Letter Contracts. And, that J&A, in reliance on the representations of the Agency, and in adhering to and discharging its obligation to provide a vital service without interruption, suffered immediate and ongoing financial deprivation and loss. These financial deprivations and losses continue into 2010.

## VII. RELIEF

**WHEREFORE,** Plaintiff respectfully seeks judgment against Defendants and requests that this Honorable Court:

141.  Compel Defendants to act in accordance with recommendations (as they relate to the Plaintiff) set forth in the April 1, 2008 D.C. Auditors' Report on CFSA, by complying with the D.C. Procurement Practices Act of 1985 as amended, pursuant to Title 27 DCMR  (See D.C. Code §§ 2-301.04 and 2-303.20(n)) by immediately negotiating a fair, reasonable, and legally binding contract with J & A.

142.  Enjoin Defendants and their agents from refusing to engage in meaningful negotiations, and to comply with D.C. procurement process and enter into a legitimate contract with Plaintiff that incorporates fair *per-diem,* COLA, and reimbursement rates.

143.  Declare unconstitutional and unlawful pursuant to Rule 57 of the Federal Rules of Civil Procedure:

a.  Defendant's violation of Plaintiff's rights under the Procedural Due Process Clause of the Fifth Amendment to the United States Constitution due to unfair procurement and contracting practices as described above;

b.  Defendants' violation of Plaintiff's rights under the First Amendment clause to the United States Constitution due to retaliatory customs and practices as described above;

c.  Defendants' past and current actions and practices as harmful to children in the child-welfare system, eligible for independent living services and in violation of the Modified Final Order and Amended Implementation Plan in *LaShawn A. v. Fenty.*

144.   Award damages for Quantum Meruit, Unjust Enrichment, and Detrimental Reliance, in the amount in excess of Seven Million, Eight Hundred Seventy Five Thousand, One Hundred Two Dollars ($7,875,102.00).

145.   Enter judgment against the Defendants, awarding damages pursuant to 42 U.S.C. §1983 caused by violation of Plaintiff's federal rights.

146.   Require the District to pay appropriate attorneys' fees.

147.   Render any other relief that this court deems appropriate.

## **JURY TRIAL DEMAND**

Plaintiff demands a jury trial for resolution of this matter pursuant to Fed. R. Civ. P. 38(b) and Fed. R. Civ. P. 5(b).

RESPECTFULLY SUBMITTED,

John F. Mercer DC Bar # 184549
Counsel for the Plaintiff
Mercer Law Associates, PLLC.
1629 K Street, N.W.
Suite 300
Washington, D.C. 20036
Tel. 202.349.1686
Mob. 240.535.8758
Fax. 240.206.8486
Email: jmjmercer@aol.com

Dated September 2, 2010

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of September, 2010, a copy of the forgoing AMENDED COMPLAINT was served upon:

Ellen Efros, Esq.
Chad Copeland, Esq.
Assistant Attorneys General
Office of the Attorney General
District of Columbia
Equity I Section
441 Fourth Street, N.W.
Washington, D.C. 20001

 by electronic filing directed to the email addresses registered with the Court

John F. Mercer